**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JONATHAN H. MORRIS | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Case No. |
| | : | 1:06-CV-01131 (HHK) |
| BUVERMO PROPERTIES, INC., et. al., | : | Next Event:  Status Conference |
| | : | April 20, 2007 at 10:30 a.m. |
| Defendants. | : | |

## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rules 7 and 56.1, Defendants Buvermo Properties, Inc., Fidelio Properties, F.P. Executive Partners, L.L.C., Janivo Realty, Inc., Donelux, Inc., Orvan, Inc., Fidelio Properties Management, Inc. and John Gardner hereby file their Motion for Summary Judgment.

As established in Defendants' Memorandum of Points and Authorities in Support of their Motion for Summary Judgment submitted herewith, the majority of Plaintiff's claims are based on an alleged oral employment agreement for a period of ten years.  These claims are barred under the statute of frauds and Plaintiff, as an at-will employee, has no prospective right to the compensation and damages he seeks in this lawsuit.  Plaintiff's claim for breach of the implied covenant of good faith and fair dealing is not actionable in an employment at-will context. Finally, Plaintiff's fraud and tortious interference claims fail because he cannot establish the requisite elements for each claim.  There are no genuine issues as to any material fact and Defendants are entitled to summary judgment with respect to each count set forth in  Plaintiff's Amended Complaint.

WHEREFORE, for the reasons set forth in Defendants' Memorandum of Points and Authorities in Support of their Motion for Summary Judgment, Defendants respectfully request that this Court GRANT their Motion for Summary Judgment and dismiss  each claim set forth in the Amended Complaint with prejudice and provide such other relief as the Court deems just and proper.

Respectfully submitted,

SMITH, LEASE & GOLDSTEIN, LLC

By:    /s/  Marc J. Smith                        
Marc J. Smith
D.C. Bar No. 460255
11 North Washington Street
Suite 520
Rockville, Maryland 20850
Phone: (301) 838-8950

Counsel for Plaintiff

## REQUEST FOR ORAL HEARING

Defendants respectfully request an oral hearing with respect to their Motion for Summary Judgment.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JONATHAN H. MORRIS | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Case No. |
| | : | 1:06-CV-01131 (HHK)(DAR) |
| BUVERMO PROPERTIES, INC., et. al., | : | Next Event:  Status Conference |
| | : | |
| | : | April 20, 2007 at 10:30 a.m. |
| Defendants. | : | |

**DEFENDANTS' STATEMENT OF MATERIAL FACTS**
**AS TO WHICH THERE IS NO GENUINE ISSUE**

Pursuant to Local Rules 7 and 56.1, and in support of their Motion for Summary Judgment, Defendants Buvermo Properties, Inc., Fidelio Properties, F.P. Executive Partners, L.L.C., Janivo Realty, Inc., Donelux, Inc., Orvan, Inc., Fidelio Properties Management, Inc. and John Gardner hereby file their Statement of Material Facts as to which There is no Genuine Issue.

**<u>Introduction</u>**

The Plaintiff in this case, a former employee of Defendant Buvermo Properties, Inc., has sued his former employer and seven other parties for damages allegedly arising out of his employment with Buvermo.  Each of the eight Defendants in this case is involved to some degree in the business of investing in commercial real estate in the Washington D.C. metropolitan area.  The relationship among the Defendants and their respective role in this case is described in detail below.

**Fidelio Properties**

1.      Fidelio Properties ("Fidelio") is a New York general partnership that provides capital for commercial real estate investments in the Washington, D.C. area.  (Deposition of John Gardner ("Gardner Dep.") at 49-50, 56-57).[1]

2.      At all times relevant hereto, Fidelio has been comprised of five (5) partners, Donelux, Inc., Janivo Realty, Inc., Orvan, Inc., Fidelio Properties Management, Inc. and F.P. Executive Partners, LLC -- all of whom are named defendants in this case.  (Id. at 59-60).

3.      Fidelio and its partners are governed by the terms of a partnership agreement (the "Fidelio Partnership Agreement").  (Id., Exhibit 4).

4.      Fidelio provides capital for a wide range of commercial real estate projects, including retail centers, office buildings, condominium developments and hotel properties.  (Id. at 50-51).

5.      The amount of capital provided by Fidelio varies from project to project, and has ranged from $200,000 to over $20,000,000.   (Id. at 55-56).   Fidelio's capital is provided principally by two Dutch families.  (Id., Exhibit 9).

6.      Typically, Fidelio conducts its business in partnership with a developer or other third party and seeks investments that are relatively long-term in nature.  (Id. at 50-54).

**Janivo Realty, Inc. and Donelux, Inc.**

7.      As set forth in Article IV of the Fidelio Partnership Agreement, Fidelio's affairs are conducted by a management committee consisting of Janivo Realty, Inc. ("Janivo") and Donelux, Inc. ("Donelux").  (Id. at 61, Exhibit 4).

---

[1]   Relevant excerpts from Mr. Gardner's deposition transcript, together with pertinent Exhibits, are attached hereto as Exhibit 1.

8.    The management committee is responsible for making all major investment decisions on behalf of Fidelio.  (Id. at 61-62; Deposition of Joost Tjaden ("Tjaden Dep.") at 17-18).[2]

9.    The management committee determines whether to invest capital and/or sell the partnership's interest in any given project and makes personnel decisions involving Fidelio's affiliates.  (Tjaden Dep. at 17-18; Gardner Dep. at 62).

10.    Mr. Joost Tjaden and Mr. André van Rhee are the designated representatives of Janivo and Donelux, respectively, and vote on all matters handled by Fidelio's management committee.  (Gardner Dep. at 64; Tjaden Dep. at 16; Deposition of André van Rhee ("van Rhee Dep.") at 24).[3]

11.    Both Mr. Tjaden and Mr. van Rhee reside in the Netherlands.  (van Rhee Dep. at 45; Tjaden Dep. at 16, 70).

### Fidelio Properties Management, Inc.

12.    Fidelio Properties Management, Inc. ("FPMI") is the designated managing general partner of Fidelio.  (Gardner Dep. at 60-61).

13.    As set forth in Section 4.04 of the Fidelio Partnership Agreement, FPMI carries out certain responsibilities on behalf of Fidelio that have been delegated to it by the management committee.  (Id. at 62, Exhibit 4).

---

[2]   Relevant excerpts from Mr. Tjaden's deposition transcript, together with pertinent Exhibits, are attached hereto as Exhibit 2.

[3]   Relevant excerpts from Mr. van Rhee's deposition transcript, together with pertinent Exhibits, are attached hereto as Exhibit 3.

**Buvermo Properties, Inc.**

14.    Buvermo Properties, Inc. ("Buvermo") is a Delaware corporation that functions as the operating arm of Fidelio.  (Gardner Dep. at 49; Deposition of Laurence Millspaugh ("Millspaugh Dep.") at 14-15; Tjaden Dep. at 13).[4]

15.    Buvermo is responsible for locating suitable real estate investments for Fidelio and negotiating the purchase of and managing Fidelio's real estate assets to maximize their value.  (Id).

16.    Fidelio owns the majority of Buvermo's stock.  (Gardner Dep. at 24).  Defendant John Gardner owns a minority position in Buvermo, but has provided Fidelio with a proxy to vote his shares.  (Gardner Dep. at 24; Tjaden Dep. at 34).

17.    Buvermo's operations are governed by its Bylaws which provide in Article II, Section 6, for the removal of officers at any time by the shareholders, with or without cause. (Deposition of Jonathan Morris ("Morris Dep."), Exhibit 3).[5]

18.    At all relevant times hereto, Buvermo has employed both a president and a "senior advisor" who work in a collaborative fashion in connection with each project presented to Fidelio's management committee for consideration.  (Gardner Dep. at 135-136; Tjaden Dep. at 62-63).

19.    In practice, Buvermo's president is expected to locate investments on behalf of Fidelio and then discuss the suitability of each such investment with the senior advisor.  (Id.).  If,

---

[4]    Relevant excerpts from Mr. Millspaugh's deposition transcript, together with pertinent Exhibits, are attached hereto as Exhibit 4.

[5]  Relevant excerpts from Mr. Morris' deposition transcript, together with pertinent Exhibits, are attached hereto as Exhibit 5.

and only if, there is a consensus between the president and senior advisor, is the proposed investment presented to Fidelio's management committee for consideration. (Id.).

### F.P. Executive Partners, LLC

20.    F.P. Executive Partners, LLC ("FPEP") is a limited liability company that holds a nominal partnership interest in Fidelio. (Gardner Dep. at 26-27, Exhibit 4).

21.    FPEP is the vehicle through which some of Buvermo's employees are provided with an opportunity to participate in Fidelio's investments. (Gardner Dep. at 26-27, 255-256).

22.    Membership in FPEP is governed by the terms of a Limited Liability Company Operating Agreement (the "FPEP LLC Agreement"). (Gardner Dep. at 27, Exhibit 7).

### FPEP "Promoted Interest"

23.    As described to some degree in the Amended Complaint, Fidelio has historically distributed a certain percentage of the proceeds from its investments to the members of FPEP after first recovering its initial capital investment and a preferred rate of return. (See Amended Complaint ¶¶ 20, 21).

24.    This concept, which is commonly referred to as a "promoted interest," is intended as compensation for successfully managing and increasing the value of Fidelio's real estate investments over the long-term. (Gardner Dep. at 276-277; van Rhee Dep. at 61).

25.    A member of FPEP receives value (i.e. cash) for their promoted interest only if the property at issue has appreciated sufficiently in value to allow Fidelio to recoup its initial capital investment and receive a preferred rate of return. (Gardner Dep. at 117, 212).

26.    The promoted interest is not intended as compensation for identifying a real estate investment; rather, it is intended as compensation for increasing the value of the investment over its lifetime. (Gardner Dep. at 277, 281).

27.     As noted by Mr. van Rhee during his deposition, a promoted interest is intended as compensation "for successfully managing our interest in a project.  It's -- it's not that we give money because they source [originate] it; we give money if they bring it to a good end."  (van Rhee Dep. at 61).

28.     The framework of promoted interest structure is set forth in Section 3.03 of the Fidelio Partnership Agreement and in the FPEP LLC Agreement.  (Gardner Dep., Exhibits 4, 7).

29.     There are a number of conditions that must be satisfied before members of FPEP are entitled to receive a promoted interest.  First, Fidelio's management committee must approve the purchase and actually acquire an interest in the property at issue.  (Gardner Dep. at 263; Millspaugh Dep. at 65-66).

30.     Second, in accordance with Section 3.03 of the Fidelio Partnership Agreement, the property must then be designated by Fidelio's management committee as an "FPEP Property."  (Gardner Dep. at 250).

31.     Even after these conditions are satisfied, the value of the promoted interest is contingent on Fidelio recouping its initial capital investment and receiving a preferred rate of return.  (Id. at 212).  If there is a shortfall, a member's promoted interest would have no value and the shortfall would be offset against the profit from the next deal.   (Id. at 230-231).

**Redemption**

32.     Participation as a member of FPEP is a benefit that is provided only to Buvermo's employees, and, to that end, the FPEP LLC Agreement provides for redemption of a member's interest at market value upon withdrawal or cessation of employment.  (Gardner Dep. at 255-256; 117).

33.     Specifically, Section 8.9 of the FPEP LLC Agreement provides, in relevant part:

> <u>Redemption of Member's Membership Interest.</u>  Notwithstanding any other provision of this Article VIII to the contrary, in the event that either Gardner or Bonacci (the "<u>Departed Employee</u>") withdraws from the Company or ceases to be employed by Buvermo Properties, Inc. or another affiliate of Fidelio, by reason of death, disability, retirement or any other reason (such withdrawal or cessation is hereinafter referred to as the "<u>Termination</u>"), then the Manager shall have the right, upon written notice to the Departed Employee given within sixty (60) days of the Termination, to redeem the Departed Employee's entire Membership Interest and the Membership Interest of any transferee of or successor to the Departed Employee, which transferred interests for the purposes of this Section 8.9 shall be deemed to be the Membership Interest of the Departed Employee (the "<u>Call</u>").

(<u>Id.</u>, Exhibit 7).

34.     Mr. Bonacci, who is referenced in Section 8.9, is a former employee of Buvermo. (<u>Id.</u> at 28, 35).  When Mr. Bonacci resigned, his membership interest in FPEP was redeemed in accordance with Section 8.9.    (Gardner Dep. at 28, 35; Deposition of Kara McCormick ("McCormick Dep.") at 138).[6]

35.     Given the nature of the promoted interest structure, an FPEP member's promoted interest in a recently acquired parcel of real estate would have no value in a redemption context due to the fact that the market value of the property would not have appreciated between the time of acquisition and redemption.  (Gardner Dep. at 117, 270).

36.     This point was acknowledged by Plaintiff's counsel, Ziad Haddad, during discovery in this case.

> A:     Yeah.  So – so I think what you're trying to say:  Do you take the future into account at all when someone buys a piece of real estate, and does that ultimately accrue to the benefit of Fidelio?  Is that what you're asking?

---

[6]    Relevant excerpts from Ms. McCormick's deposition, together with pertinent exhibits, are attached hereto as Exhibit 6.

Q:    No, not when you buy a piece of real estate. When you buy a [sic] someone's interest in a venture which relates to a piece of interest – a piece of real estate.

A:    Oh, okay. Oh, I got you. Until you go down that road, you haven't created that value. That's the whole – that's why we're in this business.

Q:    I understand –

A:    So –

Q:    -- I understand you haven't created the value. But do you take into consideration the potential value?

A:    (no response)

Q:    **Take for instance, Spotswood** [a shopping center in which Fidelio recently purchased an interest]**, Spotswood today. Fidelio's interest in Spotswood today, it's probably not worth that much. It just recently invested in the property. The property has not made much gains, I would assume – I don't know this for a fact, but I would assume since it was recently purchased.**

(Millspaugh Dep. at 109-111)(emphasis added)

37.    Accordingly, an FPEP member who is terminated from Buvermo would receive no compensation for a promoted interest held in a recently acquired parcel of property. (Gardner Dep. at 117, 270).

**John Gardner**

37.    John Gardner is a minority stockholder of Buvermo and served as its president for over twenty (20) years. (Gardner Dep. at 13; Tjaden Dep. at 33-34).

38.    According to Mr. Gardner, the principal role of the president of Buvermo is to act as a fiduciary to Fidelio's investors. (Id. at 135-136).

8

39.    According to Mr. Gardner's testimony, in order to properly represent the interests of Fidelio's investors, it is critical that the president of Buvermo maintain a collaborative working relationship with the company's senior advisor.  (Id. at 136-137).

40.    In addition to his role as Buvermo's president, Mr. Gardner was, at all times relevant hereto, the president of FPMI (Fidelio's managing general partner), Donelux and Janivo and vice-president of Defendant Orvan, Inc.  (Id. at 23, 30-31).[7]

41.    At all relevant times hereto, Mr. Gardner has also been a member of FPEP pursuant to the terms of the FPEP LLC Agreement.  (Id. at 26).

42.    At the time Plaintiff was hired in June 2005, Mr. Gardner's membership interest in FPEP entitled him to a 13% "promoted interest" on any project designated by the management committee as an "FPEP property" after Fidelio recovered its initial investment and a preferred rate of return.  (Id. at 211-212).

43.    Mr. Gardner's membership in FPEP also provided him with the right to contribute up to 2.5% of the capital for any of Fidelio's investments.  (Id. at 90-91. 180-181).

44.    Even after he relinquished his role as Buvermo's president, Mr. Gardner remained an active contributor with respect to Fidelio's investments.  (Id. at 90).

**Mr. Gardner Agrees to Step Down and Assume Role of Senior Advisor.**

45.    In late 2004 or early 2005, Buvermo's senior advisor, Chris Zachariasse, met with Mr. Gardner, Mr. Tjaden and Mr. van Rhee and announced his intention to retire.  (Tjaden Dep. at 60-61; van Rhee Dep. at 43, 47-48).

---

[7]    Apart from its status as a partner of Fidelio, Orvan had no role with respect to Plaintiff's employment with Buvermo or with the issues raised in his Amended Complaint.

46.     After a series of discussions, a joint decision was made to bring a new president in and have Mr. Gardner transition into the senior advisor role that Mr. Zachariasse was to vacate at the end of 2005.  (Tjaden Dep. at 61, 68; van Rhee Dep. at 51; Gardner Dep. at 131).

47.     In approximately February 2005, Buvermo engaged the services of an executive search firm, Equinox Partners, to lead the effort to recruit a new president.  (Deposition of Marsha Pearcy ("Pearcy Dep.") at 26).[8]

48.     Marsha Pearcy, an executive recruiter employed by Equinox, spearheaded the search effort and was assisted by Equinox's CEO, Anthony LoPinto.  (Pearcy Dep. at 26, 45).

49.     Following its engagement, Equinox prepared a "Position Specification" for distribution to candidates describing Buvermo's business, the position responsibilities and candidate profile.  (Pearcy Dep., Exhibit 8).

50.     The Position Specification is silent regarding a specific term of employment, a fact acknowledged by Plaintiff during his deposition.  (Id.; Morris Dep. at 140).

51.     Both Ms. Pearcy and Mr. LoPinto confirmed during their depositions that there were no discussions with Buvermo concerning a specific time commitment or a guaranteed term of employment for any candidate.  (Pearcy Dep. at 99-100, 102; Deposition of Anthony LoPinto ("LoPinto Dep.") at 39-40).[9]

**Plaintiff is Interviewed To Succeed Mr. Gardner as Buvermo's President.**

52.     In approximately May 2005, Ms. Pearcy initiated discussions with Plaintiff concerning the opportunity at Buvermo.  (Pearcy Dep. at 165-166; Morris at 113).

---

[8]   Relevant excerpts from Ms. Pearcy's deposition transcript, together with pertinent Exhibits, are attached hereto as Exhibit 7.

[9]   Relevant excerpts from Mr. LoPinto's deposition transcript, together with pertinent Exhibits, are attached hereto as Exhibit 8.

53.    At this time, Plaintiff had twenty-five (25) years of experience in the real estate business, but had never held the position of president or CEO in any of his previous jobs. (Morris Dep. at 69-70, 119).

54.    During their depositions, both Ms. Pearcy and Mr. LoPinto confirmed that there were no discussions with Plaintiff concerning a specific term of employment.  (Pearcy Dep. at 99, 168; LoPinto Dep. at 65).

55.    Plaintiff was subsequently interviewed for the position by Mr. Gardner, Mr. Tjaden and Mr. van Rhee.  (Gardner Dep. at 208; Tjaden Dep. at 107-108; van Rhee Dep. at 75, 77; Morris Dep. at 154-155).

56.    During these interviews, Plaintiff alleges that he agreed to commit to work for ten (10) years or until he was sixty (60) years of age, and that Buvermo agreed to "commit" to him for that period of time as well.  (Morris Dep. at 136-139, 160-161).

57.    As set forth above, however, both Ms. Pearcy and Mr. LoPinto testified during their depositions that no such discussions took place.  (Pearcy Dep. at 99; LoPinto Dep. at 65).

58.    During their depositions, Mr. Gardner, Mr. Tjaden and Mr. van Rhee testified that while Buvermo/Fidelio were seeking to remain in the market for the long-term and were seeking a candidate who viewed the position as a long-term opportunity, there were no representations whatsoever concerning a specific term of employment.  (Gardner Dep. at 129, 197-198; Tjaden Dep. at 94-98, 157-159; van Rhee Dep. at 71-75, 120).

59.    During his deposition, Plaintiff admitted that his purported ten (10) year agreement with Buvermo was based upon oral discussions and that nothing was ever put in writing concerning a ten (10) year term of employment.  (Morris Dep. at 169-170).

> Q:    All right.  Now, apart from what we've talked about today
>        – we've talked about discussions that you've had with

various people – what evidence do you have that Buvermo agreed to employ you for a 10-year period of time?

A:  Other than the discussions that I had that were on point with executives of the company, board members and the agent of the company, that's all I've got.

Q:  You've got oral discussions.

A:  What I just said is what I've got.

Q:  Okay.  Now, is there a single document, to your knowledge, that reflects a 10-year term of employment?

A:  I told you I have what I have.  If I had something above and beyond that, I would be happy to tell you.

Q:  My question simply is is there any document which supports the fact that you were offered a 10-year term of employment?

A:  A document?

Q:  A document.  A writing.

A:  No.

(Morris Dep. at 169-170).

### **Plaintiff Is Hired as Buvermo's President.**

60.    On June 3, 2005, Plaintiff executed an offer letter from Buvermo, accepting employment as Buvermo's president.  (Morris Dep., Exhibit 7).

61.    Plaintiff's offer provides for an annual base salary of $250,000 and a "promoted interest" in several current projects (subject to a two (2) year vesting period) and in future projects initiated after the commencement of his employment.  (Id.).

62.    According to his offer letter, Plaintiff's rights with respect to his promoted interests were to be "governed by the FPEP LLC Agreement" described above.  (Id.)  The offer letter specifically provides as follows:

Dear Jonathan:

I am pleased to offer you the following terms of employment with Buvermo Properties, Inc.

Position- President of Buvermo Properties, Inc.

Starting Date- June 27, 2005.

Benefits- Standard benefits, including health care benefits, 401k participation, etc.

Promoted Interest-
Current Projects- You will be entitled, upon start of employment, to the share of FPEP promoted interest currently owned by Fidelio Properties for land parcels adjacent to the Sheraton Reston parcels, and remaining land parcels at Twinbrook.  **Such interests will be subject to a two year vesting period**.

Future Projects- You will be entitled to the FPEP promote currently available to me for all projects initiated after December 31, 2005, and for all projects initiated by you prior to that time, except that the preferred return to Fidelio and other capital providers will be reduced from 12% to 10% to reflect current market conditions, and which may be subject to change relative to future projects dependent upon future market conditions.  For any projects jointly initiated by you and me prior to year end, we will mutually agree on a fair split of the promote.  In addition, you will also be provided the right to invest prorata 2.5% of the capital for all future projects, on a nonselective basis.

**All items will be governed by the FPEP LLC agreement, of which you will become a member**.

My Future involvement-
My intent is to continue to work full time at least through year end, and to provide you full support in all Buvermo/Fidelio activities during that period, and for an extended period of time thereafter as well.  I will continue to retain the title of president of Fidelio Properties Management, Inc. the managing general partner of Fidelio Properties, as well as the managing member of the LLC's through which Fidelio possesses its property ownership interests, however the intent is for you over time to take over that position as well.  I also intend to continue as a prorata 2.5% investor for all future projects.

> Future decision making-
> As we discussed, for any future investment decisions, both you and
> I will have to agree before we submit the investment to the Fidelio
> Partners for their approval.
>
> Please indicate you agreement with these terms by signing below.

(Morris Dep., Exhibit 7)(emphasis added).

63.     The offer letter is signed by both Mr. Gardner and Plaintiff.  (Id.).  During his deposition, Plaintiff admitted that he read the offer and was in agreement with its contents.  (Id. at 179, 209-210).

64.     Plaintiff also conceded that the offer letter does not contain a specific term of employment and understood this before he signed it.  (Id. at 217-218).

65.     As explicitly set forth in Plaintiff's offer letter, Plaintiff's right to a promoted interest in "current projects" is expressly subject to a two (2) year vesting period.  (Morris Dep., Exhibit 7).

66.     Although Plaintiff now disputes the meaning of this unambiguous provision, it was intended to require Plaintiff to be employed for at least a two (2) year period before he would be entitled to receive an interest in the properties at issue.  (Gardner Dep. at 269; Tjaden Dep. at 112).

67.     With respect to the "future projects" described in his offer letter, Plaintiff understood that he would be entitled to receive the promoted interest that had been made available to Mr. Gardner during his tenure as Buvermo's president.  (Gardner Dep. at 90; Morris Dep. at 141-142).

68.     Although not material to the disposition of this Motion, Plaintiff claims (incorrectly) that he is entitled to a 15.5% promoted interest.  (Morris Dep. at 142).  However, at

all relevant times hereto, it is undisputed that Mr. Gardner only held a 13% interest.  (Gardner Dep. at 211-212).

69.     As set forth above, Plaintiff's offer letter explicitly provides that his "promoted interests" were to be "governed by the FPEP LLC agreement."  During his deposition, Plaintiff admitted that Exhibit 4 to his deposition was the FPEP LLC Agreement that was in existence at the time he was hired.  (Morris Dep. at 108, Exhibit 4).

70.     Before he was hired, Plaintiff received an explanation from Mr. Gardner with respect to how the FPEP LLC Agreement worked, including the redemption provision.  (Gardner Dep. at 98-99, 228-232, 286-287).

71.     According to Mr. Gardner, Plaintiff never objected to the redemption mechanism. (Gardner Dep. at 286-287).

72.     During his deposition, Plaintiff admitted that during his employment with Buvermo, he had unrestricted access to all company documents and had reviewed the FPEP LLC Agreement.  (Morris Dep. at 105).

73.     Although Plaintiff now contends that he is not bound by the FPEP LLC Agreement because it allegedly was to be "modernized," he admitted during his deposition that he did not have any understanding of what the new terms were to be and did not know how the agreement was going to change beyond admitting him as a member.  (Morris Dep. at 107, 205-207, 220).

74.     Plaintiff also admitted that he had not even discussed the alleged changes to the FPEP LLC Agreement with anyone.  (Id.).

75.     According to the undisputed testimony the only substantive change to the FPEP LLC Agreement that was contemplated after Plaintiff was hired was amending the agreement to

15

add Plaintiff as a member.    (Gardner Dep. at 87, 100-101, 283; Tjaden Dep. at 58-59; McCormick Dep. at 46).

76.    While there were no plans to change the FPEP LLC Agreement in any other way, there was some discussion during Plaintiff's employment about amending Section 3.03 of Fidelio's Partnership Agreement to simplify the process of designating a property an "FPEP Property" and revising the form on which the designation is memorialized.  (Gardner Dep. at 87, 100-101).

77.    As set forth in Plaintiff's offer letter, it was also clearly anticipated that, notwithstanding Mr. Gardner's relinquishment of his role as Buvermo's president, he would retain a substantive ongoing role with the company and its affiliates, including his role as president of FPMI (Fidelio's general partner).   (Morris Dep., Exhibit 7).

78.    Plaintiff understood that, as president of FPMI, Mr. Gardner would continue to sign off on transactions on behalf of Fidelio, even after December 31, 2005.  (Id. at 213-214).

79.    Plaintiff also testified that he was aware that he would be required to obtain Mr. Gardner's approval on all projects before they could be submitted to the management committee and that he expected this requirement to exist beyond December 31, 2005.  (Id. at 216-217).

80.    During his deposition, Plaintiff testified that he had no concerns with the portion of his offer letter detailing Mr. Gardner's continuing involvement with Buvermo's affairs.  (Id. at 211-212).

81.    On September 19, 2005, Mr. Gardner submitted a memorandum to Mr. Tjaden outlining the terms of his ongoing employment with Buvermo/Fidelio, which included: (i) full-time employment through December 31, 2005; (ii) transition to the role of advisor, similar to that

occupied by Mr. Zachariasse, following year end; and (iii) continued employment with Buvermo after March 31, 2006 for a period of three (3) years at a reduced salary.  (Morris Dep., Exhibit 8).

82.     Mr. Tjaden testified that this memorandum accurately reflected his understanding of Mr. Gardner's continuing role with Buvermo.  (Tjaden Dep. at 78-80).

83.     During his deposition, Plaintiff confirmed that when he received a copy of this memorandum, he did not question or object to the description of Mr. Gardner's ongoing role with Buvermo.  (Morris Dep. at 225-228).

### Plaintiff Commences Employment

84.     Plaintiff commenced employment with Buvermo on June 29, 2005.  (Morris Dep. at 173).

85.     Soon thereafter, Plaintiff began experiencing what he perceived to be problems in terms of his relationship with Mr. Gardner and complained that Mr. Gardner was interfering with his ability to perform his job.  (Morris Dep. at 244-245; Gardner Dep. at 304; Tjaden Dep. at 125-126).

86.     During his deposition, Plaintiff could only specifically identify one (1) potential deal that Mr. Gardner allegedly interfered with.  (Morris Dep. at 253).

87.     According to Plaintiff's own testimony, the extent of Mr. Gardner's "interference" was his investigation of the suitability of the investment and providing his opinion about rental rates that could be expected.  (Id. at 246-248).

88.     At the same time, Mr. Gardner also had concerns regarding Plaintiff's job performance, particularly his lack of interest in Buvermo's day-to-day operations.  (Gardner Dep. at 161-164).

89.     Kara McCormick, Buvermo's Vice President of Finance, also testified during her deposition that she perceived issues with Plaintiff's performance.  (McCormick Dep. at 73-76).

90.     During their depositions, Mr. Tjaden and Mr. van Rhee both testified that they were also disappointed with Plaintiff's job performance and Mr. van Rhee had discussions with a colleague in December 2005 regarding terminating Plaintiff's employment because of doubts whether he could fulfill his role as their fiduciary in the States.  (Tjaden Dep. at 130-131; van Rhee Dep. at 89-92, 99-101).

91.     During a meeting held in December 2005, an agreement was reached that Mr. Gardner would retain responsibility for managing Buvermo's relationship with one of its principal partners, JBG, but would limit his time at the office to one (1) day per week.  (Morris Dep. at 276-282; Tjaden Dep. at 128-129; van Rhee Dep. at 97).

92.     According to Mr. Tjaden and Mr. van Rhee, the decision to limit Mr. Gardner's time at the office was attributable to their desire to provide Plaintiff with every opportunity to succeed in his role.  (Tjaden Dep. at 128; van Rhee Dep. at 101).

### Spotswood Valley and Reston International Center

93.     On January 31, 2006, Fidelio entered into a letter of understanding with a previous partner, SJM Acquisitions, LLC, to purchase a shopping center known as Spotswood Valley Square Shopping Center located in Harrisonburg, Virginia.  (Gardner Dep. at 351, Exhibit 17).

94.     There is no dispute that Plaintiff initiated this project.  (Gardner Dep. at 350).

95.     During Plaintiff's employment with Buvermo, discussions were also initiated with JBG concerning the acquisition of an office building in Reston, Virginia known as the "Reston International Center."  (Gardner Dep. at 326).

96.    It is undisputed that Mr. Gardner initiated this particular project.  (<u>Id.</u>).

97.    Mr. Gardner does not claim entitlement to nor has he received a promoted interest in either the Spotswood Valley or Reston International Center projects.  (Gardner Dep. at 327, 361; Tjaden at 89, 91; van Rhee Dep. at 61-64).

**<u>Plaintiff's Employment is Terminated in March 2006</u>**

98.    On March 22, 2006, Plaintiff attended a dinner meeting with Mr. Gardner, Mr. van Rhee and Mr. Tjaden.  (Morris Dep. at 296).

99.    During this meeting, Plaintiff became upset when Mr. Gardner produced a document that Plaintiff perceived as altering his entitlement to receive the promoted interest described in his offer letter.  (Morris Dep. at 297-299, 302).

100.    According to Mr. Gardner, the document was merely a template of the proposed new property designation form that was to be used in conjunction with the planned amendment of Section 3.03 of the Fidelio Partnership Agreement and in no way was intended to alter Plaintiff's right to receive a promoted interest.  (Gardner Dep. at 321-322, 324, Exhibit 16).

101.    Despite the fact that Mr. Gardner indicated that the document was only "an example," Plaintiff reacted angrily.  (Morris Dep. at 302-303).

102.    Shortly thereafter, Plaintiff engaged in a heated discussion with Mr. Rhee concerning a separate issue and abruptly left the dinner meeting prior to its conclusion.  (<u>Id.</u> at 303-308; Gardner Dep. at 340).

103.    During his deposition, Mr. Tjaden testified that Plaintiff's conduct at the dinner meeting "shocked" him and described Plaintiff's behavior as erratic and inappropriate.  (Tjaden Dep. at 136, 146, 150).

104.    Following this meeting, Mr. van Rhee prepared a written statement concerning Plaintiff's inappropriate and unprofessional behavior that corroborates Mr. Tjaden's testimony about the incident.  (van Rhee Dep., Exhibit 1).

105.    The following day, Mr. Tjaden and Mr. van Rhee made the decision to terminate Plaintiff's employment.  (Tjaden Dep. at 150-151).

106.    According to Mr. Tjaden and Mr. van Rhee, Plaintiff was terminated because they had lost faith that Plaintiff could properly fulfill his fiduciary role and represent their interests in the United States.  (Tjaden Dep. at 136-137; van Rhee Dep. at 106-107).

107.    Plaintiff was formally advised of his termination on March 24, 2006.  (Morris Dep. at 311, Exhibit 18).

108.     During his deposition, Plaintiff confirmed that he received his full salary (a total of $206,250.00) through the date of his termination.  (Morris Dep. at 239-242).

109.    At the time of Plaintiff's termination, the Spotswood Valley shopping center -- the only project initiated by Plaintiff during his employment -- had not been acquired.  (Morris Dep. at 311).

110.    In fact, the Spotswood Valley acquisition did not close until July 6, 2006.  (Gardner Dep. at 353).

111.    Likewise, at the time of Plaintiff's termination, Reston International Center had not been acquired.  (Morris Dep. at 311).

112.    In this regard, Fidelio did not acquire its interest in the Reston International Center until the deal closed on June 9, 2006.  (Gardner Dep. at 369).

113.     In addition to these undisputed facts, at the time of Plaintiff's termination, Plaintiff had not yet been admitted as a member of FPEP and neither Spotswood Valley nor

Reston International Center had been designated by the management committee as an "FPEP Property." (Morris Dep. at 318; Tjaden Dep. at 9, 27; van Rhee Dep. at 10, 15).

114.    Defendants intended to admit Plaintiff as a member in FPEP, but he was terminated before his admission could take place. (Gardner Dep. at 89; Tjaden Dep. at 50).

**Subsequent Events**

115.    Following Plaintiff's termination, Laurence Millspaugh was hired by Buvermo as its new president pursuant to the terms of an offer letter dated July 6, 2006. (Millspaugh Dep. at 9-10, Exhibit 1).

116.    Mr. Millspaugh commenced employment with Buvermo on August 15, 2006. (Id.).

117.    Following Mr. Millspaugh's hire, Mr. Gardner assumed the role of advisor and remained an active participant in the decision-making process. (Id. at 15).

118.    As with Plaintiff, Mr. Millspaugh understood he was to work with Mr. Gardner on major decisions and, if there was a consensus, the issue would be brought before the partners. (Id. at 19).

119.    As set forth in his offer letter, Mr. Millspaugh received a promoted interest on "future projects" as well as certain "current projects," including the Spotswood Valley and Reston International Center properties. (Id., Exhibit 1).

120.    Mr. Millspaugh was provided with a promoted interest in Spotswood Valley and Reston International Center because he would be responsible for managing these projects. (van Rhee Dep. at 62-66; Gardner Dep. at 364-365).

121.    Mr. Gardner did not receive any promoted interest with respect to either of these properties. (Tjaden Dep. at 89-91).

122.    As in Plaintiff's case, Mr. Millspaugh's rights with respect to the promoted interests described in his offer letter are "governed by the FPEP LLC agreement."  (Millspaugh Dep., Exhibit 1).

123.    During his deposition, Mr. Millspaugh testified that the FPEP LLC Agreement that is set forth as Exhibit 7 to Mr. Gardner's deposition was the document to which he would be made a party.  (Millspaugh Dep. at 84-85).  This FPEP LLC Agreement is the same document in place when Plaintiff was hired.  (Morris Dep. at 108, Exhibit 4).

124.    During his deposition, Mr. Millspaugh also confirmed his understanding that if he left the company, his membership interest in FPEP would be redeemed in accordance with Section 8.9 of the FPEP LLC Agreement.  (Millspaugh Dep. 45, 89-91).

125.    Mr. Millspaugh also testified that he understood he would be required to be bound by the redemption provision in order to receive a promoted interest and that he considered this arrangement to be fair and consistent with the terms of his offer letter.  (Id. at 92-94, 119).

126.    On December 5 2006, the management committee designated Spotswood Valley and the Reston International Center "FPEP Properties" in accordance with Section 3.03 of the Fidelio Partnership Agreement and provided Mr. Millspaugh a promoted interest in these properties, thereby affording Mr. Millspaugh the opportunity to receive compensation for his promoted interests at some point in the future, provided the properties meet the required financial objectives.  (Tjaden Dep. at 9, 27; van Rhee Dep. at 10-11, 15).

Respectfully submitted,

SMITH, LEASE & GOLDSTEIN, LLC


By:      /s/ Marc J. Smith
         Marc J. Smith
         D.C. Bar No. 460255
         11 North Washington Street
         Suite 520
         Rockville, Maryland 20850
         Phone: (301) 838-8950

         Counsel for Defendants

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| JONATHAN H. MORRIS | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Case No. |
| | : | 1:06-CV-01131 (HHK)(DAR) |
| BUVERMO PROPERTIES, INC., et. al., | : | Next Event:  Status Conference |
| | : | April 20, 2007 at 10:30 a.m. |
| Defendants. | : | |

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1,

Defendants Buvermo Properties, Inc., Fidelio Properties, F.P. Executive Partners, L.L.C., Janivo

Realty, Inc., Donelux, Inc., Orvan, Inc., Fidelio Properties Management, Inc. and John Gardner

hereby file their Memorandum of Points and Authorities in Support of their Motion for Summary

Judgment.

**INTRODUCTION**

The Plaintiff in this case, a former employee of Defendant Buvermo Properties, Inc.,

alleges that he was employed by Buvermo pursuant to an alleged oral agreement for a ten year

term.  In his Amended Complaint, Plaintiff contends that his termination after less than nine

months of employment constitutes a breach of his alleged ten year oral employment agreement.

As a result of this alleged breach, Plaintiff claims he is entitled to damages for the loss of his

salary during the entire span of his purported ten year engagement.  Plaintiff also claims he is

entitled to receive damages arising out of an alleged interest in all real estate transactions

initiated by Buvermo from January 1, 2006 through the conclusion of his purported ten year

engagement in June 2015.

As established below, Plaintiff's claims have no merit whatsoever.  Plaintiff's claim regarding an alleged ten year oral employment agreement is barred by the statute of frauds.  By virtue of the fact that he cannot prove employment for a definite term, Plaintiff was clearly an at-will employee with no prospective right to receive salary or any other component of compensation he seeks in this case.  There are no genuine issues of material fact in this case, and Defendants are entitled to judgment as a matter of law with respect to each claim set forth in the Amended Complaint.

## SUMMARY JUDGMENT STANDARDS

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); Tao v. Freeh, 27 F.3d 635, 638 (D.C. Cir.1994). Under the applicable summary judgment standards, Defendants, as the moving party, bear the "initial responsibility of informing the district court of the basis for [its] motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Plaintiff, in response to Defendants' motion, must "go beyond the pleadings and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." Id. at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. Laningham v. U.S. Navy, 813 F.2d 1236, 1242-43 (D.C.Cir.1987); Liberty Lobby, 477 U.S. at 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249-50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." Williams v. Callaghan, 938 F.Supp. 46, 49 (D.D.C.1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with specific facts showing that there is a genuine issue for trial." Id. at 587, 475 U.S. 574, 106 S.Ct. 1348.

## ARGUMENT

In his Amended Complaint, Plaintiff asserts the following causes of action, all of which relate to his claim that he had an enforceable ten (10) year employment agreement with Buvermo: (i) breach of contract (Count I); (ii) breach of implied covenant of good faith and fair dealing (count II); (iii) anticipatory breach of contract (Count III); (iv) declaratory judgment

(Count IV); (v) intentional misrepresentation/fraud (Count V); and (xi) tortious interference with contractual relations (Count VII).[1]

As set forth below, none of Plaintiff's claims can be sustained.

## I.    Virginia Law Governs Plaintiff's Claims

In this lawsuit, subject matter jurisdiction is predicated upon the diversity of citizenship between the parties; accordingly, a threshold issue exists as to the applicable law governing the case.  In diversity actions, it is well established that the choice of law rules of the jurisdiction in which the district court sits determines the applicable substantive law.  Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941); Republican National Committee v. Taylor, 299 F.3d 887, 889 (D.C. Cir. 2002); Ideal Electronic Security Co., Inc. v. International Fidelity Insurance Co., 129 F.3d 143, 148 (D.C. Cir. 1997).

In determining the applicable substantive law, the District of Columbia has adopted a modified "interest analysis" approach. Under this approach, the first determination is whether a "true conflict" exists; that is, whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdictions is different.  GEICO v. Fetisoff, 958 F.2d 1137, 1141 (D.C. Cir. 1992).  If there is a true conflict, the District of Columbia follows the approach set forth in the Restatement (Second) of Conflict of Laws, § 188 (1971), which provides that in the absence of a valid choice of law provision, the rights and duties of the parties are determined by the local law of the state which has the most significant relationship to the transaction and the parties.  Ideal Electronic Security, 129 F.3d at 148.  In this regard, the contacts to be taken into account include: (i) the place of contracting; (ii) the place the contract was negotiated; (iii) the place of performance; (iv) the location of the subject matter of

---

[1]  The Amended Complaint does not include a Count VI.

the contract; and (v) the domicile, residence, nationality, place of incorporation and place of business of the parties. Restatement (Second) of Conflict of Laws, § 188 (1971).

In this case, two (2) jurisdictions have a potential "competing" interest in this case -- the Commonwealth of Virginia and, to a much lesser extent, the District of Columbia. As set forth below, the law in Virginia and in the District of Columbia is not in conflict with respect to the claims set forth in Plaintiff's Amended Complaint. For example, both of these jurisdictions require employment agreements of the duration alleged by Plaintiff to be in writing pursuant to their respective statute of frauds. Similarly, both of these jurisdictions recognize that absent an enforceable agreement for employment for a specific period of time, employment is "at-will" and may be terminated at any time.

Even if the Court were to apply the contact analysis set forth in § 188 of the Restatement (Second) of Conflict of Laws, it is evident that Virginia has, by far, the most significant connection to the parties and transactions at issue. In this regard, the District of Columbia's relationship with this case has been incidental. According to the Plaintiff, some of the discussions leading to his decision to accept employment with Buvermo occurred in the District. (Morris Dep. at 136). Plaintiff also testified that his offer letter was signed at an apartment Mr. Gardner maintained in the District. (Id. at 179). Notwithstanding this minimal contact, it is undisputed that none of the parties reside in or are based in the District of Columbia. (Amended Complaint ¶¶ 1-9).

In contrast, Virginia's relationship with this case is substantial. In this regard, all of the Defendants maintain their principal place of business or reside in Virginia. (Amended Complaint ¶¶ 2-9). Further, Plaintiff was hired as Buvermo's president and the employment agreement that serves as the basis for Plaintiff's claims was clearly to be performed at

Buvermo's offices in Virginia.  Likewise, the properties in which Plaintiff claims a "promoted interest" in this case -- Spotswood Valley and Reston International -- are both located in Virginia.  (Defendants' Statement of Material Facts ("SMF") ¶¶ 93, 95).  Accordingly, unlike the District of Columbia, Virginia clearly has a substantial interest in this case which deals with issues relating to its real estate, residents and/or those conducting business within its borders.  As such, Virginia law clearly governs the claims asserted by Plaintiff in this case.

## II.   Defendants Are Entitled To Summary Judgment With Respect to Plaintiff's Breach of Contract Claim.

In Count I of his Amended Complaint, Plaintiff asserts a cause of action against Buvermo for breach of an alleged ten (10) year employment agreement.  The damages Plaintiff seeks include compensation for the loss of his $250,000 annual salary through June 2015, and the value of an alleged FPEP promoted interest in all projects initiated by Buvermo from December 31, 2005 through June 2015.  (Morris Dep. at 316-318).   Further, notwithstanding the two (2) year vesting period set forth in his offer letter, Plaintiff also seeks the value of the promoted interest owned by Fidelio for land parcels adjacent to the Sheraton Reston parcels and the remaining land parcels at Twinbrook.  (Id. at 316-317).  Finally, Plaintiff also seeks to enforce his purported "option" to invest his own equity in Spotswood Valley and Reston International Center or "any other future projects initiated by Buvermo."  (Amended Complaint ¶ 42).

For the reasons set forth below, Plaintiff's breach of contract claim has no merit and Defendants are entitled to summary judgment with respect to Count I of the Amended Complaint.

**A.    Plaintiff's Alleged 10-Year Employment Agreement Is Based Upon A Purported Oral Agreement And Is Therefore Barred Pursuant To The Statute of Frauds.**

During discovery in this case, not a single witness corroborated Plaintiff's claim that Buvermo agreed to employ him for a period of ten (10) years.  (SMF ¶¶ 51, 54, 57, 58).  Further, Plaintiff's offer letter does not reflect a specific term of employment and Buvermo's Bylaws specifically provide for the removal of officers at any time, with or without cause.  (SMF ¶¶ 17, 60, 64).   Most importantly, during his deposition, Plaintiff conceded that his purported ten (10) year employment agreement with Buvermo was based entirely upon oral discussions and that nothing was ever put in writing concerning a ten (10) year term of employment.  (SMF ¶ 59). This admission is fatal to Plaintiff's breach of contract claim.

Under Virginia's statute of frauds, contracts that cannot be performed within one (1) year must be in writing and signed by the party to be charged.  Specifically, § 11-2 of the Virginia Code provides, in relevant part:

> Unless a promise, contract, agreement, representation, assurance, or ratification, or some memorandum or note thereof, is in writing and signed by the party to be charged or his agent, no action shall be brought in any of the following cases. . . .

> Upon any agreement that is not to be performed within a year.

Va. Code § 11-2(8).[2]   In Virginia, the statute of frauds extends specifically to employment contracts that cannot be performed within one (1) year.  Falls v. Virginia State Bar, 240 Va. 416, 397 S.E.2d 671 (1990)(statute of frauds bars claim where employee allegedly was promised that employment would continue as long as his performance was satisfactory); Walton v. Greenbrier

---

[2]   Like Virginia, the District of Columbia's statute of frauds also requires a signed writing for all contracts that cannot be performed within one year.  See D.C. Code Ann. § 28-3502.

Ford, Inc., 370 F.3d 446, 453-54 (4th Cir. 2004)(employee's claims that he was employed under a three-year oral employment agreement barred pursuant to statute of frauds).

In his Amended Complaint, Plaintiff contends that Buvermo agreed to employ him "for a period of not less than ten years."  (Amended Complaint ¶ 44).  Accordingly, Plaintiff's alleged employment agreement was <u>not</u> capable of being fully performed within one year and therefore falls squarely under the provisions of Virginia's statute of frauds.  By Plaintiff's own admission, his purported ten (10) year employment agreement was based upon an oral agreement and never reduced to writing.  (SMF ¶ 59).  As such, Plaintiff's claim that he had a ten (10) year employment agreement is plainly unenforceable under Virginia's statute of frauds.

### B.     Plaintiff Was An At-Will Employee And His Termination Does Not Give Rise To A Breach Of Contract Claim.

The Commonwealth of Virginia "strongly adheres to the common law employment at-will doctrine."  <u>County of Giles v. Wines</u>, 262 Va. 68, 72, 546 S.E.2d 721, 723 (2001); <u>Bailey v. Scott-Gallaher, Inc.</u>, 253 Va. 121, 123, 480 S.E.2d 502, 503 (1997); <u>Lawrence Chrysler Plymouth Corp. v. Brooks</u>, 251 Va. 94, 96, 465 S.E.2d 806, 808 (1996).  In Virginia, "an employment relationship is presumed to be at-will, which means that the employment term extends for an indefinite period and may be terminated by the employer or employee for any reason upon reasonable notice."  <u>Giles</u>, 262 Va. at 72, 546 S.E.2d at 723; <u>Progress Printing Co. v. Nichols</u>, 244 Va. 337, 340, 421 S.E.2d 428, 429 (1992).[3]  The presumption that an at-will employment relationship exists may be rebutted, however, if sufficient evidence is produced to show that the employment is for a definite, rather than an indefinite, term.  <u>Giles</u>, 262 Va. At 72, 546 S.E.2d at 723; <u>Progress Printing</u>, 244 Va. at 340, 421 S.E.2d at 429.

---

[3]   In the District of Columbia, absent expression of a specific term of employment, there is also a presumption that employment is "terminable at will by any party at any time."  <u>Reaves-Bey v.</u>

As established above, the purported oral agreement to employ Plaintiff for "a period of not less than ten years" is unenforceable under the statute of frauds. There is no other evidence in the record that demonstrates that Plaintiff's employment was for a definite, rather than an indefinite, term. As such, according to well-established precedent, Plaintiff has failed to present sufficient evidence to rebut the presumption of at-will employment. Given the at-will nature of the employment relationship, Plaintiff's termination after less than one (1) year of employment simply does not constitute a breach of contract.

### C.    Plaintiff Has Been Fully Compensated In Accordance With The Terms Of His Offer Letter

#### 1.    Plaintiff's Salary

As one element of his breach of contract claim, Plaintiff seeks damages for the loss of his salary for the duration of his alleged ten (10) year employment agreement, or through June 2015. (Morris Dep. at 316-318). However, given the at-will nature of his employment with Buvermo, Plaintiff has no prospective right to receive his salary beyond the date of his termination on March 24, 2006. See e.g. Va. Code Ann. § 40.1-29 ("Upon termination of employment an employee shall be paid all wages or salaries due him for work performed prior thereto"); Duggin v. Adams, 234 Va. 221, 226, 360 S.E.2d 832, 836 (1987) ("Unlike a party to a contract for a definite term, however, an individual's interest in a contract terminable at will is essentially only an expectancy of future economic gain, and he has no legal assurance that he will realize the expected gain.").

It is undisputed that Plaintiff received a total of $206,250 in salary during his nearly nine (9) months of employment. (SMF ¶ 108). It is also undisputed that Plaintiff's salary was paid in

---

Karr, 840 A.2d 701, 704 (D.C. 2004); Strass v. Kaiser Foundation Health Plan of Mid-Atlantic, 744 A.2d 1000, 1011 (D.C. 2000).

full through the date of his termination. (Id.). As an at-will employee, Plaintiff has no right to receive salary for the period beyond his termination date.

### 2.    Plaintiff's Investment "Option"

In his Amended Complaint, Plaintiff alleges that he has been denied the "option" set forth in his offer letter to invest his own capital in Spotswood Valley and Reston International Center "or any other future projects initiated by Buvermo." (Amended Complaint ¶ 42). As with Plaintiff's entitlement to salary, given the at-will nature of his employment, Plaintiff's "option" to invest ended at the time his employment was terminated and he has no prospective rights in this regard. With respect to Spotswood Valley and Reston International, Plaintiff has no right to invest in these projects because neither property had been acquired at the time of his termination. (SMF ¶¶ 109-112).

### 3.    Plaintiff's Right To FPEP Promoted Interests

As set forth in his offer letter, Plaintiff was also eligible to receive an FPEP promoted interest in several specific "current projects" and in "future projects" initiated after the commencement of his employment. The relevant portion of Plaintiff's offer letter provides as follows:

> Promoted Interest-
> Current Projects- You will be entitled, upon start of employment, to the share of FPEP promoted interest currently owned by Fidelio Properties for land parcels adjacent to the Sheraton Reston parcels, and remaining land parcels at Twinbrook. **Such interests will be subject to a two year vesting period**.
>
> Future Projects- You will be entitled to the FPEP promote currently available to me for all projects initiated after December 31, 2005, and for all projects initiated by you prior to that time, except that the preferred return to Fidelio and other capital providers will be reduced from 12% to 10% to reflect current market conditions, and which may be subject to change relative to future projects dependent upon future market conditions. For any

projects jointly initiated by you and me prior to year end, we will mutually agree on a fair split of the promote.  In addition, you will also be provided the right to invest prorata 2.5% of the capital for all future projects, on a nonselective basis.

**All items will be governed by the FPEP LLC agreement, of which you will become a member**.

(SMF ¶ 62)(emphasis added).

In his breach of contract claim, Plaintiff seeks to recover damages for the value of the FPEP promoted interest for both the "current projects" and "future projects" described in his offer letter.  (Morris Dep. at 316-318).  With respect to his claim for the FPEP promoted interest for "future projects," Plaintiff asserts that he is entitled to damages for <u>all</u> projects initiated by Buvermo during his purported ten (10) year engagement.  (Morris Dep. at 316-318).  In other words, notwithstanding his status as an at-will employee and his termination on March 24, 2006, Plaintiff contends he is entitled to recover damages for each and every project initiated by Buvermo until the expiration of his alleged "employment agreement" in June 2015.  As with his demand for ten (10) years of salary, there is simply no basis to support this claim.

### A.    Plaintiff's FPEP Promoted Interest For Current Projects Is Expressly Subject To A Two Year Vesting Period

As unambiguously set forth in Plaintiff's offer letter, Plaintiff's FPEP promoted interest for current projects is expressly "subject to a two year vesting period."  (SMF ¶¶ 62, 65, 66).  Plaintiff was terminated after less than nine (9) months of employment; accordingly, his FPEP promoted interest in current projects was unvested at the time of his termination.  As such, Plaintiff has no right to recover damages based upon the loss of this unvested interest.

### B.    Plaintiff Has No Enforceable FPEP Promoted Interest For "Future Projects"

Plaintiff's claim that he is entitled to continue receiving an FPEP promoted interest on all projects initiated by Buvermo during his alleged ten (10) year employment agreement cannot be

11

reconciled with his status as an at-will employee. As with his salary, Plaintiff's right to receive an FPEP promoted interest on "future projects" came to an end when he was terminated on March 24, 2006. (SMF ¶107). According to Plaintiff's Amended Complaint, only two (2) projects had been initiated prior to his termination -- Spotswood Valley and the Reston International Center. (Amended Complaint ¶ 39). Accordingly, the appropriate inquiry is whether Plaintiff has any enforceable interest in either of these projects. For the reasons set forth below, Plaintiff clearly does not.[4]

According to the undisputed evidence in this case, there are several important conditions that must be satisfied before members of FPEP are entitled to receive a promoted interest. First and foremost, Fidelio's management committee must approve the investment and actually acquire an interest in the property at issue. (SMF ¶ 29). Second, in accordance with Section 3.03 of the Fidelio Partnership Agreement, Fidelio's management committee must formally designate the property an "FPEP Property." (SMF ¶ 30). Until Fidelio actually acquires an interest in a project and chooses to designate it as an "FPEP Property," no member of FPEP has any right to receive a promoted interest. (SMF ¶¶ 29, 30).

Even after these two (2) conditions are met, a member of FPEP receives value (i.e. cash) for their promoted interest if, and only if, the property at issue appreciates sufficiently in value over time such that Fidelio is able to recoup its initial capital investment and receive a preferred rate of return. (SMF ¶¶ 25, 31). For this reason, the promoted interest structure is not intended as compensation for uncovering a potentially favorable real estate investment; rather, it is intended as compensation for successfully managing the investment and adding value over its lifetime. (SMF ¶¶ 24, 26, 27).

---

[4]    Although the scope of inquiry is properly limited to Spotswood Valley and the Reston International Center projects, the analysis set forth herein is equally applicable to any FPEP

There is no dispute that the Spotswood Valley and Reston International projects were initiated during the course of Plaintiff's brief tenure with Buvermo. Standing alone, however, this fact does not entitle Plaintiff to a promoted interest in either of these projects. At the "initiation" stage, the promoted interest in any given project is merely an expectation of a future economic benefit that may or may not be realized. (SMF ¶¶ 29-31). This is precisely the reason why, following the initiation of a project, a number of conditions must be met in order to become entitled to receive a promoted interest. (Id.).

In this case, at the time Plaintiff was terminated, none of the conditions precedent identified above had been met. In this regard, it is undisputed that Fidelio had not acquired an interest in either Spotswood Valley or the Reston International Center as of Plaintiff's termination on March 24, 2006. (SMF ¶¶ 109, 111). In fact, Fidelio's interests in Spotswood Valley and the Reston International Center were acquired months after Plaintiff was terminated. (SMF ¶¶ 110, 112). It is also undisputed that as of the date of Plaintiff's termination, neither Spotswood Valley nor the Reston International Center had been designated an "FPEP Property" by the management committee. (SMF ¶¶ 113). In fact, neither of these projects was designated as an "FPEP Property" until December 5, 2006, over eight (8) months after Plaintiff was terminated. (SMF ¶ 126).

In addition to the fact that Spotswood Valley and the Reston International Center had not been acquired or designated, Plaintiff had not yet been admitted as a member of FPEP at the time of his termination. (SMF ¶¶ 113). The lack of urgency in admitting Plaintiff as a member of FPEP is indicative of the fact that the promoted interest structure is not designed or intended to provide compensation at the initiation of a project. Even if Plaintiff had been admitted as a member of FPEP, his right to receive an FPEP promoted interest in Spotswood Valley and the

---

promoted interest to which Plaintiff claims he is entitled.

Reston International Center was contingent on the acquisition and designation of these properties -- events that occurred long after his termination. (SMF ¶¶ 109-112). Simply stated, at the time of his termination, neither Plaintiff nor anyone else was entitled to a promoted interest for Spotswood Valley or Reston International Center.

The fact that these properties were eventually acquired after Plaintiff's termination does not operate to retroactively vest Plaintiff with a promoted interest. Indeed, as set forth above, the promoted interest structure is specifically intended as compensation for successfully managing an investment and adding value over its lifetime. (SMF ¶¶ 24, 26, 27). This requirement necessarily contemplates active employment with Buvermo. (SMF ¶¶ 21, 32). Plaintiff's successor, Mr. Millspaugh, has been assigned responsibility for managing both Spotswood Valley and Reston International Center and, accordingly, has been provided with a promoted interest in these projects. (SMF ¶¶ 119, 120). In contrast, Plaintiff will have no role whatsoever with respect to the management of these projects. As such, and for the reasons set forth above, it is patently clear that Plaintiff has no enforceable FPEP promoted interest in Spotswood Valley or the Reston International Center.

Significantly, even if Plaintiff was a member of FPEP and had an enforceable FPEP promoted interest, his membership interest in FPEP (the vehicle through which he would have received the benefit of his promoted interest) would have been redeemed at the time of his termination at market value in accordance with Section 8.9 of the FPEP LLC Agreement. As noted by Mr. Gardner, a member's interest in a recently acquired property like Spotswood Valley or Reston International Center would have no value in the context of redemption due to the lack of appreciation. (SMF ¶ 35). Accordingly, to the extent Plaintiff held any interest in Spotswood Valley or the Reston International Center, he would have been required to surrender such interest

14

at the time of his termination without receiving anything in return. (SMF ¶37). Mr. Haddad's judicial admission regarding Fidelio's interest in Spotswood Valley ("Fidelio's interest in Spotswood today, it's probably not worth that much. It just recently invested in the property"), confirms that any interest Plaintiff held was of no value. (SMF ¶36).

Despite the fact that Plaintiff's offer unequivocally provides that his promoted interests "will be governed by the FPEP LLC agreement," it is anticipated that Plaintiff will argue that the agreement was to be "modernized" and that he is not bound by its terms. Apart from Plaintiff's self-serving testimony, there is <u>no</u> evidence that the FPEP LLC Agreement was to be revised, except to admit Plaintiff as a member. (SMF ¶75). This conflict in evidence, however, is not an impediment to granting summary judgment in Defendants' favor.

In this regard, despite Plaintiff's assertion that the FPEP LLC Agreement was to be revised in some fashion, he admitted during his deposition that he did not have an understanding of what the "new" terms were to be and did not know how the agreement was going to change beyond admitting him as a member. (SMF ¶ 73). Significantly, Plaintiff admitted that specific revisions to the agreement had never even been discussed. (SMF ¶ 74). In other words, according to Plaintiff's own testimony, the terms of the alleged "modernized" FPEP LLC Agreement were to be decided at a later date.

It is well established in Virginia that "there must be mutual assent of the contracting parties to terms reasonably certain under the circumstances in order to have an enforceable contract." <u>Allen v. Aetna Casualty and Surety Company</u>, 222 Va. 361, 364, 281 S.E.2d 818, 820 (1981). An "agreement to agree" constitutes only an agreement to negotiate terms at a later date and is unenforceable under Virginia law. <u>Id.</u>; <u>475342 Alberta Ltd. v. Braley</u>, 932 F. Supp. 764, 766 (W.D.Va.1966); <u>W.J. Schafer Associates v. Cordant</u>, 254 Va. 514, 519, 493 S.E.2d 512

(1977); EG&G, Inc. v. Cube Corp., 63 Va. Cir. 634, 2002 WL 31950215 (2002); International

Paper Co. v. Brooks, 63 Va. Cir. 494, 2003 WL 23573614 (2003).  Accord Obelisk Corp. v.

Riggs Nat. Bank of Washington, D.C., 668 A.2d 847, 855 (D.C. 1995)(in the District of

Columbia, jury instruction regarding unenforceability of an "agreement to agree" proper).

    Under Plaintiff's version of the facts, the terms of the alleged "modernized" FPEP LLC

Agreement were to be decided at a later date.  Given Plaintiff's own lack of understanding as to

the substance of the alleged revisions, there was clearly no mutual assent as to the terms of the

alleged revised agreement.  If anything, the purported "modernized" agreement envisioned by

Plaintiff is merely an unenforceable "agreement to agree" in the future.  The only FPEP LLC

Agreement in existence and which is applicable in this case, is the document reviewed by

Plaintiff at the inception of his employment -- an agreement which has been in place since FPEP

LLC was formed and which has applied uniformly to its members, including Mr. Gardner, Mr.

Bonacci, and now, Mr. Millspaugh.  (SMF ¶¶ 22, 69, 75, 123).

    **III.    Virginia Does Not Recognize A Cause Of Action For Breach Of Implied
             Covenant Of Good Faith And Fair Dealing**

    In Count II of his Amended Complaint, Plaintiff asserts that his employment agreement

includes an implied covenant of good faith and fair dealing and that Buvermo and Fidelio

violated this implied covenant by terminating his employment.  The problem with this claim is

that Virginia does not recognize an independent claim for breach of the implied covenant of

good faith and fair dealing in an at-will employment contract.  Derthick v. Bassett-Walker, Inc.,

904 F. Supp. 510, 522 (W.D. Va. 1995), aff'd. 106 F.3d 390 (4th Cir. 1997), cert. denied 522

U.S. 819 (1997).; Sneed v. American Bank Stationary Co., 764 F. Supp. 65, 67 (W.D. Va. 1991);

Wright v. St. Charles Water Authority, 59 Va. Cir. 244, 2002 WL 31989105 (2002); Schryer v.

VBR, 25 Va. Cir. 464, 1991 WL 835295 (1991).  Accord Paul v. Howard University, et. al., 754

A.2d 297 (D.C. 2000) (in the District of Columbia, claim for breach of implied duty of good faith and fair dealing cannot be asserted by at-will employee).

Accordingly, Defendants are entitled to summary judgment with respect to Count II of the Amended Complaint.

### IV.    Plaintiff's Anticipatory Breach Of Contract Claim Is Without Merit.

In Count III of his Amended Complaint, Plaintiff asserts a cause of action for anticipatory breach of contract. This claim is merely a recast version of Plaintiff's breach of contract claim set forth in Count I. For the reasons set forth in Section II above, Defendants are entitled to summary judgment with respect to Count III of the Amended Complaint.

### V.    Plaintiff Is Not Entitled To A Declaratory Judgment In His Favor.

In Count IV of his Amended Complaint, Plaintiff seeks a declaratory judgment from this Court that he is entitled to receive payment for the promoted interests described in his offer letter and for all other projects initiated by Buvermo from January 1, 2006 through June 29, 2015. Plaintiff also seeks a declaratory judgment that he is entitled to exercise his "option" to invest his own capital in Spotswood Valley and the Reston International Center "and in all future projects." For the reason set forth in Section II above, Plaintiff is not entitled to the damages he seeks and Defendants are entitled to summary judgment with respect to Count IV of the Amended Complaint.

### VI.    Plaintiff Cannot Establish The Requisite Elements Of Fraud

In Count V of his Amended Complaint, Plaintiff asserts a claim for fraud, based solely upon the following allegations:

- Gardner, individually and on Buvermo's behalf, represented to plaintiff that, although Gardner would remain partially involved in Buvermo's operations to the extent required by Plaintiff to facilitate the transition, plaintiff would be in charge of the business operations and that, no later than December 31, 2005, Gardner would cease having any further involvement in Buvermo's operations.

17

- Gardner, individually and on Buvermo's behalf, further represented to plaintiff that plaintiff's employment with Buvermo would continue for a minimum of ten years.

- Gardner, individually and on Fidelio's behalf, further represented to plaintiff that plaintiff would receive payment for his percentage of cash receipts generated from the Sheraton Reston and Twinbrook parcels, from the [Spotswood] Valley Shopping Center and the Reston JBG Deal, and from all other projects initiated by Buvermo on Fidelio's behalf from January 1, 2006 through June 29, 2015.

- Gardner, individually and on Fidelio's behalf, further represented to plaintiff that plaintiff would be afforded the option of investing his own equity in all future projects in an amount equal to 2.5% of the capital invested by Fidelio or its affiliated companies in any such project.

(Amended Complaint ¶¶ 67-70). During his deposition, Plaintiff was not able to identify any other facts that supported his claim for fraud. (Morris Dep. at 327-328).

In Virginia, a plaintiff asserting a cause of action for fraud bears the burden of proving, by clear and convincing evidence, the following elements: (1) a false representation of a material fact; (2) that the representation was made intentionally and knowingly; (3) intent to mislead; (4) reliance by the party misled; and (5) resulting damage to the party misled. Evaluation Research Corp. v. Alequin, 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994); Richmond Metropolitan Authority v. McDevitt Street Bovis, Inc., 256 Va. 553, 557-58, 507 S.E.2d 344, 346-47 (1998). Additionally, in order to recover for fraud, plaintiff's reliance upon the defendant's representations must be reasonable. Metrocall of Delaware, Inc. v. Continental Cellular Corp., 246 Va. 365, 374, 437 S.E.2d 189, 194 (1993); Sneed v. American Bank Stationary Co., 764 F. Supp 65, 68 (W.E. Va. 1991).

In this case, the few allegations pled by Plaintiff simply do not support a cause of action for fraud. As an initial matter, Plaintiff's first allegation regarding Mr. Gardner's alleged representation that he would relinquish his role with Buvermo no later than December 31, 2005 is inconsistent with Plaintiff's offer letter and his own testimony. During his deposition, Plaintiff

admitted that he understood that Mr. Gardner would retain a significant role with Buvermo after December 31, 2005.  (SMF ¶¶ 78-83).  In this regard, Plaintiff understood he was obligated to obtain Mr. Gardner's approval on all projects and that Mr. Gardner would continue to be responsible for signing off on all transactions after December 31, 2005.  (SMF ¶ 78).  Moreover, Plaintiff later learned that Mr. Gardner would continue as an employee of Buvermo for at least three years, and testified that he had no objection to Mr. Gardner's ongoing role.  (SMF ¶¶ 81-83).

The three remaining allegations upon which Plaintiff relies are insufficient to support a claim for fraud.  In this regard, regurgitating the allegations supporting his breach of contract claim, Plaintiff claims that he was falsely promised ten years of employment and a promoted interest in all projects initiated by Buvermo from January 1, 2006 through June 29, 2015.  As established in Section II above, the alleged ten year employment agreement is unenforceable under the statute of frauds and Plaintiff has no contractual right to receive the promoted interests he seeks.  Where, as here, a promise is legally unenforceable, "a plaintiff is unable, *as a matter of law*, to establish that his reliance was reasonable."  Sneed, 764 F. Supp. at 68 (emphasis in original), citing Longnecker v. Ore Sorters (N.A.), Inc., 634 F. Supp. 1077, 1082 (N.D. Ga. 1986).  Plaintiff's inability to establish the reasonableness of his reliance is underscored by the fact that the purported misrepresentations are inconsistent with the terms of his employment set forth in his offer letter, which contains no fixed term of employment or promise of ten years worth of promoted interests.  See e.g. Barrett v. Independent Order of Foresters, 625 F.2d 73 (5th Cir. 1980); Grayson v. American Airlines, Inc., 803 F.2d 1097 (10th Cir. 1986); Kovacs v. Electronic Data Systems Corp., 762 F. Supp. 161 (E.D. Mich. 1990), aff'd. 929 F.2d 701 (6th Cir. 1991); Longnecker, supra.

Plaintiff's fraud claim is also precluded because it is merely a restatement of his breach of contract claim and only seeks damages for economic loss. Virginia follows the "economic loss rule" that prohibits the assertion of tort claims to recover for purely economic loss arising out of contractual relationships. Sensenbrenner v. Rust, Orling & Neale Architects, Inc., 236 Va. 419, 374 S.E.2d 55 (1988). Accord Bowler v. Stewart-Warner Corp., 563 A.2d 344, 355 (D.C. 1989). As set forth in Sensenbrenner,

> The law of torts is well equipped to offer redress for losses suffered by reason of a "breach of some duty imposed by law to protect the broad interests of social policy." [citation omitted]. Tort law is not designed, however, to compensate parties for losses suffered as a result of a breach of duties assumed only by agreement. That type of compensation necessitates an analysis of the damages which were within the contemplation of the parties when framing their agreement. It remains the particular province of the law of contracts.

Sensenbrenner, 236 Va. at 425, 374 S.E. 2d at 58. The Plaintiff in this case alleges nothing more than disappointed economic expectations. "An unfulfilled promise regarding a prospective event, standing alone, does not support a cause of action for fraud." Sneed, 764 F. Supp. at 68. As in Sneed, Plaintiff's fraud claim "is nothing more than an "attempt to dress up a contract claim in a fraud set of clothes." Id. (citation omitted).

### VII. There Is No Evidence That Mr. Gardner Tortiously Interfered With Plaintiff's Employment With Buvermo

In the final count set forth in the Amended Complaint, Plaintiff alleges that Mr. Gardner tortiously interfered with and induced Buvermo to breach Plaintiff's employment contract. (Amended Complaint ¶ 78). According to Plaintiff, Mr. Gardner engaged in wrongdoing by continuing to "interfere" with Buvermo's business operations and by allegedly making misrepresentations to "the Buvermo board" regarding Plaintiff's job performance. (Id.).

20

In Virginia, the requisite elements for a *prima facie* showing of a tortious interference with a contract are: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship; and (4) resultant damage. Duggin v. Adams, 234 Va. 221, 226, 360 S.E.2d 832, 835 (1987); Chaves v. Johnson, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985). When a contract is terminable at-will, however, the standards are more rigid. In this regard, where, as here, the contract at issue is terminable at-will, a plaintiff must also allege and prove as part of his *prima facie* case not only intentional interference, but that the defendant employed "improper methods." Duggin, 234 Va. at 226-27, 360 S.E.2d at 836. Methods of interference that are considered "improper" include "those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common-law rules." Id. Such methods may include "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship." Id.

In this case, Plaintiff's claim for intentional interference with contract cannot be sustained for several fundamental reasons. First, it is undisputed that Mr. Gardner has an ownership interest in Buvermo as a minority stockholder. (SMF ¶ 16). It is also undisputed that following the commencement of Plaintiff's employment, Mr. Gardner remained employed by Buvermo and held a key role with respect to its ongoing operations. (SMF ¶¶ 77-83). In this regard, Mr. Gardner had to approve of any project identified by Plaintiff before it could be proposed to the management committee and was responsible for signing off on all purchase transactions. (SMF ¶¶ 78, 79). Plaintiff's offer letter also clearly contemplates Mr. Gardner

would retain an ongoing and substantive role with Buvermo. (SMF ¶ 62). During his deposition, Plaintiff acknowledged Mr. Gardner's ongoing role with Buvermo. (SMF ¶¶ 78, 79). As an owner/agent of Buvermo, Mr. Gardner is legally incapable of tortiously interfering with Plaintiff's employment agreement with Buvermo. See e.g. Ashco International, Inc. v. Westmore Shopping Center Assoc. et. al., 42 Va. Cir, 427, 1997 WL 1070624 (1997) ("a principal and agent are not separate persons for purposes of a conspiracy or tortious interference action and, likewise, cannot conspire with each other or interfere with their own contractual relationships."); Fox v. Deese, 234 Va. 412, 427, 362 S.E.2d 699, 708 (1987) (same). Accord McManus v. MCI Communications Corp., 748 A.2d 949, 958 (D.C. 2000), cert. denied 531 U.S. 1183 (2001) ("it is axiomatic that an employer cannot interfere with its own contract.")

Further, there is simply no evidence that Mr. Gardner engaged in any conduct that could be construed as improper. With respect to Plaintiff's complaint about Mr. Gardner's continued involvement in the business, as set forth above, Mr. Gardner clearly had an ongoing and substantive role with Buvermo and therefore had a legitimate reason to remain involved with its affairs. Further, after Plaintiff was hired, Mr. Gardner continued to invest his own capital in projects initiated by Buvermo and therefore had an additional reason to remain involved. (SMF ¶¶ 43, 44). Indeed, during his deposition, Plaintiff admitted that he had a fiduciary responsibility to Mr. Gardner by virtue of his status as an investor. (Morris Dep. at 216). Finally, there is no evidence that Mr. Gardner orchestrated or was involved with the decision to terminate Plaintiff. Rather, the decision to terminate Plaintiff was made solely by Mr. Tjaden and Mr. van Rhee following Plaintiff's reprehensible conduct at the dinner meeting held on March 22, 2006. (SMF ¶¶ 103, 105, 106). According to Mr. Tjaden and Mr. van Rhee, Plaintiff was terminated

because his behavior at the dinner meeting led them to conclude that he could not properly fulfill his fiduciary role.  (Id.).

There is no evidence that Mr. Gardner used "improper methods" or even interfered at all with Plaintiff's employment agreement.  As such, Defendants are entitled to summary judgment with respect to Count VII of the Amended Complaint.

## **CONCLUSION**

For the reasons set forth above, Defendants respectfully request that the Court GRANT their Motion for Summary Judgment as to each count set forth in Plaintiff's Amended Complaint, dismiss the Amended Complaint with prejudice and provide Defendants such other and further relief as the Court deems proper.

Respectfully submitted,

SMITH, LEASE & GOLDSTEIN, LLC


By:   /s/ Marc J. Smith
          Marc J. Smith
          D.C. Bar No. 460255
          11 North Washington Street
          Suite 520
          Rockville, Maryland 20850
          Phone: (301) 838-8950

          Counsel for Defendants