# EXHIBIT

# 1

13

1          A     Yes.

2          Q     Mr. Gardner, how long have you been employed by

3     Buvermo?

4          A     Since April 15th, 1985, a little over 21 years.

5          Q     Okay.  And does the same hold true for the

6     employment -- or the positions that you hold in the various

7     entities such as FP -- let's see here -- Fidelio Properties

8     Management, Inc., for instance?

9          A     We formed some of the those entities at later

10    dates.  But since they've been formed, I've been that

11    party, the party whose been in charge.  And I think it was

12    shortly after I joined that I became the -- the acting

13    party for the ones that were in effect at the time.

14               There have been a number of -- you know, for

15    instance, FPEP wasn't formed until 1993, various things

16    like that.

17         Q     Okay.  Was your first sort of role in connection

18    with the Buvermo and related entities to be hired as -- by

19    Buvermo in April of '85?  Is that the first position you

20    held?

21         A     Yeah.  We -- I would have to -- there was a

22    period of transition -- there was a person who had been

23

1    Q    -- okay with you.

2    A    Yeah.

3    Q    Is that how you refer to that entity?

4    A    You know, we -- I just signed -- the name of

5    it -- that's the name.

6         Maybe we should know exactly what the name.  Is

7    it -- Fidelio Property Management, Inc., I think, is right,

8    FPMI.

9    Q    And it's your understanding that FPMI is the

10   managing general partner of Fidelio Properties --

11   A    Yes --

12   Q    -- correct?

13   A    -- yes.

14   Q    And do you recall how long you've served as

15   president for FPMI?

16   A    A substantial period of time.  I don't recall

17   when I actually took on that role.  And we may have changed

18   the managing general partner at some point along the way.

19   But for the last at least 15 years.

20   Q    Okay.  Do you hold any other positions at FPMI,

21   to your knowledge?

22   A    Not at -- I don't believe so, at FPMI.

Morris vs. Buvermo, et al.                                    Deposition of J. Gardner 10/26/06

24

1      Q    Going back to Buvermo, apart from being its
2  president, do you hold any other positions at Buvermo?
3      A    I don't think so.
4      Q    Do you have any ownership interest in Buvermo?
5      A    Yes.
6      Q    What is that ownership interest?
7      A    I think it's approximately 12 percent.
8      Q    So you're a shareholder?
9      A    Yes.
10  (Mr. O'Connor entered the conference room.)
11      Q    Who is the remaining shareholder -- who are the
12  other shareholder of Buvermo?
13      A    The other shareholders are Fidelio Properties.
14      Q    Approximately 88 percent?
15      A    Yes.
16      Q    And are those ownership interests reflected
17  anywhere, such as in a stock certificate?
18      A    Yes, I believe they are.
19      Q    And do you still have those stock certificates?
20      A    I believe so.
21      Q    And have those been -- did you bring those with
22  you today?

26

1   hold any other positions at Buvermo?

2        A    Not at Buvermo.

3        Q    Okay.  What about at Fidelio; do you have any --

4   do you hold any sort of office at Fidelio?

5        A    Not at Fidelio itself.  I'm a member of FPEP,

6   which is a member of Fidelio.

7        Q    How long have you been a member of FPEP?

8        A    Since its formation.  And I believe it was formed

9   around 1993.

10            I'm sorry.  What was the question again?

11       Q    How long have you been a member of FPEP?

12       A    Okay.  Yeah.  Okay.  Yes, since about 1993.

13       Q    I may have said "Fidelio" so --.

14       A    I wasn't sure whether you said that or not.  And

15  I was thinking:  Wait a minute.  I might have answered the

16  wrong question.

17       Q    We're dealing with a lot of entities, so it's --

18       A    Yeah.

19       Q    -- going to happen, so I'll try to do my best.

20            Has your membership interest in FPEP in any way

21  increased or decreased since 1993?

22       A    The membership in FPEP has changed itself, but

27

1    the -- the FPEP -- when you say "membership interest in

2    FPEP," I'm a member of FPEP.  And by virtue of that

3    membership, I have various ownership entities in each of

4    the properties that are designated FPEP properties.

5              And those membership in those properties have

6    changed over time.  You know, each property designates one

7    separately.  There's really no ownership interest in FPEP

8    in general.  It only entitles you to ownership, you know,

9    to a certain percentage interest of those properties.  So

10   it's the property interests that have changed over time.

11        Q    Okay.  So it's not -- is it your understanding

12   that you don't have any fixed membership interest in FPEP?

13        A    What FPEP provides for is FPEP provides for a

14   participation in properties which Fidelio owns.  And the

15   FPEP agreement specifies two things; what percentage --

16   what the ownership interest in this property is on the part

17   of FPEP, and then there's also a specification about what

18   percentage that I own relative -- relative to other members

19   of FPEP.

20        Q    Okay.  I think when we get into that, when we

21   pull out the FPEP agreement --

22        A    That's probably better to do that because it's

Morris vs. Buvermo, et al.                                    Deposition of J. Gardner 10/26/06

28

1   not like a -- you know, I own 20 percent of a company or

2   something like that.  The ownership interest really runs to

3   the properties.

4       Q    I'm sorry.  You're still a member of FPEP today?

5       A    Yes.

6       Q    And did you at any time cease being a member of

7   FPEP and then become a member again or has --

8       A    No.

9       Q    -- it been continuous?

10      A    Continuous.

11      Q    And today -- sitting here today, who are the

12  other members of FPEP?

13      A    There are no other members of FPEP today.  I

14  believe that's true.  The only possible difference is

15  Fidelio acquired an interest of a departing partner.  I

16  don't remember if they acquired that interest -- I don't

17  believe they acquired it by entering FPEP.  I think they

18  just acquired that prior to the ownership being passed to

19  FPEP.  That's what I don't recall.

20      Q    Are you referring to Steve Bonacci?

21      A    Yes.

22           "Bonacci".

Morris vs. Buvermo, et al.                                    Deposition of J. Gardner 10/26/06

29

1      Q      "Bonacci".

2      A      B-o-n-a-c-c-i.

3      Q      What about Fidelio Properties Investments, Inc.?

4      A      Fidelio Properties --

5             MR. SMITH:  What's the question?

6             BY MR. HADDAD:

7      Q      Does Fidelio Properties Investments have a

8  membership interest in FPEP?

9      A      I don't know that.  I'd have to look at the

10  document to see.  I think they may have a small interest.

11     Q      Do you know who the managing member of FPEP is?

12     A      It's -- again, we have all of these corporate

13  entities.  I think it's FP Investments, I believe; but I'd

14  have to check the document to see.

15     Q      Uh-huh.

16            Do you hold any position at FP Investments?

17     A      I believe I do.

18     Q      Okay.

19     A      I believe I'm the president of FPEP Investments

20  as well.

21     Q      Do you know how long you've held that position?

22     A      Since it's inception as well.

30

1          There was one entity I was a vice president of

2   and not a president.  I just don't recall which one that

3   was.  So I'm assuming that when we get there, you'll let me

4   at least look at a list or something to make sure I've

5   given you the right name.

6          Whatever we've given you is the correct name.  I

7   may just be remembering it wrong.

8          I believe I'm president of FP Investments, Inc.

9       Q    You're also the vice president and secretary of

10  Orvan, Inc.; is that correct?

11      A    Yes.

12      Q    How long have you served in those positions?

13      A    I would -- for a long period of time.  I would

14  assume again more than 15 years or however long they've

15  been in existence.

16      Q    Okay.  Do you have any ownership interest in

17  Orvan, Inc.?

18      A    No.

19      Q    You are the president and secretary of Donelux,

20  Inc.; correct?

21      A    Yes.

22      Q    And how long have you shared in those positions?

Morris vs. Buvermo, et al.                                    Deposition of J. Gardner 10/26/06

31

1       A       Same.

2       Q       For about 15 years at least?

3       A       However long they've been in existence.

4       Q       However long?

5       A       Yeah.

6       Q       And do you have any ownership interest --

7       A       No.

8       Q       -- in Donelux?

9       A       No.

10      Q       Just one other thing about depositions:  If you

11  could just wait until I complete the questions --

12      A       Okay.

13      Q       -- even if you know what I'm going to ask.

14      A       Okay.

15      Q       It just makes it a lot easier for the court

16  reporter.

17              Janivo Realty, Inc., you're the president and

18  secretary of that company; correct?

19      A       Yes.

20      Q       Okay.  How long have you served in that capacity?

21      A       Same answer.

22      Q       Okay.  For as long as that company's --

32

1      A    I believe --

2      Q    -- in existence?

3      A    -- so.  I don't recall when I -- when I entered

4  that one.

5      Q    And do you have any ownership interest in Janivo

6  Realty, Inc.?

7      A    No.

8      Q    I believe we discussed Fidelio Partnership

9  Management, Inc., before, or FPMI.  You indicated that you

10 were the president of that company; is that correct?

11     A    Does that say "president" there?

12     Q    That's what your answers to interrogatories

13 indicate; correct?

14     A    Yeah.

15     Q    It further indicates that you are the CEO and

16 secretary of that company?

17     A    Yes.

18     Q    Okay.  And just in case I neglected to ask you

19 earlier, do you have any ownership interest in FPMI?

20     A    No.

21     Q    Apart from Mr. Bonacci, have there been any other

22 members of FPEP since its inception?

33

```
 1      A    No.

 2            Oh, no.  I'm sorry.  That's not correct.

 3  Mr. Chris Zachariasse has been an earlier member.

 4      Q    Do you recall approximately when he ceased being

 5  a member?

 6      A    Probably a year ago or so.

 7            MR. SMITH:  Are we talking about Bonacci or

 8  Zachariasse?

 9            MR. HADDAD:  Zachariasse.

10      A    Yeah, I think it was, like, a year ago.

11            BY MR. HADDAD:

12      Q    And what were the circumstances surrounding his

13  no longer being a member of FPEP?

14      A    He was a member -- he had a prorated interest in

15  the properties, but did not -- was not entitled to a

16  promoted interest.  And that was an agreement that Fidelio

17  had agreed to do with him.  And we felt the easiest way to

18  bring him into that membership was through FPEP.

19            But later we felt it was simpler to go ahead and

20  separate him out and make him a separate -- a separate

21  owner -- have a separate ownership interest in a part of

22  the properties apart from FPEP, so that was done at a
```

34

1    subsequent time.

2       Q    Okay.  Are there any sort of written amendments

3    to the FPEP agreement which would reflect any of this?

4       A    There was a -- as I recall, he did resign from

5    FPEP; and I'm sure he was admitted into FPEP.  I just

6    don't -- I'm sure that had taken place.

7       Q    Are you, by any chance, confusing Mr. Zachariasse

8    with an entity in which he was, I believe, an owner, called

9    VBM?

10      A    I think I am, yes.  I'm sorry.  I think I'm

11   confusing those.

12      Q    So VBM was once a member of FPEP --

13      A    Yes.

14      Q    -- and no longer is --

15      A    And no longer is, yes.  I think that's correct.

16   I -- I was confused.

17      Q    How did Mr. Bonacci acquire his interests in

18   FPEP?

19      A    I'm not sure -- you mean why was he given the

20   interest?  Maybe you could help me.

21      Q    He became a member of FPEP at some point;

22   correct?

35

1        A     Yes.  He and I both became a member of FPEP.

2        Q     Was that also at its inception?

3        A     Yes.

4        Q     And why was he given membership to FPEP?

5        A     He was given membership for the same reason that

6   I was, that the Fidelio partners wanted to provide an

7   ownership incentive to us in addition to our -- our salary

8   compensation.

9        Q     When Mr. Bonacci left the company, what happened

10  to his membership interest?

11       A     Fidelio purchased his membership interest in

12  accordance with the terms of the FPEP agreement.

13       Q     So is Fidelio now a member of FPEP?

14       A     I -- that's what I don't recall.  I don't believe

15  they are.  I believe that what the FPEP agreement provides

16  for is that -- when I say -- I think I misspoke.

17             I think the way the FPEP agreement works is it's

18  the managing member who actually purchases the interest,

19  but the funds are provided from Fidelio.  I think that's

20  what's provided for in the FPEP agreement.

21       Q     Okay.  The management member being FP

22  Investments?

49

1      Q     Okay.  And so why do you -- why do you do these

2  every year, if the term is unspecified?  I mean why not

3  just continue on with your presidency?

4      A     Well, you know, the presidency is at will; and it

5  can go or be terminated at will.  I don't know why we did

6  these every year as opposed to just letting one run on.  I

7  don't know the answer to that.

8      Q     And you've done these once a year since the

9  formation of Buvermo Properties, Inc.?

10     A     I believe, you know, pretty close once a year.

11     Q     Let's just -- generally can you tell me what

12 Buvermo does as a business.  What is the business of

13 Buvermo?

14     A     Yeah.  Buvermo is employed by Fidelio to manage

15 its assets.  And it's involved in finding assets to invest

16 in; it's involved in negotiating the contracts for those

17 assets; it's involved in acquiring and closing on the

18 sales, structuring any of the ventures with any venture

19 partners or people we act with; and then in supervising and

20 directing the efforts to take that asset once owned and

21 take it through to fruition and have it realize its full

22 value as a real estate asset.  So it's involved in that

50

```
 1    whole process on behalf of Fidelio.
 2         Q    Okay.  So Fidelio is actually the one who
 3    actually invests the money?
 4         A    Yes.
 5         Q    Okay.  And Buvermo itself doesn't invest any
 6    money --
 7         A    No.
 8         Q    -- in these -- in these deals; correct?
 9         A    No.
10         Q    And what kind of investments are we talking
11    about?
12         A    The -- the typical investment we do are in
13    commercial real estate properties in the Washington, D.C.,
14    area.  And that ranges anywhere from -- we've done
15    self-storage deals; we've done a resident -- a retail deal.
16    We have done a number of office buildings deals.  We have
17    some hotel -- an interest in a hotel property and want it
18    to be developed.
19              So we have a fairly broad range.  And there are
20    also some residential deals, typically condominiums.  So
21    it's commercial real estate in the Washington, D.C., area;
22    and they're typically done in partnership with a developer
```

51

1    or some other partners.

2        Q    Okay.  And what kind of terms in terms of time

3    frames?  What kind of turnaround do you look for in

4    these -- in these investment typically?

5        A    Typically we would be in the three- to five-year

6    time frame.  But that's ranging anywhere from a year, not

7    too much longer than that.  It depends on the market

8    conditions.

9        Q    Okay.  So how many over the -- you know, on

10   average per year, how many transactions, acquisitions deals

11   does Buvermo --

12       A    Yeah.

13       Q    -- locate on behalf of Buvermo?

14       A    There's really no typical thing.  We try to take

15   advantage of opportunities.  In some years we may do one or

16   two.  I don't remember -- I would say in the most we might

17   have done four or five.

18            But when we talk about deals, it's not just buy a

19   building here or buy a building there.  Many times we have

20   very complex structures and complex acquisitions.

21            Like we might buy a parcel of land and

22   subsequently divide that land, and then we may then partake

52

1    in the vertical development of that land in another

2    venture.   And then we may spin that off into another

3    partnership, for instance; so this one that looks like a

4    deal may end up being seven or eight deals over the course

5    of its entire transaction.   That's not untypical for us.

6         Q    Uh-huh.

7         A    And so we have to be involved all the way along

8    the way in structuring and making sure those deals work and

9    making sure that the property is -- the value is maximized

10   in the property.

11        Q    Okay.  You talked about a three- to five-year

12   turnaround is what you typically look for.  And I believe

13   you also indicated that it ends up being shorter than that;

14   sometimes it ends up being longer.  Is that correct?

15        A    Yes.

16        Q    What's the longest sort of deal that Fidelio has

17   held onto -- investment that it's held onto since you've

18   been at --

19        A    We --

20        Q    -- Buvermo?

21        A    -- purchased a business park -- land for a

22   business park out near Dulles Airport in 1983.  And that

53

1   was a hundred-acre site with a very large number of

2   parcels, and we sold the last parcel there last year.

3       Q    Okay.

4       A    So that's probably in a given location the

5   longest we've been involved.

6            Now, in that particular transaction we probably

7   did fifteen or twenty separate individual transactions as a

8   part of that land ownership.  So I think we might have

9   developed ten or eleven office buildings, each a separate

10  deal.  We sold off sites to three or four restaurants, also

11  separate deals.  And we also sold off sites to, like, four

12  or five hotels.

13           So it was the land ownership that went that long,

14  but in that period of time there may have been ten or

15  fifteen deals that were three- to five-year individual

16  deals within.

17      Q    Okay.  Aside from that particular deal in which

18  you -- the land ownership lasted for an extended period of

19  time, can you give me examples of other lengthy investments

20  that Fidelio was involved in exceeding five years?

21      A    Yeah.  One investment we started in 1986 with the

22  Oliver Carr Company, and it was to have been matured in

54

1   1990.

2           The market went bad, as did Carr, as did the

3   bank, as did everything else in those time (sic).  And we

4   ended up owning that land and carrying that land for

5   another ten years beyond that, not by any desire of

6   ourselves, but because the market shifted on us and we had

7   no choice.  That could well be the next longest asset we

8   have owned, I believe.  I don't recall one we've owned

9   longer than that.

10      Q    But would you say that the majority of the

11  investments are between the three- to five-year time

12  period?

13      A    That's what we try to target, three to five.  But

14  we've -- it's really difficult to project lives in today's

15  marketplace.  We did an office building that we started

16  construction on that we were going to own for three years,

17  and somebody bought our interest six months later.

18      Q    Okay.

19      A    So these things do -- do change quickly.

20      Q    I understand that there are, you know, exceptions

21  to the rule.  But would you say that the general rule has

22  been over the last 20 years that Fidelio has held onto its

55

1    investments between three to five years?

2        A    The reason -- we target that.  We are

3    entrepreneurial investors, and that's the typical time

4    frame for entrepreneurial investors.

5        Q    I understand you target that.

6             Has that actually been what has happened?

7        A    I would only be guessing.  If I took the

8    investments we've done in the last ten years, how many of

9    them fell between three and five and how many were shorter

10   and how many were longer, I don't know how those -- you

11   know, I could figure it out.  But I'm not even sure the

12   majority fell between three to five.

13            It's just such a -- the market's -- you're

14   really -- when I say the objective of three to five, that's

15   totally dependent upon the markets and how the markets

16   respond.

17       Q    Can you give me a range of an amount that Fidelio

18   typically invests in these -- how much equity -- is there a

19   range of equity that it usually contributes?

20       A    There have -- we have contributed -- the lowest

21   amount that we've ever put in investments is probably two

22   hundred thousand.  The biggest amount that we put in an

56

1    investment, depending on how far back you want to go, you

2    know, might be twenty-five or thirty million.

3         Q    Okay.  How about during your time there?

4         A    That's going back through my time.  Yeah.

5    Through the twenty years that I've been involved, the

6    biggest investment we made -- I was trying to think if

7    there was one bigger than twenty-five or thirty.  There

8    probably was one or two bigger than that.

9         Q    That was an investment that Fidelio made in which

10   it invested twenty-five million of its own funds?

11        A    Yeah.  More than twenty-five.

12             For the last ten or fifteen years, I think the

13   most we've done is maybe typically five to seven.  We may

14   have done more than that.  I'd have to remember.  But, you

15   know, one to five to seven is probably more typical.

16             Now, when I say that, that -- when I talk about

17   individual investments, that might be one of those

18   buildings at Dulles Business Park that I mentioned.  It

19   might have a three million dollar investment, but in that

20   park we might have six or seven of those in that park.

21        Q    Now, Fidelio, it's a general partnership;

22   correct?

Morris vs. Buvermo, et al.                                    Deposition of J. Gardner 10/26/06

57

 1        A    Yes.

 2        Q    And it has no officers or directors; is that

 3   right?

 4        A    I believe that's right.

 5        Q    Does it have any employees?

 6        A    No.

 7             MR. HADDAD:   Exhibit 4, please.

 8             (The Fidelio Properties first amendment to fourth

 9              amended and restated partnership agreement was

10              marked Plaintiff's Exhibit No. 4 for

11              identification.)

12             BY MR. HADDAD:

13        Q    Mr. Gardner, you've been handed what's been

14   marked as Exhibit 4 to your deposition.  This appears to be

15   a Fidelio -- a document entitled "Fidelio Properties First

16   Amendment to Fourth Amended and Restated Partnership

17   Agreement".

18        A    Yes.

19        Q    And attached to that four-page document or

20   five-page document is a document titled, "Fourth Amended

21   and Restated Partnership Agreement of Fidelio Properties".

22        A    Yes.

59

1    '93.

2        Q    I've asked you whether it's been in any way

3    amended.  Are you aware of any amendments to this that have

4    changed these partnership percentages?

5        A    The partnership percentages change over time.

6    This is -- this says as of this date this is what they are.

7    We report those in our annual financial statements.  But

8    those are updated.  The financial statements would update

9    that every time.

10       Q    Okay.  So these might have changed, but you're

11   not sure?

12       A    Yeah, I'm -- I'd have to look at the current

13   financial statements to see.  But these might have changed.

14       Q    Are you aware of any other partners of Fidelio

15   Properties, other than the ones identified in the back?

16       A    I'd have to look at the current list to say.  I

17   don't know.

18       Q    Well, take a look at this first amendment to the

19   Fourth Amended and Restated Partnership Agreement, the very

20   front here.

21       A    Okay.

22       Q    It identifies Orvan, Donelux; Janivo; Fidelio

60

1    Properties Management, Inc.; and FPEP --

2          A    Okay.

3          Q    -- as its partners?

4          A    Right.

5          Q    And it's your testimony that this agreement

6    hasn't since been amended; correct?

7          A    I believe that's true, but I don't know -- I'd

8    have to look at the financial statements to see if that's

9    true, it lines up with the current ownership, if that's

10   your question.

11         Q    Just trying to confirm who the partners are.

12         A    Right.

13         Q    Do you have any reason to believe that there are

14   any other partners?

15         A    Not without looking.  You know, I'd have to look

16   and see.  But I believe these are the -- let me just see if

17   I can --.

18   (The witness reviewed document.)

19         A    I believe these are the partners.

20         Q    Okay.  Now, how is the business of Fidelio run?

21   Who manages the business of Fidelio?

22         A    The managing general partner, as provided for in

Morris vs. Buvermo, et al.                                    Deposition of J. Gardner 10/26/06

61

1    the partnership agreement.

2         Q    Okay.  If you take a look at page 6 of the

3    partnership agreement itself, it's marked D-000263.

4         A    Okay.

5         Q    Taking a look at paragraph 4.01, do you see that?

6         A    Yes.

7         Q    Now, this suggests that a management committee

8    consisting of Donelux and Janivo --

9         A    Shall constitute the management committee --

10        Q    Correct.

11        A    -- that's correct.

12        Q    Are you familiar with that management committee?

13        A    Yes.

14        Q    Okay.  And is that how decisions are made on

15   behalf of Fidelio?

16        A    If you read all of 4.1, 4.1 outlines -- or all of

17   4.

18        Q    .01.

19        A    Yeah.

20             But if you read all of 4, it describes how the

21   partnership is managed, particularly 4.03.

22        Q    But I'm just trying to get your understanding as

MDW Court Reporting, Inc.  (703) 591-2341

62

1    to how in practice it's managed.

2        A    In practice it's managed in the way this

3    provides.  What this really provides is there's certain --

4    the management committee delegates certain responsibilities

5    to the managing general partner.  And it withholds -- it

6    also retains the right to approve -- to act on certain

7    other conditions.  And that's the way we manage it.

8            So particularly, for instance, if we were going

9    to sell a property or if I were going to buy a property,

10   the -- the managing general partner can't -- doesn't have

11   the authority to do that without specific approval of the

12   management committee; otherwise, they've delegated general

13   operating responsibilities to the manager, to the general

14   partner.

15       Q    Uh-huh.

16            When you say "managing general partner," you're

17   referring to FPMI; is that correct?

18       A    Yes.

19       Q    And who makes decisions on behalf of FPMI?

20       A    The president of FPMI.

21       Q    That being you?

22       A    Yes.

64

1    Q    Okay.  But there are decisions that are outside

2    the scope of what FPMI can do on its own; and so,

3    therefore, in those situations the decision is taken to a

4    management committee; correct?

5    A    Correct.

6    Q    And that consists of Janivo and Donelux; correct?

7    A    Yes.

8    Q    And the representatives Janivo and Donelux are

9    Mr. van Rhee and Mr. Tjaden; correct?

10   A    Yes.

11   Q    Paragraph 4.10(1)a refers to a designated

12   representative.

13   (The witness reviewed document.)

14   A    Yes.

15   Q    Okay.  Do you have any understanding of what that

16   is?

17   A    Yes.

18   Q    Okay.  And is there a designated representative?

19   A    The designated representative for Donelux is

20   Mr. van Rhee and for Janivo is Mr. Tjaden.

21   Q    I see.

22        And are you a designated representative for any

77

1     A    Yeah.

2         And he's, you know, a careful attorney; so I'm

3  assuming this was done properly.  He's out of New York.

4     Q    Turning to the LLC agreement of the operating

5  agreement of FPEP, LLC, the first page identifies --

6  identifies you; Mr. Bonacci; VBM-USA; and FP Investments,

7  Inc., as its members.  Do you see that?

8     A    Yes.

9     Q    And are you aware of any documents, other than

10  the operating agreement, which confirms their participation

11  as members in this LLC?

12     A    I don't know.  I'm not sure -- you know, I just

13  don't know.

14     Q    And the LLC agreement that we're looking at right

15  now, this operating agreement, has it ever been amended?

16     A    Not to my knowledge.

17     Q    You would know if it was, though; right?

18     A    I would think so.

19     Q    In fact, if it were to be amended, you would

20  probably be in charge of taking care of that; correct?

21     A    I think so.

22     Q    You think so?

87

1    thinking about how I should change it.  We would get

2    started on it; then we'd start it, start it, stop.

3           There was really no time pressure because we had

4    not acquired any properties in that intervening time, so we

5    really didn't feel a real sense of urgency, but we thought

6    it did need to be done.  We really worked on it probably

7    that whole year in various -- you know, in bits and pieces.

8       Q    Did you ever provide Mr. Morris with a proposed

9    draft of the FPEP agreement?

10      A    I -- you know, I sent him drafts of things we

11   did; and I tried --

12      Q    Of the FPEP operating agreement?

13      A    Yeah, some of the thoughts.

14          And I sat down and went over the FPEP agreement

15   with him.  The FPEP agreement was, you know, pretty much --

16   it stands in -- we're not making many changes to this.  The

17   main changes we were making was to Section 3.03 of the

18   Fidelio agreement and the designation itself.  Those were

19   the two documents that we were changing.

20          This really had no substantive -- we didn't

21   contemplate any substantive changes, other than to do the

22   cleanups on things like this.

89

1      Q      -- which designates the members and the

2   membership percentage?

3      A      Right.

4             At the time that was written, it was thought --

5   that would have been a constant.  In practice that changes

6   property by property.  We pick up that change now in the

7   designation, so we really would intend to remove this and

8   refer to the designation instead.  That kind of change is

9   always contemplated.

10     Q      I see.

11            What was the intention in terms of who would

12  remain a member of the FPEP agreement after Mr. Morris's

13  hiring?

14     A      The intention after Mr. Morris's hiring is that

15  he and I would be the FPEP members.

16     Q      Okay.  And would FP Investments, Inc., remain --

17     A      Yeah.  I'm sorry.  FP Investments would have

18  remained as well.

19     Q      As the managing member?

20     A      Yes.

21     Q      Okay.  And why did you think it was important for

22  you to remain a member of FPEP?

Morris vs. Buvermo, et al.                    Deposition of J. Gardner 10/26/06

90

1      A      Because I was continuing in my ownership interest
2  in the properties.
3      Q      Okay.  Ownership interest in properties that had
4  already been --
5      A      Plus new property as well.  I would have an -- I
6  would have an interest in new properties that were to be
7  acquired.
8      Q      Okay.  Would that be a promote interest, or would
9  that only be a capital contribution --
10      A      It would --
11      Q      -- interest?
12      A      -- have been only been a capital contribution
13  interest, but it would have been through FPEP.
14      Q      I see.
15      A      So we would have -- FPEP provides for both the
16  capital ownership interest and also a promote interest.
17  And I would have given up my promote interest, but retained
18  my capital contribution interest.
19      Q      Okay.  And these membership percentages here,
20  they are important because that relates to the breakdown of
21  the promote interest --
22      A      That's correct.

91

1      Q      -- right?

2             It doesn't relate to capital contributions --

3      A      That's correct.

4      Q      -- correct?

5      A      There's a separate part that relates to capital

6  contribution that we never -- this had a -- I'm not sure

7  whether this referred to the capital contributions.

8  (The witness reviewed document.)

9      A      I'd have to look and see.  It may not even refer

10  to capital contributions.

11     Q      Well --

12     A      That may have been done --

13     Q      -- if you refer to page 5 --

14  (Proceedings participants speaking at the same time.)

15     A      I'm sorry.

16     Q      Take a look at --

17     A      Again, that was the reference to capital

18  contribution.  The detailed description is only in -- in

19  the Fidelio agreement.

20     Q      But the capital contributions are made through

21  FPEP; correct?

22     A      That's correct.

98

1    amend the operating agreement at the time that

2    Mr. Morris – --

3         A    The --

4         Q    -- commenced his employment?

5         A    Yeah.

6              This was important was because we were switching

7    ownership on the day -- existing ownership assets from one

8    place to another.  There were really no properties which

9    would have been involved when Mr. Morris arrived, and so we

10   didn't feel that it was necessary -- there was no sense of

11   urgency.  Here there was a sense of urgency because we were

12   transferring physical properties.  Here there didn't seem

13   to be that sense of urgency.

14        Q    Okay.  And when you say "we," who are you

15   referring to?

16        A    "We" -- the royal "we".  I didn't think there was

17   a sense of urgency.

18             And Mr. Morris didn't press either.  Neither he

19   nor I felt that -- my impression was neither he nor I felt

20   there was a sense of urgency because there was no immediate

21   properties that would have fallen into this category.

22        Q    You hadn't provided Mr. Morris with a copy of the

99

```
 1   FPEP operating agreement prior to his hiring; correct?

 2        A    I don't believe I provided him a copy, but I went

 3   over the terms and described how the FPEP agreement worked.

 4        Q    Okay.  You went over it in terms with him in

 5   person?

 6        A    I -- yeah.  I think we -- he and I talked about

 7   in general the concept of FPEP and how it worked.

 8        Q    But you didn't have with you --

 9        A    No.

10        Q    -- when you were talking with him --

11        A    No, I --

12        Q    Let me --

13        A    I'm sorry.

14        Q    You didn't have with you at the time a copy of

15   the FPEP agreement; correct?

16        A    No -- that is correct.

17        Q    So Mr. Morris had not reviewed the FPEP agreement

18   prior to his hiring by Buvermo; correct?

19        A    I think that's correct.

20        Q    And it was you that suggested that the --

21   suggested to Mr. Morris, if I'm not mistaken, that there

22   wasn't -- that there was a lack of urgency in amending it
```

100

1    at that time; correct?

2        A    I think both of -- my understanding of that was

3    that both of us agreed.  I -- I didn't feel there was a

4    sense of urgency, and Jonathan didn't raise a sense of

5    urgency, and that seemed logical to me because there were

6    really no properties that were involved.

7        Q    Okay.  And you had explained to him -- and had

8    you explained to him that it wasn't urgent because there

9    were no properties involved?

10       A    I believe -- I believe that was what was said.  I

11   don't recall that specifically, but I'm sure that that's

12   what I would have said.

13       Q    You indicated that you did some reworking of this

14   agreement during Mr. Morris's employment?

15           MR. SMITH:  You're referring to the operating

16   agreement?

17           MR. HADDAD:  Correct.  I'm talking about the

18   operating agreement.

19       A    No.  What I -- the thing that I did some

20   reworking was the paragraph 303 out of the Fidelio

21   Properties agreement and the property designations.  I

22   really did no reworking on the -- on the operating

Morris vs. Buvermo, et al.                                    Deposition of J. Gardner 10/26/06

101

1      agreement itself, the FPEP operating agreement itself.

2             BY MR. HADDAD:

3      Q     I see.

4             But it was your intention to do some reworking on

5      the operating agreement itself; correct?

6      A     No.  The thought was that the changes that needed

7      to be made were really in 303 and in the property

8      designation.

9             The operating agreement itself really was the

10     substance of the deal.  The only changes we -- would have

11     made there would have been these -- these cosmetic changes

12     or changes otherwise that would conform to 303; like, for

13     instance, as I mentioned, about the operating agreement --

14     Exhibit 7, I guess it is and that page 6 -- just conforming

15     the changes of the membership percentage to be consistent

16     with current practice.

17     Q     So you would --

18     A     Those were the only changes we were really

19     thinking of.

20     Q     Okay.  So you were thinking of no changes, but

21     you didn't begin to make any of those changes?

22     A     I didn't begin to make those.

117

1    those --

2         A     That's what I don't recall.  There may not have

3    been.  I don't -- I don't remember.  You'll just have to --

4    I'll have to refresh my memory.

5              Probably there was not.

6         Q     Why do you say that?

7         A     Because of the way the FPEP agreement works.  The

8    way the FPEP agreement works is there's a clause in the

9    operating agreement itself that provides that if a party

10   is -- employment is terminated, that the -- either party

11   can cause the property to be valued and then their interest

12   bought out in the value at that time.

13             And the way that works -- the way the clause is

14   designed to work, it's the value of property at any given

15   time.  And if we've just purchased a property, there is --

16   in order to have a promote, you have to have an increase in

17   value above the capital that had been invested in the

18   property.

19             And since we're just buying the property now,

20   we're buying it at market value, there is no increase in

21   value.  So you really don't need a vesting provision there;

22   it's automatically put into the deal.

129

1      A     No, not because of my age; just to encourage me

2   to retire.  Yeah, I resisted the fact that they needed to

3   bring in somebody else because I thought I was perfectly

4   capable and had performed very well for them, both of which

5   they didn't disagree with.

6      Q     Uh-huh.

7            But it was -- I mean that's why they were asking

8   you to retire, correct, your age?

9      A     The thing they were asking me to do is they

10  wanted someone who they could see take it for the next very

11  long period of time.

12     Q     They wanted to bring somebody on who would take

13  control of the company for several years to come?

14     A     And what they wanted is someone who -- you know,

15  they planned on if -- if the circumstances were correct and

16  if the markets would support new investments, they were

17  going to tell someone that we intend to be here a long

18  time; and in turn they would like someone who also as

19  circumstances were -- were correct, if the person worked

20  out and if things continued on, that they were in a

21  position to be there a long time as well.

22           And I think those were -- were the way (sic) they

Morris vs. Buvermo, et al.                                    Deposition of J. Gardner 10/26/06

131

1              MR. SMITH:  Asked and answered.

2        A    I do.  I like -- I like this program that we're

3   following.

4              BY MR. HADDAD:

5        Q    So when do you intend to formally step down?

6        A    I am now working no more than half-time, and my

7   salary has also been reduced accordingly.

8              That was, by the way, initially effective as of

9   year end '06.  But I had to come back in full-time until we

10  replaced -- until we hired a new -- another person.

11       Q    What was your intention prior to hiring

12  Mr. Morris with respect to what your continued role would

13  be at Buvermo?

14       A    My expectation was that I would transition into a

15  role as advisor, I would continue to work on a part-time

16  basis in that capacity, and that I would also continue as a

17  pro rata investor.

18       Q    And when would you be transitioning into the role

19  of advisor?

20       A    It was to occur over a period of time.  Initially

21  it was starting from the point that would -- when we hired

22  Jonathan initially, the plan was that I was to work

135

1          And this role that you would have played, that

2    you contemplated playing as sort of a consultant to

3    Jonathan, as somebody who helped him through --

4          A     Right.

5          Q     -- his -- this, I guess, so-called transition

6    period, I mean is that what you envisioned being an advisor

7    was?

8          A     Yeah.

9          Let me amplify or help -- maybe help you

10   understand that.

11         The -- the -- there are two important elements,

12   as I see, of the job.  One -- and this is one that is very

13   critical to our job -- is that the person who runs that job

14   plays the role of fiduciary.  That's the most important

15   role that they play.

16         And the reason that's important is our Dutch guys

17   are 3,000 miles away.  They have a substantial amount of

18   money invested in U.S. assets.  And the way our business

19   model works is that the -- Fidelio itself acts as if it has

20   local market knowledge and that money is locally based

21   because we can act quickly, we know the markets, we can

22   respond quickly in real estate.

136

1            And the only way the Dutch guys are comfortable

2    enough in giving up that kind of power to this local

3    arrangement is if they have absolute confidence that that

4    guy acts every time in their best interests, which is the

5    definition of a fiduciary.

6            So it's very important they believe if there's a

7    conflict, the person here will act in the Fidelio's best

8    interests, even against his own.  That's at the heart of

9    the operations.  And that takes a lot of trust and a lot of

10   understanding.

11           The way we've worked in the past, in addition to

12   that level of confidence is there's been a second party,

13   in -- in the prior years, Mr. Zachariasse, who also acts as

14   an advisor, gets involved and in effect gives a second

15   opinion about things of value.

16           And it's very important that those two parties

17   act very closely together and act with unanimity because

18   the Dutch guys, first off, they depend on trusting this

19   guy's judgment and they next depend on these two people

20   working together, working out differences, coming to a

21   common conclusion in order for them to feel comfortable

22   that their money is being properly spent.

137

1          And so we're -- what we're doing is trying to

2     replicate that in the future --

3          Q     Uh-huh.

4          A     -- which means it's very important for me to work

5     with Jonathan, or whoever's in that role, in helping --

6     first off, making sure that they understand that role, they

7     play that properly, and give my feedback; and that people

8     feel comfortable that's happening; and that we work closely

9     together; and then we continue on working closely together

10    at each investment we do.

11         So that's at the heart of the company.   That's

12    what makes it work, and that's why we've been successful.

13         Q     Uh-huh.

14         A     And so my role is to build those kinds of, you

15    know, relationships with Jonathan; help him build those

16    relations with our guys; and make sure that that, in fact,

17    is what's happening; and then tailing that principal role

18    off and -- and then having it perform this -- this sort of

19    advisor role where there's trust built up between the two

20    of us and act together.   And then our guys see that trust

21    and also have that trust that the person's acting as a

22    fiduciary.

161

1   done them in the past or in understanding the deals as they

2   were taking place.  And these were deals that had to be

3   closed.

4           And the agreement was with Jonathan that I would

5   continue with the existing portfolio, a lot of which we

6   were selling.  And it would not make sense to have him

7   involved in those in any case.

8       Q    Uh-huh.

9       A    But I was hoping that he would have played a lot

10  stronger role in understanding the operations,

11  understanding the existing business, and in helping to run

12  that business.  It is an operating business.

13          And, frankly, I don't think he did that very

14  well; and it was of concern because we were having things

15  that weren't -- weren't getting done.

16      Q    I'm a bit confused because I thought that you

17  just indicated that as part of your full-time position

18  there, it was your job to maintain the existing sort of

19  operations, the existing deals.

20      A    That was the agreement we made.  There were a

21  number of deals that we had that were being sold.  And the

22  selling would take place about by year end, and so I was

162

1    conducting those sales operations.  We both agreed that was

2    the thing --

3        Q    Uh-huh.

4        A    -- that was proper for me to do that and have

5    Jonathan not involved with those.

6        Q    And so why is it that you -- I mean is that what

7    you're referring to with Jonathan not getting involved in

8    that, that concerned you?

9        A    Well, there were, you know, understanding the

10   business and how it operated.  You know, we have a long

11   history of the business; and Jonathan seemed to have very

12   little interest in understanding how we had done things in

13   the past.

14       Q    Well, how do you know what he understood and

15   didn't understand?

16           MR. SMITH:  I think you're not giving John enough

17   time the get his full answer out.

18           Were you done?

19           Can we read back that last question and his

20   answer?  If he's done, he's done.  I just thought he wasn't

21   done.

22   (The record was read by the court reporter.)

Morris vs. Buvermo, et al.                        Deposition of J. Gardner 10/26/06

163

1        A       There were other aspects of the business that I

2   was concerned whether Jonathan was getting deeply involved

3   in as well.

4                BY MR. HADDAD:

5        Q       Okay.  What were those?

6        A       The -- a lot of the financial reporting aspects

7   of the business.

8        Q       Okay.  And what discussions did you have with

9   Jonathan about that?

10       A       Well, we were -- in preparing the board package,

11  I was trying to get Jonathan a lot more involved in

12  understanding the finances, where they came from, how they

13  came about; and he seemed reluctant to want to do that.

14       Q       Okay.  Well, what did he say, "I don't want to

15  look at these"?

16       A       Yeah.  Or, you know, didn't seem to, you know,

17  want to pay attention to them.

18       Q       Well, what did he do exactly?

19       A       He, you know, just resisted.

20       Q       So he refused to look at what you were showing

21  him?

22       A       He was reluctant to look at it.  If he did, it

164

1    was on some sort of cursory basis, in my view.

2              MR. HADDAD:  Mark this as Exhibit 10, please.

3              (The memorandum dated 9/19/05 was marked

4               Plaintiff's Exhibit No. 10 for identification.)

5              BY MR. HADDAD:

6        Q    Mr. Gardner, you've been handed what's been

7    marked as Exhibit 10.  It's a memo you prepared to

8    Mr. Tjaden on September 19th, 2005.

9              Do you recognize this document?

10   (The witness reviewed document.)

11       A    Yes.

12       Q    And why did you prepare the document?

13       A    To make sure that there was a good understanding

14   between Joost and myself as to what our -- my future

15   arrangement was between he and I going forward and then

16   later for us to make sure that this is -- if he and I

17   agreed, that this would -- we would put this in place.  You

18   know, he would have Andre agree; and -- and, you know, this

19   would be the way we would go forward.

20       Q    Why did this -- who requested this?  Did

21   Mr. Tjaden request this?

22       A    I think he and I both talked about writing

180

```
 1       Q     -- Reston --

 2       A     No.

 3             I have -- I've invested capital --

 4       Q     You need to let me finish.

 5       A     I'm sorry.

 6             THE COURT REPORTER:  Please.

 7             BY MR. HADDAD:

 8       Q     You don't have an FPEP promote in Spotswood or

 9   Reston?

10       A     That is correct.

11       Q     Okay.  Go ahead.

12       A     There are -- in that new Reston deal -- I have my

13   old FPEP promotes in the old Reston deals.  But in the new

14   Reston, which is the Reston International Center --

15       Q     Correct.

16       A     -- which is the one we're talking about --

17       Q     Uh-huh.

18       A     -- I don't have a promote in that or Spotswood.

19       Q     But you've invested -- you've made a capital

20   contribution to both these deals?

21       A     The 2 and a half percent capital contribution,

22   yes.
```

181

1      Q      And it's your understanding that you have to

2   invest an amount equal to 2 and a half percent or up to 2

3   and a half percent?

4      A      The agreement -- my understanding of the

5   agreement is that I can elect up to 2 and a half percent.

6   If I choose a lower amount than 2 and a half percent, then

7   that lower amount would then apply also to any additional

8   deals.

9      Q      I see.

10         So is that what "on a nonselective basis" means?

11      A      That's correct.  What it means is you can't

12   cherry-pick.  I can't say, "I like that deal, and I want to

13   invest in that; but I don't like this deal, and I don't

14   want to invest in that."

15      Q      What if you -- what if a great deal comes along,

16   say, Reston International Center.  Let's assume it's a

17   great deal; and you do, in fact, invest 2.5 percent.

18         Does that mean that for every deal from that

19   point forward you have to invest 2.5 percent?

20      A      No.  What it means is I have the option in

21   each -- in a future deal.  But if I chose in the next deal

22   to do 2, then every deal thereafter I could -- I would have

197

1    nonguarantee with --

2         A    Mr. Morris --

3         Q    -- with Buvermo?

4         A    Yeah.  My understanding of the deal with

5    Mr. Morris was in his offer letter, and I think it --

6    that -- that captures it.

7              If you want to talk about that, I would -- I

8    would prefer to have that in front of me when we talk about

9    it.

10        Q    I'm not talking about that.

11             I'm just talking about:  Was there a discussion

12   between you and Mr. Morris regarding a non- -- what you

13   considered to be a nonbinding term of employment?

14        A    No.

15        Q    Okay.

16        A    There was no agreement on -- there was no comment

17   on term.  I read the term as at-will.

18        Q    Okay.  And no discussion whatsoever regarding

19   duration, of how long you'd want him around?

20        A    No discussion at all in terms -- in those terms,

21   no.  There was an at-will -- this is the deal; this is the

22   salary; these are the other terms.  But the -- but the term

198

1    was an at-will contract, not -- without any -- any term.

2         Q    Yet you envisioned all throughout that you wanted

3    somebody to be around for a certain time period of time at

4    least?

5         A    Right.

6         Q    So I would imagine that those discussions came up

7    somehow with Mr. Morris.

8         A    But not in terms of a contract.  The contract

9    was:  This is the salary; this -- and we'll have no

10   contract.  You can have discussions about intent.  But when

11   you say, "This is what we're going to agree to," what we

12   agreed to was a (sic) at-will contract.

13        Q    And your -- fine.

14             But let's get into your discussions about intent.

15             Your discussions about intent were:  We intend to

16   have somebody around for -- we intend to be around for 10

17   to 20 years, and we would like to have somebody who intends

18   to stay with us for 10 to 20 years?

19        A    But, remember, this --

20        Q    I'm just asking is that the -- is that the kind

21   of discussion --

22        A    I'm not even sure I had the discussion with

208

1     Q     But you would have liked to have seen him --

2     A     Well, I don't know.  I had some of the same --

3     Q     Sir, you have to let me finish my question.

4     A     I -- yeah.

5     Q     And I'm sorry to cut you off.

6     A     No, no.  I -- I --

7     Q     You would have liked to have seen him succeed you

8     as the president of the company; isn't that right?

9     A     Not necessarily.  No.  I think that some of the

10    concerns that the Fidelio partners had were concerns that I

11    shared.  And I think that I was pleased for both Fidelio

12    and for Mr. Bonacci.  And I -- and for JBG I think that was

13    a very good fit; so I was very pleased with the outcome of

14    that.

15    Q     Okay.  Your interviews -- how many interviews did

16    you have with Mr. Morris?

17    A     Whew.  Five or six.  I don't remember.

18    Q     Okay.  Where did they occur?

19    A     All -- almost all either in -- in the D.C. area,

20    either at -- a lot of times at the -- at the hotel where

21    his residence is, the --

22    Q     The Ritz-Carlton?

211

1  was anything that -- that was materially different along

2  the way.  There might have been, but I don't recall it.

3       Q    Okay.  Do you recall having any discussions with

4  him about what the promote percentage was that he'd be

5  entitled to?

6       A    Whew.  I think I might have.  And I think that

7  generally what I said is what's written in the offer

8  letter, that he would have the same promote that I was

9  entitled to.

10      Q    Okay.  And at that time what was your

11  understanding as to what promote percentage you were

12  entitled to?

13      A    I think at that time I was entitled to 13

14  percent.

15      Q    Okay.  And why do you think that?

16      A    Because that's what it is.

17      Q    Do you recall ever mentioning to -- do you recall

18  ever telling Mr. Morris that your promote percentage was

19  actually 15.5 percent?

20      A    No.

21      Q    Okay.  And you handed me a document today -- or

22  your attorney handed me a document today indicating that

Morris vs. Buvermo, et al.                                    Deposition of J. Gardner 10/26/06

212

1    the FPEP sharing ratio shall remain at 15.5 percent.

2        A    Yes.

3        Q    Okay.  And so that's what -- the percentage that

4    would be paid to -- of what's remaining after the equity

5    investors such as Fidelio was paid --

6        A    Right.

7        Q    -- its capital investment plus gets its IRR.

8    FPEP would get 15.5 percent of what's remaining?

9        A    That's what that document says.

10       Q    Okay.  And this was as of February 6th of 2002?

11       A    Yes.

12            Could I see the document?

13       Q    Sure.  Let me make a copy.

14   (Whereupon, a brief recess was taken.)

15            MR. HADDAD:  Can we mark this as Exhibit 12.

16            (The FPEP promote structure revision document was

17             marked Plaintiff's Exhibit No. 12 for

18             identification.)

19            BY MR. HADDAD:

20       Q    This is a document that was provided to me today.

21   It's titled, "Proposed Revision to FPEP Promote Structure

22   for Future Projects."

228

```
 1    other capital providers will be reduced from 12 percent to

 2    10 percent to reflect current market conditions,"

 3    et cetera.

 4              It doesn't tell me what that FPEP promote is, but

 5    I believe we've just discussed you felt it was 13 percent.

 6    Correct?

 7         A    That's right.

 8         Q    And nor does it tell me sort of how that -- how

 9    that comes about.

10         A    You mean how the promote works?

11         Q    Well, I would like to know from you what

12    discussions you had with Jonathan Morris, explaining how

13    the promote works --

14         A    Okay.

15         Q    -- prior to his execution of this agreement.

16         A    Okay.  I can do that.

17              What I did -- and typically, you know, we would

18    go through a typical deal; and -- and I would describe it

19    for Jonathan that -- you know, what we would do.

20              And many times -- you know, we actually have a

21    computer program that -- that does this that is -- what we

22    do is in order to explain it, we take a property and we
```

229

1    project out both -- there are -- there are two levels of

2    the profit, and you project out how the property will

3    perform.

4                And then typically in our ventures with a

5    development partner, the development partner removes a --

6    he has a certain promote level.

7                And what -- what happens is we make an investment

8    in the property, and that investment accrues at a preferred

9    rate.  And we have a schedule.  So if it's a 10-percent

10   preferred rate and we've made a million-dollar investment,

11   then the sum of the initial investment and the preferred

12   would that next year be 110 if we'd received no cash flows.

13   The next year, it would be 121, because we're compounding

14   110 at 10 percent, all the way out until we receive cash.

15          Q     Uh-huh.

16          A     And then any cash we receive would tend to offset

17   that preferred balance.  And you continue to receive cash

18   until that return of capital and any cumulative preferred

19   has gone to zero.

20                And then any amount in excess of that would be

21   the amount available subject to the preferred.  And if

22   there was a 13-percent share of that, then you take 13

230

1    percent of that number; and that would be the preferred

2    that that party would be entitled to.

3         And generally I would explain it just in those

4    terms.  And typically I would say if there's a 15 and a

5    half percent that had gone totally to Fidelio, 13 and a

6    half -- 13 percent would go to me and 2 and a half would go

7    to this entity that bought out Mr. Bonacci's interest.

8    That's generally the way we would -- we would keep score on

9    those.  And that would represent the preferred interest.

10        And that's basically the way -- typically I would

11   do it with an actual, you know, pro forma in hand, but

12   explain it in those terms.

13        Q    And at what point did you advise Mr. Morris that

14   he would not be entitled to his promote in the event he was

15   terminated before a deal was closed?

16        A    Generally when I describe the Fidelio agreement,

17   I go through both how it works in a base case, you know,

18   how those preferreds work and all of those.  And then I

19   talk particularly -- since -- since it really -- it

20   really -- this is what I would call the fiduciary part of

21   the deal.  I would go through -- and, in fact, it's -- it's

22   an advantage in many cases, and I'll explain that in a

Morris vs. Buvermo, et al.                    Deposition of J. Gardner 10/26/06

231

1    minute.

2            But I typically go through the fact that two

3    things happen.  One is not only do you calculate each

4    property, but there is also an offset provision.  So in the

5    event a property that we'd owned never made that hurdle

6    rate and there was a shortfall, then that shortfall is

7    offset by the profit from the next deal.  So it's really a

8    cumulative thing.  And I explain that because that's an

9    important part of the feature.

10            And then, lastly, I explain the -- the put-call

11    provisions; that there is -- if a -- if a party leaves,

12    then within a certain time after their leaving, either the

13    general partner can require a purchase of the entire

14    interest or a departing partner can require to be bought

15    out.

16            And the price that they're bought out at is the

17    market value of that property as if sold at that current

18    state at that time and then that value run through all of

19    the -- what we call waterfalls, all of the calculations of

20    the promote.  And whatever promote you'd be entitled to at

21    the end, that would be what you get.  And you would add up

22    those and net them against any losses, and that's how you

232

1    -- how you would -- would be settled up.

2        And that -- that's a strength in many ways

3    because what it does is it gives a party such as myself the

4    ability to liquify an unliquid investment because Fidelio

5    is guaranteed to buy and I'm guaranteed to be -- so in a

6    sense, that's an advantage.  In a sense it's a disadvantage

7    because Fidelio has on it the other side.

8        And I thought I was fair on both parties.  It's

9    really a fair clause on both parties' side (sic) because

10   both parties get the option to exercise this.

11       And generally that's the way I explain the FPEP

12   agreement to people when I talk to them.

13   Q    Uh-huh.  And --

14   A    So I tell them both the offsetting provisions and

15   also the put-call provisions.

16   Q    Okay.  And when exactly do you recall telling

17   Jonathan Morris about that?

18   A    I -- you know, I can't recall a specific

19   conversation; but that's generally a conversation early on

20   when I have a discussion with people.

21   Q    I'm hearing that that's generally a conversation.

22   But it sounds to me you don't recall having that specific

250

1    A    Right.

2    Q    I'm trying to find out what additional conditions

3  you believe needed to be satisfied in order for him to

4  be --

5    A    Okay.  I think the condition that needs to be

6  satisfied is it has to be designated as an FPEP property

7  prior to termination.

8    Q    Okay.

9    A    However, I believe our guys have been willing to

10 say that we would -- we would not treat it that way; we

11 would treat it as if it had been executed earlier for this

12 purpose.

13    Q    You guys are willing to do that for Mr. Morris,

14 is what you're saying?

15    A    Yes.

16    Q    Okay.

17    A    For -- for purposes of -- of dealing -- we're --

18 we're saying that:  Yeah, if we intended to do it, then

19 let's treat it as if we have done it.  Even though that's

20 not the way -- that's not the way the rules say, we would

21 treat it that way.

22    Q    Okay.  And I think we've established that you did

255

```
 1    properties have to be designated as FPEP properties, that

 2    condition's going to be satisfied sooner --

 3        A    Correct.

 4        Q    -- sooner than later; correct?

 5        A    It would; that's correct.

 6        Q    All right.  Now, the only thing that may not be

 7    satisfied is -- this additional condition that you've

 8    discussed is that it needs to be satisfied -- it needs to

 9    be designated an FPEP property prior to termination?

10        A    Yeah.  You have to be an employee in order to be

11    entitled to the benefit.

12        Q    Okay.  Where does it say that?

13        A    Well, what it does -- it says is that if you're

14    not an employee, you aren't entitled.  You -- you --

15        Q    What's "it"?

16             MR. SMITH:  Hold on.  Hold on.  You're

17    interrupting the answer.

18        A    The -- the FPEP agreement provides that the --

19    Fidelio has the right to terminate if you're not an

20    employee.

21             Now, I'm inferring from that that you would have

22    to be an employee to be entitled.  I guess that's
```

Morris vs. Buvermo, et al.                              Deposition of J. Gardner 10/26/06

256

1   probably -- they -- I guess they could -- they could ask --

2   they could name you an FPEP, you know, designee, I guess.

3   I don't know.  I guess they're not -- that they have the

4   right to do that.

5           But the practice by far has been that that

6   benefit is only for employees.  That's the practice.

7           BY MR. HADDAD:

8       Q    Okay.  Now you're referring to the FPEP operating

9   agreement?

10      A    Yes.

11      Q    Okay.  And this is the FPEP operating agreement

12  that you intended to amend but did not?

13          MR. SMITH:  Say that again.

14          BY MR. HADDAD:

15      Q    This is the FPEP operating agreement that you

16  intended to amend but did not?

17      A    This is the operating agreement that we did not

18  intend to amend, except as necessary to conform to the

19  other changes we made.

20      Q    So you intended to amendment it?

21          MR. SMITH:  It's been asked and answered.  You

22  didn't get the response you wanted, but he responded to

263

1       Q    Okay.

2       A    -- after the 12 to 10.

3       Q    All right.  Anything else that you recall?

4       A    Yeah.  I had been assuming all along that this

5    was governed by the FPEP agreement, and I did add this last

6    item from an earlier draft to make sure that it was clear

7    that the -- all items were governed by the FPEP

8    agreement --

9       Q    Uh-huh.

10      A    -- because that's an important thing.

11           And I think somebody -- either I remembered or

12   somebody reminded me, you know:  Let's not assume this.

13   Let's make sure that everybody fully understands that

14   that's the case.

15      Q    Okay.  Are you done?

16      A    Yeah.

17           By the way, there was -- you know, when you asked

18   about the conditions, there was a condition included that I

19   forgot to -- you know, we actually have to own the

20   property.  You know, it -- it's not an FPEP property if we

21   don't own it; so we actually have to acquire the property.

22      Q    Own the property.

Morris vs. Buvermo, et al.                    Deposition of J. Gardner 10/26/06

269

1     to a two-year vesting period.

2          A    Yes.

3          Q    And what did you intend that to mean?

4          A    What we intended it to mean is that if Mr. Morris

5     was not employed within -- if he was no longer employed

6     prior to the end of that two-year period, that those

7     properties would -- he would not be entitled to an interest

8     in those properties.  He would have to be employed for a

9     period of two years or longer for that interest to -- for

10    him to be entitled to that interest.

11         Q    Okay.  And do you recall having a specific

12    discussion with Mr. Morris as to the meaning of that

13    two-year vesting period?

14         A    I think the discussion that I had with Mr. Morris

15    is that those were properties that we had acquired some

16    time ago; and because of the passage of time and their

17    increase in value, there was at the time a promoted

18    interest that was associated with them.

19              But any properties that we acquired at a given

20    point, we would have bought them for market value.  And the

21    value would have been the price we paid, so there would

22    have been no promoted interest there.

270

1            And you automatically get a vesting -- you know,

2    the FPEP deal is basically a vesting -- a self-vesting

3    deal.  So anytime you acquire a property, the value is zero

4    when you acquire it, by definition, because that's the

5    market price.  It's only with the passage of time that

6    there becomes a value.

7            So there was really no -- there was self-vesting

8    in the FPEP agreement, but these properties were one (sic)

9    which really hadn't been initiated.  In fact, they were

10   accruing value because they had been purchased some time

11   ago.  And we were willing to provide that additional value,

12   but we needed some time to pass for us to be sure that that

13   value was appropriate.

14       Q    Uh-huh.

15       A    And that's what was -- and that two-year vesting

16   period for those and not for the current properties.  The

17   current properties have built-in vesting.  The older

18   properties, we had to build in a vesting period.

19       Q    And so what specifically do you recall telling

20   Mr. Morris would be the conditions to those vesting?

21       A    Well, what the -- the understanding about vesting

22   is employment.

276

1    would vest in Mr. Morris for all projects initiated after

2    December 31, 2005, irrespective of who initiated those

3    projects; correct?

4         A    Yes.

5              MR. SMITH:  Object to the form of the question.

6              BY MR. HADDAD:

7         Q    Now, just to see if I understand your

8    interpretation of the future projects provision, your

9    interpretation is that in the event Mr. Morris initiates a

10   deal after December 31st and if he is terminated at any

11   time prior to closing, then he would lose any interest in

12   that deal?

13        A    Yes.

14        Q    And terminated for any reason whatsoever?

15        A    Yes.

16        Q    And that would be irrespective of whether

17   Mr. Morris was wholly responsible for bringing that deal to

18   the table?

19        A    Yes.

20        Q    And it would be irrespective of any amount of

21   work that Mr. Morris put into the deal?

22        A    Yes.

277

1      Q     And the same would apply even if he was

2   terminated one hour before the deal was closed?

3      A     Yes.

4      Q     And you believe that to be a reasonable

5   interpretation?

6      A     Yes, I do; and I'll tell you why.

7            The properties themselves -- buying is an

8   important part of the initiation of the project, but the

9   value of the property is something that accrues over a long

10  period of time.  And the role of Mr. Morris or anyone else

11  is not only to buy well but also to make the property

12  increase in value, add to the increase of value over time.

13           And, you know, the whole -- again, I don't want

14  to beat this too much.  But, you know, the whole role of

15  the fiduciary is to keep a close eye and make sure that

16  value is added properly all the way along.  So there's a

17  lot of role to be played.  And he really only captures the

18  value as that property increases in value over time.

19           So I think that is a fair deal.  It's a deal I've

20  lived with for 20 years, and I think it's been very fair.

21  That's exactly the way it works.

22     Q     Uh-huh.

281

1    give them that promote to do it anyway because Fidelio is

2    not the beneficiary.  They have fiduciary -- well, they

3    just don't do it that way.

4            And so I think it's a very fair system, and I

5    think it works very fairly, and I think it compensates

6    properly.  It's not the acquisition by itself.  It's the

7    value added over the entire term of the investment that

8    Fidelio's interested in, and that's why this compensation

9    system is designed that way.

10       Q    Uh-huh.

11       A    And it's worked that way for -- for many years

12   for us.

13       Q    Let's take a look at the last sentence of this

14   first page of Exhibit 14, the offer letter.  It says, "All

15   items will be governed by the FPEP, LLC, agreement of which

16   you will become a member."

17           And I think we've already established that he

18   never became a member.  Correct?

19       A    Yes.

20       Q    And I think we've also established that the FPEP,

21   LLC, agreement was supposed to be amended and never was.

22   Correct?

283

1    indentation problem, but it was intended for this to be

2    that (indicating).  And you could argue:  Well, why did you

3    indent that way?  But the intent was to be this way

4    (indicating).

5         Q    And was the FPEP agreement that you refer to in

6    here the FPEP agreement that was in existence at the

7    time --

8         A    Yeah.

9         Q    -- or the FPEP agreement as amended?

10        A    The FPEP agreement that was in existence in time

11   modified as necessary to admit Mr. Morris.

12        Q    Okay.

13        A    And --.

14        Q    And let me see if I understand defendants'

15   position on the redemption issue.

16             Looking through your interrogatory answers, is it

17   defendants' contention that even though Mr. Morris was not

18   made a member of the FPEP agreement, that his interests --

19   any FPEP promote interest, if recognized, would be subject

20   to redemption?

21        A    Redemption?  Are you referring to a clause in

22   here or what?

286

1      Q     Okay.  And then you would have provided,

2   certainly, Mr. Morris with an opportunity to review it;

3   correct?

4      A     Yes.

5      Q     Okay.  And wasn't it sort of the understanding

6   that he would then review it and pass it by his attorney

7   for his attorney's comments?

8      A     Yes.

9      Q     Okay.  And it's entirely possible, is it not,

10  that Mr. Morris wouldn't have agreed to that provision, is

11  it not?

12         MR. SMITH:  Object; that calls for speculation.

13  It's speculative.

14      A     We would not have agreed to do it without this

15  clause.

16         BY MR. HADDAD:

17      Q     Okay.  But you didn't tell Mr. Morris that prior

18  to his employment with Buvermo, did you?

19         MR. SMITH:  Tell him what?

20         MR. HADDAD:  Tell him that you would not hire him

21  unless he would have agreed to a redemption provision.

22      A     I told him about this part of the agreement.  And

Morris vs. Buvermo, et al.                                    Deposition of J. Gardner 10/26/06

287

1    for the entire time that Jonathan was employed by us, he

2    never once told me that he had a problem with this clause.

3              BY MR. HADDAD:

4        Q    You testified earlier, Mr. Gardner, that you

5    don't have any specific recollection of discussing the

6    redemption provision with Mr. Morris.  Do you recall saying

7    that?

8              MR. SMITH:  I object; that's misstating the

9    record.

10             BY MR. HADDAD:

11       Q    Do you recall --

12             MR. SMITH:  The record is going to speak for

13   itself.

14             BY MR. HADDAD:

15       Q    Well, do you recall saying that?

16       A    I do.

17       Q    Okay.

18       A    But I don't -- but I do recall discussing it.  I

19   just don't recall the specific discussion.

20       Q    So now you do recall discussing it with

21   Mr. Morris?

22             MR. SMITH:  Hold on.  Don't -- I'm going to

304

1          No.  I think we have a service.

2          BY MR. HADDAD:

3     Q    Who is the service?

4     A    I don't know; I'd -- I'd be guessing.

5     Q    Do you recall having any disagreements with

6  Mr. Morris during his employment with Buvermo about --

7  well, him complaining about you interfering with his

8  ability to do his work?

9     A    Yes.

10    Q    Okay.  And what specifically do you recall about

11 that?

12    A    Well, I recall Jonathan and I having a number of

13 discussions about his frustrations, whether I was

14 interfering with his ability to do his job or not, yes.

15    Q    Okay.  Do you recall meeting with Mr. Morris and

16 the Dutch, as you guys called them, Mr. van Rhee and

17 Mr. Tjaden, regarding ironing out those differences?

18    A    Yes.

19    Q    And that was in December; correct?

20    A    Yes.

21    Q    Okay.  And it was determined at that meeting that

22 you should cease spending as much time as you were at the

Morris vs. Buvermo, et al.                           Deposition of J. Gardner 10/26/06

321

1     Q    You've been handed what's been marked as Exhibit

2  16 to your deposition, Mr. Gardner.  Please take a look at

3  this document and tell in me if you recognize it.

4     A    Yes.

5     Q    And is that your handwriting on this document?

6     A    I don't believe so.

7     Q    Do you recognize this handwriting?

8     A    No.

9     Q    Are you positive that's not your handwriting?

10    A    I'm pretty sure it's not my handwriting.  I don't

11 know if it's Ms. McCormick's handwriting or not, but I

12 don't think it's mine.

13    Q    Okay.  Is this a document that you prepared?

14    A    Yes.

15    Q    And when did you prepare the document?

16    A    Whew.  Goodness, I don't remember how long ago.

17 It was sometime prior to March.

18    Q    Of 2006?

19    A    Yes.

20    Q    Was it after you were supposed to be staying out

21 of the office but for one day a week?

22    A    I think I had done a draft of this -- I don't

322

1    remember when it was done.

2         Q    Okay.  What was the purpose of this?  Why did you

3    draft it?

4         A    The purpose of this is we were working on -- we

5    were working on revising Section 3.03 of the Fidelio

6    Properties agreement and the property designation, and this

7    was a format for the redesigned designation.

8              And I've found whenever I do formats, that

9    they're more effective if I fill in numbers.  Even if they

10   aren't the right numbers, at least people can see what they

11   mean and how they add.  And so at that time I picked these

12   numbers just as examples in order to have something on the

13   page.

14        Q    Okay.  So was this -- this was prepared to serve

15   as a new template for the FPEP designations?

16        A    Yes.

17        Q    Okay.  And do you have an idea of what year it

18   might have been prepared?

19        A    My --

20        Q    You said before March.  Was it in 2006?

21        A    I believe so.  It might have been the end of

22   2005.  I don't remember --

324

1       A     That's correct.

2       Q     Okay.  And according to Mr. Morris's offer letter

3   and to your prior memorandum to Mr. Tjaden, you weren't

4   supposed to receive any promotes after 2006?

5       A     That's correct.

6       Q     Yet you left yourself on here as a promote

7   recipient.

8       A     This is -- this was designed to conform with the

9   way things had been done in the past so people could see

10  how it was used in the past.  In the future there would be

11  different names, different percentages, various other

12  things.  That was why I did it, so it would tie in with

13  people in the past.

14          I had no intention -- and, by the way, I don't

15  have any promote interests going forward after 2005.  And I

16  surely, if I were going to get it, wouldn't back into

17  getting it by putting it on a sheet like this.  I mean

18  that's --.

19          Are you -- are you inferring that I put my

20  percentage here in order to obtain that percentage in

21  future dealings?  Is that what you're inferring?

22      Q     What I'm saying is that -- and just to remind

326

1    past.  They'd been in the company for a while, hadn't they?

2         A    Well -- and this shows them how it would have --

3    the -- if you saw this designation previously, it looked

4    nothing like this.  And this was to relate to -- now, maybe

5    I did it wrong; maybe it wasn't helpful.  But I surely

6    didn't do it with the intention of changing my promote.

7         Q    Because you never had any intention of trying to

8    claim a promote for the JBG Reston deal, which is the

9    Reston International Center?

10        A    I at this stage of the game -- I think Jonathan

11   and I talked once.  And I said, "Jonathan, you know" -- I

12   intended this to be more of, you know, I had the right, you

13   know to -- to -- you know, this is my deal.  I generated it

14   under this new format.

15             I had the right to go back and argue:  Look, this

16   is a different format.  There -- when we conceived of the

17   earlier one, it was conceived on the basis that I would not

18   be primarily responsible for JBG.

19             It would be logical for me to go back and say,

20   "Wait a minute.  Now that I'm primarily responsible, we

21   should renegotiate the deal in the future."

22             But I said, "Jonathan, I'm not going to do that.

327

1    Even though it's logical that I could do that and it's" --

2    and I" -- "and I should be entitled to it, I'm not going to

3    do that.  And the reason I'm not is because I want you to

4    be the guy in charge and I want you to go do it and I want

5    to give that promote to you."

6        Q    Well, it would have also been contrary to the

7    agreement that you entered into with -- that the defendants

8    had entered into with Mr. Morris.

9        A    Well, we could have -- you know, the deal was at

10   that time that I was going to back off and Jonathan was

11   going to carry the lion's share.  If we've renegotiated

12   that with regard to -- to JBG, it would have been logical

13   to talk about that.

14            But I'm saying even though it might have been

15   logical, that was not my intent and I was not going to do

16   that.

17       Q    You agree, though, it would have been

18   inconsistent with the terms of Mr. Morris's offer letter?

19       A    Right.

20            But there were other things -- we would have had

21   to have talked about it and renegotiated it.  And Jonathan

22   could have said, "Hey, wait a minute.  That is wrong; I

340

1      Q    I'm sorry.  Your answer was?

2           Had you told Mr. Morris that you intended to

3    bring out those documents at the meeting?

4      A    I -- I might have told him that I planned to do

5    it.  But the documents themselves and the issues themselves

6    didn't really affect Mr. Morris at all.  It was a past deal

7    that I had with the Fidelio properties that we were to wind

8    up.  And I thought Andre was wrong in berating Mr. Morris.

9           But I thought it was the kind of thing that, you

10   know, should have -- you know, should not have been

11   something that was a major concern.  But, you know, it

12   could have, you know, been handled properly and -- and

13   would not have been an issue.

14     Q    So Mr. Morris ultimately after what one might

15   consider a heated exchange left the restaurant?

16     A    Yes.

17     Q    Okay.  And do you recall who was doing the

18   yelling and who was doing the listening in that meeting?

19     A    I think the best recollection that I have of that

20   meeting is in the document that I wrote several days

21   thereafter that we've given to you.

22     Q    Okay.  How many days thereafter did you prepare

350

1    discussion?

2        A    I do that.  And I don't know remember whether it

3    was during that period of time or later.

4        Q    Okay.

5        A    I -- you know, I don't recollect that.  I might

6    have said it then, but right now I can't pin the date down

7    without looking.  But there is a date.

8        Q    There's no dispute here, is there, that

9    Mr. Morris initiated that deal --

10       A    That's correct --

11       Q    -- himself; is that correct?

12       A    -- there is no dispute.

13       Q    In which case I don't think it matters whether

14   it's 2005 or --

15       A    It --

16       Q    -- 2006?

17       A    -- probably doesn't.

18       Q    But it is -- I believe it's 2005.

19       A    Yeah.  I think you could well be right.  I just

20   don't remember.

21       Q    Okay.  And there was a time in early 2006 that

22   Fidelio committed to investing in that transaction; isn't

Morris vs. Buvermo, et al.                    Deposition of J. Gardner 10/26/06

351

1    that right?

2        A    I'm not sure when we made that commitment --

3        Q    Okay.

4        A    -- but we did commit.

5        Q    You entered into a letter of understanding with

6    SJM --

7        A    Yes.

8        Q    -- regarding that particular transaction;

9    correct?

10       A    Yes.

11           By the way, the principal of SJM is

12    Steve Garchik, and we had previous -- done two deals

13    previously with him.  So we did have knowledge of him.  He

14    knew us, and we liked respect him as a developer.

15       Q    Okay.

16           MR. HADDAD:  If you could mark this as Exhibit

17    17.

18           (The SJM letter dated 1/31/06 was marked

19            Plaintiff's Exhibit No. 17 for identification.)

20           BY MR. HADDAD:

21       Q    Mr. Gardner, this is the letter of understanding

22    that Fidelio executed with SJM --

353

1      Q     If you could -- these reflect various -- this

2   document marked Gardner 18 reflects various payments that

3   appeared to have been made from Fidelio Properties account

4   to SJM Partners, Inc., account.  One is for 175,000, and

5   then appears on the second page another for 250,000?

6      A     I have two on the front page.

7      Q     I'm sorry.  Are they both on there?

8      A     Yes.

9      Q     So one for 175,000 and one for 250,000.  Do you

10  see that?

11     A     Yes.

12     Q     And that is consistent with your recollection of

13  what occurred?

14     A     I don't recall the amounts, but these look

15  like -- I know they were sizable amounts.

16     Q     And ultimately the deal closed on July 6th, 2006;

17  isn't that right?

18     A     If you have that date --

19     Q     Yeah.

20     A     -- I have no reason to disagree.

21     Q     Well, I don't have the closing settlement

22  statement -- I do have the settlement statement, but not

361

1    that the only person that you know of that has a promoted

2    interest in this deal is Mr. Millspaugh --

3        A    Yes.

4        Q    -- at 12 percent?

5        A    Yes.

6        Q    And you're not sure about the remaining 3 and a

7    half percent?

8        A    We haven't decided yet, if anything, that's done

9    with that right now.  That's on Fidelio's side of the

10   ledger.  And it may well be that it stays there.  We just

11   don't know.

12       Q    Do you recall why this spreadsheet was prepared?

13       A    We prepare spreadsheets a number of times to try

14   to look at the performance -- so we prepare a number of

15   these as the -- as the investment progresses so -- and

16   they're basically to keep track of the investment, to make

17   sure we understand the economics of the investment and how

18   it works.

19       Q    Okay.  And isn't this also what you use to sort

20   of show the Fidelio partners?

21       A    We use a format like this.  Now, whether we

22   showed them this one or not I don't know.

364

1    Q    And as you rated the Spotswood deal as a sort

2  of -- a grade-C deal, where would you rate this one?

3    A    A grade-C deal in what regard?

4    Q    Well, I believe you testified earlier that you

5  believed that the Spotswood deal was sort of on a grade-C

6  level.  Am I mistaken?

7    A    You're mistaken, yes.

8    Q    Okay.  How would you compare this in terms of

9  potential profitability with the Spotswood Valley deal?

10    A    Well, they're -- they're very different animals.

11        The Spotswood Valley building is in existence, so

12  there's no new development.  It does need some

13  repositioning, and it does need some refinancing down --

14  and it needs some careful reworking, releasing, and things

15  like that.  There's value to be added, but it's a single

16  property, and there are a lot less things that need to be

17  done to it.  It's much smaller.

18        Reston International Center is a much riskier

19  venture with a lot -- you know, a lot more risk involved, a

20  lot more rezoning development and other things that need to

21  take place.

22        And there has to be basically a redoing of that

365

 1  whole end to become another Reston Town Center, which is a

 2  very risky proposition long-term.  But it also has

 3  potential for having a lot of profit long-term.  So much

 4  higher risk, much higher reward, much more effort involved,

 5  much larger process, and a lot more moving parts.

 6       Q    And I had asked you whether you had done any

 7  projections similar to the one that you had done on

 8  Spotswood for Reston International.  I believe your answer

 9  was no.

10       A    It's too early.  We believe it's too early now to

11  do those in any meaningful fashion.

12       Q    Okay.  And have --

13       A    We were planning now, and we need to have the

14  plans further down before we can even attempt something

15  like that.

16       Q    I see.

17            Have you done anything at all in that regard in

18  terms of projections?

19       A    We have basically made judgments on that one that

20  the price -- that it's worth the price we paid.  That's

21  been the judgment we've made.

22            And there's a lot of potential.  But it's also

369

1    correct?

2        A    I'm pretty sure it was after.

3        Q    Okay.  And it was initiated prior to Mr. Morris's

4    termination; correct?

5        A    Yes.

6        Q    And the deal on this closed in June of '06;

7    correct?

8        A    Yeah.  I don't know the exact date, but it did

9    close -- or it has closed.

10              (The letter dated 6/9/06 was marked Plaintiff's

11               Exhibit No. 21 for identification.)

12              BY MR. HADDAD:

13       Q    Take a look at Exhibit 21.  This is a

14   confirmation of an amount wired by Fidelio in connection

15   with the Reston International deal; is that right?

16       A    Yes, I believe so.

17       Q    And that was, give or take, maybe a few thousand

18   dollars, the amount invested by Fidelio in that deal; is

19   that right?

20       A     I don't know the amount that's invested today

21   because I don't know whether we put more money in the deal

22   since then or not.  And I don't know whether we had amounts

## FIDELIO PROPERTIES

### FIRST AMENDMENT TO FOURTH AMENDED AND

### RESTATED PARTNERSHIP AGREEMENT

THIS AMENDMENT is made as of January 1, 1995, by, between and among the entities whose signatures appear below, each of which is a "Partner" of FIDELIO PROPERTIES, a New York general partnership (the "Partnership").

### RECITALS

A.    The Partnership was formed pursuant to a partnership agreement dated December 31, 1980 between Eroica N.V. and Agrippina Property, N.V. under the name Pimea Partnership.

B.    Fidelio Properties Management, Inc., a Delaware corporation owned in equal shares by Donelux, Inc. and Janivo Realty, Inc. is the managing partner (the "Managing Partner").

C.    The remaining Partners are Donelux, Inc., Janivo Realty, Inc., Orvan, Inc. and F.P. Executive Partners, L.P. ("FPEP").

D.    The Partners amended and restated the partnership agreement on September 1, 1993 by a Fourth Amended and Restated Partnership Agreement (the "Fourth Agreement").

E.    The Partners have agreed to amend the Fourth Agreement as hereinafter set forth.

B286074.RICCP2685764

EXHIBIT
10/26/06
Gardner 4

D-00282

STATEMENT OF AGREEMENT .

In consideration of the mutual covenants and benefits herein contained, the parties do hereby amend the Fourth Agreement as follows (as amended the "Agreement"):

1.   Section 3.03 is amended to add a category of Special Existing FPEP Properties and add a new subsection (g) and as so amended is restated in its entirety as follows:

3.03 Distributions and Allocations to FPEP

(a)   From time to time the Management Committee may designate in writing (the "Designation") a property owned or to be acquired by the Partnership (either directly or indirectly through other entities) as an "FPEP Property" and the terms of FPEP's participation therein. The FPEP Properties shall be divided into three classes, (i) those acquired by the Partnership prior to December 31, 1992 (other than those designated as Special Existing FPEP Properties) (the "Existing FPEP Properties") (ii) those acquired thereafter (the "New FPEP Properties") and (iii) those designated as "Special Existing FPEP Properties". Capitalized terms in this Section 3.03 and not defined herein shall have the meaning given to them in the Designation.

(b)   FPEP shall make an initial contribution to the capital of the Partnership of $220,000 as contemplated in Section 2.01 (b), which shall be allocated among the New FPEP Properties in such proportions as the Management Committee shall determine from time to time. FPEP shall not be required to make any further contribution of funds to the Partnership.  However, at the time when the Partnership makes an initial or subsequent Non-FPEP Investment in a New FPEP Property, FPEP shall be entitled, to contribute an amount not to exceed 2.4% of such Non-FPEP Investment to such New FPEP Property and such amount shall be reflected in the Designation.  At such time as the Non-FPEP Partners make an Initial Investment or an Additional Investment in any New FPEP Property, the FPEP Investment in all New FPEP Properties shall be reallocated to the extent deemed appropriate by the Management Committee.

(c)   Subject to (d), (e) and (g) below, funds received by the Partnership from an FPEP Property shall be paid to FPEP to the extent allocated to FPEP in the

—2—

D-00283

Designation for that property; except that distributions to FPEP with respect to an FPEP Property shall only be made at the time of the sale or refinancing of such Property from the net proceeds of such transaction. Any distributions from net cash flow to which FPEP could be entitled but for the previous sentence, shall bear interest at the Hurdle Rate until distributed to FPEP. In no event shall FPEP be required to return to the Partnership any funds distributed to FPEP, regardless of whether a Shortfall (as defined in (f) below) arises thereafter. Subsections (d), (e) and (g) shall not apply to distributions made to FPEP pro rata with the Non-FPEP Partners on account of the FPEP Investment and the Hurdle Rate Amount attributable to such Investment and such distributions shall be made to FPEP notwithstanding the foregoing limitations in this subparagraph (c).

(d)   When a New FPEP Property is sold or otherwise disposed of and FPEP is entitled to a distribution, if the Management Committee shall determine that a Shortfall (as defined in (f) below) exists for all of the New FPEP Properties, taken as a whole, then the distribution to FPEP shall be reduced and the distributions to the Non-FPEP Partners shall be increased by the amount of such Shortfall multiplied by 12.12%.

(e)   When an Existing FPEP Property is sold or otherwise disposed of and FPEP is entitled to a distribution, if the Management Committee shall determine that a Shortfall (as defined in (f) below) exists for all of the Existing FPEP Properties, taken as a whole, then the distribution to FPEP shall be reduced and the distributions to the Non-FPEP Partners shall be increased by the amount of such Shortfall multiplied by 12.12%.

(f)   The Shortfall shall be the amount by which (i) all net cash flow or net proceeds of sale of refinancing received by the Partnership (for the account of the Non-FPEP Partners) from all Properties that were previously sold or otherwise disposed of are less than (ii) the Non-FPEP Investments in all such Properties plus the Hurdle Rate Amounts thereon.

In addition, if, in the judgment of the Management Committee, the value of any New or Existing FPEP Property, as the case may be, which has not been sold or otherwise disposed of, is such that a Shortfall is anticipated, then such amount shall be added to the Shortfall.

(g)   No distribution with respect to a Special Existing FPEP Property shall be made to FPEP until both Special Existing FPEP Properties have been sold or otherwise disposed of.  If the Management Committee shall determine

-3-

D-00284

that a Shortfall (as defined in (f) above) exists for either Special Existing FPEP Property, then the distribution, if any, to FPEP from the other Special Existing FPEP Property shall be reduced and the distributions to the Non-FPEP Partners shall be increased by the amount of such Shortfall multiplied by 20.20%.

(h)   Partnership income, gain, loss or deduction or any special item of revenue) attributable to an FPEP Property, shall be allocated among the Partners in the manner provided in the Designation (with such changes as the Management Committee shall make from time to time to reflect FPEP's interest and the other Partners' interest in such FPEP Property), except that the allocation of profit attributable to amounts reallocated on account of a Shortfall pursuant to (d), (e) or (g) above, respectively, shall be reallocated among the Non-FPEP Partners.

2.    Except as amended hereby the Partnership Agreement shall continue in full force and effect.

3.    This Amendment may be executed in a number of counterparts, all of which together shall for all purposes constitute one Agreement, binding on all the Partners.

IN WITNESS WHEREOF, the Partners have executed this Agreement as of the day and year first above written.

| Partners | Address/Telex |
|---|---|
| ORVAN, INC. | c/o Buvermo Properties, Inc. |
| By: _____ | 700 13th Street, Suite 325 |
| Frans H. J. Boons | Washington, D.C. 20005 |
| Designated Representative | Telefax: (202) 347-4545 |
| DONELUX, INC. | c/o Buvermo Properties, Inc. |
| By: _____ | 700 13th Street, Suite 325 |
| Frans H. J. Boons | Washington, D.C. 20005 |
| Designated Representative | Telefax: (202) 347-4545 |

b287325.riccp2685764

D-00285

JANIVO REALTY, INC.

By: _____
Robert C.M.H. Specken
Designated Representative

c/o Buvermo Properties, Inc.
700 13th Street, Suite 325
Washington, D.C. 20005
Telefax:  (202) 347-4545


FIDELIO PROPERTIES MANAGEMENT
INC.

By: _____
John Gardner, President

c/o Buvermo Properties, Inc.
700 13TH Street, Suite 325
Washington, D.C. 20005
Telefax: (202) 347-4545


F.P. EXECUTIVE  PARTNERS, L.P.
By:  F.P. Investments, Inc.,
General Partner

By: _____
John Gardner, President

c/o Buvermo Properties, Inc.
700 13th Street, Suite 325
Washington, D.C. 20005
Telefax:    (202) 347-4545


-5-

D-00286

FOURTH AMENDED AND RESTATED PARTNERSHIP AGREEMENT

OF

FIDELIO PROPERTIES

A New York General Partnership

Dated: As of September 1, 1993

y181945.ricCP2685764

D-00254

# F I D E L I O   P R O P E R T I E S

## T A B L E   O F   C O N T E N T S

| | | | |
|---|---|---|---|
| RECITALS | | | 1 |
| STATEMENT OF AGREEMENT | | | 1 |
| ARTICLE I | | GENERAL PROVISIONS | 1 |
| | 1.01 | Name of the Partnership | 1 |
| | 1.02 | Business of the Partnership | 1 |
| | 1.03 | Principal Office of the Partnership | 2 |
| | 1.04 | Duration of the Partnership | 2 |
| | 1.05 | Partners' Addresses | 2 |
| | 1.06 | Title to Partnership Property | 2 |
| ARTICLE II | | CAPITAL CONTRIBUTIONS, CAPITAL ACCOUNT, PARTNERSHIP INTEREST | 2 |
| | 2.01 | Contributions to Capital/Property | 2 |
| | 2.02 | Further Contributions | 2 |
| | 2.03 | Capital Accounts | 3 |
| | 2.04 | Partner's Partnership Interest | 3 |
| ARTICLE III | | PROFITS AND LOSSES; CASH DISTRIBUTIONS | 3 |
| | 3.01 | Profits and Losses | 3 |
| | 3.02 | Distributions of Excess Cash | 4 |
| | 3.03 | Distributions and Allocations to FPEP | 4 |
| ARTICLE IV | | MANAGEMENT | 6 |
| | 4.01 | Partnership Policy Decisions | 6 |
| | 4.02 | Removal from Management Committee | 7 |
| | 4.03 | Management of the Partnership | 7 |

D-00255

T A B L E  O F  C O N T E N T S (Cont'd)

| 4.04 | Managing Partner | 8 |
|------|------------------|---|
| 4.05 | Emergency Action | 9 |
| 4.06 | Costs and Expenses | 9 |
| 4.07 | No Special Compensation for Partners | 10 |
| 4.08 | Exculpation and Indemnification of Partners | 10 |
| 4.09 | Appointment of Committees | 10 |
| 4.10 | FPEP's Acknowledgment | 10 |
| 4.11 | Partners' Discretion | 11 |
| ARTICLE V | BOOKS, RECORDS AND BANK ACCOUNTS | 11 |
| 5.01 | Books and Records | 11 |
| 5.02 | Accounting Method and Fiscal Year | 12 |
| 5.03 | Reports | 12 |
| 5.04 | Bank Accounts | 13 |
| 5.05 | Valuation of Partnership Assets | 13 |
| ARTICLE VI | TRANSFER OF INTERESTS | 14 |
| 6.01 | Assignment of Partner's Interests | 14 |
| 6.02 | Admission of Additional Partner | 15 |
| 6.03 | No Withdrawal of Partners | 15 |
| 6.04 | New Partners and Transferees of Partnership Interests | 16 |

D-00256

T A B L E   O F   C O N T E N T S  (Cont'd)

|         | 6.05 | Section 754 Election | 16 |
| ARTICLE VII | | DISSOLUTION AND TERMINATION | 17 |
|         | 7.01 | Events of Dissolution | 17 |
|         | 7.02 | Continuation; Conduct of Business Pending Liquidation | 17 |
|         | 7.03 | Distribution Upon Liquidation | 18 |
| ARTICLE VIII | | MISCELLANEOUS | 19 |
|         | 8.01 | Notices | 19 |
|         | 8.02 | Successors and Assigns | 19 |
|         | 8.03 | Amendment | 20 |
|         | 8.04 | Partition | 20 |
|         | 8.05 | No Waiver | 20 |
|         | 8.06 | Entire Agreement | 20 |
|         | 8.07 | Captions | 20 |
|         | 8.08 | Counterparts | 20 |
|         | 8.09 | Applicable Law | 20 |
|         | 8.10 | Arbitration | 20 |
|         | 8.11 | Power of Attorney | 21 |
|         | 8.12 | Competition | 21 |
| SCHEDULE A | | Partnership Percentages | |

D-00257

FIDELIO PROPERTIES

FOURTH AMENDED AND RESTATED PARTNERSHIP AGREEMENT

THIS AGREEMENT is made as of September 1, 1993, by, between and among the entities whose signatures appear below, each of which is a "Partner" of FIDELIO PROPERTIES, a New York general partnership (the "Partnership").

RECITALS

A.   The Partnership was formed pursuant to a partnership agreement dated December 31, 1980 between Eroica N.V. and Agrippina Property, N.V. under the name Pimea Partnership.

B.   F. P. Executive Partners, L. P., a Delaware limited partnership ("FPEP") has joined the Partnership effective as of the date hereof.

C.   Fidelio Properties Management, Inc., a Delaware corporation owned in equal shares by Donelux, Inc. and Janivo Realty, Inc. is the managing partner (the "Managing Partner").

D.   The remaining Partners are Donelux, Inc., Janivo Realty, Inc., and Orvan, Inc.

E.   The Partners have decided to amend and restate the existing partnership agreement to reflect their understanding.

STATEMENT OF AGREEMENT

In consideration of the mutual covenants and benefits herein contained, the parties do hereby amend and restate their existing partnership agreement in its entirety to read as follows (the "Agreement"):

ARTICLE 1

GENERAL PROVISIONS

1.01  Name of the Partnership.  The name of the Partnership shall be "Fidelio Properties", or such other name as the Management Committee (as such term is defined in Section 4.01) may from time to time determine.

1.02  Business of the Partnership.  The business of the Partnership shall be to acquire, own, develop, construct, finance (as borrower or lender), operate and sell interests in real estate or related businesses located in the United States of America (or in entities with substantial interests or capabilities in real estate or related businesses), the interim investment of Partnership assets in liquid assets, the creation of partnerships, corporations, trusts and other entities and the issuance of interests therein and such other activities as the

D-00258

Management Committee shall deem to be reasonably related to the Partnership's business.

    1.03  <u>Principal Office of the Partnership</u>.  The Principal office of the Partnership shall be 700 13th Street, Suite 325, Washington, D. C. 20005, or at such other place as the Management Committee may establish.

    1.04  <u>Duration of the Partnership</u>.  The Partnership commenced January 1, 1981 and shall continue until terminated in accordance with Article VII.

    1.05  <u>Partners' Addresses</u>.  The addresses of the Partners are as set forth opposite their signatures below.

    1.06  <u>Title to Partnership Property</u>.  All property owned by the Partnership, whether real or personal, tangible or intangible, shall be deemed to be owned by the Partnership as an entity, and no Partner shall have any direct ownership of such property.  Title to Partnership assets may be held by a nominee which may be one or more individuals, corporations, partnerships, trusts or other entities, but such nominees may not become Partners without the approval of the Management Committee.

<u>ARTICLE II</u>

<u>CAPITAL CONTRIBUTIONS, CAPITAL ACCOUNT,
PARTNERSHIP INTEREST</u>

    2.01  <u>Partnership Percentage and Share of Capital</u>.

    (a)  The Partners and their predecessors have made various contributions of cash and property to the capital of the Partnership.

    (b)  FPEP shall contribute $200,000 to the capital of the Partnership on or before December 31, 1993 and an additional $20,000 on or before June 30, 1994.

    (c)  <u>Schedule A</u> sets forth each Partner's Partnership Percentage as of the date hereof.

    2.02  <u>Further Contributions</u>.  No Partner shall be obligated or required to make or entitled to make any additional contributions to the capital of the Partnership, except as otherwise agreed by the Management Committee or as provided in Section 3.03.

    2.03  <u>Capital Accounts</u>.  Each Partner shall have a capital account (the "Capital Account") consisting of its contributions to capital pursuant to Article II (i) increased by its additional contributions to capital of cash and property and further increased by its share of Partnership profits and gains (including profits and gains exempt from tax), (ii) decreased by

-2-

D-00259

its share of Partnership losses, any cash distributions, and
distributions of property, and its share of expenditures of the
Partnership described in Section 705(a)(2)(B) of the Internal
Revenue Code of 1986 (the "Code"), and (iii) otherwise adjusted
in accordance with all mandatory requirements of Section
1.704-1(b)(2)(iv) of the Regulations adopted pursuant to the Code
(the "Regulations"). All references in this Agreement to the
Code or to the Regulations shall mean the Code or the Regulations
as in effect on the date hereof. Any property other than cash
contributed pursuant to Article II after the date hereof or
distributed hereafter shall be taken into account for purposes of
reflecting such contributions or distributions in such Partner's
Capital Account at its fair market value (net of liabilities
assumed by the Partnership or Partner, as the case may be, and
liabilities to which such property is subject) Transfer of a
Partnership Interest (as hereinafter defined) shall include a
transfer of the transferor's Capital Account and the transferred
Capital Account shall be combined with the transferee's Capital
Account. Each Partner's distributive share of tax depreciation,
amortization and gain or loss shall be determined so as to take
into account the variation between adjusted tax basis and book
value of Partnership property in accordance with Code Section
704(c).

     2.04  <u>Partner's Partnership Interest</u>. Each Partner's
"Partnership Interest" shall consist of its entire interest in
the Partnership and its rights under this Agreement, including
its Capital Account, its right to receive distributions, if any,
and its right to vote on Partnership matters.

ARTICLE III

PROFITS AND LOSSES; CASH DISTRIBUTIONS

     3.01  <u>Profits and Losses</u>. Subject to Section 3.03, the
profits and losses of the Partnership for any fiscal year shall
be shared in accordance with a composite of the Partners'
respective Partnership Percentages as they exist from time to
time during the year. Whenever a Partner enters or leaves the
Partnership, the Partnership shall allocate items of income,
loss, gain, deduction and credit to the Partners by an interim
closing of the Partnership books which traces the Partnership
items to the particular segment of the Partnership's taxable year
during which such items are incurred, unless the new or departed
Partner and the Management Committee agree to make such
allocation by a proration of Partnership income, loss, gain,
deduction and credit for the entire year based on the number of
days the entering or leaving Partner was a member of the
Partnership. The Managing Partner shall calculate each Partner's
composite Partnership Percentage for the year by taking a
weighted average (based on number of days) of its Partnership
Percentage from time to time during the year. For purposes of
determining Capital Accounts, all items of income, depreciation,
gain, loss, or deduction shall be shared among the Partners in

-3-

D-00260

accordance with their respective Partnership Percentages,
provided that, with respect to any property contributed to the
Partnership after March 31, 1984, such items shall be shared
among the Partners so as to take into account the variation
between the basis of such property to the partnership and its
fair market value at the time of contribution pursuant to Section
704(c) of the Code.

3.02  <u>Distributions of Excess Cash</u>.  The Management
Committee, in its sole discretion, shall determine when cash or
other assets of the Partnership shall be distributed to the
Partners and when such cash or other assets shall be reserved for
Partnership purposes, including the acquisition or renovation of
properties.  Any cash which is thus identified as excess cash
shall be distributed to the Partners, after giving effect to
Section 3.03, pro rata in accordance with the respective Capital
Accounts of the Partners other than FPEP immediately prior to the
date of distribution.  The Management Committee may refrain from
distributing cash to Partners even though Partnership income has
been credited to the Partners' Capital Accounts.  The Management
Committee shall make a determination whether there is excess cash
at least quarterly and shall promptly distribute any cash
determined to be excess.

3.03  <u>Distributions and Allocations to FPEP</u>.

(a)  From time to time the Management Committee may
designate in writing (the "Designation") a property owned or to
be acquired by the Partnership (either directly or indirectly
through other entities) as an <u>"FPEP Property"</u> and the terms of
FPEP's participation therein.  The FPEP Properties shall be
divided into two classes, those acquired by the Partnership prior
to December 31, 1992 (the "Existing FPEP Properties") and those
acquired thereafter (the "New FPEP Properties").  Capitalized
terms in this Section 3.03 and not defined herein shall have the
meaning given to them in the Designation.

(b)  FPEP shall make an initial contribution to the
capital of the Partnership of $220,000 as contemplated in Section
2.01(b), which shall be allocated among the New FPEP Properties
in such proportions as the Management Committee shall determine
from time to time.  FPEP shall not be required to make any
further contribution of funds to the Partnership.  However, at
the time when the Partnership makes an initial or subsequent
Non-FPEP Investment in a New FPEP Property, FPEP shall be
entitled, to contribute an amount not to exceed 2.4% of such
Non-FPEP Investment to such New FPEP Property and such amount
shall be reflected in the Designation.  At such time as the
Non-FPEP Partners make an Initial Investment or an Additional
Investment in any New FPEP Property, the FPEP Investment in all
New FPEP Properties shall be reallocated to the extent deemed
appropriate by the Management Committee.

-4-

D-00261

(c)    Subject to (d) and (e) below, funds received by the Partnership from an FPEP Property shall be paid to FPEP to the extent allocated to FPEP in the Designation for that Property; except that distributions to FPEP with respect to an FPEP Property shall only be made at the time of the sale or refinancing of such Property from the net proceeds of such transaction. Any distributions from net cash flow to which FPEP would be entitled but for the previous sentence, shall bear interest at the Hurdle Rate until distributed to FPEP. In no event shall FPEP be required to return to the Partnership any funds distributed to FPEP, regardless of whether a Shortfall (as defined in (f) below) arises thereafter. Subsections (d) and (e) shall not apply to distributions made to FPEP pro rata with the Non-FPEP Partners on account of the FPEP Investment and the Hurdle Rate Amount attributable to such Investment and such distributions shall be made to FPEP notwithstanding the foregoing limitations in this subparagraph (c).

(d)    When a New FPEP Property is sold or otherwise disposed of and FPEP is entitled to a distribution, if the Management Committee shall determine that a Shortfall (as defined in (f) below) exists for all of the New FPEP Properties, taken as a whole, then the distribution to FPEP shall be reduced and the distributions to the Non-FPEP Partners shall be increased by the amount of such Shortfall multiplied by 12.12%.

(e)    When an Existing FPEP Property is sold or otherwise disposed of and FPEP is entitled to a distribution, if the Management Committee shall determine that a Shortfall (as defined in (f) below) exists for all of the Existing FPEP Properties, taken as a whole, then the distribution to FPEP shall be reduced and the distributions to the Non-FPEP Partners shall be increased by the amount of such Shortfall multiplied by 12.12%.

(f)    The Shortfall shall be the amount by which (i) all net cash flow or net proceeds of sale or refinancing received by the Partnership (for the account of the Non-FPEP Partners) from all Properties that were previously sold or otherwise disposed of are less than (ii) the Non-FPEP Investments in all such Properties plus the Hurdle Rate Amounts thereon.

In addition, if, in the judgment of the Management Committee, the value of any New or Existing FPEP Property, as the case may be, which has not been sold or otherwise disposed of, is such that a Shortfall is anticipated, then such amount shall be added to the Shortfall.

(g)    Partnership income, gain, loss or deduction (or any special item of revenue) attributable to an FPEP Property, shall be allocated among the Partners in the manner provided in the Designation (with such changes as the Management Committee shall make from time to time to reflect FPEP's interest and the other Partners' interest in such FPEP Property), except

-5-

D-00262

that the allocation of profit attributable to amounts reallocated on account of a Shortfall pursuant to (d) or (e) above, respectively, shall be reallocated among the Non-FPEP Partners.

### ARTICLE IV

### MANAGEMENT

4.01 <u>Partnership Policy Decisions</u>. Except as otherwise expressly provided in this Agreement, all decisions respecting matters set forth herein or otherwise affecting or arising out of the conduct of the business of the Partnership shall be made by a management committee (the "Management Committee"). Donelux, Inc. and Janivo Realty, Inc. shall constitute the Management Committee. They shall act by vote of at least fifty-one percent (51%) of the members of the Management Committee, each member having one vote.

(a)   Each Partner may act on Partnership matters, including the modification or amendment of this Agreement, through a designated agent or representative (the "Designated Representative") pursuant to written authorization with full power and authority to bind such Partner with respect to this Agreement, any amendment hereto, and all aspects of the business of the Partnership. Each Designated Representative may be granted the power to appoint substitute Designated Representatives.

(b)   No Partner, as a member of the Management Committee or as a Partner, may vote upon, or otherwise act in connection with, any agreement or understanding between the Partnership, on the one hand, and the Partner or its Affiliates (as such term is defined in Section 6.01), on the other, or consent to any transfer of a Partnership Interest in which it or its Affiliate is transferor or transferee directly or indirectly. In such event all actions of the Partnership shall be taken by such disinterested member(s) of the Management Committee acting alone. The members of the Management Committee shall be entitled to cause the Partnership to retain the services of their respective Affiliates in the performance of their duties and obligations under this Agreement, unless expressly prohibited by a specific provision hereof, so long as all dealings are on terms and conditions that are not materially less favorable to the Partnership than the terms and conditions available from non-affiliated third parties or are otherwise approved by the Management Committee.

(c)   If the interest of any Partner shall be transferred in violation of Article VI, such Partner shall be barred from being a member of the Management Committee and shall not be entitled to vote on any matters which are submitted to a vote of the Partners. In such event all actions of the Partnership shall be taken by the other member(s) of the

-6-

D-00263

Management Committee or Partner(s) other than FPEP, as the case
may be, acting alone.

    4.02  <u>Removal from Management Committee</u>.  No Partner may
serve as a member of the Management Committee if it or any of its
Affiliates is in material breach of its obligations under this
Agreement or other material agreements with the Partnership, or
if it or any of its Affiliates is a bankrupt Partner as described
in Section 7.01(c).  In such event all actions of the Partnership
shall be taken by the other member of the Management Committee
acting alone.

    4.03  <u>Management of the Partnership</u>.  The Management
Committee shall have full power and authority to act on behalf of
and to bind the Partnership and shall have all specific rights
and powers required or appropriate to the operation and
management of the business of the Partnership which, by way of
illustration but not by way of limitation, shall include the
right and power:  (i) to take actions normal or customary for the
owner of properties similar to the partnership's assets; (ii) to
deal with federal, state and local governments and their agencies
and authorities; (iii) to commence, defend, and settle
litigation; (iv) to procure and maintain insurance covering such
risks as the Management Committee shall determine; (v) to borrow
funds and to guarantee obligations of others; (vi) to acquire,
take, hold, sell or otherwise dispose of all property and assets,
real, personal and mixed, in the name of a nominee; (vii) to form
partnerships, corporations and other entities and issue interests
therein and acquire shares thereof in public or private
transactions; (viii) to execute and deliver deeds, deeds of
trust, notes, leases, subleases, mortgages, bills of sale,
financing statements, security agreements and any and all other
instruments necessary or incidental to the conduct of the
business of the Partnership and the financing thereof; (ix) to
admit additional Partners to the extent such admission is
authorized by this Agreement; (x) to coordinate all accounting
and clerical functions of the Partnership; (xi) to employ such
accountants, attorneys, managers, agents and other personnel as
the Management Committee deems necessary or desirable to carry on
the business of the Partnership; (xii) to sell, lease, convey,
transfer, demolish, exchange or otherwise dispose of all or any
parts of the property and other assets of the Partnership at any
time or from time to time, (xiii) to adopt the Partnership's
annual budget and such other budgets and plans to govern the
conduct of the Partnership's business as it deems appropriate,
and (xiv) approve each annual financial statement and each annual
current value appraisal presented pursuant to Section 5.05. The
members of the Management Committee shall cause to be elected as
directors of Buvermo Properties, Inc. and of other subsidiary
entities those Designated Representatives of the members of the
Management Committee who desire to serve as such and/or such
other persons as the Management Committee may deem appropriate.

D-00264

4.04  <u>Managing Partner</u>. The Management Committee may designate, from time to time, one or more Partners to act as managing partner of the Partnership (the "Managing Partner"). Each Managing Partner will have full power and authority to act for and on behalf of the Partnership and to bind the Partnership on all matters on which the Management Committee or the Partners have taken or authorized action to be taken pursuant to this Agreement.  Additionally, the Management Committee hereby authorizes the Managing Partner to take all actions of the type described in subsections 4.03(i), (ii) to the extent needed to develop real estate assets of the Partnership, (iii) provided the amount in issue does not exceed $5,000,000 or otherwise adversely affects the Partnership or its business in a material way, (iv), (viii) only with respect to leases and subleases, [and then subject to any criteria established by the Management Committee,] (x) and (xi) subject to direction from the Management Committee or its audit committee with respect to accounting matters, provided such actions do not conflict with the annual budgets adopted pursuant to Section 4.03 and such other directions as the Management Committee may provide.  Unless expressly authorized by the Management Committee, the Managing Partner shall not have authority to carry out the transactions described in subsections 4.03 (ii) or (iii) except as provided above, (v), (vi), (vii), (viii) except as provided above with respect to leases, (ix), (xii), (xiii) or (xiv) except as provided above.  The delegation of authority by the Management Committee to the Managing Partner contained in Section 4.04 may be modified at any time and from time to time by action of the Management Committee.

(a)  Any person dealing with the Partnership shall be entitled to rely upon the authority of the Managing Partner and need not inquire further into the proceedings of the Partnership or the authority of the Managing Partner to bind the Partnership.

(b)  The Management Committee has designated Fidelio Properties Management, Inc. ("FPM") as the Managing Partner and it shall serve without compensation.

(c)  The business of the Partnership shall be operated and managed by the Managing Partner to the best of its ability, in a careful and prudent manner and in accordance with good industry practice.

4.05  <u>Emergency Action</u>. If, in the case of activities described in subsections 4.03(i), (ii) and (iii), a situation shall arise which places any asset (or any material portion thereof) of the Partnership in immediate danger of loss, destruction, material damage or injury to persons and the immediate action or attention of the Partnership is required in order to preserve or protect such asset(s), and the Managing Partner shall have attempted to contact the Designated Representatives of the members of the Management Committee, and shall be unable to communicate with a majority of such Designated

-8-

D-00265

Representatives in order to authorize any needed action, and no member of the Management Committee who shall have been successfully contacted by the Managing Partner shall have objected to the proposed action, then the Managing Partner shall have full power and authority to act for and on behalf of the Partnership and to bind the Partnership without prior authorization or action of the Management Committee.  Any person dealing with the Partnership in such circumstance shall be entitled to rely upon the authority of the Managing Partner to bind the Partnership.  The Managing Partner shall immediately communicate the results of any such actions to all of the members of the Management Committee by telephone, telex or other available means of communication.  The grant of authority to the Managing Partner in this Section 4.05 shall be sufficient authorization for it to act on behalf of the Partnership in such an emergency, notwithstanding any other provisions of this Agreement.

4.06  <u>Costs and Expenses</u>.  The Partnership shall be responsible for paying all costs and expenses of forming and continuing the Partnership and conducting its business.  Any such costs and expenses which are or have been paid by a Partner on behalf of the Partnership shall be reimbursed by the Partnership so long as such cost or expense was intended to advance the Partnership's business and was deemed by the Management Committee to be reasonable.

4.07  <u>No Special Compensation for Partners</u>.  No Partner shall receive compensation for services rendered pursuant to this Agreement, unless same is expressly approved by the Management Committee.

4.08  <u>Exculpation and Indemnification of Partners</u>.  No Partner (nor any of its officers, directors, shareholders, agents or attorneys, or Designated Representatives, each of which is included in the term Partner for purposes of this Section 4.08) shall be liable, responsible or accountable in damages or otherwise to the Partnership or to any other Partner for any act or omission under the provisions of this Agreement, unless such act or omission constitutes intentional misconduct, gross negligence or fraud.  Each Partner shall be indemnified and held harmless by the Partnership from and against any liabilities, damages, costs and expenses (including reasonable attorneys' fees) suffered or incurred by such Partner by reason of any action, proceeding or claim asserted or instituted against it in connection with the performance of its duties and obligations hereunder; provided, however, that a Partner shall not be so indemnified for any such liability, damage, cost or expenses' resulting from an act or omission which is finally determined by an arbitration proceeding or a court of competent jurisdiction to constitute intentional misconduct, gross negligence or fraud.

4.09  <u>Appointment of Committees</u>.  From time to time the Management Committee may delegate to subcommittees comprised of

-9-

D-00266

certain of its members or other persons authority to act for and
on behalf of the Management Committee in discharging its
obligations under this Agreement.  At the request of any member
of the Management Committee, the Management Committee may
override any action of any subcommittee.

    4.10  <u>FPEP's Acknowledgment</u>.  FPEP acknowledges and
agrees that notwithstanding its capital contributions and FPEP's
right to its interest in the Partnership, no investment in or
interest of FPEP in the Partnership shall limit in any way the
rights of the other Partners and/or the Management Committee to
conduct the Partnership's business in a manner that best serves
the interests of such other Partners.  Accordingly, FPEP agrees
that even if such decision would have an adverse impact on FPEP's
investment or interest in the Partnership or the benefits to be
derived therefrom by FPEP (and even if such impact on FPEP is
more severe than the impact on other Partners):

    (i)  FPEP is not entitled to vote on any Partnership
matters;

    (ii)  the Management Committee and/or the Partners
other than FPEP, as the case may be, have full and complete
power and authority to conduct the Partnership's business
and deal with the Partnership's assets in any manner they
may determine in their sole discretion;

    (iii)  the Management Committee and/or the Partners may
exercise their powers pursuant to this Agreement to (aa)
authorize transactions with Affiliates of a Partner or other
self-dealing between the Partners or their Affiliates and
the Partnership, (bb) acquire, dispose of, encumber or
modify the terms of the Partnership's interest in a property
or entity, including an FPEP Property, (cc) set policies,
establish budgets and reduce, eliminate or defer the
allocation of resources to any FPEP Property, (dd) determine
which properties shall be FPEP properties and the extent and
duration of FPEP's interest, (ee) dissolve the Partnership
or admit new Partners whose interests may be senior to
FPEP's, and (ff) otherwise take actions on behalf of the
Partnership which may adversely affect FPEP's Partnership
Interest or the economic value thereof; and

    (iv)  decisions of the Management Committee and/or the
Partners other than FPEP may disproportionately benefit
other Partners or harm FPEP and FPEP waives any right to
challenge such decisions on the grounds that it has
adversely and/or disproportionately affected the
Partnership, FPEP or its interest in the Partnership.

    4.11  <u>Partners' Discretion</u>.  Any decision, consent,
approval, authorization or other determinations by the
Management Committee or the Partners other than FPEP may be made

in the unlimited discretion of the Management Committee or such Partners as to what is in their respective best interests.

## ARTICLE V

### BOOKS, RECORDS AND BANK ACCOUNTS

5.01  <u>Books and Records</u>.  The Partnership shall keep or cause to be kept true books of account with respect to its operations.  Such books shall be maintained at the principal office of the Partnership or at such other offices as the Management Committee shall determine, and each Partner and its duly authorized representatives shall at all reasonable times have access to such books for the purpose of reviewing or copying same.

5.02  <u>Accounting Method and Fiscal Year</u>.  The Partnership's books shall be kept on the accrual method of accounting in accordance with United States federal income tax law.  The Management Committee is authorized to select accounting methods for the Partnership and to modify such method.  The Partnership's books shall be closed and balanced at the end of each Partnership year.  The fiscal year of the Partnership shall be the calendar year, unless otherwise determined by the Management Committee from time to time.  The Management Committee shall select the partnership's accountants.

5.03  <u>Reports</u>.  The Management Committee shall cause the following reports to be delivered to each Partner:

(i)  Within one hundred and twenty (120) days after the end of each fiscal year an audited financial report of Ohe Partnership, including balance sheets on both a cost basis and a current value basis or such other basis as the Management Committee shall elect, and a profit and loss statement, and, if such profit and loss statement is prepared on an accrual basis, then a cash flow and source and application of funds statement shall be included;

(ii)  Within seventy (70) days after the end of each fiscal year such information as may be needed to enable each Partner to file its United States federal income tax return and any other required income tax returns;

(iii)  Within forty-five (45) days after each calendar quarter an unaudited statement of income, expense and cash flow for the Partnership, a Partnership balance sheet and a report on significant new developments.

To the extent that information needed for any of the foregoing reports is not available from joint ventures in which the Partnership participates, the Management Committee may delay these reports or issue interim reports on the required reporting dates.  The cost of all reporting shall be paid by the

-11-

D-00268

Partnership as a Partnership expense.  Any Partner other than
FPEP may, at any time and at its own expense, cause an audit of
the Partnership books to be made by a certified public accountant
of its own selection; provided such audits not be made more often
than once in every 12 months.

    Notwithstanding the foregoing, the Management
Committee may, at any time, restrict the reports being delivered
to FPEP to such reports with respect to FPEP Properties as the
Management Committee determines to be relevant to FPEP's interest
in such FPEP Properties.

    5.04  <u>Bank Accounts</u>.  The Management Committee shall
cause one or more Partnership accounts to be maintained in banks
selected by it, which accounts shall be used for the deposit of
all gross income received from operation of the Partnership and
the payment of expenditures incurred by the Partnership.
Separate accounts may be (but need not be) maintained for each
Partnership property.  The Management Committee may designate or
allow the Managing Partner to designate such signatories for the
accounts as they determine. Such signatories need not be
Partners.  All funds shall be and remain the property of the
Partnership.

    5.05  <u>Valuation of Partnership Assets</u>.  On or before
December 1 of each year Buvermo Properties, Inc. shall prepare
and deliver to the appraiser described below a market value
appraisal of each of the Partnership's real estate assets
(including notes due to the Partnership and secured by interests
in real property and other material assets related to its real
estate).  All estimates of value shall speak as of the following
December 31.  Such appraisals shall be certified by a real estate
appraisal company (the "Appraiser") selected by the Management
Committee, which company shall be of national reputation with a
staff of M.A.I. appraisers.  Once the Appraiser has been
selected, it shall continue as the Appraiser until replaced by a
vote of the Management Committee.  GA/Partners, Incorporated, One
Thomas Circle, N.W., Washington, D. C. 20005 has been designated
as the Appraiser.  The appraisal in each year shall be prepared
in a manner consistent with that prepared as of December 31, 1988
and in accordance with such instructions as may be agreed upon by
the Management Committee from time to time.  The appraisal of
each investment in real property shall be separately set forth.
The Appraiser shall complete its certification on or before
December 31 (or such other date as the Management Committee may
designate) of each year and a summary of the results, with
comparisons to the prior year on a property by property basis,
shall be submitted to the Management Committee for approval and
when approved shall be provided to all Partners.  The appraisals
at December 31 of each year shall be used for setting the market
values of the Partnership's real property in the following year,
unless modified by the Management Committee.  Notwithstanding the
foregoing, the Management Committee in any year may determine the

-12-

D-00269

value of Partnership assets based on the previous year's values
or in such other manner as it may determine.

ARTICLE VI

TRANSFER OF INTERESTS

6.01  Assignment of Partner's Interest.

(a)  A Partner shall not sell, assign, give,
transfer, bequeath, encumber, pledge, hypothecate or otherwise
dispose of, in any manner whatsoever, or agree to do any of the
foregoing, directly or indirectly (any such transaction is
referred to as a "Transfer"), its interest in the Partnership,
which term includes the benefits accruing therefrom and its
interest (legal or beneficial) in any Partnership property,
whether now owned or hereafter acquired, in whole or in part,
without the prior written consent of the Management Committee.
The term Transfer also includes the disposition of an interest
in or change in the holders of shares or other equity interests in
any Partner or in any parent (direct or indirect) corporation or
entity otherwise controlling a Partner.  Each Partner shall
notify the Management Committee of any and all such Transfers. A
Transfer made other than in accordance with the requirements of
Article VI shall be void, and shall not be reflected on the books
of the Partnership.  No person or entity purporting to acquire
any interest in violation of such requirements shall be entitled
to receive any distributions of capital, or shall it be entitled
to share in profits or losses, or to participate in Partnership
decisions assert any other rights or privileges under this
Agreement.

(b)  Notwithstanding Section 6.01(a), any Partner
other than FPEP may Transfer all or part of its interest in the
Partnership to or for the benefit of an Affiliate of such
Partner; provided such Transfer does not violate any agreements
by which the Partnership or a Partner is bound and such Transfer
complies with Section 6.04.  An "Affiliate" is a trust,
corporation or other entity which is controlled by such Partner,
is under common control with such Partner or controls such
Partner at the time of Transfer and thereafter.  For purposes of
determining an Affiliate, (i) control by a natural person shall
be deemed to include control by his spouse, parents, siblings,
aunts and uncles (by blood), the lineal descendants of any of the
foregoing (by blood or adoption) and the spouse of each of the
foregoing, and (ii) the principal shareholders of Donelux, Inc.
and Janivo Realty, Inc. shall not be deemed Affiliates of each
other by virtue of the fact that they jointly hold interests in
FPM or, indirectly, FPEP.  Control shall mean the ownership of at
least 50% of the voting or beneficial interests in each entity in
any chain of ownership.

(c)  Notwithstanding Section 6.01(a), each of
FPEP's limited partners may Transfer their respective interests

-13-

D-00270

in FPEP (i) pursuant to Section 8.9 of the FPEP Limited Partnership Agreement dated as of August 30, 1993 (the "FPEP Agreement"), and (ii) to their respective spouse, parents, adult children, adult siblings and lineal descendants of any of the foregoing (by blood or adoption) or the spouse of any of the foregoing or any trust for the benefit of any of the foregoing, provided same is controlled in all respects by the limited partner as at September 1, 1993.

(d)   In the event that, pursuant to Section 8.9 of the FPEP Agreement, FPEP shall elect to or be required to redeem the partnership interest of any limited partner of FPEP, then the Partnership shall furnish to F.P. Investments, Inc., as general partner of FPEP, the funds required for such redemption promptly upon receipt of notice from F.P. Investments, Inc. that the purchase price for such limited partner's partnership interest has been finally determined in accordance with Section 8.9 of the FPEP Agreement.

(e)   The provisions of this Section 6.01 shall not be construed to prohibit any parent corporation of a Partner, other than FPEP, from encumbering, pledging or hypothecating its assets, provided that the interest in the Partnership is not directly or indirectly the principal asset of such parent.

(f)   Each Partner hereby approves and ratifies any Transfer made in accordance with this Article VI, accepts such transferee as a Partner in the Partnership (or in FPEP, as the case may be) and authorizes the Managing Partner to execute, for the Partnership and each Partner, any documents required by law to effect admission of such permitted transferee.

6.02   <u>Admission of Additional Partner</u>.   At any time the Management Committee may admit additional Partners to the Partnership and elect one or more of such Partners to be members of the Management Committee.   Any such additional Partner shall be issued an interest in the Partnership in exchange for cash and such other assets as the Management Committee deems appropriate. All valuations of assets and Partnership Interests by the Management Committee and the Partnership Percentage issued to the additional Partner may be senior or junior to or <u>pari passu</u> with any Partner and shall be binding on all Partners.

6.03   <u>No Withdrawal of Partners</u>.   No Partner may withdraw from the Partnership at any time.

6.04   <u>New Partners and Transferees of Partnership Interests</u>.   Notwithstanding any other provisions of this Agreement, no new Partner or transferee of an interest in the Partnership shall be deemed to be a Partner hereunder or have any rights under this Agreement unless (i) such transferee acquired its interest in accordance with the provisions of this Agreement, (ii) such transferee and its transferor have delivered to the Managing Partner a written assignment of the interest in the

-14-

D-00271

Partnership and an agreement (in form and substance acceptable to the Management Committee) whereby the transferee agrees to be bound by the terms of this Agreement and assumes all of the obligations and liabilities of its transferor hereunder, (iii) such transferee has paid or provided for payment of all costs of the Partnership in connection with the Transfer, (iv) such new Partner or transferee is either a corporation organized under the laws of the United States or a United States partnership comprised of such corporations, or a United States trust for the benefit of a Partner, (v) the Managing Partner, on behalf of all the Partners, shall have signed an instrument consenting to such new Partner's or transferee's admission, which consent shall be provided as to each new Partner or transferee that meets the requirements of Article VI, and (vi) the Transfer shall not result in a termination of the Partnership for United States Federal Income Tax purposes.

(a)  No Partner may Transfer its interest unless it delivers to the Managing Partner an acceptable opinion of counsel that such Transfer does not violate the securities laws of the United States, its states, territories or possessions.

(b)  With respect to any Transfer pursuant to Section 6.01(b) or (c), the transferor Partner shall not be released from its obligations to the Partnership without the consent of the Management Committee.

(c)  The Management Committee, in its discretion, may waive from time to time one or more of the conditions contained in (a) or (b) above as to any Transfer.

6.05  <u>Section 754 Elections</u>.  The Partnership has elected to adjust the basis of the Partnership's assets pursuant to Section 754 of the Internal Revenue Code.

ARTICLE VII

DISSOLUTION AND TERMINATION

7.01  <u>Events of Dissolution</u>.  The Partnership shall be dissolved only upon any of the following occurrences and for no other reason:

(a)  upon demand by Donelux, Inc. or Janivo Realty, Inc.;

(b)  upon the sale or other disposition of all or substantially all of the Partnership's assets;

(c)  upon the filing by any Partner of a voluntary petition in bankruptcy or upon the filing against any Partner of a petition seeking to adjudicate such Partner as bankrupt or insolvent unless same is dismissed in 60 days, or upon the filing by any Partner of any petition or answer seeking any

-15-

D-00272

reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief for itself under the present or any future Federal Bankruptcy Code or any other present or future applicable federal, state or other statute or law regarding bankruptcy, insolvency or other relief for debtors, or any Partner's seeking, or consenting to, or acquiescing in the appointment of any trustee, receiver, conservator or liquidator of such Partner or of all or any substantial portion of its property or of its interest in the Partnership; or

(d)   in any event, on December 31, 2080.

Dissolution of the Partnership shall be effective on the day on which the event occurs giving rise to the dissolution.

7.02   Continuation; Conduct of Business Pending Liquidation.  Notwithstanding the dissolution of the Partnership, the Partners shall have the option, upon the consent of all of them (other than any Partner which may have become bankrupt), if given within thirty (30) days after notice of the filing of the bankruptcy petition, to form a new partnership, on the terms and conditions contained in this Agreement and such other terms as may be agreed upon, for the purpose of holding the assets of the Partnership and continuing the business of the Partnership.  In such event any bankrupt Partner shall be treated as having withdrawn from the Partnership and shall receive its pro rata share of the assets of the Partnership as determined by the Management Committee, which may be distributed in such manner as the Management Committee in its discretion shall provide. Notwithstanding the foregoing, FPEP's consent shall not be required in order to form a new partnership to hold the assets and continue the business.

If the remaining Partners, other than FPEP, do not agree to form a new partnership, the Partnership, within thirty (30) days after the filing of the bankruptcy petition shall be liquidated and shall immediately commence to wind up its affairs. Pending the termination of the Partnership, the business of the Partnership, as such, shall continue to be governed by this Agreement.  Upon dissolution of the Partnership, a liquidator appointed by the Management Committee shall liquidate the assets of the Partnership and apply and distribute the proceeds thereof as contemplated by this Agreement.

7.03   Distributions Upon Liquidation.  The assets of the Partnership shall be liquidated to the extent necessary to provide for payment of liabilities owing to creditors (including any partner that may be a creditor) and for such reserves as the liquidator (or, in the absence thereof, the Managing Partner) may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Partnership, and shall be liquidated to such further extent as the Management Committee may deem advisable. After paying all liabilities that are known and

-16-

D-00273

not contingent, the fair market values of the remaining assets of the Partnership shall be determined based upon the most recent appraisals pursuant to Section 5.05 (with such adjustments as the Management Committee may approve) and the Partners' Capital Accounts shall then be adjusted as if each such asset had been sold at its fair market value.  Liquidating distributions shall then be made to the Partners in an amount equal to and in accordance with the balances of their Capital Accounts.  Any Partner that has a negative balance in its Capital Account after such adjustment shall pay the amount thereof to the Partnership to be distributed to and among the Partners pro rata in accordance with their positive Capital Accounts, as so adjusted. Any such negative balance shall be paid to the Partnership within the period specified in Section 1.704-1(b)(2)(ii)(b)(3) of the Regulations.  Assets of the Partnership that are distributed in kind shall be distributed on the basis of their fair market value as determined above. All distributions shall be made as promptly as may reasonably be feasible, except to the extent of any reserves established as aforesaid, which may be held for such period as the Management Committee may deem advisable.

ARTICLE VIII

MISCELLANEOUS

8.01  <u>Notices</u>.  Any and all notices, elections or consents or demands permitted or required to be made under this Agreement shall be in writing, signed by the Partner giving same and shall be delivered personally, or by telex or telephone facsimile, or sent by registered or certified mail, to each other Partner at its address set forth opposite its signature below or at such other address as may be supplied by written notice given in conformity with the terms of this Section 8.01.  Mailed notices shall be deemed delivered five (5) business days after the date of mailing.

Copies of all notices shall be sent to:

```
        Buvermo Properties, Inc.
        700 13th Street, Suite 325
        Washington, D. C. 20005
        Attention:  John Gardner
        Telephone:  202/347-8880
        Telefax:    202/347-4545

        Vado Beheer B.V.
        Postbus 79, 5600 AB
        Eindhoven, The Netherlands
        Attention:  Frans H. J. Boons
        Telephone:  011-31-40-116-116
        Telefax:    011-31-40-114-022
```

-17-

D-00274

Janivo Holding B.V.
P. O. Box 1079, 4801 BB
Breda, The Netherlands
Attention:  Robert C. M. H. Specken
Telephone:  011-31-76-267-500
Telefax:    011-31-76-200-121 or
            011-31-76-213-453

Whitman Breed Abbott & Morgan
200 Park Avenue, 27th Floor
New York, New York 10166
Attention:  Richard Crystal, Esq.
Telephone:  212/351-3477
Telefax:    212/351-3131

8.02  <u>Successors and Assigns</u>.  This Agreement and each
and every provision hereof shall be binding upon and shall inure
to the benefit of the Partners, their respective successors and
assigns, and each such successor or assignee shall hold such
interest subject to all of the terms and provisions of this
Agreement.

8.03  <u>Amendment</u>.  Any amendment of this Agreement shall
be valid or binding upon the Partners only if such amendment
shall be in writing and duly executed by Partners holding more
than seventy-five percent (75%) of the Partnership Percentages.

8.04  <u>Partition</u>.  The Partners hereby agree that no
Partner, nor any successor-in-interest to any Partner, shall have
the right to have any real property of the Partnership
partitioned, or to file a complaint or institute any proceeding
at law or in equity to have the assets of the Partnership
partitioned, and each Partner, on behalf of itself, its
successors and assigns, hereby waives any such right.

8.05  <u>No Waiver</u>.  No consent or waiver, express or
implied, to or of any breach or default in the performance of any
obligation hereunder shall constitute a consent or waiver to or
of any other breach or default in the performance of the same or
any other obligation hereunder.  Unless the context requires a
contrary result, the failure of any Partner to insist upon strict
performance of any obligation hereunder shall not be a waiver of
such Partner's right to demand compliance in the future.

8.06  <u>Entire Agreement</u>.  This Agreement constitutes the
full and complete agreement of the parties hereto with respect to
the subject matter hereof, except for other agreements or
instruments of even date herewith.

8.07  <u>Captions</u>.  Titles or captions of Articles or
sections contained in this Agreement are inserted only as a
matter of convenience and in no way define, limit, extend or
describe the scope of this Agreement or the intent of any
provision hereof.

-18-

y181945.ricCP2685764

D-00275

8.08   <u>Counterparts</u>.  This Agreement may be executed in a number of counterparts, all of which together shall for all purposes constitute one Agreement, binding on all the Partners.

8.09   <u>Applicable Law</u>.  This Agreement and the rights and obligations of the parties hereunder shall be governed by and interpreted, construed and enforced in accordance with the laws of the State of New York.

8.10   <u>Arbitration</u>.  The parties agree that in the event that any claim, dispute or misunderstanding arising out of or in connection with any party's obligations hereunder cannot be promptly resolved despite the good faith efforts of the parties, such matter shall be submitted to arbitration, in the City of New York, New York, or such other place as may be selected by mutual agreement of the parties, in accordance with the commercial rules then obtaining of the American Arbitration Association, and judgment upon any award rendered in such arbitration may be entered in any court having jurisdiction thereof.  Arbitration shall be the exclusive remedy hereunder except for actions seeking solely equitable relief.

8.11   <u>Power of Attorney</u>.  Each of the undersigned does hereby constitute and appoint the Managing Partner (acting through its officers) as its true and lawful representative and attorney-in-fact, in its name, place and stead to make, execute, sign and file all such instruments, documents and certificates which may from time to time be required in order to carry out the business of the Partnership or in order to comply with the laws of the United States of America, the State of New York or any other jurisdiction in which the Partnership shall determine to do business, or any political subdivision or agency thereof.  Such representative and attorney-in-fact shall not, however, have any right, power or authority to amend or modify this Agreement or vote on Partnership matters on behalf of such Partner.

8.12   <u>Competition</u>.  All Partners, other than FPM and FPEP, shall be free to engage in competing businesses and no Partner shall have any interest therein as a consequence of this Agreement.  This provision shall not be construed to modify or limit any restrictive covenants contained in any management agreement.

IN WITNESS WHEREOF, the Partners have executed this Agreement as of the day and year first above written.

| Partners | Address/Telex |
|---|---|
| <u>ORVAN, INC.</u> | c/o Buvermo Properties, Inc. |
| | 700 13th Street, Suite 325 |
| By: | Washington, D. C. 20005 |
| Frans H. J. Boons | Telefax: 202/347-4545 |
| Designated Representative | |

-19-

D-00276

DONELUX, INC.

By: _____
    Frans H. J. Boons
    Designated Representative

c/o Buvermo Properties, Inc.
700 13th Street, Suite 325
Washington, D. C. 20005
Telefax:  202/347-4545


JANIVO REALTY, INC.

By: _____
    Robert C. M. H. Specken
    Designated Representative

c/o Buvermo Properties, Inc.
700 13th Street, Suite 325
Washington, D. C. 20005
Telefax:  202/347-4545


FIDELIO PROPERTIES MANAGEMENT, INC.

By: _____
    John Gardner, President

c/o Buvermo Properties, Inc.
700 13th Street, Suite 325
Washington, D. C. 20005
Telefax:  202/347-4545


F. P. EXECUTIVE PARTNERS, L. P.
By:  F. P. Investments, Inc.,
    General Partner

By: _____
    John Gardner, President

c/o Buvermo Properties, Inc.
700 13th Street, Suite 325
Washington, D. C. 20005
Telefax:  202/347-4545

y181945.ricCP2685764

D-00277

SCHEDULE A

DESIGNATION OF NEW FPEP PROPERTY

1.  Effective as of _____, 199_, the Management Committee
    hereby designates the Partnership's interest in _____
    _____
    as a New FPEP Property pursuant to Section 3.03 (a) of the
    Partnership's Fourth Amended and Restated Partnership
    Agreement dated as of September 1, 1993 as amended from time
    to time (the "Fidelio Agreement").

2.  The Partnership has invested in such New FPEP Property
    (including costs related to the investigation, acquisition
    and financing of such Property and budgeted costs related to
    the development, renovation, operation, leasing and repair of
    such Property) $_____ as of _____, 199_ (the
    "Initial Investment").  The Initial Investment plus any
    Additional Investment (as hereinafter defined) shall
    constitute, from time to time, the "Non-FPEP Investment" in
    this New FPEP Property.  "Additional Investment" shall mean
    all other and further expenditure of funds, deposits or other
    outlays by or on behalf of the Partnership and related to
    this New FPEP Property, including the amount, in all years
    prior to the calculation, by which (i) cash received by the
    Partnership from the operation of this New FPEP Property as a
    rental property are exceeded by (ii) costs and expenses of
    owning, operating, maintaining, repairing, leasing and
    managing such Property, including professional fees
    attributable to such activities.

3.  FPEP has agreed to contribute $_____ to the Partnership as
    FPEP's initial investment in this New FPEP Property (the
    "FPEP Investment").  The FPEP Investment shall be re-
    determined from time to time in accordance with Section
    3.03(b) of the Fidelio Agreement.

4.  Cash receipts ("Receipts") from this New FPEP Property
    (including receipts described in 2(i) above, excess proceeds
    of secured borrowings, and cash proceeds from the sale or
    other disposition of this New FPEP Property) in excess of all
    costs or other expenditures, including costs and expenses
    described in 2(ii) above (unless same are counted as part of
    the Non-FPEP Investment) and all other expenses, whether
    capital or otherwise, including amortization of debt,
    attributable to this New FPEP Property and its operation,
    refinancing or sale (the "Costs") and after providing such
    reserves ("Reserves") as the Management Committee may
    determine, shall be allocated among the Partners as follows:

        (i)    First, pari passu based on its Investment, to (x)
    each Partner other than FPEP until such Non-FPEP Partners
    have received a return on their Non-FPEP Investment equal to
    ten percent (10%) per annum compounded annually from the

date(s) of Investment to the date of receipt of the return of such Investment (the "Hurdle Amount"), and to (y) FPEP until it has received the Hurdle Amount on its FPEP Investment;

(ii)    Next, to the Partners pari passu in relation to their respective Investments until (x) the Partners other than FPEP have received an amount equal to the Non-FPEP Investment, and (y) FPEP has received an amount equal to the FPEP Investment; and

(iii)    Next, any surplus proceeds shall be applied as follows:  twelve and twelve one-hundredths percent (12.12%) to FPEP and eighty-seven and eighty-eight one-hundredths percent (87.88%) to FPEP and the Non-FPEP Partners, pro rata in accordance with their respective Investment in the Property on the date immediately prior to any return of Investment pursuant to Section 4(ii) above.  Notwithstanding the foregoing, upon the Partnership's disposition of this New FPEP Property, (subject to Section 3.03 (d) of the Fidelio Agreement with respect to the Hurdle Rate Shortfall) all available funds shall be distributed in accordance with each Partner's capital account established with respect to this Developed Property, after completing all allocations pursuant to Paragraph 5 below.

Items allocated to Partners other than FPEP, pursuant to Paragraphs 4 and 5 hereof, shall be shared among them as provided in the Fidelio Agreement.

5.    Profits and Losses.

(a)    Profits:  Profits for any fiscal year shall be allocated in the following order of priority:

(i)    First, to the Partners in a total amount equal to the excess, if any, of (a) the cumulative distributions made pursuant to Section 4(i) hereof from the commencement of the investment to a date 75 days after the end of such fiscal year, over (b) the sum of the cumulative profits allocated pursuant to this Section 5(a)(i) for the current and all previous fiscal years;

(ii)    Second, to each Partner with a Capital Account balance with respect to this New FPEP Property which is less than the amount distributable to such Partner under Paragraph 4(ii) hereof, pro rata, until such Partner's Capital Account balance is equal to such amount; and

(iii)    Thereafter, the balance shall be shared 12.12% to FPEP and 87.88% to FPEP and the Non-FPEP Partners, pro rata in accordance with their respective Investment in the Property on the date immediately prior to any return of Investment pursuant to Section 4(ii) above.

-2-

D-00279

(b)  Losses:   Losses for any fiscal year shall be allocated in the following order of priority:

(i)    To each Partner with a Capital Account balance with respect to this New FPEP Property which exceeds the amount distributable to such Partner under Paragraph 4 hereof, pro rata, until his Capital Account balance is equal to such amount;

(ii)    Second, to each Partner with a positive Capital Account balance with respect to this New FPEP Property, pro rata, until all positive Capital Account balances have been eliminated; and

(iii)  Thereafter 12.12% to FPEP and 87.88% to the other Partners.


### FIDELIO PROPERTIES MANAGEMENT COMMITTEE:


Janivo Realty, Inc.                    Donelux, Inc.


By:_____            By:_____
Name: Robert C.M.H. Specken        Name: Frans H.J. Boons
Title: Designated                  Title: Designated
       Representative                     Representative


Acknowledged and Accepted as of
this 1st day of September, 1993

F. P. EXECUTIVE PARTNERS, L. P.

By:  F. P. Investments, Inc.,
     general partner


    By:_____
       Name:   John Gardner
       Title:  President


    By:_____
       Name:   Steven Bonacci
       Title:  Secretary


-3-

D-00280

SCHEDULE A

<u>FIDELIO PROPERTIES</u>

<u>PARTNERSHIP PERCENTAGES</u>

| PARTNER | PARTNERSHIP PERCENTAGES September 1, 1993 |
|---------|---------|
| JANIVO REALTY, INC. | 53.51998%* |
| DONELUX, INC. | 35.75396%* |
| FIDELIO PROPERTY MANAGEMENT, INC. | 00.00413%* |
| ORVAN, INC. | 10.33946%* |
| F. P. EXECUTIVE PARTNERS, L. P. | 0.38247% |
| | 100% |

y181945.ricCP2685764

D-00281

## F.P. EXECUTIVE PARTNERS, L.P.

### CONSENT TO CONVERSION

THIS CONSENT (the "Consent") dated as of May 17, 2000, by and between F. P.

Investments, Inc., a Delaware corporation, with offices at 1901 North Moore Street, Suite 804,

Arlington, VA 22209, as general partner (the "General Partner") of F.P. Executive Partners, L.P.

(the "Limited Partnership"), and John Gardner, an individual residing at 6501 West Langely

Lane, McLean, Virginia 22101, Steven R. Bonacci, an individual residing at 1665 Wickham

Way, Crofton, Maryland 21114, and VBM-USA, Inc., a Maryland corporation, with an office c/o

Waterford Development, Inc., 11800 Sunrise Valley Drive, Reston, VA 20191, as limited

partners (the "Limited Partners") of the Limited Partnership (the General Partner and the Limited

Partners being hereinafter sometimes referred to collectively as the "Partners").

The date of filing of the original certificate of limited partnership in the office of the

Secretary of State of the State of Delaware was August 24, 1993. The General Partner and the

Limited Partners formed the Limited Partnership for the specific purposes and scope set forth in

the First Amended and Restated Limited Partnership Agreement of F.P. Executive Partners, L.P.

dated as of January 1, 2000 (the "Limited Partnership Agreement").

Pursuant to the Section 17-219 of the Delaware Revised Uniform Limited Partnership

Act, Section 18-214(h) of the Delaware Limited Liability Company Act and consistent with the

provisions of the Limited Partnership Agreement, the undersigned, being all the Partners of the

Limited Partnership, hereby consent to the conversion of the Limited Partnership into F.P.

Executive Partners, LLC, a limited liability company to be organized under the laws of the State

of Delaware simultaneously with the conversion of the Limited Partnership authorized hereby.

The name of the limited liability company into which the Limited Partnership shall be converted

is F.P. Executive Partners, LLC. Furthermore, the undersigned hereby approve and consent to

DEF-ID-018

10/26/06 EXHIBIT ~~HH~~

Gardner  7

the adoption of the operating agreement dated the date hereof and attached hereto as <u>Exhibit A</u> as the operating agreement for limited liability company.

The General Partner is hereby authorized and directed to take all actions, including but not limited to, filing the Certificate of Conversion and any other document, as the General Partner, in its sole discretion, shall deem advisable. Each Partner shall sign the Certificate of Conversion and any other document and take any other action which the General Partner deems necessary to properly effectuate the conversion authorized hereby.

**IN WITNESS WHEREOF,** the undersigned have executed this Consent as of the date first above written.

GENERAL PARTNER:

F.P. INVESTMENTS, INC.

By: _____
    Name:
    Title:

LIMITED PARTNERS:

_____
John Gardner

_____
Steve Bonaselli

VBM-USA, INC.

By: _____
    Name: Chris Zachariasse
    Title:

- 2 -

DEF-ID-019

451162-v3  0026857-0064

# EXHIBIT A

## OPERATING AGREEMENT

DEF-ID-020

- 3 -

451162-v3  0026857-0064

## Limited Liability Company Operating Agreement

## Of

## F.P. Executive Partners, LLC

### PREAMBLE

This Limited Liability Company Operating Agreement (the "Agreement") of F.P. Executive Partners, LLC (the "Company"), a limited liability company organized pursuant to the Delaware Limited Liability Company Act (the "Act") and having an address at c/o Fidelio Properties, 1901 North Moore Street, Suite 804, Arlington, VA 22209, is entered into and shall be effective as of May __, 2000, by and among F.P. Investments, Inc., a Delaware corporation having an address at c/o Fidelio Properties, 1901 North Moore Street, Suite 804, Arlington, VA 22209, John Gardner ("Gardner"), an individual residing at 6501 West Langely Lane, McLean, Virginia 22101, Steven R. Bonacci ("Bonacci"), an individual residing at 1665 Wickham Way, Crofton, Maryland 21114, and VBM-USA, Inc. ("VBM-USA"), a Maryland corporation, with an office c/o Waterford Development, Inc., 11800 Sunrise Valley Drive, Reston, VA 20191, as members (each a "Member", collectively, the "Members").

WHEREAS, the Members desire to establish their respective rights and obligations in respect of the business and operation of the Company; and

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

DEF-ID-021

# ARTICLE I.

## GENERAL PROVISIONS

This Limited Liability Company Operating Agreement of F.P. Executive Partners, LLC is entered into and shall be effective as of the first date written above by and among the Members set forth on the signature page hereof, pursuant to the provisions of the Act, on the following terms and conditions:

1.1.    <u>Organization</u>.  The Members hereby organize the Company as a Delaware limited liability company pursuant to the provisions of the Act.

1.2.    <u>Name</u>.  The name of the Company shall be "<u>F. P. Executive Partners, LLC</u>", and all Company business shall be conducted in such name.  The Company shall hold all of its property in the name of the Company and not in the name of any Member.

1.3.    <u>Term</u>.  The Company shall be dissolved and its affairs wound up in accordance with the Act and this Agreement on December 31, 2050, unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or this Agreement.

1.4.    <u>Purpose</u>.  The Company is formed for the sole purpose of acquiring, holding and disposing of a general partnership interest in Fidelio Properties ("<u>Fidelio</u>"), a New York general partnership and, subject to Fidelio's approval, in subsidiaries and affiliates of Fidelio.  Fidelio owns, operates, manages and sells interests in real estate or related businesses located in the United States of America as more fully described in the Fidelio Properties Fourth Amended and Restated Partnership Agreement dated as of September 1, 1993, as amended by a First Amendment dated as of January 1, 1995 and as the same may be further supplemented and amended from time to time (the "<u>Fidelio Agreement</u>").  Each Member acknowledges that he has reviewed the Fidelio Agreement and is fully familiar with the terms thereof.

-2-

DEF-ID-022

1.5.    Office.  The location of the principal place of business of the Company shall be 1901 North Moore Street, Suite 804, Arlington, VA 22209, or such other place of business as the Manager shall designate upon written notice to the Members.

1.6.    Registered Office; Agent for Service of Process.  The registered office of the Company in the State of Delaware shall be c/o The Corporation Trust Company, having an office at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 and The Corporation Trust Company is hereby designated as agent for service of process (the "Registered Agent") as reflected in the Certificate of Formation as filed in the office of the Secretary of the State of Delaware, which office and Registered Agent may be changed at any time by the Manager.  In the event the Registered Agent ceases to act as such for any reason or the registered office shall change, the Manager shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be and send notice thereof to all Members.

1.7.    Filings.  The Company shall exist under and be governed by, and this Agreement shall be construed in accordance with, the applicable laws of the State of Delaware. The Members shall make all filings and disclosures required by, and shall otherwise comply with, all such laws.  The Members shall execute and file in the appropriate public records any assumed or fictitious name certificates and other documents and instruments as may be necessary or appropriate with respect to the formation of, and conduct of business by, the Company.

1.8.    Title to Property.  All real and personal property owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such property in its individual name or right, and each Membership Interest (as hereinafter defined) in the Company shall be deemed personal property for all purposes.

DEF-ID-023

1.9.    <u>Payments of Individual Obligations</u>.  The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be transferred or encumbered for or in payment of any individual obligation of a Member.

1.10.    <u>Activities</u>.

(a)    The Manager shall devote so much of its business time and efforts to the furtherance of the business of the Company and performance of its responsibilities under this Operating Agreement as it shall reasonably deem necessary.

(b)    The Members expressly agree that any Member may at any time engage in and possess interests in other business ventures of any and every nature and description, independently or with others, including, but not limited to, engaging in activities which parallel or compete with the business of the Company, and neither the Company nor any other Member shall by virtue of this Agreement have any right, title or interest in or to such independent activities or to the income or profits derived therefrom.

ARTICLE II.

<u>CAPITAL</u>

2.1.    <u>Capital Contributions</u>.  No Member shall be obligated to make any contributions of money or property (the "<u>Capital Contributions</u>") to the capital of the Company. However, each Member may make contributions to capital to fund capital contributions to Fidelio which the Company is permitted to make pursuant to Section 3.03(b) of the Fidelio Agreement, in such amounts as all the Members shall agree.

2.2.    <u>Membership Interest</u>.  Each Member's interest in the Company (the "Membership Interest") shall include any and all benefits and rights to which such Member may be entitled as provided in this Agreement and all obligations of such Member pursuant to the provisions of this Agreement.  Each Member shall participate in the Company based on its

-4-

DEF-ID-024

Capital Contributions, except as to certain matters which by their terms are based on the Membership Percentages.

2.3.   <u>Maintenance of Capital Accounts</u>.  Separate capital accounts shall be maintained for each Member in accordance with the provisions of Treas. Reg. Sec. 1.704.-1(b). In the event any Member transfers any Membership Interest in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

2.4.   <u>Company's Contribution to Capital of Fidelio</u>.  The Company has made and will from time to time make contributions to the capital of Fidelio (the "FPEP Contribution") which have been and shall be allocated by Fidelio among the "New FPEP Properties" (as defined in Section 3.03 of the Fidelio Agreement) as provided in Section 3.03 of the Fidelio Agreement and as reflected in the Property Designations (as defined in Section 3.03 of the Fidelio Agreement) issued by Fidelio from time to time.

2.5.   <u>Withdrawal and Return of Capital</u>.  No Member shall be entitled to demand or receive a return of his Capital Contributions or withdraw from the Company.  No Member shall have the right to withdraw any part of his Capital Contributions or to receive any distributions from the Company prior to its liquidation and termination, unless such withdrawal is permitted under this Agreement.  No Member shall be entitled to demand and receive property other than cash in return of capital.  No Member shall receive any interest, salary, or drawing with respect to his Capital Contributions or his Capital Account or for services rendered on behalf of the Company or otherwise in his capacity as a Member, except as otherwise provided in this Agreement or agreed to by the Members.  Each Member shall participate in the Company

DEF-ID-025

-5-

based on its Capital Contribution as described herein, except as to certain matters which by their terms are based on the percentages (the "Membership Percentage") set forth below:

| MEMBER | MEMBERSHIP PERCENTAGE |
|--------|----------------------|
| F. P. Investments, Inc. | 1.00% |
| Gardner | 83.03% |
| Bonacci | 15.97% |

## ARTICLE III.

### DISTRIBUTIONS

3.1.    Available Cash.  For purposes of this Agreement, the term "Available Cash" of the Company for any period shall mean the aggregate of cash received by the Company during such period from Fidelio with respect to each FPEP Property.

3.2.    Distribution of Available Cash.  Available Cash distributed by Fidelio on account of an FPEP Investment (as defined in Section 3.03 of the Fidelio Agreement and the Property Designation) in a particular New FPEP Property and identified by Fidelio as being on account of the return on or of such FPEP Investment in such New FPEP Property, including distributions with respect to any Hurdle Amount (as defined in Section 3.03 of the Fidelio Agreement and the Property Designation) for that FPEP Investment, shall be shared among the Members in accordance with their respective Capital Contributions to fund such FPEP Investment.  Any remaining Available Cash from such FPEP Investment shall be distributed among the Members in accordance with their respective Membership Percentages.  All distributions shall be made promptly after receipt by the Company of Available Cash from Fidelio.  Proceeds and earnings derived from temporary investment of funds of the Company shall be distributed to the Members entitled to such temporarily invested funds.

-6-

DEF-ID-026

3.3.    Taxes Withheld.  For purposes of this Agreement, any amount of taxes required to be withheld by the Company with respect to any amount distributable to any Member shall be deemed to be a distribution or payment to such Member and shall reduce the amount otherwise distributable to such Member pursuant to this Agreement.

## ARTICLE IV.

## ALLOCATION OF PROFITS AND LOSSES

4.1.    Allocation.  All items of Company income, gain, loss, deduction and any federal, state or local tax credit or other tax benefit shall be allocated among the Members as follows:

(i) allocations on account of an FPEP Investment in a particular New FPEP Property and on account of the return on such FPEP Investment in such New FPEP Property, including any allocations with respect to any Hurdle Amount on such FPEP Investment, shall be made to the Members in accordance with their respective Capital Contributions to such New FPEP Property;

(ii) allocations from a Special Existing FPEP Property (as defined in the Fidelio Agreement and the  Property Designation) shall be made 2/3 to Gardner and 1/3 to Bonacci;

(iii) any allocations with respect to income or loss from any temporarily invested funds of the Company shall be allocated among the Members in accordance with their interest in such funds; and

(iv) any other allocations shall be allocated in accordance with the Membership Percentages.

-7-

447702-v6  0026857-0064

DEF-ID-027

## ARTICLE V.

## ACCOUNTING AND RECORD KEEPING

5.1.    Responsibility for Books of Account. The Manager shall be responsible for ensuring that proper and complete records and books of account are kept in which shall be entered fully and accurately all transactions and other matters relative to the Company's business in accordance with this Agreement and generally accepted accounting principles consistently applied. The books of account shall be kept on a cash basis. Each Member shall be entitled, upon reasonable notice to the Manager, to access to such records and books for inspection and copying during reasonable business hours.

5.2.    Tax Statement. As soon as reasonably practicable after the end of each fiscal year, the Manager shall deliver to each Member such information concerning the Company as shall be necessary for a Member to prepare its income or other tax returns. The Company shall elect to be taxed as a partnership.

5.3.    Fiscal Year. The fiscal year of the Company shall be the calendar year.

5.4.    Banking. The funds of the Company shall be deposited in such bank account or accounts, or invested in such interest-bearing investments, as shall be designated by the Manager. All withdrawals from any such bank accounts shall be made by the Manager or the duly authorized agent or agents of the Manager. Company funds shall be held in the name of the Company and shall not be commingled with those of any other person.

-8-

DEF-ID-028

## ARTICLE VI.

## POWERS, RIGHTS, AND DUTIES OF THE MEMBERS

6.1.    <u>Management of Business</u>.  The Members, other than the Manager, shall not participate in the management or control of the Company nor shall they transact any business for the Company.

6.2.    <u>Liability of the Members</u>.  The Members, including the Manager, shall not have any personal liability whatsoever to the creditors of the Company for the debts of the Company or any of its losses beyond their agreed contribution to the capital of the Company.

6.3.    <u>Voting Rights</u>.  Notwithstanding anything to the contrary herein contained, any matter requiring the consent or approval of the Members pursuant to this Agreement shall be given by the affirmative vote (at a meeting, or in lieu thereof, by written consent of the required percentage) of Members holding over seventy-five percent (75%) of the aggregate Membership Percentages held by all of the Members.

## ARTICLE VII.

## MANAGEMENT

7.1.    <u>Control of Business</u>.  The business and assets of the Company shall be controlled exclusively by the Manager as herein provided.  Except as otherwise provided in this Agreement, (i) none of the Members shall have any authority to act for or assume any obligations or responsibilities on behalf of the other Members, (ii) nor shall any Member, other than the Manager, have any authority to bind the Company.  This Agreement shall not be deemed to create a company, partnership or joint venture between or among the Members with respect to any activity whatsoever other than the purpose set forth in Section 1.4, and the conduct of business activities incidental thereto.

DEF-ID-029

7.2.    Authority of the Manager.  The Manager shall have the authority to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company.  Pursuant to the foregoing, it is understood and agreed that the Manager shall have all of the rights and powers of a Manager or Managing Member as provided in the Act and as otherwise provided by law, and any action taken by the Manager shall constitute the act of and serve to bind the Company.  In dealing with the Manager acting on behalf of the Company, no person shall be required to inquire into the authority of the Manager to bind the Company, but shall be entitled to rely conclusively on the power and authority of the Manager to bind the Company as set forth in this Agreement.

7.3.    Limits on Manager's Authority.  Notwithstanding anything herein to the contrary, the Manager shall not cause or permit the Company to:

(i)    Commingle any of the Company's funds, or employ or permit another to employ those funds or assets in any manner, except for the exclusive benefit of the Company (except to the extent that funds are temporarily retained by agents of the Company); or

(ii)    Reimburse the Manager for expenses incurred by the Manager, except that the Manager shall be reimbursed for actual costs incurred by the Manager in carrying out its duties hereunder.

7.4.    Approval of Members for Certain Transactions.  Notwithstanding anything herein to the contrary, the Manager shall not, without the affirmative vote of the Members holding more than seventy-five (75%) of the aggregate Membership Interests and unless such act is required in connection with the business of Fidelio as contemplated in the Fidelio Agreement:

-10-

447702-v6  0026857-0064

(i)    borrow any money by or on behalf of the Company or give any security therefor or lend money on behalf of the Company or renew or extend any loan;

(ii)    provide any guaranty by the Company on behalf of another person, firm or corporation;

(iii)    purchase, lease (as lessee), license (as licensee) or otherwise acquire on behalf of the Company any assets or property;

(iv)    sell, mortgage, pledge, create a security interest in, lease (as lessor), license (as licensor) or otherwise dispose of any assets or property of the Company;

(v)    confess a judgment against the Company or settle or compromise any action, suit or proceeding (including any arbitration proceeding or any claim for past or present taxes due) against the Company;

(vi)    cause the liquidation or dissolution of the Company; or

(vii)    change the Company business or cause it to engage in activities not contemplated by this Agreement.

7.5.    Liability of the Manager.  Neither the Manager nor Fidelio nor any partner therein, nor any of their respective officers, directors, members or shareholders shall be liable, responsible, or accountable in damages or otherwise to the Company or any Member for any action taken or failure to act on behalf of the Company within the scope of the authority conferred by this Agreement or the Fidelio Agreement or by law, unless the act or omission was performed or omitted fraudulently.

7.6.    Members' Acknowledgment.  The Members acknowledge and agree that the Manager is an affiliate of Fidelio and as such it may conduct the business of the Company in a manner that best protects Fidelio's interests.  Accordingly:

-11-

DEF-ID-031

(i)    the Members have reviewed and are familiar with the Fidelio Agreement, including Section 3.03 and Section 4.10 thereof, and accept the possibility that decisions may be made that have an adverse impact on the Company's interest in Fidelio or in an FPEP Property or the benefits to be derived therefrom by the Company;

(ii)    The Manager has full and complete power and authority to conduct the Company's business and deal with the Company's assets in any manner it may determine, and it may cause the Company to act in a manner that is in the best interests of Fidelio or Fidelio's other partners and such action may have a disproportionately adverse effect on the Company and its interest in Fidelio or in an FPEP Property;

(iii)    The Members shall not be entitled to receive any distributions from the Company, unless authorized by the Manager and in exercising its powers the Manager need not consider any adverse impact on its Members or the Company's interest in Fidelio or in an FPEP Property;

(iv)    the Manager may cause the Company, as a partner in Fidelio, to (aa) authorize transactions with affiliates of a partner of Fidelio or other self-dealing between the partners of Fidelio or their affiliates and Fidelio, (bb) authorize the acquisition, disposition, encumbering or modification of the terms of Fidelio's interest in an FPEP Property or entity, (cc) approve policies and budgets or allow the reduction, elimination or deferral of the allocation of resources to investments in which the Company has an interest, (dd) dissolve Fidelio or admit new Fidelio partners whose interests may be senior to the Company's, and (ee) take actions which may otherwise adversely affect the Company's interest in Fidelio or in an FPEP Property or the economic value thereof; and

-12-

DEF-ID-032

(v)    The Members accept the fact that decisions of the Manager on behalf of the Company may disproportionately benefit other Fidelio partners and the Members waive any right to challenge such decisions on the grounds that it has adversely affected Fidelio, the Company or its interest in Fidelio or in an FPEP Property.

7.7.    <u>Return of Capital</u>.  The Manager shall not be liable for the return or payment of all or any portion of the capital or profits allowable to any of the Members (or their assignees or transferees), it being expressly agreed that any such return of capital or payment of profits made pursuant to this Agreement shall be made solely from the assets (which shall not include any right of contribution from the Manager) of the Company.

7.8.    <u>Indemnification</u>.  The Company, its receiver or its trustee (in the case of its receiver or trustee, only to the extent of its trust or receivership assets) shall indemnify and hold harmless each Member or any officers and directors of such Member, from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts, omissions or alleged acts or omissions arising out of their activities on behalf of the Company or in furtherance of the interests of the Company, including but not limited to any judgment, award, settlement, reasonable attorneys' fees, and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding, or claim, if the acts, omissions, or alleged acts or omissions upon which the actual or threatened action, proceeding, or claims are based were for a purpose reasonably believed to be in the best interests of the Company and were not performed or omitted fraudulently or as a result of gross negligence by the Members.  Any such indemnification shall only be from the assets of the Company.

-13-

DEF-ID-033

7.9.    Limitations.  Notwithstanding anything to the contrary in Section 7.8 above, no Member shall be indemnified from any liability for fraud, bad faith, willful misconduct, or gross negligence.

7.10.    Tax Matters Member.  The Manager is specifically authorized to act as the Tax Matters Member under the Code and in any similar capacity under state or local law.  Any Member designated as Tax Matters Member shall take such action as may be necessary to cause each other Member to become a notice member within the meaning of § 6223 of the Code.

## ARTICLE VIII.

## DISPOSITIONS OF MEMBERSHIP INTERESTS

8.1.    Withdrawal.  Except as contemplated by this Article VIII, withdrawals by any Member of any or all of its interest in the Company shall not be permitted without the consent of the Manager.

8.2.    Death of Member.  The death of a Member shall not dissolve or terminate the Company.  The estate (or the legal heir(s) of the deceased Member thereafter) shall retain said Member's Membership Interest and remain bound by all the provisions of this Agreement, the Company shall continue, and the estate or a legal heir(s) may be admitted as a Substituted Member after complying with Section 8.6 hereof.

8.3.    Bankruptcy of a Member.  The bankruptcy of a Member shall not dissolve or terminate the Company.  The representative, administrator, trustee, committee (or analogous fiduciary) of the bankrupt Member shall retain the interest of the bankrupt Member in the Company and such interest shall remain bound by all the terms and conditions of this Agreement.

8.4.    Transfers to Immediate Family.  An individual Member may transfer its interest in the Company during his lifetime by gift to, or in trust for the benefit of, said Member's

-14-

DEF-ID-034

Immediate Family (as defined below); provided that, with respect to any transfer by way of a trust, the Initial Member (as defined below) shall serve as trustee and control all decisions with respect to the Company and such Membership Interest. If an interest in the Company is transferred pursuant to this Section 8.4, the transferee may become a Substituted Member in accordance with Section 8.6 below. For purposes of this Section 8.4, "Immediate Family" shall mean (i) the respective spouse, parents, adult children, adult siblings, and lineal descendants of a Member (by blood or adoption) or the spouse of any of the foregoing, or (ii) an entity in which any of the persons set forth in (i) above owns and continues to own all of said entity's beneficial interests and all voting interests in and control of such entity shall be retained by the Initial Member.

Each transferee of a Member's interest shall grant to the person (the "Initial Member") who holds such interest on the date hereof, all voting rights and powers with respect to that interest and no such transfer shall be effective until such grant has been made.

8.5.    Assignments by Members.  Except as expressly provided in Sections 8.2, 8.3 and 8.4 above, a Member's Membership Interest or right to receive distributions on account thereof may not be assigned, sold, transferred, mortgaged, pledged, hypothecated or otherwise encumbered without the prior approval of the Manager in its sole discretion. The foregoing restrictions also shall apply to any shares or partnership interests or membership interests or other ownership interests, legal or beneficial, in any entity that is a Member in the Company, or owns any interest, direct or indirect, in any Member. Notwithstanding anything contained herein to the contrary, in the event that any transfer of a Membership Interest made pursuant to Sections 8.2, 8.3 or 8.4, will, in the opinion of the Manager, result in the termination of the Company for purposes of the then applicable provisions of the Internal Revenue Code of 1986, as amended

-15-

DEF-ID-035

from time to time, such transfer shall be null and void, unless the approval of the Manager is obtained.

Unless an assignee becomes a Substituted Member pursuant to Section 8.6 below, the assignee shall have no right to require any information on or accounting with respect to Company transactions, or to inspect the Company's records and books of account. In such event, the assignment merely entitles the assignee to receive the assigned share of distributions, income and losses to which the assigning Member otherwise would be entitled.

8.6.    Substituted Members. No assignee may become a Substituted Member without the written approval of the Manager. Such approval may be conditioned upon the Substituted Member (i) paying the legal and other costs incurred by the Company due to the admission of the Substituted Member, (ii) executing any documents which the Manager deems necessary, including, without limitation, an amendment to this Agreement naming such party as a Member, and (iii) if there is more than one such Substituted Member, all such Substituted Members shall have irrevocably named a single Substituted Member to act for each of them with respect to all Company matters, including votes, amendment of the Agreement, waivers, releases, or otherwise, in a manner acceptable to the Manager.

8.7.    Amendment to Articles of Organization. After a person is entitled to become a Substituted Member, the Manager shall promptly take such steps as may be necessary and appropriate to prepare and file an amendment to the Articles of Organization should such amendment be required by law or deemed advisable by the Manager, and each Member authorizes the Manager to execute any such amendment pursuant to the power of attorney hereinafter set forth in Section 10.2 below.

-16-

DEF-ID-036

8.8.    <u>Transferees Bound by Operating Agreement</u>.  Any assignee and any person admitted to the Company as a Substituted Member shall be subject to and bound by all the provisions of this Agreement as if originally a party to this Agreement.

8.9.    <u>Redemption of Member's Membership Interest</u>.  Notwithstanding any other provision of this Article VIII to the contrary, in the event that either Gardner or Bonacci (the "<u>Departed Employee</u>") withdraws from the Company or ceases to be employed by Buvermo Properties, Inc. or another affiliate of Fidelio, by reason of death, disability, retirement or any other reason (such withdrawal or cessation is hereinafter referred to as the "<u>Termination</u>"), then the Manager shall have the right, upon written notice to the Departed Employee given within sixty (60) days of the Termination, to redeem the Departed Employee's entire Membership Interest and the Membership Interest of any transferee of or successor to the Departed Employee, which transferred interests for purposes of this Section 8.9 shall be deemed to be the Membership Interest of the Departed Employee (the "<u>Call</u>").  If such Call is not exercised by the Manager prior to expiration of the Manager's right to make the Call, the Departed Employee shall have the right, exercisable by giving written notice to the Manager within sixty (60) days after expiration of the Manager's right to make the Call or earlier waiver of such right, to require such redemption by the Manager (the "<u>Put</u>").  The Manager may waive its Call right and the Departed Employee may waive its Put right and either party may permit its respective right to expire unexercised.  The purchase price ("<u>Purchase Price</u>") relating to a Put or Call shall be determined as follows:

(i)    Within thirty (30) days after written notice of the exercise of the Put or Call has been given by one party to the other the Manager and the Departed Employee each shall submit to the other a sum (the "<u>Market Value</u>") representing its calculation of the market

-17-

DEF-ID-037

value of Fidelio's interest in each property which, as of the date of Termination, has been

designated by Fidelio as an FPEP Property.  If the lower of the Market Values for an FPEP

Property is equal to at least eighty percent (80%) of the higher of the Market Values, then the

Purchase Price for that Property shall be equal to the average of the two (2) Market Values.  In

the event that the lower of the Market Values is equal to less than eighty percent (80%) of the

higher of the Market Values, then the parties shall have thirty (30) days to agree upon a Market

Value for such Property.  If the parties fail to agree on a Market Value within said thirty (30)

days, then within ten (10) days thereafter, they shall jointly appoint a disinterested arbitrator,

experienced in evaluating properties of the type designated as FPEP Property in the

Washington, D. C. metropolitan area, to determine the Market Value.  The arbitrator shall

designate as the Market Value the market value which the arbitrator determines is closest to the

market value of the FPEP Property in question, and such designation shall be conclusive for

purposes hereof.

    (ii)  The Market Value, as determined pursuant to Section 8.9(i) hereof, for

each FPEP Property, shall be reduced in accordance with Section 3.03 of the Fidelio Agreement

(such reduction to include, without limitation, the estimated costs of completing a sale of the

relevant FPEP Property and by any liability of Fidelio or the ownership entity in connection

with the relevant FPEP Property, and such reserves as the Management Committee of Fidelio

may determine). The Purchase Price for each FPEP Property to be received by the Departed

Employee shall equal the amount which such Departed Employee would receive upon

liquidation of the relevant FPEP Property for the Market Value, as finally determined, following

the sale of each FPEP Property, the distribution of the appropriate proceeds to Fidelio, and by

DEF-ID-038

Fidelio to the Company (pursuant to the Fidelio Agreement), and the liquidation of the Company.

(iii)    The amount to which a Departed Member is entitled shall also be reduced by the amount of offsets relating to any indebtedness of the Departed Employee to the Company or Fidelio or its affiliates and any claim by the Company or Fidelio or its affiliates against the Departed Employee.

(iv)    The Manager shall obtain the funds required to pay the Purchase Price to the Departed Employee from Fidelio pursuant to Section 6.01(c) of the Fidelio Agreement, and the Purchase Price shall be paid to the Departed Employee promptly after its determination pursuant to Section 8.9(i) hereof, provided that the Departed Employee shall execute all documents deemed necessary by the Company or Fidelio for the Departed Employee to convey and surrender all of his right, title and interest in the Company and release any claims against Fidelio, the Company or any of their partners, members or shareholders or any of their respective officers, directors, employees or agents.

## ARTICLE IX.

## MEMBERSHIP INTEREST OF THE MANAGER

9.1.    Admission of a Manager.  In the event of the withdrawal, dissolution or bankruptcy of the Manager, if such Manager is not replaced by a new Manager designated by the Manager, then the Members shall designate a new successor Manager and the successor person or entity shall be admitted as a Manager of the Company when and if such person or entity:

(i)    accepts and assumes, in form satisfactory to counsel to the Company, all of the terms and provisions of this Agreement; and

-19-

DEF-ID-039

(ii)    executes such other documents or instruments as counsel to the Company may require (or as may be required by law) in order to effect the admission of such person or entity as a Manager of the Company.

## ARTICLE X.

## POWER OF ATTORNEY

10.1.    Power of Attorney.  Each Member, including each Substituted Member, by the execution or adoption of this Agreement (as the case may be), irrevocably constitutes and appoints the Manager and any officer thereof as their true and lawful attorney-in-fact with full power and authority in their name, place, and stead to execute, acknowledge, deliver, swear to, file, and record at the appropriate public offices such documents as may be necessary or appropriate to carry out the provisions of this Agreement and the business of the Company.

This power of attorney may be exercised by the Manager, acting alone for each Member, or by listing all of the Members and executing any instrument with a single signature of the Manager as attorney-in-fact for all of them.

This appointment by each Member of the Manager as attorney-in-fact shall be deemed to be a power coupled with an interest, in recognition of the fact that each Member under this Agreement shall be relying upon the power of the Manager to act as contemplated by this Agreement in any filing and in any other action on behalf of the Company, and shall survive the death or other incapacity of any person hereby giving the power and the transfer or assignment of any Member's interest in the Company.  The foregoing power of attorney of each Member shall survive each transfer only until such time as the transferee shall have been admitted to the Company as a Substituted Member and all required documents and instruments shall have been duly executed, filed, and recorded to effect the substitution.

-20-

DEF-ID-040

## ARTICLE XI.

## TERM, DISSOLUTION, AND WINDING UP

11.1.    Term.  The Company shall commence on the date hereof and shall continue in existence until terminated in accordance with this Article X.

11.2.    Dissolution.  The Company shall be dissolved only in the following events and no other event shall dissolve the Company:

(i)    The sale or other disposition of all or substantially all of the operating assets of the Company or a sale of the entire business of the Company; or

(ii)    The occurrence of any event which makes it unlawful for the business of the Company to be carried on; or

(iii)    The entry of a decree of judicial dissolution under Section 18-802 of the Act.

11.3.    Effect of Dissolution.  Upon dissolution, the Company shall cease carrying on, as distinguished from the winding up of the Company business, but the Company is not terminated.  It continues until the winding up of the affairs of the Company is completed, and the certificate of cancellation has been issued by the Secretary of State.

11.4.    Procedure Upon Dissolution.  Upon winding up of the Company, the Manager shall liquidate the assets of the Company and shall apply and distribute the proceeds of such liquidation in the following order of priority:

(i)    to the payment of the debts and liabilities of the Company (other than those owed to Members) and the expenses of liquidation;

(ii)    to the setting up of such reserves as the Manager may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company arising out of or in connection with the Company or the FPEP Property; any such reserves may be paid

-21-

DEF-ID-041

over by the Manager to a person, firm or corporation, as escrowee, chosen with reasonable care

by the Manager, to be held by such escrowee (or its designated successor) for the purpose of

disbursing such reserves in payment of any of the aforementioned contingencies and, at the

expiration of such period as the Manager shall deem advisable, to distribute the balance

thereafter remaining in the manner hereinafter provided;

       (iii)    to the payment of principal and interest on any debts or liabilities owed to

Members by the Company; and

       (iv)    the balance, if any, to the Members in accordance with the provisions of

Section 3.2.

       11.5.   <u>Source of Distributions to Members on Dissolution</u>.  Upon dissolution,

each Member shall look solely to the Company assets for the return of its capital contributions

and undrawn income.  If the assets of the Company remaining after the payment or provision for

the debts and liabilities of the Company are insufficient for the return of capital contributions or

undrawn income of any Member, such Member shall have no recourse against any other Member

for that purpose.  In no event shall the Company's interest in Fidelio or an FPEP Property be

distributed to any Member upon dissolution or liquidation.  Instead, the Manager shall dispose of

such interest on such terms as it deems appropriate.

       11.6.   <u>Winding Up and Certificate of Dissolution</u>.  The winding up of the

Company shall be completed when all debts of the Company have been paid and discharged or

reasonably adequate provision therefor has been made, and all of the remaining assets of the

Company have been distributed to the Members.  Upon the completion of winding up of the

Company, a certificate of cancellation shall be delivered to the Secretary of State for filing.  The

certificate of cancellation shall set forth the information required by the Act.

-22-

DEF-ID-042

## ARTICLE XII.

### MISCELLANEOUS PROVISIONS

12.1.    Amendments/Waivers.  Amendments to this Agreement may be proposed by any Member.  The unanimous written approval of the Members is necessary for the adoption of any amendment to this Agreement, and such amendment shall become effective upon such approval being obtained.

12.2.    Notices.  All notices provided for in this Agreement shall be in writing and directed by hand delivery or by registered or certified mail or by telefax, to the Company at its principal office, and to the Members at their respective addresses as they appear in the records of the Company, or at such other address as the Company or the Members shall from time to time designate to the others in writing.  If transmitted by hand delivery or by telefax, notice shall be deemed given when same is received by the addressee.  Mailed notices shall be deemed delivered five (5) business days after the date of mailing when addressed as below and with appropriate postage attached.

Copies of all notices shall be sent to:

```
Buvermo Properties, Inc.
1901 North Moore Street, Suite 804
Arlington, VA 22209
Attention:     John Gardner and Steve Bonacci
Telephone:     (703) 465-8200
Telefax:       (703) 465-8262

VBM B.V.
Binnen Kalkhaven 39
3300 AA Dordrecht, Netherlands
Attention:     Chris Zachariasse
Telephone:     011-31-786-130-570 or 140-464
Telefax:       011-31-786-130-343
```

DEF-ID-043

447702-v6  0026857-0064

Whitman Breed Abbott & Morgan LLP
200 Park Avenue, 27th Floor
New York, New York 10166
Attention:    Richard Crystal, Esq.
Telephone:   (212) 351-3477
Telefax:      (212) 351-3131

12.3.   Governing Law.  This Agreement and the legal relations among the parties

shall be governed by and construed in accordance with the laws of the State of Delaware.

12.4.   No Membership Intended for Nontax Purposes.  The Members have

formed the Company under the Act, and expressly do not intend hereby to form a partnership

under any partnership or limited partnership act.  The Members do not intend to be partners one

to another, or partners as to any third party.  To the extent any Member, by word or action,

represents to another person that any other Member is a partner or that the Company is a

partnership, the Member making such wrongful representation shall be liable to any other

Member who incurs personal liability by reason of such wrongful representation.

12.5.   Rights of Creditors and Third Parties Under Agreement.  This Agreement

is entered into between the Company and the Members for the exclusive benefit of the Company,

its Members, and their successors and assigns.  This Agreement is expressly not intended for the

benefit of any creditor of the Company or any other person, natural or otherwise.  Except and

only to the extent provided by applicable statute, no such creditor or third party shall have any

rights under this Agreement or any agreement between this Company and any Member with

respect to any Capital Contribution or otherwise.

12.6.   Waiver of Partition.  No Member shall, either directly or indirectly, take

any action to require partition, file a bills for Company accounting or appraisement of the

Company or of any of its assets or properties or cause the sale of any Company property and,

notwithstanding any provisions of applicable law to the contrary, each Member (and each of his

-24-

447702-v6 0026857-0064

DEF-ID-044

legal representatives, successor or assigns) hereby irrevocably waives any and all rights it may have to maintain any action relating to any assets or properties of the Company, except as expressly provided in this Agreement.

　　　　12.7.　Successors.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon any successor in interest and assigns of the Members hereunder, except as may be otherwise provided herein.

　　　　12.8.　Entire Agreement.  This Agreement constitutes the entire understanding of the parties hereto with respect to the subject matter hereof and no amendment, modification or alteration of the terms hereof shall be binding unless in writing and made in accordance with Section 10.1.

　　　　12.9.　Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be an original, but all of which shall constitute one instrument.

　　　　12.10.　Captions.  The captions herein are inserted for convenience of reference only and shall not affect the construction of this Agreement.

　　　　12.11.　Validity and Severability.  It is intended that this Agreement shall not be in violation of any valid applicable laws, whether federal, state, local or of any foreign country, and to that end it is agreed that the rights, duties, and obligations of the parties hereto as provided for in this Agreement shall be binding only insofar as it is lawful for the parties so to agree.  If any provision of this Agreement is at any time in violation of any such law, this Agreement shall (during the period so in violation) be considered divisible and inoperative as to such invalid portion for the locality where so invalid, but in all other respects this Company shall be binding.

DEF-ID-045

-25-

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

<u>MANAGER:</u>

F. P. INVESTMENTS, INC.

By: _____
    Name:
    Title:

<u>MEMBERS:</u>

_____
John Gardner

_____
Steve Bonacci

VBM-USA

By:_____
    Name:  Chris Zachariasse
    Title:

DEF-ID-046

-26-

# CONFIDENTIAL



### POSITION SPECIFICATION

## Buvermo Properties, Inc.

## President & Chief Executive Officer

### POSITION SUMMARY

Equinox Partners has been retained by Buvermo Properties, Inc. (Buvermo), to recruit a President and CEO to manage the Company's investment activities focused on the greater Washington, DC metropolitan market. The President will succeed John Gardner, who has been in that role for the past 20 years.

### CLIENT SUMMARY

Buvermo represents a group of investors consisting primarily of two prominent Dutch families and a Dutch lender. Active since 1978, Buvermo is committed to investing in commercial real estate in the Washington, DC area. Buvermo acts as a provider of entrepreneurial capital, both debt and equity. The capital typically is provided in a venture format, in participation with developers and other capital providers. Buvermo has established an excellent reputation and a proven track record for its investments. Over the past 10 years, the Company has participated in investments in excess of $500 million, with individual investments ranging from approximately $1.0 million to $100 million, including both debt and equity capital.

John Gardner has led Buvermo's activities for the past 20 years. He recently decided to retire from active management of the business and will transition to a role as investor and advisor to management and the Company's board (consisting of representatives of the two families). The board has recently confirmed its long term commitment to the market and will recruit new leadership to manage the business.



10/26/06   EXHIBIT

Gardner   9

**D-001063**

# CONFIDENTIAL

## POSITION RESPONSIBILITIES

The President will be responsible for all aspects of Buvermo's investment activity, which will continue to be focused on development/redevelopment opportunities in the greater Washington, DC metro market through joint ventures with local developers.   The Company currently enjoys an excellent reputation, and the successful candidate will reinforce its position in the market.

Key responsibilities include:

- Manage the overall business affairs and investment activities of the Company, reporting to a board of 2 senior representatives of the ownership group

- Maintain an active and highly visible presence in the Washington, DC market and establish a broad range of relationships with the first-tier owner/builder/ developers  and investors that are based in the region

- Identify and develop relationships with new, upcoming development partners

- Establish and maintain a series of relationships with local players with the objective of developing a regular pipeline of joint venture investment opportunities, and be recognized as an investor of choice by the local development community

- Maintain a deep and broad knowledge of the market dynamics, business cycles and real estate investment activity throughout the region

- Expand relationships with other capital providers  that are active in the market

- Directly manage investment analysis, financial structuring and negotiation of joint ventures and associated debt placement,  involving a wide range of types of development projects

- Supervise the management and administration of ongoing investments and loan administration for debt placed on behalf of the Dutch lender

- Manage the Washington, DC office, including development, training, and supervision of support staff, currently consisting of two full-time and one part-time employee

- Ongoing quarterly reporting to the Board, with regular interim updates and communications as required

D 001064

# CONFIDENTIAL

## CANDIDATE PROFILE

The successful candidate will be a seasoned investment professional with a proven track record and strong working knowledge of real estate investments, particularly development and redevelopment projects.

Specific aspects of the profile are as follows:

## Experience

- Minimum 15 years of relevant real estate development, finance and investment experience across all real estate sectors

- Strong knowledge of the Washington, DC real estate market, including a network of relationships and contacts in the real estate community

- Experience as a CEO, Chief Investment Officer, or a senior financial (capital markets) officer of a successful public or private commercial real estate development firm, investment fund or advisor

- Extensive experience in structuring and managing real estate joint ventures with well-established local market owners/builders/developers

- Strong working knowledge and direct experience with large-scale commercial development and potentially other product types

- Verifiable track record of finance and capital markets transactions involving complex development and land development projects

## Personal Attributes

- Impeccable integrity, trustworthiness, and reputation, with the ability to serve as a fiduciary

- Outstanding interpersonal skills

- Entrepreneurial orientation, with an ability to aggressively and opportunistically penetrate the market, establish and maintain relationships and develop a consistent pipeline of investment opportunities

- An articulate, decisive, and effective communicator who can interact effectively with partners, financial institutions and a remote Board of Directors

- Ability to integrate and transition into the role, developing a close working relationship with the retiring President, who will remain as an advisor and investor

- Creative and strategic thinker with a strong intellect

D-001065

# CONFIDENTIAL

## Education

- Undergraduate degree required
- MBA or other advanced degree a plus

### COMPENSATION

The successful candidate must be a high-performing professional with broad experience and a proven track record to effectively execute the role as outlined.  As such, the compensation plan for this individual will be commensurate with the skills required of the position, and will be comprised of a base salary, bonus and an equity component.

### CONTACT INFORMATION

All inquiries and correspondence should be directed to:

Marsha Pearcy
Managing Director
Equinox Partners
1825 I Street, N.W.
Washington, D.C.
Phone: (202-296-7900)
Cell: 202-306-0416
mpearcy@equinoxsearch.com

Anthony J. LoPinto
Managing Director & CEO
Equinox Partners
675 Third Avenue, 20th Floor
New York, NY 10017
Phone: (212) 660-7440
Cell: (917-494-8093)
alopinto@equinoxsearch.com

www.equinoxsearch.com

March 21, 2005

D-001066

## DESIGNATION OF FPEP PROPERTY

Effective as of _____, the Management Committee hereby designates the
Partnership's interest in _____ as an FPEP Property pursuant to Section
3.03 (a) of the Partnership's Fourth Amended and Restated Partnership Agreement dated
as of September 1,1993 as amended for time to time (the "Fidelio Agreement").

The Partnership has made an equity investment in such FPEP Property as of
_____ (the "Initial Investment"). It is agreed that FPEP will contribute to the
Partnership as FPEP's Investment in this FPEP Property (the " FPEP Investment") its pro
rata share of the Initial Investment, as well as subsequent Investments as made by the
Partnership, in accordance with the percentages shown on Attachment A.

Signatures to be added

**Attachment A to the _____ Property Designation**

% of total capital invested by Fidelio Interests (the Pro Rata Participants)

| | |
|---|---|
| Fidelio Properties Partners other than FPEP | 85% |
| FPEP | 5% |
| VBM USA | 10% |
| Total | 100% |

Breakdown of FPEP's Capital %

| | |
|---|---|
| John Gardner | 2.5% |
| Jonathan Morris | 2.5% |

| | |
|---|---|
| Preferred IRR | 10% |

| | |
|---|---|
| FPEP Promote Percentage | 13% |

Breakdown of FPEP's Promote Percentage

| | |
|---|---|
| John Gardner | 10% |
| Jonathan Morris | 3% |

JHM0241

# CONFIDENTIAL

SJM Acquisition, LLC
9001 Congressional Court
Potomac, Maryland 20854

January 31, 2006

Fidelio Properties
c/o Buvermo Properties, Inc.
1901 N. Moore Street
Suite 804
Arlington, VA 22209



Re:    Spotswood Valley Square Shopping Center, Harrisonburg,
       Virginia (the "Project")

This letter confirms the understanding and agreement reached by and among Spotswood
Valley Center Investors, LLC and Spotswood Valley Center Manager, LLC (together, the
"Developer") and Fidelio Properties ("Fidelio") regarding the acquisition of the Project
by an entity that Fidelio and Developer intend to form for the purpose of acquiring the
Project (the "Company"). Developer and Fidelio are in the process of negotiating an
operating agreement for the Company (the "LLC Agreement"), which they expect to
conclude shortly.

SJM Acquisitions, LLC ("Contract Purchaser"), an affiliate of Developer, has entered
into an Agreement of Purchase and Sale (the "Sale Agreement") with RAC-Harrisonburg,
L.P. ("Seller") setting forth the terms and conditions for the acquisition of the Project.
Contract Purchaser has previously posted a deposit of $250,000 pursuant to the terms of
the Sale Agreement.

The Sale Agreement provides for an inspection period (the "Inspection Period") that is
due to expire on January 31, 2006, unless it is extended by the parties to the Sale
Agreement. The Sale Agreement also provides that an additional deposit of $250,000
shall be posted by the Contract Purchaser upon the expiration of the Inspection Period,
thereby increasing the total deposit under the Sale Agreement to $500,000.00 (the
"Deposit"). Following the expiration of the Inspection Period, the Deposit will be at risk.
The Sale Agreement contains certain conditions to closing which, if they are not satisfied,
would entitle the Contract Purchaser to terminate the Sale Agreement and receive back
the Deposit. It is anticipated that the Contract Purchaser's rights under the Sale
Agreement will be assigned to the Company following the formation of the Company.

The parties hereto desire to set forth the rights and obligations between themselves
pending the formation of the Company, the execution of the LLC Agreement and the
closing on the purchase of the Project.

**D-001360**

Fidelio Properties
January 31, 2006
Page 2

**CONFIDENTIAL**

In view of the foregoing, the parties agree as follows:

1.    Developer and Fidelio agree that they are satisfied with their examination and investigation of the Project and, therefore, the Inspection Period shall be allowed to expire without terminating the Sale Agreement. The parties will proceed to post the additional portion of the Deposit as hereinafter provided.

2.    Developer has agreed to contribute 15% of the equity required to complete the acquisition and Fidelio has agreed to contribute 85% of the equity required for the acquisition. Therefore, immediately following the execution of this letter agreement, the respective contributions of each party toward the total Deposit required under the Sale Agreement shall be adjusted to reflect this 85-15 ratio. To that end, (i) Fidelio shall immediately wire the sum of $250,000 to the Escrow Agent under the Sale Agreement to increase the total deposit to $500,000.00, and (ii) Fidelio shall immediately wire the sum of $175,000 to Developer in reimbursement of a portion of the Deposit previously posted.

3.    Following the execution of this letter agreement, Fidelio and Developer shall proceed with the drafting and negotiation of the Operating Agreement. As soon as the draft of the Operating Agreement is agreed upon, the parties shall execute the Operating Agreement. Promptly following the execution of the Operating Agreement, the Sale Agreement shall be assigned to the Company by the Contract Purchaser.

4.    If, for any reason whatsoever, the parties are unable to agree upon the terms of the Operating Agreement or fail to execute the Operating Agreement within thirty (30) days from the date hereof, then the Developer shall have the right, at its option, to proceed with the acquisition of the Project without Fidelio, provided the Developer reimburses Fidelio for all funds paid by Fidelio toward the Deposit and for any amounts advanced by Fidelio under Paragraph 6 below. If Developer fails to exercise the option provided in the preceding sentence within sixty (60) days of the date of this letter agreement, then Fidelio shall have the right to proceed with the acquisition of the Project without Developer provided Fidelio reimburses the Developer for the portion of the Deposit funded by the Developer, any amounts advanced by the Developer under Paragraph 6 below and the Developer's actual out-of-pocket costs and expenses incurred in negotiating the Sale Agreement and in performing due diligence in connection with the Project. Upon the making of such payment, Developer shall direct the Contract Purchaser to assign the Sale Agreement to Fidelio and thereafter Developer shall have no further rights or obligations with respect to the Project or under the Sale Agreement or this letter agreement.

5.    Until the closing on the acquisition of the Project, all decisions that arise with respect to the Sale Agreement and the acquisition of the Project, including all decisions relating to the financing of such acquisition, shall be subject to the joint approval of the Developer and Fidelio.

**D-001361**

Fidelio Properties
January 31, 2006
Page 3

**CONFIDENTIAL**

6.    If and to the extent that any fees and/or deposits are required to be posted on behalf of the Company prior to the closing under the Sale Agreement in connection with the assumption of the existing loan secured by the Project or obtaining a new mezzanine loan, Developer and Fidelio shall provide the funds needed for such fees and deposits in the ratio of 85%-15%, the same as provided above with respect to the Deposit under the Sale Agreement.

7.    In the event any of the conditions precedent to the closing under the Sale Agreement are not satisfied or in the event the Seller thereunder is in default, thereby creating the opportunity to terminate the Sale Agreement without forfeiting the Deposit, the parties shall confer with each other on how to proceed. If both parties are in agreement on the course of action they desire to take in such situation, whether it is to waive the condition or default or to terminate the Sale Agreement, they shall proceed with such course of action. If, however, they are not in agreement, such that one party desires to terminate (the "Terminating Party") the Sale Agreement and the other desires to waive and proceed with closing (the "Waiving Party"), the Waiving Party shall have the right to proceed with the acquisition of the Project without the Terminating Party in accordance with the following steps. Within three (3) business days after determining that they are in disagreement, the Waiving Party shall notify the Terminating Party in writing of its desire to proceed to closing. Within ten (10) business days after the delivery of such notice, the Waiving Party shall reimburse the Terminating Party for all funds paid by the Terminating Party on account of the Deposit, any amounts advanced by the Developer under Paragraph 6 below and the Developer's actual out-of-pocket costs and expenses incurred in negotiating the Sale Agreement and in performing due diligence in connection with the Project. If the Waiving Party fails to make such payment to the Terminating Party within such ten (10) day period, such failure shall be treated as an election by the Waiving Party to terminate the Sale Agreement. In the event that only one party proceeds with the acquisition of the Project as provided herein, the parties shall take all actions necessary to dissolve the Company to cancel and terminate the Operating Agreement, and to assign the Sale Agreement to the Waiving Party.

8.    This letter agreement may be executed in counterparts, all of which together shall constitute the same agreement.

Please indicate your agreement with the foregoing by executing this letter agreement below and returning a copy to Developer.

Sincerely,

SPOTSWOOD VALLEY CENTER INVESTORS, LLC

By:    _____
        Stephen J. Garchik
        Title:  President

**D-001362**

Fidelio Properties
January 31, 2006
Page 4

# CONFIDENTIAL

SPOTSWOOD VALLEY CENTER MANAGER, LLC

By:    _____
       Stephen J. Garchik
       Title: President


SJM ACQUISITIONS, LLC

By:    _____
       Stephen J. Garchik
       Title: President


FIDELIO PROPERTIES,
a New York general partnership

By:    Fidelio Properties Management, Inc.,
       a Delaware corporation
       Managing General Partner

     By:    _____
       John Gardner
       Title: President

DCDOCS\7005876.2 1/31/2006 11:50 AM

D-001363