# EXHIBIT

# 2

9

```
 1       A    No.
 2       Q    Okay.  Were you provided with a board package in
 3    connection with this meeting?
 4       A    Yes, I was.
 5       Q    Okay.  And where is that right now?
 6       A    It's in my bag.
 7       Q    And where is your bag?
 8       A    In the -- in the car.
 9       Q    Downstairs?
10       A    With my luggage, yes.
11       Q    Were any resolutions passed at today's meeting?
12       A    Yes, we passed resolutions.
13       Q    Okay.  Do you have a recollection of what
14    resolutions were passed?
15       A    I do.
16       Q    What are they?
17       A    We passed -- we passed a resolution designating
18    certain interests in the FPEP to Laurey Millspaugh, and we
19    passed a resolution amending Article 303 of the FPEP -- of
20    the Fidelio partnership agreement.
21       Q    Were those resolutions in writing?
22       A    Yes, they were.
```

13

1    investments in real estates (sic).

2        Q    In properties and so forth?

3        A    In property; right.

4        Q    And is there a term, a time frame that you look

5    for in investments in terms of how long the investment is

6    to last?

7        A    It's not a criteria of the investment, but

8    typically they will last three to five years.

9        Q    Okay.  And is there a range of the amount of

10   equity that Fidelio or one of its affiliates is willing to

11   invest in these types of investments?

12       A    There's no set range, but typically it's a --

13   it's a minority position.

14       Q    And can you tell me typically what the amount of

15   the investment is?

16       A    It ranges from 1 to 5 million; but there's,

17   again, no set criteria.

18       Q    Okay.  Now, Buvermo is the operating company of

19   Fidelio partnerships; correct?

20       A    That's correct.

21       Q    And what does that mean?

22       A    I think what it would mean is that it's the -- in

16

1        Q     Now, you are the designated representative of

2    Janivo Realty; correct?

3        A     Correct.

4        Q     And Mr. van Rhee is the designated representative

5    of Donelux, Inc.; correct?

6        A     Right.

7        Q     Is it fair to say that you and Andre essentially

8    vote on decisions of the Fidelio management committee?

9        A     That's correct.

10       Q     Is there anyone else involved in making decisions

11   on behalf of the management committee?

12       A     No.  I think -- it's Andre and myself.

13       Q     And if I --

14       A     Not the -- let me see.  There may be certain

15   cases where I would check with my colleague in the

16   Netherlands, who's also a board member of Janivo Realty,

17   and where it's -- where I sort of prediscuss a decision

18   that I would make as the representative.

19       Q     Okay.  And that would be Steven Vis?

20       A     Yes.

21       Q     Okay.

22       A     That's correct.

17

1    Q    And what's your understanding as to what

2  decisions you feel entitled to make on behalf of Janivo

3  without Mr. Vis's -- without consulting first with Mr. Vis?

4    A    Any decision that would -- would entail an

5  investment that's larger than $10 million for Janivo

6  Realty's piece.  So we would then be talking about a $20

7  million equity deal, which we've never done.

8    Q    Okay.

9    A    Anything below that I have authority to deal with

10  on my own.  But in a general sense I discuss what goes on

11  here with him because he's my partner and colleague.

12    Q    Of course.

13         That's your practice, at least?

14    A    Right.

15    Q    But you don't feel that you're compelled to do so

16  except for certain circumstances which you've just

17  described; correct?

18    A    Right.

19    Q    And the management committee of Fidelio is what

20  decides whether to invest in a deal initiated by Buvermo;

21  correct?

22    A    That's correct.

18

1            Amongst others; right.

2       Q    What do you mean "amongst" --

3       A    It makes -- it makes practically all the

4    decisions relating to --

5       Q    When you say --

6       A    -- to our investments, divestitures, hiring.   It

7    makes -- the management committee makes all the actual

8    decisions.

9       Q    I see.

10           When you said "amongst others," you meant amongst

11   other decisions?

12      A    Yes.

13      Q    Okay.  And so included in that -- and I apologize

14   if that's among the things you just stated -- but included

15   in that the management committee decides whether to sell

16   interests in certain deals; correct?

17      A    That's correct.

18      Q    And in connection with doing so, it issues

19   resolutions -- resolutions authorizing, you know, either

20   the purchase or sale of investments; correct?

21      A    Correct.

22           MR. HADDAD:  Let me just show you --.

26

1      A      I've taken a look.

2      Q      You've reviewed them?

3      A      I -- well, you asked me to take a look, which

4  I've done.

5      Q      Okay.

6      A      Reviewing really would mean --

7      Q      That's fine.  I don't think that's going to be

8  necessary --

9      A      -- that you want me to --

10     Q      -- but if it becomes necessary, you let me know;

11 and I'll surely allow you to review them.

12            These are the FPEP designations.  Well, they're

13 titled, "Designation of New FPEP Property," for Twinbrook

14 Metro Park, 11720 Sunrise Valley Drive, and Roland Clarke

15 option; correct?

16     A      Correct.

17     Q      And all three designations were executed by

18 Fidelio's property management committee; correct?

19     A      Correct.

20     Q      Let me ask you:  To your knowledge, have any

21 FPEP -- other FPEP designations been issued since

22 Mr. Morris's termination in March of '06?

27

1       A     Yes.

2       Q     Okay.  And that would be the designations that

3   were issued today; correct?

4       A     Correct.

5       Q     Okay.  And the designations -- the FPEP

6   designations that were issued today relate to both the --

7   relate to Spotswood?

8       A     Correct.

9       Q     Okay.  And also to Reston International Center?

10      A     Correct.

11      Q     Okay.  And any other properties?

12      A     (No response.)

13      Q     Let me rephrase that.

14            Were any other properties designated as FPEP

15  properties today?

16      A     I believe so.

17      Q     Okay.  And can you tell me which properties those

18  were?

19      A     I don't recall.  The problem is we signed --

20  we discuss these decisions materially, and then we -- we

21  are -- and there's a list.  I'm fully aware of what it is.

22  And then later on we sign the designation.  I sign as

33

```
1        A    He's the president.

2        Q    And what about Ms. McCormick?

3        A    She's vice president.

4        Q    And what about Mr. Gardner?

5        A    He's an employee.

6        Q    Now, Buvermo has no directors at all; correct?

7        A    That's correct.

8        Q    And its business is run by its shareholders;

9   correct?

10       A    Correct.

11       Q    And what's your understanding as to who the

12  shareholders of Buvermo are?

13       A    My understanding is that at this moment, 83

14  percent is held by Fidelio Properties and 17 percent by

15  John Gardner -- no.  Wait.  87 percent and 12 is my

16  understanding, 12 Mr. Gardner and 87 percent -- or it's --

17  13 is -- I thought it was 88-12, or perhaps it's 83-17.

18  Mr. Gardner has a minority position.

19       Q    Okay.  So I take it, then, you are aware that at

20  some point in time -- well, at some point in time Fidelio

21  was the sole shareholder; correct?

22       A    Correct.
```

34

1          Q    Okay.  And at some point in time Mr. Gardner was

2    authorized to transfer stock to himself and Mr. Bonacci;

3    correct?

4          A    Correct.

5          Q    And Mr. Bonacci has since left the company;

6    correct?

7          A    Correct.

8          Q    And presumably his shares were purchased back?

9          A    I would presume.  I don't know.

10         Q    In any event, both Mr. Gardner and Mr. Bonacci

11   have authorized Fidelio to make --

12         A    All decisions.

13         Q    -- to make all decisions.

14              They have, in effect, provided Fidelio with a

15   proxy?

16         A    Correct.

17         Q    Okay.  And is it fair to say that both you and

18   Mr. van Rhee as designated representatives make those

19   decisions on behalf of Fidelio dealing with Buvermo's

20   business?

21         A    Correct.

22         Q    Let me show you what were previously marked as

Morris vs. Buvermo, et al.                                    Deposition of J. Tjaden 12/05/06

50

1        Q    And perhaps VBM, but you're not sure?

2        A    I'm not sure.

3        Q    Okay.  And do you know why -- well, do you know

4    whether any such resolution was passed during Mr. Morris's

5    employment with Buvermo to make him a member of FPEP?

6        A    I believe it was not.

7        Q    Okay.  Do you know why one was not?

8        A    Because -- I don't believe why it was not, and

9    I don't know why it was not.  If not, it should have.  It

10   certainly was the intent.

11       Q    Okay.

12       A    And, again, as far as I'm concerned, that's all

13   following a resolution by the management committee that he

14   should participate, as is stated in his letter -- in a

15   letter written to him.

16            And for the rest, it is up to the management, in

17   that case Mr. Morris, to just implement these things and

18   get them signed, amended, whatever; and then, if necessary,

19   get our -- get us to review it if he feels uncertain that

20   the thing's not been done right.

21       Q    Okay.  So just to make sure I understand you

22   correctly, do you recall there ever being a resolution that

Morris vs. Buvermo, et al.                                Deposition of J. Tjaden 12/05/06

58

```
 1        A     At least, in a general sense.

 2        Q     Okay.  And I --

 3        A     And I never took an agreement and -- and went

 4   through it and said, "All right.  Here's where you change

 5   it."  I never directed him in that manner.

 6        Q     Fair enough.

 7              I think you actually misunderstood me.  I wasn't

 8   asking you whether or not you spoke with Mr. Morris about

 9   what specific provisions needed to be changed.  I'm asking

10   you whether you recall specifically telling Mr. Morris that

11   it was his responsibility to see to it that the FPEP

12   agreement was amended.

13        A     No.  The specific --

14              MR. SMITH:  Object to the form.

15        A     Let me tell you.  The specific responsibility

16   that he had was to -- to take the letter that we had given

17   him and that he had signed where it said specifically that

18   FPEP agreement was the basis of our dealing with him --

19   so -- but that -- and when -- that the agreement should be

20   amended in such a manner that he would be admitted.

21              So whatever administrative resolution was

22   necessary for him to be admitted, it wasn't -- it did not
```

Morris vs. Buvermo, et al.                                    Deposition of J. Tjaden 12/05/06

59

1    specifically -- we had never discussed any specifics of the

2    agreement itself because, other than admitting him, there

3    was no -- and changing one name for the other and making

4    sure the percentages were correct, there was nothing to be

5    changed.

6            BY MR. HADDAD:

7        Q    Uh-huh.

8        A    If -- that is in -- in that sense that amendment,

9    yes.

10           Any other amendments, we would not have changed

11   the FPEP agreement.  We want -- that's -- and he -- he --

12   that was not part of the understanding.

13       Q    Okay.

14       A    The understanding was that the existing agreement

15   would rule his -- the agreement with him, the existing FPEP

16   agreement.

17       Q    Okay.  And just to be clear, Mr. Tjaden, I

18   appreciate your testimony.  But, frankly, I'm not very

19   interested right now in what your understanding was or what

20   you believe Mr. Morris's understanding was.

21           I'm interested in specific discussions you had

22   with Mr. Morris.  And what I would like to know is:  Do you

60

1    recall having a specific discussion with Mr. Morris in

2    which you advised him that it was part of his

3    responsibilities to see to it that he was somehow added to

4    the FPEP operating agreement?

5         A    Not -- not that specifically, no.

6         Q    Okay.  And, in fact, he was not a member of FPEP

7    at the time; correct?

8         A    That's correct.

9         Q    Okay.  And he himself would not have had

10   authority at the time to amend the agreement; correct?

11        A    That's correct.

12        Q    Now, at some point there came a time where you

13   and Mr. van Rhee approached Mr. Gardner about his retiring

14   from Buvermo; correct?

15        A    That's correct.

16        Q    Okay.  And when was that?

17        A    My recollection is that was at the end of 2004,

18   early 2005.

19        Q    And was this a discussion that you and

20   Mr. van Rhee had together with Mr. Gardner?

21        A    There was Mr. Zachariasse involved in that

22   discussion as well.

61

```
1        Q    Was it in person?

2        A    I don't recall.

3        Q    But it was all in one -- you were all

4    participants in this one discussion?

5        A    I don't recall.  There must have been several

6    discussions.  It was initiated by Mr. Zachariasse, who told

7    us of his decision to retire as a senior advisor.

8        Q    Okay.

9        A    And that prompted a discussion with Mr. Gardner

10   about succession in general of Mr. Zachariasse and it was

11   logical that he would step in that role.  And that was

12   something that we felt was appropriate.  And it -- I don't

13   recall a specific conversation.  We must have had several

14   over several months.

15       Q    What was Mr. Zachariasse's role at the time in

16   terms of --

17       A    It was senior --

18       Q    -- senior advisor?

19       A    -- senior advisor to the partnership.

20       Q    Uh-huh.

21            What did he do?

22       A    He and Mr. Gardner would discuss specific
```

62

1    investment proposals; and they would be discussed with the
2    partners, meaning Mr. van Rhee and myself, once
3    Mr. Zachariasse and Mr. Gardner agreed.
4         Q    Okay.  So as it existed back then, in 2004,
5    Mr. Gardner as president of Buvermo would seek deals on
6    behalf of Fidelio; correct?
7         A    Correct.
8         Q    And before he presented them to the partners of
9    Fidelio, yourself -- well, the partners who were
10   represented by yourself and Mr. van Rhee, he would discuss
11   those investments with Mr. Zachariasse?
12        A    Correct.
13        Q    And Mr. Zachariasse in his role as advisor would
14   either approve of or disapprove of or just perhaps even
15   consult with Mr. Gardner regarding the investment?
16        A    Yeah -- "consult," I don't know --
17        Q    Okay.  Was it your understanding that
18   Mr. Zachariasse had veto authority as to whether or not
19   something would be presented to the partners?
20        A    He did not have veto authority, no.
21        Q    Okay.  Now --
22        A    But in effect, you know, this is a -- very much a

63

1    European model of making decisions.  We wanted consensus

2    between them.

3         Q    Between those two individuals?

4         A    Yes.

5         Q    Okay.

6         A    He had no formal veto rights.

7         Q    I see.

8              Mr. Zachariasse himself didn't seek out any

9    deals; correct?

10        A    I think there may have been one or two

11   transactions that he brought to the table.

12        Q    Okay.  Do you recall when that might have been?

13        A    I do not.

14        Q    Okay.  And I take it by the 2004 time frame you

15   trusted Mr. Gardner enough for him to become the advisor.

16   Correct?

17        A    Absolutely, absolutely.

18        Q    Why not have him continue in his role as

19   president and, you know, sort of play a dual function of

20   both president and advisor?

21        A    I don't understand that question.

22        Q    Why was there a need -- well, did --

68

1   whereby the person who would be appointed as the president

2   would ultimately in -- in -- over a period of time also

3   become general partner basically signing off on the

4   investments.

5           You know, I remember specifically we asked

6   Mr. Gardner -- and we've told Mr. Morris that Mr. Gardner

7   and he would have to decide on all -- on investment

8   proposals prior to them -- or divestitures prior to them

9   being decided by us.

10          Q    What was Mr. Gardner's reaction to your proposal?

11          A    He -- he fully agreed.  And, again, it was not

12   one discussion where we had one meeting where we presented

13   it to him.  It was more a discussion that took place over

14   several instances.

15          Q    Over the course of several months?

16          A    Yes.

17          Q    Okay.  And that was in the 2004, 2005 time frame?

18          A    Right.

19          Q    Okay.  So do you recall any resistance on

20   Mr. Gardner's part to --

21          A    Not at all.

22          Q    No resistance at all?

70

1    welcome in the sense that it should always be discussed

2    with the president.

3            But if I find something through connections that

4    I might have, I'll throw it in the pot.  I never have, but

5    there -- on certain occasions I will be approached in the

6    Netherlands by somebody who has a deal in the Washington

7    market.  I don't go out looking for them.  But certainly

8    any -- and deals are very -- good deals are very rare, so

9    anybody who can contribute to putting deals on the table is

10   very welcome.

11       Q    Uh-huh.

12            But it certainly is included in the job

13   description of the president of Buvermo --

14       A    Absolutely --

15       Q    -- to do that?

16       A    -- yes --

17       Q    Okay.

18       A    -- prime responsibility.

19       Q    And it's not the prime responsibility --

20       A    It is.  It is.

21       Q    Okay.  If you'll just let me finish.

22            It's not the prime responsibility of the advisor

78

```
1    candidate with an understanding as to what the position was

2    going to be; correct?

3        A    Correct.

4        Q    And I assume that when you reviewed it, you

5    reviewed it with -- you reviewed it to confirm that the

6    position is properly described in the specification.

7    Correct?

8        A    Correct.

9        Q    Let me show you what was marked --

10       A    You want this back?

11       Q    You can just leave them there for now.  I'll take

12   them back at the end.

13           Let me show you what's marked as Exhibit No. 10

14   to Mr. Gardner's deposition.

15   (Document presented.)

16       Q    And just let me know if you recognize this

17   document.

18       A    I do.

19       Q    Okay.  Now, this is a memorandum that was

20   prepared by John Gardner to you; is that right?

21       A    (The witness moves head up and down.)

22       Q    Okay.
```

Morris vs. Buvermo, et al.                                    Deposition of J. Tjaden 12/05/06

79

1        A    Correct.

2        Q    Did you request that he prepare this memorandum?

3        A    I don't recall.

4        Q    Okay.  Do you recall any discussions about this

5   memorandum prior to having received it?

6        A    Certainly --

7        Q    Okay.

8        A    -- I recall that, yes.

9        Q    And let me be more clear.  Do you recall any

10   discussions with Mr. Gardner about the need to put your

11   understanding in writing?

12        A    Put our understanding in writing?

13        Q    Correct.  Your understanding with Mr. Gardner.

14        A    Correct.

15        Q    In fact, this is what this memorandum reflects;

16   it reflects your understanding with Mr. Gardner regarding

17   his ongoing employment with Buvermo and Fidelio; correct?

18        A    Correct.

19        Q    All right.  And so -- I'm sorry.  I didn't catch

20   your response.  But do you recall having -- ever having

21   made a request to Mr. Gardner that this understanding be

22   put in writing?

80

1        A    I don't recall that.

2        Q    Okay.  Do you have any understanding as to why he

3    prepared this for you?

4        A    It was -- it was, I am sure, to clarify what

5    his -- what his role was and what his remuneration was

6    going to be.  It is mostly about financial matters --

7        Q    Uh-huh.

8        A    -- and -- and it reflects the transition that

9    we -- that we wanted to achieve.

10        Q    Uh-huh.

11             Do these terms set forth in this memorandum

12    accurately reflect the agreement between --

13        A    Yes.

14        Q    -- Fidelio, Buvermo, and Mr. Gardner as of

15    September 19th, 2005?

16        A    They reflect the tentative agreement he and I had

17    within -- with each other, as he states.  And it was later

18    confirmed in discussions that we had with Mr. van Rhee.

19        Q    Okay.  And that was confirmed orally, correct,

20    not in writing?

21        A    Correct.

22        Q    Do you recall yourself having any discussions

89

1        Q     Just to be clear, I'm not interested in

2   Mr. Gardner's right to invest equity in any deals.  What

3   I'm interested in is whether Mr. Gardner has been granted a

4   right to receive an FPEP promote in any deal that was

5   originated after or initiated after year-end 2005.

6        A     Yes.

7        Q     Okay.  And what deals would those be?

8        A     There's some -- I would think they would include

9   Spotswood, Reston International.

10       Q     Was that agreement reflected in any of the

11  resolutions you signed today?

12       A     I believe so.

13             We designated -- I think -- I think I'm confused.

14  I think I'm confused.  We designated Laurey Millspaugh to

15  receive a portion of those promotes.

16       Q     Uh-huh.

17       A     And I do not believe that Mr. Gardner has

18  participated in any promotes since January 1 --

19       Q     Okay.

20       A     -- of this year.

21       Q     All right.  So has Mr. -- well, Mr. Gardner was

22  responsible for originating the Reston International Center

Morris vs. Buvermo, et al.                                    Deposition of J. Tjaden 12/05/06

90

1    deal; correct?

2        A    Yes.

3        Q    Okay.  Has he been offered anything in connection

4    with those efforts?

5        A    I don't recall.

6        Q    You don't know?

7        A    No.  As I said, I'm a little confused.

8        Q    Okay.  Do you know whether Mr. Gardner is being

9    paid or has been promised payment in any amount in excess

10    of the $150,000 base salary that he is to receive from

11    Buvermo?

12        A    Other than what is reflected here under Point 7,

13    nothing else has been paid to him, no.

14        Q    And is there any agreement to pay him anything in

15    the future?

16        A    No.

17            MR. SMITH:  Ziad, can I make a suggestion which

18    may be a time-saving tool --

19            MR. HADDAD:  Sure, yeah.

20            MR. SMITH:  -- because I'm going to have to go

21    back and clean some things up --

22            MR. HADDAD:  Uh-huh.

91

1          MR. SMITH:  -- I think.

2          Could you show him Laurey's offer letter and just

3    let him look at it.  I think that's going to clarify the

4    record in terms of who's receiving the promotes 2005

5    forward.

6          MR. HADDAD:  Well, I think he's already said that

7    John Gardner is not receiving any promotes.  So if that's

8    your understanding, then --

9          MR. SMITH:  It is.  But it's a little muddled, I

10   think he said -- okay.

11         MR. HADDAD:  Okay.  I don't think it's all that

12   unclear.

13         BY MR. HADDAD:

14   Q    I'm just trying to find out, Mr. Tjaden -- it

15   appears based on your testimony and based on the records

16   that I've seen, that Mr. Gardner has not been provided with

17   a promoted interest in either the Spotswood or Reston

18   International Center deal.  Correct?

19   A    Correct.

20   Q    Okay.  And yet Mr. Gardner was chiefly

21   responsible for bringing the Reston International deal to

22   the table; correct?

Morris vs. Buvermo, et al.                                Deposition of J. Tjaden 12/05/06

94

1    that he be given any promoted interest in the Reston

2    International Center deal?

3        A    He certainly did not -- he certainly did not

4    mention it to me.

5        Q    Okay.  And what about Spotswood Valley?

6        A    Same.

7        Q    Now, in connection with your search back in

8    2005 --

9        A    Yes.

10       Q    -- when you were looking for a -- initially

11   looking for Mr. Gardner's replacement, generally speaking

12   what were you looking for in a candidate?

13       A    Pretty much as has been described here

14   (indicating).

15       Q    In the position specification?

16       A    Yeah.

17       Q    Okay.  And you're referring to what?  Page 3?

18       A    Page 3.  Someone with that level of experience,

19   track record, and attributes as described.

20       Q    Did you have any interest -- well, were you

21   interested in looking for somebody to take over for a

22   certain period of time?

95

```
 1        A    No.

 2        Q    Okay.  So you didn't care how long the person was

 3   going to remain with the company?

 4        A    Well, we -- we wanted to get somebody who -- who

 5   didn't have a short-term view.

 6        Q    Okay.  What do you mean by that?

 7        A    Well, who was prepared to stay on and for -- to

 8   our liking, I should say, for as -- for the next years.  We

 9   did not want anyone to come in and see this as a two-year

10   assignment.

11        Q    Uh-huh.

12             Why is that?

13        A    Because we are long-term investors.

14        Q    Okay.  And so you would want somebody to come in

15   and stick around throughout the investments?

16        A    Partly.  I mean generally when -- when I am

17   involved in hiring a president, I do it -- and I do these

18   things a lot; that's part of my profession and my -- my

19   role.  I tend to -- we -- I look for people who want to see

20   this as a career and for the longer term.

21        Q    Okay.

22        A    We're never interested in the short-term
```

96

1    assignments of positions such as this.  The fiduciary role

2    is critical, and long-term orientation is important.

3        Q    Did you have an understanding going into the

4    interview process about what kind of time frame you were --

5    you had envisioned the president serving?

6        A    No.

7        Q    You had no understanding whatsoever?

8        A    No.  But it had to be somebody who was prepared

9    to say on longer term.

10       Q    Okay.

11       A    For the longer term.

12       Q    What do you mean by --

13       A    So if we would have found somebody who was 35 and

14   we would have -- well, our commitment to the market as

15   investors is long-term.  We have been in this particular

16   forum present for, I think, over 20 years.  And, as far as

17   I'm concerned, Janivo will want to be there in the next 20

18   years.  Janivo's a company that was formed a long time ago,

19   and its goal is long-term oriented.

20            It doesn't mean that we would under any

21   circumstances agree -- and I never have -- to turn that

22   around.  The president of the company always, you know, is

97

1    in that role and in that position as long as he performs

2    and if it's to our liking.  It's entirely -- and I've never

3    done anything else but that.  It's up to the shareholders

4    to see if things go well.

5        Q    You keep making reference to the term

6    "long-term".  I'm just trying to get an understanding from

7    you as to what you mean by that.

8        A    You know, on the East Coast, that's very often

9    the question I get from Americans.  "Long-term" to us means

10   over the longer term.  As I said, we've been here 20 years.

11   I want to be here for another 20 or 30 or 40 years -- not

12   myself, but as an institution.  We want to be present in

13   this market for the longer term, so we are looking for

14   people who are interested to participate over the longer

15   term in --

16       Q    Okay.

17            MR. SMITH:   (Indicating).

18       A    -- in and that goal.

19            BY MR. HADDAD:

20       Q    Is it fair to then say that you are looking for a

21   candidate who was willing to stick around for 20 -- up to

22   20 years?

Morris vs. Buvermo, et al.                                        Deposition of J. Tjaden 12/05/06

98

```
 1        A      If he would have performed, absolutely.

 2        Q      And did you discuss that interest at any time

 3   with Mr. LoPinto?

 4        A      Oh, absolutely, we did.  But we were -- let me

 5   say this differently.  We are not -- we are and we were not

 6   interested in anybody taking that position who wanted to

 7   make a quick buck and get out.

 8        Q      Okay.

 9        A      And you have to see it in that -- in that -- in

10   that light.  That doesn't mean that in a legal sense we

11   would bind ourselves to anything that is other than an

12   employment agreement at-will.

13        Q      Do you have any legal training?

14        A      It's a different thing.

15               No.

16        Q      Let me ask you:  What were your discussions with

17   Mr. LoPinto about this particular subject?

18        A      That we were looking for someone who saw -- who

19   saw this as a long-term -- as an opportunity over the

20   longer term.  Mr. Gardner has been there for 20 years.

21        Q      Do you recall having a discussion with

22   Mr. LoPinto regarding Mr. Morris's age?
```

107

1   negotiation.

2       Q    But I thought I heard you say that under no

3   circumstances would you do that.

4       A    Well, let me say it differently.  If Mr. Gardner

5   would be terminated tomorrow, we would still pay him that

6   amount.  It's -- it's money.

7       Q    Okay.  But do you understand this to be a

8   guaranteed term of employment?

9       A    No.  We can fire or terminate Mr. Gardner at

10  will.  We'll probably owe him the money.

11      Q    I see.

12           How many times did you meet with Mr. Morris in

13  connection with his interviews?

14      A    I don't recall.

15      Q    Was it more than once?

16      A    I would think it was probably twice.

17      Q    Okay.  And do you recall where you met with him?

18      A    I do not.

19      Q    And --

20      A    I do.  One of the times was in Washington.

21      Q    Okay.

22      A    Perhaps twice.

Morris vs. Buvermo, et al.                                      Deposition of J. Tjaden 12/05/06

108

1        Q    Do you recall meeting him --

2        A    It might have been one time in New York.  I

3   don't -- I don't recall.

4        Q    All right.  Do you have any specific recollection

5   of any interview with him outside of the District?

6        A    As I said, I don't.

7        Q    Okay.  Let's take a look at --.

8             MR. HADDAD:  Bear with me one second here.

9             BY MR. HADDAD:

10       Q    Let's take a look at Exhibit No. 14 to

11   Mr. Gardner's deposition.

12   (Document presented.)

13       Q    Mr. Tjaden, do you recognize this document?

14       A    I do.

15       Q    And this is the --

16       A    It's a letter to Mr. Morris.

17       Q    Okay.  And this is the letter that you believe

18   identifies his terms of employment with Buvermo?

19       A    Correct.

20       Q    Okay.  Incidentally, did you play any role in

21   drafting this letter?

22       A    I certainly played a role in the contents of it.

Morris vs. Buvermo, et al.                          Deposition of J. Tjaden 12/05/06

                                                                    112

1    (Proceedings participants speaking at the same time.)

2        Q    Okay.

3        A    -- a net interest.

4        Q    You mentioned earlier the two-year vesting

5    period.  When you reviewed this document, what did you

6    understand that to mean?

7        A    The only way I interpret it is that if you are --

8    you have to be at the company for two years in order to

9    receive this interest.

10       Q    Uh-huh.

11            And do you recall --

12       A    Vest over a period of two years.

13       Q    Okay.  And so your understanding is that the

14   individual, in this case Jonathan Morris, Jonathan Morris

15   would have to be at the company at the end of two years in

16   order to --

17       A    Yes.

18       Q    -- attain those interests?

19       A    Absolutely.

20       Q    Okay.  And do you recall having a discussion with

21   Mr. Morris prior to his employment about that?

22       A    No.

125

1  well, strike that.

2         I'm not sure if this is something that you

3  already responded to.  But did you have an understanding as

4  to why he was paid -- well, why he was paid through a

5  company as a consultant?

6      A    Yes.  It was on his request because he was a --

7  he wanted to maintain his residenceship (sic) in Florida.

8      Q    Okay.  And did he make that request to you?

9      A    I think he did not to me -- perhaps he made it to

10 Andre van Rhee and myself.  But he certainly mentioned the

11 possibility of wanting to structure it in that manner.

12     Q    Okay.  Did he tell you why?

13     A    So that he -- well, he said it was -- it was more

14 tax efficient for him to be paid in a different manner.

15     Q    Okay.

16     A    It has to do with estate taxes.

17         MR. HADDAD:  Let's take a five-minute break.

18 (Whereupon, a brief recess was taken.)

19         BY MR. HADDAD:

20     Q    Do you recall at any time having discussions with

21 Mr. Morris regarding his concerns about John Gardner's

22 interference with his operation of Buvermo?

126

1      A    Yes, I do.

2      Q    Okay.  And when do you recall first discussing

3  that with Mr. Morris?

4      A    Probably in the August, September time frame.

5      Q    And what was the nature his complaint?

6      A    That Mr. Gardner was interfering with his -- with

7  him properly doing his job and that Mr. Gardner wouldn't

8  let go of -- of the company and that Mr. Gardner was, you

9  know, in the marketplace, scurrying for deals and -- and

10  that Mr. Gardner had little belief in him.

11      Q    Okay.  And what, if anything, did you do in

12  response to these complaints?

13      A    I discussed them with Mr. van Rhee; I discussed

14  them with Mr. Gardner; and I discussed them with him,

15  Mr. Morris.

16      Q    And was this also in the August time frame?

17      A    It was around that time.  And then it occurred

18  again, I think, in early December, when both Mr. Morris and

19  Mr. Gardner called me and said that they had resolved that

20  they could no longer work together.

21          And it was very obvious to us that -- that the

22  two characters of the two men was so different, that it was

128

1        A        Correct.

2        Q        And Gardner at that time -- Mr. Gardner was told

3   at that time that from that point forward he was not to be

4   in the office except for one day a week; correct?

5        A        That's correct.

6        Q        And that was a decision that was made by you and

7   Mr. van Rhee; correct?

8        A        Correct.

9        Q        And why did you make that decision?

10       A        Because we wanted to give Mr. Morris every

11   opportunity that there was to -- to have a positive result.

12   We were backing in effect him in fulfilling his role as

13   president of Buvermo.

14       Q        And aside from being there only one day a week,

15   what were the other terms of this agreement?

16       A        In -- in general we -- in general we also

17   provided for Mr. Gardner to, you know, take on the role of

18   Mr. Zachariasse a little sooner.  I think Mr. Zachariasse

19   had his farewell dinner party around December 11, 12.  So

20   effectively we said:  Look, why don't we implement your

21   taking that role sooner to be more of an advisor, rather

22   than very proactively in the office.

Morris vs. Buvermo, et al.                                    Deposition of J. Tjaden 12/05/06

129

1       Q    Okay.  Wasn't there some sort of understanding as

2   to -- well, wasn't there some sort of understanding that

3   Mr. Gardner would limit his function to servicing old JBG

4   deals or existing --

5       A    And --

6       Q    -- JBG deals?

7       A    -- and you're right.  And we did say that as far

8   as the market was concerned, that Mr. Gardner would commit

9   himself to the relationship with JBG, that new

10  relationships would be handed over to Mr. Morris.

11      Q    And you expected Mr. Gardner to -- I assume you

12  expected Mr. Gardner to adhere to that agreement --

13      A    Certainly.

14      Q    -- correct?

15           Did you at any time after -- throughout this time

16  period when Mr. Morris started talking to you about

17  Mr. Gardner and his -- Mr. Gardner's -- well, at least

18  Mr. Morris's view that Mr. Gardner was interfering -- do

19  you recall ever having thoughts about whether this had

20  something to do with Mr. Gardner having a difficult time

21  letting go of his role?

22      A    I had -- certainly to some extent I did think

Morris vs. Buvermo, et al.                                    Deposition of J. Tjaden 12/05/06

130

1    that.

2            But I have to also say that I was disappointed

3    and becoming increasingly disappointed with the way that

4    Mr. Morris was handling that whole situation.

5        Q    "That whole situation" being the situation with

6    Mr. Gardner?

7        A    Yes, because I -- the -- the big disappointment

8    was that he was not able to -- to work things out and take

9    the lead with Mr. Gardner.  It was a real disappointment.

10       Q    And you attributed that to Mr. Morris?

11       A    Partly, of course.

12       Q    Why?

13       A    Because, in my experience, when there are -- when

14   two people, particularly with such different characters,

15   can't get along, it usually has to do with both of them,

16   rather than with only one.

17       Q    So your attributing some fault to Mr. Morris was

18   based on your general experience?

19       A    Yes.

20       Q    But was it based in any way specifically on their

21   interactions and what was actually going on?

22       A    Well, I found certain representations of

131

1    Mr. Gardner meeting with real estate people other than JBG

2    in the marketplace and being extremely hung up about that

3    and -- inappropriate and -- and not in the sense of a

4    partnership.  You know, you can turn it around and say, you

5    know, "The more leads I get, the better it is."  And

6    Mr. Morris showed -- that was an example where I thought he

7    was -- that it was inappropriate.

8        Q    Even though that was the agreement that had been

9    reached; correct?

10       A    Well, the agreement that had been reached is

11   to not go out -- that Mr. Gardner would not go out and

12   solicit -- actively solicit transactions.  The agreement

13   was not that if Mr. Gardner was called by somebody he'd

14   known for a long time who was in the market and said, "Hey,

15   why don't we meet with each other to discuss the business,"

16   that Mr. Gardner would not do that.

17           We did not have to sit down and dictate or write

18   down specifically what each of these men should do.

19   They're both grownups.

20       Q    There came a time -- you had a March board

21   meeting; correct?

22       A    (The witness moves head up and down.)

136

1      Q    That was a new opportunity --

2      A    Yeah.

3      Q    -- for Fidelio?

4      A    New deals change attitudes.

5      Q    Now, you ultimately voted in favor of terminating

6 Mr. Morris in March of 2006; correct?

7      A    That's correct.

8      Q    All right.  As best as you can, tell me what your

9 basis for terminating him was.

10     A    It was -- it was really that dinner that we had

11 at the Four Seasons Hotel where he behaved erratically and

12 entirely inappropriately towards us, meaning Mr. van Rhee

13 and myself; and where I was very concerned and deeply

14 concerned when that -- when he abruptly left the dinner

15 meeting without any further explanation; that somebody like

16 that would represent us in a fiduciary basis.

17          And as a fiduciary -- I mean it's such an

18 important part of the whole role.  I lost all -- all faith.

19 I was -- I was shocked to my deepest roots.

20          And he called me later after the dinner and --

21 and he must have known how I felt.  And I have to say I --

22 you know, I probably was his biggest supporter through

Morris vs. Buvermo, et al.                          Deposition of J. Tjaden 12/05/06

137

1    that -- through all these difficult times; but that -- this

2    was just the straw that broke the camel's back.  There was

3    no way that we could continue, I felt.

4            And I had a meeting with Mr. van Rhee the next

5    morning, a breakfast meeting.  And he apparently felt the

6    same way, because we determined at that time that we would

7    terminate the relationship with Mr. Morris.

8        Q    Okay.  So his conduct at the March meeting --

9        A    Yes.

10       Q    -- was, in your opinion, the reason for his

11   termination?

12       A    Yes.

13       Q    Okay.  Now, let's talk a little bit about that.

14            This was March 22; correct?

15       A    Correct.

16       Q    And this was a dinner at the Four Seasons Hotel?

17       A    Correct.

18       Q    Okay.  And at that dinner Mr. Gardner took some

19   documents out of his pocket; correct?

20       A    Correct.

21       Q    And he showed them to you and Mr. van Rhee at the

22   table?

146

1    purposes of this discussion here that Mr. Gardner did take

2    it upon himself to do it -- okay? -- but had failed to show

3    it to Mr. Morris prior to your dinner.

4            Do you find that to be appropriate conduct on

5    Mr. Gardner's part?

6        A    I find it very unusual.

7        Q    But you --

8        A    I would have expected him to discuss that, yes,

9    absolutely.

10       Q    And you would understand why Mr. Morris might get

11   angered if something that he felt Mr. Gardner had taken

12   charge of was presented at this meeting, prior to his

13   review?

14           MR. SMITH:  Object to form.

15       A    My interpretation of his irritation was that he

16   did not understand that this was an example.  That's

17   different.

18           Had he been totally unaware of what was going on,

19   then I can understand that he would have been irritated.  I

20   could not understand that he became -- he went -- I don't

21   know what the proper way to say it, but he went ballistic.

22           BY MR. HADDAD:

150

1    Mr. Morris left; correct?

2        A    Correct.

3        Q    And you discussed what had happened; correct?

4        A    Correct.

5        Q    Okay.  And did you solicit any -- did you

6    solicit -- well, did you ask Mr. Gardner as to what

7    his view -- did you discuss termination at that point?

8        A    Mr. van Rhee and I were shocked, as was

9    Mr. Gardner.  We were totally shocked.

10            And in addressing -- it was discussed, and I

11   addressed Mr. van Rhee, and he addressed me about this --

12   on this issue.  We sort of looked at each other and said,

13   You know, is this -- can this go on?  And we decided we

14   would sleep -- we would sleep on it.

15            And I was -- as I said, I was -- I was in shock.

16   But we did mention that this might perhaps lead to

17   termination, yes.  But we wanted to sleep on it.

18       Q    And did you ask at that time Mr. Gardner what his

19   views were on the issue -- well, on whether to terminate

20   Mr. Morris?

21       A    We -- I had not asked.  I did not.

22            But wait.  I did -- let's say it differently.  I

Morris vs. Buvermo, et al.                                    Deposition of J. Tjaden 12/05/06

151

1    had -- Mr. Gardner was never involved in the decision.

2    That decision was made by Mr. van Rhee and myself the next

3    day at the breakfast meeting.

4            Was termination mentioned?  Could this go on any

5    further?  We talked mostly about trying to interpret what

6    had happened, rather than what the consequences might be.

7    And we did all understand that it might lead to

8    termination.

9        Q    Uh-huh.

10            During that discussion that night between the

11   three of you, did you discuss Mr. Morris's performance

12   otherwise outside the dinner, his performance on behalf

13   Buvermo?

14       A    That evening we didn't; I don't think so.

15       Q    And you stated that you then spoke with

16   Mr. Morris on the telephone later --

17       A    Yes.

18       Q    -- that evening?

19       A    I invited him to come to -- to the meeting, and I

20   told him how shocked I was.

21       Q    Okay.  So you called him up to invite him to a

22   breakfast meeting?

157

1           MR. SMITH:  I have a few questions I want to ask.

2           MR. HADDAD:  Go for it.

3                      CROSS-EXAMINATION

4           BY MR. SMITH:

5      Q    You testified about the negotiations leading up

6   to the offer of employment to Mr. Morris; and I believe you

7   said that you had a long-term view of the opportunity and

8   you expected that -- and I'm summarizing, obviously --

9   Mr. Morris, you wanted to make sure that he had somewhat of

10  a long-term perspective as well?

11     A    Correct.

12     Q    I'm just drawing your attention to that

13  testimony.

14          During those discussions did the company Buvermo

15  offer any specific term of employment to Mr. Morris?

16          MR. HADDAD:  I'm just going to object to

17  foundation.

18          But go ahead.

19     A    No.

20          BY MR. SMITH:

21     Q    All right.  And did Mr. Morris ever attempt to

22  even negotiate a fixed term of employment?

Morris vs. Buvermo, et al.                          Deposition of J. Tjaden 12/05/06

158

1      A   He did not.

2        MR. HADDAD:  Again, I'm going to object to

3  foundation.

4        BY MR. SMITH:

5      Q   And did Mr. Morris attempt to negotiate a

6  severance package or a payment in the event he was

7  terminated?

8      A   He did not.

9        MR. HADDAD:  Same objection.

10       BY MR. SMITH:

11     Q   All right.  And did the company agree to employ

12  Mr. Morris until he reached the age of 60 years old?

13       MR. HADDAD:  Same objection.

14     A   Absolutely not.

15       MR. SMITH:  Just so I understand what your

16  objection is.

17       MR. HADDAD:  Well, you're asking him what Buvermo

18  agreed to.  And I don't think that he's the only one who

19  plays a role in that.

20       MR. SMITH:  Well, the question assumes,

21  obviously, he was participating in the discussions.  All

22  right.  I understand your objection.

MDW Court Reporting, Inc.  (703) 591-2341

159

1          MR. HADDAD:  Okay.

2          BY MR. SMITH:

3      Q    All right.  Did the company ever agree to employ

4   Mr. Morris for a ten-year period?

5      A    No.

6          MR. HADDAD:  Can I just make -- I'll just make

7   a --

8          MR. SMITH:  You can.

9          MR. HADDAD:  -- continuing objection --

10          MR. SMITH:  Sure, sure.

11          MR. HADDAD:  -- to any questions related to what

12   the company did without first establishing that he knows

13   what the various people with authority to bind the company

14   did.

15          BY MR. SMITH:

16      Q    Now, you understand that my questions are

17   directed to your participation in discussions --

18      A    I understand.

19      Q    -- with Mr. Morris?  All right.

20          And in terms of Mr. Gardner's ongoing role after

21   December of '05, did you anticipate that Mr. Gardner would

22   have any ongoing role with the company after December