# EXHIBIT

# 3

Morris vs. Buvermo, et al.                                    Deposition of A. van Rhee 12/06/06

10

1    yesterday evening?

2        A    Yeah.

3        Q    What documents did you review?

4        A    That was the partnership agreement of Fidelio and

5    the FPEP partnership agreement or bylaws or whatever the

6    name is and the Buvermo bylaws and my own letter that I

7    made about what happened in the March dinner and after

8    that.

9        Q    Let's talk about some of the resolutions that

10   were passed at yesterday's meeting.  Do you recall what

11   resolutions were passed?

12       A    They were designations for FPEP for the Spotswood

13   Shopping Center and Reston International Center, I think.

14   And it was -- we decided to make changes to the FPEP

15   agreement or whatever that is to make it possible to enter

16   Mr. Millspaugh and to take away the name of Mr. Bonacci,

17   who left the company quite some time ago.

18       Q    Were any other properties other than Spotswood

19   and Reston International Center designated as FPEP

20   properties?

21       A    Not as I recall.

22       Q    And did the designations reflect an FPEP

15

1          Okay.  And Mr. Millspaugh was appointed president

2     at yesterday's meeting --

3          A    No --

4          Q    -- is that correct?

5          A    -- no.  That was -- I want to be careful.

6     Anyway, the appointment was earlier.  Whether that was

7     confirmed, I don't think that was necessary at this

8     meeting.  I mean I think we had done that earlier.

9          Q    So you don't recall --

10         A    The only thing we did is bring him into FPEP,

11    written.  But he was already president.  I mean that's --

12    that was last meeting all -- at last meeting already.

13         Q    Okay.  So you don't recall any discussion at

14    yesterday's meeting regarding confirming Mr. Millspaugh as

15    the president of --

16         A    Buvermo.

17         Q    -- Buvermo?

18         A    No.

19              He was chairing the meeting; I mean nothing new.

20         Q    Let's just go through some of the organizations

21    in which you're involved.

22              You are familiar with the general partnership

24

1      for Donelux on that management committee; correct?

2          A    Correct.

3          Q    And Mr. Tjaden is the designated representative

4      for Janivo Realty; correct?

5          A    Yes.

6          Q    Okay.  So the two of you essentially make

7      decisions on behalf of the management committee of Fidelio;

8      correct?

9          A    Yes.

10         Q    And is there anybody else that participates in

11     those decisions?

12         A    Not in decision.  But if you have consultants,

13     you ask them before you make decisions.

14         Q    Okay.  But the decisions themselves are --

15         A    Are entirely up to us, yeah.

16         Q    Up to you and Mr. --

17         A    Tjaden.

18         Q    -- Tjaden?  Thank you.

19              And it's the management committee that decides

20     whether to invest in deals initiated by Buvermo; correct?

21         A    That's correct.

22         Q    And it also decides whether to sell interests in

43

1      A    It might have been even in the best interests of

2    Mr. Gardner.

3      Q    Okay.  But there was a time where you --

4      A    There was a time that we came to the

5    conclusion -- all of us, not Mr. Tjaden and myself; but it

6    was Mr. Tjaden, it was myself, Mr. Zachariasse, and

7    Mr. Gardner himself -- that changes would inevitably come

8    and that the moment might -- might come closer.

9      Q    Okay.  And who initiated that discussion or

10   understanding?

11     A    Mr. Zachariasse did.

12     Q    Okay.  And what specifically did he envision?

13     A    As I recall it, he first announced that he would

14   withdraw as consultant.  And that started the discussion

15   because I -- it was very well known that I would withdraw

16   after the 1st of April upcoming.  I said, "Hey, there's a

17   whole generation shift coming.  And so what does that mean

18   for" -- for the company, for the structure?"

19          And that discussion ended in -- in the idea that

20   we needed a new president to bring in new relationships in

21   the market while -- and that, in my opinion, is the

22   basis -- while Mr. Gardner is still dealing with his JBG

45

1      A      That's true.

2      Q      At least -- you're from Holland?

3      A      The Netherlands, yes.

4      Q      The Netherlands.  Sorry.

5             And your testimony is that that had nothing to do

6    with requesting -- Mr. --

7      A      No.

8      Q      -- Gardner requesting the change --

9      A      We're very aware of --

10     Q      -- to Buvermo's presidency?

11     A      -- of all these 78 people, presidents in the

12   United States companies.  We always think that's very

13   different from what we do, but we know that in America

14   that's different.

15     Q      You said you needed new blood to bring in new

16   types of -- I'm sorry -- different investors --

17     A      Yeah.

18     Q      -- to the mix; correct?

19     A      Yeah.

20     Q      What --

21     A      Not that different.  Not different investors to

22   us, because we are a rather closed party --

47

1           But it might have come without him as well

2    because the relationship was always -- also a man that we

3    did other business with before, so it was not completely.

4        Q    Okay.  But I don't think that -- you're not

5    disputing that Mr. Morris was responsible for bringing in

6    the Spotswood deal; correct?

7        A    You've read it.

8        Q    I'm sorry?

9        A    You have read that.  I've written that down.

10        Q    Oh, okay.

11        A    Yeah.

12        Q    All right.

13        A    No.

14        Q    Just to be clear, you're not disputing that?

15        A    No, no, no, I'm not.

16        Q    When did these discussions about Mr. -- about

17    finding a replacement for Mr. Gardner begin?

18        A    Instead of saying the date, that was when

19    Mr. Zachariasse announced that he would not be very long

20    among us.

21        Q    Okay.  So you have no recollection of what year

22    it was?

48

1      A    It might be two years ago, something like that.

2      Q    Okay.  That would put us in the 2004 time frame?

3      A    I suppose so.

4      Q    All right.  Certainly, in any event, it was

5   before Mr. Morris was hired; correct?

6      A    Oh, yes --

7      Q    All right.

8      A    -- absolutely.

9      Q    And what did you at the time -- the three of

10  you -- or even the four of you -- you, Mr. Tjaden,

11  Mr. Zachariasse, and Mr. Gardner -- envision would happen

12  upon the hiring of this new president?

13     A    In what way?

14     Q    Well, in terms of who would assume what role.

15     A    Finally, after the whole transition process, the

16  new man would take the role of Mr. Gardner and Mr. Gardner

17  would take the role of Mr. Zachariasse.  That was the idea.

18  What that legally completely means -- but that was the

19  fundamental idea.

20          But being very comfortable with Mr. Gardner as

21  our fiduciary, we were very careful not to give all that

22  position immediately to a new guy we didn't know.

51

1          Q    I see.

2               The transitional period dealt with substituting

3    Mr. Morris also as president of FPMI; correct?

4          A    Yeah.  That was envisioned, of course.

5          Q    Mr. Zachariasse continued as advisor of Buvermo

6    through --

7          A    Through the -- sorry.

8          Q    -- through 2005; correct?

9          A    Yeah, in December.  Half December, I think he

10   resigned.

11         Q    How long had he been in that role prior to that,

12   roughly speaking?

13         A    Longer than I in my role.

14         Q    Okay.  So over seven years?

15         A    Yes.

16         Q    Okay.  Do you have an understanding as to what he

17   did in that role?

18         A    Yeah, I think so.

19         Q    Okay.  Can you tell me what he did.

20         A    He screened together with Mr. Gardner all

21   propositions for new deals.  He may have come -- and I

22   think he did -- come with ideas about deals himself.  He

61

1            MR. SMITH:  Do you mean a promoted interest, or

2     do you mean something different?

3            MR. HADDAD:  In any way.

4        A    No, as far as I know.

5            But I mean you constantly suggest that people get

6     compensated for sourcing a project, but that's not what it

7     is.  We compensate people for successfully managing our

8     interest in a project.  It's -- it's not that we give money

9     because they source it; we give money if they bring it to a

10    good end.

11           BY MR. HADDAD:

12       Q    Okay.  I'm not --

13       A    There's a very different approach.

14       Q    I don't agree with your characterization of what

15    I'm suggesting.

16           I'm just asking you whether Buvermo or Fidelio or

17    anyone else, for that matter, has compensated Mr. Gardner

18    for sourcing the JBG deal?  And your answer to that is

19    "No"; correct?

20       A    Correct.

21       Q    And let me ask a similar question, different but

22    similar.  Does Fidelio or Buvermo, for that matter, have

62

1    any intention in the future of compensating Mr. Gardner for

2    sourcing the JBG Reston International Center deal?

3          A    No.

4                He co-invests.  That should be it.

5          Q    Aside from his --

6          A    No.

7          Q    -- co-investment?

8          A    No.

9                MR. HADDAD:  Why don't we take a five-minute

10   break.

11   (Whereupon, a brief recess was taken.)

12               BY MR. HADDAD:

13         Q    Upon Mr. Millspaugh's hire he was provided with

14   an offer letter; correct?

15         A    That's correct.

16         Q    And among other things Mr. Millspaugh has been

17   offered a promoted interest in both Spotswood and Reston

18   International Center; correct?

19         A    That's correct.

20         Q    Okay.  What is your understanding as to what

21   Mr. Millspaugh is doing -- what work is he doing on the

22   Spotswood Center deal?

Morris vs. Buverno, et al.                                    Deposition of A. van Rhee 12/06/06

63

1      A     He is managing our involvement there.

2      Q     And what does that entail?

3      A     I don't know in detail.  He meets with the

4   people.  He -- all kind of decisions having to be made by

5   the developer there.  He does that together with them.

6      Q     Who is the developer?

7      A     Mr. Garchik.  Do I say it right?

8      Q     Okay.  And Mr. Garchik is responsible for

9   developing -- has assumed the role of developer of that

10  property; correct?

11     A     I don't know that very correctly.  I know that

12  our contact there is Mr. Garchik.  But whose role in that

13  project exactly is -- we are equity providers in that.

14  We're not managing that ourselves.

15     Q     Do you have any understanding as to how much of

16  his time Mr. Millspaugh puts towards management of the

17  Spotswood deal?

18     A     No idea.

19     Q     Okay.  Do you know how many meetings he's had

20  with Mr. Garchik or any other investor in that deal since

21  he came aboard?

22     A     I have no idea.  I'm not the controller of the

64

1    company.

2        Q    Okay.  Do you have any understanding as to how

3    much of a time investment he needs to put into that deal

4    during its life span?

5        A    I have no idea.

6        Q    Okay.  You obviously approved Mr. Millspaugh's

7    offer letter?

8        A    Yes.

9        Q    And why --

10       A    Yes.

11       Q    And why did you feel that he should be entitled

12   to a promote in Spotswood?

13       A    Because he has to manage it.  I mean this project

14   is developing under his management.

15       Q    Uh-huh.

16            Well, are you sure that it's him who's managing

17   it or Mr. Garchik?

18       A    It's different roles.  As I said, we supply

19   equity to developers.

20       Q    Uh-huh.

21       A    We are not the developer ourselves.  So he is

22   managing our interest in that project.  And as I explained

65

1     to you earlier, it's not who initiates it.  It's the one

2     who brings to it a good end, from our perspective.

3          Q     Uh-huh.

4          A     And that he has to do.  That's his role.  He is

5     our man to see to it that our money is well invested.  So

6     if that is successful, he should be rewarded for that.

7     That's how we see it.

8          Q     The money in Spotswood was invested prior to

9     Mr. Millspaugh's hiring; correct?

10         A     Yes, I suppose so.

11         Q     Uh-huh.

12         A     Although, I never know what the exact moment of

13    bringing the money is and what committing to bringing the

14    money is.

15         Q     Okay.  And you keep suggesting that Mr. -- or you

16    have suggested that Mr. Millspaugh is managing that

17    investment; correct?

18         A     We've made him responsible for that.

19         Q     Okay.  And you've stated that as part of his

20    management he meets with individuals; correct?

21         A     Yes.  He told me that.

22         Q     Okay.  But you have no understanding as to how

Morris vs. Buvermo, et al.                                    Deposition of A. van Rhee 12/06/06

66

1    often or when he meets with individuals; correct?

2        A    That's correct.

3        Q    And you have no understanding as to what time

4    commitment the Spotswood -- management of the Spotswood

5    Valley deal entails; correct?

6        A    Correct.

7        Q    Now, with respect to the Reston International

8    Center, what does Mr. Millspaugh do in connection with that

9    project?

10       A    As far as I know, he's heavily involved with

11   that.

12       Q    Heavily involved?

13       A    Yes.

14       Q    Okay.  What do you mean by "heavily"?  What is he

15   doing?

16       A    What he does for all the projects that we are

17   involved in, taking care of our interests there.  But what

18   it means, I mean that's not a shareholder's role.

19       Q    You don't know what that means?

20       A    No.  Seeing what he exactly does day-to-day for

21   that is not my role to have an opinion about.

22       Q    Well, you're compensating him for that; correct?

71

1    opinion about his predecessor.

2        Q    This is --

3        A    Kara McCormick.

4        Q    Kara McCormick.

5             Incidentally, do you recall ever having

6    discussions with Mr. Morris about terminating

7    Ms. McCormick?

8        A    That's a difficult question.  But he might have

9    brought that up, that he would not have forever a role for

10   her, what is different from discussing terminating.  But

11   whether she would have a long-term future, that I think he

12   brought once up.

13       Q    So your recollection is that he suggested to you

14   that she may not have a long-term future with --

15       A    I think that what he suggested to me is that she

16   had ambitions to go more into the market and that he didn't

17   think that that was her strengths and that she might be not

18   completely satisfied in the other side of her role.

19       Q    When you were looking for a replacement for

20   Mr. Gardner, did you consider how long you wanted the

21   replacement to be around?

22       A    We wanted stability, so we want somebody who can

72

1    do this for years.

2         Q    Okay.  You, as Mr. Tjaden did, wanted a long-term

3    employee?

4         A    Yeah.  We wanted a long-term commitment to us,

5    yeah.

6         Q    And what do you characterize as being a long-term

7    commitment?

8         A    Not looking for other jobs while you're here.

9    That's -- that's what I call a long-term commitment.

10        Q    Okay.

11        A    Not seeing it as a career step.

12        Q    Okay.  Do you have in mind any year range as to

13   what a long-term commitment might be?

14        A    No.

15        Q    Do you consider two years to be a long-term

16   commitment?

17        A    No.

18        Q    Okay.  Do you consider five years to be a

19   long-term commitment.

20        A    I'm not going to answer that.  But if you ask how

21   many years, I say no, I have not, then don't go --

22        Q    I'm --

73

1      A    -- the way that I gave the next -- I take a high

2    one, a low one, a high one, a low one.

3      Q    I'm just asking you:  Do you consider five years

4    to be a long-term commitment?

5      A    That can be a long-term commitment.

6      Q    Okay.  Do you believe five years may be a

7    long-term commitment?

8      A    Yeah.  If you have a long-term commitment and you

9    leave after five years, you're not wrongdoing to the other

10   party.  If you take a long-term commitment and you leave

11   after two years, I mean you're not honest, in my value

12   system, whatever the offers you get are.

13     Q    Okay.  Do you believe that the reverse applies;

14   if you make a long-term commitment to an employee and you

15   terminate him after two years, then that's not right?

16          MR. SMITH:  Object to form.

17     A    Not at all.  I mean if you contract somebody, one

18   thing is the commitment in time; but the other thing is

19   that he has to perform his role well.  And if that is not

20   the case, then whatever your idea was, your intention was,

21   you have to stop that as soon as possible.

22          BY MR. HADDAD:

Morris vs. Buvermo, et al.                    Deposition of A. van Rhee 12/06/06

74

1    Q    But assuming the individual is performing his

2  role well, do you believe that it would be wrong to

3  terminate somebody --

4    A    Then it would be wrong, yes.  Yes, I agree.

5    Q    Do you recall having any discussions with --

6  well, have you ever had any discussions with Mr. LoPinto?

7    A    Yes, before the hiring and at the interviewing.

8    Q    Do you ever recall expressing to him your

9  interest in having a long-term commitment from a candidate?

10   A    Yeah.  He must have heard that, yes.

11   Q    He must have heard that?

12   A    Yes.

13   Q    Okay.  Do you generally recall discussing --

14   A    Because --

15   Q    -- it with him?

16   A    -- it's so at the -- at the core of what we are

17  looking for.  We are not looking for short-term things.  We

18  had one for over twenty years.  If we could get another one

19  for over twenty years, whatever it would be, that would be

20  stable.  You cannot put all your trust in somebody who

21  comes and goes and comes and goes.

22   Q    Okay.  And do you recall ever discussing your

75

1    preference for a long-term commitment with Mr. Morris?

2        A    During interview he asked us what our commitment

3    was to the business because that was basically the start of

4    the downturn, at least -- no, it was not the down-turn yet.

5    But we were very scared that this enormous boom in the real

6    estate market would not last.  So that there could be a

7    time that there wouldn't be much business, because we were

8    basically -- as we did, after all, we sold about all our

9    port- -- our whole portfolio.

10            So we discussed that, that -- whether we would

11   stay committed; although, we might go through a very slow

12   period.  And there I -- because we -- every ten years we

13   commit to this business.  And we just had the decision of

14   our own shareholders to commit another ten years to this

15   operation.  So that -- he asked how committed we were.

16            Janivo was even longer-term committed than we

17   are.  We review that every ten years.  They say this is

18   indefinite.

19            So I explained to him that we were committed for

20   another ten years.

21       Q    Okay.  And did you speak with him about what his

22   level of commitment was?

77

1    nice -- as I recall it -- but I don't know how he stated

2    that literally or whatever -- that this was a nice last job

3    for him.

4        Q    Okay.  He left you with the impression that he

5    was willing to make a long-term commitment?

6        A    Yeah.

7        Q    Do you recall how many interviews you had with

8    Mr. Morris prior to him being hired?

9        A    One or two.

10       Q    Do you recall where those interviews took place?

11       A    One must -- was in a hotel.  I think it was the

12   Hyatt somewhere downtown.  But, anyway, in -- in the area

13   here; but I don't know exactly which place.

14       Q    One you believe at the Hyatt in D.C.?

15       A    Yeah.  I think it was the Hyatt.  But it was a

16   hotel.

17       Q    That was in the District; correct?

18       A    Yeah, I think it was in the District.  But even

19   it may be in Virginia.  I don't know.

20       Q    Okay.  Let me show you what was marked as Exhibit

21   No. 14 to Mr. Gardner's deposition.

22   (The witness reviewed document.)

89

1       A     Yep, that's correct.

2       Q     And that gut feeling of yours persisted

3    throughout his employment?

4       A     Yes, yes, yeah.

5       Q     Okay.  And what, if anything, during his

6    employment with Buvermo -- well, did you feel that your gut

7    feeling was substantiated during his employment with

8    Buvermo?

9       A     Later on yes.  In the beginning I was -- I was

10    more confirmed in the positives because he came with the

11    Spotswood project, one of the things that we -- that we

12    hoped for that a new guy would do.

13       Q     Uh-huh.

14       A     So basically the idea was:  Yes, I don't like the

15    guy so much; but he is doing what he should do.  And then

16    after a while we got down to whether he was doing what he

17    should do.  But in the beginning that was confirmed, so

18    I -- I had peace with the fact that we had hired him.

19       Q     When did you get doubt that he wasn't doing what

20    he should do?

21       A     That was first in the August meeting, and that

22    was -- I call that a transition problem.  I was very

90

1    disappointed in the first meeting we had where he was the

2    president basically; that he didn't present things; that he

3    didn't prepare the board book; but that he had Mr. Gardner

4    do everything.  He even didn't read the book very well.

5            So I was very, very disappointed then.  So we

6    discussed that, that it was his role; so that at next

7    meeting he should make the presentations, that he should

8    prepare the board book or let it be prepared but that it

9    was his responsibility and not Mr. Gardner's.

10       Q    Uh-huh.

11           How do you know that Mr. Gardner was the sole

12   person -- well, how did you know that Mr. Gardner prepared

13   it and not Mr. Morris?

14       A    Well, we found out during the meeting; and he --

15   he confirmed that.

16       Q    Mr. Morris confirmed it?

17       A    Both confirmed it.

18       Q    Okay.  How do you know that Mr. Morris hadn't

19   reviewed it? -- I think is what you stated.

20       A    Because he was surprised about things coming up

21   during the meeting.  I mean normally you would expect him

22   to take the lead and to explain us, but Mr. Gardner had to

Morris vs. Buvermo, et al.                              Deposition of A. van Rhee 12/06/06

91

1    explain him a bit (sic).

2             And he was just not -- he was only intimate

3    with -- I don't know whether Spotswood was already done or

4    whether he was after it, but it was his connection.

5             One -- one of the things that he had brought as

6    one of his strengths was his position with the Guggenheim

7    family.  He knew them well, and that could -- could bring

8    another type of projects (sic) to us.

9             Now, that subject, he brought himself.  But the

10   whole rest, I got the idea he wasn't interested in at all.

11        Q    This was a management committee in --

12        A    In France.

13        Q    -- in August of '05; right?

14        A    In August '05 in France.

15        Q    Do you recall what time in August it was?

16        A    No.

17        Q    In any event, Mr. Morris had been hired by the

18   company in June of '05; correct?

19        A    Yeah.

20        Q    And he didn't start until June 27th of '05?

21        A    Yeah, yeah.

22        Q    So you felt that it would have been his

Morris vs. Buvermo, et al.                                  Deposition of A. van Rhee 12/06/06

92

1    responsibility to prepare a board package --

2        A    Yes.  But we agreed in the end that he would do

3    it the next time.

4        Q    Okay.

5        A    But I mean you asked whether I felt confirmed in

6    my doubts about the man, yes or no.  Now, that was a

7    negative; but then coming up with Spotswood was a positive.

8    So I was -- I was in doubt for a long time.

9        Q    I'm just trying to understand why that's a

10   negative.

11           He'd only been working there for a little over a

12   month; correct?

13       A    Yeah.

14       Q    All right.  And yet you expected him to make a

15   presentation on investments that preexisted him?

16       A    Yes.  I would expect him to have read everything

17   about these things in the first few weeks of working there

18   and then taking the lead in the meeting and maybe saying,

19   "Now, here for this I give Mr. Gardner the work because he

20   is more intimate with this than I am."

21           But he didn't take that role at all.  He didn't

22   take any -- any president's role.

Morris vs. Buvermo, et al.                                    Deposition of A. van Rhee 12/06/06

97

1    is after discussing a lot with Mr. Tjaden, with

2    Mr. van t'Hooft, with Mr. Vis, we should give the man a

3    fair chance to -- to go through this transition.

4            So this transition is supposed to be with the

5    full-time presence of Mr. Gardner up to the end of year.

6    Now, that was about two weeks from where we were, I think.

7    So we said:  My God.  Let's get this to end of year.  Then

8    Mr. Gardner goes to his one-day-a-week idea.  Let's see how

9    that works out.

10       Q    Who proposed the one-day-a-week idea?

11       A    That was the old idea.

12       Q    The old idea?

13       A    Yeah, that -- that was already -- whether it was

14   exactly one day, but he would be full-time in the office

15   until the end of the year.  And after that whether it's in

16   my mind one day a year, I -- one day a week I don't know.

17   But I think we have discussed it that way.  But it might

18   have been two days.  But, anyway, far less than half.

19       Q    Did you feel that Mr. Gardner's -- limiting

20   Mr. Gardner's time in the office was necessary for

21   Mr. Morris to complete the transition?

22       A    That might be.  We wanted to give him that

99

1    Mr. Tjaden had also, as it turned out, that we had to ask

2    them specifically whether that was the case or not because

3    from -- we cannot see what really happens in that office.

4        Q    Okay.  And what was the question you specifically

5    recall asking?

6        A    "Are things now going well between you two?"

7        Q    Okay.  And this was a question that was posed to

8    Mr. Gardner alone -- I mean Mr. Morris alone?

9        A    As I recollect it, we asked it in the car to him

10   alone because Mr. Gardner was not in that same car.  And

11   Mr. Tjaden and I agreed that we had to ask it also when

12   both people were there, so we had to repeat that question

13   at the dinner.

14       Q    I see.

15            And in the car what was Mr. Morris's response, if

16   you recall?

17       A    That he had found a way of living with

18   Mr. Gardner.

19       Q    Okay.  And what was the response at dinner?

20       A    The same.

21       Q    Okay.  Do you recall discussing the possibility

22   of terminating Mr. Morris in December of '05?

100

```
 1        A    Yes.  I have discussed that with my colleague.

 2        Q    Okay.  That was Mr. --

 3        A    Mr. van t'Hooft.

 4        Q    -- van t'Hooft?

 5        A    Mr. van t'Hooft, yes.

 6        Q    And that is in the December time frame?

 7        A    That was in December time frame.

 8        Q    Okay.  And what specifically do you recall

 9   discussing about that?

10        A    Well, whether -- whether we still had any belief

11   that this character could be our fiduciary in the States.

12        Q    And this was after the meeting in which he put

13   his foot up on the table?

14        A    Yeah, that was after all this.

15        Q    And what was the basis for that specific

16   discussion, the discussion about potentially terminating

17   Mr. Morris?

18        A    Yeah.  We were not discussing whether we would

19   terminate him.  We were discussing whether this could go

20   on.

21             And that's a different discussion, whether you --

22   you see this as being a structural solution or having your
```

101

1    doubts where it is.  And, of course, if the doubts get

2    stronger and stronger, you come to a moment that

3    termination is maybe.

4            But we -- we were not discussing then:  Shall we

5    terminate him?  We were discussing:  Is this the solution?

6    Do we really believe that this -- this is a good thing for

7    us?

8        Q    And I take it ultimately you concluded that it

9    was?

10       A    No.  We concluded that we had to be fair to the

11   man and then to give him more time.  We did not conclude

12   that we were sure that it was the right thing.  Not at all.

13       Q    And what discussions did you have with Mr. Morris

14   in December in which you explained to him that you thought

15   he was immature?

16       A    I have never told that to the man.  That's not

17   what I tell people.

18       Q    Uh-huh.

19            What discussions did you have with Mr. Morris at

20   all in December about any concerns you may have had

21   regarding him?

22       A    In December?  I think, nothing because that

106

1    know?

2          And maybe Mr. Tjaden know -- knew more about that

3    because he had these conversations when they had a clash.

4    But I was -- I was aware about all kind of -- not doubts,

5    but worries that Mr. Gardner had about how things would be

6    taken care of in the future.  But a worry is different from

7    a doubt.  I mean he is a very fiduciary man for us, and --

8    and -- and these things is what he said.

9          Now, I -- that's the reason that we kept him in

10   place; and he also advised us to keep him for a while in

11   place in the president of F -- of Fidelio Partners

12   Management, whatever the name is, because we had to be

13   really sure that Mr. Morris could play that role as well,

14   not only be active in the real estate markets, but also be

15   a good fiduciary representative for us in the States.

16        Q    Uh-huh.

17             Did you seek any information about Mr. Morris's

18   performance in his role as president during -- since --

19   during the period of December through March, before coming

20   to the conclusion that you should terminate him?

21        A    No.  We did it immediately after that because our

22   termination had to do with the fiduciary function:  Could

107

1    we trust this man?  And for whatever reason.  I mean if we

2    don't trust him, whatever the reason is, we cannot work

3    like that.

4              And the other thing is:  Was he doing his -- his

5    office work or his other work right?  That was not the

6    issue basically for us.

7              That was our surprise.  First, the surprise

8    during -- during the -- the dinner; that John Gardner said

9    that he was not well taking care of his normal

10   responsibilities.

11             But the day after that, when we informed

12   Kara McCormick about our decision, then we got stories

13   that -- and that confirmed it all in a much stronger way.

14             Without that we would have done the same.  We

15   were not discontinuing him because he wasn't doing his --

16   his office work right, because we are not controllers of

17   the office work of the president, but because we could not

18   trust him with our interests in the U.S. anymore because

19   the personal trust was broken.

20       Q    You had a discussion with Kara McCormick about

21   the goings-on in the office after you made the decision to

22   terminate Mr. Morris; correct?

Morris vs. Buvermo, et al.                                    Deposition of A. van Rhee 12/06/06

                                                                              120

1     commitment to the market --

2          A    (The witness moves head up and down.)

3          Q    -- is that correct?

4          A    That's correct.

5          Q    All right.  Now, during the course of those

6     discussions with Mr. Morris, did you at any time agree to a

7     specific term of employment with Mr. Morris?

8          A    None whatsoever.

9               MR. SMITH:  All right.  No further questions.

10              MR. HADDAD:  None.

11         (At 11:42 a.m. the taking of the deposition

12          was concluded.)

13

14

15

16

17

18

19

20

21

22

*VADO Beheer B.V.*
*André C. van Rhee*

van Rhee  1

## Declaration re the termination of Jonathan Morris at Buvermo Inc.

1.  Arrived in Washington on Dulles International Airport on March 22nd in the afternoon. Was picked up, together with Joost Tjaden (JT) by Jonathan Morris (JM), who brought us to the Reston Heigts project, where John Gardner (JG) and Kara McCormick (KMC) joined the party. During the trip to Reston JM presented his proposal to hire a person named Steve Evans, a high quality real estate man, therefore expensive but necessary to guarantee enough deal flow, since JM himself was so busy with the first project he contracted (Spotswood Valley Square shopping center), that he had not enough time to go for other projects. JT and I told him that we could understand that he needed someone to do more of the backoffice work for the projects (since we recently lost two people in the office, Andy VanHorn and Laura Preede), but that JM alone should be enough to source new deals with new parties. That was supposed to be specifically his own responsibility. He disagreed, since his way of working was to do a project preparation from start to signatures himself, which took him long days. After the Reston project presentation by John Schlichting of JBG we arranged a dinner in our hotel for the four of us (JT, JM, JG, AvR) to discuss the current organization and changes to be proposed by JM and JG. Therefore KMC should not join.

2.  Before the dinner JG arrived first in the bar, where he showed me some documents for my approval about his own profit sharing in the Buvermo results (fees minus costs) and the redrafted (by Forrest Walpole, a lawyer and long term personal friend of JG) FPEP contract (promoted interest scheme) for the management, since the current version is highly complicated by historical situations that do not exist anymore. The change of management was a good moment to simplify the text of the arrangement. Then JM arrives, who reacts surprised to the documents, which he had not seen or discussed with JG before we arrived. That surprised me highly and was a negative signal about their cooperation. At the same time I wondered whether we also had a Buvermo profit sharing scheme for JM, since in my opinion the incentives should as much as possible be linked to the profit levels for the partners. By the way, JT disagrees about that, which caused that he did not include that in the contract for JM, which he negotiated. I had negotiated it differently for JG in the past. We decided to go to our table in the restaurant and start our dinner meeting there.

3.  Early during the dinner, after some social talk, JT asked how JM and JG operated together, since in the beginning of the transition there had been some clashes. JM answered that things were going fine, though they sometimes had different opinions, but could always talk it through in mutual respect and come to joint conclusions to present to us. JG confirmed. Then I came back to the idea of total profit sharing, continuing the discussion with John Gardner, which had been abrupted by going to dinner. On his request I explained my ideas about profit sharing in more detail to JM, since this is for him an entirely new issue. He reacted, to my surprise, highly irritated, stating that this type of profit sharing has not been agreed with him and he will never accept it either. My answer is that I of course will respect his contract and that this discussion, started between JG and myself, is apparently at the wrong address with JM. JT adds that this is all a rather philosophical conversation about profit sharing systems, which must at all times be possible during a business dinner, but that this will have of course no consequence for JM's contract. Moreover he says to disagree with me about the subject and proposes to leave it at that, which JG and I happily accepted.

4.  But now JM gets out of control. He cannot be stopped and says that he cannot accept that people are tinkering with his employment conditions behind his back. I repeat that that is not the case nor my intention at all. Than JM complains further that the documents JG had presented to me before the dinner were not known to himself. My reaction is that if that is true, I indeed find that wrong from the viewpoint that JM is fully responsible towards the

FADO Beheer B.V.
André C. van Rhee

## Declaration re the termination of Jonathan Morris at Buvermo Inc.

partners for Buvermo/Fidelio and therefore he should be involved in and aware of all documents to be presented to the partners. Then a great difference of conception surfaces about how far the responsibility of JM toward the partners reaches. JM is of the opinion that his responsibility is to source and realize projects, but that the Buvermo organisation still is a responsibility of the Partners themselves (which might have been the model at his former job with Lerner, where the partners were locally present). This clearly is not the model the Dutch partners have in mind and have communicated all the way through the hiring process. They want a fiduciary for their American real estate interests in the person of the president of Fidelio/Buvermo. This is the role JG has played well for 20 years. JM also starts complaining about the role of JG, claiming that JG operates behind his back and is busy with greedily cashing bonuses. This makes clear to me that the statement of JM and JG about their working relationship has been far from true, and had as purpose to hide their sizeable mutual problems for us.

The conversation gets unpleasant and confused and unexpectedly JM declares that he is very confused about this conversation with us and has decided to leave this dinner meeting with immediate effect to go home, leaving the 3 of us in great astonishment. This is the first time in my life that somebody working for us leaves a meeting prematurely in anger, unless in case of health problems. This is absolutely unacceptable and a proof of very bad manners, especially from the local fiduciary.

5. We continue our meeting dinner without JM to see what action should be taken. JT and myself come to the provisional conclusion that we cannot leave the fiduciary function, linked to the presidency of Buvermo/Fidelio, to a man who acts so unstably, does not listen and keeps highly irrational viewpoints. I had already in December last year substantial doubts about the character of JM, but was persuaded that he should be given time for a fair chance to prove himself. We asked JG for his opinion. He agreed with us that JM was not the right character for Buvermo/Fidelio, but even more important, that he did not see JM spending enough energy and time for Fidelio to successfully generate enough new deals. Moreover he saw JM taking too much distance from the business details, which he found dangerous for the partners' interests. JT and I want to think it over overnight and make a breakfast appointment to come to a final decision. We leave the dinner meeting confused.

6. During breakfast on March 23rd, JT and myself came to the conclusion that JM indeed should disappear. He turned out to have called JT last night, who invited him to the hotel after breakfast to discuss the situation with the partners. Before the breakfast I had called my colleague Willem van 't Hooft in Holland to check my judgement with him. He fully agreed, since he also had developed great doubts about the man during the December meeting. JT and myself discussed how to proceed and agreed that we wanted to play this in a decent way under recognition of the positive role JM had played in the sourcing of the Spotswood Valley Square Shopping Center project via his relations with Steve Garcheck and the Guggenheim family trust.

7. JM arrived later on at the breakfast table. After an exchange of polite social talk, among which no excuses from JM for his behaviour of last night, JT told JM that the partners had decided to terminate his contract with immediate effect, because the current constellation did not function in a way that we felt our interests being well taken care of. I add to that that we understand that the succession of JG, who is still involved as an important advisor and co-investor, could certainly not have been easy. But I had expected that JM would have claimed his full position towards JG. In case that would have resulted in a clash between the two, we would have been prepared, as we had expressly committed to him, to support JM's

*VADO Beheer B.V.*
*André C. van Rhee*

## Declaration re the termination of Jonathan Morris at Buvermo Inc.

position. But instead of such development, we had been wrongly told that everything between the two was fine.

JM took this all very quietly, in sharp contrast with the former evening. He said he would do whatever the partners would ask him to do. He could from our standpoint understand our decision, but felt betrayed by JG, who had made his position unworkable. He had his contract with him in an unsigned version (which later turned out to be also an incomplete old version) and had studied its implications for this situation. We responded that we wanted to treat him fairly, not necessarily following the letter of the contract, in recognition of his positive role in the Spotswood project. Then he pointed to specific text in the contract stating his rights to promoted interest (PI) on all projects originated after 1-1-2006. So implicitly he claimed PI on both the Spotswood and the Reston Heights project (the last one sourced by JG). We did not react specifically and arranged with him that he would come back later that same day with his exit-proposal, which he first wanted to discuss with his lawyer. We arranged a meeting with him at 4.00 pm in the Four Seasons Hotel, but later on that meeting was cancelled by JM, because he needed more time with his lawyer.

We thought that his lawyer, to whom JG had immediately sent all relevant documents (assignment letter, FPEP charter, etc.), had explained to him that according to all contracts his PI-position was far weaker than JM had assumed earlier, because of additions in the final version of the assignment letter, the standing FPEP rules and his formal position as free-lance advisor, since for tax reasons he had denied to assume the formal president position. That all must have required a rethinking of his exit demands.

8.  The next day, March 24th, we received, after an ongoing exchange of e-mails between JM and JT, a letter from JM, in which he surprisingly announced that he had reconsidered his position and had decided to take a short holiday and then by the end of the week would return to the office in his full position as president of Buvermo. This move changed our approach to how to handle the exit of JM. We immediately asked JG to organize a lawyer to represent Buvermo. So we met later on with Forrest Walpole, who documented the decision making of the former day and made a letter to JM, which was e-mailed, delivered to his DC-suite and mailed (registered) to his formal Florida residence. We further asked mr. Walpole to contact the lawyer of JM to, if possible, avoid this matter to become a mutually money and time consuming procedure. We felt that his legal position was not very bright, but nevertheless, under the condition that he would co-operate well, we still wanted to be flexible and reasonable, based on his merits for the Spotswood project, and realizing that this whole course of events had also for him been a major disappointment.

9.  Later on the day we explained the situation to Kara McCormick in the office. Her comments were enlightening. She for the first time felt free to give her opinion on JM, which was devastating. He was almost never in the office, did not bother about what was going on and was continuously occupied with his private investments. She was really relieved with the decision to separate.

10. The rest of the story will be satisfactorily documented by the correspondence between parties and the reports of our lawyer and JG.

Eindhoven, 13 April 2006

André C. van Rhee.

DEF-007 (10/25/06)