# EXHIBIT

# 4

9

1       Q      All right.  So if you'll just take a look at

2    Exhibit 1 to your deposition.  And is this your offer

3    letter with Buvermo?

4       A      Yes.

5       Q      Okay.  And that's your signature on the second

6    page?

7       A      Yes.

8       Q      And is this the -- is this the only written

9    agreement between you and Buvermo, signed by you and

10   Buvermo, setting forth the terms of your employment with

11   Buvermo?

12      A      Yes.

13      Q      And I assume this hasn't been amended since you

14   saw it here?

15      A      Correct.

16      Q      Okay.  And it indicates on here that there's a

17   starting date of August 15th, 2006?

18      A      Yes.

19      Q      Is that when you started employment with Buvermo?

20      A      Yes.

21      Q      And did you sign this letter on or about July

22   6th, 2006?

10

```
 1        A    Yes.
 2        Q    And it indicates that you are being hired for the
 3   position of president of Buvermo Properties, Inc.  Do you
 4   see that?
 5        A    Yes.
 6        Q    Is it your understanding that you are the acting
 7   president of Buvermo Properties, Inc.?
 8        A    Yes.
 9        Q    Okay.  And is that your official title?
10        A    Yes.
11        Q    Okay.  Do you know what Mr. Gardner's title is at
12   Buvermo?
13        A    Currently?
14        Q    Currently.
15        A    Advisor.  I don't know if that is a formal title.
16        Q    Are you aware that he still considers himself to
17   be the president of Buvermo?
18        A    No --
19             MR. SMITH:  Object to form.
20        A    -- I -- no, I am not familiar with that.
21             BY MR. HADDAD:
22        Q    Have you at any time been told that certain
```

14

1      Q    Uh-huh.

2           Are you aware that the paperwork that you're

3    referring to was never done for Jonathan Morris?

4      A    No, don't know anything about that.

5      Q    Okay.  Can you tell me what you believe to be

6    your duties and responsibilities as president of Buvermo.

7      A    I am responsible for generating new business,

8    negotiating terms of new business, coordinating with

9    John Gardner on all major decisions, and executing the

10   wishes of our partners as they arise.

11     Q    Now, Buvermo locates deals on behalf of Fidelio;

12   correct?

13     A    Correct.

14     Q    Okay.  And your understanding is your job is to

15   go out there and find deals and present it to the

16   management committee of Fidelio; correct?

17     A    Correct.

18     Q    All right.  And at some point in time they may --

19   well, if Fidelio decides to invest in those -- that

20   particular deal, then it would be part of your

21   responsibilities to bring the deal to a closing; correct?

22     A    Correct.

15

1      Q     And then what is your understanding as to what
2   you would do thereafter in connection with that particular
3   deal?
4      A     In conjunction with the other parties involved,
5   oversee and manage that investment.
6      Q     Okay.  And what in terms of consulting with
7   John Gardner -- you identified that as -- I think
8   "consulting" is not the word you used, but running things
9   by -- is it your understanding you are supposed to run
10  major decisions by John Gardner?
11     A     Well, run major decisions by him, I'm not quite
12  sure what you mean by that.
13     Q     You mentioned John Gardner in your discussion of
14  what your duties are.  What do you believe John Gardner's
15  role is currently?
16     A     John Gardner's role is an active advisor and
17  participant in the decision-making process, and that is the
18  way I have operated since I've arrived.
19     Q     Okay.  Is it his role to be generating new
20  business on behalf of Fidelio?
21            MR. SMITH:  Buvermo?
22            MR. HADDAD:  Well, it's Fidelio ultimately.

19

```
1       A       Yes, that is the way I have been operating.

2       Q       But you weren't told that that was a requirement?

3       A       When you say "you have not been told that that is

4    a requirement" -- I don't want to be so careful to parse

5    words --

6       Q       That's fine.

7       A       -- but I think it's important clarify that the

8    position was described to me as one whereby I would work

9    with John Gardner on all major decisions; and if the two of

10   us agree on major decisions, we would carry forth those

11   decisions to the partners.

12      Q       Okay.  What were major decisions?

13      A       Any major business decision that impacts the

14   business.

15      Q       Can you give me examples?

16      A       We did not and have not talked about major

17   decisions in that specificity.

18      Q       So the major decisions that impact the business

19   is something that you were told you'd need to consult with

20   Mr. Gardner about, but it hasn't been clearly defined what

21   those major decisions are?

22      A       No.  I was telling you my understanding of what a
```

Morris vs. Buvermo, et al.                    Deposition of L. Millspaugh 10/27/06

45

1  process about redemption of any of those interests?

2      A    You need to help me with "redemption".

3      Q    Okay.  Did you discuss what would happen in the

4  event that acquired an interest in profits?  Did they use

5  the term "promote" with you?

6      A    Oh, yes, uh-huh --

7      Q    Okay.

8      A    -- yes.

9      Q    Let's just use that term.

10     Did they -- did you discuss with anybody prior to

11  executing your offer letter what would happen upon

12  termination of your employment, at the end of your

13  employment, with respect to those promoted interests that

14  you had acquired throughout your time there?

15     A    I don't recall any very specific conversations

16  about ending employment there.

17     Q    Okay.

18     A    Give me a moment, and I will think if there was

19  anything that we talked about in terms of -- I -- I do know

20  that we talked about other people that had left the company

21  and that they had been there for years and years and years

22  and that those people got a share of the value that had

65

```
 1        A    No, I don't.
 2        Q    And so at least with respect to that aspect of
 3   your employment relationship, you're not sure what the deal
 4   is?
 5        A    Correct.
 6        Q    And it's never been explained to you; correct?
 7        A    I think that you're casting a -- a specific case
 8   about firing, when perhaps the discussion has been more
 9   general.  I had a more general discussion, but not the
10   specific one you've mentioned about being fired.
11        Q    We talked earlier about what the conditions to
12   you receiving a promoted interest in a deal were --
13        A    Yes.
14        Q    -- okay?
15             And you indicated that you would have to run the
16   deal by John Gardner --
17        A    Yes.
18        Q    -- before you took it to the board --
19        A    Yes.
20        Q    -- okay?
21             And then the board would have to approve the
22   deal; correct?
```

66

1      A      Correct.

2      Q      All right.  And then you also indicated that the

3   deal would -- that you would have to close to deal?

4      A      Correct.

5      Q      And so you see those as the conditions precedent

6   to your deal vesting?

7      A      Oh, yeah.  I mean if the deal doesn't close while

8   you're there, the deal doesn't close while you're there.

9      Q      Okay.  So the deal doesn't close while you're

10   there; and, you know, that's unfortunate.

11          What I'm asking you is:  Is it your understanding

12   that your agreement with them is that, under any

13   circumstance, if you're not there when a deal closes,

14   you're not entitled to that promoted interest?

15      A      We never discussed the promoted interest in the

16   context you've just described.

17      Q      Okay.  And sitting here today, you don't have any

18   understanding as to at what your rights would be in the

19   event that -- in that context?

20      A      Sitting here today, I do not understand what my

21   rights would be if I got fired and what any interest would

22   be in a deal that I have not yet closed, but I've been

84

1     A   I can't say it was part of my agreement.  It was

2  my expectation that if I left that company and no longer

3  worked there, I couldn't expect to gain any more financial

4  benefits from that company.

5     Q   Okay.  All right.

6          MR. HADDAD:  Could you mark that as Exhibit 3.

7          (The e-mail was marked Plaintiff's Exhibit No. 3

8           for identification.)

9          BY MR. HADDAD:

10     Q   Is this an e-mail from you to Ms. Pearcy, at the

11  bottom?

12  (The witness reviewed document.)

13     A   No, this is not me.

14     Q   Okay.  Let's take a look at Exhibit No. 7 to

15  Mr. Gardner's deposition.  If you'll just flip through this

16  document and tell me if you recognize it.

17  (The witness reviewed document.)

18     A   Yes, I recognize it.

19          And I would like to clarify it.

20     Q   Sure.

21     A   There were several -- the first week at work I

22  looked at several documents that were different iterations

85

1    at different times of this document.  So whether this was

2    the first version or one that was slightly amended a year

3    or two later I can't say.  But the basic concept document I

4    have reviewed.

5         Q    Okay.  When you reviewed -- I assume that when

6    you reviewed the documents at work, you were looking for

7    the one that was the most recent; correct?

8         A    Right, right.

9         Q    I think I can represent to you that this is the

10   last draft of the operating agreement or the last sort of

11   version of the operating agreement that's been agreed to.

12        This is the document that -- is this the document

13   that you believe governs your -- the items contained in

14   your offer letter?

15        A    You mean this very one or this -- I mean I

16   haven't read the whole thing.  But if this is the -- if

17   this is the most recent version of the FPEP document, this

18   would be the document I'd be added as partner to.  And once

19   I'm added as -- not partner; I'm sorry -- as a party to --

20        Q    Uh-huh.

21        A    -- and once I am, then that would govern the --

22   the mechanisms that were described in the offer letter,

89

1              MR. SMITH:  I'll --

2      A    Well, no, no.  This hasn't been modified.  You're

3  talking about the modified version --

4      Q    Uh-huh.

5      A    -- with me as a party.

6              You're saying if that modified version is in

7  conflict with my offer letter --

8      Q    Uh-huh.

9      A    -- should I be able to discuss it and negotiate;

10  and I would say yes.

11     Q    You spoke earlier about the formula for valuing

12  your interests upon departing the company.

13     A    Uh-huh.

14     Q    If you could turn to page -- I want to say it's

15  17 of the FPEP operating agreement.  Yes.  And if you'll

16  take a look at Section 8.9, and go ahead and review it, and

17  let me know when you're done.

18     A    Okay.

19  (The witness reviewed document.)

20              MR. SMITH:  You want him to read the whole

21  section?

22              MR. HADDAD:  I think that's probably best.

90

1    (The witness reviewed document.)

2              THE WITNESS:  Do you want me to read 8.9?

3              MR. SMITH:  The whole thing.

4              THE WITNESS:  Or keep going past --

5              MR. HADDAD:  Keep reading all of 8.9.

6              THE WITNESS:  Oh, wow.

7              MR. HADDAD:  If you're familiar with it, you

8    don't have to; right?

9              THE WITNESS:  I read this two months ago, but I'm

10   not familiar enough to be able to cite it back to you.

11             MR. HADDAD:  Okay.

12   (The witness reviewed document.)

13             THE WITNESS:  Okay.  I've read it.

14             BY MR. HADDAD:

15        Q    Did you have any understanding as to whether or

16   not you would be subject to this provision when you entered

17   into your agreement with Buvermo?

18        A    I did not think about the -- the mechanics or the

19   spec- -- specificity of this paragraph when I entered into

20   the purchase (sic) letter.

21        Q    Was this process that's described in here

22   described to you before entering into this offer letter?

91

1       A    Not specifically.

2       Q    What, if anything, do you recall being said about

3  this particular process?

4       A    That if the employee leaves the company -- again,

5  remember, I wasn't thinking about firing; I was thinking

6  about leaving the company, which is just the way I thought;

7  I didn't think about the other instance.  But that if you

8  leave, that the value would be determined and the value

9  would be paid at that time based on the value at that time,

10  not a future time.

11      Q    Okay.  And did they get into how they would

12  calculate the value at that time?

13      A    No, we didn't talk specifics.

14      Q    All right.

15      A    I don't recall we talked -- talked specifics.

16  Again, it was a general conversation.

17      Q    Okay.

18      A    I don't want to misstate it.  We might have --

19      Q    That's fine.

20           Do you recall with whom that conversation took

21  place?

22      A    I think I would have talked about it with

92

1    John Gardner, about what happens if an employee leaves.

2    And it would have been a very general -- I have a very

3    general understanding about it, and I can't say

4    specifically how much we talked about it or whether we

5    talked about it, other than that.  It was not a major

6    discussion.

7        Q    Uh-huh.

8             Do you consider yourself today bound by the

9    provision?

10       A    I don't think I'm bound by any provisions of a

11   document I'm not a party to.

12       Q    Okay.  Do you accept the fact that if you were

13   ever going to be provided with a promoted interest in any

14   property, you would be required to agree to this provision?

15       A    Oh, I would -- I would assume I would have to

16   agree with this provision --

17       Q    Uh-huh.

18       A    -- to be entered into a -- to be a party of this

19   document, in order then to get the promoted interest you

20   describe.

21       Q    Why do you make that assumption?

22       A    Because until you're a party to the agreement,

93

1   you're not a party to the agreement.

2        Q    But why do you make the assumption that you would

3   have to agree to this particular provision?

4        A    I was offered terms of employment to come join a

5   company and a group of investors that have been successful

6   and have a model.  And I was invited and -- and thrilled to

7   be able to join an existing setup.

8        Q    Uh-huh.

9        A    I never expected then or today to be hired to

10  come and change the setup.  I am being hired to plug into a

11  system, and I'm thrilled because it's a wonderful system.

12  I feel I'm very fortunate.  Therefore, I would not expect

13  to make any changes to this or any of the other terms of

14  the agreements that seemed to have worked very well over

15  many years.

16       Q    Uh-huh.

17            You mentioned earlier that you would expect, you

18  know, as with any employment, that when you were

19  terminated, if you owned any interest in anything, that

20  those would be dealt with fairly; correct?

21       A    Correct.

22       Q    Do you think that this is a fair treatment of

94

1   redeeming someone's interests?

2       A    I think it's fair.

3       Q    Okay.  And I just want to make sure that you

4   understand this -- well, I just want to see what your

5   understanding is of this provision here.

6           It suggests that -- it states that upon

7   termination of an employee, there is a time period within

8   which either a call can be made by the LLC or a put can be

9   made by the departed employee; correct?

10      A    Yes, that's what --

11      Q    Okay.

12      A    -- it seems to say.

13      Q    And then in the event either one is exercised,

14  then -- well, I'm sorry -- in connection with the put or

15  the call, purchase price would have to be offered for the

16  interests that are owned by that employee; right?

17      A    Yeah, I think I'm reading it the exact same

18  way --

19      Q    Okay.

20      A    -- you're reading it.

21      Q    Okay.

22      A    I'm just only reading it --

109

1    the -- the percentage of what the market value of the

2    actual property is on that day?

3        A    I think you're trying to say that Fidelio has

4    X-percent interest in the property; they don't own X

5    percent of the overall property; they own X percent of the

6    equity investment of the property.  Is that you're telling

7    me -- asking me?

8        Q    What I'm saying is that if Fidelio owns X percent

9    of a property -- okay? -- is the value of that X percent

10   based solely on -- okay? -- the value of the property; or

11   in valuing its interest, you also take into consideration

12   the future -- the future gains that might be had from that

13   property?

14       A    Oh, I think you have to look at all of those.

15   But I think -- I think the market price that an appraiser

16   would come up with or if you put it out to bid and got

17   offers from several, you know, willing buyers, that would

18   determine what it is.  And --

19       Q    The market price of what?

20       A    Of the partnership interest.

21       Q    Okay.

22       A    Yeah.  So -- so I think what you're trying to

110

1    say:  Do you take the future into account at all when

2    someone buys a piece of real estate, and does that

3    ultimately accrue to the benefit of Fidelio?  Is that what

4    you're asking?

5         Q    No, not when you buy a piece of real estate.

6              When you buy a someone's interest in a venture

7    which relates to a piece of interest -- a piece of real

8    estate.

9         A    Oh, okay.  Oh, I got you.

10             Until you go down that road, you haven't created

11   that value.  That's the whole -- that's why we're in this

12   business.

13        Q    I understand --

14        A    So --

15        Q    -- I understand you haven't created the value.

16             But do you take into consideration the potential

17   value?

18        A    (No response.)

19        Q    Take, for instance, Spotswood, Spotswood today.

20   Fidelio's interest in Spotswood today, it's probably not

21   worth that much.  It just recently invested in the

22   property.  The property has not made much gains, I would

111

1   assume -- I don't know this for a fact, but I would assume,

2   since it was recently purchased.

3            The projections are, though, that down the

4   future, in ten years, the expected revenue from this is

5   fairly sizable.  So someone shopping for Fidelio's

6   interests today -- okay? -- I would assume -- and correct

7   me if I'm wrong -- but I would assume that one of the

8   considerations that would be taken into -- one of things

9   that would be taken into consideration by Fidelio and by

10  the purchaser in buying that interest in Spotswood would

11  be, Well, geez, what are the projections on Spotswood?  Is

12  it going to make money for me down the road?

13           And so if it's going to make money for me down

14  the road, it may be worth -- the interest may be worth to

15  me more now -- it may be worth more now than what the

16  actual value of the property is.

17           You follow me?

18       A    I know what you're saying, but it's a circular

19  argument because Fidelio -- Fidelio -- when -- the value

20  was already there before Fidelio got in the deal, so you're

21  not creating any new value down the road.  That would have

22  already happened.

119

1    the question because that's not what it is.

2            But go ahead.

3        A    I have not.

4            MR. HADDAD:   I have no further questions.

5            MR. SMITH:   I just have one.

6                        CROSS-EXAMINATION

7            BY MR. SMITH:

8        Q    Mr. Millspaugh, with respect to the LLC agreement

9    that we've -- that you've talked about during your

10   deposition, which is Gardner Exhibit No. 7, you testified,

11   I believe, that you read this agreement two months ago

12   approximately.  Is that right?

13       A    That's right.

14       Q    And when you read it, did you find it to be

15   inconsistent in any manner with the terms set forth in your

16   offer letter?

17       A    No, it was consistent.

18           MR. SMITH:   Thank you.

19           No further questions.

20           MR. HADDAD:   Just give me one second.

21   (Off the record.)

22           MR. HADDAD:   I have no further questions.



BUVERMO Properties, Inc.
1901 N. Moore Street
Suite 804
Arlington, VA 22209

703/465-8200
Fax: 703/465-8262

July 6, 2006

Laurence Millspaugh
9305 Burning Tree Road
Bethesda, Maryland 20817



Dear Laurey,

I am pleased to offer you the following terms of employment with Buvermo Properties, Inc.

Position- President of Buvermo Properties, Inc.

Starting Date- August 15, 2006

Starting Salary- $325,000 per annum

Benefits- Standard benefits, including health care benefits, 401K participation etc.

Promoted Interest-

Future Projects-
The Fidelio Partners have agreed to permit FPEP to be entitled to a promoted interest for all projects for which FPEP is entitled to participate, in accordance with the provisions of the Fidelio Property and FPEP agreements. You will be entitled to a 12% promoted interest for all FPEP projects initiated after the date of your employment, after return of capital and a preferred 12% return to Fidelio and other capital providers. The preferred return may be subject to change relative to future projects dependent upon future market conditions. In addition, you will also be provided the right but not the obligation to invest pro rata up to 2.5% of the capital for all future projects, on a nonselective basis.

Current Projects-
You will be entitled, upon start of employment, to the share of the FPEP promoted interest currently owned by Fidelio Properties for land parcels adjacent to the Sheraton Reston parcels. With regard to the recently acquired Reston International parcels, the Spotswood Valley Shopping Center and any FPEP properties acquired prior to the start of your employment, you will be entitled to a 12% promoted interest as described above. The promoted interests for all Current Projects, in addition to being in accordance with the provisions of the Fidelio Property and FPEP agreements, will also be subject to a two year vesting period.

All items will be governed by the FPEP LLC agreement, of which you will become a member.

Your Role in the Future-
The intent is for you to assume the position of president of Buvermo Properties, Inc., the service provider for Fidelio Properties, upon commencement of your employment. . I will continue to retain the title of president of Fidelio Properties Management, Inc., the managing general partner of Fidelio Properties, as well as the managing member of the LLC's through which Fidelio possesses its property ownership interests, at least through year end, with the intent for you to take over that position as well, as soon as the Fidelio Partners are comfortable with your assumption of that role. My intent is to continue to work part time for at least the next two and one half to three years to support you and Buvermo/Fidelio in any ways that both you and the Fidelio partners agree.  I also intend to continue as a pro rata 2.5% investor for all future projects.

Future Decision Making-
For any future investment decisions, both you and I will have to agree before we submit the investment to the Fidelio Partners for their approval.

While we look forward to a long and productive relationship with you, please be aware that employment with Buvermo Properties, Inc. is "at will," that is, you or Buvermo may terminate the employment relationship at any time with or without cause or notice.

Please indicate your agreement with these terms by signing below.


Sincerely,                                          Accepted,


John Gardner                                    Laurence Millspaugh