# EXHIBIT

# 5

1    weeks', quote, severance pay, which is, I guess,

2    consistent with maybe the world for various employees.

3              I mean, I'm not -- I don't understand

4    exactly what you're asking me.  If you're saying

5    severance pay is a payment for -- you know, for

6    somebody's salary that's not there or that is out sick

7    or they left the company, I mean, I'm just --

8         Q    You're telling me you don't understand the

9    concept of severance?  And if that's your answer,

10   that's okay.  I'll move on.

11        A    I'm not sure I've been involved in a

12   situation that I needed to get into the details of

13   severance pay.  I haven't really run a big company and

14   haven't had anybody ask me about that.

15             Is there another name for it?

16        Q    Well, I don't know.

17        A    Okay.

18        Q    Your resume, as I make this calculation,

19   reflects about 25 years or so of real estate

20   experience -- is that approximately correct -- looks

21   like, dating back to your experience with Smith Barney

22   in 1980?

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

1       A       That looks accurate.

2       Q       All right.  And how much of your real

3   estate experience has dealt with the contracting side

4   of the business, you know, reviewing contracts, joint

5   ventures, partnerships?  Did you involve yourself at

6   that level?

7       A       I did.  My involvement was mainly based

8   upon making sure that the language in any of these

9   agreements reflected the business terms that we had

10  come to.

11              In many cases, there was a lot more words

12  that surrounded the business terms, and I would

13  usually suggest that we had some type of term sheet

14  inserted in joint venture agreements or at least as an

15  addendum so that while you could read the words, you

16  could also associate them with an example.

17              My other principal role -- and there were

18  several -- was to ensure the protection of my company

19  and my partners to the extent that there was any

20  carve-out provisions in debt, that they were either

21  limited or extinguished entirely as it relates to the

22  organization that I was representing.

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

1    that is that at that moment, being presented with and

2    being asked to sign -- if not to sign, execute the

3    employment letter, the -- any gravity or weight or

4    significance of importance of that LLC was not

5    presented to me as anything other than more or less an

6    attachment or passthrough entity whereupon I would

7    receive my benefits that I was promised in that offer

8    letter.

9         Q    Okay.  That's fair enough.

10             And during your employment with Buvermo,

11   you had the opportunity to look at the operating

12   agreement of FPEP, LLC, right?

13        A    I had the opportunity to look at any

14   document I wanted to.  No one restricted me from

15   looking at it.

16        Q    Did you review the FPEP, LLC operating

17   agreement?

18        A    Not early on.

19        Q    All right.  What about later on during your

20   employment with Buvermo?

21        A    Well, the steps that were taken with

22   respect to reviewing that document were, in my mind --

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 107

1    document really had the basic framework in place which

2    wouldn't change?  Wasn't that your understanding?

3        A    No, not at all.

4        Q    Then what was your understanding?

5        A    I questioned John about that document and

6    how it related to the offer letter, and he told me in

7    no uncertain terms that that document will reflect

8    what's in the offer letter, period, end of

9    conversation.  And the only reason we needed to amend

10   that document was to include your name.

11       Q    Okay.  And I'm still not clear on how the

12   document was going to change other than adding your

13   name.

14       A    I don't know either.  But as we got closer

15   to a deal, which began in December of '05, John had

16   another attorney come in the office and with Kara

17   McCormick began amending the document because we were

18   getting close to doing two deals.

19            I had asked for on no less than three

20   occasions to receive a copy of the proposed amended

21   document, where I would take that document and send it

22   to my counsel for then his review, where he would give

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

1    me comments, and then I would sit down and go through

2    those comments, if he had any, about the document.

3        Q    Okay.

4            MR. SMITH:  Let me have that one marked.

5            (Thereupon, the document was marked as

6            Morris Deposition Exhibit No. 4 for

7            identification.)

8            BY MR. SMITH:

9        Q    Let me show you what I've marked as Morris

10   Exhibit Number 4 and ask if you've ever seen that

11   document before.

12       A    This is the original FPEP, LLC that was in

13   place at the time of my hiring, and it is something I

14   have seen before.

15           However, without going through this, if it

16   has been amended since the date of my hire, I have not

17   seen it before.

18       Q    Did you have an opportunity or did you read

19   this document at any time while you were employed?

20       A    I reviewed it in a very cursory manner at

21   or around the same day I sent it to my attorney and

22   told him that this was the old document and that it

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 113

1        And Ed was looking for a candidate who not

2   only could run a company and help acquire assets but

3   understood the market generally for his company and

4   comparable companies.  So we spent a lot of time

5   talking about this analysis and idea.

6        As it turned out, Ed had other candidates

7   in mind that he wanted to meet with, but he had told

8   Tony that he was still interested in talking to me

9   further.  And I had heard either from Tony or from

10  Marsha Pearcy that Buvermo may be looking for somebody

11  because John was going to retire.

12        And the comparable, what I will call

13  platforms between the two companies, the Washington

14  Real Estate Investment Trust platform being a fairly

15  large public company with a role that included myriad

16  committees and maybe a fair amount of travel and

17  meetings with analysts, investment bankers, similar to

18  what I did at The Charles E. Smith Companies but at a

19  higher level, relative to a small, pretty much

20  investment-focused company, comparing the two and

21  where I was in my life, I was much more interested in

22  the Buvermo platform.  The company had a good

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

1    looking for employment.

2        Q    Okay.  So someone contacted you?

3        A    Tony would call me from time to time.  He

4    would tell me what assignments he had.  And the

5    preponderance of the conversations were directed at my

6    pretty vast knowledge of the community, and all he

7    really wanted were some names of people that could be

8    prospects for jobs.

9        Q    Okay.  So he was just getting information

10   from you?

11       A    Right.

12       Q    And when you were having discussions with

13   WRIT and were getting set to consider the Buvermo

14   opportunity, you were unemployed at the time, right?

15       A    Right.

16       Q    And at that point in time, which I'm going

17   to identify as, you know, roughly the beginning of

18   2005 -- correct me if I'm wrong -- you had not held a

19   CEO or president's position before, had you?

20       A    Huh-uh.

21       Q    You need to --

22       A    No.

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 136

1      Q      I want to focus in on what you were

2  discussing with Marsha and Tony, and then we'll shift

3  over to the Buvermo's representatives in terms of --

4      A      I'm staying on track.  Let me finish my

5  sentence, and I'll tell you.

6      Q      Okay.

7      A      When we finished the last meeting, which

8  they told me was the last meeting, that last meeting

9  included Andre, which it had not before, so Joost,

10  Andre, John and me.  That was at the Four Seasons

11  Hotel.  I can't tell you the date, but it was a lunch.

12          And that night, LoPinto called me and he

13  told me in no uncertain terms several things.  Number

14  one, that they like you, they like your background,

15  they feel it's a good fit and they want to make you an

16  offer.

17          And he said without equivocation, I need to

18  talk to you about how long you can commit to and how

19  long they can commit to you for.  And I said they

20  wanted long term.  I told you -- or I told Marsha I

21  will commit to the long term.

22          Tony knew very well that I had taken a

Page 137

1    sabbatical.  Whether it was a sabbatical equalling

2    retirement or a sabbatical taking time off, it didn't

3    matter, but he knew I had taken some time off.  So

4    Tony said, you know, I want to get specific with you

5    here, because I need to get back to them because we

6    need to resolve this.

7             And I told him look, let's think about this

8    for a second.  Fifteen years gets me to 65.  But I'll

9    be candid with you, Tony.  I'm diabetic, I have a

10   terribly bad back.  I really don't want to work past

11   60.  So my commitment to them was to work until I was

12   60 years old at or around 10 years.  He told me that

13   he needed to get back to John and to Joost, because

14   they wanted an answer.

15            Apparently, between that conversation and

16   either the next day or next days, he went back to

17   them, and John Gardner, either at a lunch or a

18   breakfast or dinner -- because we met many, many

19   times -- he was happy, I'm glad you've committed to

20   us, we can commit to you for that time period.  We

21   have a deal.

22       Q    Who's saying this?

Misty Klapper & Associates
703-780-9559

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 138

1      A      John Gardner.

2      Q      Okay.

3      A      And then within a day or two, I received a

4  phone call.  I can't tell you exactly when, but it was

5  a cordial phone call from Joost saying I'm glad we

6  worked things out and I'm glad we worked things out

7  for the long term.  We're looking forward to having

8  you for that 10-year period, and to the extent that

9  the 10 years comes and you feel comfortable in the

10  role, in the slot, let's expand it to 15.

11             And I said that's fine.  I'm just looking

12  at my life right now, and I can give you the 10 years,

13  whatever the fractional amount was based upon my age

14  to get to age 60.

15             But, Marc, I want to tell you very clearly

16  that this was not a casual conversation.  This was

17  something that Tony was asked and that he and I

18  discussed and it wasn't something that I just came up

19  flippantly with a number.  It was a 20-minute,

20  half-hour conversation about age and where you are in

21  life and what you can commit to, and he was very

22  serious about being able to respond.  He needed to get

Page 139

1    back to them.

2            This was in my mind, to Tony, an open

3    issue.  It was an open question mark.  And I don't

4    think that the velocity of trying to hire me was

5    impeded, but I think to complete the circle and to

6    complete the picture that they had of the candidate,

7    they needed to know that.  They needed to make the

8    commitment.  I needed to make it to them.  And that's

9    what I did.

10   Q    Now, were they talking about -- and I'm

11   talking about Tony, Marsha and the Buvermo folks --

12   were they talking about a desire to have somebody who

13   could fill the position on a long-term basis because

14   that's the nature of the job, it's a -- you know,

15   there are long-term investments, they want someone who

16   is going to be there for a while to see those

17   investments through in general terms; or were they

18   talking specifically terms of employment, we're

19   agreeing to employ you for 10 years or 15 years versus

20   something more general like we're looking for somebody

21   who can commit long term because we're long-term

22   investors?

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 140

1           MR. HADDAD:  I'm just going to object to

2    the extent it calls for speculation.

3           Go ahead.

4           BY MR. SMITH:

5    Q     What was your sense?

6    A     In my sense, it was a commitment.  It was a

7    mutual commitment to be there.

8    Q     To a specific term of employment?

9    A     To age 60.

10   Q     Now, the job specification that's marked as

11   Exhibit Number 5, nothing in this document describes

12   any term of employment, does it?

13   A     No, but it also doesn't say anything about

14   the base salary, bonus or equity component.

15   Q     All right.  Well, let's talk about that.

16          What was discussed about your compensation

17   if you took the job?

18          MR. HADDAD:  Sorry.  Is this with LoPinto

19   and Pearcy or with the other defendants?

20          MR. SMITH:  Well, we can cover both.

21          BY MR. SMITH:

22   Q     So what was being discussed about

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 141

1   compensation and what was agreed to?

2       A    Well, the first phase of the conversation

3   was more general, because we hadn't had any formal

4   meetings.  So the first phase was base salary,

5   benefits, 401(k), health plan, et cetera, and a

6   participation in transactions.  And this was not a

7   detailed conversation.  This was a broad brush by Tony

8   and Marsha.

9           Once I met with John, he explained to me

10  not only how the promoted interest worked, but how it

11  actually evolved over a period of time.

12          And one of the key aspects of this was that

13  given the difficulty of finding high-yield

14  investments, since the price of properties had gone up

15  so much, that the company had dropped the benchmark

16  from a 12 percent hurdle rate to get the promoted

17  interest down to a 10 percent hurdle rate.

18          So these were the types of deals and

19  structures that I'd been involved with, so I respected

20  and appreciated and understood how this evolution

21  occurred.  Okay?

22          As we got further along, John discussed

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 142

1  both the promote that they provide to a JBG type

2  company and then the promote that the CEO gets,

3  president and CEO.  And he had discussed what he had

4  gotten in the past and how it worked.  Then he

5  explained to me that this is -- this calculation is

6  what I would get because I was stepping into his

7  shoes.

8          Subsequent to year end '05, there was no

9  ambiguity about what the promote was for me.  And you

10  probably have all the details, but in its simplest

11  form, it was 15.5 percent of any cash or other

12  consideration --

13      Q    I want to stay focused now on what the

14  discussions were before you accepted employment.

15          So what was being discussed about your

16  compensation?

17      A    The base salary, the benefits, the promoted

18  interest and the responsibilities.

19      Q    And how much -- what was the base salary

20  that was being discussed?

21      A    The base salary they told me was $250,000.

22      Q    And was that acceptable to you?

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 154

1    template of what Buvermo, Fidelio was looking for.

2        Q    Did he tell you that he was going to remove

3    himself from the process in terms of continuing to

4    pursue deals, meet with folks?  Did he ever make that

5    representation to you?

6        A    He told me that I'm the guy looking for

7    deals on the street representing Buvermo.  This did

8    not turn out to be the case.

9        Q    All right.  I understand what your position

10   is there, but did he ever say he was going to remove

11   himself from the business?

12       A    Yes.

13       Q    During that initial meeting?

14       A    No.

15       Q    How many interviews did you have with

16   Buvermo, John and the people from the Netherlands?

17       A    Let me back up and take another attempt at

18   this.  With Joost, I spent about six or seven hours

19   straight.

20       Q    Same day?

21       A    In the same day.

22       Q    And you talked about what during that

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 155

1    extended conversation?

2        A     We talked about my experience, the deals

3    I've done, the structures upon which I did them, how

4    much money I needed my partners to put in, where I got

5    the other capital from, how I financed the deals, how

6    the deals ended up, what the tenancy was like.

7    Everything you can possibly imagine about

8    transactions.

9        Q     Did you talk about what compensation you'd

10   receive if you were hired at Buvermo?

11       A     No.

12       Q     Did you talk about a term of employment?

13       A     At that meeting, no.

14       Q     Now, what about -- you spoke with Mr. van

15   Rhee at some point, correct?

16       A     Yes.

17       Q     And that was just on one occasion?

18       A     Yes.

19       Q     And what was discussed during your meeting

20   with Mr. van Rhee?

21       A     The thrust of the conversation with van

22   Rhee was much different than that with Joost.  Van

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 160

1      Q      I'm just trying --

2      A      It's very important.  Tony LoPinto implored

3   me to give him a sense of how long I can commit to

4   this company.

5      Q      I understand that.  What I'm asking for is

6   what discussions did you have with the company?  Not

7   Tony LoPinto --

8             MR. HADDAD:  He's an agent of the company.

9   Just be clear about your question.  That's all I'm

10  saying.  I mean, that's why he's confused.

11            THE WITNESS:  I'm not confused.  I've

12  answered it.

13            Within a day or two after that, John

14  Gardner told me I'm glad you've committed to at least

15  your 60th birthday.  We can commit to you for that as

16  well.  Let's get going.

17            John Gardner pushed the date of my

18  employment up several months before I was ready to

19  start work.  Within days of that conversation, Joost

20  called me and he congratulated me, thank you very

21  much, we're going to have a good time together.  I

22  understand from Tony LoPinto that you've committed to

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 161

1    work until you're 60 years old, and we can commit to

2    you for that time period as well.

3           BY MR. SMITH:

4      Q    Okay.  Could you give me a rough idea about

5    what dates we're talking about here, when these

6    conversations occurred?

7      A    Well, I don't know how rough you want to

8    know, but it was -- I mean, the date of the offer

9    letter, I think, is June 1 or June 2.  You know,

10   once -- we finished the interviews.  It was, I think,

11   between completing the interviews and either actually

12   signing the offer letter -- it was within days of

13   signing the offer letter.

14     Q    The conversation with John where he said

15   I'm glad, you know -- and I'm using your words --

16   you've committed until you're 60, and then the

17   telephone conversation with Joost, that occurred

18   before your offer letter came in, right, those two

19   conversations?

20     A    I can't remember.  My recollection is that

21   that came in before the paper came in.

22     Q    All right.  Well, let's look at the paper.

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 169

1      A      In the copy room with a fax machine that

2    people came and went every day faxing.

3      Q      All right.  And after a few months,

4    Mr. Gardner moved out of his large office and you

5    moved in, right?

6      A      After a few months, maybe more than a few

7    months, yes.

8      Q      Are you not able to give a more definitive

9    description of the time period?

10     A      It was certainly not two months.  It may

11   have been three months, which, in my opinion, isn't

12   the way you treat a brand new president and CEO.

13     Q      All right.  Now, apart from what we've

14   talked about today -- we've talked about discussions

15   that you've had with various people -- what evidence

16   do you have that Buvermo agreed to employ you for a

17   10-year period of time?

18     A      Other than the discussions that I had that

19   were on point with executives of the company, board

20   members and the agent of the company, that's all I've

21   got.

22     Q      You've got oral discussions.

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 170

1      A      What I just said is what I've got.

2      Q      Okay.  Now, is there a single document, to

3  your knowledge, that reflects a 10-year term of

4  employment?

5      A      I told you I have what I have.  If I had

6  something above and beyond that, I would be happy to

7  tell you.

8      Q      My question simply is is there any document

9  which supports the fact that you were offered a

10  10-year term of employment?

11      A      A document?

12      Q      A document.  A writing.

13      A      No.

14      Q      Is it your contention in this lawsuit that

15  you could not be terminated by Buvermo for any reason

16  at all?

17      A      No, I don't think that's true.

18      Q      All right.  What, in your mind, would

19  constitute a permissible reason to terminate your

20  employment?

21      A      Fraud.  I mean, I don't know if theft comes

22  up under fraud, but, you know, doing something

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 173

1    Q    Well, I'm trying to get an idea about

2  whether you believe the company ever promised you that

3  your compensation would continue for 10 years no

4  matter what, whether it's promoted interest, whether

5  it's salary, whether it's anything else.

6    A    Okay.  Let me be very clear.  I made a

7  commitment to this organization to work until I was

8  60 years old.  I began the job I believe on June 29th,

9  2005.  So the delta between my birthday of turning 50

10  and that date, 60, you can look at as the term because

11  that's how I looked at it.

12         They gave me a commitment that I would be

13  employed there until I was 60 years old, and

14  furthermore indicated that if that employment was in

15  good stead at that time and I wanted to continue, they

16  would commit to 65, which was their retirement age.

17         So with respect to annual compensation for

18  being the president and CEO of that company, which is

19  not deal-related, that's what I expected.  That is

20  unequivocally firmly what I expected from this

21  organization.

22         As it relates to promoted interests, do you

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 179

1      Q      And Mr. Gardner indicated specifically that

2    you're CEO as well?

3      A      Yes.

4      Q      And when did that conversation occur?

5      A      I presume the day I signed it.  This was in

6    his living room at his apartment and we sat next to

7    each other.  We went through every word on this paper.

8            Marc, this was my document to decide if

9    this is what I was told I was getting, and if so, I

10   would take the job.

11     Q      And by signing it, I take it, that you

12   agreed with what the document stated, correct?  Is

13   that fair?

14     A      That's fair.  I mean, it was embellished,

15   it was discussed, but I agreed with it once I had the

16   discussion.

17     Q      And this document, Exhibit Number 7, is

18   the -- is what you refer to as your compensation plan

19   in the complaint, right, the complaint you filed in

20   this case to initiate the lawsuit?

21     A      Yes.

22     Q      All right.  And let's talk about your

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 205

1       A       Is it my understanding that what?

2       Q       The agreement that's being referred to in

3    the offer letter is actually the FP Executive Partners

4    operating agreement?

5       A       That's being referred to?

6       Q       Yes.

7       A       No.

8       Q       What agreement is being referred to?

9       A       I asked John several questions about this

10    sentence, and the response was as follows:    Number

11    one, this agreement is old and needs to be updated and

12    modernized.

13              But you got to understand where I'm coming

14    from, because otherwise I would have said if it's that

15    important to negotiate this document right now, then

16    let's just sit down and go through it, which I did,

17    and he said no, it's merely a venue to add a name into

18    a deal.

19              And I said fine, I get it.    You'll take the

20    old agreement, you'll modernize it, you'll give me a

21    copy of it and I'll send it to my attorney.    Okay?

22              There's no way, shape or form that when I

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 206

1   was given this letter and spent 45 minutes discussing

2   its terms was there any allusion other than this was a

3   ministerial/administrative document that did nothing

4   more than reflect the terms of the promote, et cetera,

5   et cetera.  It was benign and it could be looked at in

6   the future sometime.  That was my understanding.

7           I asked about it.  I specifically got the

8   response I just told you, and I signed this agreement.

9   I was happy.  I went to work.  I got my salary.  I

10  looked for deals, and that's what I did.

11      Q     Well, you had indicated previously that you

12  actually got a copy of the FPEP operating agreement

13  which is Exhibit Number 4 to send to your lawyer.

14      A     Yes.

15      Q     Do you remember when you did that?

16      A     I believe it was either late February '06

17  or early March.

18      Q     And was it your understanding that that

19  document was going to substantively change -- and

20  obviously, your name is going to be inserted into it.

21  That's understood.  But other than that, was it to

22  substantively change, based on your understanding?

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 207

1      A      Well, since I had not read this document

2    when I signed this, I would have no idea if it needed

3    to change substantively or simply, because I didn't

4    know what the components of it were.

5      Q      After you obtained a copy of it, did anyone

6    indicate to you that, other than obviously adding you

7    as part of the agreement, it would be changed in any

8    other material respect?

9      A      How would I know?

10     Q      Well, did you ask?

11     A      They were in the middle of amending it.

12     Q      I understand that, but did you ask is this

13   document going to change in any material -- that's my

14   question.

15     A      I did not even have a conversation about

16   it.  I let them do their work.

17     Q      All right.  And who was going to control

18   what the document ultimately said?

19     A      Well, I thought the document would say

20   exactly what it says.  I had no concern when I joined

21   the company that it would say anything other than

22   this.

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 209

1    what you need to do, give me a copy of it.

2              Kara McCormick took this letter to every

3    single meeting that she had with Forrest and John to

4    track the terms of the deal.  She took this letter and

5    used it in all of the projections of the Spotswood

6    deal and I presume the JBG deal for the board package.

7              This was the Bible.  This was the

8    sacrosanct document that I trusted John Gardner, Joost

9    Tjaden, Andre van Rhee and, to the extent as an agent,

10   Tony LoPinto and Marsha Pearcy.  And if you wonder why

11   I haven't spoken to those two people, Marsha and Tony,

12   since all of this has occurred, I can't begin to tell

13   you how distasteful this whole process is.  This was

14   the deal.

15   Q    This document you're referring to as the

16   Bible is Exhibit Number 7, your offer letter?

17   A    I'm telling you that the salary, the

18   benefits --

19   Q    My question was simply the document you've

20   been referring to as the Bible, sacrosanct --

21   A    The economic benefits that I -- that inured

22   to me in this letter are what I fully expected, fully

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 210

1    trusted these guys to give me.  And to be where we are

2    right now is just unconscionable to me.

3        Q    I agree with you wholeheartedly.

4            All right.  Let's turn to the second page

5    of the document where a paragraph has been inserted as

6    to Mr. Gardner's future involvement with Buvermo's

7    business.

8            I take it that you carefully read this

9    paragraph before you signed the offer letter; is that

10   right?

11       A    I read everything before I signed the offer

12   letter.

13       Q    And you agreed with what's in this

14   paragraph?

15       A    You know, Marc --

16       Q    My question is simply did you agree with

17   what's in this paragraph?  You can say yes or no or

18   you can give a detailed explanation.

19       A    Well, I'm going to give you a detailed

20   explanation, okay?

21           This paragraph, which may take you three

22   minutes to read, okay, this paragraph was a

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 211

1    conversation that maybe took 15 hours of discussion

2    with a variety of people, okay?

3              Distilling all of that face-to-face time

4    with people down to a paragraph that encapsulates what

5    I thought, what my emotions were, what Tony thought,

6    what John thought, what Joost thought, what Andre

7    thought was virtually impossible.  I am not asking

8    anyone to take all those hours and spend whatever

9    period of time it is to regurgitate it on a piece of

10   paper or am I going to expect someone to give me a

11   piece of paper that is completely to my satisfaction

12   after spending all that amount of time.

13             So if you are asking me if this was

14   acceptable, then by virtue of the fact that I signed

15   this, it must have been.  However, my notion was from

16   all these people that John was winding down JBG deals

17   and the piece of land, and I was finding new deals,

18   and then by year end, he was physically out of the

19   office, confirmed by Joost Tjaden and Andre van Rhee

20   on December 10th, 2005.  And I recall that meeting

21   vividly.

22        Q    Did you have any concerns after you read

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 212

1   this paragraph that the role that's described for

2   Mr. Gardner was not consistent with what had been

3   discussed during these 15 hours of conversations

4   you've referred to?

5       A    No.  This was a honeymoon.  You know, this

6   was -- everybody was happy.  Everybody seemed to like

7   each other.  And the last thing that I ever thought at

8   this point in time was that I had to distrust

9   somebody.  And at that point, I would have just walked

10  away.  I mean, it just doesn't -- it's not worth the

11  energy.

12      Q    What was your reaction to the vision in the

13  letter that says that Mr. Gardner would continue to

14  retain the title of president of Fidelio Properties

15  Management, Inc. which is the managing partner of

16  Fidelio?  When you read that, were you concerned?

17      A    No.

18      Q    Did you understand that by virtue of the

19  fact that Mr. Gardner was going to retain the title,

20  he would have some involvement in the ongoing business

21  of the company after December 31st of '05?

22           MR. HADDAD:  What company?  I'm sorry.

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 213

1    What company?

2              MR. SMITH:  I'm sorry?

3              MR. HADDAD:  What company are you talking

4    about?

5              MR. SMITH:  Buvermo.

6              THE WITNESS:  As president of Fidelio?

7              BY MR. SMITH:

8         Q    As president of Fidelio Properties

9    Management, were you concerned that because he had

10   that role, he would have some involvement in Buvermo's

11   business moving forward after December 31st of '05?

12        A    After those hours of conversations with all

13   these people, I didn't have an issue with that.  I

14   don't candidly understand how a title of a Management,

15   Inc. company expands into me being fearful that he's

16   going to spend more time when I was told he wasn't.

17        Q    Well, what was your understanding of

18   Mr. Gardner's ongoing role as the president of Fidelio

19   Properties Management, Inc.?  Did you understand what

20   that entailed?

21        A    Not specifically.

22        Q    Did you understand that Mr. Gardner would

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 214

1    continue to sign off on transactions on behalf of

2    Fidelio?

3        A    Yes.

4        Q    After December 31st of '05?

5        A    Yes.

6        Q    And did you understand as well that

7    Mr. Gardner was going to continue as the managing

8    member of the LLCs through which Fidelio owned its

9    interest in the properties?

10        A    I didn't have any issue with any of this.

11    This is not something that I considered to be a

12    contentious situation.  It's a situation that I --

13        Q    I understand.

14        A    -- I understood to be pro forma.  Andre and

15    Joost wanted it this way for a period of time.  It

16    also indicates somewhere in here that I would take

17    over these roles after two years.

18        Q    Actually, what it says is the intent is for

19    you over time to take over --

20        A    In conversations, I was given a date.  It

21    was a two-year term.  That was from Andre van Rhee--

22        Q    Two-year term beyond --

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

1      A      Two years from the date I joined as

2  president and CEO of Buvermo, I would take over the

3  balance of these titles.

4      Q      So by implication, for two years after you

5  took over, Mr. Gardner would continue to have

6  involvement --

7      A      No.  Signatory.

8      Q      Signatory?

9      A      That's what he told me.  He said if you're

10  going to do a deal, I'll sign it, which by the way

11  worked in Spotswood and the JBG deal.

12      Q      Okay.  You also see in this letter that

13  Mr. Gardner advises you that he intends to continue as

14  a pro rata 2.5 investor for all future projects.

15              Did that concern you at all?

16      A      Not at all.

17      Q      Did you understand what he meant by that?

18      A      I asked him what he meant.

19      Q      And what were you told?

20      A      I was told that he was going to put in

21  2 and a half percent in all the projects, and I was

22  happy to hear that.

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 216

1      Q     And that was even after December 31st of

2  '05, wasn't it?

3      A     Yes.  That's a pari-passu equity

4  investment, and I'm happy to allow him to -- let the

5  company allow him to make that investment.

6      Q     All right.  And as an ongoing investor in

7  the company, wouldn't you by virtue of your position

8  as president be acting in a fiduciary capacity towards

9  Mr. Gardner --

10     A     Of course.

11     Q     -- as an investor?

12           And then there's a sentence in the offer

13  letter which is entitled future decision making, and

14  it states as follows.  As we discussed, for any future

15  investment decisions, both you and I will have to

16  agree before we submit the investment to Fidelio -- to

17  the Fidelio partners for their approval.

18           How did you interpret that sentence?

19     A     I interpreted it that I would find a deal.

20  I would describe it John.  I'd go through the numbers

21  with him.  And if he felt that it matched the

22  parameters of what the company was looking for, then

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 217

1    we would submit the investment to Joost and Andre.

2        Q    And how long was this arrangement to go on

3    in terms of you would have to talk to Mr. Gardner

4    about the deal before seeking approval of the Fidelio

5    partners?

6        A    The term of that, I do not recall.

7             However, again, this component and, yeah,

8    this responsibility that I had did not concern me in

9    the least.  I was happy to go over deals, describe

10   what was going on and get John's input and eventually

11   get his acquiescence that we should go to the Dutch or

12   that we shouldn't.

13            I gave him the credit and the benefit of

14   the doubt knowing that better than I do.  And if he

15   was adamant that a deal didn't make sense for them,

16   that's okay.  There's other deals out there.

17       Q    Did you anticipate that this arrangement

18   would exist past December 31st of '05?

19       A    I expected it to.

20       Q    Exhibit Number 7, your offer letter, says

21   absolutely nothing about a term of employment; is that

22   correct?

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 218

1       A    I don't see it in here.

2       Q    Okay.  It doesn't say anywhere that the

3  company has agreed to employ you for 10 years, does

4  it?

5            MR. HADDAD:  Asked and answered.

6            Go ahead.

7            THE WITNESS:  The letter does not say that.

8            BY MR. SMITH:

9       Q    And did you realize that before you signed

10  it?

11      A    Yes.

12      Q    And what did you do after you realized it?

13      A    I felt comfortable that I trusted them.

14  John had a good reputation.  I trusted him.  I've

15  known Tony LoPinto for 15 years.  I trusted him.  I've

16  known Marsha for almost as long.  I trusted her.  I

17  liked Joost.  I got along with him.

18            It was a cordial interview process.  Nobody

19  seemed to be trying to write something and do

20  something else.  I can't tell you that I felt the same

21  way about Andre, but I didn't spend as much time with

22  him.

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 220

1          A     That was John's word.

2          Q     Okay.  John's word was it was going to be

3     modernized.

4                What was your understanding regarding the

5     terms of the new operating agreement, the major

6     substantive terms of the new operating agreement?  Did

7     you have any understanding of what the terms would be?

8          A     Not really.

9                You know, I spent the better part of over

10    four years immediately in my last job making

11    investments through the promoted interest structure.

12    And moreover, I arranged the debt, the equity and

13    negotiated the promoted interest in all the deals that

14    I did with the Lerner family.  So I did or I believe

15    that I had a fairly decent body of knowledge of how

16    the promoted interest works.

17               I also was pleased to see that the

18    threshold to participate in the promote was reduced

19    from 12 to 10, and I just presumed that that was a

20    component that needed to be amended.  I didn't know

21    whether it currently said 12 or anything had changed.

22               I mean, you know, other than that and, you

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 221

1    know, putting my name in, I didn't have any

2    predisposition to what was going to change or not

3    change.

4              I will continue to tell you that I did ask

5    whether this was something that needed to be

6    negotiated, amended, whatever, immediately, and, you

7    know, I was told that we don't need to focus on this

8    until we get near a deal.

9              Now, you know, I have some thoughts on

10   reflection, which aren't probably important to you,

11   but, you know, at face value, I trusted John, I

12   trusted Andre, I trusted Joost, about, you know, what

13   this said, and my understanding of it was that they

14   were going to give me this and it was acceptable to

15   me.

16   Q    Did you have any understanding that the

17   operating agreement in its revised form would contain

18   some sort of provision whereby a departing member's

19   interest would be subject to a redemption?

20   A    You are asking me if --

21   Q    You had any understanding whether that

22   would be part of the agreement.

Page 222

1      A      That's not what you said.  You said

2   amended.

3      Q      The new document --

4      A      Right.

5      Q      -- the modernized document, was it your

6   understanding that that would include a redemption

7   provision?

8      A      Absolutely not.

9      Q      It wasn't your understanding?

10     A      No.

11     Q      Do you understand that that type of

12  provision is in the existing operating agreement?

13     A      It may well be.

14     Q      Did you negotiate that out?

15     A      I didn't negotiate any part of it.  You

16  understand that I told you that it was supposed to

17  have been amended.  The amended draft was supposed to

18  have been given to me that I then turn over to

19  counsel.

20          And I wasn't planning on hanging anybody

21  up.  In other words, I wasn't planning on getting an

22  amended copy and mulling it over for a period of time.

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 225

1              Have you ever seen this document before?

2      A      Let me tell you my relationship with this

3  document.  Okay?

4              I believe that when I was doing the budget

5  for '06, I needed to know what John's salary and

6  benefits were.  And I had been told by Kara

7  McCormick -- and I think Laura Preede was still there

8  at the time -- when I asked what the deal was so I

9  could plug in the overhead number.

10             And I don't think Laura knew, and Kara told

11  me something along the lines of it was supposed to be

12  X and it became Y, and, you know, you'd better get

13  some clarification, et cetera, et cetera.  And, Marc,

14  this was simply to associate the overhead for John in

15  the overall scheme of things for '06 and to the extent

16  we did anything more than that going forward.

17             I believe that I asked John several times

18  what the deal was, and he told me orally.  And then I

19  believe that I asked if he had any documentation of

20  this.  My recollection is that it was in an e-mail to

21  Joost and Andre about what the salary and benefits

22  were.

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 226

1          I frankly don't recall it being in

2   memorandum form unless this was an attachment to an

3   e-mail, but I -- my recollection is that it was an

4   e-mail that John printed and gave to me.

5          My only focal point was the salary that

6   would be paid -- see, it's a split year.  So John was

7   making, I think, 350, up until March -- I'm sorry,

8   through March, and then we had a -- we had to prorate

9   the 350 until March 31.  Is there a March 31?  And

10  then we would take the 150 and use it June -- March,

11  April -- April throughout the end of the year.

12         That was the only request that I had at the

13  time, and actually, I think I asked for that

14  information much later than September 19th, 2005.  It

15  was toward year end.

16         So my recollection is I did not receive

17  this document around this date.  And to the extent I

18  received it, it was subsequent to that when we were

19  doing the budget for the following year.

20     Q    Well, apart from when you received it, are

21  the contents of the document consistent with your

22  recollection of the -- what you --

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 227

1      A      This was not a document that was given to

2  me in the ordinary course of events.  In other words,

3  nobody handed me this and said here's what John is

4  doing going forward.  This was given to me or at least

5  the information in sentence three was given to me so

6  that I could confirm what the budget would be.

7      Q      Okay.  And when you received this document

8  in whatever form, when you did in fact receive it, did

9  you raise any questions with anybody concerning the

10  description of John's ongoing role with Buvermo?

11      A      No.

12      Q      Because it states in number three that

13  Mr. Gardner will continue as an employee of Buvermo

14  Properties for a period of three years after

15  March 31st of 2006, right?

16      A      Yes, it does.

17      Q      And your testimony is you didn't question

18  that, didn't raise any concerns about that?

19      A      I asked Laura I believe about the

20  employment status, and she told me -- and it might

21  have been Kara -- but I was told that John wanted to

22  remain an employee so he could continue with his

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 228

1   health insurance.

2            And not that there's anything to the

3   contrary, but I was told that there was a -- either an

4   offer or a suggestion that he would become an

5   independent contractor advisor, which is what Chris

6   Zachariasse, as I understand it, was.  And therefore,

7   John would assume the identical role both in terms of

8   his role in the company and his status in the company.

9            And, you know, it didn't bother me that he

10  wanted to maintain an employee status for the purposes

11  of the benefits.  I know how hard it is to get health

12  insurance as an individual.  So, you know, I'm

13  empathetic toward that.

14           And to the extent that he was an employee

15  for his 401(k) and his employee benefits, that didn't

16  present to me an issue that he was going to be an

17  active employee as he was, you know, prior to my

18  arrival.

19      Q    Did the money he was -- the continuing

20  salary he was going to receive for three years, did

21  that bother you?

22      A    No.  It's -- it was something that

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 239

1    many weekends and holidays as I could.

2        Q    And what about in '06 up through the date

3    of your termination in March?

4        A    I spent as much time, non-work time, in

5    Florida as I could.

6        Q    But you spent the workweek in the District?

7        A    Yeah.

8        Q    And were you paid all of your salary

9    through the date of your termination?

10       A    Was I paid all of my salary through the

11   date of termination.

12            Well, let me see.  There's two parts to

13   that question.  I did receive a check from Buvermo

14   subsequent to my termination, and I can't recall the

15   date.

16       Q    Well, I can show you.  I want to shortcut

17   some of this.

18            My documents reflect that you received --

19   well, you were issued a check dated December 14th of

20   2005 in the amount of 137,500, which is made out to

21   you personally.

22            Did you receive that check?

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 240

1      A      Yes.

2      Q      All right.  And that is an amount, I guess,

3  which you were due from the start of your employment

4  in June of '05 all the way through December?

5      A      Yes.

6      Q      And that would be at the rate of $275,000

7  annually?

8      A      Well, no.  It's at the rate of 250, plus

9  Kara grossed up the --

10     Q      That's what I mean.  It reflects the

11 gross-up?

12     A      Reflects the base plus the benefits.

13     Q      If you annualize the 275 --

14     A      Yeah.  And again, I want to be clear.  I

15 didn't make the calculation, okay?  I gave Kara what

16 my out-of-pockets were for the benefits that were

17 supposed to be subsumed by Buvermo, and she made the

18 calculation.

19     Q      Okay.  Did you disagree with the amount of

20 money that you received?  Did you feel it was a

21 miscalculation?

22     A      I personally didn't analyze it.

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 241

```
 1        Q     All right.  And my records indicate that
 2   another check was issued to you on March 31st of '06
 3   in the amount of $68,750.
 4             Did you receive that check?
 5        A     I did.
 6        Q     And that check was made out to Buvermo
 7   Properties Florida, LLC; is that right?
 8        A     Conveniently, it was.
 9        Q     And when you say conveniently --
10        A     I don't know why one's made out to me and
11   one's made out to the entity.
12        Q     Made out to the what?
13             MR. HADDAD:  Sorry.  Go ahead.  When you're
14   done, I just have -- I'm willing to stipulate that
15   we're not making a claim for --
16             MR. SMITH:  Unpaid wages?
17             MR. HADDAD:  -- unpaid wages.
18             MR. SMITH:  Okay.
19             MR. HADDAD:  I mean, you know, we are for
20   future wages or for wages since that he's accrued, but
21   not under any Unpaid Wage Claim Act or anything of
22   that sort.
```

Misty Klapper & Associates
703-780-9559

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 242

1          MR. SMITH:  Okay.  So you're willing to

2     stipulate that Mr. Morris received all of the money he

3     earned through the date of his termination?

4          MR. HADDAD:  Salary.

5          THE WITNESS:  I got the gross-up too.  I

6     got the benefit reimbursement.

7          MR. HADDAD:  Right.  But we're not making a

8     claim -- in other words, we're not making a claim for

9     salary between the date of your hire and the date of

10    your termination.  We believe that you were paid all

11    of your salary for that time.

12         THE WITNESS:  Yes.

13         MR. SMITH:  Okay.  That helps.

14         BY MR. SMITH:

15    Q    Mr. Morris, your counsel during the

16    discovery period requested all of the information,

17    documents that were resident on your hard drive of the

18    computer you used at work which we had, I guess,

19    downloaded and printed out and produced to you during

20    the discovery process.

21         I found it -- I'm not going to mark them as

22    exhibits in the deposition, but I found, you know, a

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 244

1    when you hire somebody to be the chief executive

2    officer of a company, you should allow the CEO to

3    balance what he's supposed to get done for the company

4    with what he decides to do.

5            I've never had anybody complain to me

6    before that I abused the privilege of using the

7    computer.  If I had a fear that I would be criticized

8    for using my computer for personal business, I would

9    have never done it.

10           I mean, I certainly didn't achieve the

11   level of success or elevation that I have because I

12   spent all day long on the computer not doing my job.

13   And to the extent anyone is upset that I did anything

14   at work versus just doing work, I could apologize.

15   But, you know, I do have a life and that life doesn't

16   stop at 9:00 in the morning and pick up at 6:00 at

17   night.

18           So, you know, this goes back to the shame

19   on me for not being ultrasensitive to things that may

20   be construed as something other than I consider to be,

21   you know, a natural day.

22       Q    All right.  You testified before that you

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 245

1    began experiencing problems in terms of your

2    relationship with Mr. Gardner very quickly after you

3    assumed your position at Buvermo; is that fair?

4        A    Yes, it is.

5        Q    A fair statement?

6        A    Yes.

7        Q    And what sort of problems are we talking

8    about?

9        A    Well, there's many problems that we're

10   talking about, and a lot of this information is in

11   e-mails, if you had the opportunity to read them, that

12   I sent to people, in particular to the headhunters,

13   Marsha Pearcy and Tony LoPinto.

14            I felt that John was not a person who was

15   welcoming a new senior executive.  He was somebody who

16   resisted any change.  He constantly on his own went

17   out to solicit new transactions.

18            I heard from people in the real estate

19   community that John had been at this company or the

20   other company on his own and, Jonathan, are you really

21   the president and CEO of the company.  It was actually

22   a little embarrassing.  You tell somebody you've taken

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 246

1    over a job, that you're representing the company, and

2    the previous CEO is out doing what he's been doing.

3              He pursued a transaction downtown, and I

4    was working very hard on that.  I had brought

5    Guggenheim Partners in, I had brought Cigna in to make

6    the loan, and I heard from people in Washington that

7    John Gardner was downtown meeting with them separately

8    to determine rental rates -- prospective rental rates

9    for the building which were not only in the sales

10   package that we got from the broker, but they were

11   being vetted by myself and Guggenheim also, which is

12   part of the process.

13             And it was, you know, just shocking to me

14   that John was out there on his own doing what he was

15   doing without either telling me or suggesting that

16   he's coming up with different information or

17   additional information.  And this was a very large

18   deal for us.  It was $52 million dollars.

19             And what ended up happening was, in my

20   mind, Guggenheim perceived that there was a riff

21   within Buvermo, that there was a tension between

22   John's view of the building and my view of the

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 247

1    building.  Notwithstanding the fact that the lender,

2    Cigna, who I brought on board, was -- had done their

3    underwriting, and they were prepared to make the loan.

4    And they pushed very hard for us to do the deal so

5    they could make the loan because they felt pretty

6    confident about the building.

7            Guggenheim, who I had done business with

8    previously in a large deal before, they were prepared

9    to put up over $20 million of equity.  They were very

10   sensitive to what they perceived as office politics,

11   and I had a history with them for several years.  They

12   relied upon me, but they perceived an issue internally

13   at Buvermo.

14       Q    Were you told that or is that something you

15   just perceived on your own?

16       A    No.  I think that a statement was made by

17   the financial analyst in North Carolina when we were

18   going over all the rental rates on a speakerphone when

19   John would chime in with different numbers.  And the

20   statement was along the lines of you guys don't seem

21   to be consistent in what you think you can get for

22   rental rates, and we have board meeting coming up,

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 248

1    dah, dah, dah, dah, dah, and, you know, we really need

2    this information to be tight.

3              And I was caught off guard.  I was just

4    caught off guard.  I didn't need anyone generating any

5    additional information even it was positive, because

6    you have one chance to solidify your position with the

7    lender and the equity partner.

8              And as the president and CEO of the

9    company, I felt comfortable that I was the spokesman

10   for the analysis and the underwriting and all of the

11   bits and pieces of the deal and I was the quarterback

12   to bring in the lender, the equity partner and our

13   money.

14             I had a relationship with the broker.  It's

15   a very competitive business downtown.  It's hard to

16   buy these buildings, and we were number one on the

17   list of the brokers trying to make sure that we got

18   the deal, and it really fell apart.

19        Q    And was the long and short of this that

20   John didn't assess the opportunity the same way you

21   did?  He wasn't as supportive of the transaction?

22        A    I think that's a nice way to put it.

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 253

1    building with an institutional investor or getting

2    involved in a development deal with a company like JBG

3    who shoulders a lot of the day-to-day work.  And the

4    concept of buying a 50,000 square foot office building

5    and chopping it up into a thousand or 2500 square foot

6    suites to sell to a title company or, you know, a real

7    estate company was as far off the mark as I could

8    think.

9             So my concern was that the voice of the

10   company was not just my own, but it was John's, and it

11   was inconsistent with what I believed not only the

12   history of the company had been but what was the

13   result of all these hours of conversations about where

14   we should be going with the company.

15       Q    All right.  And back to my question.  What

16   specific deals beyond the -- and I didn't get the

17   address of the building that you were talking about.

18       A    1660 L Street.

19       Q    Beyond that deal, what specific deals did

20   Mr. Gardner interfere with?

21       A    I don't recall right this second.

22       Q    Now, you had indicated that you were

Misty Klapper & Associates
703-780-9559

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 276

1    Joost, John and myself, and I said we've got to define

2    the roles because what I was told and what I agreed to

3    in the beginning is not evolving.

4            At that point, Andre van Rhee told John

5    Gardner that he could be in the office one day a week,

6    and that after six months, they would revisit that.

7    Joost seemed to agree.  I went further and said that I

8    want to be the person out looking for deals, not John.

9    I don't want John representing the company at industry

10   events.  I don't want him to carry a Buvermo business

11   card.

12           My recollection is that they agreed

13   wholeheartedly to that list that I just gave to you.

14      Q    Was this list something that was put on

15   paper?

16      A    No.

17      Q    Let me go back and just ask you about that.

18           You said they agreed to a one day a week --

19      A    No.  I'll tell you what they said.  Andre

20   van Rhee told John Gardner that he could be in the

21   office a maximum of one day per week.

22      Q    Okay.  Starting when?

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 277

1        A        Immediately.

2        Q        Okay.  What else?  What else transpired

3    during this meeting?

4        A        I was satisfied with the four or five

5    points that were put across, and I didn't feel like

6    belaboring it any further.  I said I appreciate your

7    time.  They were leaving at 2:00 p.m. for Europe, and

8    it was 9:00 or 10:00 in the morning.  John stayed

9    behind and talked to them.  That was Saturday, and

10   that was it.

11                (Thereupon, the document was marked as

12                Morris Deposition Exhibit No. 15 for

13                identification.)

14                MR. SMITH:  Do you mind if we just take a

15   break for a couple minutes?  I want to confer with

16   John, and then you can take a look at this document.

17   I'll be right back.

18                (Whereupon, a short recess was taken.)

19                BY MR. SMITH:

20       Q        All right.  I think -- were you in the

21   middle of a response?  I actually gave you that

22   document.

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 278

1              All right.  Exhibit Number 15, Mr. Morris.

2    This is another memorandum to the Fidelio board of

3    directors, and it's under your name, dated

4    December 9th of 2005.

5              Is this a memorandum you prepared and

6    delivered to the board of directors?

7         A    It was not delivered.  I actually showed it

8    to John and he suggested that personnel -- this was

9    going to be in the board package.  He suggested that

10   we don't put personnel issues in the board package

11   because his concept was that we manage the personnel

12   issues in the office.  The other guys do not.

13        Q    All right.  At the December, I think, 10th

14   meeting you had, Andre indicated that John should be

15   in the office one day a week.

16             During that conversation or, you know, even

17   after that, was it agreed that despite that

18   limitation, Mr. Gardner would continue to handle the

19   JBG relationship?

20        A    There was a discussion about how that would

21   work, and what happened was John's interest, in my

22   opinion, was that -- I'm just going to be very blunt

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 279

1    with you, okay -- he wanted to maintain a relationship

2    with several -- with one or more than one of the

3    partners of JBG, because he had a good run with them.

4         And it's personally my opinion that the --

5    and this was a very big surprise to me -- the

6    difference between Buvermo and JBG in this one aspect

7    is that the JBG company is privately owned by a set of

8    partners, and it was started by an older group of

9    partners who continue to maintain an office at the

10   building and a secretary.  And their economic interest

11   in the deals have probably been long gone, but on the

12   surface, they have a nice office, a secretary,

13   everything else.

14        What came as a surprise to me was that

15   John's retirement was governed not by him but by rules

16   that the Dutch had given him.  And I was initially

17   surprised that there was a mandatory retirement age at

18   Buvermo.

19        So when I connected the dots of what John

20   was trying to achieve with respect to the partners at

21   JBG relative to the sort of drop-dead date, if you

22   will, of working at Buvermo, I was more empathetic at

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

1   that moment than I had been for a long time.  And my

2   perception was that John wanted to maintain a

3   relationship with the JBG guys as a businessperson

4   with Buvermo as more or less the sole exception to

5   anything else that I brought up.  He didn't ask to

6   be -- have a relationship with Steve Garchik.  He

7   didn't ask to have a relationship with anybody else

8   that the company had done business with.  It was only

9   the JBG partners.

10          At that point, I decided that to make this

11  work, what I would do is I would more or less split

12  the baby.  There are managing directors and maybe

13  junior partners at JBG that have day-to-day

14  responsibilities for projects, and the partners do

15  not.  They are very senior, they do make broad

16  decisions.  You know, they control the direction of

17  the company.

18          But when you go down to the next level, you

19  will find a collection of people between the ages of

20  35 and 50 who in many cases are more or less my peers

21  in the world in terms of age and expertise, et cetera,

22  where the partners are more along John's age and

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 281

1    experience, et cetera.

2            So I figured that to allow John to have a

3    relationship with these guys -- and we can name who

4    they are, but in particular a guy named Mike

5    Glosserman, who I'm friends with or have been friends

6    with as well, he's around 60 or 61 -- that that should

7    not detract from what I'm trying to accomplish as long

8    as I maintain a relationship with these managing

9    directors, et cetera, et cetera.

10           Now, going back to something that you said

11   earlier about if John finds a deal, isn't that

12   beneficial to you.  In the case of JBG, as long as I

13   was getting the promote and the economic benefit --

14   and by the way, I always wanted to be involved.  I

15   always wanted to go to the meetings, and I always

16   wanted to know what was going on.  I never wanted to

17   be a remote control guy.

18           As long as I had the relationship with a

19   set of managing directors and an occasional

20   relationship with this particular partner and John

21   still wanted to have his chummy relationship with them

22   and have the dinners or lunches, I figured it's no

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 282

1    skin off my nose.

2            So on the one hand, I did not de facto say

3    you deal with JBG, I'll deal with the rest of the

4    world.  I did say continue your relationship, most of

5    it personal, with the JBG partners, but I need to be

6    involved at the operational level of JBG not only to

7    know what's going on with our existing remaining

8    assets, but to the extent something new comes up, I

9    want to be involved.

10           So offering that concession or allowing

11   that concession to occur I did not feel was harmful,

12   and I thought that it would be helpful to get this

13   working properly.  And that's the extent of my

14   knowledge of that conversation.

15           With the -- under the auspices of I did

16   want to find a way to make the job work, because I

17   will tell you again, I liked the job and I thought it

18   was a good fit for me, but I wanted to run the

19   company.  I wanted to have the responsibilities that I

20   was told I was going to have.  I wanted to have my

21   promote, my salary, and my benefits.  And if I was

22   allowed to do that, then I think it would have turned

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 296

1    until the recent week.  And with the disclosure of

2    this meeting, it more or less told me that John can do

3    or say one thing that is a positive thing for the

4    relationship, but then immediately do or say something

5    that is very negative for the relationship.

6          Q      So immediately following or following the

7    discussion about work, you know, conveying to the

8    Dutch investors that you're working together, the

9    relationship is better, Mr. Gardner disclosed the fact

10   that he was -- had scheduled this meeting and you

11   became upset about that?

12         A      Yes.

13         Q      And then that evening, you had dinner at

14   the Four Seasons; is that right?

15         A      Yes.

16         Q      And who was present at that meeting?

17         A      John, Joost, Andre and myself.

18         Q      All right.  And you became pretty upset

19   during this dinner meeting as well, didn't you?

20         A      I was irritated.

21         Q      And what were you irritated about?

22         A      John had taken it upon himself to pull

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 297

1    literally pieces of paper out of his pocket.  Not out

2    of a briefcase, but literally out of his pocket.  They

3    were folded like this (indicating).

4              I was talking to Joost to my right.  John

5    was talking to Andre.  Joost and I were having a very

6    social, cordial conversation about -- not about

7    business, and John starts going through pieces of

8    paper with Andre.

9         Q    I'm sorry, with what?

10        A    With Andre.  And I stopped Joost for a

11   second.  I said hold on a second.  I said, John, what

12   is it that you're going over, can you just tell me.

13             As it turns out, it was the promoted

14   interest calculation that he had generated, a

15   two-and-a-half-page document that I had seen briefly

16   the day before, which reflected -- this is his

17   document -- reflected a promote which was oriented

18   toward John Gardner taking the lion's share of the

19   promoted interest, and I was getting a smaller piece

20   of it.  That's been -- the document's in discovery.

21        Q    You have that document?

22        A    I do have that document.

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 298

1                    MR. HADDAD:  It's been produced.

2                    BY MR. SMITH:

3        Q    Okay.  I have no idea what you're talking

4    about.

5                    MR. HADDAD:  Go ahead.  Continue.

6                    THE WITNESS:  Do you want to pull it out?

7                    MR. HADDAD:  I'll see if I can find it.

8                    THE WITNESS:  I have it in my briefcase.

9                    BY MR. SMITH:

10       Q    Let me ask you a few questions about it

11   while your counsel is looking for the document.

12                   Did this promote -- it wasn't related to

13   any particular real estate project, was it?

14                   MR. HADDAD:  Just answer the question.

15                   BY MR. SMITH:

16       Q    It didn't have to do with the overage that

17   existed between Buvermo's expenses and profitability?

18   It really had nothing to do with you, did it?

19       A    No.  This was a -- this was a schedule that

20   showed where the promoted interest went.

21       Q    Promoted interest for what?

22       A    It was my presumption that John was sitting

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 299

1   there talking to them about the new promote structure.

2      Q    Okay.  When you say your presumption, you

3   didn't know one way or the other what he was talking

4   about, did you?

5           MR. SMITH:  Let me take a break.  Maybe I

6   can shortcut this.

7           (Whereupon, a short recess was taken.)

8           BY MR. SMITH:

9      Q    Mr. Morris, I'm not going to mark this as

10  an exhibit, but one of the documents that Mr. Gardner

11  pulled out of his pocket at the meeting on the 22nd,

12  the dinner meeting -- I'm going to show you -- was

13  entitled designation of FPEP property.

14          Is that the document?

15     A    It was three pages.

16          MR. HADDAD:  He's saying one of the

17  documents.  Was that one of the documents he pulled

18  out?

19          THE WITNESS:  It's a piece of one of the

20  documents, yes.

21          BY MR. SMITH:

22     Q    Okay.  And your perception was that

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 302

1          We were supposed to have the dinner the

2    following night, the more formal dinner, and we could

3    have just as easily discussed this together and then

4    presented it to the Dutch the following day.

5          The second document --

6     Q    But you're making a presumption, before we

7    move on to that second document, that Mr. Gardner was

8    attempting to alter your promote, aren't you?

9     A    Say that again?

10    Q    You're making an assumption that that's

11   what he was attempting to do, correct?

12    A    Well, like I said, I didn't study this

13   document, okay?  But when I read down to the bottom

14   and it says promote percentage and I see John Gardner

15   at 10 and Jon Morris at 3, then the bell goes off in

16   my head that this is not only inconsistent with what I

17   thought my deal was, it doesn't reflect what I see in

18   the offer letter.

19    Q    Okay.  And I understand that.  And, you

20   know, my earlier question to you was didn't

21   Mr. Gardner attempt to clarify that that's not what

22   this document was intended to do?

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 303

1    A    His only words to me were this is just an

2  example.

3    Q    Right.

4    A    Okay.  But I can't even begin to tell you

5  what it's an example of.

6    Q    All right.  But your reaction -- I mean,

7  you were angry, weren't you?

8    A    I was angry at the principle that as much

9  of an effort as I had made to date to do the things

10  that I had done, that at this dinner, which was not

11  called by anybody other than John, he's pulling out

12  pieces of paper that I haven't had the opportunity to

13  review or even to get the knowledge that you're

14  suggesting that he intimated that I could get.  And

15  now we're in front of the Dutch guys who have flown

16  for, you know, six or seven hours and I've spent three

17  or four hours with them out in Reston and they're not

18  in a good mood.  They're tired.

19    Q    All right.  Now, what about this second

20  document that Mr. Gardner pulled out?  What was that?

21    A    I don't have a copy of it, and I didn't see

22  it at the dinner.  But it was waved in front of my

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 304

1    face by Andre, and he told me this is a reconciliation

2    for John Gardner to take a check for 140 or $170,000

3    out of your company.  You should have seen it.

4        Q    Now, that arrangement where Mr. Gardner was

5    going to take that amount of money, that had nothing

6    to do -- I mean, you weren't involved in terms of

7    negotiating that with Mr. Gardner, were you?  That was

8    a preexisting arrangement he had with the partners,

9    right?

10       A    My answer to you is twofold.  Number one, I

11   suppose; and number two, the issue was that it was

12   coming out of the company that I had already worked

13   hard to arrange a budget for '06.  I worked on that.

14   This was not in the budget, to my knowledge.

15            You're talking about three months after the

16   submission and approval of the '06 budget, and the

17   overall overhead was about $1.3 million.  So you're

18   talking about at least a 10 percent delta to that.

19            And if I were Andre, I would feel that it

20   was a little sloppy on the president's part that he

21   doesn't have a copy of a check request basically for

22   10 percent of the following year's -- the next year's

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 305

1  budget.

2      Q    Now, once that second document was pulled

3  out, you became even more angry, didn't you, and --

4  let me ask you that first.  You got -- you reacted

5  very strongly to it?

6      A    I don't think I reacted any more strongly

7  than anybody else would.

8      Q    Well, did you at that point engage in a

9  rather heated discussion with Andre?

10     A    Andre yelled at me.

11     Q    And did you yell back?

12     A    No.  I stood my ground.  I mean, I -- I

13  think that I just protected my integrity.  I wasn't

14  doing anything wrong and I have nothing to hide and I

15  just wasn't given the opportunity to look at or review

16  documents with anybody and I didn't look good in front

17  of Andre.

18         I don't think he should have taken it upon

19  himself to direct as much anger as he did to me, but

20  that's the way it came across and I didn't yell,

21  scream or fight back.  I stood up for myself.  And I

22  wasn't going to take more than an hour of being

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 306

1    berated.

2        Q    Did you attempt to argue with Mr. van Rhee,

3    Andre?

4        A    I attempted to try to explain that these

5    are documents that I had not seen.  And given the

6    opportunity to see them or review them, then I would

7    have been, you know, maybe happy to go through them

8    with them in a forum not at dinner at the Four

9    Seasons, not with food being delivered and wine being

10   delivered.

11            I mean, this is very important information,

12   and this affects me and my income.  And I don't think

13   that that's an appropriate venue to pull pieces of

14   paper out of literally your pants pocket, give them to

15   the people who just flew over here from Europe, not

16   having shown them to the president and CEO.  And I

17   just think it's wrong.

18       Q    How does the payment of the 170 or whatever

19   it was thousand dollars to Mr. Gardner affect your

20   income?  I mean, your income wasn't based on anything

21   but a salary and a promote.

22       A    No.  No.  It was the fact that I had no

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 307

1    idea what was being discussed with respect to that

2    check which was what started the irritation with

3    Andre.  The fact is that that is not something that

4    was handed to me and included in our annual budget.

5    That's secondary.

6        Q    All right.  Now, you left that dinner

7    abruptly, didn't you?

8        A    I absolutely excused myself, and I told

9    them point-blank that, number one, I felt that I had

10   been subjected to as much yelling, degradation,

11   whatever, as I could possibly take.  I had gone in and

12   checked my blood sugar in the bathroom, and it was

13   three to four times higher than normal, which is very

14   dangerous.  I told them that, and I told them I had to

15   go.  I had to take a tremendous amount of insulin when

16   I got home, and it took several hours for my blood

17   sugar to return to anywhere near normal.

18            I feared for my health.  I did excuse

19   myself.  I stood up.  I pushed the chair in cordially.

20   I told them where I was going, if they wanted to reach

21   me, and I was prepared to tour the Spotswood Valley

22   Shopping Center the following day, even though I

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 308

1    wasn't in great shape in terms of my blood sugar that

2    night.

3        Q    And did you consider the way you handled

4    yourself with Andre to be professional?

5        A    I don't know exactly what the definition of

6    professional behavior would have been in that

7    particular situation.  I was -- I felt like I was

8    being attacked more so than I had ever been attacked

9    in my professional career.

10           I was making an effort to explain that I

11   had not seen these documents.  I was irritated with

12   that.  I felt that it was a continuation in some cases

13   of John just not sharing information with me before he

14   brought it to the partners, and that was just not an

15   acceptable excuse.

16       Q    All right.  And the following morning, you

17   requested to meet with the partners?

18       A    No.  They asked me to meet.

19       Q    All right.  And this was a breakfast

20   meeting?

21       A    It was a breakfast meeting for them.

22       Q    And you showed up at the meeting, correct?

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 311

1    and I told Joost that I'll be back next week.  And I

2    did not know of a termination until several hours

3    after this.  And then I was informed by e-mail.

4              BY MR. SMITH:

5        Q    All right.  The deals that you just

6    referred to, the two deals were the Spotswood deal and

7    the Reston International deal?

8        A    Yes.

9        Q    And were those the only two deals that were

10   active at the time, active, I mean, in going to

11   closure?

12       A    As far as I can recall.

13       Q    All right.  And isn't it a fact that as of

14   March 24, 2006 that those transactions had not yet

15   been consummated?

16       A    As of that date, they had not been

17   consummated.  As of that day, they had not, to my

18   knowledge, been consummated.

19             MR. SMITH:  This will be our last document

20   here.

21             (Thereupon, the document was marked as

22             Morris Deposition Exhibit No. 18 for

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 316

1    or $250,000 annually for 10 years?

2              MR. HADDAD:  I'm sorry, I -- this will have

3    to wait.  Can you reread that question, please?  Or

4    why don't you just repeat it if you remember it.

5              MR. SMITH:  Sure.  I'm just trying to

6    clarify the claims.

7              One of Mr. Morris's claims -- and correct

8    me if I'm wrong -- is to his salary through June, it

9    looks like, the year 2015; is that correct?

10             THE WITNESS:  I believe that the term is

11   correct.

12             BY MR. SMITH:

13       Q    And my question is is it a salary based on

14   250,000 or 275,000 annually?

15       A    I would presume that given the fact that

16   I'm paying my BlueCross BlueShield, it would go back

17   to the base salary of 250.

18       Q    Okay.  250 per year for 10 years?

19       A    Right.

20       Q    And you're also claiming entitlement to

21   Fidelio's share of the FPEP promote for the parcels

22   of -- land parcels adjacent to the Sheraton Reston

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 317

1    parcel and the remaining Twinbrook parcel as reflected

2    in your offer letter; is that right?

3         A    Uh-huh.

4         Q    Yes?

5         A    Yes.

6         Q    And we've talked about the two-year vesting

7    period.

8              If we're going to assume -- and we're not

9    conceding this, obviously -- you're entitled to this

10   interest, do you have -- have you quantified the

11   value?  Are you able to testify today about the value

12   of that interest?

13        A    No.  We'll either do that ourselves or have

14   an expert witness provide that information.

15             MR. HADDAD:  Right.  I mean, as you know,

16   Marc, it's been about 10 days, 10 to 15 days since we

17   received a lot of these documents which are

18   voluminous, including those from SJM and those that we

19   expect to receive from JBG.  So we have experts

20   retained for that purpose.

21             We certainly have not had time to go

22   through all those documents in the level of detail

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 318

1    that we'd like to.  So we will supplement our

2    interrogatory responses, and certainly that will be

3    the subject of the expert's report.

4              MR. SMITH:  All right.

5              BY MR. SMITH:

6        Q    Are you also claiming entitlement to the

7    promote for all new projects initiated by Buvermo

8    after December 31st, 2005, all the way through

9    June 2015?

10       A    That's the claim.

11       Q    All right.  And at the time you were

12   terminated, you had not officially been made a member

13   of the FP Executive Partners Limited Partnership, LLC?

14       A    Not to my knowledge.

15       Q    All right.  And are you able -- and I think

16   I know the answer to this.  Are you able to quantify

17   your damages for the promote?

18             MR. HADDAD:  I'll just ditto what I just

19   said about one page ago.

20             MR. SMITH:  That's fine.

21             BY MR. SMITH:

22       Q    Okay.  Are you able to quantify the damages

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 327

1          (Discussion held off the record.)

2          THE WITNESS:  What are you advising me?

3          MR. HADDAD:  I'm not going to advise you to

4    say -- I mean, do you know whether all the facts that

5    support your fraud claim are in the complaint?

6          MR. SMITH:  No.  That's not precisely the

7    question.

8          BY MR. SMITH:

9    Q    The question is:  Are there any facts that

10   you're aware of that support your fraud claim that

11   have been omitted from the complaint?

12   A    So is there anything outside the complaint

13   that we know of --

14   Q    Right.

15   A    -- that supports the claim?

16   Q    Yes.  I mean, you've used the word fraud

17   during this deposition, so I think you understand what

18   fraud is.

19          And I'm not telling you, you know, the

20   legal elements of it, but are there any facts which

21   exist which support your fraud allegations which are

22   not in the complaint that you're aware of?

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 328

1          MR. HADDAD:  And I'll just repeat my

2    objection as to legal conclusion.

3          MR. SMITH:  That's fine.

4          MR. HADDAD:  If you don't know, say you

5    don't know.

6          THE WITNESS:  I don't know.

7          MR. HADDAD:  Do you want to take a couple

8    minutes' break?

9          (Whereupon, a short recess was taken.)

10          BY MR. SMITH:

11    Q    Mr. Morris, we touched on this briefly at

12    the beginning of your deposition.

13          What efforts have you undertaken to find

14    alternative employment since you were terminated from

15    Buvermo in March of 2006?

16    A    I met with some investment brokers up here

17    and talked to them about what was going on with the

18    different firms in town.  I have spoken with another

19    brokerage firm, not a commercial firm, a residential

20    firm, and, you know, I just wanted to get some

21    feedback about what was going on, anybody hiring, not

22    hiring.

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

# CONFIDENTIAL

BY-LAWS

OF

BUVERMO PROPERTIES, INC.

ARTICLE I.

MEETINGS OF STOCKHOLDERS

SECTION 1.  <u>Annual Meeting</u>.  A meeting of shareholders shall be held annually for the purposes set forth in the notice of meeting on such date and at such time as may be fixed by the President or Secretary of the Corporation; or if no date and time are so fixed, at 10:00 A.M. on the first Wednesday in June in each and every year, unless such day shall fall on a legal holiday, in which case such meeting shall be held on the next succeeding business day.

SECTION 2.  <u>Special Meetings</u>.  Special meetings of the shareholders for any purpose may be called by the President or the Secretary, and shall be called by the President or the Secretary at the written request of the holders of record of ten percent (10%) of the outstanding shares of the Corporation entitled to vote at such meeting.  Special meetings shall be held at such time as may be fixed in the call and stated in the notices of meeting or waiver thereof.  At any special meeting only such business may be transacted as is related to the purpose or purposes for which the meeting is convened.

SECTION 3.  <u>Place of Meetings</u>.  Meetings of shareholders shall be held at such place, within or without the

Morris Dep.
Exhibit 3

Morris #3

**D-0033**

# CONFIDENTIAL

State of Delaware or the United States of America, as may be fixed in the call and stated in the notice of meeting or waiver thereof.

SECTION 4. <u>Notice of Meetings; Adjourned Meetings</u>. Notice of each meeting of shareholders shall be given in writing and shall state the place, date and hour of the meeting. The purpose or purposes for which the meeting is called shall be stated in the notice of each special meeting and of each annual meeting.

A copy of the notice of any meeting shall be given, personally or by mail, not less than twenty (20) nor more than sixty (60) days before the date of the meeting, to each shareholder entitled to vote at such meeting. If mailed, such notice is given when deposited in the mail, whether such notice is mailed within or outside of the United States, with postage thereon prepaid, directed to the shareholder at his address as it appears on the record of shareholders.

When a meeting is adjourned for less than thirty (30) days in any one adjournment, it shall not be necessary to give any notice of the adjourned meeting if the time and place to which the meeting is adjourned are announced at the meeting at which the adjournment is taken, and at the adjourned meeting any business may be transacted that might have been transacted on the original date of the meeting. When a meeting is adjourned for thirty (30) days or more, notice of the adjourned meeting shall be given as in the case of an original meeting.

D-0034

## CONFIDENTIAL

SECTION 5. <u>Waiver of Notice</u>. The transactions of any meeting of shareholders, however called and with whatever notice, if any, are as valid as those at a meeting duly held after regular call and notice, if a quorum is present either in person or by proxy and no objection to holding the meeting is made by anyone so present, and if, either before or after the meeting, each of the persons entitled to vote, not present in person or by proxy, signed a written waiver of notice, or a consent to the holding of the meeting, or an approval of the action taken as shown by the minutes thereof.

Whenever notice is required to be given to any shareholder, a written waiver thereof signed by such shareholder, whether before or after the time thereon stated, shall be deemed equivalent to such notice. Attendance of a person at a meeting of shareholders shall constitute a waiver of notice of such meeting, except when such shareholder attends for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any meeting of shareholders need be specified in any written waiver of notice thereof.

SECTION 6. <u>Qualification of Voters</u>. Except as may be otherwise provided in the Certificate of Incorporation, every shareholder of record shall be entitled to one vote on each matter submitted to a vote at a meeting of shareholders for every share standing in his name on the record of shareholders.

## CONFIDENTIAL

SECTION 7.   Quorum.   At any meeting of the shareholders the presence, in person or by proxy, of the holders of a majority of the shares entitled to vote thereat shall constitute a quorum for the transaction of any business. When a quorum is once present to organize a meeting, it is not broken by the subsequent withdrawal of any shareholders.   The shareholders present may adjourn the meeting despite the absence of a quorum.

SECTION 8.   Proxies.   Every shareholder entitled to vote at a meeting of shareholders or to express consent or dissent without a meeting may authorize another person or persons to act for him by proxy.   Every proxy must be executed by the shareholder or his attorney-in-fact.   No proxy shall be valid after the expiration of one (1) year from the date thereof unless otherwise provided in the proxy.   Every proxy shall be revocable at the pleasure of the shareholder executing it, except as otherwise provided therein and as permitted by law.   Except as otherwise provided in the proxy, any proxy holder may appoint in writing a substitute to act in his place.

SECTION 9.   Voting.   Whenever any corporate action, is to be taken by vote of the shareholders at a meeting, it shall, except as otherwise required by law or the Certificate of Incorporation, be authorized by a majority of the votes cast thereat, in person or by proxy.

SECTION 10.   Action Without a Meeting.   Whenever shareholders are required or permitted to take any action at a

## · CONFIDENTIAL

meeting or by vote, such action may be taken without a meeting, without prior notice and without a vote, by consent in writing setting forth the action so taken, signed by the holders of outstanding shares having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.  Prompt notice of the taking of the corporate action without a meeting by less than unanimous written consent shall be given to those shareholders who have not consented in writing.

SECTION 11.  <u>Record Date</u>.  The shareholders are authorized to designate a day, not more than sixty (60) days nor less than ten (10) days prior to the day of holding any meeting of shareholders as the day as of which those shareholders entitled to notice of, and to vote at, such meeting shall be determined; and only shareholders of record on such day shall be entitled to notice or to vote at such meeting.


ARTICLE II.

OFFICERS


SECTION 1.  <u>Officers</u>.  The shareholders shall elect a President, a Secretary, one or more Vice Presidents of the Corporation and from time to time may elect or appoint such other officers as it may determine.  Any two or more offices may be held by the same person.

D-0037

# CONFIDENTIAL

Securities of other corporations held by the Corporation may be voted by any officer designated by the shareholders and, in the absence of any such designation, by the President, any Vice President, the Secretary, or the Treasurer.

SECTION 2.  <u>President</u>.  The President shall be the chief operating officer of the Corporation with all the rights and powers incident to that position.

SECTION 3.  <u>Vice Presidents</u>.  The Vice Presidents shall perform such duties as may be prescribed or assigned to them by the shareholders or the President.  In the absence of the President, the Vice President of Administration shall perform the duties of the President.  In the absence of the President and the Vice President of Administration, the Vice President of Technical Operations shall function as such.

SECTION 4.  <u>Treasurer</u>.  The Treasurer, if any, shall perform all the duties customary to that office, and shall have the care and custody of the funds and securities of the Corporation.  He shall at all reasonable times exhibit his books and accounts to the shareholders upon application, and shall give such bond or bonds for the faithful performance of his duties with such surety or sureties as shareholders from time to time may determine.

SECTION 5.  <u>Secretary</u>.  The Secretary shall act as Secretary of and shall keep the minutes of the meetings of the

D-0038

# CONFIDENTIAL

shareholders, have the custody of the seal of the Corporation and perform all of the other duties usual to that office.

SECTION 6. <u>Term of Office; Removal</u>. Each officer shall hold office for such term as may be prescribed by the shareholders and may be removed at any time by the shareholders with or without cause. The removal of an officer without cause shall be without prejudice to his contract rights, if any. The election or appointment of an officer shall not of itself create contract rights.

SECTION 7. <u>Compensation</u>. The compensation of all officers of the Corporation shall be fixed by the shareholders.

## ARTICLE III.

### SHARE CERTIFICATES

SECTION 1. <u>Form of Share Certificates</u>. The shares of the Corporation shall be represented by certificates, in such form as the shareholders may from time to time prescribe, signed by the President, an Executive Vice President, or a Vice President, and by the Secretary, an Assistant Secretary, the Treasurer or an Assistant Treasurer, and shall be sealed with the seal of the Corporation or a facsimile thereof. The signatures of the officers upon a certificate may be facsimiles if the certificate is countersigned by a transfer agent or

D-0039

# CONFIDENTIAL

registered by a registrar other than the Corporation or its employees. In case any such officer who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer before such certificate is issued, it may be issued by the Corporation with the same effect as if he were such officer at the date of issue.

SECTION 2. <u>Lost Certificates</u>. In case of the loss, theft, mutilation or destruction of a stock certificate, a duplicate certificate will be issued by the Corporation upon notification thereof and receipt of such proper indemnity as shall be prescribed by the shareholders.

SECTION 3. <u>Transfer of Shares</u>. Transfers of shares of stock shall be made upon the books of the Corporation by the registered holder in person or by duly authorized attorney, upon surrender of the certificate or certificates for such shares properly endorsed.

SECTION 4. <u>Registered Shareholders</u>. Except as otherwise provided by law, the Corporation shall be entitled to recognize the exclusive right of a person registered on its books as the owner of shares to receive dividends or other distributions and to vote as such owner, and to hold such person liable for calls and assessments, and shall not be bound to recognize any equitable or legal claim to or interest in such share or shares on the part of any other person.

# CONFIDENTIAL

## ARTICLE IV.

## MISCELLANEOUS PROVISIONS

SECTION 1.  <u>Corporate Seal</u>.  The corporate seal shall have inscribed thereon the name of the Corporation and such other appropriate legend as the shareholders may from time to time determine.

SECTION 2.  <u>Fiscal Year</u>.  The fiscal year of the Corporation shall be the twelve months ending December 31 or such other period as may be prescribed by the shareholders.

SECTION 3.  <u>Checks and Notes</u>.  All checks and demands for money and notes or other instruments evidencing indebtedness or obligations of the Corporation shall be signed by such officer or officers or other person or persons as shall be thereunto authorized from time to time by the shareholders.

## ARTICLE V.

## AMENDMENTS

SECTION 1.  <u>Power to Amend</u>.  By-Laws of the Corporation may be adopted, amended or repealed by the shareholders of the Corporation.

1835b

**D-0041**

## Limited Liability Company Operating Agreement

### Of

### F.P. Executive Partners, LLC

#### PREAMBLE

This Limited Liability Company Operating Agreement (the "Agreement") of F.P. Executive Partners, LLC (the "Company"), a limited liability company organized pursuant to the Delaware Limited Liability Company Act (the "Act") and having an address at c/o Fidelio Properties, 1901 North Moore Street, Suite 804, Arlington, VA 22209, is entered into and shall be effective as of May __, 2000, by and among F.P. Investments, Inc., a Delaware corporation having an address at c/o Fidelio Properties, 1901 North Moore Street, Suite 804, Arlington, VA 22209, John Gardner ("Gardner"), an individual residing at 6501 West Langely Lane, McLean, Virginia 22101, Steven R. Bonacci ("Bonacci"), an individual residing at 1665 Wickham Way, Crofton, Maryland 21114, and VBM-USA, Inc. ("VBM-USA"), a Maryland corporation, with an office c/o Waterford Development, Inc., 11800 Sunrise Valley Drive, Reston, VA 20191, as members (each a "Member", collectively, the "Members").

WHEREAS, the Members desire to establish their respective rights and obligations in respect of the business and operation of the Company; and

NOW, THEREFORE, in consideration of the premises and mutual covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

Morris Dep.
Exhibit 4

Morris #4

**D-00294**

## ARTICLE I.

## GENERAL PROVISIONS

This Limited Liability Company Operating Agreement of F.P. Executive Partners, LLC is entered into and shall be effective as of the first date written above by and among the Members set forth on the signature page hereof, pursuant to the provisions of the Act, on the following terms and conditions:

1.1.    Organization.  The Members hereby organize the Company as a Delaware limited liability company pursuant to the provisions of the Act.

1.2.    Name.  The name of the Company shall be "F. P. Executive Partners, LLC", and all Company business shall be conducted in such name.  The Company shall hold all of its property in the name of the Company and not in the name of any Member.

1.3.    Term.  The Company shall be dissolved and its affairs wound up in accordance with the Act and this Agreement on December 31, 2050, unless the Company shall be sooner dissolved and its affairs wound up in accordance with the Act or this Agreement.

1.4.    Purpose.  The Company is formed for the sole purpose of acquiring, holding and disposing of a general partnership interest in Fidelio Properties ("Fidelio"), a New York general partnership and, subject to Fidelio's approval, in subsidiaries and affiliates of Fidelio.  Fidelio owns, operates, manages and sells interests in real estate or related businesses located in the United States of America as more fully described in the Fidelio Properties Fourth Amended and Restated Partnership Agreement dated as of September 1, 1993, as amended by a First Amendment dated as of January 1, 1995 and as the same may be further supplemented and amended from time to time (the "Fidelio Agreement").  Each Member acknowledges that he has reviewed the Fidelio Agreement and is fully familiar with the terms thereof.

-2-

D-00295

1.5.    Office.  The location of the principal place of business of the Company shall be 1901 North Moore Street, Suite 804, Arlington, VA 22209, or such other place of business as the Manager shall designate upon written notice to the Members.

1.6.    Registered Office; Agent for Service of Process.  The registered office of the Company in the State of Delaware shall be c/o The Corporation Trust Company, having an office at Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801 and The Corporation Trust Company is hereby designated as agent for service of process (the "Registered Agent") as reflected in the Certificate of Formation as filed in the office of the Secretary of the State of Delaware, which office and Registered Agent may be changed at any time by the Manager.  In the event the Registered Agent ceases to act as such for any reason or the registered office shall change, the Manager shall promptly designate a replacement registered agent or file a notice of change of address, as the case may be and send notice thereof to all Members.

1.7.    Filings.  The Company shall exist under and be governed by, and this Agreement shall be construed in accordance with, the applicable laws of the State of Delaware. The Members shall make all filings and disclosures required by, and shall otherwise comply with, all such laws.  The Members shall execute and file in the appropriate public records any assumed or fictitious name certificates and other documents and instruments as may be necessary or appropriate with respect to the formation of, and conduct of business by, the Company.

1.8.    Title to Property.  All real and personal property owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such property in its individual name or right, and each Membership Interest (as hereinafter defined) in the Company shall be deemed personal property for all purposes.

447702-v6 0026857-0064

**D-00296**

1.9.    Payments of Individual Obligations.  The Company's credit and assets shall be used solely for the benefit of the Company, and no asset of the Company shall be transferred or encumbered for or in payment of any individual obligation of a Member.

1.10.    Activities.

(a)    The Manager shall devote so much of its business time and efforts to the furtherance of the business of the Company and performance of its responsibilities under this Operating Agreement as it shall reasonably deem necessary.

(b)    The Members expressly agree that any Member may at any time engage in and possess interests in other business ventures of any and every nature and description, independently or with others, including, but not limited to, engaging in activities which parallel or compete with the business of the Company, and neither the Company nor any other Member shall by virtue of this Agreement have any right, title or interest in or to such independent activities or to the income or profits derived therefrom.

ARTICLE II.

CAPITAL

2.1.    Capital Contributions.  No Member shall be obligated to make any contributions of money or property (the "Capital Contributions") to the capital of the Company. However, each Member may make contributions to capital to fund capital contributions to Fidelio which the Company is permitted to make pursuant to Section 3.03(b) of the Fidelio Agreement, in such amounts as all the Members shall agree.

2.2.    Membership Interest.  Each Member's interest in the Company (the "Membership Interest") shall include any and all benefits and rights to which such Member may be entitled as provided in this Agreement and all obligations of such Member pursuant to the provisions of this Agreement.  Each Member shall participate in the Company based on its

-4-

D-00297

Capital Contributions, except as to certain matters which by their terms are based on the Membership Percentages.

2.3. <u>Maintenance of Capital Accounts</u>. Separate capital accounts shall be maintained for each Member in accordance with the provisions of Treas. Reg. Sec. 1.704.-1(b). In the event any Member transfers any Membership Interest in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

2.4. <u>Company's Contribution to Capital of Fidelio</u>. The Company has made and will from time to time make contributions to the capital of Fidelio (the "FPEP Contribution") which have been and shall be allocated by Fidelio among the "New FPEP Properties" (as defined in Section 3.03 of the Fidelio Agreement) as provided in Section 3.03 of the Fidelio Agreement and as reflected in the Property Designations (as defined in Section 3.03 of the Fidelio Agreement) issued by Fidelio from time to time.

2.5. <u>Withdrawal and Return of Capital</u>. No Member shall be entitled to demand or receive a return of his Capital Contributions or withdraw from the Company. No Member shall have the right to withdraw any part of his Capital Contributions or to receive any distributions from the Company prior to its liquidation and termination, unless such withdrawal is permitted under this Agreement. No Member shall be entitled to demand and receive property other than cash in return of capital. No Member shall receive any interest, salary, or drawing with respect to his Capital Contributions or his Capital Account or for services rendered on behalf of the Company or otherwise in his capacity as a Member, except as otherwise provided in this Agreement or agreed to by the Members. Each Member shall participate in the Company

D-00298

based on its Capital Contribution as described herein, except as to certain matters which by their terms are based on the percentages (the "Membership Percentage") set forth below:

| MEMBER | MEMBERSHIP PERCENTAGE |
|---|---|
| F. P. Investments, Inc. | 1.00% |
| Gardner | 83.03% |
| Bonacci | 15.97% |

## ARTICLE III.

## DISTRIBUTIONS

3.1.    Available Cash.  For purposes of this Agreement, the term "Available Cash" of the Company for any period shall mean the aggregate of cash received by the Company during such period from Fidelio with respect to each FPEP Property.

3.2.    Distribution of Available Cash.  Available Cash distributed by Fidelio on account of an FPEP Investment (as defined in Section 3.03 of the Fidelio Agreement and the Property Designation) in a particular New FPEP Property and identified by Fidelio as being on account of the return on or of such FPEP Investment in such New FPEP Property, including distributions with respect to any Hurdle Amount (as defined in Section 3.03 of the Fidelio Agreement and the Property Designation) for that FPEP Investment, shall be shared among the Members in accordance with their respective Capital Contributions to fund such FPEP Investment.  Any remaining Available Cash from such FPEP Investment shall be distributed among the Members in accordance with their respective Membership Percentages.  All distributions shall be made promptly after receipt by the Company of Available Cash from Fidelio.  Proceeds and earnings derived from temporary investment of funds of the Company shall be distributed to the Members entitled to such temporarily invested funds.

447702-v6 0026857-0064

D-00299

3.3.    <u>Taxes Withheld</u>.  For purposes of this Agreement, any amount of taxes required to be withheld by the Company with respect to any amount distributable to any Member shall be deemed to be a distribution or payment to such Member and shall reduce the amount otherwise distributable to such Member pursuant to this Agreement.

ARTICLE IV.

<u>ALLOCATION OF PROFITS AND LOSSES</u>

4.1.    <u>Allocation</u>.  All items of Company income, gain, loss, deduction and any federal, state or local tax credit or other tax benefit shall be allocated among the Members as follows:

(i) allocations on account of an FPEP Investment in a particular New FPEP Property and on account of the return on such FPEP Investment in such New FPEP Property, including any allocations with respect to any Hurdle Amount on such FPEP Investment, shall be made to the Members in accordance with their respective Capital Contributions to such New FPEP Property;

(ii) allocations from a Special Existing FPEP Property (as defined in the Fidelio Agreement and the  Property Designation) shall be made 2/3 to Gardner and 1/3 to Bonacci;

(iii) any allocations with respect to income or loss from any temporarily invested funds of the Company shall be allocated among the Members in accordance with their interest in such funds; and

(iv) any other allocations shall be allocated in accordance with the Membership Percentages.

-7-

D-00300

## ARTICLE V.

## ACCOUNTING AND RECORD KEEPING

5.1.    Responsibility for Books of Account.  The Manager shall be responsible for ensuring that proper and complete records and books of account are kept in which shall be entered fully and accurately all transactions and other matters relative to the Company's business in accordance with this Agreement and generally accepted accounting principles consistently applied.  The books of account shall be kept on a cash basis.  Each Member shall be entitled, upon reasonable notice to the Manager, to access to such records and books for inspection and copying during reasonable business hours.

5.2.    Tax Statement.  As soon as reasonably practicable after the end of each fiscal year, the Manager shall deliver to each Member such information concerning the Company as shall be necessary for a Member to prepare its income or other tax returns.  The Company shall elect to be taxed as a partnership.

5.3.    Fiscal Year.  The fiscal year of the Company shall be the calendar year.

5.4.    Banking.  The funds of the Company shall be deposited in such bank account or accounts, or invested in such interest-bearing investments, as shall be designated by the Manager.  All withdrawals from any such bank accounts shall be made by the Manager or the duly authorized agent or agents of the Manager.  Company funds shall be held in the name of the Company and shall not be commingled with those of any other person.

447702-v6 0026857-0064

**D-00301**

## ARTICLE VI.

## POWERS, RIGHTS, AND DUTIES OF THE MEMBERS

6.1.  Management of Business.  The Members, other than the Manager, shall not participate in the management or control of the Company nor shall they transact any business for the Company.

6.2.  Liability of the Members.  The Members, including the Manager, shall not have any personal liability whatsoever to the creditors of the Company for the debts of the Company or any of its losses beyond their agreed contribution to the capital of the Company.

6.3.  Voting Rights.  Notwithstanding anything to the contrary herein contained, any matter requiring the consent or approval of the Members pursuant to this Agreement shall be given by the affirmative vote (at a meeting, or in lieu thereof, by written consent of the required percentage) of Members holding over seventy-five percent (75%) of the aggregate Membership Percentages held by all of the Members.

## ARTICLE VII.

## MANAGEMENT

7.1.  Control of Business.  The business and assets of the Company shall be controlled exclusively by the Manager as herein provided.  Except as otherwise provided in this Agreement, (i) none of the Members shall have any authority to act for or assume any obligations or responsibilities on behalf of the other Members, (ii) nor shall any Member, other than the Manager, have any authority to bind the Company.  This Agreement shall not be deemed to create a company, partnership or joint venture between or among the Members with respect to any activity whatsoever other than the purpose set forth in Section 1.4, and the conduct of business activities incidental thereto.

447702-v6 0026857-0064

D-00302

7.2.    <u>Authority of the Manager</u>.  The Manager shall have the authority to manage the operations and affairs of the Company and to make all decisions regarding the business of the Company.  Pursuant to the foregoing, it is understood and agreed that the Manager shall have all of the rights and powers of a Manager or Managing Member as provided in the Act and as otherwise provided by law, and any action taken by the Manager shall constitute the act of and serve to bind the Company.  In dealing with the Manager acting on behalf of the Company, no person shall be required to inquire into the authority of the Manager to bind the Company, but shall be entitled to rely conclusively on the power and authority of the Manager to bind the Company as set forth in this Agreement.

7.3.    <u>Limits on Manager's Authority</u>.  Notwithstanding anything herein to the contrary, the Manager shall not cause or permit the Company to:

(i)    Commingle any of the Company's funds, or employ or permit another to employ those funds or assets in any manner, except for the exclusive benefit of the Company (except to the extent that funds are temporarily retained by agents of the Company); or

(ii)    Reimburse the Manager for expenses incurred by the Manager, except that the Manager shall be reimbursed for actual costs incurred by the Manager in carrying out its duties hereunder.

7.4.    <u>Approval of Members for Certain Transactions</u>.  Notwithstanding anything herein to the contrary, the Manager shall not, without the affirmative vote of the Members holding more than seventy-five (75%) of the aggregate Membership Interests and unless such act is required in connection with the business of Fidelio as contemplated in the Fidelio Agreement:

447702-v6 0026857-0064

**D-00303**

(i)      borrow any money by or on behalf of the Company or give any security therefor or lend money on behalf of the Company or renew or extend any loan;

(ii)      provide any guaranty by the Company on behalf of another person, firm or corporation;

(iii)      purchase, lease (as lessee), license (as licensee) or otherwise acquire on behalf of the Company any assets or property;

(iv)      sell, mortgage, pledge, create a security interest in, lease (as lessor), license (as licensor) or otherwise dispose of any assets or property of the Company;

(v)      confess a judgment against the Company or settle or compromise any action, suit or proceeding (including any arbitration proceeding or any claim for past or present taxes due) against the Company;

(vi)      cause the liquidation or dissolution of the Company; or

(vii)      change the Company business or cause it to engage in activities not contemplated by this Agreement.

7.5.      Liability of the Manager.  Neither the Manager nor Fidelio nor any partner therein, nor any of their respective officers, directors, members or shareholders shall be liable, responsible, or accountable in damages or otherwise to the Company or any Member for any action taken or failure to act on behalf of the Company within the scope of the authority conferred by this Agreement or the Fidelio Agreement or by law, unless the act or omission was performed or omitted fraudulently.

7.6.      Members' Acknowledgment.  The Members acknowledge and agree that the Manager is an affiliate of Fidelio and as such it may conduct the business of the Company in a manner that best protects Fidelio's interests.  Accordingly:

-11-

D-00304

(i)    the Members have reviewed and are familiar with the Fidelio Agreement, including Section 3.03 and Section 4.10 thereof, and accept the possibility that decisions may be made that have an adverse impact on the Company's interest in Fidelio or in an FPEP Property or the benefits to be derived therefrom by the Company;

(ii)    The Manager has full and complete power and authority to conduct the Company's business and deal with the Company's assets in any manner it may determine, and it may cause the Company to act in a manner that is in the best interests of Fidelio or Fidelio's other partners and such action may have a disproportionately adverse effect on the Company and its interest in Fidelio or in an FPEP Property;

(iii)    The Members shall not be entitled to receive any distributions from the Company, unless authorized by the Manager and in exercising its powers the Manager need not consider any adverse impact on its Members or the Company's interest in Fidelio or in an FPEP Property;

(iv)    the Manager may cause the Company, as a partner in Fidelio, to (aa) authorize transactions with affiliates of a partner of Fidelio or other self-dealing between the partners of Fidelio or their affiliates and Fidelio, (bb) authorize the acquisition, disposition, encumbering or modification of the terms of Fidelio's interest in an FPEP Property or entity, (cc) approve policies and budgets or allow the reduction, elimination or deferral of the allocation of resources to investments in which the Company has an interest, (dd) dissolve Fidelio or admit new Fidelio partners whose interests may be senior to the Company's, and (ee) take actions which may otherwise adversely affect the Company's interest in Fidelio or in an FPEP Property or the economic value thereof; and

-12-

D-00305

(v)     The Members accept the fact that decisions of the Manager on behalf of the Company may disproportionately benefit other Fidelio partners and the Members waive any right to challenge such decisions on the grounds that it has adversely affected Fidelio, the Company or its interest in Fidelio or in an FPEP Property.

7.7.    <u>Return of Capital</u>.  The Manager shall not be liable for the return or payment of all or any portion of the capital or profits allowable to any of the Members (or their assignees or transferees), it being expressly agreed that any such return of capital or payment of profits made pursuant to this Agreement shall be made solely from the assets (which shall not include any right of contribution from the Manager) of the Company.

7.8.    <u>Indemnification</u>.  The Company, its receiver or its trustee (in the case of its receiver or trustee, only to the extent of its trust or receivership assets) shall indemnify and hold harmless each Member or any officers and directors of such Member, from and against any loss, expense, damage or injury suffered or sustained by them by reason of any acts, omissions or alleged acts or omissions arising out of their activities on behalf of the Company or in furtherance of the interests of the Company, including but not limited to any judgment, award, settlement, reasonable attorneys' fees, and other costs or expenses incurred in connection with the defense of any actual or threatened action, proceeding, or claim, if the acts, omissions, or alleged acts or omissions upon which the actual or threatened action, proceeding, or claims are based were for a purpose reasonably believed to be in the best interests of the Company and were not performed or omitted fraudulently or as a result of gross negligence by the Members.  Any such indemnification shall only be from the assets of the Company.

447702-v6  0026857-0064

**D-00306**

7.9.    Limitations.  Notwithstanding anything to the contrary in Section 7.8 above, no Member shall be indemnified from any liability for fraud, bad faith, willful misconduct, or gross negligence.

7.10.    Tax Matters Member.  The Manager is specifically authorized to act as the Tax Matters Member under the Code and in any similar capacity under state or local law.  Any Member designated as Tax Matters Member shall take such action as may be necessary to cause each other Member to become a notice member within the meaning of § 6223 of the Code.

ARTICLE VIII.

DISPOSITIONS OF MEMBERSHIP INTERESTS

8.1.    Withdrawal.  Except as contemplated by this Article VIII, withdrawals by any Member of any or all of its interest in the Company shall not be permitted without the consent of the Manager.

8.2.    Death of Member.  The death of a Member shall not dissolve or terminate the Company.  The estate (or the legal heir(s) of the deceased Member thereafter) shall retain said Member's Membership Interest and remain bound by all the provisions of this Agreement, the Company shall continue, and the estate or a legal heir(s) may be admitted as a Substituted Member after complying with Section 8.6 hereof.

8.3.    Bankruptcy of a Member.  The bankruptcy of a Member shall not dissolve or terminate the Company.  The representative, administrator, trustee, committee (or analogous fiduciary) of the bankrupt Member shall retain the interest of the bankrupt Member in the Company and such interest shall remain bound by all the terms and conditions of this Agreement.

8.4.    Transfers to Immediate Family.  An individual Member may transfer its interest in the Company during his lifetime by gift to, or in trust for the benefit of, said Member's

-14-

D-00307

Immediate Family (as defined below); provided that, with respect to any transfer by way of a trust, the Initial Member (as defined below) shall serve as trustee and control all decisions with respect to the Company and such Membership Interest. If an interest in the Company is transferred pursuant to this Section 8.4, the transferee may become a Substituted Member in accordance with Section 8.6 below. For purposes of this Section 8.4, "Immediate Family" shall mean (i) the respective spouse, parents, adult children, adult siblings, and lineal descendants of a Member (by blood or adoption) or the spouse of any of the foregoing, or (ii) an entity in which any of the persons set forth in (i) above owns and continues to own all of said entity's beneficial interests and all voting interests in and control of such entity shall be retained by the Initial Member.

Each transferee of a Member's interest shall grant to the person (the "Initial Member") who holds such interest on the date hereof, all voting rights and powers with respect to that interest and no such transfer shall be effective until such grant has been made.

8.5.    Assignments by Members.  Except as expressly provided in Sections 8.2, 8.3 and 8.4 above, a Member's Membership Interest or right to receive distributions on account thereof may not be assigned, sold, transferred, mortgaged, pledged, hypothecated or otherwise encumbered without the prior approval of the Manager in its sole discretion. The foregoing restrictions also shall apply to any shares or partnership interests or membership interests or other ownership interests, legal or beneficial, in any entity that is a Member in the Company, or owns any interest, direct or indirect, in any Member. Notwithstanding anything contained herein to the contrary, in the event that any transfer of a Membership Interest made pursuant to Sections 8.2, 8.3 or 8.4, will, in the opinion of the Manager, result in the termination of the Company for purposes of the then applicable provisions of the Internal Revenue Code of 1986, as amended

-15-

D-00308

from time to time, such transfer shall be null and void, unless the approval of the Manager is obtained.

Unless an assignee becomes a Substituted Member pursuant to Section 8.6 below, the assignee shall have no right to require any information on or accounting with respect to Company transactions, or to inspect the Company's records and books of account. In such event, the assignment merely entitles the assignee to receive the assigned share of distributions, income and losses to which the assigning Member otherwise would be entitled.

8.6.    Substituted Members. No assignee may become a Substituted Member without the written approval of the Manager. Such approval may be conditioned upon the Substituted Member (i) paying the legal and other costs incurred by the Company due to the admission of the Substituted Member, (ii) executing any documents which the Manager deems necessary, including, without limitation, an amendment to this Agreement naming such party as a Member, and (iii) if there is more than one such Substituted Member, all such Substituted Members shall have irrevocably named a single Substituted Member to act for each of them with respect to all Company matters, including votes, amendment of the Agreement, waivers, releases, or otherwise, in a manner acceptable to the Manager.

8.7.    Amendment to Articles of Organization. After a person is entitled to become a Substituted Member, the Manager shall promptly take such steps as may be necessary and appropriate to prepare and file an amendment to the Articles of Organization should such amendment be required by law or deemed advisable by the Manager, and each Member authorizes the Manager to execute any such amendment pursuant to the power of attorney hereinafter set forth in Section 10.2 below.

-16-

447702-v6  0026857-0064

D-00309

8.8.    Transferees Bound by Operating Agreement.  Any assignee and any

person admitted to the Company as a Substituted Member shall be subject to and bound by all

the provisions of this Agreement as if originally a party to this Agreement.

8.9.    Redemption of Member's Membership Interest.  Notwithstanding any

other provision of this Article VIII to the contrary, in the event that either Gardner or Bonacci

(the "Departed Employee") withdraws from the Company or ceases to be employed by Buvermo

Properties, Inc. or another affiliate of Fidelio, by reason of death, disability, retirement or any

other reason (such withdrawal or cessation is hereinafter referred to as the "Termination"), then

the Manager shall have the right, upon written notice to the Departed Employee given within

sixty (60) days of the Termination, to redeem the Departed Employee's entire Membership

Interest and the Membership Interest of any transferee of or successor to the Departed Employee,

which transferred interests for purposes of this Section 8.9 shall be deemed to be the

Membership Interest of the Departed Employee (the "Call").  If such Call is not exercised by the

Manager prior to expiration of the Manager's right to make the Call, the Departed Employee

shall have the right, exercisable by giving written notice to the Manager within sixty (60) days

after expiration of the Manager's right to make the Call or earlier waiver of such right, to require

such redemption by the Manager (the "Put").  The Manager may waive its Call right and the

Departed Employee may waive its Put right and either party may permit its respective right to

expire unexercised.  The purchase price ("Purchase Price") relating to a Put or Call shall be

determined as follows:

(i)    Within thirty (30) days after written notice of the exercise of the Put or

Call has been given by one party to the other the Manager and the Departed Employee each

shall submit to the other a sum (the "Market Value") representing its calculation of the market

-17-

D-00310

value of Fidelio's interest in each property which, as of the date of Termination, has been designated by Fidelio as an FPEP Property. If the lower of the Market Values for an FPEP Property is equal to at least eighty percent (80%) of the higher of the Market Values, then the Purchase Price for that Property shall be equal to the average of the two (2) Market Values. In the event that the lower of the Market Values is equal to less than eighty percent (80%) of the higher of the Market Values, then the parties shall have thirty (30) days to agree upon a Market Value for such Property. If the parties fail to agree on a Market Value within said thirty (30) days, then within ten (10) days thereafter, they shall jointly appoint a disinterested arbitrator, experienced in evaluating properties of the type designated as FPEP Property in the Washington, D. C. metropolitan area, to determine the Market Value. The arbitrator shall designate as the Market Value the market value which the arbitrator determines is closest to the market value of the FPEP Property in question, and such designation shall be conclusive for purposes hereof.

        (ii)     The Market Value, as determined pursuant to Section 8.9(i) hereof, for each FPEP Property, shall be reduced in accordance with Section 3.03 of the Fidelio Agreement (such reduction to include, without limitation, the estimated costs of completing a sale of the relevant FPEP Property and by any liability of Fidelio or the ownership entity in connection with the relevant FPEP Property, and such reserves as the Management Committee of Fidelio may determine). The Purchase Price for each FPEP Property to be received by the Departed Employee shall equal the amount which such Departed Employee would receive upon liquidation of the relevant FPEP Property for the Market Value, as finally determined, following the sale of each FPEP Property, the distribution of the appropriate proceeds to Fidelio, and by

447702-v6  0026857-0064

D-00311

Fidelio to the Company (pursuant to the Fidelio Agreement), and the liquidation of the Company.

(iii)    The amount to which a Departed Member is entitled shall also be reduced by the amount of offsets relating to any indebtedness of the Departed Employee to the Company or Fidelio or its affiliates and any claim by the Company or Fidelio or its affiliates against the Departed Employee.

(iv)    The Manager shall obtain the funds required to pay the Purchase Price to the Departed Employee from Fidelio pursuant to Section 6.01(c) of the Fidelio Agreement, and the Purchase Price shall be paid to the Departed Employee promptly after its determination pursuant to Section 8.9(i) hereof, provided that the Departed Employee shall execute all documents deemed necessary by the Company or Fidelio for the Departed Employee to convey and surrender all of his right, title and interest in the Company and release any claims against Fidelio, the Company or any of their partners, members or shareholders or any of their respective officers, directors, employees or agents.

## ARTICLE IX.

## MEMBERSHIP INTEREST OF THE MANAGER

9.1.    Admission of a Manager.  In the event of the withdrawal, dissolution or bankruptcy of the Manager, if such Manager is not replaced by a new Manager designated by the Manager, then the Members shall designate a new successor Manager and the successor person or entity shall be admitted as a Manager of the Company when and if such person or entity:

(i)    accepts and assumes, in form satisfactory to counsel to the Company, all of the terms and provisions of this Agreement; and

447702-v6 0026857-0064

D-00312

(ii)      executes such other documents or instruments as counsel to the Company may require (or as may be required by law) in order to effect the admission of such person or entity as a Manager of the Company.

## ARTICLE X.

## POWER OF ATTORNEY

10.1.    Power of Attorney.  Each Member, including each Substituted Member, by the execution or adoption of this Agreement (as the case may be), irrevocably constitutes and appoints the Manager and any officer thereof as their true and lawful attorney-in-fact with full power and authority in their name, place, and stead to execute, acknowledge, deliver, swear to, file, and record at the appropriate public offices such documents as may be necessary or appropriate to carry out the provisions of this Agreement and the business of the Company.

This power of attorney may be exercised by the Manager, acting alone for each Member, or by listing all of the Members and executing any instrument with a single signature of the Manager as attorney-in-fact for all of them.

This appointment by each Member of the Manager as attorney-in-fact shall be deemed to be a power coupled with an interest, in recognition of the fact that each Member under this Agreement shall be relying upon the power of the Manager to act as contemplated by this Agreement in any filing and in any other action on behalf of the Company, and shall survive the death or other incapacity of any person hereby giving the power and the transfer or assignment of any Member's interest in the Company.  The foregoing power of attorney of each Member shall survive each transfer only until such time as the transferee shall have been admitted to the Company as a Substituted Member and all required documents and instruments shall have been duly executed, filed, and recorded to effect the substitution.

D-00313

### ARTICLE XI.

### TERM, DISSOLUTION, AND WINDING UP

11.1.  Term.  The Company shall commence on the date hereof and shall continue in existence until terminated in accordance with this Article X.

11.2.  Dissolution.  The Company shall be dissolved only in the following events and no other event shall dissolve the Company:

(i)  The sale or other disposition of all or substantially all of the operating assets of the Company or a sale of the entire business of the Company; or

(ii)  The occurrence of any event which makes it unlawful for the business of the Company to be carried on; or

(iii)  The entry of a decree of judicial dissolution under Section 18-802 of the Act.

11.3.  Effect of Dissolution.  Upon dissolution, the Company shall cease carrying on, as distinguished from the winding up of the Company business, but the Company is not terminated.  It continues until the winding up of the affairs of the Company is completed, and the certificate of cancellation has been issued by the Secretary of State.

11.4.  Procedure Upon Dissolution.  Upon winding up of the Company, the Manager shall liquidate the assets of the Company and shall apply and distribute the proceeds of such liquidation in the following order of priority:

(i)  to the payment of the debts and liabilities of the Company (other than those owed to Members) and the expenses of liquidation;

(ii)  to the setting up of such reserves as the Manager may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company arising out of or in connection with the Company or the FPEP Property; any such reserves may be paid

-21-

447702-v6 0026857-0064

**D-00314**

over by the Manager to a person, firm or corporation, as escrowee, chosen with reasonable care by the Manager, to be held by such escrowee (or its designated successor) for the purpose of disbursing such reserves in payment of any of the aforementioned contingencies and, at the expiration of such period as the Manager shall deem advisable, to distribute the balance thereafter remaining in the manner hereinafter provided;

(iii)    to the payment of principal and interest on any debts or liabilities owed to Members by the Company; and

(iv)    the balance, if any, to the Members in accordance with the provisions of Section 3.2.

11.5.    Source of Distributions to Members on Dissolution.  Upon dissolution, each Member shall look solely to the Company assets for the return of its capital contributions and undrawn income.  If the assets of the Company remaining after the payment or provision for the debts and liabilities of the Company are insufficient for the return of capital contributions or undrawn income of any Member, such Member shall have no recourse against any other Member for that purpose.  In no event shall the Company's interest in Fidelio or an FPEP Property be distributed to any Member upon dissolution or liquidation.  Instead, the Manager shall dispose of such interest on such terms as it deems appropriate.

11.6.    Winding Up and Certificate of Dissolution.  The winding up of the Company shall be completed when all debts of the Company have been paid and discharged or reasonably adequate provision therefor has been made, and all of the remaining assets of the Company have been distributed to the Members.  Upon the completion of winding up of the Company, a certificate of cancellation shall be delivered to the Secretary of State for filing.  The certificate of cancellation shall set forth the information required by the Act.

447702-v6  0026857-0064

D-00315

## ARTICLE XII.

### MISCELLANEOUS PROVISIONS

12.1.    Amendments/Waivers.  Amendments to this Agreement may be proposed by any Member.  The unanimous written approval of the Members is necessary for the adoption of any amendment to this Agreement, and such amendment shall become effective upon such approval being obtained.

12.2.    Notices.  All notices provided for in this Agreement shall be in writing and directed by hand delivery or by registered or certified mail or by telefax, to the Company at its principal office, and to the Members at their respective addresses as they appear in the records of the Company, or at such other address as the Company or the Members shall from time to time designate to the others in writing.  If transmitted by hand delivery or by telefax, notice shall be deemed given when same is received by the addressee.  Mailed notices shall be deemed delivered five (5) business days after the date of mailing when addressed as below and with appropriate postage attached.

Copies of all notices shall be sent to:

```
Buvermo Properties, Inc.
1901 North Moore Street, Suite 804
Arlington, VA 22209
Attention:    John Gardner and Steve Bonacci
Telephone:    (703) 465-8200
Telefax:      (703) 465-8262

VBM B.V.
Binnen Kalkhaven 39
3300 AA Dordrecht, Netherlands
Attention:    Chris Zachariasse
Telephone:    011-31-786-130-570 or 140-464
Telefax:      011-31-786-130-343
```

447702-v6  0026857-0064

D-00316

Whitman Breed Abbott & Morgan LLP
200 Park Avenue, 27th Floor
New York, New York 10166
Attention:    Richard Crystal, Esq.
Telephone:   (212) 351-3477
Telefax:       (212) 351-3131

12.3.  Governing Law.  This Agreement and the legal relations among the parties

shall be governed by and construed in accordance with the laws of the State of Delaware.

12.4.  No Membership Intended for Nontax Purposes.  The Members have

formed the Company under the Act, and expressly do not intend hereby to form a partnership

under any partnership or limited partnership act.  The Members do not intend to be partners one

to another, or partners as to any third party.  To the extent any Member, by word or action,

represents to another person that any other Member is a partner or that the Company is a

partnership, the Member making such wrongful representation shall be liable to any other

Member who incurs personal liability by reason of such wrongful representation.

12.5.  Rights of Creditors and Third Parties Under Agreement.  This Agreement

is entered into between the Company and the Members for the exclusive benefit of the Company,

its Members, and their successors and assigns.  This Agreement is expressly not intended for the

benefit of any creditor of the Company or any other person, natural or otherwise.  Except and

only to the extent provided by applicable statute, no such creditor or third party shall have any

rights under this Agreement or any agreement between this Company and any Member with

respect to any Capital Contribution or otherwise.

12.6.  Waiver of Partition.  No Member shall, either directly or indirectly, take

any action to require partition, file a bills for Company accounting or appraisement of the

Company or of any of its assets or properties or cause the sale of any Company property and,

notwithstanding any provisions of applicable law to the contrary, each Member (and each of his

-24-

447702-v6  0026857-0064

D-00317

legal representatives, successor or assigns) hereby irrevocably waives any and all rights it may have to maintain any action relating to any assets or properties of the Company, except as expressly provided in this Agreement.

12.7.   Successors.  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon any successor in interest and assigns of the Members hereunder, except as may be otherwise provided herein.

12.8.   Entire Agreement.  This Agreement constitutes the entire understanding of the parties hereto with respect to the subject matter hereof and no amendment, modification or alteration of the terms hereof shall be binding unless in writing and made in accordance with Section 10.1.

12.9.   Counterparts.  This Agreement may be executed in multiple counterparts, each of which shall be an original, but all of which shall constitute one instrument.

12.10.   Captions.  The captions herein are inserted for convenience of reference only and shall not affect the construction of this Agreement.

12.11.   Validity and Severability.  It is intended that this Agreement shall not be in violation of any valid applicable laws, whether federal, state, local or of any foreign country, and to that end it is agreed that the rights, duties, and obligations of the parties hereto as provided for in this Agreement shall be binding only insofar as it is lawful for the parties so to agree.  If any provision of this Agreement is at any time in violation of any such law, this Agreement shall (during the period so in violation) be considered divisible and inoperative as to such invalid portion for the locality where so invalid, but in all other respects this Company shall be binding.

D-00318

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

MANAGER:

F. P. INVESTMENTS, INC.

By: _____
     Name:
     Title:

MEMBERS:

_____

John Gardner

_____

Steve Bonacci

VBM-USA

By:_____
     Name:  Chris Zachariasse
     Title:

-26-

D-00319

Buvermo Properties, Inc.
1901 North Moore Street
Suite 804
Arlington, Virginia 22209
June 3, 2005

Jonathan Morris
The Ritz-Carlton
1155 23rd Street, N.W.
Penthouse 2D
Washington, D.C. 20037

Dear Jonathan,

I am pleased to offer you the following terms of employment with Buvermo Properties, Inc.

Position-  President of Buvermo Properties, Inc.

Starting Date-  June 27, 2005

Starting Salary-  $250,000 per annum

Benefits-  Standard benefits, including health care benefits, 401K participation etc.

Promoted Interest-
Current Projects-You will be entitled, upon start of employment, to the share of FPEP promoted interest currently owned by Fidelio Properties for land parcels adjacent to the Sheraton Reston parcels, and remaining land parcels at Twinbrook. Such interests will be subject to a two year vesting period.

Future Projects-You will be entitled to the FPEP promote currently available to me for all projects initiated after December 31, 2005, and for all projects initiated by you prior to that time, except that the preferred return to Fidelio and other capital providers will be reduced from 12% to 10% to reflect current market conditions, and which may be subject to change relative to future projects dependent upon future market conditions.  For any projects jointly initiated by you and me prior to year end, we will mutually agree on a fair split of the promote. In addition, you will also be provided the right to invest prorata 2.5% of the capital for all future projects, on a nonselective basis.

All items will be governed by the FPEP LLC agreement, of which you will become a member.

**D-001040**

Morris Dep.
Exhibit 7

Morris #7

My Future involvement-

My intent is to continue to work full time at least through year end, and to provide you full support in all Buvermo/Fidelio activities during that period, and for an extended period of time thereafter as well. I will continue to retain the title of president of Fidelio Properties Management, Inc., the managing general partner of Fidelio Properties, as well as the managing member of the LLC's through which Fidelio possesses its property ownership interests, however the intent is for you over time to take over that position as well. I also intend to continue as a prorata 2.5% investor for all future projects.

Future Decision Making-

As we discussed, for any future investment decisions, both you and I will have to agree before we submit the investment to the Fidelio Partners for their approval.

Please indicate your agreement with these terms by signing below.

Sincerely,

John Gardner

Accepted,

Jonathan Morris

D-001041

# CONFIDENTIAL

MEMORANDUM

To:  Joost Tjaden

From:  John Gardner

Subject:  Future Employment Agreement

Date:  September 19, 2005

Following is an outline of the terms which you and I have tentatively agreed to regarding my ongoing employment with Buvermo/Fidelio.

1.  I will continue to work full time through year end 2005, however I will receive my current salary and benefits through March 31, 2006.
2.  Following year end 2005, I will reduce my hours to a maximum of ½ time, and will change my role to advisor, similar to the role currently filled by Chris Zachariasse, who will be giving up his advisorship as of year end 2005.
3.  I will continue as an employee of Buvermo Properties, Inc. after March 31, 2006, for a period of three years, and will retain employee benefits, including health insurance and 401 K participation, etc. However my salary will be reduced to $150,000 the first year, $125,000 the second year, and $100,000 the third year. Any extension beyond the end of the three year period will be subject to our mutual agreement.
4.  I will retain an office at Buvermo.
5.  My role as advisor to both Jonathan Morris and the Fidelio Partners will be as mutually agreed to between myself, Morris, and the Fidelio Partners.
6.  After year end 2005, I will give up my FPEP promote interest for projects originated after that time, but will retain the option to invest capital prorata through FPEP for future projects.
7.  We will terminate the agreement for FPEP to share in shortfalls and profits from Buvermo Properties, effective year end 2005. Any amount I am due upon termination will be paid prior to March 31, 2006, after actual 2005 results are available.

*Morris #8*  **D-001057**

Morris Dep.
Exhibit 8

## Steve J. O'Connor

**From:**    FORREST WALPOLE [Forrest.walpole@verizon.net]
**Sent:**    Friday, March 24, 2006 4:22 PM
**To:**      JONATHANMORRIS@COMCAST.NET
**Cc:**      Steve J. O'Connor
**Subject:** Buvermo

Privileged and Confidential

Jonathan H. Morris:

Buvermo asked that the attached be delivered to you.

Buvermo Properties

By: Forrest Walpole, Attorney

JHM0275

Morris Dep.
Exhibit 18

*Morris # 18*

10/3/2006

**BUVERMO**
PROPERTIES

BUVERMO Properties, Inc
1901 N. Moore Street
Suite 804
Arlington, VA 22209

703/465-8200
Fax 703/465-8262

March 24, 2006

Jonathan H. Morris
The Ritz-Carlton
1155 23rd Street, N.W.
PH 1A
Washington, DC 20037

403 Australian Avenue
Palm Beach, FL 33480

Via Email: JONATHANMORRIS@COMCAST.NET

Dear Jonathan:

    This letter constitutes formal notice that your employment and all contract relationships with Buvermo Properties Inc. are hereby terminated, effective immediately.

    Please return at your earliest convenience your keys to the Buvermo office, your access card keys to 1901 N. Moore, Arlington, VA and the parking garage, as well as your Company American Express card and Smart Tag. Please make arrangements with Kara to pick up your personal property, including the HP 100 and HP 1500L.

    Sincerely,

Buvermo Properties Inc.

By: _____
    John H. Gardner, III
    President

JHM0276