# EXHIBIT

# 6

46

1  partnership agreement?
2          THE WITNESS:  Right.
3          MR. HADDAD:  Uh-huh.
4          BY MR. HADDAD:
5      Q   So you do recall any --
6      A   There weren't any changes to this.
7          MR. SMITH:  Say that again.
8          THE WITNESS:  There was no changes to this.
9          BY MR. HADDAD:
10     Q   Okay.  Were changes to this being contemplated?
11     A   I'd have to -- I don't recall.  But not to the
12 essence of the agreement, just to that one specific
13 section.  I think it's 3.03 in the Fidelio partnership
14 agreement --
15     Q   Okay.
16     A   -- that deals with FPEP.
17     Q   I'm just concerned about this particular
18 agreement here.
19     A   Not that I'd remember.
20     Q   So you don't recall any discussions regarding any
21 revisions to be made to this particular agreement?
22     A   No.

Morris vs. Buvermo, et al.                Deposition of K. McCormick 10/27/06

73

1   A   Yes.
2   Q   -- correct?
3       And so seeing that, the appropriate thing to do
4   would be to request permission from Mr. Morris as to these
5   matters; wouldn't you agree?
6   A   Many times Jonathan was not in the office or was
7   preoccupied with his own matters, so I guess I was trying
8   to handle it the most efficient way that I could.  And it
9   did not dawn on me that I would ask permission to have John
10  in the office to help with the company matters.
11  Q   The company matters that --
12  A   That he had --
13  Q   -- you agreed --
14  A   -- a lot of knowledge with -- about.
15  Q   And that you agreed that Mr. Morris was supposed
16  to be handling?
17  A   Yes, but not capable of handling, not interested
18  in handling.
19  Q   It sounds like you've had some concerns about
20  Mr. Morris?
21  A   Yes.
22  Q   And when did you voice those concerns to anyone?

Morris vs. Buvermo, et al.                    Deposition of K. McCormick 10/27/06

74

1   A    Probably not until -- the first time I remember
2   voicing a concern was March of 2006.
3   Q    After Mr. Morris's termination?
4   A    Before.
5   Q    Before.
6        When?
7   A    Probably a week before.  John and I had gone to
8   lunch, and we were concerned with how things were going.
9   And we made a conscious -- I remember saying, "Well, again
10  we'll try to make this work."  And I had concerns; and that
11  was the first time I remember voicing the concerns, that I
12  remember.
13  Q    Uh-huh.
14       But these concerns -- these are concerns you had
15  had for some time; correct?
16  A    They were building.
17  Q    But you'd had them for some time?
18  A    Yes.
19  Q    And it sounds to me like you desire to --
20  according to your testimony, is to act in the best
21  interests of the company.  Right?
22  A    Yes.

Morris vs. Buvermo, et al.                    Deposition of K. McCormick 10/27/06

75

1   Q   Don't you think it would have been important,
2   then, for you to voice those concerns at any earlier time?
3   A   I didn't think it was appropriate.
4   Q   Why not?
5   A   Because we were trying to make it work.  We were
6   trying to make the transition; we were giving it some time
7   for the transition to work.  And instead of it working, it
8   steadily got worse.
9   Q   And when did you sit down with Mr. Morris and
10  say, "Geez, Jonathan, I'm having a problem transitioning
11  from reporting to Mr. Gardner to you"?
12  A   I never had a problem with transitioning, so that
13  wasn't necessary.
14  Q   Well, I just thought you said that you were
15  trying to work out the transition.
16  A   I'm -- I don't understand the question.
17  Q   Okay.  Did you at any time -- did you at any time
18  approach Mr. Morris to discuss any of your concerns with
19  him?
20  A   No.
21  Q   Okay.  Why not?
22  A   I wasn't comfortable with him.  Taking what I

MDW Court Reporting, Inc.  (703) 625-8352

Morris vs. Buvermo, et al.                    Deposition of K. McCormick 10/27/06

76

1  said, I thought that -- I don't know.  I just didn't think
2  that he would do anything about it, and I thought it would
3  exacerbate the situation.
4      Q    But you never tried, so we don't know; correct?
5      A    Correct.
6      Q    Now, was it your understanding after this
7  arrangement was reached with Mr. Morris -- Mr. Gardner for
8  him not to be in the office, that at least from that point
9  forward Mr. Gardner was not to seek out any deals on behalf
10 of Buvermo?
11          MR. SMITH:  Object to form.
12     A    Yes.
13          BY MR. HADDAD:
14     Q    Okay.  But he, in fact, had meetings for the
15 purpose of doing so during that time frame; isn't that
16 right?
17     A    I don't know that.
18     Q    Weren't you, in fact, invited to one such
19 meeting?
20     A    I may have.  I -- I don't know who it was with.
21     Q    Terry Hinderman?  Does that name ring a bell?
22     A    I'm not very good with names.  No.

Morris vs. Buvermo, et al.                Deposition of K. McCormick 10/27/06

138

1  we were part of a bigger plan.  So I don't know why, no.
2      Q    A bit risky, don't you think, not to?
3      A    I don't know.
4      Q    Were you involved in any discussions related to
5  Mr. Bonacci's buyout?
6      A    At what time?
7      Q    Well, when he left the company, his interest in
8  FPEP was purchased.
9      A    Uh-huh.
10     Q    Were you aware of that?
11     A    I was.
12     Q    Okay.  Did you have any role in calculating that?
13     A    No.
14     Q    Okay.  I requested in discovery in this case the
15 e-mail service providers that are used by Buvermo.  Would
16 you happen to know who those are?
17     A    Our computer guy would know better than me.
18     Q    Who's your computer guy?
19     A    His name is Pete Chapman.
20     Q    Pete Chapman.
21          Do you know who he works for?
22     A    He works independently.

MDW Court Reporting, Inc.  (703) 625-8352