# EXHIBIT

# 7

Page 26

1    -- I think I was once a candidate for Russell,

2    Reynolds, I'm just trying to remember.

3        A.    Is that right?

4        Q.    I'm just trying to remember.

5        A.    Huh.

6        Q.    So you've been with Equinox since

7    2001?

8        A.    (Nodding head up and down, inaudible

9    response.)

10       Q.    Can you tell me what positions you've

11   held at Equinox?

12       A.    I'm an executive recruiter.

13       Q.    Can you tell me generally what the

14   company does?

15       A.    We are an executive search firm that

16   specializes in doing search in commercial real

17   estate.

18       Q.    As an executive recruiter what are

19   your responsibilities?

20       A.    I -- I try to bring in searches and I

21   do the searches.  I bring in business.  And that

22   means companies that have needs to -- you know,

Page 45

1        A.    And Tony and I work very

2    collaboratively.  And I wanted -- I wanted Tony

3    to be involved in the process to some extent.  I

4    wanted our new client to know that our CEO was

5    involved, so we came to work together on it.

6             I essentially was in charge of the

7    search but Tony was my colleague on it.

8        Q.    Okay.

9                              **(Power Point**

10                             **Presentation to Buvermo,**

11                             **marked for**

12                             **identification as**

13                             **Exhibit No. 2.)**

14           **BY MR. HADDAD:**

15       **Q.    Ms. Pearcy, you've been handed what's**

16    **been marked as Exhibit 2 to your deposition.**

17           **If you could just take a look at this**

18    **and let me know if you recognize this?**

19       A.    Yes, I recognize it.

20       **Q.    Okay, can you identify this document**

21    **for me, please?**

22       A.    It is a Power Point presentation that

1          Do you recall any discussions with

2   Jonathan Morris about term of employment?

3      A.    No.

4      Q.    Okay.

5          And I believe you previously indicated

6   that you weren't aware of any retirement,

7   mandatory retirement age?

8      A.    No.

9      Q.    So I assume you didn't have any

10  discussions with Jonathan Morris about retirement

11  age.

12     A.    No.  You know, I may have said to

13  Jonathan you could have this job as long as you

14  like until you retire.  I mean, just -- but

15  nothing specific.

16     Q.    What about discussions with people at

17  Buvermo such as Mr. Gardner or Mr. Vanrhee or

18  Chaden, Joost, Andr, --

19     A.    Right.

20     Q.    -- or Chris Zachariasse?

21          Do you recall having any discussions

22  with them in terms of what they were seeking in

1    **terms of a commitment from a -- a time commitment**

2    **from their -- from the candidate?**

3        A.    I do not recall their seeking any

4    specific time commitment from a candidate.

5        **Q.    Do you recall any discussions at all**

6    **with any of them regarding, you know, what their**

7    **-- what their preference was in terms of, you**

8    **know -- just to give you an example, I mean, do**

9    **you recall any discussions such as something to**

10    **the effect of, you know, we'd like a guy who is**

11    **going to be willing to stick around for a while,**

12    **something to that effect?**

13            MR. SPERDUTO:  Form, hypothetical,

14    something like that, to that effect.  I'm not

15    sure what the question is.

16            THE WITNESS:  I -- yes, we may have

17    had a conversation about the ideal, you know, how

18    long you'd like an employee to last.  I mean, I

19    can't -- I've been a headhunter for 25 years and

20    you always speak with your -- everybody enters

21    into an arrangement with a new employee assuming

22    that it will last and it will be productive and

1        A.     Right.

2        Q.     -- Andr, and Joost and, to a lesser

3    extent, I guess, Chris, to the extent he was

4    involved.

5               Do you recall having any discussion

6    with Buvermo regarding providing any candidate

7    with a guaranteed term of employment?

8        A.     None whatsoever.

9        Q.     Okay, do you recall having any

10   discussions with anybody at Buvermo regarding

11   them providing a guaranteed salary for a

12   particular duration?  In other words,

13   guaranteeing somebody a salary for a particular

14   number of years?

15       A.     No.  No.

16       Q.     Have you ever heard the term "at-will

17   employment" before?

18       A.     Yes.

19       Q.     I understand that you have no legal

20   training, but I'm -- I want to get to understand

21   what your understanding is of that term.  So if

22   you will tell me what your understanding of that

1          THE WITNESS:  Wait, let me finish.

2          MR. SMITH:  For the record, I think

3    actually these documents were produced by

4    Mr. Sperduto, which accounts for the fact that

5    they are not BATES stamped.

6          THE WITNESS:  Okay.

7          MR. HADDAD:  Thank you.

8          THE WITNESS:  Um-hum.

9          MR. SMITH:  I'm not going to ask her

10   anything beyond the first page, so I'm not asking

11   you to flip through my documents.

12         MR. HADDAD:  Do you want me to give it

13   to the Witness?

14         MR. SMITH:  If she needs it I can give

15   it back to her.

16          BY MR. SMITH:

17     **Q.    But Ms. Pearcy, having looked at this**

18   **document, do you have any recollection of when**

19   **you may have started talking to Mr. Morris about**

20   **the opportunity at Buvermo?**

21     A.    What do the dates say, Mr. Smith?  It

22   was probably around that time.  Probably in May

1    sometime.  We started the search formally in

2    March, so it was probably at the beginning of

3    May.

4         Q.    **May of 2005.**

5         A.    Yeah.

6         Q.    **Okay, all right.  Let me get that back**

7    **from you.**

8              **Now let me have you look at Exhibit**

9    **Number 21.  I think it's already been marked.**

10             MR. SPERDUTO:  I'm going to ask that

11   this portion of the transcript similarly be

12   marked as confidential.  Can we stipulate to

13   that?

14             MR. SMITH:  No objection.

15             MR. SPERDUTO:  As well as this

16   exhibit, I think.

17             BY MR. SMITH:

18        Q.    **Now Ms. Pearcy, I think you testified**

19   **that you prepared this document?**

20        A.    Um-hum, yes.

21        Q.    **All right, and in the middle of the**

22   **document there's a reference to -- and I'm going**

Page 168

1      Q.    You need to just say yes or no.

2      A.    Yes.

3      Q.    Are you referring to the same things

4   in these exhibits, the three to five year time

5   frame, to the best of your knowledge?

6      A.    I presume I am.  I mean, the first

7   document, Exhibit 20, is from notes at the

8   beginning of the search.  And I -- since this one

9   is not dated I'm presuming this is much later in

10  the search.

11     Q.    Okay.

12           During the discussions with Mr. Morris

13  concerning employment at Buvermo, was there any

14  promise made to Mr. Morris about a specific term

15  of employment?

16     A.    None.

17     Q.    Was he promised -- or let me back up.

18  Were there any discussions about a ten-year

19  guaranteed term of employment at Buvermo?

20           MR. HADDAD:  I will object to form.

21  I'm not sure what discussions you're talking

22  about.





## POSITION SPECIFICATION

## Buvermo Properties, Inc.

## President & Chief Executive Officer

### POSITION SUMMARY

Equinox Partners has been retained by Buvermo Properties, Inc. (Buvermo), to recruit a President and CEO to manage the Company's investment activities focused on the greater Washington, DC metropolitan market. The President will succeed John Gardner, who has been in that role for the past 20 years.

### CLIENT SUMMARY

Buvermo represents a group of investors consisting primarily of two prominent Dutch families and a Dutch lender. Active since 1978, Buvermo is committed to investing in commercial real estate in the Washington, DC area. Buvermo acts as a provider of entrepreneurial capital, both debt and equity. The capital typically is provided in a venture format, in participation with developers and other capital providers. Buvermo has established an excellent reputation and a proven track record for its investments. Over the past 10 years, the Company has participated in investments in excess of $500 million, with individual investments ranging from approximately $1.0 million to $100 million, including both debt and equity capital.

John Gardner has led Buvermo's activities for the past 20 years. He recently decided to retire from active management of the business and will transition to a role as investor and advisor to management and the Company's board (consisting of representatives of the two families). The board has recently confirmed its long term commitment to the market and will recruit new leadership to manage the business.



EXHIBIT
8

EQU110

## POSITION RESPONSIBILITIES

The President will be responsible for all aspects of Buvermo's investment activity, which will continue to be focused on development/redevelopment opportunities in the greater Washington, DC metro market through joint ventures with local developers.   The Company currently enjoys an excellent reputation, and the successful candidate will reinforce its position in the market.

Key responsibilities include:

- Manage the overall business affairs and investment activities of the Company, reporting to a board of 2 senior representatives of the ownership group

- Maintain an active and highly visible presence in the Washington, DC market and establish a broad range of relationships with the first-tier owner/builder/ developers  and investors that are based in the region

- Identify and develop relationships with new, upcoming development partners

- Establish and maintain a series of relationships with local players with the objective of developing a regular pipeline of joint venture investment opportunities, and be recognized as an investor of choice by the local development community

- Maintain a deep and broad knowledge of the market dynamics, business cycles and real estate investment activity throughout the region

- Expand relationships with other capital providers  that are active in the market

- Directly manage investment analysis, financial structuring and negotiation of joint ventures and associated debt placement,  involving a wide range of types of development projects

- Supervise the management and administration of ongoing investments and loan administration for debt placed on behalf of the Dutch lender

- Manage the Washington, DC office, including development, training, and supervision of support staff, currently consisting of two full-time and one part-time employee

- Ongoing quarterly reporting to the Board, with regular interim updates and communications as required

EQU111

## CANDIDATE PROFILE

The successful candidate will be a seasoned investment professional with a proven track record and strong working knowledge of real estate investments, particularly development and redevelopment projects.

Specific aspects of the profile are as follows:

## Experience

- Minimum 15 years of relevant real estate development, finance and investment experience across all real estate sectors

- Strong knowledge of the Washington, DC real estate market, including a network of relationships and contacts in the real estate community

- Experience as a CEO, Chief Investment Officer, or a senior financial (capital markets) officer of a successful public or private commercial real estate development firm, investment fund or advisor

- Extensive experience in structuring and managing real estate joint ventures with well-established local market owners/builders/developers

- Strong working knowledge and direct experience with large-scale commercial development and potentially other product types

- Verifiable track record of finance and capital markets transactions involving complex development and land development projects

## Personal Attributes

- Impeccable integrity, trustworthiness, and reputation, with the ability to serve as a fiduciary

- Outstanding interpersonal skills

- Entrepreneurial orientation, with an ability to aggressively and opportunistically penetrate the market, establish and maintain relationships and develop a consistent pipeline of investment opportunities

- An articulate, decisive, and effective communicator who can interact effectively with partners, financial institutions and a remote Board of Directors

- Ability to integrate and transition into the role, developing a close working relationship with the retiring President, who will remain as an advisor and investor

- Creative and strategic thinker with a strong intellect

EQU112

## Education

- Undergraduate degree required
- MBA or other advanced degree a plus

## COMPENSATION

The successful candidate must be a high-performing professional with broad experience and a proven track record to effectively execute the role as outlined. As such, the compensation plan for this individual will be commensurate with the skills required of the position, and will be comprised of a base salary, bonus and an equity component.

## CONTACT INFORMATION

All inquiries and correspondence should be directed to:

Marsha Pearcy                         Anthony J. LoPinto
Managing Director                     Managing Director & CEO
Equinox Partners                      Equinox Partners
1825 I Street, N.W.                   675 Third Avenue, 20th Floor
Washington, D.C.                      New York, NY 10017
Phone: (202-296-7900)                 Phone: (212) 660-7440
Cell: 202-306-0416                    Cell: (917-494-8093)
mpearcy@equinoxsearch.com             alopinto@equinoxsearch.com

www.equinoxsearch.com

March 21, 2005

EQU113