## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JONATHAN H. MORRIS,        :
                                    :

      **Plaintiff,**            :
                                      :

   v.                         :     **Case No.:  1:06CV01131 (HHK)**
                                    :     **Next Event:  Status Conference**

**BUVERMO PROPERTIES, INC., et al.,**   :           **April 20, 2007 at 10:30 a.m.**
                                    :

      **Defendants.**          :

## PLAINTIFF JONATHAN MORRIS'S MEMORANDUM OF
## POINTS AND AUTHORITIES IN OPPOSITION TO
## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Plaintiff Jonathan Morris ("Plaintiff" or "Morris"), through his undersigned counsel and pursuant to Local Rules 7(b) and 56.1, hereby submits his memorandum of points and authorities in opposition to Defendants' Motion for Summary Judgment ("Motion"), and states as follows:

## I.    UNDERLYING FACTS

Plaintiff hereby incorporates by reference the facts set forth in his Statement of Disputed Material Facts in Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Facts").

## II.    ARGUMENT

### A.    Summary Judgment Standard

The party seeking summary judgment bears the initial burden to set forth to the court the basis of its motion, supported by "'pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The moving party must then demonstrate that he or she is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c).

Once the moving party has satisfied its burden, the burden then shifts to the non-moving party "to go beyond the pleadings," and by his or her own affidavits and other documents set forth "'specific facts showing that there is a genuine issue for trial.'"  Celotex, 477 U.S. at 324. Summary judgment is inappropriate where the issues turn on the credibility or intent of the parties, and the facts must be construed in favor of the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

**B.    To The Extent Any Choice Of Law Analysis Is Necessary, This Court Should Apply District Of Columbia Law**

In a case where "jurisdiction is founded on the diversity of the parties' citizenship, [District of Columbia federal courts] apply the choice of law rules of the forum state." Republican Nat'l Comm. v. Taylor, 299 F.3d 887, 890 (D.C. Cir. 2002).  "Under District of Columbia law, the court must first determine if there is a conflict between the laws of the relevant jurisdictions."  Young Women's Christian Assoc. of the Nat'l Capital Area, Inc. v. Allstate Ins. Co. of Canada, 275 F.3d 1145, 1150 (D.C. Cir. 2002)) (citing Eli Lilly & Co. v. Home Ins. Co., 764 F.2d 876, 882 (D.C. Cir. 1985)).  "Only if such a conflict exists must the court then determine, pursuant to District of Columbia choice of law rules, which jurisdiction has the "more substantial interest" in the resolution of the issues."  Id. (citing  Nationwide Mut. Ins. Co. v. Richardson, 270 F.3d 948, 953 (D.C. Cir. 2001), Eli Lilly & Co., 764 F.2d at 882, and Greycoat Hanover F St. Ltd. P'ship v. Liberty Mut. Ins. Co., 657 A.2d 764, 767-68 (D.C. 1995)) (emphasis added).

Here, no choice-of-law analysis is necessary because, as defendants themselves concede, "the law in Virginia and the District of Columbia is not in conflict with respect to the claims set forth in Plaintiff's Amended Complaint."  Def. Mem. at 5.  Therefore, unless a conflict of law is

found to exist, this Court may apply either District of Columbia or Virginia law in resolving the issues raised by defendants' Motion.

To the extent any conflict of law is found to exist, however, this Court should apply District of Columbia law.  "In construing a contract where the laws of two jurisdictions are involved, the forum applies the law of the state which has the 'more substantial interest in the resolution of the issue.'"  Fowler v. A & A Co., 262 A.2d 344, 348 (D.C. 1970) (quoting McCrossin v. Hicks Chevrolet, Inc., 248 A.2d 917, 921 (D.C. 1969).  "Normally, this would be the law of the state where the contract was executed."  Id.  (citing Young v. State Farm Mutual Automobile Insurance Co., 213 A.2d 890, 891 (D.C. 1965))

"In tort cases, [District of Columbia Courts] use a 'governmental interests' analysis to determine whether to apply District of Columbia law."  Herbert v. DC, 808 A.2d 776, 779 (D.C. 2002).  "Under this analysis, '[w]hen the policy of one state would be advanced by application of its law, and that of another state would not be advanced by application of its law, a false conflict appears and the law of the interested state prevails.'"  Id.  "A true conflict arises when both states have an interest in applying their own laws to the facts of the case, in which case the law of the forum 'will be applied unless the foreign state has a greater interest in the controversy.'"  Id. (emphasis added).

In large part, plaintiff's contract claims concern defendants' refusal to honor certain contractual terms actually negotiated and agreed to by the parties, as opposed to the unbargained-for terms defendants would now like to impute.  Accordingly, the primary issue to be resolved with respect to plaintiff's contract claims is what the actual terms of the parties' contract were. Here, virtually all, if not all, the parties' negotiations occurred in the District of Columbia and all

agreements between the parties were entered into in this jurisdiction.  See Exh. 1 (Morris Aff.) at ¶ 6; Exh. 4 (Gardner Dep.) at 103; Exh. 9 (Morris Dep.) at 179.

As such, resolution of plaintiff's contract claims will necessarily require an examination of discussions conducted in the District of Columbia and of the resulting agreements that were entered into within its boundaries.  Moreover, throughout his employment with Buvermo, plaintiff lived in the District of Columbia.  See Exh. 1 (Morris Aff.) at ¶ 7.  And, the decision to terminate plaintiff was made in the District of Columbia, allegedly based on the events that occurred in the District.  See Defs.' Facts at ¶¶ 98-106.  Thus, the District of Columbia's relationship to plaintiff's contract claims is quite substantial.

Conversely, Virginia's relationship to plaintiff's contract claims is relatively insignificant.  Although Buvermo's offices are located in Virginia, it can hardly be said that performance of plaintiff's agreement was in any way confined to or even centered in Virginia.[1] Rather, as defendants concede, plaintiff was hired to identify investment opportunities for Fidelio in the entire Washington Metropolitan Area.  See Defendants' Statement of Material Facts As to Which There Is No Genuine Issue ("Defs.' Facts") at ¶¶ 1, 15, 19.  In discharging his duties as Buvermo's president and chief executive officer, plaintiff held countless meetings and conducted countless negotiations in the District of Columbia.  Exh. 1 (Morris Aff.) at ¶ 4.  Moreover, it bears mentioning that all of defendants' board meetings throughout plaintiff's tenure were conducted in the District of Columbia.  Id. at ¶ 5.

As for plaintiff's tort claims, it is undisputed that all of the representations underlying plaintiff's fraud claim were made in the course of negotiations in the District of Columbia.  Exh. 1 (Morris Aff.) at ¶ 6.  Moreover, given that plaintiff was living in the District throughout his

---

[1]   Although the Amended Complaint identifies Buvermo's office address as the principal place of business of the remaining corporate defendants – only one of which is a Virginia entity (Orvan) – there is no evidence that any of these defendants actually transact any business from these offices.

employment, there can be no doubt that the District is where the injury stemming from defendants' tortious conduct occurred. Id. at ¶ 7. Therefore, should this Court determine that a choice-of-law analysis is required, District of Columbia law should be applied.

### C.    The Statute Of Frauds Does Not Bar Plaintiff's Claims

In their Motion, defendants argue that plaintiff's contract based claims (Counts I, III and IV) should be dismissed, at least in part, on the basis that the agreement to employ plaintiff for a ten-year term is not reflected in any writing, and thus, cannot be enforced both under either the Virginia or District of Columbia Statute of Frauds.[2]  Defendants' statute of frauds argument must fail, however, because defendants waived their right to assert any statute of frauds defense when they admitted the existence of a contract with plaintiff.  In addition, defendants' statute of frauds defense is barred by the doctrine of equitable estoppel.

### 1.    Defendants Waived Their Statute Of Frauds Defense By Admitting To The Existence Of a Contract With Plaintiff

Defendants waived their opportunity to interpose the statute of frauds as a basis for summary judgment by admitting the existence of a contract with plaintiff.  It is well-settled that a party that has admitted to the existence of a contract may not interpose the statute of frauds as a basis for summary judgment.  See, e.g., Wemhoff v. Investors Management Corp. of America, 455 A.2d 897, 899 (D.C. 1983) (by admitting existence of contract in their answer to the complaint, appellees waived their opportunity to interpose the statute of frauds as a basis for summary judgment); Hackney v. Morelite Const., 418 A.2d 1062, 1067 (D.C. 1980) (defendant waives right to assert statute of frauds as a defense if his counsel stipulates the facts showing that an agreement has been reached); Anchorage-Hynning & Co. v. Moringiello, 697 F.2d 356, 362

---

[2]  As discussed more fully below, even if the Court agrees with defendants' statute of frauds argument, Counts I, III and IV should not be dismissed in their entirety as these claims also seek enforcement of agreements to which the statute of frauds does not apply, such as plaintiff's claims for a promoted interest in the Spotswood Valley and Reston International Center deals.

(D.C. Cir. 1983) (under District of Columbia law, a defendant waives protection of statute of frauds, and hence is barred from asserting it defensively, by admitting during course of discovery either making of contract or facts sufficient to establish its existence); Kwon v. Lee, 1993 WL 946217 at *1-2 (Va. Cir. Ct. 1993) (citing Argenbright v. Campbell, 13 Va. 144, 162 (1808) and Harris v. Diamond Constr. Co., 184 Va. 711, 722 (1946)) (admission of existence of contract constitutes waiver of the protections afforded by the statute of frauds).

Moreover, this waiver applies even though defendants deny any agreement to employ plaintiff for a ten-year term.  In Rafferty v. Nynex Corp., 744 F. Supp. 324, 329-30 (D.D.C. 1990), the plaintiff claimed that he entered into an oral, two-year employment contract with the defendants, which defendants breached by terminating him without cause.  Id. at 329. Defendants moved for summary judgment on the basis that there was no written contract or memorandum satisfying the statute of frauds.  Id.  During a deposition, the defendants acknowledged the existence of a contract, but maintained that no fixed term was ever agreed to and that the contract was terminable at will.  Id. at 330.  This Court held that, merely by admitting the existence of a contract, the defendants waived any statute of frauds defense.  Id. The Court explained that "[t]o waive application of the Statute of Frauds, the admission need not include all of the terms of the contract, but only those sufficient to conclude that an agreement existed."  Id.  In fact, the Rafferty court expressly rejected the defendants' argument that there was no waiver because they denied existence of a two-year term, reiterating that "the Statute of Frauds is waived if the defendant as much as admits to the existence of the contract."  Rafferty v. Nynex Corp., 744 F. Supp. at 330, n. 20.

Here, as in Rafferty, the defendants have acknowledged the existence of a contract with plaintiff, though they dispute its terms.  Indeed, during his deposition, Joost Tjaden ("Tjaden"),

the designated representative of Buvermo's controlling shareholder, acknowledged that Buvermo

and Morris "agreed" to a long-term commitment:

> Q.  Do you recall having any discussions with Mr. LoPinto regarding whether Jonathan
> would make a commitment to any number of years?
>
> A.  No.
>
> Q.  Okay.  Do you recall having any such discussion with Mr. Morris?
>
> A.  Yes, I did have that discussion.
>
> Q.  Okay.  And tell me about that discussion
>
> A.  It was, again, in the general sense of wanting the -- let me say it differently.
>
> Mr. Morris was very interested in finding out from us what our orientation was
> towards a longer term commitment to the market. Understandably so, he wanted as a
> candidate to know whether we wouldn't pull out in a year or two. And in that sense we
> had discussed extensively what [our] commitment was to the marketplace. And it was
> important to me as well, as I stressed to him, that he have a similar orientation as to -- as
> far as his horizon was concerned.
>
> So there were --  we did discuss it partly because he wanted to make sure that we
> were not gone in two years and partly because I wasn't --  wanted to make sure this his
> orientation was for the longer term.
>
> Q.  Uh-huh.  And what came with those discussions?
>
> A.  Well, we -- **we seemed to agree**. He seemed to be -- feel comfortable that we would
> be around for a long -- for the longer term, and I felt comfortable that his orientation was
> similar.

Exhibit 2 (Tjaden Dep.) at 102-3.

Similarly, during his deposition, John Gardner ("Gardner"), plaintiff's predecessor,

testified as follows:

> I recall having the impression that Jonathan intended to work at a position like this for an
> extended period of time if the opportunity were there and if things went well.  That was
> my recollection of the discussions with Jonathan. . . .   And he seemed to be comfortable
> with the fact that we were prepared to commit to be in the market for a long time if
> circumstances were – that that was our intention based on the circumstances.  So it

sounds like he was available and we were available for those periods of time. And that really seemed to be the only important issue in my mind."

Exhibit 4 (Gardner Dep.) at 191.

In addition, Andre van Rhee, also a designated representative of Buvermo's controlling shareholder, testified as follows:

> During [his] interview, [Morris] asked us what our commitment was to the business . . . . So we discussed that, that – whether we would stay committed; although, we might go through a very slow period. And there I – because we – every **ten years** we commit to this business. And we just had the decision of our own shareholders to commit another ten years to this operation. So that – he asked how committed we were. . . . So I explained to him that **we were committed for another ten years**."

Exhibit 3 (van Rhee Dep.) at 75 (emphasis added). Van Rhee went on to testify that he "recall[s] asking [Morris] whether this was something for him - a job if everything went right, say, for a long-term to the end maybe even, instead of a jump to something else," and Morris responded that "this was what he was really looking for." Id. at 76; see also, Pl.'s Facts at ¶¶ 51-3.

The testimony of these three principals, and Tjaden's in particular, leaves no doubt that some form of long-term commitment was discussed and agreed to with plaintiff. Although defendants may dispute that this agreement included a fixed ten-year employment term, Rafferty makes clear that the admission of an agreement alone is sufficient to preclude a statute of frauds defense.

In addition, defendants' Motion itself confirms the existence of both a written contract and contemporaneous oral agreements with plaintiff relating to his employment terms.[3] Indeed, in their Statement of Material Facts, defendants acknowledge the existence of an employment contract with plaintiff. See Defs.' Facts at ¶¶ 60-63. Defendants further contend that, in addition

---

[3]   "Where the parties did not adopt the writing as a statement of the whole agreement, parol evidence of an additional one is admissible." Brewood v. Cook, 207 F.2d 439, 441 (D.C. Cir, 1953) (citing 3 Williston, Contracts Sec. 636 (1936)). "This rule is sometimes referred to as the partial integration doctrine, due to the fact that only part of the whole transaction is integrated in the writing." Id.

to the terms set forth in plaintiff's written Offer Letter, the parties orally agreed to additional terms and conditions. Among other things, defendants claim that plaintiff agreed that his right to receive a promoted interest in any "future project" would be contingent upon the satisfaction of a number of "important conditions" not enumerated in his Offer Letter, or in any other written agreement between the parties for that matter. Id. at 29-31. As none of these conditions are set forth in any writing, defendants' argument necessarily assumes the existence of some oral agreement with plaintiff related to his employment terms.

Thus, there can be no dispute that defendants have admitted to the existence of a contract with plaintiff, which terms were in part agreed to in writing and in part agreed to orally. Although defendants deny that this contract included a fixed employment term, Rafferty makes clear that their denial is wholly irrelevant for purposes of determining whether the statute of frauds has been waived. Therefore, defendants should be deemed to have waived their statute of frauds defense.

2.    Defendants Are Equitably Estopped From Invoking The Statute Of Frauds As A Defense To Plaintiff's Claims

The doctrine of equitable estoppel also precludes defendants' reliance on the statute of frauds as a defense to plaintiff's claim of a ten-year employment term. Under both Virginia and District of Columbia law, the doctrine of equitable estoppel may serve as a bar to a statute of frauds defense. See Tidewater Beverage Services, Inc. v. Coca Cola Co., Inc., 907 F. Supp. 943, 946 (E.D. Va. 1995) ("Virginia has long recognized that the doctrine of equitable estoppel may preclude a statute of frauds defense."); Meriweather Mowing Service, Inc. v. St. Anne's-Belfield Inc., 2000 WL 33259936 (Va. Cir. Ct. 2000) (oral agreement to employ plaintiff for period of three years not barred by statute of frauds where plaintiff detrimentally relied on promise); Interdonato v. Interdonato, 521 A.2d 1124 (D.C. 1987) ("a plaintiff's 'change of position induced

by the [defendant's] parol promise would estop the latter from setting up the statute of frauds.'") (quoting Ammerman v. City Stores Co., 394 F.2d 950, 953 n. 6 (1968)); Brewood v. Cook, 207 F.2d 439, 441-2 (D.C. Cir. 1953)

"At common law, a party may assert equitable estoppel against a statute of frauds defense, even in the absence of actual fraud, if he can prove 'that the person to be estopped has misled another to his prejudice . . . or that the innocent party acted in reliance upon the conduct or misstatement by the person to be estopped.'" Tidewater Beverage Services, 907 F. Supp. at 946 (quoting T ... v. T ..., 216 Va. at 872-73, 224 S.E.2d 148 (Va. 1976)). "Absent a showing of fraud or deception, four elements must be met to establish equitable estoppel: (1) a representation; (2) reliance; (3) a change of position; and (4) detriment." Id.

Taking plaintiff's allegations as true and viewing them in the light most favorable to plaintiff, it is clear that equitable estoppel precludes defendants' statute of frauds defense. Plaintiff has stated that defendants represented that his employment would continue for a term of at least ten years. See Exh. 9 (Morris Dep.) at 136-140, 157-161, 173-4. Plaintiff also has put forth more than enough facts establishing that he relied on defendants' representations and changed his position to his detriment. For example, when plaintiff was first contacted regarding the position with Buvermo, he was residing in Florida and was independently pursuing investments of his own. See Exh. 1 (Morris Aff.) at ¶ 8. Among other things, plaintiff had identified several residential properties in Palm Beach, Florida, that he intended to purchase, renovate and resell. Id. at ¶ 9. Upon accepting his employment with Buvermo, and based on representations of a ten-year term of employment, plaintiff discontinued his pursuit on what would have been very profitable investment opportunities. . Id. at ¶ 10.

In addition, plaintiff relied to his detriment on defendants' representations by, among other things, purchasing a penthouse apartment to entertain clients, which Gardner, Tjaden and van Rhee made clear would be one of plaintiff's responsibilities.  See Exh. 9 (Morris Dep.) at 18-9; Exh. 1 (Morris Aff.) at ¶ 11.  Plaintiff informed Tjaden of his decision to purchase the penthouse, and Tjaden was very supportive of the decision and agreed that it would be perfect for entertaining defendants' clients.  See Exh. 9 (Morris Dep.) at 18-9; Exh. 1 (Morris Aff.) at ¶ 12.

Plaintiff purchased the penthouse for $1.9 million (excluding closing costs), and invested an additional $300,000 to renovate the property.  See Exh. 1 (Morris Aff.) at ¶ 13.  The penthouse was far too large for plaintiff's own personal use and, with annual carrying costs of approximately $95,000, was far too expensive to maintain without his Buvermo salary.  Id. at ¶ 14.  As a result of his sudden termination, plaintiff was forced to sell the penthouse in a soft market and will lose in excess of $100,000 on the investment, not including the carrying costs expended to date.  Id. at ¶ 15.  Plaintiff would not have purchased the penthouse had he not been guaranteed employment with Buvermo for a term of at least ten years.  Id. at ¶ 16.

Finally, upon accepting employment with Buvermo, plaintiff moved back to the District of Columbia from Florida and, in the process, sold his townhouse in Florida at a price that is far less than what it would have been worth had he held on to the property.  Id. at ¶ 17.  But for Buvermo's agreement to employ plaintiff for a minimum of ten years, plaintiff would not have sold his Florida townhouse and would not have incurred the cost or endured the hassle of relocating.  Id. at ¶ 18.

Thus, in many respects, the facts of this case closely resemble those in Nargi v. CaMac Corp. 820 F. Supp. 253 (W.D. Va. 1992).  There, the plaintiff claimed that his termination by

defendant, his former employer, constituted a breach of an oral agreement to employ plaintiff for a period of at least four years.  Id. at 255.  As in this case, the plaintiff was provided with an offer letter setting forth certain terms of his employment, but failing to mention any guaranteed term of employment.  Id. at 254-5.  The employer further denied ever having offered plaintiff employment for any definite term.  Id. at 233.  The employer moved for summary judgment, arguing that the agreement was barred by the statute of frauds, and plaintiff argued in return that the employer was equitably estopped from raising this defense.  Id. at 256.

Applying Virginia law, the Nargi court held that the employer was equitably estopped from making its statute of frauds defense.  Construing the facts in plaintiff's favor, the court accepted plaintiff's claim that the employer had promised a four-year term of employment.  Id. at 257.  The court also found that plaintiff had relied to his detriment on defendant's promise by selling his home at a loss, moving his family, ending negotiations on the purchase of a business, and closing an existing consulting business.  Id.  Finally, the court took note of plaintiff's claim that he would not have moved had he not been given assurances of long-term employment and that he expected to work for defendant for several years, earning a salary of $160,000.  Id.  Based on these facts, the court concluded that plaintiff sufficiently demonstrated the elements necessary for equitable estoppel to apply.  Id.

As with the plaintiff in Nagri, plaintiff took numerous actions in reliance on defendants' promise to employ him for a fixed term.  Therefore, pursuant to the doctrine of equitable estoppel, defendants should be precluded for invoking the statute of frauds as a defense to his claims.

3.     Whether Defendants Orally Agreed To Employ Plaintiff For A Ten-Year Term Is The Subject Of Disputed Material Facts

It is axiomatic that summary judgment cannot be granted if there are genuine issues of material fact. See Celotex, 477 U.S. at 324. Here, plaintiff claims that defendants made certain representations concerning a term of employment to which the parties orally agreed, while defendants deny making any promises about the length of plaintiff's employment. See Exh. 9 (Morris Dep.) at 136-140, 157-161, 173-4; Exh. 12 (Plaintiff's Answer to Interrogatory) at Ans. to Int. No. 7. This factual dispute goes to the heart of plaintiff's claims, and turn on the credibility of the parties and witnesses – matters inappropriate for summary judgment. Anderson, 477 U.S. at 255. Therefore, summary judgment on these claims should not be granted.

4.     An Issue Of Material Fact Exists As To Whether  Plaintiff Was Entitled To Two-Weeks' Severance Pay Pursuant To  Buvermo's Employee Manual

At the very least, the issue of whether defendants are required to provide plaintiff with two-weeks' severance pay pursuant to Buvermo's Employee Manual should be submitted to the trier of fact. Buvermo's Employee Manual provides, in relevant part, as follows:

> BUVERMO Properties may terminate an employee immediately for serious misconduct, including but not limited to dishonesty, insubordination, illegal conduct, serious deviations from rules or duties, or any other conduct that significantly interferes with the efficient operation of BUVERMO Properties.
>
> * * *
>
> In the event that any employee's employment is terminated by BUVERMO Properties for reasons other than serious misconduct, the employee will be given at least two weeks' notice or, at the supervisor's option, two weeks' severance pay. Adjustment will be made for accumulated vacation days or for time owed by the employee to BUVERMO Properties.

Exhibit 7 (Employee Manual) at § VIII(A), (B). Thus, there is an issue of fact as to whether plaintiff's engaged in any "serious misconduct," justifying his termination without severance

pay.  As defendants have not met their burden of demonstrating the absence of a genuine issue of material fact as to this issue, summary judgment should not be granted.[4]

**D.    Defendant's Are Not Entitled To Summary Judgment On Plaintiff's Claims To A  Promoted Interest In Projects Initiated Prior To His Termination**

Even if defendants could invoke the statute of frauds as a bar to plaintiff's claims for a ten-year term of employment, they are not entitled to summary judgment on plaintiff's claims to a promoted interest in deals that were initiated prior to his termination, including the Spotswood Valley Square Shopping Center ("Spotswood Valley") and the Reston International Center.

1.    <u>There Exists A Factual Dispute As To What Conditions To Receiving A Promoted Interest Were Agreed To By The Parties</u>

"In cases in which the dispositive issue involves the construction of a contract, summary judgment may be appropriate if the provisions of the contract are unambiguous."  <u>Davis v. Chevy Chase Financial Lt'd</u>, 667 F.2d 160, 169 (D.C. Cir. 1981) (summary judgment in favor of employer held improper on claim to compel former employee to sell company shares back to employer upon termination where disputed buyback provision subject to more than one reasonable interpretation).  "The meaning of a contract is, however, usually a question of fact" and "discerning contractual intent is a factual question unless the terms of the contract are "wholly unambiguous."  <u>Id.</u>  "Summary judgment on a contract is appropriate only when the relevant provisions are so straightforward that they can be read in but one way."  <u>Id.</u>; <u>see also</u>, <u>Bear Brand Hosiery Co. v. Tights, Inc.</u>, 605 F.2d 723 (4th Cir. 1979) ("If there is more than one permissible inference as to the intent to be drawn from the language employed, the question of the parties' actual intention is a triable issue of fact").

---

[4]    Indeed, in their Motion, defendants do not even argue that the basis for plaintiff's termination is the subject of undisputed facts.

In their Motion, defendants incorrectly state that, under the terms of the parties' agreement, plaintiff was not entitled to a promoted interest unless the following "important conditions" were met prior to his termination:  (1) Fidelio acquired an interest in the deal, (2) Fidelio designated the deal as an "FPEP Property" and (3) plaintiff was admitted as a member of FPEP.  <u>See</u> Motion Mem. at 12-14.  Of course, in discussing these so-called "important conditions," defendants do not once cite to any written or oral agreement with plaintiff; rather, defendants merely rely on their own self-serving testimony.[5]  <u>See id.</u>

In fact, plaintiff never agreed to any of these conditions.  On this issue, plaintiff's Offer Letter provides as follows:

> You will be entitled to the FPEP promote currently available to [Gardner] for all projects **initiated** after December 31, 2005, and for all projects **initiated** by [Morris] prior to that time, except that the preferred return to Fidelio and other capital providers will be reduced from 12% to 10% to reflect current market conditions, and which may be subject to change relative to future projects dependent upon future market conditions.  For any projects jointly initiated by [Morris] and [Gardner] prior to year end, [Morris and Gardner] will mutually agree on a fair split of the promote.  In addition, [Morris] will also be provided the right to invest pro rata 2.5% of the capital for all future projects, on a nonselective basis.

<u>Id.</u> (emphasis added).  Thus, under the terms of the Offer Letter, plaintiff was entitled to a promoted interest on all projects he "initiated" on or before December 31, 2005, and, after December 31, 2005, plaintiff was entitled to a promoted interest on all deals "initiated" by Buvermo, irrespective of who initiated the deal.[6]  <u>See</u> Exh. 2 (Tjaden Dep.) at 118-9.  Noticeably missing from this Offer Letter is any reference to the "important conditions" defendants now seek to impose.

---

[5]   In fact, at his deposition, Gardner could not point to any provision in the FPEP Agreement or the Fidelio Partnership Agreement that required a property to be designated as an FPEP property prior to the plaintiff's termination for him to be entitled to his promoted interest.  <u>See</u> Exh. 4 (Gardner Dep.) at 251-2, 259-60.

[6]   It is undisputed that plaintiff initiated the Spotswood Valley deal in or around December 2005, and that Reston International Center deal was initiated after December 31, 2005, but prior to plaintiff's termination.  <u>See</u> Exh. 4 (Gardner Dep.) at 306, 344-5, 350, 368-370; Defs.' Facts at ¶ 94.

Moreover, it is undisputed that defendants never advised plaintiff of any of the so-called "important conditions" prior to his employment with Buvermo, or even prior to his termination.[7] At their depositions, neither Tjaden, van Rhee nor Gardner could recall ever advising plaintiff that his right to receive a promoted interest on deals initiated during his tenure would be contingent on plaintiff still being employed with Buvermo when Fidelio ultimately closed on the deal and/or designated the deal as an "FPEP Property." See Exh. 2 (Tjaden Dep.) at 119-121; Exh. 3 (van Rhee Dep.) at 81-5; Exh. 4 (Gardner Dep.) at 118-9, 230-3, 241, 250-251; Exh. 1 (Morris Aff.) at ¶ 19. Nor did any of them advise plaintiff that his right to receive a promoted interest in a deal would be contingent upon identifying him as a member in the FPEP Agreement. See Exh. 2 (Tjaden Dep.) at 119-121; Exh. 3 (van Rhee Dep.) at 81-5; Exh. 4 (Gardner Dep.) at 118; Exh. 1 (Morris Aff.) at ¶ 21. To the contrary, as set forth more fully in plaintiff's Statement of Disputed Facts, it is quite clear that defendants themselves do not consider the amendment to the FPEP Agreement a necessary condition to entitlement to a promoted interest. See Pl.'s Facts at ¶¶ 26-31, 74-83, 140-3.

In addition, defendants' convenient argument that the promoted interest structure is not intended as compensation for locating a deal, but rather as compensation for successfully managing the investment, is specious. At his deposition, Tjaden conceded that, as Buvermo's president, Morris's "prime responsibility" was to identify potential investments for Fidelio. See Exh. 2 (Tjaden Dep.) at 69-70. At no time prior to his execution of the Offer Letter, or prior to his termination for that matter, did Gardner, Tjaden or van Rhee advise plaintiff that the purpose

---

[7]    When asked about his discussions with plaintiff regarding plaintiff's entitlement to a promoted interest, Gardner testified as follows:

> I don't recall a lot of the preliminary discussions. And the – the deal that we agreed to is captured in his offer letter; and I think reviewing that would be the best way for me to tell you, you know – about that.

See Exh. 4 (Gardner Dep.) at 210.

of a promoted interest was to compensate him for successfully managing defendants' interest in a project.  See Exh. 1 (Morris Aff.) at ¶ 22; Exhibit 3 (van Rhee Dep.) at 111.  Rather, it was plaintiff's understanding, as reflected in his Offer Letter, that the promoted interest was intended to compensate him for identifying the investment; i.e., "initiating" the investment.  See Exh. 1 (Morris Aff.) at ¶ 23.  Indeed, plaintiff was informed that defendants had turned over the responsibility for managing the investment to third-party operating partners.  Id.

Moreover, although van Rhee now claims that plaintiff's successor, Laurence Millspaugh ("Millspaugh"), was provided with a promoted interest in Spotswood Valley and Reston International Center because he would be responsible for managing these projects, he was unable to articulate what work Millspaugh was performing and how much time he was investing in connection with the management of those properties.  See Exh. 3 (van Rhee Dep.) at 62-67. And, at least with respect to Spotswood, van Rhee confirmed that Fidelio is merely an equity provider in the Spotswood Valley deal and stated that "[w]e're not managing that ourselves." See Exh. 3 (van Rhee Dep.) at 62-63.

Thus, because plaintiff's claims to these promoted interests requires the resolution of a factual dispute as to what, in fact, were the terms and conditions agreed to by the parties, summary judgment is inappropriate.  In this regard, this case is similar to Wemhoff v. Investors Management Corp. of America, 455 A.2d 897 (D.C. 1983), where the D.C. Court of Appeals reversed the entry of summary judgment in favor of the employer.  There, the appellant, who was hired to solicit enrollees for appellees' annuity investment program, filed suit seeking to recover commissions on each of the annuity contributions he procured prior to his termination.  Id. at 898.  Appellant alleged that appellees had orally agreed to pay him commissions on contributions made by persons he enrolled in the annuity program until their participation in the

17

program ended.  <u>Id.</u> at 899.  The appellees, in turn, asserted that the agreement did not require payment of any commissions after appellant's termination.  <u>Id.</u>  The appellees further argued that appellant should not receive commissions for contributions received after his termination because annuity accounts require constant servicing and supervision.  <u>Id.</u> at 900, n. 3.  The D.C. Court of Appeals reversed the entry of summary judgment for appellees because "a genuine issue of material fact was created as to whether the parties agreed that appellant would continue to receive his commissions after termination, . . ." <u>Id.</u> at 899.

Likewise in <u>Bear Brand</u>, <u>supra</u>, the plaintiff, Bear Brand, filed an action for declaratory judgment to compel defendant, Tights, to pay royalties that had accrued but would not be collected by Tights until after the parties' patent licensing contract was terminated by Tights. 605 F.2d at 725.  The contract required Bear Brand to, among other things, use its best efforts to persuade other manufacturers to become licensees of Tights' patents.  <u>Id.</u> at 724.  In return, Tights agreed to pay Bear Brand 12.5 percent of "the gross royalty collected in the future" under Tights' licensing program and further provided that the payments by Tights to Bear Brand "shall be made on or before the tenth day of each calendar month for collections made by Tights during the preceding month . . . ." <u>Id.</u> at 724-5.  The contract also contained a provision for termination upon 90 days' notice by either party provided that the party giving the notice of termination would be relieved of all further duties under this agreement upon the effective date of termination.  <u>Id.</u> at 725.

The lower court entered summary in Tights' favor, and Bear Brand appealed.  <u>Id.</u>  On appeal, Tights argued that the termination and payment-collection clauses of the contract unambiguously imposed upon it no obligation of payment with respect to any sums collected after the termination date.  <u>Id.</u> at 726.  The Fourth Circuit disagreed, however, holding that the

contract was readily susceptible of another reasonable reading pursuant to which Tights would be required to make payments to Bear Brand for all royalties that accrued prior to termination, though actually collected thereafter.  Id.

As Wemhoff and Bear Brand make clear, summary judgment is not appropriate where there is a factual dispute as to what the parties to a contract actually agreed to and as to what the intent of the parties was at the time of contracting.  Here, as previously set forth, there clearly is a dispute as to what the agreed-upon conditions for entitlement to a promoted interest were and as to what the parties intentions were in connection with these interests.  Therefore, summary judgment on plaintiff's claims for a promoted interest in the Spotswood Valley and Reston International Center deals should be denied.

2.    The Redemption Provision Of The FPEP Agreement Does Not Apply To Plaintiff And, In Any Event, Has Never Been Exercised By Defendants

As an additional basis for refusing to recognize plaintiff's promoted interests in deals initiated during his tenure, defendants argue that plaintiff's promoted interest "would have been redeemed" at the time of his termination at no value.  See Motion Mem. at 14-5.  First, it is undisputed that plaintiff, through no fault of his own, was never made a member to the FPEP Agreement which contains the redemption provision.  See Exh. 4 (Gardner Dep.) at 77-8.  In any event, pursuant to its own terms, the redemption provision set forth in Section 8.9 of the FPEP Agreement does not apply to plaintiff:

> Redemption of Member's Membership Interest.  Notwithstanding any other provision of this Article VIII to the contrary, in the event that either **Gardner or Bonacci** (the "Departed Employee") withdraws from the Company or ceases to be employed by Buvermo Properties, Inc. or another affiliate of Fidelio, by reason of death, disability, retirement or any other reason (such withdrawal or cessation is hereinafter referred to as the "Termination"), then the Manager shall have the right, upon written notice to the Departed Employee given within sixty (60)

19

days of the Termination, to redeem the Departed Employee's entire Membership Interest and the Membership Interest of any transferee of or successor to the Departed Employee, which transferred interests for the purposes of this Section 8.9 shall be deemed to be the Membership Interest of the Departed Employee (the "Call").

See Exh. 8 (FPEP Agreement) at § 8.9.

In addition, the following facts provide ample justification for rejecting defendants' efforts to apply the FPEP Agreement's redemption provision to plaintiff:

- At no time prior to the start of plaintiff's employment, or prior to his termination for that matter, did Gardner, Tjaden or van Rhee advise plaintiff that his right to receive any promoted interest could be redeemed upon plaintiff's termination. See Exh. 1 (Morris Aff.) at ¶ 20; Exh. 2 (Tjaden Dep.) at 123-4; Exh. 3 (van Rhee Dep.) at 85-6; Exh. 4 (Gardner Dep.) at 230-3.

- Plaintiff was not provided a copy of the FPEP Agreement prior to executing his Offer Letter.  See Exh. 4 (Gardner Dep.) at 98-99, 235.

- In fact, Gardner advised plaintiff that it was unnecessary for Morris to review the FPEP Agreement prior to his hiring because there were no deals on the table at the time.  See Exh. 4 (Gardner Dep.) at 99-100.

- Prior to executing his Offer Letter, plaintiff asked Gardner about the reference to FPEP Agreement in the letter, and Gardner told Morris that "it was to more or less to induct entities or people into the investments that prospectively we would make."  See Exh. 9 (Morris Dep.) at 104-5.

- Gardner further stated that the FPEP Agreement would be consistent with agreed-upon terms of plaintiff's Offer Letter, which does not contain any redemption provision.  See Exh. 9 (Morris Dep.) at 105-7, 208.

Even if the FPEP Agreement's redemption provision did apply to plaintiff, however, defendants failed to timely exercise their right to redeem plaintiff's interests.  It is undisputed that, to date, no "written notice" has been provided to plaintiff to redeem any of his promoted

interests pursuant to the provisions of Section 8.9 of the FPEP Agreement.[8]  See Exh. 1 (Morris Aff.) at ¶ 25.

Finally, defendants' argument that plaintiff cannot claim any interest in Spotswood Valley or Reston International Center because the terms of the FPEP Agreement were never agreed to misses the point.  Plaintiff is not seeking his promoted interests pursuant to the terms of the FPEP Agreement, either in its current form or in its contemplated amended form.  Rather, plaintiff is seeking to enforce the terms of his Offer Letter, as supplemented by the parties' oral agreements.  As reflected in plaintiff's Offer Letter and in his Amended Complaint, and as testified to by plaintiff at his deposition, the contractual terms plaintiff seeks to enforce are reasonably certain and were assented to by all parties.  See Exh. 14 (Offer Letter); Amended Complaint at ¶¶ 18-33; Pl.'s Facts at ¶¶ 54-73.

### E.    Defendants Are Not Entitled To Summary Judgment On Plaintiff's Claims Relating To His Option To Invest In Spotswood Valley And Reston International Center

As with plaintiff's claims for a promoted interest in Spotswood Valley and Reston International Center, defendants are not entitled to summary judgment on plaintiff's claims to a right to invest in those deals.  As an initial matter, it bears mentioning that defendants failed to file any answer to plaintiff's Amended Complaint, in which plaintiff's claim to enforce this contractual right were added.  Thus, the allegations in the Amended Complaint related to plaintiff's option to invest should be deemed admitted.  See Amended Complaint at ¶¶ 22, 42, 55, 58, 64 and 70.

---

[8]  Contrary to defendants' suggestion, no admission was made by plaintiff's counsel with respect to the present day value of any interest in Spotswood Valley or Reston International Center.  Indeed, the deposition excerpt relied upon by defendants for this proposition makes clear that plaintiff's counsel was merely making an assumption.  See Defs.' Facts at ¶ 37.  In fact, as defendants know full well, expert discovery pertaining to the value of plaintiff's promoted interests has been deferred until after the Court rules on defendants' summary judgment motion.  Thus, it is clear that this issue may not be disposed of summarily.

In any event, summary judgment cannot be granted as to this claim because, as previously stated, summary judgment on a contract is appropriate only when the relevant provisions are so straightforward that they can be read in but one way.  Here, the provision at issue states that, in addition to his right to a promoted interest on deals "initiated" during his tenure, plaintiff will "also be provided the right to invest pro rata 2.5% of the capital for all future projects, on a nonselective basis."  See Exh. 14 (Offer Letter).  The Offer Letter does not limit plaintiff's right to invest only in "future projects" that close or that are designated as an "FPEP Property" prior to plaintiff's termination.  Rather, as with his right to promoted interests, the Offer Letter suggests that this right extends to all projects that are "initiated" during plaintiff's employment.  Therefore, as there is more than one permissible inference as to the intent to be drawn from the language employed, the question of the parties' actual intention is a triable issue of fact.

### F.     Defendants Are Not Entitled To Summary Judgment On Plaintiff's Claims Relating To The Sheraton Reston And Twinbrook Parcels

Likewise, defendants are not entitled to summary judgment on plaintiff's claims to his promoted interests in the Sheraton Reston and Twinbrook parcels because the contract provision at issue is ambiguous and susceptible to more than one reasonable interpretation.  In connection with these interests, plaintiff's Offer Letter provides as follows:

> You will be entitled, **<u>upon start of employment</u>**, to the share of FPEP promoted interest currently owned by Fidelio Properties for land parcels adjacent to the Sheraton Reston parcels, and remaining land parcels at Twinbrook.  **<u>Such interests will be subject to a two year vesting period</u>**.

See Exhibit 14 (Offer Letter) (emphasis added).

First, this provision is ambiguous in that it suggests that interests are "subject to a two year vesting period," while at the same time stating that plaintiff is entitled to these interests

"upon start of employment."  In addition, the provision does not reflect what must or must not occur within the two-year vesting period for plaintiff to be entitled to these interests.  The provision does not state that plaintiff must be employed by Buvermo at the conclusion of the two year vesting period, nor does it reflect what the effect plaintiff's termination would be on his right to receive these interest.  In addition, neither Gardner, van Rhee, nor Tjaden ever advised plaintiff that, if he were terminated for any reason, he would not be entitled to his promoted interests in the Sheraton Reston parcels, and remaining land parcels at Twinbrook.  See Exh. 1 (Morris Aff.) at ¶ 24.  Rather, plaintiff's understanding of the vesting provision was that he would be entitled to his interests in these current projects unless he was terminated for cause. See Exh. 5 (Morris Dep.) at 191-3.  Given defendants' promises to employ plaintiff for a ten-year term, it cannot be said that plaintiff's interpretation of this provision is in any way unreasonable.

On the other hand, defendants would have this Court construe this provision as granting them the right to deny plaintiff these interests by terminating him for any reason prior to the end of the two-year vesting period.  In other words, under defendants' interpretation, defendants could terminate plaintiff one day prior to the conclusion of the two-year vesting period simply to avoid recognizing plaintiff's right to these interests.  This interpretation is both unconscionable and renders illusory the rights afforded by this provision.

### G.    Defendants Are Not Entitled To Summary Judgment On Plaintiff's Claim For Breach Of The Covenant Of Good Faith And Fair Dealing (Count II)

Defendants seek to dismiss Count III of plaintiff's Amended Complaint on the basis that neither Virginia nor the District of Columbia recognizes a claim for breach of the implied covenant of good faith and fair dealing in the context of an at-will employment contract.  See Motion Mem. at 16.  Because defendants agreed to employ plaintiff for a minimum of ten-years,

however, an at-will employment contract is not at issue here.  See Paul v. Howard Univ., 754 A.2d 297, 310 (D.C.2000) ("all contracts contain an implied duty of good faith and fair dealing, which means that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.'") (quoting Hais v. Smith, 547 A.2d 986, 987 (D.C.1988)).  Therefore, unless this Court concludes that plaintiff's claim to a ten-year term of employment is unenforceable as a matter of law, which this Court should decline to do for the reasons previously set forth, summary judgment as to this claim should be denied.

### H.    Defendants Are Not Entitled To Summary Judgment On Plaintiff's Fraud Claim (Count V)

Defendants further contend that they are entitled to summary judgment on plaintiff's fraud claim on the grounds that plaintiff has not put forth enough facts to make out a claim for fraud.  Unfortunately, defendants limit their analysis to four allegations set forth in plaintiff's Amended Complaint, ignoring a host of other allegations set forth in the complaint, as well as a number of facts that surfaced in discovery, all of which are sufficient to make out a claim for fraud.

The elements of fraud are: "a false representation of a material fact, made intentionally and knowingly, with intent to mislead, reliance by the party misled, and resulting damage to the misled party." Elliott v. Shore Stop, Inc., 238 Va. 237, 244, 384 S.E.2d 752 (Va. 1989); Higgs v. Higgs, 472 A.2d 875, 876 (D.C. 1984) ("The essential elements of fraud are: (1) a false representation, (2) concerning a material fact, (3) made with knowledge of its falsity, (4) with the intent to deceive, and (5) upon which reliance is placed").  A fraud may be founded on a promise made with no intention of fulfilling that promise, even if the underlying obligation is contractual in nature.  See Colonial Ford Truck Sales, Inc. v. Schneider, 228 Va. 671, 676-677, 325 S.E.2d

91, 94 (1985) ("When he makes the promise, intending not to perform, his promise is a misrepresentation of *present* fact, and if made to induce the promisee to act to his detriment, is actionable as an actual fraud."); Elliott v. Shore Stop, Inc., 238 Va. 237, 245, 384 S.E.2d 752, 756 (1989) (holding that a misrepresentation as to a party's present intention can be the basis of an action in tort for fraud); Sea-Land Service, Inc. v. O'Neal, 224 Va. 343, 297 S.E.2d 647 (1982) (same); Lloyd v. Smith, 150 Va. 132, 142 S.E. 363 (1928) (same).

In his Amended Complaint, plaintiff clearly alleged that Gardner, individually and on behalf of the remaining defendants, made representations to induce plaintiff to accept employment with Buvermo so that defendants could benefit from plaintiff's extensive contacts in the real estate market, including but not limited to the following allegations:

- Gardner, individually and on Buvermo's behalf, represented to plaintiff that, although Gardner would remain partially involved in Buvermo's operations to the extent required by plaintiff to facilitate the transition, plaintiff would be in charge of the business operations and that, no later than December 31, 2005, Gardner would cease having any further involvement in Buvermo's operations. Id. at ¶ 67.

- Gardner, individually and on Buvermo's behalf, further represented to plaintiff that plaintiff's employment with Buvermo would continue for a minimum of ten years. Id. at ¶ 68.

- Gardner, individually and on Fidelio's behalf, further represented to plaintiff that plaintiff would receive payment for his percentage of cash receipts generated from the Sheraton Reston and Twinbrook parcels, from the Valley Shopping Center and the Reston JBG Deal, and from all other projects initiated by Buvermo on Fidelio's behalf from January 1, 2006 through June 29, 2015. Id. at ¶ 69.

- Gardner, individually and on Fidelio's behalf, further represented to plaintiff that plaintiff would be afforded the option of investing his own equity in all future projects in an amount equal to 2.5% of the capital invested by Fidelio or its affiliated companies in any such project. Id. at ¶ 70.

- On information and belief, defendants made said representations to induce plaintiff to accept employment with Buvermo and to benefit from plaintiff's extensive contacts in the real estate market, only to then orchestrate plaintiff's termination to avoid compensating plaintiff. Id. at ¶ 72.

See also Amended Complaint at ¶¶ 14-17. Moreover, there is ample evidence in the record that defendants made these representations to induce plaintiff's acceptance of employment with Buvermo. See Pl.'s Facts at ¶¶ 41-60.

In addition, plaintiff has alleged and put forth a number of facts that, at a minimum, create a triable issue of material fact as to whether defendants made these promises with no intention of honoring them. As described in plaintiff's Statement of Disputed Facts, soon after plaintiff commenced his employment with Buvermo, he began experiencing problems with Gardner and his apparent reluctance to give up his role as Buvermo's president. See generally, Exhibit 9 (Morris Dep.) at 168, 245-251; Plaintiff's Amended Complaint at ¶ 25; Exh. 12 (Plaintiff's Answer to Interrogatories) at Ans. to Int. No. 15; Exh. 4 (Gardner Dep.) at 21-22, 142, 156-7, 159. For example, Gardner did not give up his large corner office at Buvermo until several months after plaintiff began working, forcing Morris to conduct his business from Buvermo's copy room. See Exhibit 9 (Morris Dep.) at 168. Gardner also continued to give employees of Buvermo direction to complete tasks without plaintiff's agreement and, in many cases, without plaintiff's knowledge. See Plaintiff's Amended Complaint at ¶ 25; Exh. 12 (Plaintiff's Answer to Interrogatories) at Ans. to Int. No. 15.

In addition, Gardner continued to represent himself as Buvermo's president by constantly going out on his own to solicit new investment opportunities without first seeking plaintiff's consent or even notifying him. See Exhibit 9 (Morris Dep.) at 245, 251; Plaintiff's Amended Complaint at ¶ 25; Exh. 12 (Plaintiff's Answer to Interrogatories) at Ans. to Int. No. 15. Indeed, at his deposition, Gardner stated his belief that he never relinquished his position as Buvermo's president during plaintiff's tenure, and even maintained that he still held that position on the date of his deposition (October 26, 2006), long after Buvermo hired Morris's successor, Laurence

Millspaugh.  <u>See</u> Exh. 4 (Gardner Dep.) at 21-22, 156-7.  Gardner further acknowledged that while plaintiff was solely responsible for identifying new investment opportunities, he continued to seek out deals himself.  <u>See</u> Exh. 4 (Gardner Dep.) at 156-7.  And, despite conceding that he was supposed to cede to plaintiff the day-to-day management of Buvermo's business upon plaintiff's being hired, Gardner admitted that he continued to manage Buvermo's business after plaintiff's start date.  <u>See</u> Exh. 4 (Gardner Dep.) at 142, 159.

In or around December 2005, plaintiff initiated the Spotswood Valley Square Shopping Center deal ("Spotswood Valley deal").  <u>See</u> Exh. 4 (Gardner Dep.) at 306, 344-5, 350; Defs.' Facts at ¶ 94.  At that time, Gardner proposed to van Rhee and Tjaden that they terminate plaintiff as Buvermo's president.  <u>See</u> Exh. 4 (Gardner Dep.) at 305; Exhibit 17 (Buvermo's Interrogatory Answers) at Ans. To Int. No. 21.  In recognition of the potential benefits from the Spotswood Valley deal, defendants decided not to terminate plaintiff.  <u>See</u> Exh. 4 (Gardner Dep.) at 306; Exh. 2 (Tjaden Dep.) at 135-6; Exh. 2 (van Rhee Dep.) at 89.

On January 31, 2006, Fidelio entered into a letter of understanding with SJM Acquisitions, LLC, to purchase the Spotswood Valley Square Shopping Center located in Harrisonburg, Virginia.  <u>See</u> Exh. 4 (Gardner Dep.) at 351-2; Defs.' Facts at ¶ 93.  Thus, as of January 31, 2006, it was clear that Fidelio was going to invest in the Spotswood Valley deal.  <u>See</u> Exh. 4 (Gardner Dep.) at 352.

On the evening of March 22, 2006, at a dinner with plaintiff, van Rhee and Tjaden, Gardner presented some documents to Tjaden and van Rhee that plaintiff had not previously reviewed, including a sheet of paper titled "Designation of FPEP Property."  <u>See</u> Exh. 9 (Morris Dep.) at 296-302; Exh. 16 (Designation of FPEP Property).  Contrary to the terms of plaintiff's

Offer Letter, the Designation of FPEP Property prepared by Gardner reflects the following "Breakdown of FPEP's Promote Percentage":

    John Gardner            10%

    Jonathan Morris         3%

<u>See</u> Exh. 16 (Designation of FPEP Property).   Plaintiff objected to the promoted interest breakdown reflected in the "Designation of FPEP Property," and, on March 24, 2006, Gardner caused a letter to be delivered to plaintiff, advising plaintiff that his employment with Buvermo was being terminated effective immediately.  <u>See</u> Exh. 18 (Termination Letter).

    Given Gardner's admitted failure to abide by the promises he made to plaintiff, there exists at the very least a triable issue of material fact as to whether Gardner had any intention of relinquishing his role as Buvermo's president and of ever giving up his promoted interest as had been promised.  In addition, defendants' decision to hold off on terminating plaintiff until after the Spotswood Valley deal became a certainty creates a triable issue as to whether defendants' intention was to simply use plaintiff for his contacts and to then terminate his employment in an effort to avoid recognizing his promoted interest.

    Finally, plaintiff has put forth more than sufficient evidence that he relied on defendants' representations to his detriment.  Among other things, plaintiff relocated to Washington, D.C. and discontinued his investment efforts in Florida, sold his townhouse in Florida, purchased a penthouse in the District to entertain defendants' clients.   <u>See</u> Exh., 1 (Morris Aff.) at ¶ 11.  In addition, as a result of defendants' fraudulent conduct, plaintiff has been left without employment, deprived of an annual salary plus bonuses and other remuneration, and suffered damage to his reputation.  <u>See</u> Amended Complaint at ¶ 75.  Therefore, as plaintiff has put forth

sufficient facts to make out a fraud claim, defendants' request for summary judgment should be denied.

## I.       Defendants Are Not Entitled To Summary Judgment On Plaintiff's Contractual Interference Claim (Count VII)

Defendants' claim that plaintiff tortious interference claims are deficient is demonstrably incorrect.  First, it is simply not the case, as defendants claim, that defendant Gardner is immune from a tortious interference claim simply because he may also an agent of defendant Buvermo. Indeed, this Court recognized the viability of a tortious interference claim in virtually identical circumstances in Wiggins v. Philip Morris, Inc., 853 F. Supp. 458 (D.D.C. 1994).  In Wiggins, the plaintiff employee alleged that his immediate supervisor at Philip Morris conspired with the company to tortiously interfere with plaintiff's employment relationship.  Id. at 461-62.  This Court easily concluded that plaintiff's allegations sufficed to state a claim for the tort of tortious interference.  Id. at 468.

The Wiggins holding was obviously correct under District of Columbia law, which has rejected blanket immunity for corporate employees from tortious interference claims merely because the contract is with their employer.  As recognized in Sorrells v. Garfinckel's, et al., 565 A.2d 285, 291 (1989), the corporate official may still be liable for intentional interference with a contract where the official acts improperly or with malice: "even an agent can be liable for improper interference with the principal's contractual relations  . . . . If the actor is motivated solely by a desire to harm one of the contracting parties or to interfere in the contractual relations between those parties, the interference is certainly improper."  Id. (quoting Trimble v. City & County of Denver, 697 P.2d 716, 726 (Colo. 1985)).

The same is true under Virginia law.  In Fox v. Deese, 234 Va. 412, 362 S.E. 2d 699 (Va. 1987), the Supreme Court of Virginia recognized that a city employee could tortiously interfere

with a city contract if the employee was acting outside the scope of his authority. Id. Notably, in Fox, as here, the plaintiff alleged that the defendant employee was acting improperly and maliciously with the intent of procuring the breach of a contract and injuring the plaintiff. See also, Roberts v. Parker, et al., 1992 WL 885025 at *2 (Va. Cir. 1992) (holding that corporate agents can conspire with the corporation where the agents act "outside the scope of their employment or [] participate[ ] in a conspiracy with the corporation for 'direct personal benefit . . .wholly separable from the more general and indirect corporate benefit.'") (quoting Selman v. American Sports Underwriters, 697 F. Supp. 225, 238 (W.D. Va. 1988)).

Furthermore, Gardner can hardly contend that plaintiff has failed to adduce disputed issues of fact regarding Gardner's malicious efforts that led to plaintiff's termination. Plaintiff's evidence clearly demonstrates that defendant Gardner acted improperly and in his own self-interest in procuring plaintiff's termination. For example, plaintiff's evidence demonstrates that Gardner repeatedly refused to cede his position as President of Buvermo, and instead continued to purport to act in that capacity to the detriment of both Morris and Buvermo. See, e.g., Pl.'s Facts at ¶ 97-113.

More to the point, plaintiff has shown that Gardner's two efforts to secure plaintiff's termination coincided with – and were designed to avoid – scheduled changes in Gardner's status at Buvermo. As indicated in the September 19, 2005 memorandum from Gardner to Tjaden, Gardner was scheduled to end full-time employment with Buvermo and give up his FPEP promotes interests as of December 31, 2005. See Exhibit 10 (Gardner Memo). In addition, effective March 31, 2006, Gardner's annual salary was to be reduced to $150,000. Id. Both of these events were the tied to plaintiff's replacement of Gardner as President of Buvermo.

Not coincidentally, the approach of both these dates was marked by deliberate efforts by Gardner to sabotage plaintiff in Gardner's self-interest. For example, in December 2005, Gardner proposed to van Rhee and Tjaden that plaintiff be terminated as Buvermo's president. See Exh. 4 (Gardner Dep.) at 305; Exhibit 17 (Buvermo's Interrogatory Answers) at Ans. To Int. No. 21. In this first attempt, however, Gardner did not succeed because plaintiff had recently initiated the Spotswood Valley deal. See Exh. 4 (Gardner Dep.) at 306; Exh. 2 (Tjaden Dep.) at 135-6; Exh. 3 (van Rhee Dep.) at 89.

In March 2006, however, just one week before Gardner's salary was to be significantly reduced, Gardner orchestrated plaintiff's termination. At a dinner, Gardner expressed to Tjaden and van Rhee his view that plaintiff was not "spending enough energy and time for Fidelio to successfully generate enough new deals" and that plaintiff was "taking too much distance from the business details." See Exh. 103 (van Rhee Dep.) at 103-4. Yet, as Gardner conceded at his deposition, at the time, Gardner had no knowledge of plaintiff's performance as president in the preceding months because he rarely spent time in the office after December 2005. See Exh. 4 (Gardner Dep.) at 308-10, 343-344.

Thus, plaintiff easily meets his burden of avoiding summary judgment by demonstrating material facts regarding defendant Gardner's improper, self-interested and malicious efforts resulting in plaintiff's termination. As defendants' own motion must concede, "improper methods" for a tortious interference claim includes a wide range of activities, including fraud, misrepresentation, deceit, defamation and breach of a fiduciary relationship. See, e.g., Duggin v. Adams, 234 Va. 221, 226-27, 360 S.E.2d 832, 835 (1987). Plaintiff's evidence shows that defendant Gardner employed these methods and others in orchestrating plaintiff's termination.

## III.    CONCLUSION

For all of the foregoing reasons, defendants' Motion for Summary Judgment should be denied in its entirety.

Respectfully submitted,

TOBIN, O'CONNOR, EWING & RICHARD

By:    /s/ Ziad Haddad
       David C. Tobin, Esq., D.C. Bar # 395959
       Ziad P. Haddad, Esq., D.C. Bar #469470
       5335 Wisconsin Avenue, N.W., Suite 700
       Washington, D.C.  20015
       Tel:  (202) 362-5900
       Fax:  (202) 362-5901
       *Attorney for Plaintiff Jonathan Morris*

## CERTIFICATE OF SERVICE

I HERBY CERTIFY that on February 7, 2007, a true and correct copy of the foregoing was mailed by first-class mail to:

Marc J. Smith, Esq.
Smith, Lease & Goldstein, L.L.C.
11 North Washington Street, Suite 520
Rockville, Maryland  20850

/s/Ziad Haddad
Ziad Haddad

32