**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **JONATHAN H. MORRIS,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Case No.:  1:06CV01131 (HHK)** |
| | : | **Next Event:  Status Conference** |
| **BUVERMO PROPERTIES, INC., et al.,** | : | **April 20, 2007 at 10:30 a.m.** |
| | : | |
| **Defendants.** | : | |

**STATEMENT OF DISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S
OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Jonathan Morris ("Plaintiff" or "Morris"), through his undersigned counsel and pursuant to Local Rules 7(h) and 56.1, hereby states that there exists a genuine issue necessary to be litigated with the respect to the following material facts:

**Plaintiff**

1.     Plaintiff is a professional with over 25 years of real estate investment experience principally in the Washington, D.C. Metropolitan Area.  See Exh. 1 (Morris Affidavit) at ¶ 2.

**Fidelio Properties**

2.     Defendant Fidelio Properties ("Fidelio") is a New York general partnership.  See Defendants' Statement of Material Facts As To Which There Is No Genuine Issue ("Defs.' Facts") at ¶ 1.

3.     Fidelio consists of five partners: Janivo Realty, Inc. ("Janivo"); Donelux, Inc. ("Donelux"); F.P. Executive Partners, L.L.C. ("FPEP"); Orvan, Inc. ("Orvan"); Fidelio Properties Management, Inc. ("FPMI").  Id. at ¶ 2.

4.      Fidelio is in the business of investing in real estate in the Washington, D.C. Metropolitan Area, and typically holds a minority position in those investments.  <u>See</u> Exh. 2 (Tjaden Dep.) at 12-13.

5.      The amount that Fidelio typically invests in a single investment ranges from $500,000 to $5 million.  <u>See</u> Exh. 3 (van Rhee Dep.) at 18; Exh. 2 (Tjaden Dep.) at 13.

6.      Fidelio's typical investment term is 3-5 years.  <u>See</u> Exh. 4 (Gardner Dep.) at 51, 54; Exh. 3 (van Rhee Dep.) at 18.

7.      Fidelio and its partners are governed by the terms of the Fourth Amended and Restated Partnership Agreement of Fidelio Properties, as amended ("Fidelio Partnership Agreement").  <u>See</u> Exhibit 5 (Fidelio Partnership Agreement); Defs.' Facts at ¶ 3.

8.      According to the Partnership Agreement, the business of Fidelio is to "acquire, own, develop, construct, finance (as borrower or lender), operate and sell interests in real estate or related businesses located in the United States of America . . ."  Exhibit 5 (Fidelio Partnership Agreement) at Article 1, § 1.02.

9.      As stated in Article IV of the Fidelio Partnership Agreement, decisions related to Fidelio's real estate investments, including decisions related to the acquisition, disposition and management of Fidelio's investments, are made by a management committee, consisting of Janivo and Donelux.  <u>See</u> Defs.' Facts at ¶ 7-8; Exhibit 5 (Fidelio Partnership Agreement) at Article IV.

10.      Joost Tjaden ("Tjaden") and Andre van Rhee ("van Rhee") are the designated representatives of Janivo and Donelux, respectively, and vote on all matters handled by Fidelio's management committee.  <u>See</u> Defs.' Facts at ¶ 10.

11. Tjaden and van Rhee both reside in The Netherlands. See Defs.' Facts at ¶ 11.

**Fidelio Properties Management, Inc. ("FPMI")**

12. FPMI is Fidelio's managing general partner. See Defs.' Facts at ¶ 12.

13. As set forth in Section 4.04 of the Fidelio Partnership Agreement, FPMI carries out certain responsibilities on behalf of Fidelio that have been delegated to it by the management committee, including the management of Fidelio's real estate investments. See Defs.' Facts at ¶ 13; Exhibit 5 (Fidelio Partnership Agreement) at § 4.04.

**Buvermo Properties, Inc. ("Buvermo")**

14. Buvermo Properties, Inc. ("Buvermo") is a Delaware corporation that is responsible for identifying potential investments on behalf of Fidelio. See Exh. 3 (van Rhee Dep.) at 21-2.

15. No written agreement exists between Buvermo and Fidelio that defines Buvermo's role. See Exh. 2 (Tjaden Dep.) at 15.

16. Decisions related to the business of Buvermo are made by its shareholders. See Exh. 2 (Tjaden Dep.) at 33.

17. Fidelio owns a majority of Buvermo's stock. See Defs.' Facts at ¶ 16. Although Gardner owns a minority interest in Buvermo, he has provided Fidelio with a proxy to vote his shares. Id.

18. In their capacities as designated representatives, Tjaden and van Rhee make all the decisions related to Buvermo, including all decisions as to whom to hire as Buvermo's president, the terms of the president's employment, and whether the president should be fired. See Exh. 2 (Tjaden Dep.) at 34, 36-7; Exh. 3 (van Rhee Dep. at 32-3).

19.     Pursuant to Buvermo's Bylaws, the shareholders are responsible for electing the company's officers, including its president.  See Exhibit 6 (Buvermo Bylaws) at Article II, Section 1.

20.     Article II, Section 6 of Buvermo's Bylaws provides as follows:

Each officer shall hold office for such term as may be prescribed by the shareholders and may be removed at any time by the shareholders with out without cause.  The removal of an officer without cause shall be without prejudice to his contract rights, if any.  The election or appointment of an officer shall not of itself create contract rights.

Exhibit 6 (Buvermo Bylaws) at Article II, Section 6 (emphasis added).

21.     Buvermo's president is charged with the responsibility of locating real estate investment opportunities in behalf of Fidelio.  See Defs.' Facts at ¶ 19.

22.     Prior to submitting an investment opportunity for consideration by Fidelio's management committee, the president is required to consult with an "advisor" to discuss and reach an agreement as to the whether the investment is a proper fit for Fidelio.  Id.  If the president and the "advisor" agree that the investment is a good fit, the proposed investment is then presented to Fidelio's management committee.  Id.

23.     As conceded by Tjaden during his deposition, it is the "prime responsibility" of Buvermo's president to identify potential investments for Fidelio.  See Exh. 2 (Tjaden Dep.) at 69-70.

24.     Buvermo's "advisor" is responsible for consulting with the president on deals the president has located and to decide whether they are worth proposing to Fidelio.  See Exh. 2 (Tjaden dep.) at 61-2; Exh. 3 (van Rhee Dep.) at 51-2.  The "advisor" is not responsible for the day-to-day management of Buvermo's business operations.  See Exh. 3(van Rhee Dep.) at 53-4.

25.    Buvermo's Employee Manual provides, in relevant part, as follows:

BUVERMO Properties may terminate an employee immediately for serious misconduct, including but not limited to dishonesty, insubordination, illegal conduct, serious deviations from rules or duties, or any other conduct that significantly interferes with the efficient operation of BUVERMO Properties.

* * *

In the event that any employee's employment is terminated by BUVERMO Properties for reasons other than serious misconduct, the employee will be given at least two weeks' notice or, at the supervisor's option, two weeks' severance pay. Adjustment will be made for accumulated vacation days or for time owed by the employee to BUVERMO Properties.

Exhibit 7 (Employee Manual) at § VIII(A), (B).

**FPEP Executive Partners, L.L.C. ("FPEP")**

26.    According to the Limited Liability Company Operating Agreement of FPEP (the "FPEP Agreement"), FPEP was "formed for the sole purpose of acquiring, holding and disposing of a general partnership interest in Fidelio . . ."  See Exhibit 8 (FPEP Agreement) at Article I, § 1.4.

27.    As it was described to plaintiff by defendants, FPEP is merely a pass-through entity through which plaintiff could invest in properties acquired by Fidelio and through which plaintiff would be paid both his return on the investment, as well as a promoted interest in deals that were initiated by Buvermo.  See Exh. 9 (Morris Dep.) at 104-5.

28.    According to the current and only known version of the FPEP Agreement, which has never been executed, the members of FPEP are F.P. Investments, Inc. ("FPI"), Gardner, Steven R. Bonacci ("Bonacci"), and VBM-USA, Inc. ("VBM").   See Exhibit 8 (FPEP Agreement.) at 1.

29.     At his deposition, Gardner testified that Bonacci and VBM no longer are members of FPEP, and that apart from him "[t]here are no other members of FPEP today."  See Exh. 4 (Gardner Dep.) at 26, 28, 32-4.

30.     The FPEP Agreement has never been amended, and it was not amended to reflect the withdrawal of VBM or Bonacci as members.  See Exh. 4 (Gardner Dep.) at 77, 79-80, 84-5.

31.     The FPEP Agreement is no longer relied upon to identify one's interest in any given transaction, such as the amount of one's capital contribution and his or her promoted interest percentage in any given transactions; rather, these interests are now identified in separate documents titled "Designation of FPEP Property."  Exh. 4 (Gardner Dep.) at 81-84; Exh. 3 (van Rhee Dep.) at 42.

**Defendant John Gardner ("Gardner")**

32.     Prior to Plaintiff's hiring as Buvermo's president, Gardner served in that role for over twenty (20) years.  See Defs.' Facts at ¶ 37.

33.     At all times relevant hereto, Gardner also was the president of FPMI, Donelux and Janivo, and the vice-president of Orvan.  See Defs.' Facts at ¶¶ 19 and 40.

34.     According to Gardner, Tjaden and van Rhee, Gardner's current employment status with Buvermo and Fidelio is set forth in memorandum from him to Tjaden dated September 19, 2005.  See Exh. 10 (Gardner 9/19/05 Memo); Exh. 3 (van Rhee Dep.) at 55-6; Exh. 2 (Tjaden Dep.) at 78-9.

35.     According to Tjaden and van Rhee, when plaintiff was terminated, Gardner re-claimed the role of Buvermo's president on a full-time time basis until some point in August 2006, when Millspaugh was hired.  See Exh. 2 (Tjaden Dep.) at 86; Exh. 3 (van Rhee Dep.) at 56-7.

**Tjaden and van Rhee Request Gardner's Resignation As Buvermo's President**

36.    At some point prior to 2005, Tjaden and van Rhee expressed their concern to Gardner that he was approaching their mandatory retirement age of 65 and expressed their desire to have him "step down" soon as Buvermo's president.  See Exh. 4 (Gardner Dep.) at 126-8; Exh. 11 (McCormick Dep.) at 27-9.

37.    Gardner "resisted the fact that they needed to bring in somebody else because [he] thought [he] was perfectly capable and had performed very well for them." Exh. 4 (Gardner Dep.) at 129.

38.    According to van Rhee, the basis for bringing in a new president was Fidelio's desire to cultivate relationships with new developers while Gardner was dealing with other traditional Fidelio relationships:  "We needed new blood to get new contacts because we thought that we were too narrowly in the business with two or three parties."  Exh. 3 (van Rhee Dep.) at 43-4.

39.    According to van Rhee, Fidelio was 80% dependent on JBG Companies ("JBG"), a real estate investor and developer, and "we didn't like that."  Exh. 3 (van Rhee Dep.) at 46.

40.    At his deposition, Tjaden acknowledged that he was concerned that Gardner would have a hard time letting go of his role as president.  See Exh. 2 (Tjaden Dep.) at 72.

**Plaintiff Is Assured That Gardner's Continued Role Would Be Limited**

41.    Interviews for Gardner's successor as Buvermo's president began in early 2005. See Exh. 2 (Tjaden Dep.) at 73.

42.    The person hired was to immediately take over the role as Buvermo's president, at which point Gardner was to immediately assume the role of "advisor," previously held by Chris

Zacharaisse. See Exh. 2 (Tjaden Dep.) at 74-75, 83-4; Exh. 3 (van Rhee Dep.) at 49; Exh. 4 (Gardner Dep.) at 134-5, 142.

43.    In early 2005, plaintiff was contacted by Equinox Partners, a real estate executive search firm, to determine his interest in the position of President and CEO of Buvermo. See Defs.' Facts at ¶¶ 47, 52.

44.    The situation, as described to plaintiff by Equinox's principals, Anthony LoPinto ("LoPinto") and Marsha Pearcy ("Pearcy"), was that Gardner had been asked to retire as Buvermo's president, but that Gardner was to assume the role of "advisor" then held by Zacharaisse upon the hiring of a new president. See Exh. 9 (Morris Dep.) at 129-132.

45.    Pearcy and LoPinto further assured plaintiff that Gardner, like Zacharaisse, would be hands-off on a day-to-day basis, and that his role would be limited to discussing with plaintiff the potential investment opportunities plaintiff located and whether those opportunities should be presented to Fidelio. Id.

46.    During the interview process, Gardner, van Rhee and Tjaden also confirmed that plaintiff would assume sole responsibility for the day-to-day operations of Buvermo and for locating investment opportunities, and that Gardner's role would be limited to consulting with plaintiff on the whether the investment opportunity should be presented to Fidelio. Id. at 133-4, 153-4, 163-6.

47.    Thus, it was understood that Gardner would turn over Buvermo's day-to-day operations to plaintiff, that Gardner's role would be limited to winding down existing deals, that Gardner would not be independently pursuing any new deals, and that Gardner would cease having any involvement in Buvermo's operations after December 31, 2005, except to consult with plaintiff on the investment opportunity plaintiff located. Id. at 165-6.

**Plaintiff and Buvermo Agree to a Ten-Year Term of Employment**

48.    Following plaintiff's final interviews with Tjaden, van Rhee and Gardner, LoPinto called plaintiff and asked him how many years he would be willing to commit to the position with Buvermo.  See Exh. 9 (Morris Dep.) at 136-7; Exh. 12 (Plaintiff's Answer to Interrogatory) at Ans. To Int. No. 7.  Plaintiff advised LoPinto that he would commit to a ten-year term.  Id.

49.    During his deposition, LoPinto testified that he did not recall having this conversation with plaintiff, but did not deny that it had taken place.  See Exh. 13 (LoPinto Dep.) at 57-8.

50.    Following his conversation with LoPinto, plaintiff confirmed both with Gardner and Tjaden his commitment to remain employed with Buvermo for a period of ten years and they, in turn, confirmed Buvermo's agreement to employ him for a minimum of ten years.  See Exh. 9 (Morris Dep.) at 136-140, 157-161, 173-4.

51.    At his deposition, Gardner – in his individual capacity and as the designee of all the corporate defendants – testified as follows:

- "[Tjaden and van Rhee] wanted someone who they could see take it for the next very long period of time." Exh. 4 (Gardner Dep.) at 129.

- "[Tjaden and van Rhee] were going to tell someone that we intend to be here a long time and in turn they would like someone who also as circumstances were – were correct, if the person worked out and if things continued on, that they were in a position to be there a long time as well." Id.

- "We thought it was important to let people know that the intent of the partners, assuming the market conditions were correct, was to be around for a long time. And I think in that same vein we were looking for [THAT?] intent with someone else." Id. at 188.

- "Our partners wanted to invest for the long term; and they defined it 10 to 20 years.  And we surely wanted someone who was willing to be in business that long." Id. at 189.

- "I recall having the impression that Jonathan [Morris] intended to work at a position like this for an extended period of time if the opportunity were there and if things went well. That was my recollection of the discussions with Jonathan. . . . And he seemed to be comfortable with the fact that we were prepared to commit to be in the market for a long time if circumstances were – that that was our intention based on the circumstances. So it sounds like he was available and we were available for those periods of time. And that really seemed to be the only important issue in my mind." Id. at 191.

- "[W]e didn't want to have a – hire a guy and find out he was planning on getting out of the business in two or three years or something like that." Id. at 192.

52. At his deposition, Tjaden testified as follows:

- "[W]e wanted to get somebody who – who didn't have a short-term view." Exhibit 2 (Tjaden Dep.) at 95.

- "I look for people who want to see this as a career and for the longer term." Id.

- "We're never interested in the short-term assignments of positions such as this. The fiduciary role is critical, and long-term orientation is important." Id. at 95-6.

- "[The person hired] had to be somebody who was prepared to stay on longer term." Id. at 96.

- "Q. Is it fair to say that you are looking for a candidate who was willing to stick around for 20 – up to 20 years?

  A. If he would have performed, absolutely." Id. at 97-8.

- Recalls telling LoPinto that they "were looking for someone who say – who saw this as a long-term – as an opportunity over the longer term. Mr. Gardner has been there for 20 years." Id. at 98.

- "we were not interested in anybody taking that position who wanted to make a quick buck and get out." Id.

- "What we did discuss [with LoPinto], again, is that the profile needed to reflect someone who was interested in the longer term." Id. at 101.

- Q. Do you recall having any discussions with Mr. LoPinto regarding whether Jonathan would make a commitment to any number of years?

  A. No.

Q.  Okay.  Do you recall having any such discussion with Mr. Morris?

A.  Yes, I did have that discussion.

Q.  Okay.  And tell me about that discussion

A.  It was, again, in the general sense of wanting the -- let me say it differently.

Mr. Morris was very interested in finding out from us what our orientation was towards a longer term commitment to the market. Understandably so, he wanted as a candidate to know whether we wouldn't pull out in a year or two. And in that sense we had discussed extensively what Janivo's commitment was to the marketplace. And it was important to me as well, as I stressed to him, that he have a similar orientation as to -- as *far* as his horizon was concerned. So there were --  we did discuss it partly because he wanted to make sure that we were not gone in two years and partly because I wasn't --  wanted to make sure this his orientation was for the longer term.

Q. Uh-huh.  And what came with those discussions?

A. Well, we -- **we seemed to agree**. He seemed to be -- feel comfortable that we would be around for a long -- for the longer term, and I felt comfortable that his orientation was similar.  Id. at 102-3 (emphasis added).

53.    At his deposition, van Rhee testified as follows:

- "We wanted stability, so we wanted somebody who can do this for years."  Exh. 3 (van Rhee Dep.) at 71-2.

- "We wanted a long-term commitment to us, yeah."  Id. at 72.

- "If you have a long-term commitment and you leave after five years, you're not wrongdoing to the other party.  If you take a long-term commitment and you leave after two years, I mean your not honest, in my value system, whatever the offers you get are."  Id. at 73.

- "We are not looking for short-term things.  We had one (Mr. Gardner) for over twenty years. . . .  You cannot put all your trust in somebody who comes and goes and comes and goes."  Id. at 74.

- "During [his] interview [Morris] asked us what our commitment was to the business . . . .  Se we discussed that, that – whether we would stay committed; although, we might go through a very slow period.  And there I – because we – every ten years we commit to this business.  And we just had the decision of our own shareholders to commit another ten years to this operation.  So that – he

asked how committed we were. . . .  So I explained to him that we were committed for another ten years." <u>Id.</u> at 75.

- "I recall asking [Morris] whether this was something that was for him; a job if everything went right, say, for a long-term to the end maybe even, instead of a jump to something else." <u>Id.</u> at 76.

- Morris response was "[t]hat this was what he was really looking for." <u>Id.</u> at 76.

## **Plaintiff's Offer Letter**

54.     On or about June 3, 2005, prior to the commencement of his employment with Buvermo, plaintiff executed an offer letter that was provided to him by Gardner (the "Offer Letter").  <u>See</u> Exhibit 14 (Offer Letter).

55.     Gardner drafted the Offer Letter, which was reviewed and approved by Tjaden and van Rhee.  <u>See</u> Exh. 4 (Gardner Dep.) at 262, 265; Exh. 2 (Tjaden Dep.) at 108-109; Exh. 3 (van Rhee Dep.) at 78.

56.     Plaintiff and Gardner reviewed, discussed and executed the Offer Letter at Gardner's apartment in Washington, D.C.  <u>See</u> Exh. 4 (Gardner Dep.) at 103; Exh. 9 (Morris Dep.) at 179.

57.     The Offer Letter provided that plaintiff would be paid an annual base salary of $250,000.  <u>See</u> Exhibit 14 (Offer Letter).

58.     The Offer Letter further provided that, as additional compensation, plaintiff would be entitled to the following:

the FPEP promote currently available to [Gardner] for all projects **initiated** after December 31, 2005, and for all projects **initiated** by [Morris] prior to that time, except that the preferred return to Fidelio and other capital providers will be reduced from 12% to 10% to reflect current market conditions, and which may be subject to change relative to future projects dependent upon future market conditions.  For any projects jointly initiated by [Morris] and [Gardner] prior to year end, [Morris and Gardner] will mutually agree on a fair split of the promote.  In addition, [Morris] will also be provided the right to invest pro rata 2.5% of the capital for all future projects, on a nonselective basis.

12

Id. (emphasis added).

59.     Thus, under the terms of the Offer Letter, plaintiff was entitled to a promoted interest on all projects he "initiated" on or before December 31, 2005, and, after December 31, 2005, plaintiff was entitled to promote on all deals "initiated" by Buvermo, irrespective of who initiated the deal.  See Exh. 2 (Tjaden Dep.) at 118-9.

60.     In their discussions leading up to and immediately prior to the execution of the Offer Letter, Gardner represented to plaintiff that Gardner's FPEP promote was an amount equal to 15.5% of the cash receipts or other consideration realized by Fidelio by virtue of its investment in a property or project, after Fidelio first recovered its initial investment plus a compounded rate of return of 10%.  See Exhibit 9 (Morris Dep.) at 174, 186-7.

61.     During the course of plaintiff's employment with Buvermo, Buvermo prepared a spreadsheet reflecting a calculation of plaintiff's promoted interest in a deal he initiated, the Spotswood Valley Square Shopping Center deal (the "Spotswood Valley Spreadsheet").  See Exhibit 15 (Spotswood Valley Spreadsheet).

62.     During his deposition, Gardner acknowledged that, in the Spotswood Valley Spreadsheet, plaintiff's promoted interest was calculated at 15.5%, i.e., in the same amount and manner discussed between plaintiff by Gardner.  See Exhibit 4 (Gardner Dep.) at 356-57.

63.     The Spotswood Valley Spreadsheet was distributed to the Tjaden and van Rhee to obtain their consent, as members of the Fidelio's management committee, to invest in the Spotswood Valley Square Shopping Center deal.  See Exh. 11 (McCormick Dep.) at 118-125.

64.      At no time prior to plaintiff's execution of the Offer Letter, or prior to his termination for that matter, did Gardner, Tjaden or van Rhee advise plaintiff that his right to receive a promoted interest on deals initiated during his tenure would be contingent on plaintiff

still being employed by Buvermo when Fidelio ultimately closed on the deal and/or designated the deal as an "FPEP Property." See Exh. 1 (Morris Aff.) at ¶ 19; Exh. 4 (Gardner Dep.) at 118-9, 230-3, 241, 250-251; Exh. 3 (van Rhee Dep.) at 81-5; Exh. 2 (Tjaden Dep.) at 119-121.

65.     At his deposition, Gardner could not point to any provision in the FPEP Agreement (or the Fidelio Partnership Agreement for that matter) that required a property to be designated as an FPEP property prior to the plaintiff's termination for him to be entitled to his promoted interest. See Exh. 4 (Gardner Dep.) at 251-2, 259-60.

66.     At no time prior to his execution of the Offer Letter, or prior to his termination for that matter, did Gardner, Tjaden or van Rhee advise plaintiff that his right to receive any promoted interest could be redeemed upon plaintiff's termination. See Exh. 1 (Morris Aff.) at ¶ 20; Exh. 4 (Gardner Dep.) at 230-3; Exh. 3 (van Rhee Dep.) at 85-6; Exh. 2 (Tjaden Dep.) at 123-4.

67.     At no time prior to his execution of the Offer Letter, or prior to his termination for that matter, did Gardner, Tjaden or van Rhee advise plaintiff that the purpose of a promoted interest was to compensate him for successfully managing defendants' interest in a project. See Exh. 1 (Morris Aff.) at ¶ 22; Exhibit 3 (van Rhee Dep.) at 111.

68.     Rather, it was plaintiff's understanding, as reflected in his Offer Letter, that the promoted interest was intended to compensate him for identifying the investment; i.e., "initiating" the investment. See Exh. 1 (Morris Aff.) at ¶ 23.  Indeed, plaintiff was informed that defendants had turned over that responsibility to third-party operating partners. Id.

69.     When asked about his discussions with plaintiff regarding plaintiff's entitlement to a promoted interest, Gardner testified as follows:

> I don't recall a lot of the preliminary discussions. And the – the deal that we agreed to is captured in his offer letter; and I think reviewing that would be the best way for me to tell you, you know – about that.

See Exh. 4 (Gardner Dep.) at 210.

70.    Plaintiff's Offer Letter further provided plaintiff with the following interests in "current projects":

> You will be entitled, **upon start of employment**, to the share of FPEP promoted interest currently owned by Fidelio Properties for land parcels adjacent to the Sheraton Reston parcels, and remaining land parcels at Twinbrook. Such interests will be subject to a two year vesting period.

See Exhibit 14 (Offer Letter) (emphasis added).

71.    At the time of plaintiff's hiring, Fidelio's owned a 2.5% promoted interest in land parcels adjacent to the Sheraton Reston parcels, and remaining land parcels at Twinbrook. See Exh. 4 (Gardner Dep.) at 266.

72.    Neither Gardner, van Rhee nor Tjaden advised plaintiff that, if he were terminated for any reason, he would not be entitled to his promoted interests in the Sheraton Reston parcels, and remaining land parcels at Twinbrook. See Exh. 1 (Morris Aff.) at ¶ 24.

73.    Plaintiff's understanding of the vesting provision was that he would be entitled to his interests in these current projects unless he was terminated for cause. See Exh. 5 (Morris Dep.) at 191-3.

**The FPEP Operating Agreement**

74.    Plaintiff's Offer Letter states that "All items will be governed by the FPEP LLC Agreement, of which you will become a member." See Exh. 14 (Offer Letter).

75.    During his deposition, Gardner acknowledged that, as written, the Offer Letter is not clear on what "items" would be governed by the FPEP Agreement. See Exh. 4 (Gardner Dep.) at 282-3.

76.     According to Gardner, the intention was to amend the FPEP Agreement to include plaintiff, to then provide it to him so that he could review it, and to then pass it on to his attorney for his comments.  <u>See</u> Exh. 4 (Gardner Dep.) at 285-6.

77.     At no point prior to plaintiff's employment, or termination for that matter, did anyone advise plaintiff that his right to receive a promoted interest would be contingent upon identifying him as a member in the FPEP Agreement.  <u>See</u> Exh. 1 (Morris Aff.) at ¶ 21; Exh. 4 (Gardner Dep.) at 118; Exh. 2 (Tjaden Dep.) at 119-121; Exh. 3 (van Rhee Dep.) at 81-5.

78.     Plaintiff was not provided a copy of the FPEP Agreement prior to executing his Offer Letter.  <u>See</u> Exh. 4 (Gardner Dep.) at 98-99, 235.

79.     In fact, Gardner advised plaintiff that it was unnecessary for plaintiff to review the FPEP Agreement prior to his hiring because there were no deals on the table at the time.  <u>See</u> Exh. 4 (Gardner Dep.) at 99-100.

80.     Prior to executing the Offer Letter, plaintiff asked Gardner about the reference to the FPEP Agreement in the letter, and Gardner told plaintiff that "it was to more or less to induct entities or people into the investments that prospectively we would make."  <u>See</u> Exh. 9 (Morris Dep.) at 104-5.

81.     Gardner further stated that the FPEP Agreement would be consistent with agreed-upon terms of plaintiff's Offer Letter.  <u>See</u> Exh. 9 (Morris Dep.) at 105-7, 208.

82.     Plaintiff asked Gardner on no fewer than three occasions for a copy of the proposed amended FPEP Agreement to send to his counsel.  <u>See</u> Exh. 9 (Morris Dep.) at 107-8.

83.     Despite recognizing that it was his responsibility, Gardner never amended the FPEP Agreement.  <u>See</u> Exh. 4 (Gardner Dep.) at 77-8.

**The FPEP Agreement's Redemption Provision**

84.    By its very own terms, the redemption provision set forth in Section 8.9 of the

FPEP Agreement does not apply to plaintiff:

> Redemption of Member's Membership Interest.  Notwithstanding
> any other provision of this Article VIII to the contrary, in the event
> that either **Gardner or Bonacci** (the "Departed Employee")
> withdraws from the Company or ceases to be employed by
> Buvermo Properties, Inc. or another affiliate of Fidelio, by reason
> of death, disability, retirement or any other reason (such
> withdrawal or cessation is hereinafter referred to as the
> "Termination"), then the Manager shall have the right, upon
> written notice to the Departed Employee given within sixty (60)
> days of the Termination, to redeem the Departed Employee's entire
> Membership Interest and the Membership Interest of any transferee
> of or successor to the Departed Employee, which transferred
> interests for the purposes of this Section 8.9 shall be deemed to be
> the Membership Interest of the Departed Employee (the "Call").

See Exh. 8 (FPEP Agreement) at § 8.9.

85.    In any event, to date, no "written notice" has been provided to plaintiff to redeem

any of his promoted interests pursuant to the provisions of Section 8.9 of the FPEP Agreement.

See Exh. 1 (Morris Aff.) at ¶ 25.

**Plaintiff Relies On Defendants' Promises To His Detriment**

86.    When plaintiff was first contacted regarding the position with Buvermo, he was

residing in Florida and was independently pursuing investments of his own.  See Exh. 1 (Morris

Aff.) at ¶ 8.

87.    Among other things, plaintiff had identified several residential properties in Palm

Beach, Florida, that he intended to purchase, renovate and resell.  Id. at ¶ 9.

88.    Upon accepting his employment with Buvermo, and based on representations of a

ten-year term of employment, plaintiff discontinued his pursuit of what would have been very

profitable investment opportunities.  Id. at ¶ 10.

89.     In addition, relying on defendants' agreement to employ him for the long-term, plaintiff purchased a penthouse apartment to entertain defendants' clients, which Gardner, Tjaden and van Rhee made clear would be one of plaintiff's responsibilities.  <u>See</u> Exh. 9 (Morris Dep.) at 18-9; Exh, 1 (Morris Aff.) at ¶ 11.

90.     Plaintiff informed Tjaden of his decision to purchase the penthouse for client entertainment purposes, and Tjaden was very supportive of the decision and agreed that it would be perfect for entertaining defendants' clients.  <u>See</u> Exh. 9 (Morris Dep.) at 18-9; Exh. 1 (Morris Aff.) at ¶ 12.

91.     Plaintiff purchased the penthouse for $1.9 million (excluding closing costs), and invested an additional $300,000 to renovate the property.  <u>See</u> Exh. 1 (Morris Aff.) at ¶ 13.

92.     The penthouse was far too large for plaintiff's own personal use and, with annual carrying costs of approximately $95,000, was far too expensive to maintain without his Buvermo salary.  <u>Id.</u> at ¶ 14.

93.     As a result of his sudden termination, plaintiff was forced to sell the penthouse in a soft market and will lose in excess of $100,000 on the investment, not including the carrying costs expended to date.  <u>Id.</u> at ¶ 15.

94.     Plaintiff would not have purchased the penthouse had he not been guaranteed employment with Buvermo for a term of at least ten years.  <u>Id.</u> at ¶ 16.

95.     In addition, upon accepting employment with Buvermo, plaintiff moved back to the District from Florida and, in the process, sold his townhouse in Florida at a price that is far less than what it would have been worth had he held on to the property.  <u>Id.</u> at ¶ 17.

96.     But for Buvermo's agreement to employ plaintiff for a minimum of ten years, plaintiff would not have sold his Florida townhouse and would not have incurred the cost or endured the hassle of relocating.  Id. at ¶ 18.

**Plaintiff Commences His Employment and Gardner Refuses To Step Down**

97.     Plaintiff commenced employment with Buvermo on or about June 29, 2005.  See Exh. 1 (Morris Dep.) at 173.

98.     Almost immediately, plaintiff began experiencing problems with Gardner and his apparent reluctance to give up his role as Buvermo's president.  See generally, Exhibit 9 (Morris Dep.) at 168, 245-251; Plaintiff's Amended Complaint at ¶ 25; Exh. 12 (Plaintiff's Answer to Interrogatories) at Ans. to Int. No. 15; Exh. 4 (Gardner Dep.) at 21-22, 142, 156-7, 159.

99.     For example, Gardner did not give up his large corner office at Buvermo until several months after plaintiff began working, forcing plaintiff to conduct his business from Buvermo's copy room.  See Exhibit 9 (Morris Dep.) at 168.

100.    Gardner continued to give employees of Buvermo direction to complete tasks without plaintiff's agreement and, in many cases, without plaintiff's knowledge.  See Plaintiff's Amended Complaint at ¶ 25; Exh. 12 (Plaintiff's Answer to Interrogatories) at Ans. to Int. No. 15.

101.    Gardner also continued to represent himself as Buvermo's president by constantly going out on his own to solicit new investment opportunities without first seeking plaintiff's consent or even notifying him.  See Exhibit 9 (Morris Dep.) at 245, 251; Plaintiff's Amended Complaint at ¶ 25; Exh. 12 (Plaintiff's Answer to Interrogatories) at Ans. to Int. No. 15.

102.    Indeed, at his deposition, Gardner openly admitted that he never relinquished his position as Buvermo's president during plaintiff's tenure, and even maintained that he still held

that position on the date of his deposition (October 26, 2006), long after Buvermo hired Morris's

successor, Lawrence Millspaugh.  <u>See</u> Exh. 4 (Gardner Dep.) at 21-22, 156-7.

103.    Gardner further acknowledged that while plaintiff was solely responsible for

identifying new investment opportunities, he continued to seek out deals himself.  <u>See</u> Exh. 4

(Gardner Dep.) at 156-7.

104.    Despite conceding that he was supposed to cede to plaintiff the day-to-day

management of Buvermo's business upon plaintiff's being hired, Gardner admitted that he

continued to manage Buvermo's business after plaintiff's start date.  <u>See</u> Exh. 4 (Gardner Dep.)

at 142, 159.

105.    Moreover, as plaintiff described in his answers to interrogatories (and during his

deposition), Gardner also interfered with the progress of plaintiff's dealings with third parties:

> For example, the first deal plaintiff pursued, immediately upon joining Buvermo, was an
> office building located in the central business district of Washington, D.C. called '1660 L
> Street" which was offered for sale by Cushman & Wakefield's Investment Sales Team.
> Plaintiff brought in Cigna Investments to make a $30+ million mortgage and
> Guggenheim Real Estate Partners to invest $20 million of equity.  While plaintiff was
> running numbers and checking on rental rates, Mr. Gardner was meeting separately,
> without plaintiff's knowledge, with leasing agents in an effort to establish that the deal
> did not work.   As plaintiff and Mr. Gardner engaged in conference calls with
> Guggenheim to go over the underwriting, Mr. Gardner frequently chirped in many times
> with suspect questions about the deal.  Guggenheim's trepidation brought on by Mr.
> Gardner's criticism of the deal led it to pass on the deal, after plaintiff had successfully
> negotiated the joint-venture agreement with Guggenheim and Cigna had orally
> committed to making the loan.  After the deal fell through, members of Cushman &
> Wakefield's Investment Sales Team told plaintiff that Buvermo would never get a deal
> done until Mr. Gardner was gone.

<u>See</u> Exh. 12 (Plaintiff's Answer to Interrogatories) at Ans. to Int. No. 15; <u>see also</u>, Exh. 9

(Morris Dep.) at 245-250.

106.    In December 2005, plaintiff met with Tjaden, van Rhee and Gardner to discuss

issues about Gardner's interference, whereupon it was agreed that Gardner would spend no more

than one day a week in the office, that Gardner would be prohibited from soliciting new investment opportunities, and that his role would be limited to managing existing JBG deals under plaintiff's supervision.    See Exh. 9 (Morris Dep.) at 278-282; Defs.' Facts at ¶ 84; Plaintiff's Amended Complaint at ¶ 27; Exh. 12 (Plaintiff's Answer to Interrogatories) at Ans. to Int. No. 15.

107.    Beginning in March, however, Gardner resumed coming into the office on a regular basis.  See Exh. 9 (Morris Dep.) at 293-4.

108.    At that time, plaintiff also learned that Gardner had arranged a meeting with a partner of a real estate firm in Washington, D.C. to discuss and review new investment opportunities, and that Gardner had asked Buvermo employee Kara McCormick ("McCormick") to attend the meeting, all without plaintiff's prior knowledge or consent.  See Exh. 9 (Morris Dep.) at 293-4; Exh. 12 (Plaintiff's Answer to Interrogatories) at Ans. to Int. No. 15.

109.    At his deposition, Gardner acknowledged that, despite his agreement to limit his business dealings to JBG, Gardner set up a meeting with a third party to explore potential business opportunities on behalf of Buvermo, that he did so without the knowledge and consent of plaintiff, and that he solicited McCormick, plaintiff's only assistant at the time, to attend the meeting without requesting plaintiff's permission.  See Exh. 4 (Gardner Dep.) at 318-320.

110.    On the evening of March 22, 2006, at a dinner with plaintiff, van Rhee and Tjaden, Gardner presented some documents to Tjaden and van Rhee that plaintiff had not previously reviewed, including a sheet of paper titled "Designation of FPEP Property."  See Exh. 9 (Morris Dep.) at 296-302; Exh. 16 (Designation of FPEP Property).

111.    Contrary to the terms of plaintiff's Offer Letter, the Designation of FPEP Property prepared by Gardner reflects the following "Breakdown of FPEP's Promote Percentage":

John Gardner          10%

Jonathan Morris       3%

See Exh. 16 (Designation of FPEP Property).

112.    Gardner knew at the time of the March 22 dinner that plaintiff had not had an opportunity to review the "Designation of FPEP Property."  See Exh. 4 (Gardner Dep.) at 337.

113.    van Rhee became upset with plaintiff for not knowing what was contained in the documents that Gardner presented at the dinner.    See Exh. 4 (Gardner Dep.) at 338; Exh. 9 (Morris Dep.) at 301.

**Plaintiff Is Terminated By Buvermo Without Explanation Or Just Cause**

114.    Unbeknownst to plaintiff, in December 2005, Gardner proposed to van Rhee and Tjaden that they terminate plaintiff as Buvermo's president.  See Exh. 4 (Gardner Dep.) at 305; Exhibit 17 (Buvermo's Interrogatory Answers) at Ans. To Int. No. 21.

115.    By that time, however, plaintiff already had identified Spotswood Valley Shopping Center as a potential investment for Fidelio.  See Exh. 4 (Gardner Dep.) at 306.

116.    Tjaden was interested in seeing where the Spotswood Valley deal was going to go.  See Exh. 2 (Tjaden Dep.) at 135-6.

117.    van Rhee also was pleased with plaintiff because he had initiated the Spotswood Valley deal.  See Exh. 3 (van Rhee Dep.) at 89.

118.    On March 24, 2006, Gardner caused a letter to be delivered to plaintiff, advising plaintiff that his employment with Buvermo was being terminated effective immediately.  See Exh. 18 (Termination Letter).  The letter was signed by Gardner in his purported capacity as Buvermo's president (the same position plaintiff had been hired to fill) and failed to identify any basis for plaintiff's termination.  Id.

119.    From December 2005 through termination, van Rhee and Tjaden did not travel to the United States and, thus, had no direct knowledge of what was going on in terms of day-to-day management.  See Exh. 4 (Gardner Dep.) at 343-344.

120.    At his deposition, Gardner admitted to knowing very little about plaintiff's performance as president leading up to his termination because he rarely spent time in the office after the December 2005 meeting.  See Exh. 4 (Gardner Dep.) at 308-10, 343-344.

121.    At his deposition, van Rhee conceded that he had no concerns with plaintiff's overall work performance as of December 2005.  See Exh. 3 (van Rhee Dep.) at 96.

122.    van Rhee further testified that he was not aware of any issues with plaintiff's performance from January 1, 2006 to the March 22, 2006 dinner meeting.  See Exh. 3 (van Rhee Dep.) at 98.

123.    At the March dinner, Gardner expressed to Tjaden and van Rhee his view that plaintiff was not "spending enough energy and time for Fidelio to successfully generate enough new deals" and that plaintiff was "taking too much distance from the business details."  See Exh. 103 (van Rhee Dep.) at 103-4.

124.    van Rhee conducted no investigation of plaintiff's performance in managing the office before deciding to terminate him.  See Exh. 3 (van Rhee Dep.) at 106-7.

**The Spotswood Valley Square Shopping Center and Reston International Center Deals**

125.    In or around December 2005, plaintiff initiated the Spotswood Valley Square Shopping Center deal ("Spotswood Valley deal").  See Exh. 4 (Gardner Dep.) at 306, 344-5, 350; Defs.' Facts at ¶ 94.

126.    On January 31, 2006, Fidelio entered into a letter of understanding with SJM Acquisitions, LLC, to purchase the Spotswood Valley Square Shopping Center located in Harrisonburg, Virginia.  <u>See</u> Exh. 4 (Gardner Dep.) at 351-2; Defs.' Facts at ¶ 93.

127.    Thus, as of January 31, 2006, it was clear that Fidelio was going to invest in the Spotswood Valley deal.  <u>See</u> Exh. 4 (Gardner Dep.) at 352.

128.    According to Gardner, the Spotswood Valley deal was fairly sizeable and "on the range of good investments for [Fidelio]."  <u>See</u> Exh. 4 (Gardner Dep.) at 345.

129.    Prior to plaintiff's termination, Gardner's involvement in the Spotswood Valley deal was limited solely to a review of the documents related to that deal.  <u>See</u> Exh. 4 (Gardner Dep.) at 346-7.

130.    In February 2006, Fidelio made initial deposits totaling $425,000 toward the Spotswood Valley deal.  <u>See</u> Exh. 4 (Gardner Dep.) at 352-353.

131.    The Spotswood Valley deal ultimately closed on July 6, 2006, and Fidelio made a capital investment of approximately $3.3 million in the deal at that time.  <u>See</u> Exh. 4 (Gardner Dep.) at 353-4.

132.    At the time of plaintiff's termination, van Rhee believed that plaintiff should be rewarded for his role in securing the Spotswood Valley deal.  <u>See</u> Exh. 3 (van Rhee Dep.) at 109.

133.    Tjaden also considered it fair treatment to pay plaintiff for interest in Spotswood or to recognize his promoted interest in Spotswood because of the work he had done on that deal. <u>See</u> Exh. 2 (Tjaden Dep.) at 154.

134.    During plaintiff's employment with Buvermo, discussions also were initiated with JBG concerning the acquisition of an office building in Reston, Virginia known as the "Reston International Center."  <u>See</u> Exh. 4 (Gardner Dep.) at 326.

135.    The Reston International Center deal was initiated by Gardner after December 31, 2005, but prior to plaintiff's termination, and closed in June 2006.  <u>See</u> Exh. 4 (Gardner Dep.) at 368-370.

136.    Tjaden testified during his deposition that, in recognition of Gardner's efforts on the Reston International Center deal, Gardner was paid his full salary through the hiring of Laurence Millspaugh ("Millspaugh") in August 2006.  <u>See</u> Exh. 2 (Tjaden Dep.) at 92; Defs.' Facts at ¶ 116.

137.    In his offer letter, Millspaugh was promised a promoted interest in the Spotswood Valley and Reston International Center deals.  <u>See</u> Defs.' Facts at ¶ 117; Exhibit 19 (Millspaugh Offer Letter).

138.    Although van Rhee testified that Millspaugh was provided with a promoted interest in Spotswood Valley and Reston International Center because he would be responsible for managing these projects, he was unable to articulate what work Millspaugh was performing and how much time he was investing in connection with the management of those properties.  <u>See</u> Exh. 3 (van Rhee Dep.) at 62-67.

139.    During his deposition, van Rhee further confirmed that Fidelio is merely an equity investor in the Spotswood Valley deal and stated that "[w]e're not managing that ourselves."  <u>See</u> Exh. 3 (van Rhee Dep.) at 62-63.

140.    As with plaintiff's Offer Letter, Millspaugh's offer letter states that "[a]ll items will be governed by the FPEP LLC agreement, of which you will become a member."  <u>See</u> Exh. 19 (Millspaugh Offer Letter).

141.    The FPEP Agreement has never been amended to add Millspaugh as a member.  <u>See</u> Exh. 4 (Gardner Dep.) at 77-8, 105.

142.    At his deposition, Gardner testified that defendants intended to honor their agreement, as stated in Millspaugh's offer letter, to provide Millspaugh with a promoted interested in the Spotswood Valley and Reston International Center deals, regardless of whether the FPEP agreement is amended.  See Exh. 4 (Gardner Dep.) at 106-113.

143.    On December 5, 2006, the Fidelio Management Committee designated Spotswood Valley and the Reston International Center as "FPEP Properties."    See Exhibit 20 (Spotswood and RIC Designations).    The FPEP designations identify Millspaugh's 12% promoted interest in the Spotswood Valley and Reston International Center deals.  Id.

Respectfully submitted,

TOBIN, O'CONNOR, EWING & RICHARD


By:    /s/ Ziad Haddad _____
David C. Tobin, Esq., D.C. Bar # 395959
Ziad P. Haddad, Esq., D.C. Bar #469470
5335 Wisconsin Avenue, N.W., Suite 700
Washington, D.C.  20015
Tel:  (202) 362-5900
Fax:  (202) 362-5901
*Attorney for Plaintiff Jonathan Morris*


## CERTIFICATE OF SERVICE

I HERBY CERTIFY that on February 7, 2007, a true and correct copy of the foregoing was mailed by first-class mail to:

Marc J. Smith, Esq.
Smith, Lease & Goldstein, L.L.C.
11 North Washington Street, Suite 520
Rockville, Maryland  20850


/s/Ziad Haddad_____
Ziad Haddad