Case 1:06-cv-01131-HHK    Document 32-4    Filed 02/07/2007    Page 1 of 42

Morris vs. Buvermo, et al.                    Deposition of J. Tjaden 12/05/06

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - -x
                                    :
JONATHAN H. MORRIS,                 :
                                    :
                Plaintiff,          :
                                    :
        vs.                         :  Case No.
                                    :  1:06CV01131  (HHK)
BUVERMO PROPERTIES, INC., et al.,   :
                                    :
                Defendants.         :
                                    :
- - - - - - - - - - - - - - - - - -x


                          Washington, D.C.

                          Tuesday, December 5, 2006


    Deposition of JOOST E. TJADEN, witness, called for

examination by counsel for the plaintiff, pursuant to

notice, at the offices of Ziad P. Haddad, Esq., Tobin,

O'Connor, Ewing & Richard, 5335 Wisconsin Avenue,

Northwest, Suite 700, Washington, D.C., before

Malynda D. Whiteley, a Registered Professional Reporter and

a notary public in and for the District of Columbia,

beginning at 1:36 p.m., when were present on behalf of the

respective parties:

**EXHIBIT**
**2**

Case 1:06-cv-01131-HHK    Document 32-4    Filed 02/07/2007    Page 2 of 42

Morris vs. Buvermo, et al.                    Deposition of J. Tjaden 12/05/06

**2**

APPEARANCES

ON BEHALF OF THE PLAINTIFF:
   ZIAD P. HADDAD, ESQ.
   Tobin, O'Connor, Ewing & Richard
   5335 Wisconsin Avenue, Northwest
   Suite 700
   Washington, D.C. 20015
   (202) 362-5900

ON BEHALF OF THE DEFENDANTS:
   MARC J. SMITH, ESQ.
   Smith, Lease & Goldstein
   11 North Washington Street
   Suite 520
   Rockville, Maryland 20850
   (301) 838-8950

ALSO PRESENT:
   John Gardner
   Andre C. van Rhee

**3**

INDEX

EXAMINATION BY COUNSEL FOR:
PLAINTIFF,    DEFENDANTS,
WITNESS        MR. HADDAD    MR. SMITH

Joost E. Tjaden       4, 161      157

EXHIBITS

| PLAINTIFF'S | | FOR IDENT. |
|---|---|---|
| No. 1 | Consent to Action | 19 |
| No. 2 | Consent to Action | 19 |
| No. 3 | Consent to Action | 19 |
| No. 4 | Consent to Action | 19 |
| No. 5 | Designation | 25 |
| No. 6 | Designation | 25 |
| No. 7 | Designation | 25 |

**4**

PROCEEDINGS

Whereupon,

JOOST TJADEN,

witness, was called for examination by counsel for the plaintiff, and after having been duly sworn, was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE PLAINTIFF

BY MR. HADDAD:

Q   Please you state your full name for the record.

A   Joost Tjaden.

Q   Okay.  So the pronunciation is "Tjaden"?

A   Yes.

Q   Okay.  Mr. Tjaden, have you ever had your deposition taken before?

A   I have.

Q   You have.

In the United States?

A   In the United States.

Q   Okay.  When was the last time you had your deposition taken?

A   I don't recall.  It must be more than twenty years ago.

**5**

Q   Okay.  Well, then, I'm going to give you a short refresher course on the deposition rules.

Your testimony is being taken under oath, so it's very important for you to tell the truth just as you would while testifying in a courtroom.  Do you understand?

A   Yeah.

Q   And it's very important that when I ask you questions, you respond to me with words, rather than with shakes of the head or things like "Uh-huh" or "Uh-uh".  Is that okay?

A   Yes.

Q   Okay.  And in addition to that, it is extremely important, as Mr. Gardner may have told you, that we not speak over each other.  So I'd ask you that you wait until I'm done with my questions before responding, and I'll try to do the same with respect to your answers.  Okay?

A   That's okay, yes.

Q   Okay.  And from time to time --

THE WITNESS:  Can I borrow a piece of your paper?

MR. SMITH:  Yeah.

BY MR. HADDAD:

Q   From time to time I may ask you a question that

6

1  you don't understand. And if you do not understand, please
2  let me know; and I'll try to rephrase the question or
3  clarify. Okay?
4      A  I will.
5      Q  And, finally, if you need to take a break, just
6  let me know; and I'll try to find a convenient time for us
7  to break.
8      A  Thank you.
9      Q  Okay. Now, what, if anything, did you do to
10 prepare for your deposition today?
11     A  I read some of the documents.
12     Q  Do you recall any specific documents that you
13 reviewed?
14     A  I reviewed the -- the FPEP partnership agreement,
15 the Fidelio partnership agreement, Buvermo bylaws, the --
16 what do you call it? -- the letter that was sent to
17 Jonathan Morris --
18     Q  The offer --
19     A  -- his employment agreement.
20     Q  The offer letter?
21     A  Yeah, right.
22        And a memorandum from John Gardner stating his

7

1  future role.
2        That's as far as I can remember.
3      Q  Okay.
4      A  Oh. And there were two other documents that
5  related to the conversation we had at dinner at the Four
6  Seasons, one put together by Andre van Rhee and the other
7  one put together by John Gardner.
8      Q  Okay. All along during this case, I've been
9  calling you "Mr. Tjaden"; so from time to time I may refer
10 to you as that. And I apologize for that, but it's just
11 sort of how I've come to know you. So please forgive me in
12 advance.
13        Did you discuss your deposition with anybody
14 prior to today?
15     A  With (indicating).
16        MR. SMITH: You can disclose the fact that you've
17 talked to me, but just don't disclose the substance.
18        BY MR. HADDAD:
19     Q  Okay. You met with counsel?
20     A  Yes.
21     Q  You met with Marc Smith?
22     A  Yes.

8

1      Q  When did you meet with Mr. Smith?
2      A  Yesterday afternoon.
3      Q  Okay. Now, you attended a meeting today;
4  correct?
5      A  Yes --
6      Q  And what meeting --
7      A  -- that's correct.
8      Q  -- was that?
9      A  It was the partnership, Fidelio partnership
10 meeting.
11     Q  Okay. And where did that take place?
12     A  At the offices of Buvermo, Buvermo Properties.
13     Q  In Virginia?
14     A  In Virginia, yes.
15     Q  And who was present at that meeting?
16     A  Andre van Rhee, John Gardner, Laurey Millspaugh,
17 and Kara McCormick.
18     Q  And yourself?
19     A  And myself, yes. Besides myself.
20     Q  Okay. Do you have with you right now, sitting
21 here, any documents that you reviewed or executed during
22 this meeting?

9

1      A  No.
2      Q  Okay. Were you provided with a board package in
3  connection with this meeting?
4      A  Yes, I was.
5      Q  Okay. And where is that right now?
6      A  It's in my bag.
7      Q  And where is your bag?
8      A  In the -- in the car.
9      Q  Downstairs?
10     A  With my luggage, yes.
11     Q  Were any resolutions passed at today's meeting?
12     A  Yes, we passed resolutions.
13     Q  Okay. Do you have a recollection of what
14 resolutions were passed?
15     A  I do.
16     Q  What are they?
17     A  We passed -- we passed a resolution designating
18 certain interests in the FPEP to Laurey Millspaugh, and we
19 passed a resolution amending Article 303 of the FPEP -- of
20 the Fidelio partnership agreement.
21     Q  Were those resolutions in writing?
22     A  Yes, they were.

10

1  Q  Okay. And you signed them?
2  A  Yes, I did.
3  Q  And those are also with your board package
4  downstairs in your luggage?
5  A  Yes, they are.
6  Q  Were any other resolutions --
7  A  No, as a matter of fact, they're not. They're
8  not.
9  Q  They're not there?
10  A  They're at the office.
11  Q  They remained at Buvermo's --
12  A  I did not --
13  Q  -- office?
14  A  -- bring a copy. You're right.
15  MR. HADDAD: Okay. I'm going to use some
16  exhibits from John Gardner's deposition; I'm trying to save
17  some trees.
18  Do you have a copy of that set with you, Marc?
19  MR. SMITH: Yeah.
20  MR. HADDAD: Perfect.
21  BY MR. HADDAD:
22  Q  Mr. Tjaden, I am handing you what was marked as

11

1  Exhibit No. 4 to John Gardner's deposition. It's been
2  identified as Fidelio's partnership agreement, with the
3  first few pages being the First Amendment to the Fourth
4  Amended and Restated Partnership Agreement. Do you
5  recognize this document?
6  A  Yes, I do.
7  Q  Okay. And do you also recognize it as Fidelio's
8  partnership agreement?
9  A  Yes, I do.
10  Q  And when I say "Fidelio," I mean, of course,
11  Fidelio Properties.
12  A  (The witness moves head up and down.)
13  Q  Now, you're not an officer of Fidelio Properties;
14  is that correct?
15  A  I am not.
16  Q  Okay. And you're not an employee of Fidelio
17  Properties; correct?
18  A  That's correct.
19  Q  Okay. And you are not directly a partner of
20  Fidelio Properties?
21  A  That's correct.
22  Q  If you'll turn to the last page of this document,

12

1  it identifies five entities with partnership interests in
2  Fidelio. Do you see that?
3  A  I do.
4  Q  Okay. Now, do you know of any other partners of
5  Fidelio Properties?
6  A  I do not.
7  Q  And do you know whether these partnership
8  interests -- or partnership percentages, I should say, have
9  changed since the date of this schedule?
10  A  As far as I can tell, they have not.
11  Q  And could you describe for me the business of
12  Fidelio.
13  A  Sure. It makes real estate investments in
14  Washington, D.C., and surroundings.
15  Q  And is there a particular kind of real estate
16  investment, or is it just any investment dealing with real
17  estate?
18  A  Any investment dealing with real estate --
19  Q  Yeah.
20  A  -- except for companies that, in their turn, deal
21  in real estate. So we would not invest in, quoted,
22  companies that deal in real estate. It's direct

13

1  investments in real estates (sic).
2  Q  In properties and so forth?
3  A  In property; right.
4  Q  And is there a term, a time frame that you look
5  for in investments in terms of how long the investment is
6  to last?
7  A  It's not a criteria of the investment, but
8  typically they will last three to five years.
9  Q  Okay. And is there a range of the amount of
10  equity that Fidelio or one of its affiliates is willing to
11  invest in these types of investments?
12  A  There's no set range, but typically it's a --
13  it's a minority position.
14  Q  And can you tell me typically what the amount of
15  the investment is?
16  A  It ranges from 1 to 5 million; but there's,
17  again, no set criteria.
18  Q  Okay. Now, Buvermo is the operating company of
19  Fidelio partnerships; correct?
20  A  That's correct.
21  Q  And what does that mean?
22  A  I think what it would mean is that it's the -- in

14

1  the marketplace Fidelio is really not that well-known
2  because it's the investment entity. But the operating
3  company is known as being the investor, and it's our --
4  it's the face to the outside world.
5      Buvermo is also the company that -- where --
6  where a lot of the -- and the fee income that might be
7  generated is -- is generated through Buvermo; and expenses
8  are being paid through Buvermo; and they have to do with
9  operating the office, basically anything that has to do
10 with employees as well as maintaining an office in the
11 Washington area.
12     Q  Okay. So is it fair to say that Buvermo is
13 charged with the role of locating deals on behalf of
14 Fidelio?
15     A  That's correct.
16     Q  Okay. And once it locates a deal, Fidelio then
17 decides whether or not to invest; correct?
18     A  That's correct.
19     Q  And once Fidelio invests itself, either directly
20 or through an affiliated entity invests money into a
21 particular deal; correct?
22     A  Fidelio will, yes.

15

1      Q  Fidelio will; correct.
2      And then after the deal has been consummated, who
3  is responsible for sort of day-to-day follow-ups on the
4  deal?
5      A  Do you mean the monitoring of the investment?
6      Q  Of the investment.
7      A  That would be Buvermo.
8      Q  That would be Buvermo as well?
9      A  Yes. It's finding, monitoring, and preparing,
10 and divestiture, and decisions for the partners.
11     Q  Okay. Is there, to your knowledge, any written
12 agreement between Buvermo and Fidelio concerning what
13 Buvermo's role is?
14     A  Not to my knowledge.
15     Q  Now, Fidelio has a management committee; correct?
16     A  Yes.
17     Q  Okay. And that management committee consists of
18 Donelux, Inc., and Janivo Realty, Inc.; correct?
19     A  That's correct.
20     Q  And those are the only two entities that comprise
21 the management committee; correct?
22     A  That's correct.

16

1      Q  Now, you are the designated representative of
2  Janivo Realty; correct?
3      A  Correct.
4      Q  And Mr. van Rhee is the designated representative
5  of Donelux, Inc.; correct?
6      A  Right.
7      Q  Is it fair to say that you and Andre essentially
8  vote on decisions of the Fidelio management committee?
9      A  That's correct.
10     Q  Is there anyone else involved in making decisions
11 on behalf of the management committee?
12     A  No. I think -- it's Andre and myself.
13     Q  And if I --
14     A  Not the -- let me see. There may be certain
15 cases where I would check with my colleague in the
16 Netherlands, who's also a board member of Janivo Realty,
17 and where it's -- where I sort of prediscuss a decision
18 that I would make as the representative.
19     Q  Okay. And that would be Steven Vis?
20     A  Yes.
21     Q  Okay.
22     A  That's correct.

17

1      Q  And what's your understanding as to what
2  decisions you feel entitled to make on behalf of Janivo
3  without Mr. Vis's -- without consulting first with Mr. Vis?
4      A  Any decision that would -- would entail an
5  investment that's larger than $10 million for Janivo
6  Realty's piece. So we would then be talking about a $20
7  million equity deal, which we've never done.
8      Q  Okay.
9      A  Anything below that I have authority to deal with
10 on my own. But in a general sense I discuss what goes on
11 here with him because he's my partner and colleague.
12     Q  Of course.
13     That's your practice, at least?
14     A  Right.
15     Q  But you don't feel that you're compelled to do so
16 except for certain circumstances which you've just
17 described; correct?
18     A  Right.
19     Q  And the management committee of Fidelio is what
20 decides whether to invest in a deal initiated by Buvermo;
21 correct?
22     A  That's correct.

---

18

1      Amongst others; right.
2      Q    What do you mean "amongst" --
3      A    It makes -- it makes practically all the
4  decisions relating to --
5      Q    When you say --
6      A    -- to our investments, divestitures, hiring. It
7  makes -- the management committee makes all the actual
8  decisions.
9      Q    I see.
10      When you said "amongst others," you meant amongst
11  other decisions?
12      A    Yes.
13      Q    Okay.  And so included in that -- and I apologize
14  if that's among the things you just stated -- but included
15  in that the management committee decides whether to sell
16  interests in certain deals; correct?
17      A    That's correct.
18      Q    And in connection with doing so, it issues
19  resolutions -- resolutions authorizing, you know, either
20  the purchase or sale of investments; correct?
21      A    Correct.
22      MR. HADDAD:  Let me just show you --.

---

19

1      We can mark these as Exhibits 1 through 4.
2  (Discussion off the record.)
3      (The consents to action were marked Plaintiff's
4      Exhibit Nos. 1 through 4, respectively, for
5      identification.)
6  BY MR. HADDAD:
7      Q    Mr. Tjaden, if you'll just take a look at these
8  and just let me know after you've had an opportunity to
9  review them all.
10  (The witness reviewed documents.)
11      A    Uh-huh, I have read them.
12      Q    Okay.  Now, just taking --
13      A    I've reviewed them.
14      Q    Okay.  Taking a look at Exhibit No. 1 to your
15  deposition, this is a resolution of the shareholders of
16  Buvermo Properties Management, Inc., dated June 16th, 2006;
17  am I correct?
18      A    Yes.
19      Q    Okay.  And Fidelio Properties Management, Inc.,
20  is the managing partner of Fidelio Properties; correct?
21      A    Correct.
22      Q    Okay.  And its shareholders are Janivo Realty,

---

20

1  Inc., and Donelux, Inc.; correct?
2      A    I believe so.
3      Q    Okay.  You're not certain?
4      A    Well, it -- it states it's -- it's correct.
5      Q    Okay.  And this particular consent to action, if
6  you will, is to authorize Fidelio Properties Management,
7  Inc., to enter to into agreements to buy Spotswood Valley
8  Shopping Center; is that right?
9      A    Correct.
10      Q    And this is signed by you on the first page and
11  by Mr. van Rhee on the second page?
12      A    Correct.
13      Q    Okay.  And do you execute these consent to
14  actions (sic) for all properties which you decide to --
15  well, which you and Mr. van Rhee decide should be invested
16  in by Fidelio?
17      A    I do.
18      Q    Okay.  And if you'll turn to Exhibit No. 2, this
19  is a similar consent to action for Fidelio Properties
20  Management, Inc., which I will, if you don't mind, call
21  FPMI.  Is that okay with you?
22      A    (The witness moves head up and down.)

---

21

1      Q    "Yes"?
2      A    Yes, that's okay.
3      THE WITNESS:  Sorry.
4      BY MR. HADDAD:
5      Q    And this is the consent to action for the
6  purchase of Reston International Center; correct?
7      A    Correct.
8      Q    Okay.  That's also, by the way, dated June 16th,
9  2006; correct?
10      A    Correct.
11      Q    Okay.  To your knowledge, have any other consent
12  to actions to invest in any deal been issued by -- well,
13  been signed by you since June of '06?
14      A    I don't recall.
15      Q    Okay.
16      A    But I would think that we might have signed a few
17  today.
18      Q    Okay.  Do you know if you signed one today with
19  respect to the Reston International Convenience Center?
20      A    No, I don't think we did.
21      Q    Okay.  And do you know whether you signed one
22  today regarding Merchants Fund?

---

Case 1:06-cv-01131-HHK    Document 32-4    Filed 02/07/2007    Page 7 of 42

Morris vs. Buvermo, et al.                    Deposition of J. Tjaden 12/05/06

22

1    A   I don't recall.

2    Q   Okay. Other than consents to action to enter

3  into agreements to buy real estate, other than the one that

4  you think you may have been entered today, do you recall

5  any others since June of '06 that were signed by you?

6    A   I don't recall.

7    Q   If you'll turn to Exhibit No. 3, this appears to

8  be a consent to action of the shareholders of FPMI

9  authorizing FPMI to sell its interests in certain -- well,

10  in certain parcels; correct?

11    A   Correct.

12    Q   And included in that is the Twinbrook Metro Park

13  parcels; correct?

14    A   Correct.

15    Q   Okay. This was executed on the 9th of December

16  of 2005 by you and Mr. -- well, by you and Mr. van Rhee;

17  correct?

18    A   Correct.

19    Q   All right. Have you, to your knowledge, executed

20  any other such consents to action calling for the sale of

21  any property of Fidelio since December of '05?

22    A   I don't recall.

23

1    Q   Do you recall whether you might have done

2  anything like that today?

3    A   I believe we did not today.

4    Q   Okay. And, finally, if you'll just take a look

5  at Exhibit No. 4, this is a consent to action of the

6  shareholders of FPMI to participate in the purchase

7  agreement for 11720 Sunrise Valley Drive; is that right?

8    A   Correct.

9    Q   And that's one of the Sheraton Reston parcels;

10  correct?

11    A   That's correct.

12    Q   Okay. And this is signed also by you and

13  Mr. van Rhee; correct?

14    A   Correct.

15    Q   The management committee of Fidelio is what

16  decides whether to designate a property as an FPEP

17  property; correct?

18    A   That's correct.

19    Q   And that's something that you and Mr. van Rhee do

20  in your representative capacities; correct?

21    A   That's correct.

22    Q   And what is the criteria for designating a

24

1  property as an FPEP property?

2    A   In principle any property that would include

3  equity participation by certain officers of Buvermo would

4  be designated an FPEP property, if so choose. There are

5  no set criteria for that I know.

6    Q   Okay. What's the practice been?

7    A   The practice has been to include the CEO and one

8  other officer in -- and to participate in -- in the upside

9  and also in the investment proviso alongside Fidelio in all

10  properties. That's the practice.

11    Q   Okay. I'm not sure if you were referring to --

12  well, I'm not sure if you were referring to the promote

13  there or if you were referring to -- well, to the

14  designation there, whether you're referring to allowing

15  somebody to invest pro rata, making an equity contribution.

16        It sounded to me like you were referring to an

17  equity contribution. Is that correct?

18    A   Both.

19    Q   Both.

20        Okay. So is it fair to say that the practice of

21  Fidelio is to designate as FPEP properties all properties

22  that were originated by Buvermo on its behalf?

25

1    A   Yes.

2    Q   And when Fidelio decides to designate a property

3  as an FPEP property, it issues a resolution reflecting that

4  decision; correct?

5    A   That's correct.

6    Q   All right. Let's go through that briefly.

7        MR. HADDAD: Let's mark this as 5, please.

8        (The designation was marked Plaintiff's Exhibit

9        No. 5 for identification.)

10        MR. HADDAD: Mark this as 6, please.

11        (The designation was marked Plaintiff's Exhibit

12        No. 6 for identification.)

13        MR. HADDAD: Did I give you 7 yet? This is 7.

14        (The designation was marked Plaintiff's Exhibit

15        No. 7 for identification.)

16        BY MR. HADDAD:

17    Q   Mr. Tjaden, you have been handed what have been

18  marked as Exhibits 5 through 7 of your deposition. Just

19  please take a look at these documents and let me know when

20  you're ready to discuss them.

21    A   Thank you.

22  (The witness reviewed documents.)

Case 1:06-cv-01131-HHK    Document 32-4    Filed 02/07/2007    Page 8 of 42

Morris vs. Buvermo, et al.                          Deposition of J. Tjaden 12/05/06

26

1    A  I've taken a look.

2    Q  You've reviewed them?

3    A  I -- well, you asked me to take a look, which

4  I've done.

5    Q  Okay.

6    A  Reviewing really would mean --

7    Q  That's fine.  I don't think that's going to be

8  necessary --

9    A  -- that you want me to --

10    Q  -- but if it becomes necessary, you let me know;

11  and I'll surely allow you to review them.

12        These are the FPEP designations.  Well, they're

13  titled, "Designation of New FPEP Property," for Twinbrook

14  Metro Park, 11720 Sunrise Valley Drive, and Roland Clarke

15  option; correct?

16    A  Correct.

17    Q  And all three designations were executed by

18  Fidelio's property management committee; correct?

19    A  Correct.

20    Q  Let me ask you:  To your knowledge, have any

21  FPEP -- other FPEP designations been issued since

22  Mr. Morris's termination in March of '06?

27

1    A  Yes.

2    Q  Okay.  And that would be the designations that

3  were issued today; correct?

4    A  Correct.

5    Q  Okay.  And the designations -- the FPEP

6  designations that were issued today relate to both the --

7  relate to Spotswood?

8    A  Correct.

9    Q  Okay.  And also to Reston International Center?

10    A  Correct.

11    Q  Okay.  And any other properties?

12    A  (No response.)

13    Q  Let me rephrase that.

14        Were any other properties designated as FPEP

15  properties today?

16    A  I believe so.

17    Q  Okay.  And can you tell me which properties those

18  were?

19    A  I don't recall.  The problem is we signed --

20  we discuss these decisions materially, and then we -- we

21  are -- and there's a list.  I'm fully aware of what it is.

22  And then later on we sign the designation.  I sign as

28

1  managing director of Janivo many things where materially

2  they get prediscussed, it's approved, and I'm just signing

3  it.  So you almost sign without reading and reviewing very

4  carefully.  That's the practice, unfortunately, I have to

5  say.

6        So I am certain of Spotswood, I am certain of

7  Reston International, and I'm not of the others.

8    Q  Okay.  Do you recall whether Reston International

9  Convenience Center might have been one of the properties

10  designated as an FPEP property?

11    A  It might very well.  We tried -- I mean the

12  reason I'm saying that is that we try to designate, as we

13  usually do, all properties and investments that have been

14  made.  And -- and so I don't recall.

15    Q  Okay.  But to the extent any other properties

16  have been designated, it would have been done so through

17  some sort of writing; correct?

18    A  Correct.

19    Q  Signed by you and Mr. van Rhee; correct?

20    A  Correct.

21    Q  Okay.  And those would be among the documents

22  that were left at Buvermo's offices; correct?

29

1    A  Correct.

2    Q  Okay.  Now, you mentioned earlier Mr. Steven Vis?

3    A  Yes.

4    Q  He is a codirector, along with yourself, in

5  Janivo Realty, Inc.; correct?

6    A  Correct.

7    Q  And you two are the sole directors of Janivo

8  Realty, Inc.; correct?

9    A  Correct.

10    Q  And Janivo Holding BV is the sole shareholder of

11  Janivo Realty, Inc.; correct?

12    A  Correct.

13    Q  Okay.  And do you hold any position with that

14  company, Janivo Holding BV?

15    A  I am a managing director; an officer and managing

16  director is what you would say.

17    Q  And I believe we've already established that you

18  are the designated representative for Janivo in connection

19  with Fidelio matters.  Correct?

20    A  That's correct.

21    Q  And because Janivo is a shareholder of FPMI as

22  well, you are also the designated representative of Janivo

Case 1:06-cv-01131-HHK    Document 32-4    Filed 02/07/2007    Page 9 of 42

Morris vs. Buvermo, et al.                    Deposition of J. Tjaden 12/05/06

30

1  in connection with all matters dealing with FPMI; correct?
2      A   Correct.
3      Q   Who is Robert Specken?
4      A   He was my predecessor, and he has since left the
5  company.
6      Q   Okay.  So he preceded you as the designated
7  representative for Janivo; correct?
8      A   That's correct.
9      Q   All right.  And when did you take over that role
10 from him?
11     A   I don't recall exactly, but probably in 1994.
12     Q   Okay.  Now, Mr. Gardner is the president and
13 secretary of Janivo; is that correct?
14     A   Correct.
15     Q   And other than being a partner in Fidelio, does
16 Janivo have any other business?
17     A   No.
18     Q   We've talked already about FPMI, Fidelio
19 Properties Management, Inc.?
20     A   (The witness moves head up and down.)
21     Q   And I believe we've established that that's the
22 managing partner of Fidelio.  Correct?

31

1      A   Correct.
2      Q   And we've also established that the shareholders
3  are Janivo and Donelux; correct?
4      A   Correct.
5      Q   All right.  And the president, chief executive
6  officer, and secretary of FPMI is John Gardner; correct?
7      A   Correct.
8      Q   And does FPMI have any business independent of
9  Fidelio Properties?
10     A   No.
11     Q   Okay.  So its sole business is to serve as the
12 management agent of Fidelio Properties; correct?
13     A   Correct.
14     Q   Incidentally, for investments that Fidelio enters
15 into, where does it receive its funding?
16     A   You mean where in the United States or --?
17     Q   Well, I mean who funds Fidelio's investments.
18     A   Janivo Realty and -- and the -- the parties,
19 Donelux and -- I don't know exactly how it's been
20 structured on the Donelux side.
21     Q   Okay.  Donelux or Orvan; correct?
22     A   Yeah.

32

1      Q   Now, you are not an officer of Buvermo
2  Properties, Inc.; correct?
3      A   Correct.
4      Q   And for simplicity's sake I will refer to it as
5  "Buvermo"; okay?
6      A   (The witness moves head up and down.)
7      Q   And you're also not a director of Buvermo;
8  correct?
9      A   Correct.
10     Q   And you are not yourself a shareholder of
11 Buvermo; correct?
12     A   Correct.
13     Q   And nor are you an employee of Buvermo?
14     A   Correct.
15     Q   Okay.  Do you know who Buvermo's current officers
16 are?
17     A   Laurey Millspaugh and Kara McCormick.
18     Q   Does Buvermo have any other employees, other than
19 those two individuals?
20     A   No -- yes.  John Gardner.
21     Q   What position does Mr. Millspaugh hold at
22 Buvermo?

33

1      A   He's the president.
2      Q   And what about Ms. McCormick?
3      A   She's vice president.
4      Q   And what about Mr. Gardner?
5      A   He's an employee.
6      Q   Now, Buvermo has no directors at all; correct?
7      A   That's correct.
8      Q   And its business is run by its shareholders;
9  correct?
10     A   Correct.
11     Q   And what's your understanding as to who the
12 shareholders of Buvermo are?
13     A   My understanding is that at this moment, 83
14 percent is held by Fidelio Properties and 17 percent by
15 John Gardner -- no.  Wait.  87 percent and 12 is my
16 understanding, 12 Mr. Gardner and 87 percent -- or it's --
17 13 is -- I thought it was 88-12, or perhaps it's 83-17.
18 Mr. Gardner has a minority position.
19     Q   Okay.  So I take it, then, you are aware that at
20 some point in time -- well, at some point in time Fidelio
21 was the sole shareholder; correct?
22     A   Correct.

34

1    Q   Okay. And at some point in time Mr. Gardner was
2  authorized to transfer stock to himself and Mr. Bonacci;
3  correct?
4    A   Correct.
5    Q   And Mr. Bonacci has since left the company;
6  correct?
7    A   Correct.
8    Q   And presumably his shares were purchased back?
9    A   I would presume. I don't know.
10   Q   In any event, both Mr. Gardner and Mr. Bonacci
11  have authorized Fidelio to make --
12   A   All decisions.
13   Q   -- to make all decisions.
14      They have, in effect, provided Fidelio with a
15  proxy?
16   A   Correct.
17   Q   Okay. And is it fair to say that both you and
18  Mr. van Rhee as designated representatives make those
19  decisions on behalf of Fidelio dealing with Buvermo's
20  business?
21   A   Correct.
22   Q   Let me show you what were previously marked as

35

1  Exhibits 2 and 3 --.
2      MR. HADDAD: Hold on for a second. Sorry. Bear
3  with me for one second here. Let me just make sure.
4      BY MR. HADDAD:
5    Q   -- 2 and 3 of Mr. Gardner's deposition. And I'll
6  ask you to let me know when you're ready to discuss those
7  briefly.
8  (The witness reviewed documents.)
9    A   (Indicating).
10   Q   You ready?
11   A   Yeah.
12   Q   Okay. Now, these are consents to action of
13  shareholders of Buvermo Properties, Inc.; correct?
14   A   Correct.
15   Q   Okay. And one of these is dated March --
16  sorry -- May 20th, 2005; that would be Exhibit No. 2.
17  Exhibit No. 3 is one dated June 16th, 2006. Correct?
18   A   Correct.
19   Q   Okay. And both of these designate Mr. Gardner --
20  or sorry -- appoint Mr. Gardner as the president, the CEO,
21  and the secretary of Buvermo Properties, Inc.; correct?
22   A   Correct.

36

1    Q   And do you recall ever reviewing these prior to
2  today?
3    A   I believe I've -- I believe we've certainly
4  discussed it. I'm not sure if I reviewed it.
5    Q   Okay. When you say "we," who are you referring
6  to?
7    A   Andre van Rhee and myself.
8    Q   Okay. And do you have any specific recollections
9  of discussing these consents to action?
10   A   My sense is that Jonathan Morris was the
11  president and CEO of Buvermo prior to that date. And when
12  we -- he was terminated, John Gardner had to be put back
13  into that position.
14   Q   Okay. And that's why you believe the consent to
15  action dated June 16th, 2006, was issued?
16   A   I would think so, yes. I don't -- yes, yeah.
17   Q   Do you recall providing John Gardner with
18  authorization to execute either one of these two consents
19  to action?
20   A   I do not. But I cannot -- you know, I'm sure
21  that he -- that it was discussed. I just don't recall.
22   Q   Okay. Is it fair to say that ultimately the

37

1  decision of whether to hire or fire the president of
2  Buvermo rests with you and Mr. van Rhee?
3    A   Absolutely.
4    Q   Do you recall ever seeing any consent to action
5  such as this designating Mr. Morris as the president of
6  Buvermo?
7    A   I do not.
8    Q   Okay. Have you ever seen a consent to action, or
9  any other document for that matter, appointing
10  Mr. Millspaugh as president of Buvermo?
11   A   We resolved it today, that he should be
12  appointed, as I said; and perhaps it was signed today. But
13  as management committee, we resolved today that he should
14  be nominated to be the president, just as much as I do
15  recall resolving -- you know, making the decision that --
16  that Jonathan be the president and CEO of Buvermo.
17   Q   In fact, you and Mr. van Rhee agreed at a board
18  meeting that Mr. Morris was the successor to Mr. Gardner as
19  president; correct?
20   A   Yes.
21   Q   And that was in August 2005; correct?
22   A   Around that time, yes.

Case 1:06-cv-01131-HHK    Document 32-4    Filed 02/07/2007    Page 11 of 42

Morris vs. Buvermo, et al.                    Deposition of J. Tjaden 12/05/06

38

1    Q   Okay. Do you recall whether today you signed
2    anything, any paper identifying Mr. Millspaugh as the
3    president; or was it just sort of an oral resolution?
4    A   No; it was a resolution that was minuted.
5    Q   Okay. Who was there -- was anybody there writing
6    notes?
7    A   Yes, Mr. Millspaugh was taking notes. And we
8    asked him to specifically, as part of the resolution, state
9    the resolution from the management committee where we
10   thanked Mr. Gardner for his prior services.
11   Q   Okay. Do you believe that anything more needs to
12   be done to confirm Mr. Millspaugh as the president of the
13   company?
14   A   Well, obviously, he needs to be formally
15   appointed through this consent.
16        And we have always left as a matter of principle
17   and as a matter of business undertaking the administrative
18   material effects of the corporation to those in charge.
19        As far as I was concerned, you know, when
20   Jonathan joined, he should -- the resolution was -- I mean
21   it was taken that he be the president and CEO of Buvermo.
22   And as far as I'm concerned, that was paper afterwards. It

39

1    was not something that we think we should be reviewing
2    or -- or the wording of it. I'm sure we might -- I think
3    we might have, but it was up to and it is up to -- to the
4    people involved to make sure the paper trail is -- works
5    correctly.
6    Q   Okay. Who, in your opinion, is responsible for
7    that?
8    A   The president of Buvermo.
9    Q   Okay. You've indicated that Mr. Millspaugh must
10   be formally appointed. What do you mean by that?
11   A   Well, we have sent him a letter, just as we did
12   Mr. Morris, in which we said, "You're going to be the
13   president and CEO." And then we assumed that he will take
14   care of whatever resolutions need to be signed to implement
15   that decision.
16   Q   I see.
17        So in your --
18   A   We don't -- we don't get involved in that manner
19   and detail in the day-to-day operation, including making
20   sure that -- that the book -- you know, that
21   the resolutions are in order. We take a decision in
22   principle, and then that's up to the company to make sure

40

1    they're implemented.
2    Q   I see.
3        Do you recall ever discussing with Mr. Morris the
4    need for him to prepare and execute a consent to action
5    designating himself as president of Buvermo?
6    A   Well, he was not -- this, again, I do not.
7        And let me point out that this, again, is --
8    Mr. Gardner is the president of Fidelio Properties, FPMI,
9    and as such also the general partner of Fidelio; that
10   position he was going to continue to retain.
11       And the interpretation of -- let's take
12   Mr. Millspaugh, who was appointed as the president of
13   Buvermo. It's up to him to make sure that Mr. Gardner
14   signs whatever resolutions need to be signed to appoint him
15   to be the president.
16       I'm not going to get involved in the management,
17   in my position, to figure that out. I would assume that if
18   Mr. Millspaugh is not successful in convincing Mr. Gardner
19   to sign these consents, then he would come to us, because
20   I'm not going to go and ask him, you know, "Has this all
21   happened?"
22       We make a decision in principle; let's record it.

41

1    And then it's up to the company to implement that decision.
2    Q   Uh-huh.
3        So as far as both Mr. Morris and Mr. Millspaugh
4    are concerned -- well, as far as Mr. Morris -- wait.
5        As far as Mr. Morris and Mr. Millspaugh are
6    concerned, you felt that you as designated representative
7    had done all that was necessary for you to do in order to
8    effectuate the transition of them becoming president of
9    Buvermo; correct?
10   A   Absolutely.
11   Q   Okay. And all that was left was for
12   John Gardner, as the president of FPMI, to prepare some
13   sort of written resolution confirming that change?
14   A   I -- without wanting to be disrespectful, I think
15   the way I interpret it is that I would have expected
16   Mr. Morris to prepare the resolutions, hand them to
17   Mr. Gardner, and say, "Would you please sign this,
18   which will" -- "and that will effect my appointment"; and
19   not for Mr. Gardner to go prepare it and carry to it
20   Mr. Morris. I mean that's the way I would have thought
21   that they would have worked it out.
22       I would expect Mr. Millspaugh to prepare these

Case 1:06-cv-01131-HHK    Document 32-4    Filed 02/07/2007    Page 12 of 42

Morris vs. Buvermo, et al.                    Deposition of J. Tjaden 12/05/06

42

1 resolutions in which he's appointed --
2    Q    Uh-huh.
3    A    -- the president and CEO. And then if
4 Mr. Gardner doesn't sign them, then I would expect
5 Mr. Millspaugh to pick up the phone and call Andre or
6 myself.
7    Q    I see.
8       Do you know what the practice has been at Buvermo
9 in terms of who in the past has drafted these consents to
10 action on its behalf?
11    A    They were the responsibility of Mr. Gardner --
12    Q    Okay.
13    A    -- before he became -- and once Mr. Morris became
14 the president, whether he was -- indeed, the resolution was
15 signed, it was up -- the interpretation -- I have very
16 strong feelings about it. The interpretation --
17 his nomination -- the interpretation of his nomination, to
18 me, means that he was from that point on taking care of all
19 administrative matters. Whatever resolutions needed to be
20 signed, he had to prepare them for signatures for whoever
21 needed to sign them.
22    Q    Why -- I'm under the impression that you think

43

1 that this is a necessary step to Mr. Morris becoming
2 president or Mr. Millspaugh --
3    A    I would think --
4    Q    -- becoming president?
5    A    I would think so, yeah.
6    Q    Why do you think that?
7    A    I think that's a good question. Let me tell you
8 why I think that's the way.
9       In the Netherlands you are -- as officers you are
10 registered in a central database which is public. And now
11 that you say this, I think this goes -- it's just normal
12 corporate governance that would make me think that this
13 needs to be signed to confirm resolutions taken at a -- at
14 a different level.
15    Q    Do you know what the Fidelio articles of
16 incorporation or bylaws say about that?
17       MR. SMITH: I'm sorry. The Fidelio bylaws?
18       MR. HADDAD: Thank you.
19       BY MR. HADDAD:
20    Q    What the Buvermo --
21       THE WITNESS: The Buvermo bylaws.
22    Q    -- the Buvermo bylaws say about that?

44

1    A    That the president, CEO is appointed by the -- by
2 FPMI.
3    Q    Okay.
4    A    By its --
5    Q    By the shareholders?
6    A    By the shareholders; right.
7    Q    Who's Fidelio, not FPMI; correct?
8    A    It is -- you're right.
9    Q    Okay. And Mr. Gardner to a lesser extent.
10       But as you sit here today, you don't recall any
11 discussions with Mr. Morris about him needing to go through
12 this process; correct?
13    A    No.
14       Nor do I recall, frankly, that he mentioned that
15 he wasn't getting any signatures done. We just assumed --
16 I just assumed. I'm not sure; you have to ask Mr. van Rhee
17 himself. I just assumed once that resolution was taken by
18 us, it was paper -- it was plumbing thereafter and just
19 paperwork.
20    Q    Okay. Now, you have no interest in or position
21 with Donelux; correct?
22    A    Correct.

45

1    Q    Nor do you have any interest in or position with
2 Orvan?
3    A    Correct.
4    Q    And the same applies to VADO; correct?
5    A    Correct.
6    Q    FPEP -- you're not an officer in FPEP; correct?
7    A    Correct.
8    Q    And you're not a member of FPEP; correct?
9    A    Correct.
10    Q    And you're not an employee of FPEP; correct?
11    A    Correct.
12    Q    Okay. Do you know who the current members of
13 FPEP are?
14    A    The current members of FPEP are Fidelio -- no.
15 The current members of FPEP -- I apologize -- are -- in
16 addition, are Mr. Gardner and Mr. Millspaugh. And VBM --
17    Q    You think VBM may be --
18    A    Yes. I --
19    Q    -- but you're not sure?
20    A    Maybe VBM, but not -- no, not anymore. They
21 were. But I mean were they --
22    Q    You are not certain?

Case 1:06-cv-01131-HHK    Document 32-4    Filed 02/07/2007    Page 13 of 42

Morris vs. Buvermo, et al.                              Deposition of J. Tjaden 12/05/06

46

1    A   I'm not certain, no.

2    Q   All right. So you've identified Gardner and

3  Millspaugh and potentially VBM.

4        Anybody else that you know of?

5    A   No.

6    Q   Have you ever heard of a company called FP

7  Investment, Inc.?

8    A   Oh, yes. They have a very small interest.

9    Q   Incidentally, when was Mr. Millspaugh made -- if

10  you know, when was Mr. Millspaugh made a member of FPEP?

11   A   As we resolved today, that he would become a

12  member of FPEP.

13   Q   Who is "we" resolved?

14   A   The management committee.

15   Q   Can you explain to me why the management

16  committee of Fidelio would have any role in that?

17   A   We -- at our sole discretion, we -- we determine

18  who is going to be -- who will be a member of FPEP.

19   Q   Even though Fidelio's not a member of FPEP?

20   A   Correct.

21   Q   And neither are you or Mr. van Rhee; correct?

22   A   Correct.

47

1    Q   Do you hold any position with FP Investment?

2    A   No.

3    Q   Either directly or indirectly?

4    A   No.

5    Q   Do you know who the shareholders of FP

6  Investments are?

7    A   Fidelio, I believe, is the shareholder of FP

8  Investments.

9    Q   I'm going to hand you what's previously been

10  marked as Exhibit No. 7 to Mr. Gardner's deposition. I ask

11  that you take a look at this document and just let me know

12  if you recognize it.

13  (The witness reviewed document.)

14   A   I do.

15       MR. HADDAD: Can we go off the record real quick.

16  (Off the record.)

17       BY MR. HADDAD:

18   Q   Okay. Mr. Tjaden, I believe you indicated you're

19  ready to discuss this.

20   A   Yeah.

21   Q   Okay. Now, Exhibit No. 7 to Mr. Gardner's

22  deposition is -- well, it's a document entitled, "FP

48

1  Executive Partners, LP, Consent to Conversion". And

2  attached to that is the operating agreement of FPEP;

3  correct?

4    A   Correct.

5    Q   Okay. And, to your knowledge, has this FPEP

6  operating agreement been amended at any time?

7    A   Not to my knowledge.

8    Q   And although you resolved today that

9  Mr. Millspaugh become a member of FPEP, you don't recall

10  signing any or reviewing any revised FPEP agreement;

11  correct?

12   A   Well, becoming a member doesn't necessarily

13  mean -- mean that we have to amend the agreement, does it?

14   Q   Well, let me direct you to page 6 of this

15  agreement. And if you'll take a look at the top, it

16  appears to identify the various members and

17  membership percentages of the members. Do you see that?

18   A   Yeah.

19   Q   Okay. Does that in any way change your opinion

20  about whether or not this needs to be amended?

21   A   It does.

22   Q   Okay. But, to your knowledge, it hasn't been

49

1  done?

2    A   No. It was resolved to make those changes that

3  are necessary to admit Mr. Millspaugh as a limited partner

4  and --

5    Q   And do you --

6    A   -- other changes necessary because Mr. Bonacci,

7  to my knowledge, of VBM -- but, yeah, yeah, to make those

8  changes necessary to reflect the --

9    Q   The current --. Sorry.

10   A   Yeah, the current -- the current -- that

11  Mr. Millspaugh be admitted as a partner.

12   Q   Okay. So a resolution was passed today to make

13  whatever amendments are necessary to reflect the current

14  understanding as to who the members are in FPEP; correct?

15   A   Correct.

16   Q   And that would include Mr. Millspaugh; correct?

17   A   Correct.

18   Q   Mr. Gardner?

19   A   Correct.

20   Q   And Mr. -- I'm sorry -- and a small interest in

21  FP Investments?

22   A   Correct.

50

1    Q   And perhaps VBM, but you're not sure?

2    A   I'm not sure.

3    Q   Okay.  And do you know why -- well, do you know

4    whether any such resolution was passed during Mr. Morris's

5    employment with Buvermo to make him a member of FPEP?

6    A   I believe it was not.

7    Q   Okay.  Do you know why one was not?

8    A   Because -- I don't believe why it was not, and

9    I don't know why it was not.  If not, it should have.  It

10   certainly was the intent.

11   Q   Okay.

12   A   And, again, as far as I'm concerned, that's all

13   following a resolution by the management committee that he

14   should participate, as is stated in his letter -- in a

15   letter written to him.

16       And for the rest, it is up to the management, in

17   that case Mr. Morris, to just implement these things and

18   get them signed, amended, whatever; and then, if necessary,

19   get our -- get us to review it if he feels uncertain that

20   the thing's not been done right.

21   Q   Okay.  So just to make sure I understand you

22   correctly, do you recall there ever being a resolution that

51

1    he should participate in FPEP, "he" being Mr. Morris?

2    A   We agreed that he would.  His letter, as far as I

3    recall, that was sent to him indicated that he would

4    receive a -- if I may call it, a promoted interest in

5    certain properties and a promoted interest in certain

6    existing properties and a promoted interest in new

7    properties.  But he never was admitted as a -- as a

8    partner.

9    Q   Okay.  And my question to you is simply:  Do you

10   know why he was not admitted as a partner?

11   A   I -- I believe it will have to -- it probably had

12   to do with him neglecting to do the paperwork.

13   Q   Okay.  That's your belief.

14       What did you base that on?

15   A   Well, it didn't happen, did it?

16   Q   Okay.  So you felt it was his responsibility to

17   make these amendments?

18   A   Absolutely.

19   Q   Okay.  Did you ever have any discussions with

20   Mr. Morris about that?

21   A   Only very much in the end.  He -- when -- we had

22   a meeting -- we had a dinner meeting in March of this year,

52

1    and during that meeting we discussed desig- --- designating

2    him, and we discussed changing the provisions of the

3    article.  I think it's Article 303.  I'll look that up.

4        MR. SMITH:  What exhibit number is this?  Are you

5    referring to Gardner Exhibit 4?

6        THE WITNESS:  Yeah.

7    A   We discussed simplifying Article 303 of Exhibit

8    No. 4, and that had to do with designating a portion of the

9    promote to him.  And at that -- at that time it became very

10   clear to me that he hadn't even read any of the documents.

11       BY MR. HADDAD:

12   Q   So is that the first time, then, you recall

13   discussing with Mr. Morris your understanding that he was

14   responsible for effectuating these changes?

15   A   Very specifically, yes; although, we

16   had previously -- and when I say "we," it was both

17   Mr. van Rhee and myself -- mentioned to him that any of

18   these administrative -- as I would see them, administrative

19   matters were his responsibility as well; and that it was up

20   to him to bring those things to our attention if he

21   couldn't get them done.

22   Q   And so you recall specifically identifying the --

53

1    A   There were other -- other administrative matters

2    that he didn't really get done, and I think to a certain

3    extent, he believes that that was our responsibility and

4    not his.

5    Q   When do you recall having that discussion with

6    Mr. Morris?

7    A   In March of this year was the last time we had

8    it.  We had it also in August of the prior year.  And I

9    think I might have had similar discussions with him between

10   August and March.

11   Q   And do you recall -- well, tell me as best as you

12   can what you recall specifically saying to Mr. Morris

13   during these meetings regarding --

14   A   Well, it --

15   Q   -- handling these administrative matters.

16   A   That it was a matter of the president of Buvermo

17   to make sure that the administrative matters were taken

18   care of in a -- properly; and that if they weren't, that

19   that was not something that he should look to us or others

20   to do; but he should either do them himself or initiate

21   that work; and that he didn't.

22       And he kept -- Mr. Morris kept having a different

Morris vs. Buvermo, et al.                                    Deposition of J. Tjaden 12/05/06

---

54

1 opinion about that. And although he didn't -- I mean he
2 would usually acknowledge that, yes, indeed, that he
3 understood what we meant with that; but then it wouldn't
4 get done.
5        And it was obvious to me at the -- at the March
6 dinner that he hadn't really read this material; although,
7 that would -- all of these documents are -- were in his
8 office.
9    Q  Uh-huh.
10       Do you have any understanding as to what
11 Mr. Morris and Mr. Gardner had discussed regarding the
12 amendment of the FPEP agreement?
13       MR. SMITH: I'm going to object. There's no
14 foundation about amending the FPEP agreement, so I'm going
15 to object to the form of the question.
16       BY MR. HADDAD:
17    Q  You can answer, if you understand what I'm
18 asking.
19    A  My counsel here objects; then I don't think I'm
20 going to answer that question.
21    Q  Well, to the extent that you understand my
22 question, you have an obligation to answer it.

---

55

1        MR. SMITH: Could you repeat it.
2        MR. HADDAD: Sure.
3        BY MR. HADDAD:
4    Q  My question to you is: Do you have any
5 understanding as to what the agreement was between
6 Mr. Morris and Mr. Gardner regarding any amendment to the
7 FPEP operating agreement?
8    A  I do not.
9    Q  When you had these discussions regarding
10 administrative matters with Mr. Morris, you indicated that
11 you may have had such a discussion with him in August
12 of '05; correct?
13    A  Yeah.
14    Q  And what specific administrative matters were you
15 referring to?
16    A  Well, very simple matters: Preparing
17 resolutions; making sure that they were correct,
18 resolutions relating to his appointment as president,
19 resolutions relating to his being designated a portion of
20 the promote, his right to participate in any new -- new
21 transactions -- although, those occur at the time when the
22 investment is being made -- but also his admittance to --

---

56

1 his being admitted to -- to the partnership.
2        And all of those matters in general terms, I --
3 he knew that -- that I felt strongly that he should just
4 take care of them and we'd hear about it if it wouldn't
5 happen.
6    Q  And so you have a specific recollection, sitting
7 here today, of mentioning these specific administrative
8 matters to him back in August of '05?
9    A  I remember his -- his doubting whether -- whether
10 he should -- whether he was responsible as president of
11 Buvermo to take the lead in getting those things done
12 administratively that should get done in order for Buvermo
13 to be run smoothly.
14       He -- and this was more a general conversation.
15 He thought the whole setup of the way decisions were being
16 made was bizarre. He told me so several times. I think it
17 was in August in France that he did again. And so I said,
18 "Well, if you think so -- you're the guy who runs the
19 operation -- why don't you come up with proposals that tell
20 us?" And we felt that -- but he never really followed up
21 on those suggestions.
22    Q  Okay.

---

57

1    A  He would have a tendency to complain and then not
2 take the lead.
3    Q  So is it fair to say, then, that what you recall
4 is having general discussions with him about his
5 responsibility to handle administrative matters. Correct?
6    A  Yeah. In addition to finding opportunities,
7 et cetera.
8    Q  Correct.
9        But not specifically telling him, "You are
10 responsible for amending the operating agreement"; correct?
11    A  No, no. You're -- absolutely, that's correct.
12    Q  So you --
13       MR. SMITH: I'm going to object to the form.
14       BY MR. HADDAD:
15    Q  I'm sorry --
16    A  I did not specifically take the agreement and
17 say, "Well, here is what you should amend." That's -- to
18 me, when you're an officer of -- that's part of the
19 fiduciary role that Mr. Morris was supposed to have, is
20 that -- it was to make sure that our paperwork was in
21 order.
22    Q  Okay. And I appreciate --

---

Case 1:06-cv-01131-HHK    Document 32-4    Filed 02/07/2007    Page 16 of 42

Morris vs. Buvermo, et al.                    Deposition of J. Tjaden 12/05/06

58

1    A    At least, in a general sense.

2    Q    Okay.  And I --

3    A    And I never took an agreement and -- and went

4    through it and said, "All right.  Here's where you change

5    it."  I never directed him in that manner.

6    Q    Fair enough.

7        I think you actually misunderstood me.  I wasn't

8    asking you whether or not you spoke with Mr. Morris about

9    what specific provisions needed to be changed.  I'm asking

10   you whether you recall specifically telling Mr. Morris that

11   it was his responsibility to see to it that the FPEP

12   agreement was amended.

13   A    No.  The specific --

14       MR. SMITH:  Object to the form.

15   A    Let me tell you.  The specific responsibility

16   that he had was to -- to take the letter that we had given

17   him and that he had signed where it said specifically that

18   FPEP agreement was the basis of our dealing with him --

19   so -- but that -- and when -- that the agreement should be

20   amended in such a manner that he would be admitted.

21       So whatever administrative resolution was

22   necessary for him to be admitted, it wasn't -- it did not

59

1    specifically -- we had never discussed any specifics of the

2    agreement itself because, other than admitting him, there

3    was no -- and changing one name for the other and making

4    sure the percentages were correct, there was nothing to be

5    changed.

6        BY MR. HADDAD:

7    Q    Uh-huh.

8    A    If -- that is in -- in that sense that amendment,

9    yes.

10       Any other amendments, we would not have changed

11   the FPEP agreement.  We want -- that's -- and he -- he --

12   that was not part of the understanding.

13   Q    Okay.

14   A    The understanding was that the existing agreement

15   would rule his -- the agreement with him, the existing FPEP

16   agreement.

17   Q    Okay.  And just to be clear, Mr. Tjaden, I

18   appreciate your testimony.  But, frankly, I'm not very

19   interested right now in what your understanding was or what

20   you believe Mr. Morris's understanding was.

21       I'm interested in specific discussions you had

22   with Mr. Morris.  And what I would like to know is: Do you

60

1    recall having a specific discussion with Mr. Morris in

2    which you advised him that it was part of his

3    responsibilities to see to it that he was somehow added to

4    the FPEP operating agreement?

5    A    Not -- not that specifically, no.

6    Q    Okay.  And, in fact, he was not a member of FPEP

7    at the time; correct?

8    A    That's correct.

9    Q    Okay.  And he himself would not have had

10   authority at the time to amend the agreement; correct?

11   A    That's correct.

12   Q    Now, at some point there came a time where you

13   and Mr. van Rhee approached Mr. Gardner about his retiring

14   from Buvermo; correct?

15   A    That's correct.

16   Q    Okay.  And when was that?

17   A    My recollection is that was at the end of 2004,

18   early 2005.

19   Q    And was this a discussion that you and

20   Mr. van Rhee had together with Mr. Gardner?

21   A    There was Mr. Zachariasse involved in that

22   discussion as well.

61

1    Q    Was it in person?

2    A    I don't recall.

3    Q    But it was all in one -- you were all

4    participants in this one discussion?

5    A    I don't recall.  There must have been several

6    discussions.  It was initiated by Mr. Zachariasse, who told

7    us of his decision to retire as a senior advisor.

8    Q    Okay.

9    A    And that prompted a discussion with Mr. Gardner

10   about succession in general of Mr. Zachariasse and it was

11   logical that he would step in that role.  And that was

12   something that we felt was appropriate.  And it -- I don't

13   recall a specific conversation.  We must have had several

14   over several months.

15   Q    What was Mr. Zachariasse's role at the time in

16   terms of --

17   A    It was senior --

18   Q    -- senior advisor?

19   A    -- senior advisor to the partnership.

20   Q    Uh-huh.

21       What did he do?

22   A    He and Mr. Gardner would discuss specific

62

1   investment proposals; and they would be discussed with the
2   partners, meaning Mr. van Rhee and myself, once
3   Mr. Zachariasse and Mr. Gardner agreed.
4      Q   Okay.  So as it existed back then, in 2004,
5   Mr. Gardner as president of Buvermo would seek deals on
6   behalf of Fidelio; correct?
7      A   Correct.
8      Q   And before he presented them to the partners of
9   Fidelio, yourself -- well, the partners who were
10  represented by yourself and Mr. van Rhee, he would discuss
11  those investments with Mr. Zachariasse?
12     A   Correct.
13     Q   And Mr. Zachariasse in his role as advisor would
14  either approve of or disapprove of or just perhaps even
15  consult with Mr. Gardner regarding the investment?
16     A   Yeah -- "consult," I don't know --
17     Q   Okay.  Was it your understanding that
18  Mr. Zachariasse had veto authority as to whether or not
19  something would be presented to the partners?
20     A   He did not have veto authority, no.
21     Q   Okay.  Now --
22     A   But in effect, you know, this is a -- very much a

63

1   European model of making decisions.  We wanted consensus
2   between them.
3      Q   Between those two individuals?
4      A   Yes.
5      Q   Okay.
6      A   He had no formal veto rights.
7      Q   I see.
8          Mr. Zachariasse himself didn't seek out any
9   deals; correct?
10     A   I think there may have been one or two
11  transactions that he brought to the table.
12     Q   Okay.  Do you recall when that might have been?
13     A   I do not.
14     Q   Okay.  And I take it by the 2004 time frame you
15  trusted Mr. Gardner enough for him to become the advisor.
16  Correct?
17     A   Absolutely, absolutely.
18     Q   Why not have him continue in his role as
19  president and, you know, sort of play a dual function of
20  both president and advisor?
21     A   I don't understand that question.
22     Q   Why was there a need -- well, did --

64

1      A   If you want -- we wanted --
2      Q   -- you --
3      A   -- two people, one as an advisor to us and the
4   other as president.  It's a little difficult to then make
5   that one -- back into one person --
6      Q   Okay.
7      A   -- so we could have looked for an advisor, rather
8   than for president.
9      Q   That's true.
10         This is the model that you preferred.  You wanted
11  a president and an advisor; correct?
12     A   That's correct.
13     Q   All right.  So why did you not look for an
14  advisor?
15     A   This seemed a natural role for Mr. Gardner
16  to take upon him --
17     Q   Uh-huh.
18     A   -- having been with the company for 20 years or
19  so.
20     Q   Do any of the companies with which you're
21  affiliated have a mandatory retirement age?
22         MR. SMITH:  Are you talking about in the

65

1   Netherlands?
2          MR. HADDAD:  Yes.
3          BY MR. HADDAD:
4      Q   Any company that you're affiliated --
5      A   In the Netherlands it's a -- it's a very usual
6   thing, yes.
7      Q   Okay.  And --
8      A   Certainly not in the United States.
9      Q   That's true.
10         So in the Netherlands it's not out of the
11  ordinary for there to be a retirement age; correct?
12     A   Correct.
13     Q   And with Janivo is there a retirement age?
14     A   I don't know.
15     Q   Okay.
16     A   I really don't.
17     Q   All right.  Do you know of --
18     A   For officers.  I do not believe that I have a
19  mandatory retirement.  But I might have.  But I -- for
20  employees there is a mandatory --
21     Q   Uh-huh.
22     A   -- retirement age --

66

1    Q    What is that age?

2    A    -- for nonofficers.

3         It's 65 years.

4    Q    Okay.  For nonofficers it's 65 years?

5    A    (The witness moves head up and down.)

6    Q    But you don't believe that that applies to

7    officers?

8    A    I don't know.

9    Q    Okay.

10   A    We were certainly aware of the fact that it --

11   that is something that's not done in the United States.

12   Q    Uh-huh.

13        But wasn't that, in fact, one of the

14   considerations you took into account in requesting

15   Mr. Gardner's resignation?

16        MR. SMITH:  Object to form.  We haven't talked

17   about a resignation yet.

18        You can answer the question if you understand it.

19   A    In -- when looking at Mr. Gardner's own -- own

20   plans, if I interpret them rightly and if you take the

21   example of Mr. Zachariasse, his active continued

22   involvement was very important to us.  And, therefore, it

67

1    was more natural for him to move into a senior advisor role

2    than to continue as president, and find somebody who wanted

3    to be a senior advisor.

4         His age specifically, whether it was -- it could

5    have been 68 or 65.  I don't know how many -- even how old

6    he is, frankly.

7    BY MR. HADDAD:

8    Q    Uh-huh.

9    A    So we never said, "You're going to be 65, and

10   this is it"; certainly not.

11   Q    Was his age a consideration at all?

12   A    No.  As I said, it was Mr. Zachariasse

13   who prompted the whole discussion because he decided to

14   retire.

15        MR. SMITH:  When we're at a good place, about

16   five minutes?

17        MR. HADDAD:  Okay.  We're almost there.

18   BY MR. HADDAD:

19   Q    And so what was specifically your proposal to

20   Mr. Gardner?

21   A    That we -- that we look for a new president to

22   run the operation and that there be a transition period

68

1    whereby the person who would be appointed as the president

2    would ultimately in -- in -- over a period of time also

3    become general partner basically signing off on the

4    investments.

5         You know, I remember specifically we asked

6    Mr. Gardner -- and we've told Mr. Morris that Mr. Gardner

7    and he would have to decide on all -- on investment

8    proposals prior to them -- or divestitures prior to them

9    being decided by us.

10   Q    What was Mr. Gardner's reaction to your proposal?

11   A    He -- he fully agreed.  And, again, it was not

12   one discussion where we had one meeting where we presented

13   it to him.  It was more a discussion that took place over

14   several instances.

15   Q    Over the course of several months?

16   A    Yes.

17   Q    Okay.  And that was in the 2004, 2005 time frame?

18   A    Right.

19   Q    Okay.  So do you recall any resistance on

20   Mr. Gardner's part to --

21   A    Not at all.

22   Q    No resistance at all?

69

1    A    As a matter of fact -- no, not at all.  As a

2    matter of fact, he -- if there was any reluctance, it was

3    that he felt very strongly that the role that -- that this

4    new person was going to be hired, that the role -- that

5    that new person would be able to fulfill the fiduciary

6    role, because he felt himself responsible for that as well

7    on our behalf.

8         And so he -- but as far as his own personal

9    motivation was concerned, I recollect very strongly that he

10   was very much in favor in gradually winding down and

11   becoming a different kind of a participant.

12   Q    The role of seeking deals on behalf of -- well,

13   the role of seeking deals on behalf of Fidelio is one

14   that's played by the president of Buvermo; correct?

15   A    Not exclusively.

16   Q    Okay.  Who else is involved in that?

17   A    Can I -- can I describe it a little more

18   extensively?

19        The way these -- we are a small group.  Although

20   there's substantial funding behind it, we still are a small

21   group of people.  And anybody who participates and who

22   have -- who might have -- be able to find a deal, we

70

1  welcome in the sense that it should always be discussed
2  with the president.
3        But if I find something through connections that
4  I might have, I'll throw it in the pot. I never have, but
5  there -- on certain occasions I will be approached in the
6  Netherlands by somebody who has a deal in the Washington
7  market. I don't go out looking for them. But certainly
8  any -- and deals are very -- good deals are very rare, so
9  anybody who can contribute to putting deals on the table is
10 very welcome.
11   Q  Uh-huh.
12        But it certainly is included in the job
13 description of the president of Buvermo --
14   A  Absolutely --
15   Q  -- to do that?
16   A  -- yes --
17   Q  Okay.
18   A  -- prime responsibility.
19   Q  And it's not the prime responsibility --
20   A  It is. It is.
21   Q  Okay. If you'll just let me finish.
22        It's not the prime responsibility of the advisor

71

1  to search for deals; correct?
2   A  That's -- that's probably correct, yes.
3   Q  Okay. And, in fact, Mr. Zachariasse in his role
4  as advisor played a very limited role in that regard;
5  correct?
6   A  No. He would be very active and certainly was in
7  the past -- he has his own real estate company in the
8  Washington area -- in bringing deals and telling us other
9  deals that he did where we would not participate.
10   Q  Did you --
11   A  But it was not his prime role.
12   Q  Okay. Did you testify earlier -- correct me if
13 I'm wrong. I thought you testified that he had located
14 perhaps one, maybe two deals on behalf of Buvermo.
15   A  That's correct.
16   Q  Okay. That's in how many years' span?
17   A  It doesn't -- that we did, that we executed on.
18   Q  Okay. So he proposed more than that --
19   A  He did --
20   Q  -- to you?
21   A  -- absolutely.
22   Q  I see.

72

1   A  Not so much to us as to Mr. Gardner. Remember,
2  they had to agree on anything before we saw it.
3   Q  I see.
4        Do you recall Mr. Gardner having any concerns
5  about not -- well, about the change in his role preventing
6  him from seeking out deals on behalf of Buvermo?
7   A  No.
8        MR. HADDAD: Just a couple more questions, and
9  then we'll take a break.
10        BY MR. HADDAD:
11   Q  Do you recall having any discussions -- well, do
12 you recall yourself having any concerns about how
13 Mr. Gardner would handle the transition from president to
14 advisor?
15   A  Well, certainly I was concerned that -- given
16 the difference in character between Mr. Gardner and
17 Mr. Morris, that that transition would go smoothly.
18   Q  Apart from the difference in character, did you
19 have any concerns that Mr. Gardner would have a hard time
20 letting go of his former role at Buvermo?
21   A  I was concerned about certain aspects of that as
22 well, yes.

73

1   Q  Okay. And why did you have those concerns?
2   A  Because I think it's only natural for someone who
3  has been in charge for a long time to let go, particularly
4  given Mr. Gardner's strong belief that whoever took over
5  that role had to be able to fulfill the fiduciary
6  obligations. So he felt very responsible for -- for us.
7   Q  And you had these concerns notwithstanding your
8  perception that Mr. Gardner was fully supportive of your
9  suggestion to move him, to transition him from role of
10 president to advisor?
11   A  Yes.
12        MR. HADDAD: Now why don't we break.
13 (Whereupon, a brief recess was taken.)
14        BY MR. HADDAD:
15   Q  Now, in the winter -- well, let's say in early
16 2005 Buvermo began the interview process for Mr. Gardner's
17 successor as president; correct?
18   A  Correct.
19   Q  And what was your involvement in that entire
20 process?
21   A  I reviewed the -- well, first of all, we made a
22 decision to get an executive search firm. And I

74

1  participated in interviewing that search firm and in
2  reviewing the job description and the general description
3  of the company.
4     Q  Okay.  And the intention was to find somebody to
5  take over the position, the title, and role of John Gardner
6  as president of Buvermo; correct?
7     A  In that role, yes.
8     Q  And John Gardner was then to become the advisor,
9  just like Mr. Zachariasse; correct?
10    A  That's the role he would play.  In addition, he
11 would retain his -- his position as president of -- is it
12 FPMI? -- basically the general partner over it until such
13 time that we felt comfortable with whoever was going to be
14 the president, that he could assume that role as well,
15 because there was a transitionary period in between --
16    Q  And was it your --
17    A  -- which Mr. Zachariasse -- that role
18 Mr. Zachariasse had never had.
19    Q  I see.
20       So the transition period was supposed to be for
21 taking over the role as president of FPMI; correct?
22    A  The president -- yeah, ultimately.

75

1     Q  Okay.  That was the --
2     A  Initially it was to be to president of Buvermo
3  and then over a period of time to also take over the role
4  of the general partner.
5     Q  And when you say initially was to be the
6  president of Buvermo, do you mean that upon hiring the
7  individual, he would assume that position?
8     A  Yes.
9     Q  And, likewise, Mr. Gardner would immediately --
10 would at that time assume the position of advisor, but
11 would retain his role as president of FPMI for some period
12 of time?
13    A  Correct.
14    Q  Incidentally, was Mr. Zachariasse at any time
15 involved in the day-to-day operations of Buvermo?
16    A  No.
17    Q  And did he maintain an office at Buvermo?
18    A  No.
19    Q  Okay.  And the executive search firm that you
20 referred to was Equinox; correct?
21    A  Can I just say that Mr. Zachariasse was based in
22 the Netherlands.  If he would have asked for an office at

76

1  Buvermo, we would have gladly given it to him.
2     Q  Okay.  The executive search firm you referred to
3  was Equinox; correct?
4     A  Correct.
5     Q  And you indicated that they provided you with a
6  position description?
7     A  Correct.
8     Q  And you reviewed that; correct?
9     A  Correct.
10    Q  Let me show you what was marked as Exhibit 9 to
11 Mr. Gardner's deposition.  I'll just have you review that
12 and let me know if you recognize that document.
13 (The witness reviewed document.)
14    A  Yes, I do.
15    Q  And is that the position specification that you
16 reviewed for the position of president and CEO of Buvermo?
17    A  Yep.
18    Q  And what was your understanding as to the --
19 well, let me stop there.
20       You reviewed and approved this position
21 specification; correct?
22    A  Yes, I did.

77

1     Q  Okay.  And what was your understanding of the
2  purpose of the position specification?
3     A  Well, to get someone -- to get the correct person
4  with the right characteristics to want to attain that job,
5  attain that position.
6     Q  Did you have any understanding as to whom this
7  position specification was being provided to?
8     A  No.
9     Q  You did not?
10    A  Who -- with the exact name?
11    Q  Well, let me ask you -- let me put it this way:
12 Was it your understanding when you reviewed this position
13 specification that it would be provided to various
14 candidates?
15    A  Of course.
16    Q  Okay.  And that would include candidates such
17 Jonathan Morris; correct?
18    A  Yes.
19    Q  Okay.  And the purpose of the --
20    A  If he asked for it.  But I hope he really did
21 (phonetic).
22    Q  Okay.  And the purpose of it was to provide the

78

1  candidate with an understanding as to what the position was
2  going to be; correct?
3      A   Correct.
4      Q   And I assume that when you reviewed it, you
5  reviewed it with -- you reviewed it to confirm that the
6  position is properly described in the specification.
7  Correct?
8      A   Correct.
9      Q   Let me show you what was marked --
10     A   You want this back?
11     Q   You can just leave them there for now.  I'll take
12  them back at the end.
13         Let me show you what's marked as Exhibit No. 10
14  to Mr. Gardner's deposition.
15  (Document presented.)
16     Q   And just let me know if you recognize this
17  document.
18     A   I do.
19     Q   Okay.  Now, this is a memorandum that was
20  prepared by John Gardner to you; is that right?
21     A   (The witness moves head up and down.)
22     Q   Okay.

79

1      A   Correct.
2      Q   Did you request that he prepare this memorandum?
3      A   I don't recall.
4      Q   Okay.  Do you recall any discussions about this
5  memorandum prior to having received it?
6      A   Certainly --
7      Q   Okay.
8      A   -- I recall that, yes.
9      Q   And let me be more clear.  Do you recall any
10  discussions with Mr. Gardner about the need to put your
11  understanding in writing?
12     A   Put our understanding in writing?
13     Q   Correct.  Your understanding with Mr. Gardner.
14     A   Correct.
15     Q   In fact, this is what this memorandum reflects;
16  it reflects your understanding with Mr. Gardner regarding
17  his ongoing employment with Buvermo and Fidelio; correct?
18     A   Correct.
19     Q   All right.  And so -- I'm sorry.  I didn't catch
20  your response.  But do you recall having -- ever having
21  made a request to Mr. Gardner that this understanding be
22  put in writing?

80

1      A   I don't recall that.
2      Q   Okay.  Do you have any understanding as to why he
3  prepared this for you?
4      A   It was -- it was, I am sure, to clarify what
5  his -- what his role was and what his remuneration was
6  going to be.  It is mostly about financial matters --
7      Q   Uh-huh.
8      A   -- and -- and it reflects the transition that
9  we -- that we wanted to achieve.
10     Q   Uh-huh.
11         Do these terms set forth in this memorandum
12  accurately reflect the agreement between --
13     A   Yes.
14     Q   -- Fidelio, Buvermo, and Mr. Gardner as of
15  September 19th, 2005?
16     A   They reflect the tentative agreement he and I had
17  within -- with each other, as he states.  And it was later
18  confirmed in discussions that we had with Mr. van Rhee.
19     Q   Okay.  And that was confirmed orally, correct,
20  not in writing?
21     A   Correct.
22     Q   Do you recall yourself having any discussions

81

1  with Mr. Morris prior to his hiring regarding any of these
2  terms set forth in this memorandum?
3      A   Certainly, I recall discussing with him the role
4  that John Gardner would play.  I do.  And so as far as
5  the -- these points that are mentioned, we did not --.
6         Now, let me correct -- let me correct it.  I
7  think that Mr. Morris was fully aware of these terms in a
8  financial sense as well because he was the president of
9  Buvermo and the payroll goes through Buvermo.  We did not
10  involve him in the discussion about it; but we told him
11  that these were the terms, yes, prior to September 19.  It
12  was very important to us that he know and he would know
13  what Mr. Gardner's role was going to be in the future.
14     Q   Wasn't that something that he -- well, it was
15  important to you that he know that at the time that he
16  accepted employment with Buvermo; correct?
17     A   Yes.
18     Q   Yet for whatever reason --
19     A   Again, not the financial part of it.
20         What was important was that he knew that
21  Mr. Gardner would be retaining an office and be paid as if
22  he was full-time employed until the end of year and, as a

82

1    matter of fact, be there on a full-time basis.  That --
2    that he -- as far as I recall, he did know.
3        It was important also that he understood that as
4    of January 1 of the following year he would take on the
5    role that Mr. Zachariasse had and that it was a -- not the
6    financial implication of that, because that was something
7    that we had agreed with, with Mr. Gardner.  And it was also
8    important that he and -- that he and Mr. Gardner discuss
9    their varied -- you know, the transition period and how
10   that might occur.
11       Q    Uh-huh.
12       A    And also a financial sense, that he would take
13   the -- on a percentage basis the promote that Mr. Gardner
14   had, which I believe was 12 percent.
15       Q    Okay.  We'll get to that shortly.
16           But there's one thing that I'd like some
17   clarification on.  I believe you stated earlier that the
18   transition from president to advisor was to take place upon
19   Mr. Gardner's hiring.  Isn't that right?
20       A    Yes, absolutely.
21       Q    So, then, why is it that in here his transition
22   to role of advisor wasn't going to take place until the

83

1    following year-end of 2005?
2        A    One doesn't exclude the other, does it?
3        Q    Well, I'm not sure I understand you.  What do you
4    mean by that?
5        A    Well, if Mr. Morris -- the intent was that
6    Mr. Morris -- and that's how we've -- we've actually --
7    certainly I, but I'm sure Mr. van Rhee as well, treated
8    Mr. Morris.  He was the president of Buvermo.
9            Mr. Gardner would be -- would retire as president
10   of Buvermo but retain his position as president of FPMI
11   and -- and become -- and fill the role of Chris Zachariasse
12   as of year-end 2005 because until that time Mr. Zachariasse
13   was the senior advisor, he wasn't retiring until such time.
14       Q    So, then, the switch from president to advisor
15   was not to take place --
16       A    No.
17       Q    -- immediately?
18       A    It was.
19       Q    Okay.
20       A    The switch -- no, no.  The -- not the switch.
21   The switch -- you're correct.  But the -- the appointment
22   of Mr. Morris as -- as president was to take effect

84

1    immediately, and the resignation of Mr. Gardner was -- as
2    president of Buvermo was to take effect immediately.  And
3    Mr. Gardner would be -- become the -- senior advisor as
4    of the time that Mr. Zachariasse retired.
5        Q    Okay.  I think I understand now.
6            This paragraph 1 indicates that he would receive
7    his current salary and benefits, Mr. Gardner would, through
8    March 31, 2006 --
9        A    Uh-huh.
10       Q    -- and paragraph 3 further states that he would
11   continue as an employee of Buvermo after March 31, 2006,
12   for a period of three years.  Do you see that?
13       A    Yeah, I do.
14       Q    Okay.  And do you know what the significance of
15   that date is, March 31, 2006?
16       A    No.  It was -- I do not -- I mean the way -- to
17   me, this is an explanation of the financial understanding
18   we have.
19       Q    Okay.  Does Buvermo have a fiscal year?
20       A    Yes.
21       Q    And when is the fiscal year?
22       A    December 31.

85

1        Q    Okay.
2        A    So this basically meant an additional three
3    months at full pay.
4        Q    An additional quarter into the fiscal year?
5        A    (The witness moves head up and down.)
6        Q    But you don't recall any discussions regarding
7    why this is March -- why March 31, 2006, would be the date?
8        A    Well, we could have made it June 30; but that was
9    not acceptable to us.  It's just -- it's a monetary -- it's
10   a deal.
11       Q    Uh-huh.
12       A    And it's solely a monetary -- there is no other
13   explanation as far as we -- or interpretation or -- in our
14   negotiations, we decided on March 31.
15       Q    Okay.  And as stated in paragraph 3, he was to
16   continue his employment for a period of three years after
17   March 31, 2006; correct?
18       A    Correct.
19       Q    But starting, I presume, April 1, 2006, for the
20   first year, he was to be paid $150,000 for that first year;
21   correct?
22       A    Correct.

86

1    Q   And then thereafter on the second year 125,000
2  and then on the third 100,000; correct?
3    A   Correct.
4    Q   Okay.  Was this agreement followed?
5    A   Has it been implemented?
6    Q   Yes.
7    A   Yes.
8    Q   Okay.  Do you know whether there has been any
9  modification --
10   A   Oh.  Wait, wait, wait, wait, wait.  When Mr. --
11 when we terminated Mr. Morris, we asked Mr. Gardner to step
12 back into his role as the president; and he retained his
13 full salary -- I don't recall what we really did -- but
14 through that period until Mr. Millspaugh was appointed.
15   Q   Until the August 2006 time frame?
16   A   Correct.
17   Q   And then --
18   A   Yes, that's correct.
19   Q   -- what's your understanding now as to when
20 Mr. Gardner's -- so I take it now Mr. Gardner is being
21 compensated at this $150,000-per-year rate?
22   A   Correct.

87

1    Q   Okay.  And the second-year rate of $125,000,
2  that's to take effect when?
3    A   I don't recall.
4    Q   Okay.
5    A   Twelve months after the 150-.  And I thought it
6  was -- the point is I don't recall.  I belive that we
7  had -- I don't know.  It -- once Mr. Millspaugh was in
8  Mr. Gardner's -- he went to the reduced salary, as is
9  indicated here.  And then in twelve months -- but I don't
10 know the exact date.
11   Q   Okay.  So is it to run, then, for three years
12 from --
13   A   Yes.
14   Q   -- the date that he stepped down --
15   A   Correct.
16   Q   -- as president --
17   A   Correct.
18   Q   -- upon Mr. Millspaugh's hiring?
19   A   Correct.
20   Q   Paragraph No. 6 indicates that after year-end
21 2005 Mr. Gardner would give up his FPEP promote interest
22 for projects originated after that time, but that he would

88

1  retain his right to invest equity in the projects; correct?
2    A   Correct.
3    Q   Okay.  And has this particular agreement been
4  followed?
5    A   And we amended to it reflect the time that
6  Mr. Gardner was president -- president and CEO upon the
7  termination of Mr. Morris until Mr. Millspaugh was
8  appointed --
9    Q   Okay.
10   A   -- whatever we adjusted it.
11   Q   Well, let me ask you this:  Have you recognized
12 any promoted interest belonging Mr. Gardner for properties
13 that originated after 2005?
14   A   Yes.
15   Q   The Spotswood deal, for instance?
16       MR. SMITH:  Can I make sure that he understands
17 the question.  Do you mind if I give my understanding, and
18 then you can --
19       MR. HADDAD:  Well, let me see if I can clarify it
20 for him.
21       MR. SMITH:  Okay.
22       BY MR. HADDAD:

89

1    Q   Just to be clear, I'm not interested in
2  Mr. Gardner's right to invest equity in any deals.  What
3  I'm interested in is whether Mr. Gardner has been granted a
4  right to receive an FPEP promote in any deal that was
5  originated after or initiated after year-end 2005.
6    A   Yes.
7    Q   Okay.  And what deals would those be?
8    A   There's some -- I would think they would include
9  Spotswood, Reston International.
10   Q   Was that agreement reflected in any of the
11 resolutions you signed today?
12   A   I believe so.
13       We designated -- I think -- I think I'm confused.
14 I think I'm confused.  We designated Laurey Millspaugh to
15 receive a portion of those promotes.
16   Q   Uh-huh.
17   A   And I do not believe that Mr. Gardner has
18 participated in any promotes since January 1 --
19   Q   Okay.
20   A   -- of this year.
21   Q   All right.  So has Mr. -- well, Mr. Gardner was
22 responsible for originating the Reston International Center

90

1  deal; correct?
2      A   Yes.
3      Q   Okay. Has he been offered anything in connection
4  with those efforts?
5      A   I don't recall.
6      Q   You don't know?
7      A   No. As I said, I'm a little confused.
8      Q   Okay. Do you know whether Mr. Gardner is being
9  paid or has been promised payment in any amount in excess
10  of the $150,000 base salary that he is to receive from
11  Buvermo?
12     A   Other than what is reflected here under Point 7,
13  nothing else has been paid to him, no.
14     Q   And is there any agreement to pay him anything in
15  the future?
16     A   No.
17         MR. SMITH: Ziad, can I make a suggestion which
18  may be a time-saving tool --
19         MR. HADDAD: Sure, yeah.
20         MR. SMITH: -- because I'm going to have to go
21  back and clean some things up --
22         MR. HADDAD: Uh-huh.

91

1          MR. SMITH: -- I think.
2      Could you show him Laurey's offer letter and just
3  let him look at it. I think that's going to clarify the
4  record in terms of who's receiving the promotes 2005
5  forward.
6          MR. HADDAD: Well, I think he's already said that
7  John Gardner is not receiving any promotes. So if that's
8  your understanding, then --
9          MR. SMITH: It is. But it's a little muddled, I
10  think he said -- okay.
11         MR. HADDAD: Okay. I don't think it's all that
12  unclear.
13     BY MR. HADDAD:
14     Q   I'm just trying to find out, Mr. Tjaden -- it
15  appears based on your testimony and based on the records
16  that I've seen, that Mr. Gardner has not been provided with
17  a promoted interest in either the Spotswood or Reston
18  International Center deal. Correct?
19     A   Correct.
20     Q   Okay. And yet Mr. Gardner was chiefly
21  responsible for bringing the Reston International deal to
22  the table; correct?

92

1      A   Correct.
2      Q   Okay. And so what I'm trying to find out from
3  you is: Has any agreement been reached by anyone with
4  Mr. Gardner regarding payment for his contribution with
5  respect to Reston International?
6      A   No. We have -- what we agreed with Mr. Gardner
7  is that he would be paid his full salary through the period
8  until such time that Mr. Millspaugh came on board.
9      Q   I see.
10         And was that in recognition of his efforts for
11  Reston International Center?
12     A   Yes.
13     Q   And apart from that has anything else been paid
14  to him --
15     A   No.
16     Q   -- as part of that?
17     A   No.
18     Q   No.
19         And has anything else been promised to him as
20  part of that?
21     A   No.
22     Q   Do you recall having any discussions with

93

1  Mr. Gardner after Mr. Morris's termination regarding who
2  should receive a promoted interest in either Spotswood or
3  Reston International Center?
4      A   The only thing that was brought up was salary.
5  We discussed -- I think Mr. van Rhee and I discussed
6  amongst ourselves whether we should do something like that,
7  but we felt it was better to stick to the original deal as
8  far as the promote was concerned. We wanted to get a new
9  guy on board as soon as possible and lose as little time as
10  possible and not get confused.
11     Q   And when did you have that discussion with
12  Mr. van Rhee?
13     A   Probably, you know, in the months following
14  Mr. -- or in the weeks following Mr. Morris's
15  resignation --
16     Q   And --
17     A   -- when it became clear that -- that Mr. Gardner
18  had to step back in.
19     Q   Back into the position?
20     A   Yeah, yeah.
21     Q   Did Mr. Gardner ever propose to you or, to your
22  knowledge, to Mr. van Rhee -- did he ever propose to you

Case 1:06-cv-01131-HHK    Document 32-4    Filed 02/07/2007    Page 25 of 42

Morris vs. Buvermo, et al.                                  Deposition of J. Tjaden 12/05/06

94

1    that he be given any promoted interest in the Reston
2    International Center deal?
3        A   He certainly did not -- he certainly did not
4    mention it to me.
5        Q   Okay.  And what about Spotswood Valley?
6        A   Same.
7        Q   Now, in connection with your search back in
8    2005 --
9        A   Yes.
10       Q   -- when you were looking for a -- initially
11   looking for Mr. Gardner's replacement, generally speaking
12   what were you looking for in a candidate?
13       A   Pretty much as has been described here
14   (indicating).
15       Q   In the position specification?
16       A   Yeah.
17       Q   Okay.  And you're referring to what?  Page 3?
18       A   Page 3.  Someone with that level of experience,
19   track record, and attributes as described.
20       Q   Did you have any interest -- well, were you
21   interested in looking for somebody to take over for a
22   certain period of time?

95

1        A   No.
2        Q   Okay.  So you didn't care how long the person was
3    going to remain with the company?
4        A   Well, we -- we wanted to get somebody who -- who
5    didn't have a short-term view.
6        Q   Okay.  What do you mean by that?
7        A   Well, who was prepared to stay on and for -- to
8    our liking, I should say, for as -- for the next years.  We
9    did not want anyone to come in and see this as a two-year
10   assignment.
11       Q   Uh-huh.
12           Why is that?
13       A   Because we are long-term investors.
14       Q   Okay.  And so you would want somebody to come in
15   and stick around throughout the investments?
16       A   Partly.  I mean generally when -- when I am
17   involved in hiring a president, I do it -- and I do these
18   things a lot; that's part of my profession and my -- my
19   role.  I tend to -- we -- I look for people who want to see
20   this as a career and for the longer term.
21       Q   Okay.
22       A   We're never interested in the short-term

96

1    assignments of positions such as this.  The fiduciary role
2    is critical, and long-term orientation is important.
3        Q   Did you have an understanding going into the
4    interview process about what kind of time frame you were --
5    you had envisioned the president serving?
6        A   No.
7        Q   You had no understanding whatsoever?
8        A   No.  But it had to be somebody who was prepared
9    to say on longer term.
10       Q   Okay.
11       A   For the longer term.
12       Q   What do you mean by --
13       A   So if we would have found somebody who was 35 and
14   we would have -- well, our commitment to the market as
15   investors is long-term.  We have been in this particular
16   forum present for, I think, over 20 years.  And, as far as
17   I'm concerned, Janivo will want to be there in the next 20
18   years.  Janivo's a company that was formed a long time ago,
19   and its goal is long-term oriented.
20           It doesn't mean that we would under any
21   circumstances agree -- and I never have -- to turn that
22   around.  The president of the company always, you know, is

97

1    in that role and in that position as long as he performs
2    and if it's to our liking.  It's entirely -- and I've never
3    done anything else but that.  It's up to the shareholders
4    to see if things go well.
5        Q   You keep making reference to the term
6    "long-term".  I'm just trying to get an understanding from
7    you as to what you mean by that.
8        A   You know, on the East Coast, that's very often
9    the question I get from Americans.  "Long-term" to us means
10   over the longer term.  As I said, we've been here 20 years.
11   I want to be here for another 20 or 30 or 40 years -- not
12   myself, but as an institution.  We want to be present in
13   this market for the longer term, so we are looking for
14   people who are interested to participate over the longer
15   term in --
16       Q   Okay.
17           MR. SMITH:  (Indicating).
18       A   -- in and that goal.
19           BY MR. HADDAD:
20       Q   Is it fair to then say that you are looking for a
21   candidate who was willing to stick around for 20 -- up to
22   20 years?

98

1    A   If he would have performed, absolutely.
2    Q   And did you discuss that interest at any time
3   with Mr. LoPinto?
4    A   Oh, absolutely, we did. But we were -- let me
5   say this differently. We are not -- we are and we were not
6   interested in anybody taking that position who wanted to
7   make a quick buck and get out.
8    Q   Okay.
9    A   And you have to see it in that -- in that -- in
10   that light. That doesn't mean that in a legal sense we
11   would bind ourselves to anything that is other than an
12   employment agreement at-will.
13   Q   Do you have any legal training?
14   A   It's a different thing.
15      No.
16   Q   Let me ask you: What were your discussions with
17   Mr. LoPinto about this particular subject?
18   A   That we were looking for someone who saw -- who
19   saw this as a long-term -- as an opportunity over the
20   longer term. Mr. Gardner has been there for 20 years.
21   Q   Do you recall having a discussion with
22   Mr. LoPinto regarding Mr. Morris's age?

99

1    A   Not Mr. Morris's specific age. We did ask -- you
2   know, we -- when -- in describing the role and the
3   function, we did discuss ideal age categories. It was
4   clear that we would not end up with someone who was 30
5   years old, because it didn't give us the experience level
6   that we wanted; and that most likely we'd end up with
7   somebody between, you know, 42, 52, 53, that kind of age
8   group. And it was discussed in that manner.
9    Q   Okay. And that's because somebody who was too
10   young, you felt, wouldn't have enough experience?
11   A   Yeah.
12   Q   Okay. And you also didn't want to hire somebody
13   who was too old; correct?
14      MR. SMITH: (Indicating).
15   A   No, it has nothing to do with age. You try to
16   pinpoint me towards a specific age. That has nothing to do
17   with it.
18      It has to do with -- with the role that that
19   person is playing, which means that you have to have a
20   presence and a -- not only your experience, but you have to
21   have a presence in the market. You have to -- you have to
22   have an established name. You have to have credentials.

100

1   And usually those people end up being in that age bracket.
2      BY MR. HADDAD:
3    Q   Okay.
4    A   You know, I know a guy we'd like to hire
5   immediately; but he happened -- you know, this -- this guy
6   that I'm thinking of, he got his MBA degree -- or I think
7   electrical engineering degree when he was 19 and his MBA,
8   21. That's an exception.
9      Usually people with this kind of experience level
10   and presence in the market -- and don't forget, it's the
11   fiduciary role that's so critical to us; and they have a --
12   they -- they usually fall in this category.
13      THE COURT REPORTER: Excuse me.
14      I put "indicating" because I saw you do something
15   but you didn't say anything.
16      MR. SMITH: Yeah. I do want to lodge an
17   objection to the question.
18      BY MR. HADDAD:
19   Q   Do you recall having a discussion with
20   Mr. LoPinto about wanting to find out whether
21   John Gardner -- I mean Jonathan Morris would work at the
22   company up until the age of 65?

101

1    A   No.
2      And it certainly -- certainly not in any legal
3   sense, but whether -- no. I mean I -- in any other way
4   than is -- than that we wanted somebody who had a
5   orientation towards being there over the longer term, I did
6   not.
7    Q   I --
8    A   I mean, again, this is -- you're trying to say I
9   don't -- I didn't even know how old Mr. Morris was. And to
10   then say, Will he be around until his's 65, that's like
11   mandatory retirement age. We did not discuss that.
12      But what we did discuss, again, is that the
13   profile needed to reflect someone who was interested in the
14   longer term.
15   Q   Just to be clear, I'm not trying to do anything,
16   other than just to find out your answers to my specific
17   questions.
18      So I take it, then, that you did not have a
19   specific -- a discussion with Mr. LoPinto about asking
20   Mr. Morris whether he would be willing to work there up
21   until the age of 65?
22   A   Correct.

102

1    MR. SMITH: Asked and answered.
2    BY MR. HADDAD:
3    Q   Okay. And do you recall having any discussion
4    with Mr. Morris regarding whether -- sorry -- with
5    Mr. Gardner -- sorry.
6        Do you recall having any discussion with
7    Mr. LoPinto regarding whether Jonathan would make a
8    commitment to any number of years?
9    A   No.
10   Q   Okay. Do you recall having any such discussion
11   with Mr. Morris?
12   A   Yes, I did have that discussion.
13   Q   Okay. And tell me about that discussion.
14   A   It was, again, in the general sense of wanting
15   the -- let me say it differently.
16       Mr. Morris was very interested in finding out
17   from us what our orientation was towards a longer term
18   commitment to the market. Understandably so, he wanted as
19   a candidate to know whether we wouldn't pull out in a year
20   or two. And in that sense we had discussed extensively
21   what Janivo's commitment was to the marketplace. And it
22   was important to me as well, as I stressed to him, that he

103

1    have a similar orientation as to -- as far as his horizon
2    was concerned.
3        So there were -- we did discuss it partly because
4    he wanted to make sure that we were not gone in two years
5    and partly because I wasn't -- wanted to make sure this his
6    orientation was for the longer term.
7    Q   Uh-huh.
8        And what came with those discussions?
9    A   Well, we -- we seemed to agree. He seemed to
10   be -- feel comfortable that we would be around for a
11   long -- for the longer term, and I felt comfortable that
12   his orientation was similar.
13   Q   Okay. Are you opposed as a matter of practice to
14   providing any guarantees of employment terms?
15   A   Yes.
16   Q   Okay.
17   A   Very strongly so. I don't have them myself.
18   Q   Yet Jim Smith -- you know him; correct?
19   A   (The witness moves head up and down.)
20   Q   The offer that was made to him contained a
21   guarantee of two years' salary; correct?
22   A   Well, you have to see it in a different manner.

104

1    It was not to make sure that he would stick around for two
2    years. It guaranteed him upon termination a payment of two
3    years. That's -- you have to see it as a -- as a downside
4    protection, which he asked for. That's a -- that's a
5    different manner. It's not a two-year rat. And that --
6    that's a different manner entirely.
7    Q   Well, let's assume -- I'm just trying to get your
8    understanding as to what you think a guaranteed employment
9    term is.
10       Is it your understanding that if you hired
11   somebody for a guaranteed two-year period, that you have to
12   keep them on for two years?
13       MR. SMITH: I'm going to object to the extent
14   that it calls for a legal conclusion.
15       BY MR. HADDAD:
16   Q   I'm just asking for your understanding.
17   A   If I would hire someone for two years, which I
18   never have, then that would be for a specific task to be
19   done in those two years.
20       And if somebody like that would ask for a
21   protection in case we would terminate him, of being -- of
22   having a payment made, which might extend to paying someone

105

1    two years' salary, then I would agree to that. And I know
2    that under certain circumstances you can then also say you
3    have to be present or not compete. I'm familiar with that.
4    Q   Well, I'm just trying to --.
5        Are you done responding?
6    A   (The witness moves head up and down.)
7    Q   I'm just trying to get a sense from you. You
8    seem to have drawn a distinction between the guaranteed
9    salary of two years to Mr. Smith and a guarantee of a
10   two-year employment. I'm just trying to get an
11   understanding from you as to what the significance of that
12   distinction is.
13   A   Well, again, Mr. Smith's orientation was also
14   long-term. And it was irrelevant to give him a two-year
15   employment guarantee, because his orientation would have
16   been -- he didn't take the job -- to be there over the
17   longer period.
18       He asked for protection, and he got it. It was a
19   matter of negotiation. He asked to be protected on the
20   downside should something happen unforeseen, because we
21   have the right as employers -- and that's something we will
22   always want -- to terminate somebody without cause. And

106

1  that's -- you know, it's -- you can read it.  You've read
2  it in the all the documentation.
3      However, if Mr. Morris or even Mr. Smith, in this
4  case, he asks for a downside protection, we gave it to him.
5  It was negotiated.  Perhaps he asked for more, and we
6  negotiated for two years.  It was probably something that
7  he had with his prior employer.
8      Q  Let's turn back to Exhibit No. 10 of
9  Mr. Gardner's deposition, the memorandum to you.
10      A  Right.
11      Q  Now, taking a look at Exhibit 3 -- sorry -- I
12  mean paragraph 3 --
13      A  Yeah.
14      Q  -- I take it, then, from your testimony that you
15  don't construe this as a guaranteed term of employment?
16      A  I have to say that the negotiation with
17  Mr. Gardner, who has been there for 20 years, is entirely
18  different.  If someone like -- would have been with us for
19  a short period of time and asked for similar terms, we
20  would not have given them.
21      And these -- these things are -- all of these
22  things are -- have to do with relationships and with

107

1  negotiation.
2      Q  But I thought I heard you say that under no
3  circumstances would you do that.
4      A  Well, let me say it differently.  If Mr. Gardner
5  would be terminated tomorrow, we would still pay him that
6  amount.  It's -- it's money.
7      Q  Okay.  But do you understand this to be a
8  guaranteed term of employment?
9      A  No.  We can fire or terminate Mr. Gardner at
10  will.  We'll probably owe him the money.
11      Q  I see.
12      How many times did you meet with Mr. Morris in
13  connection with his interviews?
14      A  I don't recall.
15      Q  Was it more than once?
16      A  I would think it was probably twice.
17      Q  Okay.  And do you recall where you met with him?
18      A  I do not.
19      Q  And --
20      A  I do.  One of the times was in Washington.
21      Q  Okay.
22      A  Perhaps twice.

108

1      Q  Do you recall meeting him --
2      A  It might have been one time in New York.  I
3  don't -- I don't recall.
4      Q  All right.  Do you have any specific recollection
5  of any interview with him outside of the District?
6      A  As I said, I don't.
7      Q  Okay.  Let's take a look at --.
8      MR. HADDAD:  Bear with me one second here.
9      BY MR. HADDAD:
10      Q  Let's take a look at Exhibit No. 14 to
11  Mr. Gardner's deposition.
12  (Document presented.)
13      Q  Mr. Tjaden, do you recognize this document?
14      A  I do.
15      Q  And this is the --
16      A  It's a letter to Mr. Morris.
17      Q  Okay.  And this is the letter that you believe
18  identifies his terms of employment with Buvermo?
19      A  Correct.
20      Q  Okay.  Incidentally, did you play any role in
21  drafting this letter?
22      A  I certainly played a role in the contents of it.

109

1      Q  Do you recall reviewing it prior to it being
2  signed by --
3      A  I do.
4      Q  You do recall?
5      A  (The witness moves head up and down.)
6      Q  Okay.  And do you recall making any changes or
7  proposing any changes to the agreement?
8      A  I do not.
9      Q  And do you recall -- in your capacity as a
10  representative of -- designated representative of
11  Fidelio -- I'm sorry -- of Janivo --
12      A  Right.
13      Q  -- do you recall authorizing Mr. Gardner to make
14  this offer to Mr. Morris?
15      A  Yes, I do.
16      Q  Okay.  And directing your attention to halfway
17  down the first page under Current Projects, do you see that
18  paragraph?
19      A  Yes.
20      Q  Okay.  And this refers to FPEP promoted interest
21  currently owned by Fidelio Properties for land parcels
22  adjacent to the Sheraton Reston parcels and remaining land

110

1   parcels at Twinbrook. Do you see that?
2      A   Yes.
3      Q   Okay. And do you know --
4      A   And it ends with "such interest will be subject
5   to a two-year vesting period." Is that the paragraph?
6      Q   That is the paragraph.
7         Do you know what the share of the FPEP promoted
8   interest owned by Fidelio at that time was?
9      A   Not exactly.
10     Q   Okay.
11     A   It was about -- it was about 20 percent.
12     Q   Okay. Does 2 and a half percent maybe --
13     A   20 percent of the total.
14     Q   Oh. 20 percent of the total --
15     A   The total was -- I believe that the total was 15
16  and a half, of which Mr. Gardner had 12; so it must have
17  been 3 and a half or a number around there. Perhaps it was
18  3 out of -- if it was -- you said it was 20 percent --
19     Q   Yeah.
20     A   -- down to the 15, which is 3 percent.
21     Q   So your understanding was that the total FPEP
22  promote was 15 and a half percent; correct?

111

1      A   Yeah, around that number --
2      Q   All right.
3      A   -- of which Mr. Gardner had around 12.
4      Q   All right. Your understanding was Mr. Gardner
5   had 12 percent?
6      A   (The witness moves head up and down.)
7      Q   Okay. And so does that mean that you believe
8   FPEP had somewhere around 3 and a half percent in these
9   land parcels?
10     A   Correct.
11     Q   Okay. And that's an interest --
12     A   No, no, not FPEP. Fidelio Properties.
13     Q   Thank you. Fidelio Properties.
14        And do you know how it acquired that FPEP
15  promoted interest?
16     A   It was -- it was a -- it was a portion that was
17  left when Mr. Bonacci left the company. So you have to
18  probably subtract from that the -- after his vesting period
19  he had a right when he left to -- to be paid off, so we
20  paid him off. So it was -- probably would be a portion in
21  addition -- the value that had accrued beyond what we had
22  paid him --

112

1      (Proceedings participants speaking at the same time.)
2      Q   Okay.
3      A   -- a net interest.
4      Q   You mentioned earlier the two-year vesting
5   period. When you reviewed this document, what did you
6   understand that to mean?
7      A   The only way I interpret it is that if you are --
8   you have to be at the company for two years in order to
9   receive this interest.
10     Q   Uh-huh.
11        And do you recall --
12     A   Vest over a period of two years.
13     Q   Okay. And so your understanding is that the
14  individual, in this case Jonathan Morris, Jonathan Morris
15  would have to be at the company at the end of two years in
16  order to --
17     A   Yes.
18     Q   -- attain those interests?
19     A   Absolutely.
20     Q   Okay. And do you recall having a discussion with
21  Mr. Morris prior to his employment about that?
22     A   No.

113

1      Q   Okay. I take it, then, you didn't discuss with
2   Mr. Morris what the effective termination would be on this
3   vesting period; correct?
4      MR. SMITH: I'm sorry. The what?
5      MR. HADDAD: The effect of his termination would
6   be on this vesting period.
7      A   Prior to his --?
8      BY MR. HADDAD:
9      Q   Prior to his being hired.
10     A   I did not know.
11     Q   And if I could direct your attention to the
12  Future Projects section of this offer letter, also located
13  on the first page. Do you see that?
14     A   Yeah.
15     Q   Okay. And this suggests that -- this refers to
16  the FPEP promote currently available to me, "me" being
17  John Gardner; correct?
18     (The witness reviewed document.)
19     A   Yes.
20     Q   Okay. And your understanding is John Gardner's
21  FPEP promote percentage was 12 percent?
22     A   Correct.

114

1    Q   Let me show you briefly what was marked as
2  Exhibit No. 12 to Mr. Gardner's deposition and ask you if
3  you recognize this document.
4  (Document presented.)
5    A   I do.
6    Q   Okay. And this is a document that was signed by
7  yourself, Mr. Morris -- sorry -- Mr. Gardner, Mr. van Rhee,
8  and one other person; correct?
9    A   Correct.
10   Q   And who is that other person? Do you recognize
11 the signature?
12   A   It must be -- at the time it must be
13 Mr. Zachariasse.
14   Q   Okay. And this was signed on February 6th, 2002;
15 correct?
16   A   Yes.
17   Q   Okay. And paragraph 4 indicates that the FPEP
18 sharing ratio shall remain at 15.5 percent. Do you see
19 that?
20   A   Yes.
21   Q   Okay. And it then sets forth certain percentages
22 of how that percentage would be broken down as between

115

1  Mr. Gardner and Mr. Bonacci in the year 2002 and then
2  subsequently in the year 2003; correct?
3    A   Correct.
4    Q   All right. Are you aware of any other document
5  that further defines this sharing percentage -- well, are
6  you aware of any other document -- executed document after
7  February 6th, 2002, that further defines what the sharing
8  percentage would be for the FPEP -- the sharing ratio would
9  be for the FPEP promote?
10   A   I do not believe there is any such document.
11   Q   Okay.
12   A   We did -- as I recall, the -- it's the management
13 committee that on a per-deal basis can set that the -- that
14 designates the share. And Mr. Gardner's share has been 12
15 percent.
16   Q   And that's the management committee of Fidelio;
17 correct?
18   A   Correct.
19   Q   Now --
20   A   Can I -- this word "remain," as I now recall how
21 we got here, was we increased the portion from 12 to 15 and
22 a half percent in order to allow Mr. Bonacci to

116

1  participate. So the -- the FPEP promote portion, we
2  increased it, I believe, to that percentage point. So
3  Mr. Gardner retained his own position. Above that it went
4  to 15 and a half percent, and Mr. Bonacci started off with
5  something, and then it reversed over time to Mr. Bonacci.
6    Q   I'm not sure I understood that.
7        You're referring to the first sentence here where
8  it says that, "FPEP sharing ratio shall remain at 15 and a
9  half percent"?
10   A   (The witness moves head up and down.)
11   Q   And you're -- is that right?
12   A   (The witness moves head up and down.)
13   Q   "Yes"?
14   A   Yes.
15   Q   And you're interpreting that to mean that -- I
16 mean, to me, this suggests that prior to this it was at 15
17 and a half percent. Is that not your understanding?
18   A   My understanding -- my recollection is that it
19 was at a lower rate and we increased it to accommodate
20 Mr. Bonacci participating.
21   Q   Okay. In any event, it was 15 and a half percent
22 as of February 6th, 2002; correct?

117

1    A   Correct.
2    Q   Okay. And what is the FPEP share ratio today?
3    A   12 percent --
4    Q   So it's been --
5    A   -- 12 and a half.
6    Q   -- reduced to 12 percent?
7    A   Correct.
8    Q   Okay. So the only person --
9    A   Well, there's -- wait, wait, wait. On certain of
10 the old deals, as we have discussed, there's -- there -- it
11 was still at 15 and a half percent. And Mr. Bonacci, as I
12 said, resigned. We then paid him off. And so that portion
13 refers back to the partnership, effectively to the Fidelio
14 partnership. Effectively, therefore, the net out from the
15 investors is 12 and a half percent or 12.
16   Q   Why does it revert back to the Fidelio
17 partnership?
18   A   By that portion that we -- we took that over as
19 Fidelio -- as the Fidelio Partnership. It wasn't given out
20 to anyone. On a two-year vesting period, Mr. Morris was
21 going to take a portion of that.
22   Q   Uh-huh.

118

1     Does Fidelio still own that 3 and a half percent?
2     A   On those properties where -- that are still
3   around, I think they're very limited.
4     Q   What about --
5     A   The new properties, no.
6     Q   What about the new properties?
7     A   No.
8     Q   Okay.  So now, for all intents and purposes, the
9   FPEP promote --
10    A   Is 12 and a half.
11    Q   -- is 12 percent?
12    A   Right; 12.
13    Q   You keep saying 12 and a half percent.
14    A   Well, it -- I think it's 12.  And when -- because
15  I'm not correct -- I'm not -- I'm somewhat confused whether
16  it's 12 or 12 and a half percent.
17    Q   Uh-huh.
18        But is all of that going to Laurey Millspaugh?
19    A   Correct.
20    Q   Now, according to the offer letter, Exhibit
21  No. 14, Mr. Morris was entitled to Mr. Gardner's share of
22  the promote on all deals Mr. Morris initiated prior to

119

1   December 31, 2005; correct?
2     A   (The witness moves head up and down.)
3     Q   "Yes"?
4     A   Yes, correct.
5     Q   Okay.  And after December of 2005, starting in
6   January of 2005 (sic), Mr. Morris would be entitled under
7   the terms of this agreement to the promote on all deals
8   he -- all deals that were initiated, irrespective of who
9   initiated the deal; correct?
10    A   Correct.
11    Q   Okay.  And did you, Mr. Tjaden, or anyone else,
12  to your knowledge, advise Mr. Morris prior to his
13  termination that he would not be entitled to receive his
14  promoted interests unless the deal closed before his
15  termination?
16    A   I did not.
17    Q   And, to your knowledge, did anybody else?
18    A   No.
19    Q   Okay.  And did you or anyone else, to your
20  knowledge, advise Mr. Morris prior to his termination by
21  Buvermo that he would not be entitled to receive his
22  promoted interest unless the deal was designated by Fidelio

120

1   as an FPEP property?
2     A   I did not.
3     Q   And did anyone else, to your knowledge?
4     A   Not that I know -- well, not that I know, no.
5     Q   Okay.  And, likewise, Mr. Tjaden, did you or
6   anyone else, to your knowledge, advise Mr. Morris prior to
7   his termination that there was -- that there was even a
8   possibility that a deal originated through Buvermo would
9   not be designated as an FPEP property?
10    A   I did not.
11    Q   And did anyone else, to your knowledge?
12    A   Not that I know.
13    Q   Okay.  And did you or anyone else, to your
14  knowledge, advise Mr. Morris prior to his termination that
15  there was any possibility that he would not be added as a
16  member to FPEP?
17    A   I did not.
18    Q   Okay.  And did you or anyone else -- did anyone
19  else, to your knowledge?
20    A   Not that I know of.
21    Q   Okay.  And did you or anyone else, to your
22  knowledge, advise Mr. Morris prior to his termination that

121

1   in the event he wasn't named a member to the FPEP
2   partnership -- I'm sorry -- the FPEP, LLC, that he -- prior
3   to his termination that he would not be entitled to
4   promoted interests on properties that were initiated during
5   his term?
6     A   I did not.
7     Q   And did anyone else, to your knowledge?
8     A   Not that I know of.
9     Q   Did you or anyone else, to your knowledge,
10  provide Mr. Morris with a copy of the Fidelio partnership
11  agreement prior to his acceptance of his employment with
12  Buvermo?
13    A   I did not.
14    Q   Okay.
15        MR. SMITH:  I object to the form of the question.
16        BY MR. HADDAD:
17    Q   Do you know of anyone else providing it to him
18  prior to his employment with Buvermo?
19    A   Again, I assume that somebody who takes --
20  somebody that we wanted to hire with a -- that kind of
21  profile takes his position seriously and he reads a letter
22  where it says, you know, this agreement governs our -- our

122

1   deal, asks for that agreement. I don't know whether he
2   asked. If not, he should have probably asked.
3       I have no idea whether he did or not, frankly.
4       BY MR. HADDAD:
5   Q   Well, I think you may be jumping the gun a little
6   bit, because I'm referring to the Fidelio partnership
7   agreement and not the FPEP, LLC, agreement. Okay?
8       I'm just asking whether you --
9   A   It's the same. Not that I know. We did --
10  we did discuss with him -- and this relates to a comment I
11  made earlier -- on various occasions that the office was
12  his office, all documentation where he could ask freely for
13  them and obtain access to them. This was prior, long prior
14  to his termination.
15      And -- and we -- I recall having that discussion
16  with him several times. But that relates to making sure
17  the paper trail was in order. And, you know, documents
18  like that have to be read.
19  Q   Okay. I'm just curious to know. I believe the
20  answer to my question was you did not provide him with a
21  copy of the partnership --
22  A   I did not, no.

123

1   Q   If you would just let me finish.
2       You did not provide him with a company of the
3   Fidelio partnership agreement prior to him being hired;
4   correct?
5   A   That's correct.
6   Q   Okay. And you don't know of anyone else having
7   provided him with a copy of the Fidelio partnership
8   agreement prior to him being hired; correct?
9   A   That's correct.
10  Q   All right. And, likewise, you did not provide
11  him with a copy of FPEP's operating agreement prior his
12  hiring; correct?
13  A   That's correct.
14  Q   And you don't know of anyone else having provided
15  him with a copy of that agreement prior to him being hired;
16  correct?
17  A   That's correct.
18  Q   And did you or anyone else, to your knowledge,
19  advise Mr. Morris prior to his termination that any
20  promoted interests he may have would be subject to
21  redemption if and when his employment with Buvermo
22  terminated?

124

1   A   I did not.
2   Q   Okay. And do you know whether anyone else did?
3   A   I do not.
4   Q   Do you have any understanding as to how
5   Mr. Morris was paid by Buvermo?
6   A   I don't think we paid him.
7   Q   Okay. He was compensated for his services
8   somehow; correct?
9   A   I think one of his companies or -- I think for
10  tax reasons, he did want to be -- certainly not the
11  president. I'm not sure whether -- I don't know how that
12  really went. But I recall that for tax reasons he didn't
13  want to be on payroll, so I think we paid someone in
14  Washington or Florida --
15  Q   Okay. So I take --
16  A   -- Florida entity of -- that he -- that he owned.
17  Q   All right. Did you have any involvement in that
18  decision-making process?
19  A   On who was paid?
20  Q   On how he was paid.
21  A   No.
22  Q   Okay. And were you in any way involved in --

125

1   well, strike that.
2       I'm not sure if this is something that you
3   already responded to. But did you have an understanding as
4   to why he was paid -- well, why he was paid through a
5   company as a consultant?
6   A   Yes. It was on his request because he was a --
7   he wanted to maintain his residenceship (sic) in Florida.
8   Q   Okay. And did he make that request to you?
9   A   I think he did not to me -- perhaps he made it to
10  Andre van Rhee and myself. But he certainly mentioned the
11  possibility of wanting to structure it in that manner.
12  Q   Okay. Did he tell you why?
13  A   So that he -- well, he said it was -- it was more
14  tax efficient for him to be paid in a different manner.
15  Q   Okay.
16  A   It has to do with estate taxes.
17      MR. HADDAD: Let's take a five-minute break.
18  (Whereupon, a brief recess was taken.)
19      BY MR. HADDAD:
20  Q   Do you recall at any time having discussions with
21  Mr. Morris regarding his concerns about John Gardner's
22  interference with his operation of Buvermo?

126

1    A    Yes, I do.
2    Q    Okay. And when do you recall first discussing
3  that with Mr. Morris?
4    A    Probably in the August, September time frame.
5    Q    And what was the nature his complaint?
6    A    That Mr. Gardner was interfering with his -- with
7  him properly doing his job and that Mr. Gardner wouldn't
8  let go of -- of the company and that Mr. Gardner was, you
9  know, in the marketplace, scurrying for deals and -- and
10  that Mr. Gardner had little belief in him.
11    Q    Okay. And what, if anything, did you do in
12  response to these complaints?
13    A    I discussed them with Mr. van Rhee; I discussed
14  them with Mr. Gardner; and I discussed them with him,
15  Mr. Morris.
16    Q    And was this also in the August time frame?
17    A    It was around that time. And then it occurred
18  again, I think, in early December, when both Mr. Morris and
19  Mr. Gardner called me and said that they had resolved that
20  they could no longer work together.
21       And it was very obvious to us that -- that the
22  two characters of the two men was so different, that it was

127

1  difficult for both of them to make this transition work
2  smoothly.
3       Our response was always -- when I say "our," it
4  was after discussing it with Mr. van Rhee -- and I
5  shouldn't speak on his behalf.
6       My response was always two-fold. On the one
7  hand, that he was the president of Buvermo; and that he
8  should take the lead; and that he should -- but at the same
9  time that he should -- he should work things out with
10  Mr. Gardner; and that January 1 was approaching fast; and
11  that Mr. Gardner would then not be in the office that much.
12       And every time they -- even after that time when
13  they both called me and when they were on the same phone,
14  they seemed to patch things up.
15    Q    Okay. Prior to December of '05 do you recall
16  putting any guidelines into place to address the issues
17  between Mr. Gardner and Mr. Morris?
18    A    Not other than in very general terms that we felt
19  that it was their responsibility to work this stuff out, as
20  grown people.
21    Q    And then in December things came a bit to a head;
22  correct?

128

1    A    Correct.
2    Q    And Gardner at that time -- Mr. Gardner was told
3  at that time that from that point forward he was not to be
4  in the office except for one day a week; correct?
5    A    That's correct.
6    Q    And that was a decision that was made by you and
7  Mr. van Rhee; correct?
8    A    Correct.
9    Q    And why did you make that decision?
10    A    Because we wanted to give Mr. Morris every
11  opportunity that there was to -- to have a positive result.
12  We were backing in effect him in fulfilling his role as
13  president of Buvermo.
14    Q    And aside from being there only one day a week,
15  what were the other terms of this agreement?
16    A    In -- in general we -- in general we also
17  provided for Mr. Gardner to, you know, take on the role of
18  Mr. Zachariasse a little sooner. I think Mr. Zachariasse
19  had his farewell dinner party around December 11, 12. So
20  effectively we said: Look, why don't we implement your
21  taking that role sooner to be more of an advisor, rather
22  than very proactively in the office.

129

1    Q    Okay. Wasn't there some sort of understanding as
2  to -- well, wasn't there some sort of understanding that
3  Mr. Gardner would limit his function to servicing old JBG
4  deals or existing --
5    A    And --
6    Q    -- JBG deals?
7    A    -- and you're right. And we did say that as far
8  as the market was concerned, that Mr. Gardner would commit
9  himself to the relationship with JBG, that new
10  relationships would be handed over to Mr. Morris.
11    Q    And you expected Mr. Gardner to -- I assume you
12  expected Mr. Gardner to adhere to that agreement --
13    A    Certainly.
14    Q    -- correct?
15       Did you at any time after -- throughout this time
16  period when Mr. Morris started talking to you about
17  Mr. Gardner and his -- Mr. Gardner's -- well, at least
18  Mr. Morris's view that Mr. Gardner was interfering -- do
19  you recall ever having thoughts about whether this had
20  something to do with Mr. Gardner having a difficult time
21  letting go of his role?
22    A    I had -- certainly to some extent I did think

130

1 that.

2     But I have to also say that I was disappointed

3 and becoming increasingly disappointed with the way that

4 Mr. Morris was handling that whole situation.

5     Q    "That whole situation" being the situation with

6 Mr. Gardner?

7     A    Yes, because I -- the -- big disappointment

8 was that he was not able to -- to work things out and take

9 the lead with Mr. Gardner. It was a real disappointment.

10    Q    And you attributed that to Mr. Morris?

11    A    Partly, of course.

12    Q    Why?

13    A    Because, in my experience, when there are -- when

14 two people, particularly with such different characters,

15 can't get along, it usually has to do with both of them,

16 rather than with only one.

17    Q    So your attributing some fault to Mr. Morris was

18 based on your general experience?

19    A    Yes.

20    Q    But was it based in any way specifically on their

21 interactions and what was actually going on?

22    A    Well, I found certain representations of

131

1 Mr. Gardner meeting with real estate people other than JBG

2 in the marketplace and being extremely hung up about that

3 and -- inappropriate and -- and not in the sense of a

4 partnership. You know, you can turn it around and say, you

5 know, "The more leads I get, the better it is." And

6 Mr. Morris showed -- that was an example where I thought he

7 was -- that it was inappropriate.

8    Q    Even though that was the agreement that had been

9 reached; correct?

10    A    Well, the agreement that had been reached is

11 to not go out -- that Mr. Gardner would not go out and

12 solicit -- actively solicit transactions. The agreement

13 was not that if Mr. Gardner was called by somebody he'd

14 known for a long time who was in the market and said, "Hey,

15 why don't we meet with each other to discuss the business,"

16 that Mr. Gardner would not do that.

17     We did not have to sit down and dictate or write

18 down specifically what each of these men should do.

19 They're both grownups.

20    Q    There came a time -- you had a March board

21 meeting; correct?

22    A    (The witness moves head up and down.)

132

1    Q    And Mr. Morris picked you up at the airport;

2 correct?

3    A    Correct.

4    Q    And do you recall asking him on arriving from the

5 airport whether John was behaving?

6    A    That I do not recall.

7     I do recall asking how things were working out

8 between John Gardner and him.

9    Q    I see.

10     And that was in the car ride?

11    A    (The witness moves head up and down.)

12    Q    Okay. And what was your --

13    A    Or it was later on.

14     And I asked the question again of both of them

15 when we had dinner, to hear it from both of them.

16    Q    But do you have a specific recollection of a

17 discussion that you had -- do you have any recollection of

18 a discussion that you had with Mr. Morris in his car when

19 he picked you up from the airport, regarding Mr. Gardner?

20    A    Yeah, and asking him whether -- how the

21 relationship was going and whether it was working out. And

22 he was positive in his reply.

133

1    Q    Now, what is your understanding as to when the

2 possibility of terminating Mr. Morris was first put on the

3 table?

4    A    It was after -- after our dinner or in the

5 process of our dinner, it -- it occurred to me that this

6 was really not going as -- in the way that it should,

7 particularly as far as Mr. Morris's role as fiduciary was

8 concerned.

9    Q    Okay. Before we get to that, was there any

10 discussion back in December of '05 about terminating

11 Mr. Morris?

12    A    Not from my point of view.

13     When they both called me at the beginning of

14 December and said that they had decided that they thought

15 that the relationship should be terminated or words to that

16 effect, they brought it up. And we, as I have said, then

17 convinced them that they shouldn't.

18    Q    And when you're saying "they," you're referring

19 to both John Gardner --

20    A    Yeah.

21    Q    -- and John Morris?

22    A    They -- they didn't say, you know, "He's got to

Case 1:06-cv-01131-HHK   Document 32-4   Filed 02/07/2007   Page 35 of 42

Morris vs. Buvermo, et al.                   Deposition of J. Tjaden 12/05/06

134

1    go," or, "I've got to go," or -- they stated in general

2    terms that it was not working out.

3        MR. HADDAD: Bear with me for one second.

4    (Off the record.)

5        BY MR. HADDAD:

6        Q   I take it, then, you don't recall any -- well, do

7    you recall any discussions between yourself and

8    Mr. van Rhee regarding terminating Mr. Morris, in December

9    of '05?

10       A   I recall that we doubted whether this would work

11   out. That is the translation of that or the interpretation

12   of that.

13       Q   Okay.

14       A   And we -- as a matter of fact, we -- I think I

15   also recall that we -- we were all -- I mean by this time

16   more people were looking at the situation than just

17   Mr. van Rhee and myself. Our colleagues were there as

18   well.

19       And during the December dinner, at which time

20   Mr. Zachariasse retired -- it was his farewell dinner --

21   certain comments were made by our partners, Mr. Vis and

22   Mr. Van 't Hooft, that they were not very optimistic that

135

1    this would last very long.

2        Q   Okay. But was the idea of terminating him

3    floated?

4        A   No.

5        Q   Notwithstanding these alleged concerns regarding

6    Mr. Morris and his relationship with Mr. Gardner not

7    working out, you decided to stick with him after December

8    of '05; correct?

9        A   Yes.

10       Q   And what was the basis for that decision?

11       A   And this is almost -- I -- I personally liked him

12   a lot. I had faith in his pulling through and being able

13   to -- you know, to get us the position in the marketplace;

14   and I was willing to back that.

15       Q   In fact, as of that time he had already initiated

16   negotiations regarding Spotswood; correct?

17       A   Correct.

18       Q   And you knew of that at that time; correct?

19       A   Yes.

20       Q   And you were interested in seeing where that deal

21   was going to go; correct?

22       A   Of course.

136

1        Q   That was a new opportunity --

2        A   Yeah.

3        Q   -- for Fidelio?

4        A   New deals change attitudes.

5        Q   Now, you ultimately voted in favor of terminating

6    Mr. Morris in March of 2006; correct?

7        A   That's correct.

8        Q   All right. As best as you can, tell me what your

9    basis for terminating him was.

10       A   It was -- it was really that dinner that we had

11   at the Four Seasons Hotel where he behaved erratically and

12   entirely inappropriately towards us, meaning Mr. van Rhee

13   and myself; and where I was very concerned and deeply

14   concerned when that -- when he abruptly left the dinner

15   meeting without any further explanation; that somebody like

16   that would represent us in a fiduciary basis.

17       And as a fiduciary -- I mean it's such an

18   important part of the whole role. I lost all -- all faith.

19   I was -- I was shocked to my deepest roots.

20       And he called me later after the dinner and --

21   and he must have known how I felt. And I have to say I --

22   you know, I probably was his biggest supporter through

137

1    that -- through all these difficult times; but that -- this

2    was just the straw that broke the camel's back. There was

3    no way that we could continue, I felt.

4        And I had a meeting with Mr. van Rhee the next

5    morning, a breakfast meeting. And he apparently felt the

6    same way, because we determined at that time that we would

7    terminate the relationship with Mr. Morris.

8        Q   Okay. So his conduct at the March meeting --

9        A   Yes.

10       Q   -- was, in your opinion, the reason for his

11   termination?

12       A   Yes.

13       Q   Okay. Now, let's talk a little bit about that.

14       This was March 22; correct?

15       A   Correct.

16       Q   And this was a dinner at the Four Seasons Hotel?

17       A   Correct.

18       Q   Okay. And at that dinner Mr. Gardner took some

19   documents out of his pocket; correct?

20       A   Correct.

21       Q   And he showed them to you and Mr. van Rhee at the

22   table?

138

1    A   He had shown them to us prior to that, when we
2    had a drink in the bar.
3    Q   I see.
4        And these were documents that -- at least one of
5    them impacted -- well, at least one of them involved
6    Mr. Morris; correct?
7    A   Correct.
8    Q   And that was a proposed designation of an FPEP
9    property; correct?
10       MR. SMITH:  I'm going to object to the
11   characterization of it.
12       You can still answer.
13   A   The way I understood it and interpreted it, it
14   was an example of the modification to Article 303, to
15   simplify what was in there and to retain the same essence
16   of the agreement, but to simplify the reading of it;
17   basically to clean up the difficult legal language.  And as
18   an example, it had a designation, and it struck me that
19   Mr. Morris was very irritated by it.
20       BY MR. HADDAD:
21   Q   That designation, incidentally, happened to have
22   a breakdown of the FPEP promote, giving Mr. Gardner 10

139

1    percent and Mr. Morris 3 percent; correct?
2    A   That's right.
3    Q   Uh-huh.
4        And it struck you that Mr. Morris reacted
5    negatively to that because why?
6    A   Because he thought it was an actual designation.
7    Q   Uh-huh.
8        Now, of course, you knew prior to this point that
9    Mr. Morris had had issues with Mr. Gardner; correct?
10   A   Correct.
11   Q   And what Mr. Morris saw -- well, interpreted as
12   Mr. Gardner's interference with his operation of --
13   A   No, no.
14   Q   -- Buvermo?
15   A   Not at all.  Not at -- it was very clear to me --
16   and, again, you have to see -- you have to see me as a
17   supporter of Mr. Morris.  It was very clear to me that that
18   was -- I mean that he -- that that was an example and that
19   he should have seen it that way and he should have been
20   grownup enough to -- to see, had he seen the agree- --
21   the -- the agreements, which were all in his office,
22   that -- that what was taken there was basically his name

140

1    was put in -- in place of Mr. Bonacci's name.  That was it.
2        And he -- and as a matter of fact, this was
3    pointed out to him; and he continued to be extremely
4    irritated.
5    Q   I'm sorry.  You said the agreements were in his
6    office?
7    A   Yeah, in the Buvermo office.  All the FPEP, all
8    the partnership, all the -- all the -- the bylaws of
9    Buvermo, they're all in there --
10   Q   Except that --
11   A   -- and is available at his fingertips.  He knew
12   that we were cleaning up the language.  And as -- as far as
13   I'm concerned, he had access to those papers as well.
14       As a matter of fact, I would have expected him as
15   the president of Buvermo to become very much involved in
16   that, to basically take the lead there.  I was surprised
17   that that was not the case and that he was surprised to see
18   these things.
19       Yeah.  I see it -- I saw it as a prime -- I mean
20   it's good that you asked me the question, because it was --
21   it almost set off a reaction with me, that I thought
22   this -- you know, this is not real -- this is not rationale

141

1    behavior.
2    Q   Did you ever consider the reason why Mr. Morris
3    may not have reviewed whatever was in Mr. Gardner's pocket
4    was because Mr. Gardner drafted it and hadn't shown it to
5    him?
6    A   No, never.
7    Q   You didn't consider that?
8    A   No, not at all, no.
9    Q   Okay.  Well, why wouldn't that have been a
10   consideration?
11   A   It would have been completely out of character of
12   Mr. Gardner.  I mean that would have been the first time in
13   all those years.  And, secondly, I have to repeat I
14   considered it to be a responsibility of Mr. Morris to take
15   the lead in those matters --
16   Q   Uh-huh.
17   A   -- and to ask Mr. Gardner, "How are we doing on
18   the cleaning up?  Can I help?  Can I see this stuff?"
19       And much to my surprise, all those things didn't
20   happen.
21   Q   Except for the FPEP designation is something
22   that's done by Fidelio; correct?

Case 1:06-cv-01131-HHK    Document 32-4    Filed 02/07/2007    Page 37 of 42

Morris vs. Buvermo, et al.                    Deposition of J. Tjaden 12/05/06

142

1    A   It is not -- although Fidelio and we take the
2   decisions. We are not -- Mr. van Rhee and nor myself are
3   in a position to actually take the lead, talk to the
4   lawyers.
5        We don't do that. We make decisions in
6   principle, and we assume that the -- that the guy who's in
7   charge, Mr. Morris, that he takes the lead in cleaning the
8   stuff up. And it's a very -- it's a part of the deal.
9        And on various occasions it occurred to us -- and
10  Mr. van Rhee was more clear in that than I was, because,
11  again, I was -- you know, I did like Mr. Morris very
12  much -- that he didn't -- he continued not to take the lead
13  on these issues.
14       He acted as if this was something that we were
15  supposed to do and he was not involved. "Here it is.
16  Please sign." And then he would review it or not with his
17  counsel. That's not how you do it. No. He was part of
18  the family. That's how I look at it.
19   Q   Okay. Are you done, by the way?
20   A   Sorry.
21   Q   I don't mean to interrupt you.
22   A   I'm sorry. No, no.

143

1    Q   I don't want to get off track here.
2        I just want to be very clear about something
3   because I think we're misunderstanding ourselves.
4        Right now we're talking about an FPEP designation
5   that was -- well, an example of an FPEP designation, as you
6   called it, that was pulled out of Mr. Gardner's pocket at
7   this dinner on March 22; correct?
8    A   Correct.
9    Q   Okay. And FPEP designations, if I'm not
10  mistaken, are issued by the management committee of
11  Fidelio. Correct?
12   A   Correct.
13   Q   Okay. And Mr. Gardner is the president of
14  Fidelio's managing partner; correct?
15   A   Correct.
16   Q   Okay. And so it was his responsibility, in fact,
17  to draft the designation; correct?
18   A   It was his responsibility to sign the
19  designation. I'm not sure it was his responsibility to
20  take the ultimate lead.
21       You know, in a normal -- probably -- probably
22  legally, you're entirely correct. And in legally -- and in

144

1   a legal sense Mr. van Rhee and I -- it was our
2   responsibility to draft all these things because we were
3   the ultimate decision-makers.
4        In a normal working relationship, you know, the
5   guy who's in charge of it, he goes and gets it done. And
6   if he doesn't, then, you know, the other -- there's a
7   discussion about these things.
8    Q   Well, that's what I'm trying to get to, who is in
9   charge of it.
10       It seems to me that since it's Fidelio who is
11  doing the designation and he is the president of Fidelio's
12  managing partner, that Mr. Gardner would be in charge of
13  it.
14       I'm trying to understand why you think Mr. Morris
15  is in charge of drafting the FPEP designation.
16   A   Because Mr. Morris is in charge of day-to-day
17  operations. If it would be -- if it would be a substantial
18  revision of the agreement, meaning amendments that would be
19  made, then certainly we would have asked Mr. Gardner to do
20  it, would have expected Mr. Gardner to come up with those
21  issues.
22   Q   Okay.

145

1    A   This was -- this was amending the thing to the --
2   to basically cleaning up language. It couldn't be simpler.
3    Q   Okay. Would your --
4    A   And we would have asked Mr. Gardner to review it
5   after Mr. Morris would have prepared it.
6    Q   Would your opinion in any way change if I were to
7   tell you that Mr. Gardner had voluntarily assumed the role
8   of drafting that?
9        MR. SMITH: Object to form.
10   A   I would have assumed that that would have been
11  in coordination with Mr. Morris. And I -- you know, I
12  think the fact that Mr. Gardner did that was also -- was
13  perhaps, indeed, part of his role, but in -- in cooperation
14  with Mr. Morris. I mean he was a party to the whole thing.
15       BY MR. HADDAD:
16   Q   I couldn't agree with you more that Mr. Morris
17  should have been a party to the whole thing. I'm not
18  disputing you on that.
19       MR. SMITH: I'm objecting to the characterization
20  of the testimony.
21       BY MR. HADDAD:
22   Q   I'm asking you: In the event -- let's assume for

146

1  purposes of this discussion here that Mr. Gardner did take
2  it upon himself to do it -- okay? -- but had failed to show
3  it to Mr. Morris prior to your dinner.
4         Do you find that to be appropriate conduct on
5  Mr. Gardner's part?
6     A  I find it very unusual.
7     Q  But you --
8     A  I would have expected him to discuss that, yes,
9  absolutely.
10    Q  And you would understand why Mr. Morris might get
11 angered if something that he felt Mr. Gardner had taken
12 charge of was presented at this meeting, prior to his
13 review?
14        MR. SMITH:  Object to form.
15    A  My interpretation of his irritation was that he
16 did not understand that this was an example.  That's
17 different.
18        Had he been totally unaware of what was going on,
19 then I can understand that he would have been irritated.  I
20 could not understand that he became -- he went -- I don't
21 know what the proper way to say it, but he went ballistic.
22        BY MR. HADDAD:

147

1     Q  Uh-huh.
2        Who was present at this dinner?
3     A  Mr. van Rhee, Mr. Gardner, and Mr. Morris.
4     Q  Okay.  And at this dinner there was also a
5  discussion initiated, I believe, by Mr. van Rhee regarding
6  applying any expenses -- operating expenses of Buvermo to
7  any promote that's ultimately paid; correct?
8     A  Correct.
9     Q  And reducing any promote that's ultimately paid
10 to, for instance, Mr. Gardner -- Mr. Morris by these
11 operating expenses; correct?
12    A  Correct.
13    Q  Okay.  And, in fact, Mr. van Rhee at that dinner
14 was pretty adamant about wanting that to be something that
15 Mr. Morris was -- that applied to Mr. Morris as well;
16 correct?
17    A  Well, Mr. van Rhee stressed that he thought that
18 that should be part of -- should have been part of the
19 agreement.
20        And I objected to that, as did Mr. Gardner,
21 because that was not part of the agreement.  And
22 Mr. van Rhee then conceded that and said, "You're right.

148

1  It's just a matter of principle.  I think it should be" --
2  "should really be part" -- "should have been part of it."
3         We did not negotiate that agreement, but we -- I
4  objected.  I objected to the interpretation by
5  Mr. van Rhee.
6     Q  And that was after some discussion between
7  Mr. van Rhee and Mr. Morris regarding that; correct?
8     A  Yes.  But I should say that I think I objected
9  almost immediately --
10    Q  Uh-huh.
11    A  -- to it, but they went on with each other.
12    Q  Okay.  And in the course of that discussion,
13 would you agree that Mr. van Rhee's tone wasn't necessarily
14 a cordial one?
15    A  I've -- I've known Mr. van Rhee for a long time.
16 He's -- he's always somewhat emotional about these things,
17 and it's never with disrespect.  He just states his
18 principle.
19        But it was certainly not cordial; it was
20 business-like.
21    Q  Uh-huh.
22        And, unlike you, Mr. Morris hasn't known

149

1  Mr. Van Rhee for all that long; correct?
2     A  Correct.
3     Q  So at some point Mr. Morris left the dinner;
4  correct?
5     A  Yes.
6     Q  Okay.  And did you -- by the way, did you know
7  that Mr. Morris was a diabetic?
8     A  I -- I heard that.  I did know, but I had
9  forgotten, and then I heard it again the next day because
10 we were trying to figure out what happened.
11    Q  Uh-huh.
12    A  And I never heard from Mr. Morris himself.
13    Q  From whom --
14    A  Perhaps I had in France.  I don't -- I did find
15 out somehow; but, I think, through Mr. Gardner.
16    Q  Through Mr. Gardner.
17        And this was the next day after the 23rd of
18 March?
19    A  I might have been told -- and I think I was --
20 when we met in France at -- in August of that year, of the
21 prior year.
22    Q  You, Mr. Gardner, and Mr. van Rhee stayed after

150

1  Mr. Morris left; correct?

2      A   Correct.

3      Q   And you discussed what had happened; correct?

4      A   Correct.

5      Q   Okay.  And did you solicit any -- did you

6  solicit -- well, did you ask Mr. Gardner as to what

7  his view -- did you discuss termination at that point?

8      A   Mr. van Rhee and I were shocked, as was

9  Mr. Gardner.  We were totally shocked.

10         And in addressing -- it was discussed, and I

11  addressed Mr. van Rhee, and he addressed me about this --

12  on this issue.  We sort of looked at each other and said,

13  You know, is this -- can this go on?  And we decided we

14  would sleep -- we would sleep on it.

15         And I was -- as I said, I was -- I was in shock.

16  But we did mention that this might perhaps lead to

17  termination, yes.  But we wanted to sleep on it.

18     Q   And did you ask at that time Mr. Gardner what his

19  views were on the issue -- well, on whether to terminate

20  Mr. Morris?

21     A   We -- I had not asked.  I did not.

22         But wait.  I did -- let's say it differently.  I

151

1  had -- Mr. Gardner was never involved in the decision.

2  That decision was made by Mr. van Rhee and myself the next

3  day at the breakfast meeting.

4         Was termination mentioned?  Could this go on any

5  further?  We talked mostly about trying to interpret what

6  had happened, rather than what the consequences might be.

7  And we did all understand that it might lead to

8  termination.

9      Q   Uh-huh.

10        During that discussion that night between the

11  three of you, did you discuss Mr. Morris's performance

12  otherwise outside the dinner, his performance on behalf

13  Buvermo?

14     A   That evening we didn't; I don't think so.

15     Q   And you stated that you then spoke with

16  Mr. Morris on the telephone later --

17     A   Yes.

18     Q   -- that evening?

19     A   I invited him to come to -- to the meeting, and I

20  told him how shocked I was.

21     Q   Okay.  So you called him up to invite him to a

22  breakfast meeting?

152

1      A   He called me.

2      Q   He called you.  Okay.

3         And what else do you recall being discussed

4  during that telephone call?

5      A   Without saying so, I made him understand that

6  this was a very serious issue and that we wanted him to

7  come to the meeting the next morning.

8      Q   Now, prior to leaving the table with Mr. Gardner

9  and Mr. van Rhee that evening on the 22nd, did you at all

10  discuss whether Mr. Morris should be compensated for his

11  efforts in connection with Spotswood?

12     A   Okay.  Do you mean that evening or the next day?

13     Q   That evening.

14     A   No, that evening we did not.  As I recall, those

15  discussions took place the next morning.

16     Q   Okay.  So the next morning --

17     A   Prior to meeting Mr. -- when we made the decision

18  that he was going to be terminated, which we did very soon

19  after our premeeting, our breakfast -- Mr. van Rhee and my

20  breakfast meeting started, it was very clear to both of us

21  very soon that he would be terminated.

22         And we also agreed very soon that we wanted to

153

1  treat Mr. Morris fairly and, you know, that we were

2  prepared to make a fair gesture as far as Spotswood was

3  concerned.

4         THE COURT REPORTER:  Excuse me.

5  (Discussion off the record.)

6         BY MR. HADDAD:

7      Q   You had indicated that you felt the need to treat

8  Mr. Morris fairly -- well, I'll start with that.  Correct?

9      A   Yes.

10     Q   And did you mean by that to treat him fairly in

11  connection with Spotswood?

12     A   Yeah.  And also -- also in a financial sense.

13     Q   Okay.  And --

14     A   You know, if you read the letter, termination is

15  termination.  There's no -- you know, the interpretation of

16  the letter was also very clear.  And we wanted to be fair,

17  and I -- we thought that -- well, we made a gesture.  I'm

18  not sure that -- whether I should mention that, if it would

19  enter --

20     Q   Everything you say is going to be recorded,

21  that's for sure, unless it's off the record.

22         I'm just trying to follow up on your comment that

154

1  you felt you should treat Mr. Morris fairly.
2      Did you consider paying him some amount for the
3  Spotswood fair treatment at the time?
4      A   Yes. But we considered -- we considered to pay
5  him an amount -- either pay him an amount or leave -- or
6  give him an interest in Spotswood, the promote.
7      Q   Okay. And that's because of the work he had
8  performed on Spotswood?
9      A   Correct.
10     Q   And what about with respect to Reston
11 International Center; did you consider providing him with
12 any interest or payment for that?
13     A   We did not, no.
14     Q   Now, in the course of discovery in this case,
15 I've received a couple write-ups from Mr. -- one from
16 Mr. Gardner and one from Mr. van Rhee regarding the events
17 of the March 22nd dinner.
18     My question to you is: Did you ever prepare such
19 a writing?
20     A   Do you know, I did; and I put on it my
21 BlackBerry. During the flight back home, I sent it out;
22 and nobody ever got it. And I've never bothered to write

155

1  it again.
2      Q   So I take it you don't have a copy anywhere?
3      A   It's gone. No, I don't.
4      Q   Okay. Now, Mr. Millspaugh, he was hired as the
5  president in August; correct?
6      A   Correct.
7      Q   And I take it you also reviewed his offer letter?
8      A   I did.
9      Q   Okay. And you also approved that letter;
10 correct?
11     A   Correct.
12     Q   Okay. And he was offered, it seems in terms of
13 that offer letter, a promoted interest in both Spotswood
14 and Reston International Center; correct?
15     A   Correct.
16     Q   Okay. And did you explain to him at that time
17 that these interests were being claimed by Mr. Morris in
18 this litigation?
19     A   He was aware of our dispute with Mr. Morris.
20     Q   Okay. But do you have any recollection of
21 explaining that those interests were the subject of this
22 dispute?

156

1      A   It's -- it's -- we can designate whatever we
2  want. It's -- there's nothing -- Mr. Morris makes a claim.
3  Whether it's that exact claim, it's not -- it's not a claim
4  that's in someone's name. We can designate --.
5      Q   You can increase the promote --
6      A   Yeah.
7      Q   -- is what you're saying?
8      If Mr. Morris some day wins this case, you can
9  grant him a promote and still maintain Mr. Millspaugh's
10 promote; correct?
11     A   Correct.
12     Q   Good.
13     MR. HADDAD: Actually, the only questions I have
14 left are to authenticate these board packages. But if
15 you're willing to consent -- if you're willing to stipulate
16 on the record that these are, in fact, the board
17 packages --
18     MR. SMITH: If those are the board packages I
19 sent to you and they haven't been altered in any respect,
20 certainly.
21     MR. HADDAD: Okay. I think that's it. I would
22 like off the record to discuss a few things.

157

1      MR. SMITH: I have a few questions I want to ask.
2      MR. HADDAD: Go for it.
3          CROSS-EXAMINATION
4      BY MR. SMITH:
5      Q   You testified about the negotiations leading up
6  to the offer of employment to Mr. Morris; and I believe you
7  said that you had a long-term view of the opportunity and
8  you expected that -- and I'm summarizing, obviously --
9  Mr. Morris, you wanted to make sure that he had somewhat of
10 a long-term perspective as well?
11     A   Correct.
12     Q   I'm just drawing your attention to that
13 testimony.
14     During those discussions did the company Buvermo
15 offer any specific term of employment to Mr. Morris?
16     MR. HADDAD: I'm just going to object to
17 foundation.
18     But go ahead.
19     A   No.
20     BY MR. SMITH:
21     Q   All right. And did Mr. Morris ever attempt to
22 even negotiate a fixed term of employment?

158

1    A  He did not.

2        MR. HADDAD: Again, I'm going to object to

3    foundation.

4        BY MR. SMITH:

5    Q  And did Mr. Morris attempt to negotiate a

6    severance package or a payment in the event he was

7    terminated?

8    A  He did not.

9        MR. HADDAD: Same objection.

10        BY MR. SMITH:

11    Q  All right. And did the company agree to employ

12    Mr. Morris until he reached the age of 60 years old?

13        MR. HADDAD: Same objection.

14    A  Absolutely not.

15        MR. SMITH: Just so I understand what your

16    objection is.

17        MR. HADDAD: Well, you're asking him what Buvermo

18    agreed to. And I don't think that he's the only one who

19    plays a role in that.

20        MR. SMITH: Well, the question assumes,

21    obviously, he was participating in the discussions. All

22    right. I understand your objection.

159

1        MR. HADDAD: Okay.

2        BY MR. SMITH:

3    Q  All right. Did the company ever agree to employ

4    Mr. Morris for a ten-year period?

5    A  No.

6        MR. HADDAD: Can I just make -- I'll just make

7    a --

8        MR. SMITH: You can.

9        MR. HADDAD: -- continuing objection --

10        MR. SMITH: Sure, sure.

11        MR. HADDAD: -- to any questions related to what

12    the company did without first establishing that he knows

13    what the various people with authority to bind the company

14    did.

15        BY MR. SMITH:

16    Q  Now, you understand that my questions are

17    directed to your participation in discussions --

18    A  I understand.

19    Q  -- with Mr. Morris? All right.

20        And in terms of Mr. Gardner's ongoing role after

21    December of '05, did you anticipate that Mr. Gardner would

22    have any ongoing role with the company after December

160

1    of '05?

2    A  Yes, I did.

3    Q  All right. And would he have any role in terms

4    of the -- ongoing role in terms of the investment decisions

5    that Buvermo would propose to the partners?

6    A  Absolutely.

7    Q  All right. And you testified about the time

8    period after Mr. Morris was -- or the decision had been

9    made to terminate Mr. Morris's employment, and you

10    testified that the company wanted to make a gesture to

11    Mr. Morris. Do you recall that testimony?

12    A  Yes.

13    Q  And did you believe -- "you" being Buvermo,

14    Fidelio, did you believe that you were legally obligated to

15    make that gesture?

16    A  Not at all. I mean I believe that we were not

17    legally obligated to make that gesture.

18        MR. SMITH: Okay. No further questions.

19        MR. HADDAD: I'm done.

20    A  As a matter of fact, I verified that we were

21    not obligated to do that.

22        MR. HADDAD: I don't know how much you want him

161

1    to testify about that. That gets into privileged

2    communications, I imagine.

3        MR. HADDAD: Just to be clear, one more question.

4        REDIRECT EXAMINATION

5        BY MR. HADDAD:

6    Q  From whom you did you verify that?

7    A  By getting -- getting a copy of the signed

8    letter.

9    Q  Oh. Your review of the letter --

10    A  Yes.

11    Q  -- verified that?

12        MR. HADDAD: I see. Okay.

13        MR. SMITH: We want to sign.

14    (At 5:12 p.m. the taking of the deposition

15    was concluded.)

Morris vs. Buvermo, et al.                          Deposition of J. Tjaden 12/05/06

162

1    I have examined and read the foregoing 161
2    pages and find the answers contained herein with
3    the changes made by me, if any, to be true and
4    correct.
5
6
7                    _____
                      Joost E. Tjaden
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

164

1        CERTIFICATE OF NOTARY PUBLIC/REPORTER
2        I, Malynda D. Whiteley, the officer before whom the
3    foregoing deposition was taken, do hereby certify that the
4    witness whose testimony appears in the foregoing deposition
5    was duly sworn by me; that the testimony of said witness
6    was taken by me in stenotype and thereafter reduced to
7    typewriting under my direction; that said deposition is a
8    true record of the testimony given by said witness; that I
9    am neither counsel for, related to, nor employed by any of
10   the parties to the action in which this deposition was
11   taken; and further, that I am not a relative or employee of
12   any attorney or counsel employed by the parties hereto, nor
13   financially or otherwise interested in the outcome of the
14   action.
15       Given under my hand this 7th day of December, 2006.
16
17
18                    _____
                       Notary Public in and for the
19                     District of Columbia
                       Registered Professional Reporter
20
21   My commission expires:
22   June 30, 2011

163

1    As you read your deposition, if you have any corrections to make,
     please itemize them
     below.  Do not write on the transcript.  Upon completion enter
     today's date and sign
2    your name to the signature line.  This will be attached to your
     deposition for filing.
     Thank you.
3
         CORRECTIONS TO DEPOSITION
4
     PAGE LINE              EXPLANATION
5
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
     Date        Signature