Case 1:06-cv-01131-HHK    Document 32-5    Filed 02/07/2007    Page 1 of 32

Morris vs. Buvermo, et al.                    Deposition of A. van Rhee 12/06/06

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - -x
                                      :
JONATHAN H. MORRIS,                   :
                                      :
                    Plaintiff,        :
                                      :
        vs.                           :   Case No.
                                      :   1:06CV01131 (HHK)
BUVERMO PROPERTIES, INC., et al.,     :
                                      :
                    Defendants.       :
                                      :
- - - - - - - - - - - - - - - - - - -x


                              Washington, D.C.

                              Wednesday, December 6, 2006


        Deposition of ANDRE C. VAN RHEE, witness, called for

examination by counsel for the plaintiff, pursuant to

notice, at the offices of Ziad P. Haddad, Esq., Tobin,

O'Connor, Ewing & Richard, 5335 Wisconsin Avenue,

Northwest, Suite 700, Washington, D.C., before

Malynda D. Whiteley, a Registered Professional Reporter and

a notary public in and for the District of Columbia,

beginning at 9:10 a.m., when were present on behalf of the

respective parties:

EXHIBIT
3

Case 1:06-cv-01131-HHK    Document 32-5    Filed 02/07/2007    Page 2 of 32

Morris vs. Buvermo, et al.                    Deposition of A. van Rhee 12/06/06



2

1    A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFF:
4    ZIAD P. HADDAD, ESQ.
5    Tobin, O'Connor, Ewing & Richard
6    5335 Wisconsin Avenue, Northwest
7    Suite 700
8    Washington, D.C. 20015
9    (202) 362-5900
10
11   ON BEHALF OF THE DEFENDANTS:
12   MARC J. SMITH, ESQ.
13   Smith, Lease & Goldstein
14   11 North Washington Street
15   Suite 520
16   Rockville, Maryland 20850
17   (301) 838-8950
18
19   ALSO PRESENT:
20   John Gardner
     Joost E. Tjaden
21
22

4

1    P R O C E E D I N G S
2    Whereupon,
3        ANDRE C. VAN RHEE,
4    witness, was called for examination by counsel for the
5    plaintiff, and after having been duly sworn, was examined
6    and testified as follows:
7        EXAMINATION BY COUNSEL FOR THE PLAINTIFF
8        BY MR. HADDAD:
9    Q    Please state your name for the record.
10   A    Andre van Rhee.
11   Q    I'll call you "Mr. van Rhee," if that's okay?
12   A    It doesn't matter.
13   Q    I apologize.
14       Have you ever had your deposition taken before?
15   A    Yes, but not in the States.
16   Q    Okay.  How long ago was that?
17   A    Ten, fifteen years.
18   Q    Okay.  Well, you were present yesterday for
19   Mr. Tjaden's deposition; correct?
20   A    (The witness moves head up and down.)
21   Q    Correct?
22   A    Yes, correct.

3

1    I N D E X
2
3        EXAMINATION BY COUNSEL FOR:
4        PLAINTIFF,    DEFENDANTS,
     WITNESS          MR. HADDAD    MR. SMITH
5
     Andre C. van Rhee        4        119
6
7
8    E X H I B I T S
9    PLAINTIFF'S                FOR IDENT.
10   No. 1   Declaration            58
11
12
13
14
15
16
17
18
19
20
21
22

5

1    Q    Okay.
2    A    I'm sorry.  Yeah.  I have to say it.
3    Q    Well, I'm going to go over the rules anyway just
4    because I want to make sure that you understand them and
5    you understood them yesterday.
6        I'm going to ask you a series of questions today
7    which you're required to respond to truthfully.  You're
8    responding under oath.  And it's important that when I ask
9    a question, you wait until I complete my question before
10   responding, even if you know what it is I'm going to ask.
11   Okay?
12   A    Yes.
13   Q    And I will try to do the same when you're
14   responding.
15       In addition to that, from time to time I may ask
16   a question that you don't understand; and if that's the
17   case, please let me know.  Okay?
18   A    Yes.
19   Q    And you may need to take a break from time to
20   time.  So when you do, please let me know; and we'll try to
21   accommodate your request.  Okay?
22   A    I'll do it.

Case 1:06-cv-01131-HHK    Document 32-5    Filed 02/07/2007    Page 3 of 32

Morris vs. Buvermo, et al.                    Deposition of A. van Rhee 12/06/06

**6**

1     Q    And, finally, it's important that you speak your
2 responses clearly so that the court reporter can take them
3 down. Okay?
4     A    Understood.
5     Q    Two days ago you participated in a -- well,
6 yesterday -- sorry -- you participated in a Fidelio
7 management committee meeting; correct?
8     A    Correct.
9     Q    And as part of that meeting you were provided
10 with a board package; correct?
11     A    Correct.
12     Q    Do you have a copy of that board package here
13 with you today?
14     A    Yes, I have.
15     Q    Okay. Is it in this room with us?
16     A    It is.
17     Q    Okay. May I have it, please?
18     A    Why?
19     Q    Because --
20         MR. SMITH: Well, I haven't looked at it yet; so,
21 no. The answer's no. You'll get it after I look at it.
22         BY MR. HADDAD:

**7**

1     Q    Do you know who prepared the board package?
2     A    The president with his vice president.
3         MR. HADDAD: Okay. How long would it take you to
4 take a look at that, Marc?
5         MR. SMITH: I don't know; I haven't seen it.
6         MR. HADDAD: Are you not willing to do it right
7 now?
8         MR. SMITH: I can, if you want to take a break.
9         MR. HADDAD: I do.
10         BY MR. HADDAD:
11     Q    Well, before we --
12         THE WITNESS: That's -- that's -- I'm sorry.
13         MR. HADDAD:
14     Q    I'm sorry.
15         Before we break, did you bring copies of any of
16 the resolutions that were passed at this meeting?
17     A    No.
18     Q    Okay. Those are located where?
19     A    In the office.
20     Q    Okay. At Buvermo's office?
21     A    Buvermo's office, yes.
22         MR. HADDAD: Okay. Can we get those faxed to us

**8**

1 right now, please?
2         MR. SMITH: No.
3         MR. HADDAD: Why not?
4         MR. SMITH: Because I haven't seen them yet, and
5 I don't --
6         MR. HADDAD: You can see them when they get faxed
7 to us. If you're going to say no, say no. But I just want
8 to get it on the record.
9         MR. SMITH: I haven't seen them, so I'm not going
10 to agree to produce them to you. I haven't seen any of
11 these documents.
12         MR. HADDAD: Well, I'll have them faxed to your
13 attention.
14         MR. SMITH: Let's just move forward.
15         MR. HADDAD: I'm just asking. Are you willing to
16 do that?
17         MR. SMITH: No.
18         MR. HADDAD: Okay. I'm just going to reserve the
19 right to continue all depositions until I receive documents
20 that are clearly responsive to my requests; and that I had
21 asked last week counsel consult with his clients and have
22 them produce them at these depositions, and he's failed to

**9**

1 do so.
2         MR. SMITH: We don't agree we have an obligation.
3 I'm not saying I'm not going to produce them. I just need
4 sufficient time to review them before I produce them.
5         BY MR. HADDAD:
6     Q    What did you do to prepare for your deposition?
7     A    What I did. I -- I was present during the
8 deposition of Mr. Tjaden, and I think that was a way of
9 preparing. As he told you before that, we had about an
10 hour with -- with our counsel. And yesterday night I
11 reviewed a few papers. Yeah.
12     Q    Okay. You met with counsel as well?
13     A    Five minutes after the meeting here --
14     Q    Okay.
15     A    -- in the shopping center.
16     Q    Prior to yesterday's deposition did you meet with
17 your counsel in connection with your deposition here today?
18     A    That was not specific (sic) mine. Together,
19 Mr. Tjaden and I had a meeting with counsel.
20     Q    You had a meeting with counsel on Monday?
21     A    That was Monday, I suppose, yeah.
22     Q    And you stated that you reviewed some documents

10

1  yesterday evening?

2     A  Yeah.

3     Q  What documents did you review?

4     A  That was the partnership agreement of Fidelio and

5  the FPEP partnership agreement or bylaws or whatever the

6  name is and the Buvermo bylaws and my own letter that I

7  made about what happened in the March dinner and after

8  that.

9     Q  Let's talk about some of the resolutions that

10 were passed at yesterday's meeting.  Do you recall what

11 resolutions were passed?

12    A  They were designations for FPEP for the Spotswood

13 Shopping Center and Reston International Center, I think.

14 And it was -- we decided to make changes to the FPEP

15 agreement or whatever that is to make it possible to enter

16 Mr. Millspaugh and to take away the name of Mr. Bonacci,

17 who left the company quite some time ago.

18    Q  Were any other properties other than Spotswood

19 and Reston International Center designated as FPEP

20 properties?

21    A  Not as I recall.

22    Q  And did the designations reflect an FPEP

11

1  percentage that would be paid to certain individuals?

2     A  Yes.

3     Q  Okay.  And do you recall what percentage -- what

4  individuals were identified as potential recipients of an

5  FPEP promote?

6     A  Promote only Mr. Millspaugh, but co-investment

7  also Mr. Gardner.

8     Q  Did Mr. Millspaugh invest in the equity in the --

9     A  No.

10    Q  -- Spotswood deal?

11    A  No.

12    Q  And what about Reston International Center?

13    A  No, he didn't.

14    Q  And what about Mr. Gardner; did he invest in

15 either one of those --

16    A  Yes.

17    Q  -- deals?

18    A  Yes.

19    Q  Okay.  It's important that you wait until I

20 complete my question.  Is that fair?

21    A  I'm sorry.

22    Q  Okay.  And do you know the percentage of

12

1  investment that Mr. Gardner made in both deals?

2     A  I think it's 2 and a half percent.

3     Q  2 and a half percent.

4     And the promote that was designated to Mr. --

5  well, that was identified -- the percentage of promote that

6  was identified for Mr. Millspaugh, was that 12 percent?

7     A  As I recall, yes.

8     Q  On both deals?

9     A  On both deals.

10    Q  And what is the hurdle rate for Fidelio on both

11 deals?

12    A  That's a difficult question because we've changed

13 it, but I think it's 10 percent now -- no.  It might be 11

14 percent now.  There has been a lot of discussion about the

15 hurdle rate.

16    Q  Is that also reflected in the designations?

17    A  Yes.

18    Q  Were consents to action executed yesterday?

19    A  What exactly is a consent to action?

20       MR. HADDAD:  Do we have the deposition exhibits

21 from yesterday?

22       THE COURT REPORTER:  (The court reporter moves

13

1  head up and down.)

2  (Documents presented.)

3       MR. HADDAD:  Thank you.

4     BY MR. HADDAD:

5     Q  Let me show you what was marked as Exhibit Nos.

6  1, 2, 3, and 4 to Mr. Tjaden's deposition yesterday.

7  (The witness reviewed documents.)

8     A  I don't remember whether there was one due,

9  because sometimes we sign them when they are sent home and

10 we sign them and send it back.  I don't know whether any of

11 it needed consent.  Now, maybe -- maybe the -- what's the

12 name of that project? -- the Merchant Fund site -- right?

13 I want to say it right.  But don't remember whether we

14 signed something on that.

15    Q  Okay.  So you --

16    A  What we would have signed is what it is because

17 we empower them anyway to do that project.  But whether we

18 signed it yesterday I don't know.

19    Q  I see.

20       So you gave authorization yesterday --

21    A  For that project, yes.

22    Q  And that's the Merchants Fund project?

14

1    A   Yes.

2    Q   To proceed with the sale of that -- I mean --

3  sorry -- the --

4    A   The purchase.

5    Q   -- purchase --

6    A   Yes, the purchase.

7    Q   -- of an interest in that deal; correct?

8    A   Yes.

9    Q   All right. And what about with respect to the

10  Reston International Convenience Center; was any action

11  taken with respect to that?

12    A   I think that happened before.

13    Q   That's previously happened?

14    A   Yeah, I suppose so.

15    Q   You're not certain?

16    A   May I ask my former president and advisor whether

17  that is? I mean otherwise, I don't know. I don't know.

18    Q   Well, if you don't know, that's fine.

19    A   Yeah.

20    Q   We'll find out somehow through --

21    A   Yeah.

22    Q   -- documentary evidence.

15

1        Okay. And Mr. Millspaugh was appointed president

2  at yesterday's meeting --

3    A   No --

4    Q   -- is that correct?

5    A   -- no. That was -- I want to be careful.

6  Anyway, the appointment was earlier. Whether that was

7  confirmed, I don't think that was necessary at this

8  meeting. I mean I think we had done that earlier.

9    Q   So you don't recall --

10    A   The only thing we did is bring him into FPEP,

11  written. But he was already president. I mean that's --

12  that was last meeting all -- at last meeting already.

13    Q   Okay. So you don't recall any discussion at

14  yesterday's meeting regarding confirming Mr. Millspaugh as

15  the president of --

16    A   Buvermo.

17    Q   -- Buvermo?

18    A   No.

19        He was chairing the meeting; I mean nothing new.

20    Q   Let's just go through some of the organizations

21  in which you're involved.

22        You are familiar with the general partnership

16

1  known as Fidelio Properties, I take it?

2    A   Yes.

3    Q   And for simplicity's sake, I'm going to refer to

4  that company as "Fidelio" today. Okay?

5    A   That's all right.

6    Q   And you do not hold any position at Fidelio

7  directly; correct?

8    A   Personally no.

9    Q   Okay. And you're not personally a partner of

10  Fidelio; correct?

11    A   That's correct.

12    Q   Yesterday I had Mr. Tjaden take a look at Exhibit

13  No. 4 to Mr. Gardner's deposition.

14  (The witness reviewed document.)

15    Q   And do you recognize this to be the partnership

16  agreement of Fidelio?

17    A   Yes, I do.

18    Q   Okay. And turning to the last page of that

19  document, do you recognize the entities identified there to

20  be the current partners of Fidelio?

21    A   Absolutely.

22    Q   Okay. And do you know whether their partnership

17

1  percentages have been -- whether the partnership

2  percentages have changed since the date of that schedule?

3    A   Not in many, many years.

4    Q   Okay. If I can just have that back, please.

5  (Document presented to counsel.)

6    Q   And could you just generally describe the

7  business of Fidelio for me.

8    A   As I see it, that is supplying equity to real

9  estate developers in the area of Washington, including some

10  Maryland, Virginia. And on top of that we have an activity

11  where we also supply loans from a Dutch bank; so we are

12  some type of an agent or whatever our formal position is in

13  that. Those are the -- the two activities.

14    Q   What Dutch bank is that?

15    A   That was what was called until very recently

16  Bouwfonds, what is now called SNS Property Finance.

17    Q   Okay. And that's something that Fidelio does as

18  part of its business?

19    A   That as Buvermo, I suppose.

20    Q   Okay.

21    A   As Buvermo, yeah.

22    Q   What kind of investments does Fidelio contribute

18

1  equity to?
2      A   Generally it's redevelopment.  It's buying a
3  property, changing the -- how do you call that? -- the
4  rights to -- to construct; generally to try to get higher
5  density or a different use and then redevelop that;
6  although, we don't develop.  But we supply equity to
7  developers, and our management is discussing that with
8  those developers.
9      Q   I see.
10     And would you agree that typically the term of
11  the investment is three to five years?
12     A   Yes, typically that -- that's what we -- what we
13  like very much.  But we have had it between one and
14  twenty-eight years, I think, so --.
15     Q   Okay.  But those would be the exceptions --
16     A   But we are looking for things that are in that
17  range.
18     Q   Okay.  You're looking for things in the three- to
19  five-year range?
20     A   Yes.
21     Q   With respect to Spotswood do you have an
22  understanding as to how long you expect your investment in

19

1  that property to continue?
2      A   That might very well be in that range, might be a
3  little bit longer.  It depends on how long we are in and at
4  what moment you sell it.
5      Q   Okay.  So going in --
6      A   Yes.
7      Q   -- going into that --
8      A   I mean the re- -- oh, sorry.  I'll wait.
9      Q   Going into that, did you have any intention or
10  understanding as to how long Fidelio would remain invested
11  in that property?
12     A   In my recollection, that would be at the high end
13  of the two to five.
14     Q   Two to five years?
15     A   Yeah.
16     Q   Okay.  And what about with respect to Reston
17  International Center?
18     A   That is longer.
19     Q   Okay.  How long are you anticipating --
20     A   That might be --
21     Q   -- that deal --
22     A   -- seven years, might be even ten years.

20

1      Q   There is quite a bit of development that's
2  anticipated on that particular --
3      A   Yes.
4      Q   -- deal?
5      And that's why you're considering perhaps
6  sticking around in that investment for a longer period of
7  time?
8      A   That's true.  But we might as well sell it off if
9  there is new -- new density agreed, that somebody else
10  might pick it up.  I mean that's why it can be between one
11  and so many years.
12     Q   Uh-huh.
13     A   The project itself might take that.  But whether
14  our involvement will take the same time, that's absolutely
15  not sure.
16     Q   Right.
17     A   It's all a matter of IRR.
18     Q   Okay.  You said "IRR"; correct?
19     A   Yes, yes.
20     Q   And can you tell us what that means.
21     A   Internal rate of return.
22     Q   Okay.

21

1      A   What means that -- that is the combination of the
2  profit you make as a percentage of the investment and the
3  time frame.  So the shorter you have it, the higher the
4  IRR.  And the higher the profit, the higher it is.  And
5  there is an optimum.
6      Q   Okay.  Can you tell me typically the amount of
7  investment that Fidelio makes in its deals.
8      A   I would say between half and two and a half
9  million.
10     Q   So between five hundred --
11     A   Thousand --
12     Q   -- thousand --
13     A   -- and two and a half million.
14     Q   -- and two and a half million?
15     And we talked about Buvermo.  Well, you mentioned
16  Buvermo earlier.  Buvermo is Fidelio's operating company;
17  correct?
18     A   That's correct.
19     Q   Okay.  And what does that mean to you?
20     A   That all the personnel is employed by Buvermo
21  because the partnership doesn't have employees.
22     Q   Okay.  So Fidelio's actions in the marketplace

Morris vs. Buvermo, et al.                    Deposition of A. van Rhee 12/06/06

22

1  are done through Buvermo; is that right?
2     A   Yes.
3     Q   Buvermo is the entity that's responsible for
4  identifying deals on behalf of Fidelio?
5     A   Yes.
6     Q   Okay. Do you know of any other entity or person
7  that identifies deals on behalf of Fidelio, other than
8  Buvermo?
9     A   Anybody might. Our -- our consultants might.
10  They're not employed; they're self-employed people.
11     Q   Okay. So Fidelio has hired some consultants?
12     A   Yeah. And I suppose that Buvermo employs the --
13  or hires the consultants. So we have Mr. Zachariasse who
14  left, but we still have Mr. Pijper who is still there.
15  They might come up with leads.
16     Q   Where does Mr. Pijper reside?
17     A   Where? In Holland, the Netherlands.
18     Q   To your knowledge, has he ever resided in the
19  United States?
20     A   I don't think so.
21     Q   Does Fidelio invest exclusively in the
22  United States?

23

1     A   Yes.
2     Q   And does it invest -- I take it most of its deals
3  are concentrated in the D.C. area. Correct?
4     A   D.C. plus environment.
5     Q   D.C. plus what?
6     A   It's the greater Washington area.
7     Q   I see. Okay.
8     A   Spotswood is not exactly in D.C.
9     Q   Right.
10        Now, does Fidelio invest in other states, other
11  than Maryland or Virginia --
12     A   No.
13     Q   -- and D.C., if you want to consider that --
14     A   No.
15     Q   -- a state?
16     A   No.
17     Q   Fidelio has a management committee; correct?
18     A   Yes.
19     Q   And that consists of Donelux, Inc., and Janivo
20  Realty, Inc.; correct?
21     A   That's correct.
22     Q   Okay. And you are the designated representative

24

1  for Donelux on that management committee; correct?
2     A   Correct.
3     Q   And Mr. Tjaden is the designated representative
4  for Janivo Realty; correct?
5     A   Yes.
6     Q   Okay. So the two of you essentially make
7  decisions on behalf of the management committee of Fidelio;
8  correct?
9     A   Yes.
10     Q   And is there anybody else that participates in
11  those decisions?
12     A   Not in decision. But if you have consultants,
13  you ask them before you make decisions.
14     Q   Okay. But the decisions themselves are --
15     A   Are entirely up to us, yeah.
16     Q   Up to you and Mr. --
17     A   Tjaden.
18     Q   -- Tjaden? Thank you.
19        And it's the management committee that decides
20  whether to invest in deals initiated by Buvermo; correct?
21     A   That's correct.
22     Q   And it also decides whether to sell interests in

25

1  deals that it has -- Fidelio's invested in; correct?
2     A   Yes, correct.
3     Q   And the management committee also decides whether
4  to designate a property as an FPEP property; correct?
5     A   That's correct.
6     Q   And what is the criteria for determining whether
7  a property should be designated as an FPEP property?
8     A   Basically every property would qualify, we think.
9  But we always keep it open because you never know what kind
10  projects you have at hand, whether they fit into that or
11  not and what relationship at what moment with the people
12  involved. It's -- so it's open for decision every time,
13  but generally every property qualifies.
14     Q   Okay. And that would be every property that was
15  initiated by Buvermo?
16     A   It doesn't matter who initiates it. Any property
17  that we invest in.
18     Q   Have you designated any property as an FPEP
19  property that was not initiated by Buvermo?
20     A   Oh, I suppose, yes. But I don't know exactly who
21  initiates something because the moment we get it on the
22  table to agree -- to decide, then quite a period of

MDW Court Reporting, Inc.  (703) 591-2341

Case 1:06-cv-01131-HHK    Document 32-5    Filed 02/07/2007    Page 8 of 32

Morris vs. Buvermo, et al.                    Deposition of A. van Rhee 12/06/06

26

1  preparation has -- has preceded that. And who was the
2  initial -- the initiative -- I mean often maybe JBG is the
3  initiative and asked Buvermo, Are you interested to go
4  along with this? I think that happens often because many
5  of our projects come from that corner.
6      So who is -- the initiative is -- is not -- is
7  not any -- any condition or any -- any way we look at it.
8  They manage this operation; and if they manage nice
9  projects, they get their promote on those nice projects.
10     Q  Are you aware of any property that has not been
11 designated -- any property that's been invested in by
12 Fidelio that has not been designated as an FPEP property?
13     A  I'm not sure, but I can imagine that in what we
14 call the Dulles Business Park not everything always has
15 been FPEP. But I'm not sure.
16     That was a very atypical project.
17     Q  Okay. So you think maybe some of the Dulles
18 Business Park may not have been designated as FPEP
19 properties?
20     A  That might be.
21     And then I'm talking about the old projects
22 there --

27

1      Q  Okay.
2      A  -- because the later ones -- as long as I've been
3  involved, they all have been.
4      Q  Okay. As long as you've been involved in the
5  management committee of Fidelio --
6      A  Yeah.
7      Q  -- all properties that Fidelio has invested in
8  have been designated as FPEP properties?
9      A  As far as I recall.
10     Q  Okay. And when did you begin serving on the
11 management committee?
12     A  I think, about seven years ago.
13     Q  We talked earlier in today's deposition about two
14 designations -- FPEP designations that were passed at
15 yesterday's meeting --
16     A  (The witness moves head up and down.)
17     Q  -- one for Spotswood and one for Reston
18 International Center. Do you recall that?
19     A  Yeah; I told you.
20     Q  Uh-huh.
21     Aside from those two property designations, have
22 you designated any other properties as FPEP properties

28

1  since Jonathan Morris's termination in March of '06?
2      A  I wouldn't know.
3      Q  You don't know?
4      A  I don't recall that. I mean we make our written
5  designations, and they go in file, and we run another 50
6  companies. I'm not recalling all these things. That's why
7  we put it on paper.
8      Q  You are a codirector in Donelux with a gentleman
9  called Willem van t'Hooft; is that correct?
10     A  This is correct.
11     Q  And the company called VADO is the sole
12 shareholder of Donelux; correct?
13     A  The company is not called VADO, but it's VADO
14 Fin. It's a Belgian company. The ultimate owner is even
15 not VADO. It's a very complicated structure.
16     Q  Okay. I'm sorry. The company is called VADO --?
17     A  VADO Fin, Van Dornness Financing Company
18 (phonetic). It's a Belgian company.
19     Q  Do you hold any position with that company?
20     A  No. Oh, position.
21     Q  Uh-huh.
22     A  Oh, oh, yeah. Yes, yes. I'm a board member of

29

1  that, yeah.
2      Q  You're a board member of the company I will call
3  for short VADO; right?
4      A  Yeah, yeah, sure.
5      Q  And we talked about you being the designated
6  representative for Donelux in connection with Fidelio
7  business; correct?
8      A  That's correct.
9      Q  And that's also the case in connection with
10 Fidelio Properties Management, Inc.; correct?
11     A  Correct.
12     Q  Apart from being a partner in Fidelio, does
13 Donelux have any other business?
14     A  We have some financial transactions with
15 affiliated companies.
16     Q  Companies affiliated with Donelux or companies
17 affiliated with Fidelio?
18     A  With Donelux.
19     Q  Is that also real estate business?
20     A  No. It's lending; lending, borrowing.
21     Q  I see.
22     And you are also a codirector in Orvan with

30

1  Mr. van t'Hooft?
2      A   I suppose so.
3      Q   You're not entirely sure?
4      A   I am not entirely sure because Orvan is some kind
5  of a middle -- middle holding company with a very old
6  history.  I don't even understand how it ever came into
7  being.  But it's not very operational.  Donelux is the
8  owner of Orvan, so Donelux for us is the -- is the unit.
9  But I might be a codirector there as well, but I'm not
10  sure.
11     Q   Donelux is the sole shareholder of Orvan;
12  correct?
13     A   That's correct; I believe so.
14     Q   Okay.  And you are the president of Orvan;
15  correct?
16     A   I don't think so.  I think Mr. Gardner is
17  president of both of these companies.
18     Q   Do you know who the designated representative of
19  Orvan is with respect to Fidelio business?
20     A   I will be -- I will be that.
21     Q   Okay.
22     A   In the management company there is no Orvan.

31

1      Q   Okay.  Fidelio Properties Management, Inc., you
2  recognize that company?
3      A   Yeah.
4      Q   Okay.  I'm going to refer to it as FPMI --
5      A   Yeah.
6      Q   -- for simplicity's sake.
7          That is the managing partner of Fidelio; correct?
8      A   That's correct.
9      Q   And its shareholders are Janivo and Donelux;
10  correct?
11     A   That's correct.
12     Q   Okay.  And you are, again, the designated
13  representative of Donelux in connection with FPMI; correct?
14     A   That's correct.
15     Q   Now, you personally are neither an officer,
16  director, or shareholder of Buvermo; correct?
17     A   That's right.
18     Q   And you're not an employee of Buvermo; correct?
19     A   Neither.
20     Q   And it is also your understanding that the
21  business of Buvermo is run by its shareholders; correct?
22     A   How do you mean that?

32

1      Q   Okay.  Well, the decisions on what Buvermo does
2  is made by its shareholders?
3      A   I -- I see that very differently.  I mean this
4  company has a president who runs the company, but there are
5  decisions that are for the -- for the owners to take.  But
6  a president is managing the company, not shareholders.
7      Q   Okay.  Can you distinguish for me what decisions
8  might be made by the shareholders of Buvermo versus ones
9  that are made by the president of Buvermo?
10     A   The budget, for instance, is decided by the
11  shareholders; but executing the budget is the discretion of
12  the president.
13     Q   Okay.  What about the hiring and firing of a
14  successor president?
15     A   That absolutely is a shareholders' prerequisite,
16  whatever you call it.
17     Q   That would be something that the shareholders
18  would do?
19     A   Oh, yeah, absolutely.
20     Q   Okay.
21     A   As a decision-making because the execution of
22  such a decision is, in my opinion, up to the president.

33

1      Q   Just the formalizing of it with the --
2      A   We are involved in selection process, et cetera.
3  But the moment we make our decision, then the management
4  executes decision.
5      Q   Uh-huh.
6          Well, who would be responsible for deciding what
7  the terms of the employment would be?
8      A   They have to be agreed by the shareholders, but
9  they're not necessarily made by the shareholders.  They
10  have to be agreed.
11     Q   Okay.  I take it, then, it's fair to say that the
12  terms of Mr. Morris's employment were agreed to by the
13  shareholders?
14     A   Yes, they were.
15     Q   And the shareholders of Buvermo include Fidelio;
16  correct?
17     A   (The witness moves head up and down.)
18     Q   And also includes Mr. Gardner?
19     A   Yes.
20     Q   And do you know whether Mr. Bonacci's shares in
21  Fidelio have ever been purchased back from him?
22     A   I don't recall the thing happening, but it -- it

34

1   must have been.

2       Q   Only because he's gone you say "it must have

3   been"?

4       A   Because that was part of his departing. I mean

5   all ties have been -- have been cut off.

6       Q   Okay. Let me show you what were marked as

7   Exhibits 2 and 3 in Mr. Gardner's deposition. Take a look

8   at those and let me know when you're ready to discuss them,

9   Mr. van Rhee.

10  (The witness reviewed documents.)

11      A   I've seen them.

12      Q   Okay. And these are consents to action of the

13  shareholders of Buvermo Properties, Inc.; correct?

14      A   Correct.

15      Q   And they designate -- among other things, they

16  designate Mr. Gardner as the president, chief executive

17  officer, and secretary of Buvermo Properties, Inc.;

18  correct?

19      A   That's correct.

20      Q   And one is dated May 20th, 2006. That's Exhibit

21  No. 2. And the other one is June -- I'm sorry.

22      A   2005.

35

1       Q   Thank you.

2           One is May 20th, 2005, Exhibit No. 2. And the

3   other one is June 16 of 2006; that would be Exhibit 3.

4   Correct?

5       A   Correct.

6       Q   Do you know if any such consent to actions were

7   ever executed identifying Mr. Morris as the president of

8   the company?

9       A   I don't think so because although we decided that

10  he would be the president, I think it never happened

11  because he requested not to be nominated the president.

12      Q   I see.

13          Did he requested that of whom?

14      A   I suppose, Mr. Gardner and Mr. Tjaden; not

15  myself. I have not involved myself in the hiring other

16  than that I have spoken to the man to -- to screen him.

17  But Mr. Tjaden has represented our party also in these

18  negotiations.

19      Q   Okay. So your understanding that these were not

20  executed -- that such a consent to action was not executed

21  by Mr. Morris because he had requested not to be president

22  is based solely on your discussions with --

36

1       A   That's how I understood --

2       Q   If you'll let me finish.

3       A   Sorry.

4       Q   -- is based solely on your discussions with

5   Mr. Gardner and Mr. Tjaden; correct?

6       A   That's correct.

7       Q   You have no other independent basis for reaching

8   that conclusion; correct?

9       A   That's correct.

10          It's maybe not even completely correct because I

11  think that Mr. Morris himself has explained it as well to

12  me.

13      Q   And what did he explain to you?

14      A   Why he did be formally the president. He once

15  explained his tax -- tax position, what was at the -- at

16  the basis of this all.

17      Q   And what specifically do you recall him saying

18  about that?

19      A   As I recall it -- but I am not an American tax

20  expert -- is that he had a capital gain situation from his

21  former employment and that he needed to remain a resident

22  in Florida to have a good -- a good situation was there;

37

1   and if he would be the president in D.C., that that might

2   make him tax-paying in D.C. for that capital gain. That's

3   how I grabbed it.

4       Q   I see.

5           When did that discussion take place?

6       A   I don't know.

7       Q   At some point during his employment?

8       A   Yeah, absolutely, because I've never spoken to

9   the man after that and only before that. But that was not

10  the moment to discuss that.

11      Q   Okay. But you don't recall --

12      A   I don't know --

13      Q   -- what season --

14      A   -- when it was.

15      Q   -- what month --

16      A   No, no. I mean it's easy. It can only have been

17  in August or in December, because it certainly was not on

18  the phone, but it was personal. And I haven't met him on

19  other occasions than that so --

20      Q   Incidentally, do you know whether anything such

21  as Exhibit Nos. 2 and 3 to Mr. Gardner's deposition has

22  been prepared identifying Mr. Millspaugh as the president

38

1   of the company?

2       A   I don't recall it, but I am almost sure that it

3   has.

4       Q   Why are you almost sure that it has?

5       A   Because I know that Mr. Gardner takes care of

6   such things very well.

7       Q   I see.

8           So it's your understanding that it's

9   Mr. Gardner's role to take care of such things?

10      A   Yeah, because he's president of the company until

11  that moment. So he and the new president have to take care

12  of all these executionary things. I mean we're

13  shareholders. We're -- we're not executives.

14      Q   Okay. So you're almost sure that it's happened

15  just because you trust that --

16      A   He always gets it done.

17      Q   -- Mr. Gardner's done it?

18      A   Absolutely.

19      Q   But you have no other independent confirmation of

20  that; correct?

21      A   That's correct. I could -- could look for it,

22  but not here.

39

1       Q   Would you be concerned if it hasn't been done

2   yet?

3       A   No.

4       Q   Okay. You have no interest with Janivo; correct?

5       A   That's correct.

6       Q   Or in Janivo, I should say, or Janivo.

7           And you are not an officer, member, or employee

8   of FPEP; correct?

9       A   Correct.

10      Q   And by "FPEP" I mean FP Executive Partners, LLC,

11  I think.

12      A   Whatever the name we normally mean.

13      Q   Okay. You know what I'm talking about?

14      A   Yes.

15      Q   Do you know who the current members of FPEP are?

16      A   There's Mr. Millspaugh and Mr. Gardner.

17      Q   Do you know of any other members to FPEP?

18      A   Yeah. That's -- what is that? -- FPEP, very

19  small, small, tiny thing.

20      Q   FP Investment, Inc.?

21      A   That could be the name. Not material.

22      Q   Do you hold an office with FP Investment, Inc.?

40

1       A   No.

2       Q   Do you know whether you're a shareholder in FP

3   Investment, Inc.?

4       A   I?

5       Q   Yes, you.

6       A   Or Donelux? What do you mean?

7       Q   You personally.

8       A   Personally no, no, no.

9       Q   Do you know whether Donelux is a shareholder in

10  FP Investment, Inc.?

11      A   In FP Investment, Inc., no. Donelux -- no. I

12  think Fidelio is that -- that share that was Mr. Bonacci's.

13  That doesn't go to the partners; but it goes to the

14  partnership, I think.

15      Q   Let me ask it this way: Do you know who the

16  shareholders of FP Investment, Inc. are?

17      A   That's Fidelio and -- I don't know exactly. I

18  don't know. I'm not going to guess.

19      Q   Okay. Let me show you Exhibit 7 to Mr. Gardner's

20  deposition. Just let me know whether you recognize this as

21  the FPEP operating agreement.

22  (The witness reviewed document.)

41

1       A   Yes.

2       Q   This is among the documents you reviewed last

3   night?

4       A   Yes.

5       Q   Do you know whether this agreement has at any

6   point been amended?

7       A   It has.

8       Q   Okay.

9       A   Yesterday.

10      Q   It was amended, and there was a written amendment

11  to it?

12      A   We -- no, not a written amendment. We decided

13  what kind of amendment should be executed.

14      Q   I see.

15          But that amendment itself hasn't been reduced to

16  writing yet; correct?

17      A   No; I have not seen that yet.

18      Q   And just to be clear, when I say "amendment," I

19  also mean that to include any changes to the membership

20  interests designated in this agreement.

21      A   No material changes to the FPEP structure. It

22  was the people, names of the des- -- I call it the

42

1  members -- that had been changed because that was outdated.
2      Q   And that's what was discussed at yesterday's
3  meeting; correct?
4      A   Yes.
5      Q   And do you recall what was decided as to who
6  would be the members of FPEP at yesterday's meeting?
7      A   That would be Mr. Millspaugh and Mr. Gardner.
8      Q   And did you make a decision as to what membership
9  interest each of the two would hold?
10     A   That goes by designation.
11     Q   Okay.  So it would not be -- is it your
12 understanding that the percentage membership interest would
13 not be identified in the document itself?
14     A   Yeah, in the designation document, not in the --
15 in the operating paper.
16     Q   Okay.  Did there come a time when you and
17 Mr. Tjaden decided that it would be best to remove
18 Mr. Gardner from his position as president of Buvermo?
19     A   Can you repeat that, please.
20     Q   Yes.  Did there come a time when you decided with
21 Mr. Tjaden that it would be in Buvermo's best interests to
22 remove Mr. Gardner as its president?

43

1      A   It might have been even in the best interests of
2  Mr. Gardner.
3      Q   Okay.  But there was a time where you --
4      A   There was a time that we came to the
5  conclusion -- all of us, not Mr. Tjaden and myself; but it
6  was Mr. Tjaden, it was myself, Mr. Zachariasse, and
7  Mr. Gardner himself -- that changes would inevitably come
8  and that the moment might -- might come closer.
9      Q   Okay.  And who initiated that discussion or
10 understanding?
11     A   Mr. Zachariasse did.
12     Q   Okay.  And what specifically did he envision?
13     A   As I recall it, he first announced that he would
14 withdraw as consultant.  And that started the discussion
15 because I -- it was very well known that I would withdraw
16 after the 1st of April upcoming.  I said, "Hey, there's a
17 whole generation shift coming.  And so what does that mean
18 for" -- for the company, for the structure?"
19         And that discussion ended in -- in the idea that
20 we needed a new president to bring in new relationships in
21 the market while -- and that, in my opinion, is the
22 basis -- while Mr. Gardner is still dealing with his JBG

44

1  relationships and some other traditional Fidelio
2  relationships.  We needed new blood to get new contacts
3  because we thought that we were too narrowly in the
4  business with two or three parties.
5      Q   Okay.  Was Mr. Gardner's age in any way a
6  consideration in removing him as the president of Buvermo?
7      A   No.  Maybe in his own thinking, but not in ours.
8  I mean it's all whether somebody is still in the capacity
9  to do what he has to do.  And he certainly is.
10         So that is not -- we didn't want to get rid of
11 Mr. Gardner.  We thought that we needed new blood for new
12 relationships.  And he decided that he would be, as he
13 often said, "I somewhere (sic) will end up at the other
14 side of table" -- I remember him having said that a few
15 times in the past -- "being a co-investor and maybe being
16 in Mr. Zachariasse's role."  And he found that his time
17 would be there.
18         We never said, You're -- you're coming up to age
19 A, B, or C; and this is the moment that you have to go.
20     Q   Uh-huh.
21         The mandatory -- well, a mandatory retirement age
22 is something that's not uncommon in Europe; correct?

45

1      A   That's true.
2      Q   At least -- you're from Holland?
3      A   The Netherlands, yes.
4      Q   The Netherlands.  Sorry.
5          And your testimony is that that had nothing to do
6  with requesting -- Mr. --
7      A   No.
8      Q   -- Gardner requesting the change --
9      A   We're very aware of --
10     Q   -- to Buvermo's presidency?
11     A   -- of all these 78 people, presidents in the
12 United States companies.  We always think that's very
13 different from what we do, but we know that in America
14 that's different.
15     Q   You said you needed new blood to bring in new
16 types of -- I'm sorry -- different investors --
17     A   Yeah.
18     Q   -- to the mix; correct?
19     A   Yeah.
20     Q   What --
21     A   Not that different.  Not different investors to
22 us, because we are a rather closed party --

46

1    Q   Uh-huh.
2    A   -- but different developers to -- to bring our
3    equity to.
4    Q   Okay.  What was wrong with sort of the model that
5    you had in place at the time, if anything?
6    A   We were 80-percent dependent on one.  We didn't
7    like that.
8    Q   On JBG?
9    A   Yeah, JBG.  We like JBG a lot, but we think it's
10   a bit narrow.
11   Q   So Mr. Gardner wasn't successful in diversifying
12   the range of developers?
13   A   Yeah, you could say so because his -- his group
14   of people that he's very intimate with is that group.  And
15   we -- we thought it might be refreshing to have somebody
16   taking other relationships, as is developing now.  And
17   we're very happy that it really happens.
18   Q   Okay.  And, in fact, Mr. Morris accomplished that
19   by initiating the Spotswood Valley deal; correct?
20   A   Yeah, that -- that was also one of that.  What I
21   tried to say was Mr. Millspaugh now.  But Mr. Morris also
22   did that with Spotswood, I think.

47

1    But it might have come without him as well
2    because the relationship was always -- also a man that we
3    did other business with before, so it was not completely.
4    Q   Okay.  But I don't think that -- you're not
5    disputing that Mr. Morris was responsible for bringing in
6    the Spotswood deal; correct?
7    A   You've read it.
8    Q   I'm sorry?
9    A   You have read that.  I've written that down.
10   Q   Oh, okay.
11   A   Yeah.
12   Q   All right.
13   A   No.
14   Q   Just to be clear, you're not disputing that?
15   A   No, no, no, I'm not.
16   Q   When did these discussions about Mr. -- about
17   finding a replacement for Mr. Gardner begin?
18   A   Instead of saying the date, that was when
19   Mr. Zachariasse announced that he would not be very long
20   among us.
21   Q   Okay.  So you have no recollection of what year
22   it was?

48

1    A   It might be two years ago, something like that.
2    Q   Okay.  That would put us in the 2004 time frame?
3    A   I suppose so.
4    Q   All right.  Certainly, in any event, it was
5    before Mr. Morris was hired; correct?
6    A   Oh, yes --
7    Q   All right.
8    A   -- absolutely.
9    Q   And what did you at the time -- the three of
10   you -- or even the four of you -- you, Mr. Tjaden,
11   Mr. Zachariasse, and Mr. Gardner -- envision would happen
12   upon the hiring of this new president?
13   A   In what way?
14   Q   Well, in terms of who would assume what role.
15   A   Finally, after the whole transition process, the
16   new man would take the role of Mr. Gardner and Mr. Gardner
17   would take the role of Mr. Zachariasse.  That was the idea.
18   What that legally completely means -- but that was the
19   fundamental idea.
20   But being very comfortable with Mr. Gardner as
21   our fiduciary, we were very careful not to give all that
22   position immediately to a new guy we didn't know.

49

1    Q   Well, let's break it down because I think we have
2    a lot of positions involved.
3    Obviously, Mr. Gardner holds several positions
4    with these entities; correct?
5    A   (The witness moves head up and down.)
6    Q   Okay.  I'm interested, at least initially, with
7    respect to Buvermo, the role of president.  When was
8    that --
9    A   That one was supposed to be as of the first day
10   of his entering the company.
11   Q   Jonathan Morris was to assume the title and role
12   of president on the first day of his employment; correct?
13   A   Yes.
14   Q   And what was then to happen with Mr. Gardner with
15   respect to Buvermo?
16   A   He would stay on as a consultant, but also as
17   a -- as an employee because that is for his Social
18   Security, tax type of things.  And -- and he would maintain
19   the -- the president of the management company, the Fidelio
20   management.
21   Q   Okay.  All right.  Incidentally, do you recall
22   Mr. Gardner resisting to the idea of removing him as

50

1  president of Buvermo?
2      A   Not at all. I always had the idea that this was
3  what he had in mind for his future.
4      Q   And so in winter -- in early 2005 the interview
5  process for Mr. Gardner's successor as president at Buvermo
6  began; correct?
7      A   It might be then, yeah.
8      Q   Is that your recollection?
9      A   I'm not recollecting so on the calendar. I mean
10 we -- we hired the Equinox people, and then the process
11 started. And you may know when that exactly was. I don't
12 think that's so -- so important.
13     Q   When was John Gardner supposed to assume the role
14 of advisor?
15     A   That's -- that's a very specific legal question,
16 I suppose. The moment Mr. Morris would come in, he would
17 be president of Buvermo; so in that role Mr. Gardner could
18 not be president as well. So he would be advisor; but
19 still he held, say, the key as president of Fidelio
20 Management. So that was a transitional period where we had
21 to get trust in Mr. Morris before he could go to only a
22 consulting role.

51

1      Q   I see.
2          The transitional period dealt with substituting
3  Mr. Morris also as president of FPMI; correct?
4      A   Yeah. That was envisioned, of course.
5      Q   Mr. Zachariasse continued as advisor of Buvermo
6  through --
7      A   Through the -- sorry.
8      Q   -- through 2005; correct?
9      A   Yeah, in December. Half December, I think he
10 resigned.
11     Q   How long had he been in that role prior to that,
12 roughly speaking?
13     A   Longer than I in my role.
14     Q   Okay. So over seven years?
15     A   Yes.
16     Q   Okay. Do you have an understanding as to what he
17 did in that role?
18     A   Yeah, I think so.
19     Q   Okay. Can you tell me what he did.
20     A   He screened together with Mr. Gardner all
21 propositions for new deals. He may have come -- and I
22 think he did -- come with ideas about deals himself. He

52

1  was also consulting us and Mr. Gardner, because he was
2  consulting both sides you could say, about future
3  developments, where we should go. And he was -- he was
4  rather deep into the business because he was there very
5  long and had a very strong relationship with both the
6  partners.
7      Q   Where did he reside, what country?
8      A   In Holland, in the Netherlands.
9      Q   And was that throughout his role as advisor?
10     A   Yes, I suppose; although, he has houses in more
11 countries. But I think his formal residence always has
12 been the Netherlands.
13     Q   Okay. Do you know if he maintained an office in
14 the United States?
15     A   He is partner, as I see it, in a -- in a
16 development -- in a real estate development company with
17 his cousin. And they had an office in Reston International
18 Center, and later on they moved to another thing. So
19 I have always seen that as his office in the U.S. Whether
20 that is formally his office I don't know.
21     Q   Do you recall him ever presenting any deals to
22 the Fidelio management committee that he had identified?

53

1      A   First, he never presented a deal to us. If he
2  had a -- had a lead to a deal, then he would present to it
3  Mr. Gardner. And we get all propositions from Mr. Gardner.
4      Q   Can you recall any deals which he,
5  Mr. Zachariasse, identified?
6      A   I suppose, for instance, that one of the deals
7  that didn't work out so well, because it was with --
8  together with the company of his and his cousin, that he
9  might have come with that. I don't think that anybody else
10 could have brought that. So that is one that's maybe not
11 the nicest project we ever had.
12         But he was -- he was constantly -- he was very
13 often in the States, while I come here three to four times
14 a year. So he was one that constantly was in contact in
15 Holland with us and in the States with Mr. Gardner. So
16 I -- I don't know how much he can -- may have proposed.
17         Anyway, they always came together. If it's -- if
18 something was brought up for the management committee, then
19 they were both in line that this was a good proposal. And
20 we were not interested in where it came from. I've never
21 asked who initiated this.
22     Q   Okay. Do you know whether Mr. Zachariasse was

54

1   involved in day-to-day operations of Buvermo?
2       A   No, he was not.
3           But he had a very specific role in that other
4   activity of Buvermo, administering loans from Bouwfonds
5   to -- to parties in the States because he was very close to
6   Bouwfonds. He basically, I think, brought us the Bouwfonds
7   connection.
8           So what is being involved? I mean I don't see
9   anything legal if I say yes, he was close to it. But he
10  was not running anything in Buvermo, not at all.
11      Q   Okay. Let me show you what was marked as
12  Exhibit 9 to Mr. Gardner's deposition. Do you recognize
13  this document?
14  (The witness reviewed document.)
15      A   Yes, I do.
16      Q   Okay. That's something that was prepared by
17  Equinox; correct?
18      A   That's correct.
19      Q   And did you have an opportunity to review that at
20  or around the time it was prepared by Equinox?
21      A   I'm sure I have, but I don't recall it.
22      Q   You don't have a specific recollection of --

55

1       A   No --
2       Q   -- reviewing it?
3       A   -- no. But I know that their role -- everything
4   that happened was also communicated to me.
5       Q   Okay. Do you have any recollection of consenting
6   to their distribution of a position specification to
7   candidates for the president of Buvermo?
8       A   It's the only reason to make it.
9       Q   Let me show you what was marked as Exhibit No. 10
10  to Mr. Gardner's deposition. If you would just take a look
11  at that document and let me know when you're ready to
12  discuss it.
13  (The witness reviewed document.)
14      A   (Indicating).
15      Q   Are you ready?
16      A   Yes, I am.
17      Q   Have you ever reviewed this document before?
18      A   I think so.
19      Q   Okay. Do you recall when you might have first
20  reviewed it?
21      A   No. But I recognize the content so --.
22      Q   Okay. Did you understand this to be the

56

1   agreement as between Buvermo and Fidelio -- Buvermo,
2   Fidelio, and Mr. Gardner regarding Mr. Gardner's continued
3   role with these entities?
4       A   Absolutely.
5       Q   Okay. And there has been a slight modification
6   to this agreement; correct?
7       A   That's correct.
8       Q   Okay. And that deals with extending
9   Mr. Gardner's full-time employment from March 31, 2006,
10  until the date of Mr. Millspaugh's hiring; correct?
11      A   That's correct.
12      Q   Okay. And he continued to receive full-time --
13  well, he continued to receive his then current salary
14  through the August date on which he stepped down; correct?
15      A   That's correct.
16      Q   And it's your understanding now that Mr. Gardner
17  is to remain employed with Buvermo for a period of three
18  years from that actual date in August; correct?
19      A   That's correct. We shifted the whole thing up to
20  a new date of change.
21      Q   Okay. And so as of that date in August, whenever
22  it was -- do you know the specific date, by any chance?

57

1       A   No.
2       Q   Okay. But you recall it being a date in August;
3   correct?
4       A   Yes, because we had a meeting then.
5       Q   Okay. And as of that date Mr. Gardner then
6   assumed the role -- I apologize -- Mr. Gardner then began
7   with being paid $150,000 per year as per this agreement?
8       A   Yes.
9       Q   Okay. That was his annual salary; correct?
10      A   Yeah.
11      Q   Is that your understanding of what his annual
12  salary is currently?
13      A   Currently that is the 150-, currently.
14      Q   Okay. Now, you recognize that Mr. Gardner had
15  played a role in bringing in the Reston International
16  Center deal; correct?
17      A   I suppose so, yes.
18      Q   You're not sure?
19      A   No. I don't -- yeah. He played a role,
20  absolutely, because he was president at that time, I think.
21      Q   Okay.
22      A   But what the role exactly is -- as I told you,

Case 1:06-cv-01131-HHK     Document 32-5     Filed 02/07/2007     Page 16 of 32

Morris vs. Buvermo, et al.                                    Deposition of A. van Rhee 12/06/06

58

1    people can bring a project or you can find a project. And
2    I don't know how this happened, and I'm not really
3    interested in it either.
4            MR. HADDAD: Can we mark that as Exhibit 1 to
5    Mr. van Rhee's deposition.
6            (The declaration was marked Plaintiff's Exhibit
7            No. 1 for identification.)
8    BY MR. HADDAD:
9    Q    Mr. van Rhee, please take a look at what's been
10   marked as Exhibit 1 to your deposition and let me know if
11   you recognize this document.
12   (The witness reviewed document.)
13   A    I recognize this document.
14   Q    This is actually entitled "Declaration Regarding
15   the Termination of Jonathan Morris at Buvermo, Inc.";
16   correct?
17   A    That's correct.
18   Q    And this is something that you prepared on or
19   about April 13th of 2006; correct? Let me direct to you
20   the last page of the document.
21   A    Here (indicating) I see -- I see different
22   things. I think my own copy gives the date here at the

59

1    right lower corner. But yours, something else here on it.
2    Q    I will represent to you that those are Bates
3    numbers that we put on these documents.
4            But if you'll turn to the last page of the
5    document and look at the bottom left --
6    A    Okay. There still is the original numbers, yes.
7    Okay.
8    Q    But if you'll look at the bottom left side --
9    A    Yes.
10   Q    -- on the last page of this document, it bears a
11   date of April 13, 2006. Do you see that?
12   A    Yeah. That's it, yeah. I think that's it.
13   Q    That's about the time that you drafted this;
14   correct?
15   A    This is when I made it final; right.
16   Q    Now, turning to the last page of this document,
17   if you will, in the first full paragraph, it starts with
18   "JM took this all very quietly". Do you see that?
19   A    Yes, yes.
20   Q    Now, moving halfway down that paragraph, there is
21   a sentence that says -- that begins with "Then he pointed
22   to specific text in the contract". Do you see that?

60

1    A    Yes.
2    Q    Okay. And the following sentence -- I'm just
3    trying to get on the same line here -- starts with "So
4    implicitly he claimed PI on both the Spotswood and Reston
5    Heights projects." Do you see that?
6    A    Yes.
7    Q    And it says after that, "The last one sourced by
8    JG."
9    A    Yes.
10   Q    Okay. That would be John Gardner; correct?
11   A    Yes.
12   Q    So you at least recognize at the time of this
13   document that the Reston International Center deal had been
14   sourced by John Gardner; correct?
15   A    Yeah. But whether I would use the word
16   "sourced," again, I don't know. But that was his part of
17   the business because he was continuing the relationship
18   with JBG and this is JBG's project.
19   Q    Okay. Just going back to Exhibit No. 10 to
20   Mr. Gardner's deposition, my question to you is: Has, to
21   your knowledge, Mr. Gardner been compensated for his role
22   in sourcing the Reston International Center deal?

61

1            MR. SMITH: Do you mean a promoted interest, or
2    do you mean something different?
3            MR. HADDAD: In any way.
4    A    No, as far as I know.
5            But I mean you constantly suggest that people get
6    compensated for sourcing a project, but that's not what it
7    is. We compensate people for successfully managing our
8    interest in a project. It's -- it's not that we give money
9    because they source it; we give money if they bring it to a
10   good end.
11   BY MR. HADDAD:
12   Q    Okay. I'm not --
13   A    There's a very different approach.
14   Q    I don't agree with your characterization of what
15   I'm suggesting.
16           I'm just asking you whether Buvermo or Fidelio or
17   anyone else, for that matter, has compensated Mr. Gardner
18   for sourcing the JBG deal? And your answer to that is
19   "No"; correct?
20   A    Correct.
21   Q    And let me ask a similar question, different but
22   similar. Does Fidelio or Buvermo, for that matter, have

62

1  any intention in the future of compensating Mr. Gardner for
2  sourcing the JBG Reston International Center deal?
3      A  No.
4         He co-invests.  That should be it.
5      Q  Aside from his --
6      A  No.
7      Q  -- co-investment?
8      A  No.
9         MR. HADDAD:  Why don't we take a five-minute
10 break.
11 (Whereupon, a brief recess was taken.)
12        BY MR. HADDAD:
13     Q  Upon Mr. Millspaugh's hire he was provided with
14 an offer letter; correct?
15     A  That's correct.
16     Q  And among other things Mr. Millspaugh has been
17 offered a promoted interest in both Spotswood and Reston
18 International Center; correct?
19     A  That's correct.
20     Q  Okay.  What is your understanding as to what
21 Mr. Millspaugh is doing -- what work is he doing on the
22 Spotswood Center deal?

63

1      A  He is managing our involvement there.
2      Q  And what does that entail?
3      A  I don't know in detail.  He meets with the
4  people.  He -- all kind of decisions having to be made by
5  the developer there.  He does that together with them.
6      Q  Who is the developer?
7      A  Mr. Garchik.  Do I say it right?
8      Q  Okay.  And Mr. Garchik is responsible for
9  developing -- has assumed the role of developer of that
10 property; correct?
11     A  I don't know that very correctly.  I know that
12 our contact there is Mr. Garchik.  But whose role in that
13 project exactly is -- we are equity providers in that.
14 We're not managing that ourselves.
15     Q  Do you have any understanding as to how much of
16 his time Mr. Millspaugh puts towards management of the
17 Spotswood deal?
18     A  No idea.
19     Q  Okay.  Do you know how many meetings he's had
20 with Mr. Garchik or any other investor in that deal since
21 he came aboard?
22     A  I have no idea.  I'm not the controller of the

64

1  company.
2      Q  Okay.  Do you have any understanding as to how
3  much of a time investment he needs to put into that deal
4  during its life span?
5      A  I have no idea.
6      Q  Okay.  You obviously approved Mr. Millspaugh's
7  offer letter?
8      A  Yes.
9      Q  And why --
10     A  Yes.
11     Q  And why did you feel that he should be entitled
12 to a promote in Spotswood?
13     A  Because he has to manage it.  I mean this project
14 is developing under his management.
15     Q  Uh-huh.
16        Well, are you sure that it's him who's managing
17 it or Mr. Garchik?
18     A  It's different roles.  As I said, we supply
19 equity to developers.
20     Q  Uh-huh.
21     A  We are not the developer ourselves.  So he is
22 managing our interest in that project.  And as I explained

65

1  to you earlier, it's not who initiates it.  It's the one
2  who brings to it a good end, from our perspective.
3      Q  Uh-huh.
4      A  And that he has to do.  That's his role.  He is
5  our man to see to it that our money is well invested.  So
6  if that is successful, he should be rewarded for that.
7  That's how we see it.
8      Q  The money in Spotswood was invested prior to
9  Mr. Millspaugh's hiring; correct?
10     A  Yes, I suppose so.
11     Q  Uh-huh.
12     A  Although, I never know what the exact moment of
13 bringing the money is and what committing to bringing the
14 money is.
15     Q  Okay.  And you keep suggesting that Mr. -- or you
16 have suggested that Mr. Millspaugh is managing that
17 investment; correct?
18     A  We've made him responsible for that.
19     Q  Okay.  And you've stated that as part of his
20 management he meets with individuals; correct?
21     A  Yes.  He told me that.
22     Q  Okay.  But you have no understanding as to how

66

1    often or when he meets with individuals; correct?

2       A    That's correct.

3       Q    And you have no understanding as to what time

4    commitment the Spotswood -- management of the Spotswood

5    Valley deal entails; correct?

6       A    Correct.

7       Q    Now, with respect to the Reston International

8    Center, what does Mr. Millspaugh do in connection with that

9    project?

10      A    As far as I know, he's heavily involved with

11   that.

12      Q    Heavily involved?

13      A    Yes.

14      Q    Okay.  What do you mean by "heavily"?  What is he

15   doing?

16      A    What he does for all the projects that we are

17   involved with, taking care of our interests there.  But what

18   it means, I mean that's not a shareholder's role.

19      Q    You don't know what that means?

20      A    No.  Seeing what he exactly does day-to-day for

21   that is not my role to have an opinion about.

22      Q    Well, you're compensating him for that; correct?

67

1       A    No, I am compensating him for the

2    responsibility-taking.

3       Q    Okay.

4       A    And how he does that, as long as we are happy

5    with what is happening, we think he does well.  We don't

6    prescribe how he has to do that.

7       Q    Okay.  So you understand that he's been given the

8    role of managing that investment as well, Reston

9    International Center; correct?

10      A    I mean the man gets $250,000 a year.  We're not

11   going to prescribe how to manage.

12      Q    Okay.  But you don't know what he's doing in

13   connection with his management; correct?

14      A    Not day-to-day, no.  Sometimes we are with him

15   and then we see how he works, and sometimes we are not.

16      Q    Do you have any understanding as to what time

17   commitment the Reston International Center deal requires of

18   Mr. Millspaugh?

19      A    No, I don't know.  The only thing I know is that

20   he works very hard and that he makes extremely many hours.

21   So he must be busy with the project -- with the current

22   projects.  Which one most busy I don't know.

68

1       Q    Well, he's also been hired to locate new deals;

2    correct?

3       A    Correct.  And he did.

4       Q    He could very well be working on that; correct?

5       A    Also.

6       Q    You don't know what he's working on.  You just --

7       A    No.  He tells that he is working on those

8    existing deals.

9       Q    Uh-huh.

10      A    That's what he tells.  But we don't count the

11   hours.

12      Q    What specifically has he told you that he's done

13   on either Spotswood or Reston International Center?

14      A    Spotswood, he told me because I went there

15   together with him last -- last visit I made.  And he is

16   going there at least once a month, I think, that he told

17   me -- going there.  And that's quite far away.  It's many

18   hours in a car before you are there.

19           But then I suppose he's on a weekly basis in

20   contact with people.  But I suppose that.

21      Q    I'm not asking you to suppose.  I'm just asking

22   you to tell me what you actually know.

69

1       A    Well, I told to you many times that I don't

2    actually know how many time (sic) he spends on something.

3       Q    Okay.  So as far as you know, he -- you went with

4    him one time to Spotswood Valley; correct?

5       A    Yeah.  He showed --

6           MR. SMITH:  You've asked him, and he says he

7    doesn't know.  Let's not go over the same thing over and

8    over again.  You got your answer.

9           BY MR. HADDAD:

10      Q    You stated that you went with him to Spotswood

11   Valley; correct?

12      A    Yes, I did.

13      Q    That was on one occasion?

14      A    Yes.

15      Q    Okay.  And he told you at that time that he had

16   been there before?

17      A    Yes.

18      Q    Okay.  And he intimated that he had been there on

19   a monthly basis?

20      A    Yes.

21      Q    Okay.  Did he tell you what he does there when he

22   goes?

70

1    A    He might have told me.
2    Q    But you don't recall?
3    A    I don't recall at all, no.
4    Q    Has he told you specifically what he has done in
5    connection with the Reston International Center deal?
6    A    Not that I recall. But it doesn't mean no.
7    Q    Do you have any understanding sitting here today
8    as to what actions he's taken with respect to the Reston
9    International Center deal?
10   A    What I know, anyways, that he prepared the --
11   our board book.
12   Q    The board package?
13   A    Including -- the board -- the board package,
14   including that also. I mean he is working on it, as far as
15   I hear. And I have no complaints about him. Everybody's
16   very happy with him, so I think he does well.
17   Q    Okay. As far as you hear, what have you heard
18   that he's done?
19   A    That he's working hard for our projects. That's
20   what I hear.
21   Q    Okay. Who did you hear that from?
22   A    From his vice president, who had a very different

71

1    opinion about his predecessor.
2    Q    This is --
3    A    Kara McCormick.
4    Q    Kara McCormick.
5         Incidentally, do you recall ever having
6    discussions with Mr. Morris about terminating
7    Ms. McCormick?
8    A    That's a difficult question. But he might have
9    brought that up, that he would not have forever a role for
10   her, what is different from discussing terminating. But
11   whether she would have a long-term future, that I think he
12   brought once up.
13   Q    So your recollection is that he suggested to you
14   that she may not have a long-term future with --
15   A    I think that what he suggested to me is that she
16   had ambitions to go more into the market and that he didn't
17   think that that was her strengths and that she might be not
18   completely satisfied in the other side of her role.
19   Q    When you were looking for a replacement for
20   Mr. Gardner, did you consider how long you wanted the
21   replacement to be around?
22   A    We wanted stability, so we want somebody who can

72

1    do this for years.
2    Q    Okay. You, as Mr. Tjaden did, wanted a long-term
3    employee?
4    A    Yeah. We wanted a long-term commitment to us,
5    yeah.
6    Q    And what do you characterize as being a long-term
7    commitment?
8    A    Not looking for other jobs while you're here.
9    That's -- that's what I call a long-term commitment.
10   Q    Okay.
11   A    Not seeing it as a career step.
12   Q    Okay. Do you have in mind any year range as to
13   what a long-term commitment might be?
14   A    No.
15   Q    Do you consider two years to be a long-term
16   commitment?
17   A    No.
18   Q    Okay. Do you consider five years to be a
19   long-term commitment.
20   A    I'm not going to answer that. But if you ask how
21   many years, I say no, I have not, then don't go --
22   Q    I'm --

73

1    A    -- the way that I gave the next -- I take a high
2    one, a low one, a high one, a low one.
3    Q    I'm just asking you: Do you consider five years
4    to be a long-term commitment?
5    A    That can be a long-term commitment.
6    Q    Okay. Do you believe five years may be a
7    long-term commitment?
8    A    Yeah. If you have a long-term commitment and you
9    leave after five years, you're not wrongdoing to the other
10   party. If you take a long-term commitment and you leave
11   after two years, I mean you're not honest, in my value
12   system, whatever the offers you get are.
13   Q    Okay. Do you believe that the reverse applies;
14   if you make a long-term commitment to an employee and you
15   terminate him after two years, then that's not right?
16        MR. SMITH: Object to form.
17   A    Not at all. I mean if you contract somebody, one
18   thing is the commitment in time; but the other thing is
19   that he has to perform his role well. And if that is not
20   the case, then whatever your idea was, your intention was,
21   you have to stop that as soon as possible.
22        BY MR. HADDAD:

74

1    Q   But assuming the individual is performing his
2  role well, do you believe that it would be wrong to
3  terminate somebody --
4    A   Then it would be wrong, yes.  Yes, I agree.
5    Q   Do you recall having any discussions with --
6  well, have you ever had any discussions with Mr. LoPinto?
7    A   Yes, before the hiring and at the interviewing.
8    Q   Do you ever recall expressing to him your
9  interest in having a long-term commitment from a candidate?
10   A   Yeah.  He must have heard that, yes.
11   Q   He must have heard that?
12   A   Yes.
13   Q   Okay.  Do you generally recall discussing --
14   A   Because --
15   Q   -- it with him?
16   A   -- it's so at the -- at the core of what we are
17  looking for.  We are not looking for short-term things.  We
18  had one for over twenty years.  If we could get another one
19  for over twenty years, whatever it would be, that would be
20  stable.  You cannot put all your trust in somebody who
21  comes and goes and comes and goes.
22   Q   Okay.  And do you recall ever discussing your

75

1  preference for a long-term commitment with Mr. Morris?
2    A   During interview he asked us what our commitment
3  was to the business because that was basically the start of
4  the downturn, at least -- no, it was not the down-turn yet.
5  But we were very scared that this enormous boom in the real
6  estate market would not last.  So that there could be a
7  time that there wouldn't be much business, because we were
8  basically -- as we did, after all, we sold about all our
9  port- -- our whole portfolio.
10       So we discussed that, that -- whether we would
11  stay committed; although, we might go through a very slow
12  period.  And there I -- because we -- every ten years we
13  commit to this business.  And we just had the decision of
14  our own shareholders to commit another ten years to this
15  operation.  So that -- he asked how committed we were.
16       Janivo was even longer-term committed than we
17  are.  We review that every ten years.  They say this is
18  indefinite.
19       So I explained to him that we were committed for
20  another ten years.
21   Q   Okay.  And did you speak with him about what his
22  level of commitment was?

76

1    A   That was for an indefinite period.
2    Q   Okay.  So do you have a recollection -- what, if
3  anything, do you recall about discussing with Mr. Morris
4  about how long he would be willing to commit?
5    A   For an indefinite period.  That's what I recall.
6    Q   So you recall asking him how long -- do you
7  recall asking him that question?
8        MR. SMITH:  That's been asked and answered twice.
9        THE WITNESS:  Say that again.
10       BY MR. HADDAD:
11   Q   Do you recall asking Mr. Morris how long he would
12  commit for?
13   A   No.  But I recall asking him whether this was
14  something that was for him; a job if everything went right,
15  say, for a long-term to the end maybe even, instead of a
16  jump to something else.  I mean I remember -- I always do
17  that, asking why people are joining, whether they do that
18  because it's a nice in-between step or whether this is what
19  they're really looking for.
20   Q   And what was his response to that?
21   A   That this was what he was really looking for.  At
22  this -- at this phase of his life this would be a very

77

1  nice -- as I recall it -- but I don't know how he stated
2  that literally or whatever -- that this was a nice last job
3  for him.
4    Q   Okay.  He left you with the impression that he
5  was willing to make a long-term commitment?
6    A   Yeah.
7    Q   Do you recall how many interviews you had with
8  Mr. Morris prior to him being hired?
9    A   One or two.
10   Q   Do you recall where those interviews took place?
11   A   One must -- was in a hotel.  I think it was the
12  Hyatt somewhere downtown.  But, anyway, in -- in the area
13  here; but I don't know exactly which place.
14   Q   One you believe at the Hyatt in D.C.?
15   A   Yeah.  I think it was the Hyatt.  But it was a
16  hotel.
17   Q   That was in the District; correct?
18   A   Yeah, I think it was in the District.  But even
19  it may be in Virginia.  I don't know.
20   Q   Okay.  Let me show you what was marked as Exhibit
21  No. 14 to Mr. Gardner's deposition.
22   (The witness reviewed document.)

78

1    Q    This is Mr. Morris's offer letter; correct?
2    A    That's correct.
3    Q    And do you know whether you reviewed this offer
4  letter prior to it being provided to Mr. Morris for his
5  signature?
6    A    Absolutely. Things like that Mr. Gardner is not
7  executing before he has both Mr. Tjaden's and my consent.
8    Q    Uh-huh.
9         And the terms of this offer letter, did you agree
10  to these terms?
11    A    I agreed to them, yes.
12    Q    Do you recall -- well, do you recall negotiating
13  these terms with Mr. Morris?
14    A    I didn't negotiate it. I gave my powers to
15  Mr. Tjaden to represent us in that.
16    Q    I see.
17        Do you recall proposing any changes -- well, do
18  you know who drafted this agreement, by any chance?
19    A    No.
20    Q    Do you recall proposing any changes to this
21  agreement before it was submitted to Mr. Morris?
22    A    I remember having discussed a few issues like the

79

1  12- to 10-percent change, what is not of my liking. But I
2  agreed to it anyway.
3    Q    All right. Do you recall discussing any other
4  aspects of this letter with either Mr. Gardner or
5  Mr. Tjaden prior to its presentation to Mr. Morris?
6    A    We must certainly have had telephone conversation
7  on it. But basically since the negotiation has been done
8  in my name, I consent. That's the way how we operate. You
9  know, I say, "You can do it for me." Then I don't take it
10  back if not everything of it is to my liking.
11    Q    Incidentally, what was your understanding at the
12  time of this -- in June of '05 as to what FPEP's
13  promoted -- I mean Fidelio Properties' FPEP promoted
14  interest was in Sheraton Reston parcels and Twinbrook
15  parcels?
16    A    Can you repeat that.
17    Q    Did you have an understanding at the time that
18  this letter was provided to Mr. Morris as to what Fidelio
19  Properties' FPEP promoted interest was in the Sheraton
20  Reston parcels and Twinbrook?
21    A    As far as I know, we had 15 and a half percent in
22  everything; so I suppose that was also for these two.

80

1    Q    Okay. 15 and a half percent is the entire FPEP
2  promoted --
3    A    That is the --
4    Q    -- interest; correct?
5    A    What we have said, that is the maximum that we
6  will -- will give.
7    Q    Okay. But do you know whether -- of that 15 and
8  a half percent what portion of it belonged to Fidelio?
9    A    Mr. Bonacci's portion belonged to Fidelio.
10    Q    Okay. Do you know what portion that was?
11    A    I think that was the 3 and a half, the difference
12  between 12 and 15 and a half.
13    Q    Okay. And going down to the Future Projects
14  section, this refers to an FPEP promote currently available
15  to Mr. Gardner?
16    A    (The witness moves head up and down.)
17    Q    "Yes"?
18    A    Yeah.
19    Q    And you understood that to be 12 percent?
20    A    Yes.
21    Q    And this agreement provides that Mr. Morris would
22  be entitled to Mr. Gardner's FPEP promote for all projects

81

1  initiated by him prior to December 31, 2005; correct?
2         MR. SMITH: Object to form.
3    A    I don't know. I have to -- I have to check --
4         BY MR. HADDAD:
5    Q    Okay.
6    A    -- the letter to see if that is true, but that is
7  of no use. You can read it as well, whether that's true or
8  not.
9    Q    Do you have any understanding as to what your
10  intention was when you authorized this letter?
11    A    My intention in authorizing the letter was to
12  follow on with what Mr. Tjaden had negotiated, in the
13  manner of trust.
14    Q    Okay. So whatever Mr. Tjaden understood this to
15  mean is what you understood it to mean?
16    A    Whatever he contracted I support.
17    Q    Okay. Incidentally, do you recall having any
18  discussions with Mr. Morris regarding how the FPEP promote
19  works?
20    A    No.
21    Q    Okay. At any time?
22    A    Not by me. But I know Mr. Gardner did.

82

1   Q   Okay. But you weren't present for those
2   discussions; correct?
3   A   You mean before his hiring?
4   Q   Before his hiring.
5   A   No. Before his hiring I haven't been present at
6   that.
7   Q   So I take it, then, you made no representations
8   to Mr. Morris as to what would be -- you, yourself
9   personally made any representations to Mr. Morris as to
10  what would be required for him to obtain a promoted
11  interest in projects after he --
12  A   I have talked with Mr. Morris in the interviewing
13  period before the contracting. And the next time I talked
14  to him when he was in our company. So I have not been --
15  after the interviewing, what was not so specific about such
16  things, I have not been involved. Mr. Tjaden has done that
17  for me because he's much more often in the States than I
18  am.
19  Q   Let me ask it to you this way --
20  A   Yeah.
21  Q   -- did you at any time advise Mr. Morris prior to
22  his hiring that he would not be entitled to receive a

83

1   promoted interest unless a deal closed before his
2   termination?
3   A   No, I did not.
4   Q   Okay. And do you know whether anybody else
5   advised him of that prior to his hiring?
6   A   I don't know for sure, no.
7   Q   Okay. And --
8   A   I suppose so, but that is not knowing.
9   Q   Do you know whether you advised him prior to his
10  termination that he would not be entitled to a promoted
11  interest unless a deal closed before he was terminated?
12      MR. SMITH: Isn't that the same question you just
13  asked?
14      MR. HADDAD: No.
15      MR. SMITH: Objection; asked and answered.
16  A   I know I've told him, when we told him about our
17  decision to terminate him, that he was not entitled to any
18  promote.
19      BY MR. HADDAD:
20  Q   Okay. Prior to that you don't recall telling him
21  that --
22  A   I was not so close to Mr. Morris.

84

1   Q   Okay. Just let me finish my question.
2       Prior to that point, the date of his termination,
3   you do not recall telling him that he would not be entitled
4   to a promoted interest unless a deal closed before his
5   termination --
6   A   No.
7   Q   -- correct?
8       And you're not aware of anybody else having told
9   him that; correct?
10      MR. SMITH: Asked and answered.
11  A   But not in the negative either.
12      And I suppose that he has been informed. I want
13  to be that clear. I don't -- I don't know for sure, but I
14  don't want to have said something that I don't know that he
15  has been so and not have been.
16      BY MR. HADDAD:
17  Q   Okay. I'm just asking you --
18  A   Yeah. But I --
19  Q   -- what you know.
20  A   No. But I tried to specify the question.
21  Q   Okay. But just to be clear, I'm just asking
22  whether you told him or whether you know of somebody else

85

1   having told him?
2   A   I don't know for sure. And I haven't told him.
3   Q   Did you or anyone else, to your knowledge, advise
4   Mr. Morris prior to his termination that he would not be
5   entitled to receive a promoted interest unless the deal was
6   designated as an FPEP property?
7   A   That's the second time you have the same
8   question.
9   Q   It is not.
10  A   I have said I have informed the man that, to our
11  opinion, he was not entitled to any promote when we
12  discussed his termination with him.
13  Q   All right. Let me simplify this question, then.
14  Prior to the date of Mr. Morris's termination, do you
15  recall having any discussion with him about what conditions
16  would have to be met for him to be for entitled to an FPEP
17  promote?
18  A   No.
19  Q   Okay. And are you aware of anybody else having
20  such discussions?
21  A   Not in detail.
22  Q   And do you recall at any time prior to

86

1    Mr. Morris's termination discussing with him the notion of
2    redeeming -- well, let me rephrase that.
3        Do you recall discussing with Mr. Morris at any
4    time prior to his termination that in the event he were to
5    obtain an interest -- an FPEP promote interest in a deal,
6    that that interest could be redeemed upon his termination?
7    A    Now I have to think about timing of things
8    because it has been extensively discussed at the departure
9    of Mr. Bonacci. But I don't remember well whether Bonacci
10   was out before he came in or whether he was already in when
11   Bonacci went out.
12   Q    Okay. Do you, sitting here today, recall any
13   discussions between you and Mr. Morris, however, regarding
14   redemption of FPEP promote interests?
15   A    No, I never had such discussions with him.
16   Q    Mr. Tjaden testified yesterday regarding certain
17   discussions he had with Mr. Morris regarding Mr. Morris's
18   view that Mr. Gardner was interfering with his role as
19   president of Buvermo. Do you recall that?
20   A    Yes, I recall that.
21   Q    Okay. Were you involved in any such discussions
22   with Mr. Morris?

87

1    A    I remember him complaining about it, but I have
2    not gotten into -- into discussions with him. I was not
3    his talking partner.
4    Q    Okay. That was left to Mr. Tjaden mainly;
5    correct?
6    A    Yeah, not -- not for formal reasons. Mr. Tjaden
7    liked him a lot, and I didn't.
8    Q    Okay. Why didn't you like Mr. Morris?
9    A    I didn't like his character.
10   Q    Okay.
11   A    Even when we decided to hire him, I had my doubts
12   about his character, but his papers were absolutely
13   perfect. So I in the end agreed with Mr. Tjaden, who was
14   very fond of the guy. He was -- thought that we -- we had
15   the best hire we could ever have. So I said, "Okay." I
16   have no -- nothing I can really substantiate what I have
17   against the man, but he's not my -- my type. He's not
18   my type of person.
19   Q    What is it about your character that --
20   A    I think --
21   Q    -- you dislike?
22   A    -- he's -- he's very immature.

88

1    Q    You think he's immature?
2    A    Yeah.
3    Q    And you felt that way before agreeing to hire
4    him?
5    A    Yeah. But I couldn't substantiate it so --.
6    Q    Okay. What was that it that he did prior to
7    hiring him that made you think that he was immature?
8    A    That's the way how he acts. As I said, I
9    couldn't substantiate it. If I could have substantiated
10   it, then I would have substantiated it then.
11   Q    But you --
12   A    But it's just my feeling about it, and that's not
13   also a basis to -- for decisions.
14   Q    It was a gut feeling that you had?
15   A    Yeah, yeah.
16   Q    Okay. But it wasn't based on anything that you
17   observed?
18   A    It must have been. But because -- you get gut
19   feelings because you take information, but it's not always
20   easy to substantiate exactly what it is.
21   Q    Okay. So you're unable to pinpoint what it was
22   that made you feel that way?

89

1    A    Yep, that's correct.
2    Q    And that gut feeling of yours persisted
3    throughout his employment?
4    A    Yes, yes, yeah.
5    Q    Okay. And what, if anything, during his
6    employment with Buvermo -- well, did you feel that your gut
7    feeling was substantiated during his employment with
8    Buvermo?
9    A    Later on yes. In the beginning I was -- I was
10   more confirmed in the positives because he came with the
11   Spotswood project, one of the things that we -- that we
12   hoped for that a new guy would do.
13   Q    Uh-huh.
14   A    So basically the idea was: Yes, I don't like the
15   guy so much; but he is doing what he should do. And then
16   after a while we got down to whether he was doing what he
17   should do. But in the beginning that was confirmed, so
18   I -- I had peace with the fact that we had hired him.
19   Q    When did you get doubt that he wasn't doing what
20   he should do?
21   A    That was first in the August meeting, and that
22   was -- I call that a transition problem. I was very

90

1   disappointed in the first meeting we had where he was the
2   president basically; that he didn't present things; that he
3   didn't prepare the board book; but that he had Mr. Gardner
4   do everything. He even didn't read the book very well.
5       So I was very, very disappointed then. So we
6   discussed that, that it was his role; so that at next
7   meeting he should make the presentations, that he should
8   prepare the board book or let it be prepared but that it
9   was his responsibility and not Mr. Gardner's.
10      Q   Uh-huh.
11          How do you know that Mr. Gardner was the sole
12  person -- well, how did you know that Mr. Gardner prepared
13  it and not Mr. Morris?
14      A   Well, we found out during the meeting; and he --
15  he confirmed that.
16      Q   Mr. Morris confirmed it?
17      A   Both confirmed it.
18      Q   Okay. How do you know that Mr. Morris hadn't
19  reviewed it? -- I think is what you stated.
20      A   Because he was surprised about things coming up
21  during the meeting. I mean normally you would expect him
22  to take the lead and to explain us, but Mr. Gardner had to

91

1   explain him a bit (sic).
2           And he was just not -- he was only intimate
3   with -- I don't know whether Spotswood was already done or
4   whether he was after it, but it was his connection.
5           One -- one of the things that he had brought as
6   one of his strengths was his position with the Guggenheim
7   family. He knew them well, and that could -- could bring
8   another type of projects (sic) to us.
9           Now, that subject, he brought himself. But the
10  whole rest, I got the idea he wasn't interested in at all.
11      Q   This was a management committee in --
12      A   In France.
13      Q   -- in August of '05; right?
14      A   In August '05 in France.
15      Q   Do you recall what time in August it was?
16      A   No.
17      Q   In any event, Mr. Morris had been hired by the
18  company in June of '05; correct?
19      A   Yeah.
20      Q   And he didn't start until June 27th of '05?
21      A   Yeah, yeah.
22      Q   So you felt that it would have been his

92

1   responsibility to prepare a board package --
2       A   Yes. But we agreed in the end that he would do
3   it the next time.
4       Q   Okay.
5       A   But I mean you asked whether I felt confirmed in
6   my doubts about the man, yes or no. Now, that was a
7   negative; but then coming up with Spotswood was a positive.
8   So I was -- I was in doubt for a long time.
9       Q   I'm just trying to understand why that's a
10  negative.
11          He'd only been working there for a little over a
12  month; correct?
13      A   Yeah.
14      Q   All right. And yet you expected him to make a
15  presentation on investments that preexisted him?
16      A   Yes. I would expect him to have read everything
17  about these things in the first few weeks of working there
18  and then taking the lead in the meeting and maybe saying,
19  "Now, here for this I give Mr. Gardner the work because he
20  is more intimate with this than I am."
21          But he didn't take that role at all. He didn't
22  take any -- any president's role.

93

1       Q   Now, the December board meeting was the next one;
2   correct?
3       A   Yes.
4       Q   And what was your impression of how that board
5   meeting took place? What was your impression of the
6   presentation at that board meeting?
7       A   I don't recall that so much; so, I suppose,
8   better.
9       Q   And do you recall whether -- who was responsible
10  for putting that board meeting together?
11      A   I -- I suppose that -- that it was him.
12      Q   So he in effect as of December satisfied your
13  concerns that you had expressed back in --
14      A   Yes.
15      Q   -- in August?
16      A   Up to the meeting.
17          But then a few other things happened in December.
18  I think that we visited Cassidy & Pinkard. Was that in
19  December? And there he misbehaved in a horrible way. So
20  my -- my character doubts about him -- one is the work.
21  The other thing is the character. I was in December again
22  confirmed in this -- in what I had found his character

Case 1:06-cv-01131-HHK    Document 32-5    Filed 02/07/2007    Page 25 of 32

Morris vs. Buvermo, et al.                    Deposition of A. van Rhee 12/06/06

94

1  problems.
2  Q   This is a meeting with Cassidy & Pinkard. Who
3  attended that meeting?
4  A   The partners and -- and the management.
5  Q   Okay. So yourself, Mr. Tjaden --
6  A   Myself, Mr. Tjaden, Mr. van t'Hooft also.
7  Because the December meeting was the farewell meeting for
8  Mr. Zachariasse, Mr. van t'Hooft also attended. Mr. Vis, I
9  don't know whether he was at that meeting; but he was -- he
10  was also there. But whether he went with us to Cassidy &
11  Pinkard I don't know. Anyway, I think so. I suppose so,
12  he was there as well.
13  Q   And what about Mr. Gardner; was he there?
14  A   He was there. Oh, absolutely, yes.
15  Q   And Mr. Morris was there also?
16  A   And Mr. Morris also.
17  Q   And what is it that Mr. Morris did at this
18  meeting that you felt was inappropriate?
19  A   He sat there like this (indicating). I mean he
20  was absolutely immature.
21  Q   He sat with his foot up on the table?
22  A   Yeah, yeah, yeah. I mean he's -- he was just not

95

1  behaving at least as Europeans behave. It's always
2  difficult for us to -- to judge how that is in the States.
3  But I have never seen this in the States either so --.
4  Q   Other than putting his shoe up on the table, what
5  other things did he do that you felt were immature --
6  A   I don't know. --
7  Q   -- behavior?
8  A   -- specifics. But he -- he confirmed all kind of
9  doubts I had about his character.
10  But, still, I cooperate with people being not my
11  character at all that perform very well business-wise. I
12  mean that is the basis -- whether I like somebody is not
13  the basis for giving him a position.
14  Q   Okay. So aside from putting his feet up on the
15  table, you have no specific recollection of anything else
16  he did that confirmed your gut feeling that he was
17  immature?
18  A   Oh, I remember when we were in France in August,
19  we were at the beach -- and I mean I don't know his age,
20  but at least it should be somewhere supposedly maybe late
21  40s, early 50s, something like that. I mean he was
22  behaving there at the beach as a -- as a 16-year-old, with

96

1  all kind of comments about every girl walking by.
2  I mean that -- that to me -- but I'm a different
3  character. But I was -- I thought: Is this our managing
4  director in this States.
5  But maybe it's a positive here. I don't know.
6  For me it's not.
7  Q   It depends who you ask.
8  A   Yeah.
9  Q   Okay. So he was commenting on girls?
10  A   Yeah. And I mean not sometimes, because everyone
11  does it from time to time, I suppose. But it was nothing
12  but that.
13  Q   Okay. As far as getting the work done and doing
14  what he was supposed to do in his position as president of
15  Buvermo, did you have any concerns come December of '05?
16  A   No, I don't think that.
17  Q   Okay. In December of '05 there came a decision
18  to instruct Mr. Gardner to limit his appearance at the
19  office to one day a week; correct?
20  A   I don't recollect it that way.
21  Q   Okay.
22  A   I certainly have not said that. What I have said

97

1  is after discussing a lot with Mr. Tjaden, with
2  Mr. van t'Hooft, with Mr. Vis, we should give the man a
3  fair chance to -- to go through this transition.
4  So this transition is supposed to be with the
5  full-time presence of Mr. Gardner up to the end of year.
6  Now, that was about two weeks from where we were, I think.
7  So we said: My God. Let's get this to end of year. Then
8  Mr. Gardner goes to his one-day-a-week idea. Let's see how
9  that works out.
10  Q   Who proposed the one-day-a-week idea?
11  A   That was the old idea.
12  Q   The old idea?
13  A   Yeah, that -- that was already -- whether it was
14  exactly one day, but he would be full-time in the office
15  until the end of the year. And after that whether it's in
16  my mind one day a year, I -- one day a week I don't know.
17  But I think we have discussed it that way. But it might
18  have been two days. But, anyway, far less than half.
19  Q   Did you feel that Mr. Gardner's -- limiting
20  Mr. Gardner's time in the office was necessary for
21  Mr. Morris to complete the transition?
22  A   That might be. We wanted to give him that

98

1    chance. So we said we basically have to judge him when
2    John is not always in the office because maybe that is a
3    problem for him.
4         And we could very well imagine such a problem. I
5    mean if you come in a company and your predecessor is still
6    there, that is not the easiest way, especially not when the
7    predecessor is there for twenty years.
8         Q    Presumably Mr. Gardner honored that agreement
9    from --
10        A    Well --
11        Q    -- 2006 on?
12        A    I suppose so.
13        Q    Okay. And prior to your March 22 meeting, dinner
14   meeting --
15        A    Yeah.
16        Q    -- did you become aware of any issues with
17   Mr. Morris's performance during that time span, from
18   January 1 of '06 through the March meeting?
19        A    No, I don't think so.
20        Q    Okay.
21        A    We had the idea that it would -- that it was
22   going fine. And I had programmed the question, as

99

1    Mr. Tjaden had also, as it turned out, that we had to ask
2    them specifically whether that was the case or not because
3    from -- we cannot see what really happens in that office.
4         Q    Okay. And what was the question you specifically
5    recall asking?
6         A    "Are things now going well between you two?"
7         Q    Okay. And this was a question that was posed to
8    Mr. Gardner alone -- I mean Mr. Morris alone?
9         A    As I recollect it, we asked it in the car to him
10   alone because Mr. Gardner was not in that same car. And
11   Mr. Tjaden and I agreed that we had to ask it also when
12   both people were there, so we had to repeat that question
13   at the dinner.
14        Q    I see.
15        And in the car what was Mr. Morris's response, if
16   you recall?
17        A    That he had found a way of living with
18   Mr. Gardner.
19        Q    Okay. And what was the response at dinner?
20        A    The same.
21        Q    Okay. Do you recall discussing the possibility
22   of terminating Mr. Morris in December of '05?

100

1         A    Yes. I have discussed that with my colleague.
2         Q    Okay. That was Mr. --
3         A    Mr. van t'Hooft.
4         Q    -- van t'Hooft?
5         A    Mr. van t'Hooft, yes.
6         Q    And that is in the December time frame?
7         A    That was in December time frame.
8         Q    Okay. And what specifically do you recall
9    discussing about that?
10        A    Well, whether -- whether we still had any belief
11   that this character could be our fiduciary in the States.
12        Q    And this was after the meeting in which he put
13   his foot up on the table?
14        A    Yeah, that was after all this.
15        Q    And what was the basis for that specific
16   discussion, the discussion about potentially terminating
17   Mr. Morris?
18        A    Yeah. We were not discussing whether we would
19   terminate him. We were discussing whether this could go
20   on.
21        And that's a different discussion, whether you --
22   you see this as being a structural solution or having your

101

1    doubts where it is. And, of course, if the doubts get
2    stronger and stronger, you come to a moment that
3    termination is maybe.
4         But we -- we were not discussing then: Shall we
5    terminate him? We were discussing: Is this the solution?
6    Do we really believe that this -- this is a good thing for
7    us?
8         Q    And I take it ultimately you concluded that it
9    was?
10        A    No. We concluded that we had to be fair to the
11   man and then to give him more time. We did not conclude
12   that we were sure that it was the right thing. Not at all.
13        Q    And what discussions did you have with Mr. Morris
14   in December in which you explained to him that you thought
15   he was immature?
16        A    I have never told that to the man. That's not
17   what I tell people.
18        Q    Uh-huh.
19        What discussions did you have with Mr. Morris at
20   all in December about any concerns you may have had
21   regarding him?
22        A    In December? I think, nothing because that

102

1   doesn't help if you want to give people a fair chance.
2      Q   I see.
3         So you don't think it's necessary to -- you
4   didn't feel that it was necessary to tell him about your
5   concerns in December?
6      A   No; I didn't think that that would help. I
7   thought he was struggling in the transition, as Mr. Gardner
8   was, and that we should not interfere. We should give him
9   as much -- we -- that we should give him more time in the
10  second phase of it because that was the better test than
11  the first phase.
12     Q   And during that second phase of it --
13     A   Yep.
14     Q   -- is when he, in fact, managed to bring the
15  Spotswood deal to the table; correct?
16     A   Yeah, so that all sounded very positive.
17     Q   Now, let's talk about this March dinner. You
18  have prepared a statement about that; correct? We've
19  marked it as Exhibit 1?
20     A   Yes.
21     Q   And you reviewed that last night; correct?
22     A   Yes.

103

1      Q   And does it accurately reflect what you recall
2   happening that evening?
3      A   That is my recollection, more exact than I could
4   ever recall it now. That's the reason I made it.
5      Q   If you'll turn to Paragraph No. 5 on page 2.
6      A   Okay.
7      Q   If you'll just review that paragraph and let me
8   know when you're done.
9   (The witness reviewed document.)
10     A   Yep.
11     Q   Halfway through the paragraph it states, "We
12  asked JG for his opinion." Do you see that?
13     A   Yes.
14     Q   And that's referring to John Gardner; correct?
15     A   Yes.
16     Q   And then it says that -- you state that, "He
17  agreed with us that JM was not the right character for
18  Buvermo/Fidelio, but even more important that he did not
19  see JM spending enough energy and time for Fidelio to
20  successfully generate enough new deals. Moreover, he saw
21  JM taking too much distance from the business details,
22  which he found dangerous to the partners' interests."

104

1      A   Yes.
2      Q   Sitting here today, do you recall that
3   discussion?
4      A   Yes, I recall it.
5      Q   Okay. And did Mr. Gardner at that time give you
6   any specific examples of these concerns that he had?
7      A   I don't recall that.
8      Q   Okay. Did you question Mr. Gardner as to how he
9   might have known that, given his limited exposure to the
10  office since December of 2005?
11     A   No. I think I rather asked why he didn't tell us
12  earlier.
13     Q   Uh-huh.
14     A   I think that was more of my question to
15  Mr. Gardner at that -- at that time.
16     Q   Did you get a sense from Mr. Gardner as to -- I'm
17  sorry -- why he didn't tell you prior to the March dinner?
18     A   Yeah.
19     Q   Okay. What was his response to that?
20     A   That he wanted to be loyal to the cooperation
21  with Jonathan.
22     Q   And did you get the impression from Mr. Gardner

105

1   that these concerns that he was -- that his concerns were
2   based on recent events?
3      A   I think, as of the first day.
4      Q   They were concerns that he had as of the first
5   day --
6      A   That was --
7      Q   -- of Mr. Morris's employment?
8      A   The first few months that's not fair to judge,
9   but that was just confirmed.
10     Q   Do you recall asking Mr. Gardner as to what his
11  opinion was on Mr. Morris's performance in the last few
12  months after the December meeting?
13     A   No, I did not put such -- such concrete
14  questions. We asked Mr. Gardner what he thought about the
15  whole situation because Mr. Tjaden and I said, "How can we
16  ever go on like this?" and said, "How do you see that,
17  John?" And then John came with his opinion what -- maybe
18  not completely to my surprise, because I was about
19  convinced that this was going to end -- but that he was
20  confirming it all.
21     Q   Okay.
22     A   And my surprise then was: Hey, why didn't we

Case 1:06-cv-01131-HHK    Document 32-5    Filed 02/07/2007    Page 28 of 32

Morris vs. Buvermo, et al.                    Deposition of A. van Rhee 12/06/06

106

1  know?
2       And maybe Mr. Tjaden know -- knew more about that
3  because he had these conversations when they had a clash.
4  But I was -- I was aware about all kind of -- not doubts,
5  but worries that Mr. Gardner had about how things would be
6  taken care of in the future. But a worry is different from
7  a doubt. I mean he is a very fiduciary man for us, and --
8  and -- and these things is what he said.
9       Now, I -- that's the reason that we kept him in
10 place; and he also advised us to keep him for a while in
11 place in the president of F -- of Fidelio Partners
12 Management, whatever the name is, because we had to be
13 really sure that Mr. Morris could play that role as well,
14 not only be active in the real estate markets, but also be
15 a good fiduciary representative for us in the States.
16    Q  Uh-huh.
17       Did you seek any information about Mr. Morris's
18 performance in his role as president during -- since --
19 during the period of December through March, before coming
20 to the conclusion that you should terminate him?
21    A  No. We did it immediately after that because our
22 termination had to do with the fiduciary function: Could

107

1  we trust this man? And for whatever reason. I mean if we
2  don't trust him, whatever the reason is, we cannot work
3  like that.
4       And the other thing is: Was he doing his -- his
5  office work or his other work right? That was not the
6  issue basically for us.
7       That was our surprise. First, the surprise
8  during -- during the -- the dinner; that John Gardner said
9  that he was not well taking care of his normal
10 responsibilities.
11       But the day after that, when we informed
12 Kara McCormick about our decision, then we got stories
13 that -- and that confirmed it all in a much stronger way.
14       Without that we would have done the same. We
15 were not discontinuing him because he wasn't doing his --
16 his office work right, because we are not controllers of
17 the office work of the president, but because we could not
18 trust him with our interests in the U.S. anymore because
19 the personal trust was broken.
20    Q  You had a discussion with Kara McCormick about
21 the goings-on in the office after you made the decision to
22 terminate Mr. Morris; correct?

108

1    A  We informed her about our decision because we
2  thought that was very important. It's -- it's not a
3  large company; I mean there are very few people there. And
4  that she came, first, with an enormous relief -- because,
5  of course, it's very difficult to complain about your
6  president to shareholders because the big chance is that if
7  you do that, that's the end of your job. So she felt for
8  the first time free to say what was going on in that
9  office, what she didn't like at all.
10    Q  Uh-huh.
11       What specifically did she tell you?
12    A  That the man, first, was not spending much time
13 there; and that when he was there, that, as far as she
14 could see, he was more often busy with his personal
15 holdings than with Fidelio's.
16    Q  Anything else?
17    A  Oh, maybe other things as well.
18    Q  Nothing that you recall sitting here today?
19    A  Not -- not specifically. I don't think that's so
20 interesting.
21    Q  It says here on Paragraph No. 6 --
22    A  Yeah.

109

1    Q  -- in the last sentence of Paragraph No. 6 --
2    A  Yeah.
3    Q  "JT and myself" -- that's Joost Tjaden;
4  correct?
5    A  Yes.
6    Q  -- "and myself discussed how to proceed and
7  agreed that we wanted to play this in a decent way under
8  recognition of the positive role JM had played in sourcing
9  the Spotswood Valley Square Shopping Center project via his
10 relations with Steve Garchik and Guggenheim Family Trust."
11    A  That's right.
12    Q  So did you anticipate at that time wanting to
13 compensate him for that role?
14    A  That's a very difficult question. We wanted
15 to -- to treat him fairly and knew that this was bad for us
16 but it was bad for him as well. And he had had one
17 positive thing to us, as far as we could see that; and that
18 was the bringing this relationship and the -- this --
19 the Spotswood Center deal. So we said, "Somewhere we want
20 to reward you for that as a farewell gesture."
21    Q  And that's what you felt that would be fair;
22 correct?

110

1      A   We felt it would be fair if the -- the whole
2   breaking up would go in a normal way.
3      Q   And you felt that that would be fair because you
4   recognized the considerable investment he had made in
5   bringing that to you; correct?
6         MR. SMITH:  Object to form.
7      A   No.  No, no, that's not correct.
8         Again, I don't care how much time people spend on
9   what they perform.  To us, it was we got a nice project
10  through him.  And although normally we don't reward that --
11  as I explained to you, we reward when people manage a
12  project from start to finish.  That's what we reward in the
13  promoted interest.
14        But here we said, "Oh, you can say" -- we told
15  him that he was entitled to nothing but that we thought it
16  was a bit harsh.  And that's not our -- HOW Europeans try
17  to farewell people who may have done it all with the best
18  intentions, but it just doesn't work out.
19        I mean the conclusion was that the trust had been
20  broken.  And then blaming is not the issue.  The issue is
21  that you cannot proceed, you -- you cannot go on.
22        BY MR. HADDAD:

111

1      Q   Did you at any time prior to his termination tell
2   Mr. Morris that he would not be rewarded with a promote if
3   he did not see the deal through all the way to its finish?
4      A   No.
5      Q   And did anyone else, to your knowledge, make that
6   representation --
7      A   I don't know.
8      Q   -- to Mr. Morris?
9         In Paragraph No. 7, the second sentence -- and
10  I'll give you a second to locate that -- you stated that,
11  "I add to that that we understand that the succession of
12  JG," John Gardner, "who is still involved as an important
13  advisor and co-investor, could certainly not have been
14  easy."
15     A   That's correct.
16     Q   What did you mean by that?
17     A   I mean that it's very difficult for anybody to be
18  the successor of somebody who has successfully been in a
19  company for twenty years.  There's some kind of shadow
20  going around.  That's always difficult.  Some people manage
21  that well; others don't.
22     Q   At the meeting you brought up the notion of

112

1   offsetting the operating expenses of Buvermo against any
2   promoted interest that was paid to Mr. Gardner; correct --
3   I mean Mr. Morris?
4      A   That started earlier.  Before we had the dinner,
5   we were taking drinks in the lounge of the Four Seasons.  I
6   was taking drinks with Mr. Gardner, and he had a few things
7   for me.
8         And one thing was the finalization of a period of
9   Buvermo profits against costs.  And that was basically we
10  had income at Buvermo from these -- the loan administration
11  function from Bouwfonds and that had been more than the
12  cost of what was a profit-maker.  So we had made years
13  ago -- because I was not involved in the -- in the
14  remuneration of Mr. -- of Mr. Morris, but I had been
15  involved in restating the remuneration of Mr. Gardner after
16  I was in a few years.  And there -- there we made this
17  scheme.
18        And my question then was, "Hey, does Jonathan has
19  (sic) the same?" because I didn't make the contracts with
20  him.  And in the letter you can see it.  So I didn't know,
21  really.  I was supposing that he had the same type of deal
22  as Mr. Gardner had.

113

1         Then he said that that was not the case.  And
2   then I said, "Because if I would have contracted, I would
3   have always taken that in because that's one of my
4   principles; that if you reward people working for you, they
5   must be completely in line with what the owners get."
6         So if the total what we are getting out of that
7   is the -- is the first what you earn on the projects but,
8   secondly, what you earn or lose on the operation company,
9   that total is the money coming to us.  I as an ideal want
10  that management is sharing in that total and not just in
11  one side of it.
12        Now, we -- I had contracted that with
13  Mr. Gardner.  Now, Mr. Tjaden has not contracted that with
14  Mr. Morris.  So there is where the problem maybe came,
15  because I said my -- you know, I was a bit disappointed
16  that that was not in his contract.
17     Q   Uh-huh.
18     A   Then Mr. Morris entered.  He came later, and he
19  saw us sitting, so he joined.  And then lots of things
20  went -- went wrong.
21        First he heard me talking about this concept --
22     Q   Uh-huh.

114

1    A  -- and he was already then, I think -- I think it
2  was already then and not just at the dinner, saying that's
3  something that had nothing to do with him.
4        And he was seeing the other side of what was
5  there, the papers of -- that was -- we had to make changes
6  in the FPEP because Jonathan had to be brought in.  And
7  there was that paper you have in one of the exhibits with
8  the -- with the attachment for -- say, a pro forma
9  attachment.  It looks like that (indicating), if you have
10  these designations, and where by accident they had just
11  changed the names and not the percentages.
12        So where Mr. Bonacci had been in the paper, they
13  had put Mr. Morris.  And so he saw 10 percent for John and
14  3 and a half percent or something, what it is in that
15  paper, for me; and he got mad, I think.
16    Q  Okay.  Your discussion with Mr. Morris about the
17  offsetting the operating expenses of Buvermo, would you
18  agree that that was a heated discussion?
19    A  At a certain moment it was, yes.
20    Q  And both of you were speaking in a heated
21  fashion; correct?
22    A  Yes.  But I slowed down and he didn't.

115

1    Q  And you were insisting during that discussion
2  that that arrangement should have applied to him too;
3  correct?
4    A  No.  I said that, "I am of the opinion that such
5  arrangement should include it."  But very quickly -- and
6  that was the interference of Mr. Tjaden, the interference
7  of Mr. Gardner, said that it is not part of his contract.
8  I said, "Okay, okay.  So maybe I'm talking to the wrong guy
9  about this," because it was an ongoing discussion with
10  Mr. Gardner.  It was not a discussion starting between me
11  and him.  It was continuing the discussion I had at the
12  drink table with Mr. Gardner.
13        But then, of course, he -- he joined in that
14  because we were at the dinner table with all of us.
15    Q  And the discussion affected him; correct?
16    A  Not necessarily, no, because everybody confirmed
17  to him that it -- this would not be of any impact to him.
18    Q  Okay.
19    A  And then many times we all tried to explain that
20  you can have such discussion without talking about
21  somebody's contract, but just what's -- what is the right
22  way of -- of remunerating managers.  That was where it

116

1  went.
2        And then it still went wrong.  And then we said,
3  "No, no.  Let's stop this discussion."  But it was far too
4  late for him; he couldn't stop anymore.
5    Q  So your recollection is that after you assured
6  him that that arrangement would not apply to him, he
7  continued on with that discussion?
8    A  Yeah, absolutely.
9    Q  And do you recall what specifically he continued
10  on about?
11    A  Constantly that we were doing things behind his
12  back that were part of his pay -- pay scheme.
13        Well, it was just not the case.  But you couldn't
14  try to explain; it didn't derive anymore.
15    Q  Now, that discussion about doing things behind
16  his back, that came after Mr. Gardner withdrew these two
17  documents from his pocket; correct?
18    A  No, he didn't withdrew (sic) it from his pocket.
19  It was on the table between Mr. Gardner and me when
20  Mr. Morris came to the drinking table.  And he wanted to
21  know what that was.  And then he said, "I don't know these
22  papers."

117

1        And I remember I specifically said, "If that is
2  the case, there is something wrong here."  But Mr. Gardner
3  assured me that they had been on the table of Mr. --
4  Mr. Morris as well, but that he never reacted.  What maybe
5  was not surprising to him because he seemed to have not
6  reacted to many things, what we didn't know.
7    Q  Okay.  But, in any event, Mr. Morris had
8  indicated to you that he had not had an opportunity to
9  review those before, that they were --
10    A  He said he hadn't ever seen them, that it was
11  completely new to him.
12        Well, it might be true that he never saw them,
13  because if you don't look at something, you don't see them.
14    Q  Uh-huh.
15        Didn't you think Mr. Gardner had some sort of
16  obligation to talk those documents through with Mr. Morris
17  prior to presenting them to you?
18    A  Yeah.  That -- that's what I told him, yeah.
19    Q  You told that to Mr. Gardner?
20    A  Yes.
21    Q  Yet Mr. Gardner had -- as far as Mr. Morris was
22  concerned, hadn't done that; correct?

118

1    A   Yeah.  But as far as Mr. Gardner was concerned,
2  he said that he had presented those papers to him but
3  didn't get any -- any possibility to discuss it with him
4  because he wasn't interested.
5    Q   And this document is the one that reflected that
6  Mr. -- contained a breakdown of an FPEP promote; correct?
7    A   Yes.
8    Q   And it reflected that Mr. Gardner should receive
9  10 percent and Mr. Morris should receive 3 percent;
10  correct?
11    A   That was in the attachment.
12        But that could be restated immediately because
13  when he saw that -- and he said at the meeting, he said
14  that that was a mistake.  That was just a secretarial
15  error.  And you can see in his -- in his assignment letter
16  and things like that that it's different.  That was just a
17  mistake of somebody making that attachment.  Too easily
18  done; just change the name.
19    Q   Do you know who drafted those?
20    A   No.
21        MR. HADDAD:  I think I'm done.  We can take a
22  five-minute break and make sure that I've got everything I

119

1  needed.
2  (Whereupon, a brief recess was taken.)
3        BY MR. HADDAD:
4    Q   Mr. van Rhee, the meeting at Cassidy & Pinkard in
5  December, what was that for?
6    A   That we do once a year -- not always, not every
7  year -- to get an overview of the market in D.C. and
8  environs.
9    Q   And was it a -- were there other groups there as
10  well, or is it just --
11    A   No, no, no.  It's -- they give us a
12  presentation and present themselves and present the market.
13    Q   I see.
14        MR. HADDAD:  Okay.  I have no further questions.
15        MR. SMITH:  I have a couple, Mr. van Rhee.
16            CROSS-EXAMINATION
17        BY MR. SMITH:
18    Q   I want to draw your attention to your testimony
19  about your discussion with Mr. Morris about joining Buvermo
20  as its president.
21        You had testified, I believe, that you had told
22  John that Donelux had recently confirmed its long-term

120

1  commitment to the market --
2    A   (The witness moves head up and down.)
3    Q   -- is that correct?
4    A   That's correct.
5    Q   All right.  Now, during the course of those
6  discussions with Mr. Morris, did you at any time agree to a
7  specific term of employment with Mr. Morris?
8    A   None whatsoever.
9        MR. SMITH:  All right.  No further questions.
10        MR. HADDAD:  None.
11  (At 11:42 a.m. the taking of the deposition
12      was concluded.)
13
14
15
16
17
18
19
20
21
22

121

1        I have examined and read the foregoing 120
2        pages and find the answers contained herein with
3        the changes made by me, if any, to be true and
4        correct.
5
6
7              _____
8                   Andre C. van Rhee
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Morris vs. Buvermo, et al.                    Deposition of A. van Rhee 12/06/06

122

1   As you read your deposition, if you have any corrections to make,
    please itemize them
    below. Do not write on the transcript. Upon completion enter
    today's date and sign
2   your name to the signature line. This will be attached to your
    deposition for filing.
    Thank you.
3
              CORRECTIONS TO DEPOSITION
4
    PAGE LINE              EXPLANATION
5
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
    Date        Signature

123

1        CERTIFICATE OF NOTARY PUBLIC/REPORTER
2        I, Malynda D. Whiteley, the officer before whom the
3   foregoing deposition was taken, do hereby certify that the
4   witness whose testimony appears in the foregoing deposition
5   was duly sworn by me; that the testimony of said witness
6   was taken by me in stenotype and thereafter reduced to
7   typewriting under my direction; that said deposition is a
8   true record of the testimony given by said witness; that I
9   am neither counsel for, related to, nor employed by any of
10  the parties to the action in which this deposition was
11  taken; and further, that I am not a relative or employee of
12  any attorney or counsel employed by the parties hereto, nor
13  financially or otherwise interested in the outcome of the
14  action.
15      Given under my hand this 9th day of December, 2006.
16
17
18      _____
            Notary Public in and for the
19          District of Columbia
            Registered Professional Reporter
20
21  My commission expires:
22  June 30, 2011