1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - -x
                           :

JONATHAN H. MORRIS,                     :

                           :

              Plaintiff,              :

                           :

        vs.                            :   Case No.

                           :   1:06CV01131 (HHK)

BUVERMO PROPERTIES, INC., et al.,      :

                           :

             Defendants.                :

                           :

- - - - - - - - - - - - - - - - - - -x

Washington, D.C.

Thursday, October 26, 2006

Deposition of JOHN GARDNER, witness, called for
examination by counsel for the plaintiff, pursuant to
notice, at the offices of Ziad P. Haddad, Esq., Tobin,
O'Connor, Ewing & Richard, 5335 Wisconsin Avenue,
Northwest, Suite 700, Washington, D.C., before
Malynda D. Whiteley, a Registered Professional Reporter and
a notary public in and for the District of Columbia,
beginning at 9:40 a.m., when were present on behalf of the
respective parties:

EXHIBIT
4

Case 1:06-cv-01131-HHK    Document 32-6    Filed 02/07/2007    Page 2 of 100

Morris vs. Buvermo                                    Deposition of J. Gardner 10/26/06

**Page 2**

```
1              A P P E A R A N C E S
2
3   ON BEHALF OF THE PLAINTIFF:
4       ZIAD P. HADDAD, ESQ.
5       STEPHEN J. O'CONNOR, ESQ.
6       Tobin, O'Connor, Ewing & Richard
7       5335 Wisconsin Avenue, Northwest
8       Suite 700
9       Washington, D.C. 20015
10      (202) 362-5900
11
12  ON BEHALF OF THE DEFENDANTS:
13      MARC J. SMITH, ESQ.
14      Smith, Lease & Goldstein
15      11 North Washington Street
16      Suite 520
17      Rockville, Maryland 20850
18      (301) 838-8950
19
20  ALSO PRESENT:
21      Jonathan Morris
22
```

**Page 4**

```
1           E X H I B I T S (Continued)
2   PLAINTIFF'S                        FOR IDENT.
3   No. 12  FPEP promote structure revision
                document                  212
4   No. 13  Letter dated 5/24/04         220
5   No. 14  Morris offer letter          225
6   No. 15  Spotswood Valley Center document   294
7   No. 16  Designation of FPEP property  320
8   No. 17  Letter dated 1/31/06         351
9   No. 18  SJM payment records          352
10  No. 19  Letter dated 7/6/06          354
11  No. 20  Spotswood Valley financial documents  356
12  No. 21  Letter dated 6/9/06          369
13  No. 22  Letter dated 2/3/06          371
14  No. 23  11720 Sunset Valley Drive document  373
15  No. 24  Roland Clarke document       373
16  No. 25  Twinbrook document           378
17  No. 26  Wire transfer document       378
18  No. 27  Estimated value document     384
19
20
21
22
```

**Page 3**

```
1              I N D E X
2
3          EXAMINATION BY COUNSEL FOR:
4              PLAINTIFF,
    WITNESS        MR. HADDAD
5
    John Gardner              5
6
7
8             E X H I B I T S
9   PLAINTIFF'S                    FOR IDENT.
10  No. 1   Deposition notice          12
11  No. 2   Buvermo consent to action of
                shareholders           42
12
    No. 3   Buvermo consent to action of
13              shareholders           42
14  No. 4   Fidelio Properties first amendment
                to fourth amended and restated
15              partnership agreement   57
16  No. 5   FMPI consent to action of
                shareholders           65
17
    No. 6   FPMI bylaws                71
18
    No. 7   FPEP consent to conversion  72
19
    No. 8   VBM-USA manager withdrawal consent  79
20
    No. 9   Position specification     148
21
    No. 10  Memorandum dated 9/19/05   164
22
    No. 11  E-mail dated 4/15/05       203
```

**Page 5**

```
1              P R O C E E D I N G S
2       Whereupon,
3              JOHN GARDNER,
4   defendant, was called for examination by counsel for the
5   plaintiff, and after having been duly sworn, was examined
6   and testified as follows:
7       EXAMINATION BY COUNSEL FOR THE PLAINTIFF
8       BY MR. HADDAD:
9       Q   Good morning, Mr. Gardner.  My name is
10  Ziad Haddad.  As you know, I am the attorney for
11  Jonathan Morris in this case.
12          Have you ever had your deposition taken before?
13      A   Yes.
14      Q   And when was that?
15      A   Oh, a number of years ago.  Probably 20 years ago
16  was the last one that I recall.
17      Q   So you had your deposition taken more than once?
18      A   Yeah, a couple of times, but in the distant past.
19      Q   And were you a party to those cases in which your
20  deposition was taken?
21      A   In one case I believe I was a personal party as
22  well as a company representative.  In the other I was the
```

6

1  company representative.

2      Q  Can you just give me a general idea of what those

3  cases were about?

4      A  Yeah.  They were all real estate-related.  The

5  first one, I was employed by the B.F. Saul Real Estate

6  Investment Trust.  And we had a shopping center that we

7  were going to convert to another use, and some of the

8  tenants brought a lawsuit against the company and against

9  Frank Saul personally and me personally on the basis that

10  we were sending written notices through the mail and they

11  thought that that could result in a RICO charge.

12     Q  Okay.

13     A  And it was dismissed in summary judgment.

14     Q  Okay.  And the other litigation?

15     A  The other litigation was when I was with the

16  Kaempfer Company.  And we had a situation with a lender

17  where we were terminating an agreement with a lender, and

18  that ended up in litigation.

19         Those are the only ones I can recall.  I might

20  have -- I don't believe I was involved in any actual

21  depositions in any other cases.

22     Q  Okay.  It's been a while, so you're probably a

7

1  little rusty maybe on the rules.  But I'm sure you were

2  reminded a week or two ago, when Mr. Morris had his

3  deposition --

4      A  Yeah.

5      Q  -- about what the general rules are.

6         I'm here today to ask you a series of questions.

7  You're responding to my questions under oath.  In that

8  regard, even though there's no judge or jury here, it's --

9  the same rules apply in terms of truthfulness and in terms

10  of the consequences for not answering truthfully.  Do you

11  understand that?

12     A  Yes.

13     Q  And it's important, because everything is being

14  taken down today, that you vocalize or verbalize your

15  responses, rather than making gestures or saying -- you

16  know, not responding with a "Yes" or a "No".  And I'll

17  remind from time to time because that's difficult to do.

18     A  Yes.

19     Q  In addition to that, there will be certain

20  questions that I ask you that you may not understand.  And

21  if that's the case, I would ask that you please let me

22  know; and I'll try to rephrase the question or at least try

8

1  to work out what the confusion is.  Is that fair?

2      A  Yes.

3      Q  And, finally, from time to time you may wish to

4  take a break; and that's fine.  I would probably just ask

5  that we finish either the question that we're on or the

6  particular line of questioning that we're on before we

7  adjourn.  Is that okay?

8      A  Yes.

9      Q  What did you do -- without disclosing any

10  communications you may have had with your counsel, what did

11  you do to prepare for your deposition today?

12     A  I reviewed some documents; and that was basically

13  it, other than having discussions with my -- with my

14  counsel.

15     Q  Did you have any communications with anyone else,

16  other than your counsel, in connection with --

17     A  Yes.  Not that I recall.

18     Q  So you didn't speak with Mr. van Rhee or

19  Mr. Tjaden regarding your testimony --

20     A  I've spoken --

21     Q  -- today?

22     A  -- with Mr. van Rhee and Mr. Tjaden, and I've

9

1  also spoken to Mr. Millspaugh and Ms. McCormick, but I

2  don't recall any detailed discussions of my testimony.

3      Q  When did those discussions take place

4  approximately?

5      A  I spoke to Mr. van Rhee a day or so ago, and I

6  speak continually to Mr. Millspaugh and Ms. McCormick.

7      Q  In your discussion with Mr. van Rhee, was that in

8  any way related to your deposition today?

9      A  The question I asked Mr. van Rhee was about

10  his -- his -- the written document that he had written up

11  about his recollections.  It wasn't about the document

12  itself, but it's whether he would object to having that

13  disclosed or not.

14     Q  I see.

15         MR. HADDAD:  And, just for the record, counsel

16  for the defendants and I spoke before going on the record

17  about a document that, I guess, consists of a summary --

18         MR. SMITH:  Two documents.

19         MR. HADDAD:  Two documents that --.

20         Well, why don't you explain exactly what they

21  were; and we can talk on the record.

22         MR. SMITH:  They are two documents, which are

10

1  summaries from Mr. Gardner and one from Mr. Van Rhee,
2  recapping the events of, I believe, March 23rd or 24th of
3  2006. Both of those memos were addressed to Buvermo's
4  attorney, Forrest Walpole; and, therefore, the documents
5  are attorney-client privilege.
6      I explained to Mr. Haddad that we'd be willing to
7  turn those over, because I believe they're the best
8  evidence of what transpired that evening, so long as
9  Mr. Haddad agrees that our doing so doesn't constitute a
10 waiver of the attorney-client privilege.
11     MR. HADDAD: And I've agreed that to the extent
12 they are privileged documents and they do qualify under the
13 protections of that privilege, that their disclosure would
14 not constitute a waiver of that privilege. Is that fair?
15     MR. SMITH: That's fair.
16     I'll get those at a break or lunch, whenever you
17 want to.
18     MR. HADDAD: Okay.
19     BY MR. HADDAD:
20 Q   You indicated that you met with your counsel in
21 connection with this deposition.
22     Can you tell me when you met with your counsel?

11

1      THE WITNESS: When was it (addressing Mr. Smith)?
2  A  It was Tuesday, this past Tuesday.
3      BY MR. HADDAD:
4  Q  And you also indicated that you reviewed
5  documents in connection with this deposition?
6  A  Yes.
7  Q  Can you identify those documents for me?
8  A  Yeah, I -- they were the documents that the
9  attorney provided me that had been part of the record that
10 I reviewed.
11     They were things such as the Fidelio partnership
12 agreement, the FPEP agreement, the letter agreement
13 regarding Mr. Morris's employment, the memo regarding the
14 terms of my continuing employment. And there were several
15 others that I could -- but they were in that vein,
16 documents that had been previously discussed at the earlier
17 Morris deposition.
18 Q  Okay. Did you review any documents, other than
19 perhaps these document that we just -- counsel just spoke
20 about -- did you review any other documents that haven't
21 been produced in this litigation?
22 A  No.

12

1      (The deposition notice was marked Plaintiff's
2      Exhibit No. 1 for identification.)
3      BY MR. HADDAD:
4  Q  Mr. Gardner, I'm handing you what's been marked
5  as Exhibit 1 to the deposition today. Just for the record,
6  this is a notice of deposition that I sent to your counsel,
7  requesting that a designee of the various corporate
8  defendants be appointed by the corporate defendants. And I
9  refer to them as corporate defendants, even though they're
10 an LLC. I'm just referring to the various entities.
11     And is it -- am I correct in saying that you have
12 been appointed as the designee for all these entities to
13 testify at this deposition today?
14 A  I believe that's correct.
15 Q  And taking a look at the categories of -- the
16 topics -- there are 15 of them -- are you prepared to
17 testify on behalf of these entities to these categories
18 of -- to the matters identified here in this document?
19 (The witness reviewed document.)
20 A  Yes.
21 Q  Okay. And you also recognize that you are here
22 in addition to testify in your individual capacity?

13

1  A  Yes.
2  Q  Mr. Gardner, how long have you been employed by
3  Buvermo?
4  A  Since April 15th, 1985, a little over 21 years.
5  Q  Okay. And does the same hold true for the
6  employment -- or the positions that you hold in the various
7  entities such as FP -- let's see here -- Fidelio Properties
8  Management, Inc., for instance?
9  A  We formed some of the those entities at later
10 dates. But since they've been formed, I've been that
11 party, the party whose been in charge. And I think it was
12 shortly after I joined that I became the -- the acting
13 party for the ones that were in effect at the time.
14     There have been a number of -- you know, for
15 instance, FPEP wasn't formed until 1993, various things
16 like that.
17 Q  Okay. Was your first sort of role in connection
18 with the Buvermo and related entities to be hired as -- by
19 Buvermo in April of '85? Is that the first position you
20 held?
21 A  Yeah. We -- I would have to -- there was a
22 period of transition -- there was a person who had been

**14**

1  there before me -- some period of transition. But within a
2  year or so I was the person who was designated to head up
3  all of those entities.
4      Q  What position were you hired to fill at Buvermo
5  in April of '85?
6      A  I was hired to be the president of Buvermo and
7  the managing member of our other corporate entities.
8      Q  Did you assume the role of president of Buvermo
9  immediately upon being hired?
10     A  I don't recall if it was immediately upon being
11  hired; but shortly after I was hired, in any case. There
12  may have been some transition period, but I don't recall
13  that specifically.
14     Q  Do you have any recollection of how long that
15  transition period may have been?
16     A  Not more than a year.
17     Q  Who was the president of Buvermo prior to your
18  hire?
19     A  Harrison Wehner, W-e-h-n-e-r, H-a-r-r-i-s-o-n.
20     Q  Did he remain employed with the company after you
21  were hired?
22     A  For some period of time, yes.

**15**

1      Q  And what was his role during that period of time?
2      A  His role was initially president of the entities,
3  and then he transitioned into more of an advisor role, and
4  then he subsequently left the company.
5      Q  Prior to joining Fidelio -- I'm sorry -- Buvermo
6  and its related entities in April of '85, where else had
7  you worked?
8      A  From the beginning or just in the recent time?
9      Q  Well, let's say in the field of real estate.
10     A  Yeah.
11         I started in the field of real estate in 1971 in
12  Jacksonville, Florida; and I worked for several companies
13  in the Jacksonville area. For most of the time I was
14  employed by Haskell Realty Associates, H-a-s-k-e-l-l.
15     Q  And what did you do for Haskell Realty
16  Associates?
17     A  I directed the development efforts for -- we were
18  primarily shopping center developers. And I left there in
19  '74 and joined Florida Gas Company in Winter Park, Florida.
20     Q  How long were you at Florida Gas Company?
21     A  Approximately three years.
22         And I was the director of corporate development

**16**

1  there.
2      Q  And what did you do in that capacity?
3      A  Worked on developing special projects. They were
4  alternate emergency-related to give Florida Gas Company a
5  broadening of their basic activities.
6      Q  And in '77 or thereabouts you left the company?
7      A  I left -- in '77 I left Florida Gas Company to
8  join the B.F. Saul Investment Trust in Chevy Chase. I
9  think it was Chevy Chase -- you know, 8401 Connecticut
10  Avenue.
11     Q  Okay. And what did you do for B.F. Saul?
12     A  I was the vice president in charge of their
13  shopping center portion of their real estate portfolio.
14     Q  And in that capacity what did your duties
15  include?
16     A  The portfolio included about 25 shopping center
17  properties, mostly in the Washington area, but as far as
18  away as Oklahoma; so there was a geographic dispersion.
19  And I ran that division, so all of the operations I was
20  responsible for. We had leasing, management, development
21  people; and they all reported to me. And I in turn
22  reported to the management committee of the -- of the

**17**

1  trust.
2      Q  Okay. And how long were you with B.F. Saul?
3      A  About three years.
4      Q  Okay. So that brings us to about 1980?
5      A  That brings us to '81.
6         And I joined the Kaempfer Company,
7  K-a-e-m-p-f-e-r, which is a local Washington-based real
8  estate development company.
9      Q  What were your --
10     A  I was --
11     Q  What was your title there?
12     A  I believe I was the executive vice president in
13  charge of leasing and development.
14         And then I left them to join --
15     Q  To join --
16     A  -- Buvermo.
17     Q  -- Buvermo?
18         Was it your responsibility with any of these
19  prior employers to seek out real estate deals?
20     A  Yes.
21     Q  Okay. For all of them or just some --
22     A  Essentially --

18

1    Q   -- of them?
2    A   -- for all of them.
3    Q   And what was your -- how were you compensated for
4  that? I'm not interested in amounts. Were you paid
5  anything, other than just a base salary?
6    A   In almost -- well, in the case of the earlier
7  development company, I would have a share of the ownership
8  of the properties that we had -- were entitled to, that
9  we -- that we developed, in addition to a salary. So I was
10  a participant in the ownership of those properties.
11    Q   That's with -- that was with Haskell?
12    A   Haskell. That was with Haskell.
13    Q   Okay.
14    A   Florida Gas Company was a public company. I was
15  entitled to salary, bonus, stock options.
16    Q   Okay.
17    A   The B.F. Saul Real Estate Investment Trust was
18  also a public company; and it was the same, salary, bonus
19  stock options.
20        The Kaempfer Company was similar to the Haskell
21  Company. It was a salary plus an ownership interest in the
22  properties.

19

1    Q   And during your employment with Haskell, did you,
2  in fact, acquire ownership interests?
3    A   Yes.
4    Q   And have they since been redeemed?
5    A   Yes.
6    Q   Okay. And when were they redeemed?
7    A   Oh, goodness. They were redeemed primarily at
8  the time I left. I think there were some additional
9  redemptions following that.
10    Q   And do you have any recollection of when those
11  other ownership interests were redeemed relative to your
12  departing the company?
13    A   I'm not sure about the Haskell Company. My
14  recollection is that they terminated about the time I left
15  or shortly thereafter. But it was a long time ago; I just
16  don't remember the details of that.
17    Q   Was there a sort of negotiation between you and
18  Haskells as to what the value of those interests were?
19    A   There might have been.
20    Q   You don't recall?
21    A   I don't recall.
22    Q   And how about your stock options for Florida Gas

20

1  Company; were those purchased from you upon your
2  departing --
3    A   Again --
4    Q   -- the company?
5    A   -- I don't recall. I don't think there was a
6  requirement that the options be purchased upon leaving. I
7  think -- I just really don't recall the details. It may
8  have been we had to exercise them. I just don't recall the
9  details -- either there or the Saul Company -- what the
10  details were about the termination.
11    Q   So you may have held onto your stock options for
12  some time after your termination?
13    A   I don't think I held onto them, but I don't
14  remember why I didn't.
15    Q   What about Kaempfer? Am I pronouncing that
16  correctly?
17    A   Yes.
18        When I left the Kaempfer Company, we did settle
19  up and Kaempfer did -- we did agree on a value, and I got
20  paid for those values.
21    Q   Did you believe that you were required to settle
22  those up?

21

1    A   I don't recall whether I felt I was required or
2  not.
3    Q   Okay. Let me ask that a little bit differently
4  because -- do you recall there being any requirement for
5  you to sell back your ownership interests or sell your
6  ownership interests or give up your ownership interests
7  upon departing the company?
8    A   I don't recall the details of the deal. All I
9  recall is that I think both Kaempfer and I felt it was in
10  both of our best interests that we settle up at the time I
11  left.
12    Q   You indicated previously that you were hired to
13  assume the role of president of Buvermo back in 1985;
14  correct?
15    A   Yes.
16    Q   And shortly after your hire or within a year of
17  your hire, you then became the president of Buvermo?
18    A   Yes.
19    Q   Okay. And were you also the CEO of Buvermo?
20    A   I don't recall that. I don't know if we had a
21  CEO title. The company was relatively small, and the
22  president really gave you all the entitlements you needed,

22

1  so I may or may not have been. It didn't seem to be
2  important.
3     Q   Yeah.
4        You how long did you hold that position?
5     A   Until today.
6     Q   You're still the president --
7     A   Yes.
8     Q   -- of Buvermo?
9        So is it your understanding that you never
10  relinquished the presidency of Buvermo at any time in the
11  last twenty-one years?
12     A   Yes. Twenty-one -- whenever I started, from when
13  I started until --.
14     Q   Okay. Back in the '80s?
15     A   Yeah.
16     Q   And at some point you became, if I'm not
17  mistaken, the president of Fidelio Partnership Management,
18  Inc.?
19     A   FP -- yes, I think that's the title -- the
20  managing entity of Fidelio properties.
21     Q   I'll refer to it as FPMI, if that's --
22     A   I think --

23

1     Q   -- okay with you.
2     A   Yeah.
3     Q   Is that how you refer to that entity?
4     A   You know, we -- I just signed -- the name of
5  it -- that's the name.
6        Maybe we should know exactly what the name. Is
7  it -- Fidelio Property Management, Inc., I think, is right,
8  FPMI.
9     Q   And it's your understanding that FPMI is the
10  managing general partner of Fidelio Properties --
11     A   Yes --
12     Q   -- correct?
13     A   -- yes.
14     Q   And do you recall how long you've served as
15  president for FPMI?
16     A   A substantial period of time. I don't recall
17  when I actually took on that role. And we may have changed
18  the managing general partner at some point along the way.
19  But for the last at least 15 years.
20     Q   Okay. Do you hold any other positions at FPMI,
21  to your knowledge?
22     A   Not at -- I don't believe so, at FPMI.

24

1     Q   Going back to Buvermo, apart from being its
2  president, do you hold any other positions at Buvermo?
3     A   I don't think so.
4     Q   Do you have any ownership interest in Buvermo?
5     A   Yes.
6     Q   What is that ownership interest?
7     A   I think it's approximately 12 percent.
8     Q   So you're a shareholder?
9     A   Yes.
10  (Mr. O'Connor entered the conference room.)
11     Q   Who is the remaining shareholder -- who are the
12  other shareholder of Buvermo?
13     A   The other shareholders are Fidelio Properties.
14     Q   Approximately 88 percent?
15     A   Yes.
16     Q   And are those ownership interests reflected
17  anywhere, such as in a stock certificate?
18     A   Yes, I believe they are.
19     Q   And do you still have those stock certificates?
20     A   I believe so.
21     Q   And have those been -- did you bring those with
22  you today?

25

1        MR. SMITH:  (Counsel moves head from side to
2  side.)
3     A   Uh-uh.
4        MR. HADDAD:  Okay. I'm just going to request
5  that those be produced. They are responsive to our
6  document requests.
7        MR. SMITH:  Responsive. I'm not sure if they're
8  relevant, but I don't think we have a problem with that.
9        MR. O'CONNOR:  Steve O'Connor, by the way.
10        MR. SMITH:  Nice to meet you.
11        BY MR. HADDAD:
12     Q   How long have you had an ownership interest in
13  Buvermo?
14     A   I think it was since early '95.
15     Q   And prior to that did Fidelio own --
16     A   Yeah.
17     Q   -- Buvermo outright?
18     A   Yes. There was a time early on when it may not
19  have owned a hundred percent; but for almost all the time
20  I've been there, they've owned a hundred percent.
21     Q   Okay. Apart from being the president and a
22  shareholder in Buvermo, do you have any other -- do you

26

1  hold any other positions at Buvermo?
2     A   Not at Buvermo.
3     Q   Okay.  What about at Fidelio; do you have any --
4  do you hold any sort of office at Fidelio?
5     A   Not at Fidelio itself.  I'm a member of FPEP,
6  which is a member of Fidelio.
7     Q   How long have you been a member of FPEP?
8     A   Since its formation.  And I believe it was formed
9  around 1993.
10       I'm sorry.  What was the question again?
11    Q   How long have you been a member of FPEP?
12    A   Okay.  Yeah.  Okay.  Yes, since about 1993.
13    Q   I may have said "Fidelio" so --.
14    A   I wasn't sure whether you said that or not.  And
15 I was thinking: Wait a minute.  I might have answered the
16 wrong question.
17    Q   We're dealing with a lot of entities, so it's --
18    A   Yeah.
19    Q   -- going to happen, so I'll try to do my best.
20       Has your membership interest in FPEP in any way
21 increased or decreased since 1993?
22    A   The membership in FPEP has changed itself, but

27

1  the -- the FPEP -- when you say "membership interest in
2  FPEP," I'm a member of FPEP.  And by virtue of that
3  membership, I have various ownership entities in each of
4  the properties that are designated FPEP properties.
5       And those membership in those properties have
6  changed over time.  You know, each property designates one
7  separately.  There's really no ownership interest in FPEP
8  in general.  It only entitles you to ownership, you know,
9  to a certain percentage interest of those properties.  So
10 it's the property interests that have changed over time.
11    Q   Okay.  So it's not -- is it your understanding
12 that you don't have any fixed membership interest in FPEP?
13    A   What FPEP provides for is FPEP provides for a
14 participation in properties which Fidelio owns.  And the
15 FPEP agreement specifies two things; what percentage --
16 what the ownership interest in this property is on the part
17 of FPEP, and then there's also a specification about what
18 percentage that I own relative -- relative to other members
19 of FPEP.
20    Q   Okay.  I think when we get into that, when we
21 pull out the FPEP agreement --
22    A   That's probably better to do that because it's

28

1  not like a -- you know, I own 20 percent of a company or
2  something like that.  The ownership interest really runs to
3  the properties.
4     Q   I'm sorry.  You're still a member of FPEP today?
5     A   Yes.
6     Q   And did you at any time cease being a member of
7  FPEP and then become a member again or has --
8     A   No.
9     Q   -- it been continuous?
10    A   Continuous.
11    Q   And today -- sitting here today, who are the
12 other members of FPEP?
13    A   There are no other members of FPEP today.  I
14 believe that's true.  The only possible difference is
15 Fidelio acquired an interest of a departing partner.  I
16 don't remember if they acquired that interest -- I don't
17 believe they acquired it by entering FPEP.  I think they
18 just acquired that prior to the ownership being passed to
19 FPEP.  That's what I don't recall.
20    Q   Are you referring to Steve Bonacci?
21    A   Yes.
22       "Bonacci".

29

1     Q   "Bonacci".
2     A   B-o-n-a-c-c-i.
3     Q   What about Fidelio Properties Investments, Inc.?
4     A   Fidelio Properties --
5       MR. SMITH:  What's the question?
6       BY MR. HADDAD:
7     Q   Does Fidelio Properties Investments have a
8  membership interest in FPEP?
9     A   I don't know that.  I'd have to look at the
10 document to see.  I think they may have a small interest.
11    Q   Do you know who the managing member of FPEP is?
12    A   It's -- again, we have all of these corporate
13 entities.  I think it's FP Investments, I believe; but I'd
14 have to check the document to see.
15    Q   Uh-huh.
16       Do you hold any position at FP Investments?
17    A   I believe I do.
18    Q   Okay.
19    A   I believe I'm the president of FPEP Investments
20 as well.
21    Q   Do you know how long you've held that position?
22    A   Since it's inception as well.

30

1     There was one entity I was a vice president of
2  and not a president. I just don't recall which one that
3  was. So I'm assuming that when we get there, you'll let me
4  at least look at a list or something to make sure I've
5  given you the right name.
6     Whatever we've given you is the correct name. I
7  may just be remembering it wrong.
8     I believe I'm president of FP Investments, Inc.
9     Q  You're also the vice president and secretary of
10 Orvan, Inc.; is that correct?
11    A  Yes.
12    Q  How long have you served in those positions?
13    A  I would -- for a long period of time. I would
14 assume again more than 15 years or however long they've
15 been in existence.
16    Q  Okay. Do you have any ownership interest in
17 Orvan, Inc.?
18    A  No.
19    Q  You are the president and secretary of Donelux,
20 Inc.; correct?
21    A  Yes.
22    Q  And how long have you shared in those positions?

31

1     A  Same.
2     Q  For about 15 years at least?
3     A  However long they've been in existence.
4     Q  However long?
5     A  Yeah.
6     Q  And do you have any ownership interest --
7     A  No.
8     Q  -- in Donelux?
9     A  No.
10    Q  Just one other thing about depositions: If you
11 could just wait until I complete the questions --
12    A  Okay.
13    Q  -- even if you know what I'm going to ask.
14    A  Okay.
15    Q  It just makes it a lot easier for the court
16 reporter.
17    Janivo Realty, Inc., you're the president and
18 secretary of that company; correct?
19    A  Yes.
20    Q  Okay. How long have you served in that capacity?
21    A  Same answer.
22    Q  Okay. For as long as that company's --

32

1     A  I believe --
2     Q  -- in existence?
3     A  -- so. I don't recall when I -- when I entered
4  that one.
5     Q  And do you have any ownership interest in Janivo
6  Realty, Inc.?
7     A  No.
8     Q  I believe we discussed Fidelio Partnership
9  Management, Inc., before, or FPMI. You indicated that you
10 were the president of that company; is that correct?
11    A  Does that say "president" there?
12    Q  That's what your answers to interrogatories
13 indicate; correct?
14    A  Yeah.
15    Q  It further indicates that you are the CEO and
16 secretary of that company?
17    A  Yes.
18    Q  Okay. And just in case I neglected to ask you
19 earlier, do you have any ownership interest in FPMI?
20    A  No.
21    Q  Apart from Mr. Bonacci, have there been any other
22 members of FPEP since its inception?

33

1     A  No.
2     Oh, no. I'm sorry. That's not correct.
3  Mr. Chris Zachariasse has been an earlier member.
4     Q  Do you recall approximately when he ceased being
5  a member?
6     A  Probably a year ago or so.
7     MR. SMITH: Are we talking about Bonacci or
8  Zachariasse?
9     MR. HADDAD: Zachariasse.
10    A  Yeah, I think it was, like, a year ago.
11    BY MR. HADDAD:
12    Q  And what were the circumstances surrounding his
13 no longer being a member of FPEP?
14    A  He was a member -- he had a prorated interest in
15 the properties, but did not -- was not entitled to a
16 promoted interest. And that was an agreement that Fidelio
17 had agreed to do with him. And we felt the easiest way to
18 bring him into that membership was through FPEP.
19    But later we felt it was simpler to go ahead and
20 separate him out and make him a separate -- a separate
21 owner -- have a separate ownership interest in a part of
22 the properties apart from FPEP, so that was done at a

Morris vs. Buvermo                                    Deposition of J. Gardner 10/26/06

34

1 subsequent time.

2    Q   Okay. Are there any sort of written amendments

3 to the FPEP agreement which would reflect any of this?

4    A   There was a -- as I recall, he did resign from

5 FPEP; and I'm sure he was admitted into FPEP. I just

6 don't -- I'm sure that had taken place.

7    Q   Are you, by any chance, confusing Mr. Zachariasse

8 with an entity in which he was, I believe, an owner, called

9 VBM?

10    A   I think I am, yes. I'm sorry. I think I'm

11 confusing those.

12    Q   So VBM was once a member of FPEP --

13    A   Yes.

14    Q   -- and no longer is --

15    A   And no longer is, yes. I think that's correct.

16 I -- I was confused.

17    Q   How did Mr. Bonacci acquire his interests in

18 FPEP?

19    A   I'm not sure -- you mean why was he given the

20 interest? Maybe you could help me.

21    Q   He became a member of FPEP at some point;

22 correct?

35

1    A   Yes. He and I both became a member of FPEP.

2    Q   Was that also at its inception?

3    A   Yes.

4    Q   And why was he given membership to FPEP?

5    A   He was given membership for the same reason that

6 I was, that the Fidelio partners wanted to provide an

7 ownership incentive to us in addition to our -- our salary

8 compensation.

9    Q   When Mr. Bonacci left the company, what happened

10 to his membership interest?

11    A   Fidelio purchased his membership interest in

12 accordance with the terms of the FPEP agreement.

13    Q   So is Fidelio now a member of FPEP?

14    A   I -- that's what I don't recall. I don't believe

15 they are. I believe that what the FPEP agreement provides

16 for is that -- when I say -- I think I misspoke.

17        I think the way the FPEP agreement works is it's

18 the managing member who actually purchases the interest,

19 but the funds are provided from Fidelio. I think that's

20 what's provided for in the FPEP agreement.

21    Q   Okay. The management member being FP

22 Investments?

36

1    A   Yes.

2    Q   Apart from having an ownership interest in

3 Buvermo and having an interest in FPEP by virtue of being a

4 member in that, do you own any shares or have an ownership

5 interest in any of the other Fidelio entities?

6    A   No.

7        MR. SMITH: Ziad, as a point of clarification,

8 when you said "Fidelio entities," just so the record is

9 clear, could you identify those for us.

10        MR. HADDAD: Sure.

11        BY MR. HADDAD:

12    Q   That would include Fidelio; Fidelio Properties

13 Management, Inc., Fidelio Properties Executive -- Fidelio

14 Properties Executive, FPEP; Fidelio Properties Investment;

15 Orvan; Donelux; Janivo.

16    A   Yes. The answer is -- my answer is it includes

17 all of those entities, yes.

18    Q   Okay. That your ownership interest is only in --

19 that you only have an ownership interest in Buvermo and

20 Fidelio Properties Management, Inc.?

21    A   FP -- FPEP, Fidelio Properties Executive

22 Properties.

37

1    Q   Sorry. My bad.

2        Buvermo and FPEP?

3    A   Yes.

4    Q   And an indirect ownership interest in Fidelio

5 Partnership by virtue of your membership interest -- your

6 membership interest in FPEP?

7    A   Yes, through the membership interest.

8    Q   Apart from yourself, are there any other officers

9 of Buvermo at this time?

10    A   No.

11    Q   Does Buvermo have any directors?

12    A   Yes.

13    Q   What --

14    A   I'm not sure we call them "directors," but -- I

15 don't recall the title of them, but Joost Tjaden and

16 Andre van Rhee act for the management committee. I'm not

17 sure how their titles are actually written in the

18 documents.

19    Q   Let me just stop you right there.

20        Joost is J-o-o-s-t, Tjaden is T-j-a-d-e-n?

21    A   Yes. And Andre, A-n-d-r-e, van Rhee, v-a-n,

22 R-h-e-e.

Case 1:06-cv-01131-HHK    Document 32-6    Filed 02/07/2007    Page 11 of 100

Morris vs. Buvermo                                    Deposition of J. Gardner 10/26/06

38

1    Q   Just for clarification purposes, you indicated
2  that Joost and Andre are part of a management committee?
3    A   I don't recall the titles they have. I'd have to
4  look at the documents and see what their titles are.
5    Q   Are you sure they have any position at Buvermo?
6    A   I don't know, without looking at the documents.
7    Q   Isn't the business of Buvermo run by its
8  shareholders?
9    A   I believe that's right.
10   Q   And, in fact, the company passed a resolution
11  indicating that there would be no directors; isn't that
12  right?
13   A   I'd have to review the document.
14   Q   Okay. Are there any other persons employed by
15  Buvermo at this time?
16   A   Yes.
17   Q   Who is that?
18   A   Kara McCormick and Laurey, L-a-u-r-e-y,
19  Millspaugh, M-i-l-l-s-p-a-u-g-h.
20   Q   And what's Kara McCormick's title?
21   A   I don't know what her title -- I don't know what
22  her official title is; I just don't recall.

39

1    Q   And what about Mr. Millspaugh; what's his
2  position?
3    A   He will become president of Buvermo Properties.
4  He's acting as president now, but we've not done the formal
5  changing of the documents.
6    Q   So you are currently the president, and he's now
7  acting as the president?
8    A   He is -- he will become the president.
9    Q   So he's not acting as the president now?
10   A   No.
11       MR. SMITH: Object to form.
12       Go ahead.
13       BY MR. HADDAD:
14   Q   He is not?
15   A   The -- he is -- from my perspective, he's acting
16  as the president.
17   Q   Even though he's not formally the president?
18   A   Yes.
19   Q   Do you hold him out to be the president of
20  Buvermo?
21   A   We -- I don't think I've ever made that
22  representation one way or the other.

40

1    Q   Do you know whether he holds himself to be the --
2  holds himself out to be the president of Buvermo?
3    A   We have authorized him to do that if he chooses
4  to.
5    Q   When do you intend to formally make him the
6  president of Buvermo?
7    A   As soon as we can.
8    Q   What does that mean? What's holding you back?
9    A   Just haven't done it.
10   Q   What do you believe is required?
11   A   Well, really, I believe it's required that we
12  have to change the documents.
13   Q   What documents?
14   A   The documents that empower me to be president.
15   Q   By way of a shareholder meeting?
16   A   I presume that's the way it's done.
17   Q   Isn't that how you were appointed president?
18   A   I don't -- I assume so, yeah. I don't recall
19  that.
20   Q   Do you know what Buvermo Management, Inc., is?
21   A   That's a predecessor of Buvermo Properties.
22   Q   Do you know how Buvermo Properties -- I'm

41

1  sorry -- Buvermo Management, Inc., ended up being Buvermo
2  Properties?
3    A   Yes. At the time we felt that our role was much
4  broader than just management, and we felt that "Properties"
5  was a better designation than "Management" of the services
6  we provided. It's really more to real estate; it sounded
7  like it better described our function.
8    Q   So was it just a name change?
9    A   Yes.
10   Q   Is there an annual meeting of shareholders for
11  Buvermo?
12   A   I believe so.
13   Q   Do you know -- I mean are there regular meetings
14  of the shareholders of Buvermo --
15   A   Not --
16   Q   -- as far as you know?
17   A   -- regular meetings, no.
18   Q   Do you know when the last meeting of the
19  shareholders took place?
20   A   I believe that we're authorized to meet by
21  telephone or to sign resolutions or do whatever else. I
22  don't recall when the last meeting of that nature was

42

1   taken -- took place.

2       Q   How often does that occur throughout the year?

3       A   I would guess once a year.

4       Q   And who usually participates in those meetings?

5       A   Generally they're not a; meeting. They're just a

6   signing of resolutions.

7           MR. HADDAD: Why don't we mark these as Exhibits

8   2 and 3, please.

9           THE WITNESS: Would this be a reasonable time to

10  take a five-minute break?

11          MR. HADDAD: If you'd like to.

12  (Whereupon, a brief recess was taken.)

13          (The Buvermo consents to action of shareholders

14          were marked Plaintiff's Exhibit Nos. 2 and 3,

15          respectively, for identification.)

16      BY MR. HADDAD:

17      Q   Before we broke, we were speaking about how the

18  shareholders of Buvermo meet in conducting its business.

19  And you indicated that oftentimes it's not a formal

20  meeting, it's telephone calls; is that correct?

21      A   Yeah.

22      Q   Okay.

43

1       A   Or other arrangements.

2       Q   Other arrangements such as?

3       A   We might make it part of another meeting.

4       Q   Okay. What do you mean by that exactly? In

5   other words, you may be having a meeting of Fidelio --

6       A   And we may -- we may also then discuss, you know,

7   a Buvermo item or sign things. So it could be telephone

8   conversations; it could be direct discussions.

9       Q   And so some of the decisions you make are done

10  verbally or orally?

11      A   Some of the decisions regarding Buvermo or what?

12      Q   Buvermo, Buvermo's operations.

13      A   Almost all of Buvermo's operations are done under

14  my direction as president.

15      Q   Okay. Do you document all those decisions?

16      A   When I -- not necessarily.

17      Q   Okay. Let me show you what's been marked as

18  Exhibits 2 and 3 to your deposition. This is 2, and this

19  is 3 (indicating).

20  (Documents presented.)

21  (The witness reviewed documents.)

22      BY MR. HADDAD:

44

1       Q   Mr. Gardner, you've been handed what's been

2   marked as Exhibit 2 and Exhibit 3 to your deposition. I

3   ask that you take a look at these documents and tell me if

4   you recognize them.

5       A   Yes.

6       Q   And these appear to be resolutions passed by the

7   shareholders of Buvermo Properties. Exhibit 2 is dated May

8   20th of 2005?

9       A   Yes.

10      Q   And Exhibit 3 is dated June 16th of 2006?

11      A   Yes.

12      Q   And is that about when these resolutions were

13  prepared?

14      A   I believe so.

15      Q   And who prepares these?

16      A   I think they were prepared by either

17  Laura Preede, who worked for us at the time, or

18  Kara McCormick.

19          You mean "prepared," being typed or --?

20      Q   Yes.

21          Both of these suggest that the undersigned --

22  and "the undersigned" being Fidelio Properties -- is a

45

1   shareholder of Buvermo Properties, Inc. Do you see that?

2       A   Yes.

3       Q   Why aren't you identified on here as a

4   shareholder?

5       A   I don't know, other than -- I don't know.

6       Q   And both of these consents to action, as they are

7   titled, appoint you as the president and CEO, secretary of

8   Buvermo Properties, Inc. --

9       A   Yes.

10      Q   -- is that right?

11      A   Yes.

12      Q   And did you direct that these forms be prepared?

13      A   Yes.

14      Q   Why?

15      A   These are part of our annual -- you know, we do

16  these annually; and we appoint officers annually. And it

17  was time for annual appointment of officers, so I directed

18  that they prepare the form, and then I signed it.

19      Q   Okay. And do you recall, prior to signing either

20  one of these forms, having a meeting with the shareholders

21  of Buvermo?

22      A   I don't recall the meeting specifically.

46

1    Q   So you don't recall a meeting of the shareholders
2    in which the shareholders agreed to make you president?
3    A   I don't recall that meeting. But I know that
4    when we signed these, we signed these all at one time
5    generally. And generally the participants are Andre and
6    Joost, so they're clearly aware of my signing these
7    documents, and they agreed to my signing them.
8    Q   Okay. Well, they're not signatories to these
9    documents; correct?
10   A   No. I signed them with the understanding that I
11   have their approval to sign.
12   Q   And that was because you had met with them and
13   decided that you would be the president?
14   A   They're -- yeah, that I was the president; and
15   they agreed to that.
16   Q   Okay. So when the time comes to make
17   Mr. Millspaugh the president, do you intend to do a similar
18   type thing?
19   A   Yes.
20   Q   Okay. And why haven't you just gotten the
21   authorization from Mr. van Rhee and Mr. Tjaden to do that,
22   to make Mr. Millspaugh officially the president of the

47

1    company?
2    A   No particular reason. I just haven't done it.
3    Q   No particular reason?
4    A   No particular reason.
5    Q   Mr. Morris was hired by the company in June of
6    2005; isn't that right?
7    A   Yes.
8    Q   And he was hired as the president of the company;
9    isn't that right?
10   A   Yes.
11   Q   Okay. Why didn't you at that time, on the date
12   of his hiring, pass a resolution such as this officially
13   naming him the president?
14   A   We intended to do that, but Jonathan raised some
15   questions about his residency and whether he could become
16   president of Buvermo and still be a resident of Florida.
17   And we honored that concern; and we had those discussions
18   over a fairly long period of time, trying to help him
19   resolve that question.
20   Q   Okay. But those didn't -- those discussions
21   didn't happen on or before Mr. Morris's first day of
22   employment with Buvermo; isn't that right?

48

1    A   Did they or did they not? I don't -- I don't
2    recall that.
3    Q   You don't recall?
4    A   No.
5    Q   As of May 20th of 2005, the date that this
6    resolution marked as Exhibit 2 was passed, you were already
7    in the interview process for the new president of Buvermo;
8    isn't that right?
9    A   Yes.
10   Q   So why did you see -- why do you think it was
11   important to name yourself as president of company at that
12   time?
13   A   Well, we had to have a president of the company;
14   and this was the time we did it.
15   Q   Well, weren't you the president prior to May
16   20th, 2005?
17   A   Yes. We typically do these every year.
18   Q   Okay. Was there a term to your prior
19   appointment?
20   A   No.
21   Q   There was no term? It was an indefinite term?
22   A   It was an unspecified term.

49

1    Q   Okay. And so why do you -- why do you do these
2    every year, if the term is unspecified? I mean why not
3    just continue on with your presidency?
4    A   Well, you know, the presidency is at will; and it
5    can go or be terminated at will. I don't know why we did
6    these every year as opposed to just letting one run on. I
7    don't know the answer to that.
8    Q   And you've done these once a year since the
9    formation of Buvermo Properties, Inc.?
10   A   I believe, you know, pretty close once a year.
11   Q   Let's just -- generally can you tell me what
12   Buvermo does as a business. What is the business of
13   Buvermo?
14   A   Yeah. Buvermo is employed by Fidelio to manage
15   its assets. And it's involved in finding assets to invest
16   in; it's involved in negotiating the contracts for those
17   assets; it's involved in acquiring and closing on the
18   sales, structuring any of the ventures with any venture
19   partners or people we act with; and then in supervising and
20   directing the efforts to take that asset once owned and
21   take it through to fruition and have it realize its full
22   value as a real estate asset. So it's involved in that

50

1  whole process on behalf of Fidelio.

2      Q   Okay.  So Fidelio is actually the one who

3  actually invests the money?

4      A   Yes.

5      Q   Okay.  And Buvermo itself doesn't invest any

6  money --

7      A   No.

8      Q   -- in these -- in these deals; correct?

9      A   No.

10     Q   And what kind of investments are we talking

11 about?

12     A   The -- the typical investment we do are in

13 commercial real estate properties in the Washington, D.C.,

14 area.  And that ranges anywhere from -- we've done

15 self-storage deals; we've done a resident -- a retail deal.

16 We have done a number of office buildings deals.  We have

17 some hotel -- an interest in a hotel property and want it

18 to be developed.

19     So we have a fairly broad range.  And there are

20 also some residential deals, typically condominiums.  So

21 it's commercial real estate in the Washington, D.C., area;

22 and they're typically done in partnership with a developer

51

1  or some other partners.

2      Q   Okay.  And what kind of terms in terms of time

3  frames?  What kind of turnaround do you look for in

4  these -- in these investment typically?

5      A   Typically we would be in the three- to five-year

6  time frame.  But that's ranging anywhere from a year, not

7  too much longer than that.  It depends on the market

8  conditions.

9      Q   Okay.  So how many over the -- you know, on

10 average per year, how many transactions, acquisitions deals

11 does Buvermo --

12     A   Yeah.

13     Q   -- locate on behalf of Buvermo?

14     A   There's really no typical thing.  We try to take

15 advantage of opportunities.  In some years we may do one or

16 two.  I don't remember -- I would say in the most we might

17 have done four or five.

18     But when we talk about deals, it's not just buy a

19 building here or buy a building there.  Many times we have

20 very complex structures and complex acquisitions.

21     Like we might buy a parcel of land and

22 subsequently divide that land, and then we may then partake

52

1  in the vertical development of that land in another

2  venture.  And then we may spin that off into another

3  partnership, for instance; so this one that looks like a

4  deal may end up being seven or eight deals over the course

5  of its entire transaction.  That's not untypical for us.

6      Q   Uh-huh.

7      A   And so we have to be involved all the way along

8  the way in structuring and making sure those deals work and

9  making sure that the property is -- the value is maximized

10 in the property.

11     Q   Okay.  You talked about a three- to five-year

12 turnaround is what you typically look for.  And I believe

13 you also indicated that it ends up being shorter than that;

14 sometimes it ends up being longer.  Is that correct?

15     A   Yes.

16     Q   What's the longest sort of deal that Fidelio has

17 held onto -- investment that it's held onto since you've

18 been at --

19     A   We --

20     Q   -- Buvermo?

21     A   -- purchased a business park -- land for a

22 business park out near Dulles Airport in 1983.  And that

53

1  was a hundred-acre site with a very large number of

2  parcels, and we sold the last parcel there last year.

3      Q   Okay.

4      A   So that's probably in a given location the

5  longest we've been involved.

6      Now, in that particular transaction we probably

7  did fifteen or twenty separate individual transactions as a

8  part of that land ownership.  So I think we might have

9  developed ten or eleven office buildings, each a separate

10 deal.  We sold off sites to three or four restaurants, also

11 separate deals.  And we also sold off sites to, like, four

12 or five hotels.

13     So it was the land ownership that went that long,

14 but in that period of time there may have been ten or

15 fifteen deals that were three- to five-year individual

16 deals within.

17     Q   Okay.  Aside from that particular deal in which

18 you -- the land ownership lasted for an extended period of

19 time, can you give me examples of other lengthy investments

20 that Fidelio was involved in exceeding five years?

21     A   Yeah.  One investment we started in 1986 with the

22 Oliver Carr Company, and it was to have been matured in

54

1    1990.

2            The market went bad, as did Carr, as did the

3    bank, as did everything else in those time (sic). And we

4    ended up owning that land and carrying that land for

5    another ten years beyond that, not by any desire of

6    ourselves, but because the market shifted on us and we had

7    no choice. That could well be the next longest asset we

8    have owned, I believe. I don't recall one we've owned

9    longer than that.

10    Q    But would you say that the majority of the

11    investments are between the three- to five-year time

12    period?

13    A    That's what we try to target, three to five. But

14    we've -- it's really difficult to project lives in today's

15    marketplace. We did an office building that we started

16    construction on that we were going to own for three years,

17    and somebody bought our interest six months later.

18    Q    Okay.

19    A    So these things do -- do change quickly.

20    Q    I understand that there are, you know, exceptions

21    to the rule. But would you say that the general rule has

22    been over the last 20 years that Fidelio has held onto its

55

1    investments between three to five years?

2    A    The reason -- we target that. We are

3    entrepreneurial investors, and that's the typical time

4    frame for entrepreneurial investors.

5    Q    I understand you target that.

6            Has that actually been what has happened?

7    A    I would only be guessing. If I took the

8    investments we've done in the last ten years, how many of

9    them fell between three and five and how many were shorter

10    and how many were longer, I don't know how those -- you

11    know, I could figure it out. But I'm not even sure the

12    majority fell between three to five.

13            It's just such a -- the market's -- you're

14    really -- when I say the objective of three to five, that's

15    totally dependent upon the markets and how the markets

16    respond.

17    Q    Can you give me a range of an amount that Fidelio

18    typically invests in these -- how much equity -- is there a

19    range of equity that it usually contributes?

20    A    There have -- we have contributed -- the lowest

21    amount that we've ever put in investments is probably two

22    hundred thousand. The biggest amount that we put in an

56

1    investment, depending on how far back you want to go, you

2    know, might be twenty-five or thirty million.

3    Q    Okay. How about during your time there?

4    A    That's going back through my time. Yeah.

5    Through the twenty years that I've been involved, the

6    biggest investment we made -- I was trying to think if

7    there was one bigger than twenty-five or thirty. There

8    probably was one or two bigger than that.

9    Q    That was an investment that Fidelio made in which

10    it invested twenty-five million of its own funds?

11    A    Yeah. More than twenty-five.

12            For the last ten or fifteen years, I think the

13    most we've done is maybe typically five to seven. We may

14    have done more than that. I'd have to remember. But, you

15    know, one to five to seven is probably more typical.

16            Now, when I say that, that -- when I talk about

17    individual investments, that might be one of those

18    buildings at Dulles Business Park that I mentioned. It

19    might have a three million dollar investment, but in that

20    park we might have six or seven of those in that park.

21    Q    Now, Fidelio, it's a general partnership;

22    correct?

57

1    A    Yes.

2    Q    And it has no officers or directors; is that

3    right?

4    A    I believe that's right.

5    Q    Does it have any employees?

6    A    No.

7            MR. HADDAD: Exhibit 4, please.

8            (The Fidelio Properties first amendment to fourth

9            amended and restated partnership agreement was

10            marked Plaintiff's Exhibit No. 4 for

11            identification.)

12            BY MR. HADDAD:

13    Q    Mr. Gardner, you've been handed what's been

14    marked as Exhibit 4 to your deposition. This appears to be

15    a Fidelio -- a document entitled "Fidelio Properties First

16    Amendment to Fourth Amended and Restated Partnership

17    Agreement".

18    A    Yes.

19    Q    And attached to that four-page document or

20    five-page document is a document titled, "Fourth Amended

21    and Restated Partnership Agreement of Fidelio Properties".

22    A    Yes.

58

1    Q    Okay. Do you recognize that to be the
2    partnership agreement of Fidelio --
3    A    Yes --
4    Q    -- as amended?
5    A    -- that's correct. Yeah.
6    Q    So you recognize this to be the --
7    A    Current.
8    Q    -- the current partnership agreement?
9    A    Yes, I believe.
10    Q    As amended?
11    A    Yes.
12    Q    And no further amendments -- there are no further
13    amendments that you are aware of; correct?
14    A    I believe that's true.
15    Q    If you'll turn to the very last page of this
16    entire document, there is a Schedule A. Do you see that?
17    It's titled "Fidelio Properties Partnership Percentages"?
18    A    Right.
19    Q    Does this accurately reflect the percentages --
20    partnership percentages owned by each of the partners
21    identified in this document?
22    A    As of that date, I believe so, as of September 1,

59

1    '93.
2    Q    I've asked you whether it's been in any way
3    amended. Are you aware of any amendments to this that have
4    changed these partnership percentages?
5    A    The partnership percentages change over time.
6    This is -- this says as of this date this is what they are.
7    We report those in our annual financial statements. But
8    those are updated. The financial statements would update
9    that every time.
10    Q    Okay. So these might have changed, but you're
11    not sure?
12    A    Yeah, I'm -- I'd have to look at the current
13    financial statements to see. But these might have changed.
14    Q    Are you aware of any other partners of Fidelio
15    Properties, other than the ones identified in the back?
16    A    I'd have to look at the current list to say. I
17    don't know.
18    Q    Well, take a look at this first amendment to the
19    Fourth Amended and Restated Partnership Agreement, the very
20    front here.
21    A    Okay.
22    Q    It identifies Orvan, Donelux; Janivo; Fidelio

60

1    Properties Management, Inc.; and FPEP --
2    A    Okay.
3    Q    -- as its partners?
4    A    Right.
5    Q    And it's your testimony that this agreement
6    hasn't since been amended; correct?
7    A    I believe that's true, but I don't know -- I'd
8    have to look at the financial statements to see if that's
9    true, it lines up with the current ownership, if that's
10    your question.
11    Q    Just trying to confirm who the partners are.
12    A    Right.
13    Q    Do you have any reason to believe that there are
14    any other partners?
15    A    Not without looking. You know, I'd have to look
16    and see. But I believe these are the -- let me just see if
17    I can --.
18    (The witness reviewed document.)
19    A    I believe these are the partners.
20    Q    Okay. Now, how is the business of Fidelio run?
21    Who manages the business of Fidelio?
22    A    The managing general partner, as provided for in

61

1    the partnership agreement.
2    Q    Okay. If you take a look at page 6 of the
3    partnership agreement itself, it's marked D-000263.
4    A    Okay.
5    Q    Taking a look at paragraph 4.01, do you see that?
6    A    Yes.
7    Q    Now, this suggests that a management committee
8    consisting of Donelux and Janivo --
9    A    Shall constitute the management committee --
10    Q    Correct.
11    A    -- that's correct.
12    Q    Are you familiar with that management committee?
13    A    Yes.
14    Q    Okay. And is that how decisions are made on
15    behalf of Fidelio?
16    A    If you read all of 4.1, 4.1 outlines -- or all of
17    4.
18    Q    .01.
19    A    Yeah.
20    But if you read all of 4, it describes how the
21    partnership is managed, particularly 4.03.
22    Q    But I'm just trying to get your understanding as

62

1 to how in practice it's managed.

2    A   In practice it's managed in the way this

3 provides. What this really provides is there's certain --

4 the management committee delegates certain responsibilities

5 to the managing general partner. And it withholds -- it

6 also retains the right to approve -- to act on certain

7 other conditions. And that's the way we manage it.

8        So particularly, for instance, if we were going

9 to sell a property or if I were going to buy a property,

10 the -- the managing general partner can't -- doesn't have

11 the authority to do that without specific approval of the

12 management committee; otherwise, they've delegated general

13 operating responsibilities to the manager, to the general

14 partner.

15    Q   Uh-huh.

16        When you say "managing general partner," you're

17 referring to FPMI; is that correct?

18    A   Yes.

19    Q   And who makes decisions on behalf of FPMI?

20    A   The president of FPMI.

21    Q   That being you?

22    A   Yes.

63

1    Q   Okay. So when you're saying that the managing

2 partner makes decisions, you're in effect saying --

3    A   I act on behalf -- I act on behalf of the

4 managing partner. I sign as president of the managing

5 partner.

6    Q   And you make decisions on behalf of the managing

7 partner?

8    A   With regard to what?

9    Q   With regard to anything.

10    A   With regard to whether we should approve signing

11 a lease, for instance?

12    Q   Well, you indicated that the business, in some

13 instances, of Fidelio is conducted by its managing partner,

14 FPMI.

15    A   Right.

16    Q   I asked you who makes the decisions on behalf of

17 FPMI, and you indicated that you did.

18    A   I'm the authorized signatory.

19    Q   So for those decisions given to the discretion of

20 FPMI, it is you in effect that makes those decisions?

21    A   I'm authorized to sign on behalf of the entity,

22 yes.

64

1    Q   Okay. But there are decisions that are outside

2 the scope of what FPMI can do on its own; and so,

3 therefore, in those situations the decision is taken to a

4 management committee; correct?

5    A   Correct.

6    Q   And that consists of Janivo and Donelux; correct?

7    A   Yes.

8    Q   And the representatives Janivo and Donelux are

9 Mr. van Rhee and Mr. Tjaden; correct?

10    A   Yes.

11    Q   Paragraph 4.10(1)a refers to a designated

12 representative.

13 (The witness reviewed document.)

14    A   Yes.

15    Q   Okay. Do you have any understanding of what that

16 is?

17    A   Yes.

18    Q   Okay. And is there a designated representative?

19    A   The designated representative for Donelux is

20 Mr. van Rhee and for Janivo is Mr. Tjaden.

21    Q   I see.

22        And are you a designated representative for any

65

1 of the partners of Fidelio Properties?

2    A   Me myself, no. Not that I recall. I don't know

3 that I would be.

4        MR. HADDAD: Mark this as Exhibit 5.

5        (The FPMI consent to action of shareholders was

6        marked Plaintiff's Exhibit No. 5 for

7        identification.)

8        BY MR. HADDAD:

9    Q   I'm handing you what's been marked as Exhibit 5

10 to your deposition, a document entitled, "Consent to Action

11 of the Shareholders of Fidelio Properties Management, Inc."

12 Do you recognize this document, Mr. Gardner?

13    A   Yeah. Just a second.

14 (The witness reviewed document.)

15    A   Yes.

16    Q   And this identifies you as the designated

17 representative of FPMI; correct?

18    A   Right.

19    Q   And FPMI is, in fact, a partner in Fidelio;

20 correct?

21    A   Yes.

22    Q   Does that refresh your recollection as to whether

66

1  you served as a designated representative of one of the
2  members -- or one of the partners -- sorry -- of Fidelio?
3      A   Yeah. I -- this is -- this is a corporate --
4  FPMI is a -- is a member of Fidelio.
5      Q   It would be a partner.
6      A   A partner. Okay.
7      Q   I believe you testified it's the managing
8  partner.
9      A   That's right. And I'm the represent- -- okay. I
10 misunderstood your question earlier, then.
11     Q   Uh-huh.
12     A   When you asked about 4.1(a), I misunderstood the
13 question. I thought you were referring to members of
14 management committee. I'm sorry. I misspoke about that.
15         And you're right, I am -- I do agree I'm the
16 designated representative of this (indicating).
17     Q   That's okay. I'm not --
18     A   Oh, yeah.
19     Q   -- trying catch you up on anything.
20     A   And I was trying to answer it as fairly as I
21 could.
22         What I was thinking of is the management

67

1  committee itself. There's only two people who are in power
2  to act.
3      Q   Uh-huh.
4      A   I act as president of this at their direction.
5  That's really the way the thing works.
6      Q   Okay. So if I understand this correctly, the
7  management committee consists of have Donelux and Janivo
8  and --
9      A   It --
10     Q   -- Mr. van Rhee and Mr. Tjaden are the designated
11 representatives of those two entities --
12     A   That's right. And they are the ones who are
13 empowered to direct the entity of which I'm president to
14 conduct the affairs of Fidelio. I don't have a vote at the
15 management committee level, and that's what I thought you
16 were trying --
17     Q   Fine.
18         But you are the designated representative of --
19     A   FPMI.
20     Q   -- FPMI?
21     A   Yes.
22     Q   And are also the -- do you know if you're the

68

1  designated representative of any of the other members, such
2  as FPEP partners?
3      A   Well, FPEP --
4      Q   Sorry. Other partners, correct, such at FPEP?
5      A   Yeah, FPEP would be -- would be the whatever we
6  call the name of the managing member of that entity. And
7  I'm the person -- the designated person to act for that
8  party, yes.
9      Q   Uh-huh.
10         And what about Orvan; might you be the designated
11 representative Orvan as well?
12     A   I might be the -- I might be the designated
13 representative, but I don't think Orvan really votes on
14 anything.
15         But the three things -- the three people who act
16 for Fidelio are the management committee members and the
17 managing general partner.
18     Q   Okay.
19     A   You know, FPEP doesn't have a vote on matters;
20 and I don't believe Orvan does either.
21     Q   All right. You recognize that there are certain
22 decisions that you by virtue of your position as designated

69

1  representative of FPMI are entitled to make on behalf of
2  Fidelio?
3      A   Yes.
4      Q   Okay. And you also indicated that there are some
5  that are beyond the scope of your authority.
6      A   Beyond -- unless it's been delegated to me
7  specifically.
8      Q   Unless it's been delegated.
9          Can you give me an understanding as to what falls
10 within the scope of your authority and what is outside the
11 scope of authority --
12     A   Yeah.
13     Q   -- in terms of decision-making on behalf of
14 Fidelio?
15     A   If you -- it's a little bit complicated to read
16 through. But if you read through 4.03, the general ones --
17 if you go to 4.04 -- and you have to sort of do
18 back-and-forth. But these are what the management
19 committee has full authority to do.
20     Q   Okay.
21     A   And 4.04 --
22     Q   That's --

Case 1:06-cv-01131-HHK     Document 32-6     Filed 02/07/2007     Page 19 of 100

Morris vs. Buvermo                                Deposition of J. Gardner 10/26/06

70

1    A  -- is which -- are the ones that are -- it
2   delegates specifically and which it doesn't delegate.
3        But the essence of it, if you go down in here --
4   it's somewhat hard to read.  But basically any major
5   transaction -- a buy, a sell, a refinancing -- and we can
6   go through these, if you wanted to specifically --
7    Q   Just your understanding of --
8    A   Those are the nature of things.
9        Like, for instance, if the -- if the partnership
10  has agreed -- if Fidelio has agreed to buy an asset and
11  they do that specifically by resolution, then the
12  management entity is then empowered to sign documents that
13  make that happen.
14   Q   Okay.
15   A   That would be a general way those two work
16  together.
17   Q   Just going back the FPMI quickly, you're the
18  president, CEO, and secretary of that company, as well as
19  the designated representative.
20       Do you know who the shareholders are of that
21  company?
22       Well, let me refer you back to Exhibit No. 5.

71

1    A   Yes.
2    Q   It identifies Janivo Realty and Donelux as the
3   shareholders of the company.  Is that your understanding?
4    A   I -- I assume that's correct.
5    Q   Do you know if FPMI has any directors?
6    A   Offhand, I don't.
7        (The FPMI bylaws were marked Plaintiff's Exhibit
8        No. 6 for identification.)
9        BY MR. HADDAD:
10   Q   I've handed you what's been marked as Exhibit 6.
11  This is a document that defendants produced in discovery,
12  and it's identified as -- its title is "Bylaws of Fidelio
13  Properties Management, Inc."
14   A   Okay.
15   Q   Do you recognize this to, in fact, be what it
16  purports to be, the by-laws of FPMI?
17  (The witness reviewed document.)
18   A   I assume this is correct.  I don't --.
19  (The witness reviewed document.)
20   Q   I can assure you it's not a trick question.  I
21  just want to know if you can identify that as --
22   A   Yeah, I assume this is correct.  I have no reason

72

1   to believe otherwise.
2    Q   You have no reason to believe it's not the bylaws
3   of FPMI; correct?
4        THE WITNESS:  These came from our files?
5        MR. SMITH:  (Counsel moves head up and down.)
6        MR. HADDAD:  Yes.
7        (The FPEP consent to conversion was marked
8        Plaintiff's Exhibit No. 7 for identification.)
9        BY MR. HADDAD:
10   Q   You've been handed what's marked as Exhibit 7 to
11  your deposition.  It appears -- it appears to be FPEP's
12  consent to conversion, which converted FPEP Limited
13  Partnership to FPEP Limited Liability Company.  And
14  attached to it as Exhibit A appears to be the limited
15  liability company operating agreement of FPEP, LLC.
16   A   Yes.
17   Q   Do you recognize this document --
18   A   Yes, this is --
19   Q   -- to be what it purports to be?
20   A   Yes.
21   Q   And you previously indicated that FPEP was formed
22  in 1993; correct?

73

1    A   I believe that's correct.
2    Q   Okay.  And at the time it must have been a
3   limited partnership?
4    A   Yes.
5    Q   Okay.
6    A   It might have been earlier than '93, but
7   somewhere in that time frame, I believe.
8    Q   And do you still have the limited partnership
9   agreement available?
10   A   I don't know.
11   Q   You don't know if you've retained a copy of the
12  limited partnership agreement?
13   A   I don't know, no.
14   Q   This consent to conversion in the very first
15  paragraph identifies several entities and individuals as
16  its general partner and limited partners.  Do you see that?
17   A   Yes.
18   Q   And it identifies FP Investments, Inc., as its
19  general partner?
20   A   Yes.
21   Q   And FP -- I'm sorry.  And John Gardner,
22  Steven Bonacci, and VBM-USA as its limited partners?

74

1    A   Yes.
2    Q   Are you aware of any documents that are
3  maintained that reflect what these partnership interests
4  are or the amount of these partnership interests?
5    A   Yes.
6    Q   You do have those --
7    A   When --
8    Q   -- documents?
9    A   -- you say "partnership interests" --
10   Q   Let me rephrase.
11       Well, go ahead.  What were you going to say?
12   A   Please rephrase your question.
13   Q   I'm just wondering:  Do you have anything, other
14  than this particular consent to conversion, which would
15  reflect that these individuals are, in fact, the limited
16  partners -- or were, in fact, the limited partners of FPEP,
17  LP?
18   A   I don't know.
19   Q   Where would such things be maintained?
20   A   I presume, in our office.
21   Q   Do you recall whether the limited partners were
22  issued any sort of certificates reflecting a limited

75

1  partnership -- well, reflecting the fact that they are, in
2  fact, a limited partner of this partnership -- or were?
3    A   I don't recall.
4    Q   Now, turning to the limited liability -- well,
5  the operating agreement that's attached as Exhibit A in
6  this document, that first page also identifies -- bear with
7  me here for a second.
8    A   By the way, if I could -- you know, I have no
9  reason to believe -- I believe that this is a fully
10  operational document, and we act as if it is.  I just don't
11  recall where that is -- where that information is, if
12  that's -- is that what you're asking me?
13   Q   I'm asking if there's anything out there, other
14  than this document right here, that confirms that these
15  entities and individuals identified in the consent to
16  conversion are, in fact, the general partner and limited
17  partners --
18   A   Yeah.
19   Q   -- of -- or were, in fact, the general partners
20  and limited partners --
21   A   Yeah.
22   Q   -- of FPEP, LLP.

76

1    A   Right.
2    Q   LP.  Sorry.
3    A   I can't tell you -- I don't know that.  I don't
4  know that document.
5    Q   You don't know whether you have those documents?
6    A   I assume we do, but I don't know.
7    Q   If you do, they would be in your office?
8    A   I would assume so.
9    Q   Who drafted these documents on FPEP's behalf?
10   A   These were probably drafted by Dick Crystal, who
11  was a previous corporate attorney of ours.
12   Q   Did he work for a law firm --
13   A   Yeah.
14   Q   -- or was he a solo practitioner?
15   A   Yeah, he works for a law firm.  And I don't --
16  his law firm has merged and changed probably twenty times
17  since he did this work so --.  I think it was called
18  Whitman & Ransom (phonetic) at the time, but --.
19   Q   Is he still practicing; do you know?
20   A   Yes.  Either he -- yeah, he would have been the
21  one who would have done it then.
22   Q   Richard Crystal is probably his formal name?

77

1    A   Yeah.
2        And he's, you know, a careful attorney; so I'm
3  assuming this was done properly.  He's out of New York.
4    Q   Turning to the LLC agreement of the operating
5  agreement of FPEP, LLC, the first page identifies --
6  identifies you; Mr. Bonacci; VBM-USA; and FP Investments,
7  Inc., as its members.  Do you see that?
8    A   Yes.
9    Q   And are you aware of any documents, other than
10  the operating agreement, which confirms their participation
11  as members in this LLC?
12   A   I don't know.  I'm not sure -- you know, I just
13  don't know.
14   Q   And the LLC agreement that we're looking at right
15  now, this operating agreement, has it ever been amended?
16   A   Not to my knowledge.
17   Q   You would know if it was, though; right?
18   A   I would think so.
19   Q   In fact, if it were to be amended, you would
20  probably be in charge of taking care of that; correct?
21   A   I think so.
22   Q   You think so?

78

1    A   Well, you know, someone else could be; but I
2    would be the logical person.
3    Q   Well, who else could be in charge of it?
4    A   An attorney could be.
5    Q   But the decision would come from you; correct?
6    A   I would think so, yeah.
7    Q   Okay. Now, you testified earlier that VBM, the
8    company that's either owned or headed by Mr. Zachariasse,
9    has, since the drafting of this FPEP, LLC, agreement,
10   withdrawn as a member; correct?
11   A   Yes.
12   Q   And I recognize that this LLC agreement is
13   attached as an exhibit to the consent to conversion.
14       Is there any executed copy of this -- fully
15   executed copy of this LLC agreement in existence?
16   A   Not that I'm aware of. I don't know.
17   Q   Okay. But you searched your files --
18   A   Yes.
19   Q   -- and you don't recall --
20   A   I don't recall finding one, no.
21   Q   Again, just to remind you, even if you know what
22   I'm going to ask --

79

1    A   Right.
2    Q   -- I'd ask you to wait --
3    A   Right.
4    Q   -- to make it easy on the court reporter.
5        (The VBM-USA manager withdrawal consent was
6        marked Plaintiff's Exhibit No. 8 for
7        identification.)
8        BY MR. HADDAD:
9    Q   Mr. Gardner, you've been handed what's been
10   marked as Exhibit 8 to your deposition. It's a two-page
11   document. The first page is entitled, "Written Consent of
12   the Manager to the Withdrawal of VBM-USA, Inc., as a
13   Member." It's signed by you on behalf of FP Investments,
14   Inc., the manager. Do you see that?
15   A   Yes.
16   Q   And it's dated December 15th, 2004. And attached
17   to it as an exhibit is a letter from VBM-USA requesting
18   that -- indicating that it desires to withdraw as a member
19   of FPEP; correct?
20   A   Yes.
21   Q   And this obviously occurred after the execution
22   of this consent to conversion in May of 2000; correct?

80

1    A   Yes.
2    Q   And after the preparation of this FPEP, LLC,
3    agreement?
4    A   Yes.
5    Q   Okay. And yet you did not see to it that the
6    FPEP, LLC, agreement be amended, correct --
7    A   Yes.
8    Q   -- to reflect that VBM is no longer a member?
9    A   Right.
10   Q   And when VBM ceased being a member, was it paid
11   any amount for its membership interest?
12   A   What happened is its interests in the properties
13   were transferred from FPEP to another entity, and it
14   continued its ownership through that other entity.
15   Q   We talked earlier about being a member in FPEP
16   and having a membership interest in FPEP. And I think
17   there was some confusion because, if I'm not mistaken, what
18   I heard from you is that you don't specifically have a
19   membership interest in FPEP, your interest is really in the
20   properties that are acquired by Fidelio.
21   A   We have a membership interest in FPEP, but the
22   value of the interest runs through the specified interests

81

1    that FPEP has in each one of those properties.
2    Q   Okay. So you do have a membership interest in
3    FPEP, but its value is based on whatever investments --
4    A   That's correct.
5    Q   -- Fidelio has made --
6    A   And the arrangements that Fidelio has made with
7    regard to FPEP for its --
8    Q   Such as whether it's designated the property as
9    an FPEP property --
10   A   Whether you own -- the certain percentage you
11   own, what kind of hurdle rate, all of these things.
12   Q   Let's turn to page 6 of the operating agreement.
13   A   The --.
14   Q   It would be Exhibit No. 7, page 6 of the actual
15   operating agreement itself.
16   A   Okay.
17   Q   And it identifies three members there --
18   A   Right.
19   Q   -- with membership percentages. Do you see that?
20   A   Yeah.
21   Q   And my math tells me that those membership
22   percentages total 100 percent --

82

1    A    Yes.
2    Q    -- if you add all three together?
3    A    Yes.
4    Q    So, in fact, VBM at the time --
5    A    Right.
6    Q    -- this was signed didn't have a membership
7    percentage?
8    A    Yes.
9    Q    Okay.  Yet it was nonetheless a member?
10   A    Yes.  What -- what this section is, is this
11   section is modified each time we buy a property because
12   this varies as a function -- for each particular property
13   this percentage varies.
14       So the way the FPEP becomes an -- has an economic
15   interest in a property is Fidelio designates that as an
16   FPEP property.  And then there is a -- in that designation
17   it modifies this document with regard to this ownership
18   percentage.  So this varies for that particular property.
19       And this isn't a fixed number.  This changes for
20   each property, and that designation changes this each time.
21   Q    Okay.  So when this was initially set up, should
22   Fidelio sell its interest in an FPEP property --

83

1    A    Right.
2    Q    -- then some portion of the proceeds, if there
3    was a surplus, if Fidelio received its money back, plus its
4    IRR --
5    A    Right.
6    Q    -- some portion of that could very well be given
7    to FPEP as an FPEP promote; correct?
8    A    Yes.
9    Q    And that FPEP promote would be then broken down
10   in --
11   A    That's correct.
12   Q    -- accordance with this particular --
13   A    That's correct.
14   Q    -- percentage?
15   A    That's correct.
16   Q    Okay.
17   A    But the designation could change that; and then
18   if it did, then the designation would govern.
19   Q    I see.
20       So the designation could say --
21   A    Gardner could -- say, got 57 percent, Bonacci
22   got -- you know, they could change these percentages; or

84

1    they could add another person.
2    Q    And your practice has been to do that without
3    amending the actual operating agreement of FPEP itself --
4    A    That's correct.
5    Q    -- to reflect --
6    A    That's correct.
7    Q    -- the correct membership --
8    A    That's correct.
9        It's awkward, but that's the way we've done it.
10       Now, in the future we intend to make that more
11   flexible, yes.  But that's the way it works but -- it's
12   awkward, but it works.
13   Q    Okay.  So you in effect after drafting this
14   essentially disregarded this breakdown here and just did it
15   from a transaction-to-transaction basis?
16   A    What the -- what the designations would typically
17   say is, "Notwithstanding, then, the following".
18       Either it's in the designation or in some other
19   agreement or some other document.  But this by practice is
20   modified for every deal.
21   Q    And I believe that you previously testified that
22   when Mr. Bonacci gave up his membership interest in FPEP,

85

1    that this operating agreement wasn't amended to reflect
2    that fact as well?
3    A    That's correct.
4    Q    Okay.  And this operating agreement also was
5    never amended to reflect any membership interest or
6    membership by Jonathan Morris; correct?
7    A    That's correct.
8    Q    Were any efforts made in that regard?  In other
9    words, did you undertake any efforts to actually amend it
10   after Mr. Morris's hiring --
11   A    Yes --
12   Q    -- by Buvermo?
13   A    -- yes.  We -- we went through the documents and
14   prepared a draft of a revision that we thought removed some
15   of these sort of practical difficulties, like the way this
16   paragraph here works.
17   Q    Okay.  When you say "we," who are you referring
18   to?
19   A    I did some work on it; and Kara McCormick did
20   some work on it; and we had an outside attorney,
21   Forrest Walpole, who we asked to help us take a look at it.
22   And I also reviewed the changes, as we went along, with

86

1    Jonathan -- or tried to. I tried to update him on our
2    thinking as to what changes we were going to make.
3        Q    And did the work you performed result in any sort
4    of modified version of this FPEP agreement?
5        A    We never got it completely -- we never completed
6    that effort. We intended to, it but we never did.
7        Q    Right.
8            But drafts were put together --
9        A    Yes.
10       Q    -- of what was contemplated --
11       A    Yes.
12       Q    -- correct?
13       A    Yes.
14       Q    And do you still have copies of those?
15       A    I believe we do.
16       Q    Where would those be maintained?
17       A    They would be either in our office or with
18   Mr. Walpole.
19       Q    And about when were these efforts taken?
20       A    We took them in various stages. I think we did
21   some work -- it was over almost the entire course of the
22   time of Jonathan's employment. We were working -- I was

87

1    thinking about how I should change it. We would get
2    started on it; then we'd start it, start it, stop.
3            There was really no time pressure because we had
4    not acquired any properties in that intervening time, so we
5    really didn't feel a real sense of urgency, but we thought
6    it did need to be done. We really worked on it probably
7    that whole year in various -- you know, in bits and pieces.
8        Q    Did you ever provide Mr. Morris with a proposed
9    draft of the FPEP agreement?
10       A    I -- you know, I sent him drafts of things we
11   did; and I tried --
12       Q    Of the FPEP operating agreement?
13       A    Yeah, some of the thoughts.
14           And I sat down and went over the FPEP agreement
15   with him. The FPEP agreement was, you know, pretty much --
16   it stands in -- we're not making many changes to this. The
17   main changes we were making was to Section 3.03 of the
18   Fidelio agreement and the designation itself. Those were
19   the two documents that we were changing.
20           This really had no substantive -- we didn't
21   contemplate any substantive changes, other than to do the
22   cleanups on things like this.

88

1        Q    When you say --
2        A    And we --
3        Q    -- "things like this" --
4            Go ahead.
5            MR. SMITH: You interrupted him.
6            Are you finished?
7            THE WITNESS: Yes.
8            BY MR. HADDAD:
9        Q    You said "cleanups of things like this," and you
10   were --
11       A    Things like the awkward nature where the
12   membership percentage is specified in here in general terms
13   and it really needs to apply specifically to each property.
14   So that would, in my mind -- we would just make this
15   document reflect what we're doing more in practice now
16   without having the do the "whereas" and the, you know,
17   "notwithstanding" clauses.
18       Q    Okay. So you're referring to the portion on page
19   6 of the --
20       A    FPEP.
21       Q    -- FPEP operating agreement --
22       A    Yeah.

89

1        Q    -- which designates the members and the
2    membership percentage?
3        A    Right.
4            At the time that was written, it was thought --
5    that would have been a constant. In practice that changes
6    property by property. We pick up that change now in the
7    designation, so we really would intend to remove this and
8    refer to the designation instead. That kind of change is
9    always contemplated.
10       Q    I see.
11           What was the intention in terms of who would
12   remain a member of the FPEP agreement after Mr. Morris's
13   hiring?
14       A    The intention after Mr. Morris's hiring is that
15   he and I would be the FPEP members.
16       Q    Okay. And would FP Investments, Inc., remain --
17       A    Yeah. I'm sorry. FP Investments would have
18   remained as well.
19       Q    As the managing member?
20       A    Yes.
21       Q    Okay. And why did you think it was important for
22   you to remain a member of FPEP?

Morris vs. Buvermo　　　　　　　　　　　　Deposition of J. Gardner 10/26/06

---

**90**

1　A  Because I was continuing in my ownership interest
2　in the properties.
3　Q  Okay.  Ownership interest in properties that had
4　already been --
5　A  Plus new property as well.  I would have an -- I
6　would have an interest in new properties that were to be
7　acquired.
8　Q  Okay.  Would that be a promote interest, or would
9　that only be a capital contribution --
10　A  It would --
11　Q  -- interest?
12　A  -- have been only been a capital contribution
13　interest, but it would have been through FPEP.
14　Q  I see.
15　A  So we would have -- FPEP provides for both the
16　capital ownership interest and also a promote interest.
17　And I would have given up my promote interest, but retained
18　my capital contribution interest.
19　Q  Okay.  And these membership percentages here,
20　they are important because that relates to the breakdown of
21　the promote interest --
22　A  That's correct.

---

**91**

1　Q  -- right?
2　　　It doesn't relate to capital contributions --
3　A  That's correct.
4　Q  -- correct?
5　A  There's a separate part that relates to capital
6　contribution that we never -- this had a -- I'm not sure
7　whether this referred to the capital contributions.
8　(The witness reviewed document.)
9　A  I'd have to look and see.  It may not even refer
10　to capital contributions.
11　Q  Well --
12　A  That may have been done --
13　Q  -- if you refer to page 5 --
14　(Proceedings participants speaking at the same time.)
15　A  I'm sorry.
16　Q  Take a look at --
17　A  Again, that was the reference to capital
18　contribution.  The detailed description is only in -- in
19　the Fidelio agreement.
20　Q  But the capital contributions are made through
21　FPEP; correct?
22　A  That's correct.

---

**92**

1　Q  And that's why you would have remained a member
2　of FPEP?
3　A  Yes.
4　Q  That's the only reason you --
5　A  No.
6　Q  -- would have remained a member?
7　A  It would have -- the whole structure of our
8　ownership interest in the properties are governed by all of
9　the terms of the FPEP agreement.  So it was very important
10　not that I maintain -- that I agree to all of the terms of
11　this agreement going forward as well, not just the -- so it
12　was -- it was not just to reflect the capital, but to
13　reflect the nature of my ownership interest.
14　Q  Your prior ownership interest?
15　A  And the majority ownership interest.
16　Q  But in terms of promote -- okay? -- I'm just
17　trying to get a sense -- it seems to me that what you're
18　telling me is the FPEP operating agreement is in effect --
19　or FPEP is an effective vehicle by which you are paid for
20　your capital contributions, a vehicle through which you
21　make your capital contributions --
22　A  Right.

---

**93**

1　Q  -- but also a vehicle through which you are paid
2　for your capital contributions when an FPEP property is
3　sold -- okay? -- and a vehicle by which you would be -- you
4　would receive your promote in any deals in which you are
5　entitled to your promote.  Correct?
6　A  That's -- yeah.  It outlines the conditions on
7　the distribution on each of those; that's correct.
8　Q  Okay.  And --
9　A  As well as other terms.
10　Q  As well as other terms.
11　　　But isn't that in effect why the FPEP was put
12　together --
13　A  Yes.
14　Q  -- to serve as that vehicle?
15　A  Right.
16　Q  For the promote and for the capital
17　contributions; correct?
18　A  Right.
19　　　And you had asked me what question?
20　Q  I just wanted to find that out.
21　　　Oh.  What I was getting to was:  You had
22　indicated after Mr. Morris came on board, remained -- an

---

94

1   interest in remaining and intention of remaining a member
2   of the -- of the operating agreement.
3       A   Yes.
4       Q   And I wanted to know whether that interest had
5   anything to do, other than your interest in receiving
6   payment back for your capital contributions?
7       A   Right.  That was the question I was answering.
8       Q   Okay.
9       A   And the -- this -- and it's important from
10  Fidelio's standpoint as well as my standpoint -- is there
11  are other terms relative to that investment which are
12  covered in FPEP, other than just getting capital back.  And
13  so I would be subject to and beneficiary of all of those
14  other terms as well.
15      So it's not just -- you said:  Is the only reason
16  you do it to get your capital back?  No.  I'm saying there
17  are other terms, other than just cash in and cash out that
18  this document governs that it was important that it be
19  retained.
20      Q   Okay.  And would that be because of a promote
21  interest?
22      A   No.  It's because I get my membership interest,

95

1   and I get the right to invest.  But I -- under the entire
2   set of terms outlined in the document -- and so I need
3   to -- I need to both be the beneficiary of and carry the
4   burden of all of the terms outlined here, not just the: I
5   invest money and get capital back.  And it was important to
6   Fidelio partners and important to me as well.
7       Q   Okay.  So, in any event, the intention was for
8   you to remain a member, but to not necessarily have a
9   membership interest?
10      A   No.  I would be exactly the same position as I
11  have now going forward.  I'd have membership interest; I'd
12  remain a member.
13      The only difference is that with regard to any
14  particular property, I would not be receiving a promote
15  component from that property; I would only be receiving the
16  benefits due the capital position.  That's the only
17  difference.
18      Q   Under -- as it's drafted now, the membership
19  interest is in effect what would entitle -- what would
20  entitle a member to payment of a promote; so you would have
21  gotten rid of that altogether --
22      MR. SMITH:  Object --

96

1       BY MR. HADDAD:
2       Q   -- is that what you're saying?
3       A   No.  I'm saying that in a property -- let's go to
4   this section here (indicating).  This membership --
5       Q   Which section are you referring to?
6       MR. SMITH:  This (indicating).
7       BY MR. HADDAD:
8       Q   Page 6 --
9       A   Right.
10      Q   -- member and membership percentage breakdown.
11      A   Okay.  That relates to the portion of the capital
12  that's promote, how its distributed.
13      Q   Correct.  How the promote is distributed.
14      A   And this would be changed so that mine would read
15  zero in this particular component.  But it would not read
16  that with regard to all of the other aspects.
17      Q   Yours would be the zero, and Jonathan Morris's
18  would be --
19      A   Would be whatever Fidelio agreed it to be.
20      Q   Okay.
21      THE WITNESS:  Can we do another --
22      MR. HADDAD:  Sure.

97

1       THE WITNESS:  -- down-the-hall.
2       MR. HADDAD:  Then we can do a half-hour more and
3   then take a lunch break, if you want.
4   (Whereupon, a brief recess was taken.)
5       BY MR. HADDAD:
6       Q   Mr. Gardner, when VBM withdrew as a member to
7   FPEP, LLC, you saw to it that this written consent of the
8   manager, which was designated Exhibit 8 to your deposition
9   today, was prepared and executed?
10      A   Yes.
11      Q   Okay.  Why didn't you do the same thing -- and it
12  appears on page 2 that it was done the same day that you
13  received notice from VBM-USA of its intent to withdraw;
14  correct?
15      A   Yes.
16      Q   Why is it you didn't -- why is it that you didn't
17  do the same thing for this operating agreement when
18  Mr. Gardner -- I mean Mr. Morris was hired by Buvermo?
19      A   Well --
20      MR. SMITH:  I object to the form of the question.
21      BY MR. HADDAD:
22      Q   Why isn't it -- why did you not do anything to

98

1  amend the operating agreement at the time that
2  Mr. Morris - --
3      A   The --
4      Q   -- commenced his employment?
5      A   Yeah.
6          This was important was because we were switching
7  ownership on the day -- existing ownership assets from one
8  place to another.  There were really no properties which
9  would have been involved when Mr. Morris arrived, and so we
10 didn't feel that it was necessary -- there was no sense of
11 urgency.  Here there was a sense of urgency because we were
12 transferring physical properties.  Here there didn't seem
13 to be that sense of urgency.
14     Q   Okay.  And when you say "we," who are you
15 referring to?
16     A   "We" -- the royal "we".  I didn't think there was
17 a sense of urgency.
18         And Mr. Morris didn't press either.  Neither he
19 nor I felt that -- my impression was neither he nor I felt
20 there was a sense of urgency because there was no immediate
21 properties that would have fallen into this category.
22     Q   You hadn't provided Mr. Morris with a copy of the

99

1  FPEP operating agreement prior to his hiring; correct?
2      A   I don't believe I provided him a copy, but I went
3  over the terms and described how the FPEP agreement worked.
4      Q   Okay.  You went over it in terms with him in
5  person?
6      A   I -- yeah.  I think we -- he and I talked about
7  in general the concept of FPEP and how it worked.
8      Q   But you didn't have with you --
9      A   No.
10     Q   -- when you were talking with him --
11     A   No, I --
12     Q   Let me --
13     A   I'm sorry.
14     Q   You didn't have with you at the time a copy of
15 the FPEP agreement; correct?
16     A   No -- that is correct.
17     Q   So Mr. Morris had not reviewed the FPEP agreement
18 prior to his hiring by Buvermo; correct?
19     A   I think that's correct.
20     Q   And it was you that suggested that the --
21 suggested to Mr. Morris, if I'm not mistaken, that there
22 wasn't -- that there was a lack of urgency in amending it

100

1  at that time; correct?
2      A   I think both of -- my understanding of that was
3  that both of us agreed.  I -- I didn't feel there was a
4  sense of urgency, and Jonathan didn't raise a sense of
5  urgency, and that seemed logical to me because there were
6  really no properties that were involved.
7      Q   Okay.  And you had explained to him -- and had
8  you explained to him that it wasn't urgent because there
9  were no properties involved?
10     A   I believe -- I believe that was what was said.  I
11 don't recall that specifically, but I'm sure that that's
12 what I would have said.
13     Q   You indicated that you did some reworking of this
14 agreement during Mr. Morris's employment?
15         MR. SMITH:  You're referring to the operating
16 agreement?
17         MR. HADDAD:  Correct.  I'm talking about the
18 operating agreement.
19     A   No.  What I -- the thing that I did some
20 reworking was the paragraph 303 out of the Fidelio
21 Properties agreement and the property designations.  I
22 really did no reworking on the -- on the operating

101

1  agreement itself, the FPEP operating agreement itself.
2         BY MR. HADDAD:
3      Q   I see.
4         But it was your intention to do some reworking on
5  the operating agreement itself; correct?
6      A   No.  The thought was that the changes that needed
7  to be made were really in 303 and in the property
8  designation.
9         The operating agreement itself really was the
10 substance of the deal.  The only changes we -- would have
11 made there would have been these -- these cosmetic changes
12 or changes otherwise that would conform to 303; like, for
13 instance, as I mentioned, about the operating agreement --
14 Exhibit 7, I guess it is and that page 6 -- just conforming
15 the changes of the membership percentage to be consistent
16 with current practice.
17     Q   So you would --
18     A   Those were the only changes we were really
19 thinking of.
20     Q   Okay.  So you were thinking of no changes, but
21 you didn't begin to make any of those changes?
22     A   I didn't begin to make those.

102

1    Those were the only types of changes we
2 contemplated. Since those were so minor in nature we, we
3 thought those would sort of the fall out after the other
4 changes were made.
5    Q  Okay. Do you recall the first time you -- do you
6 recall the first time you provided -- do you recall ever
7 providing Mr. Morris with a copy of the FPEP operating
8 agreement?
9    A  I don't recall providing it to him, but he surely
10 had access. Our files were open, and he had ready access.
11 And if he had any questions, I would have been happy to
12 discuss it with him or go over it with him. I don't recall
13 him ever asking me any questions about it, or I would have
14 been happy to go over it with him.
15    Q  Uh-huh.
16    Wasn't there some an effort in March of 2006 to
17 make some changes to this FPEP operating agreement?
18    A  Not the operating agreement, but to Section 3.03
19 of the Fidelio agreement and to the property designations.
20    Q  I see.
21    There were meetings, however, between yourself,
22 Ms. McCormick, and Mr. Walpole; is that correct?

103

1    A  Yes.
2    Q  And those meetings related to -- are you telling
3 me that those meetings did not relate to any changes to be
4 made to the operating agreement?
5    A  No. That's correct.
6    Q  That's correct?
7    A  Yeah. The documents that we were looking at were
8 paragraph 3.03 and the property designations.
9    Now, we would later have -- once those were in
10 place, then we later would have contemplated making the
11 cosmetic changes necessary to the operating agreement.
12    Q  And hadn't you told Mr. Morris that you were
13 going to make cosmetic changes to the operating agreement
14 and provide him with a -- provide him with a draft?
15    A  What I told him that I would provide him with was
16 the draft of the other two changes. We really didn't
17 discuss the operating agreement because I didn't think that
18 was -- those changes were really -- were so minor. The
19 important changes would have been those other two
20 documents.
21    Q  Do you recall faxing a copy of the operating
22 agreement to Stephen O'Connor in March of 2006?

104

1    A  Yes.
2    Q  Why did you do that?
3    A  The question then was: What was the FPEP
4 agreement? And we felt that -- I -- we felt it was
5 important that Mr. O'Connor see the documents themselves.
6    Q  Okay. Why? Why did you feel that it was
7 important?
8    A  So that -- because we thought there were some
9 relevant paragraphs in the agreement that he should be
10 aware of.
11    Q  This is in -- do you recall at what point in
12 March this was?
13    A  It was right around the 23rd, I believe.
14    Q  You don't recall faxing him a copy of it prior to
15 that point?
16    A  We may have. Maybe we did fax it earlier because
17 I think we were talking about the FPEP agreement with
18 Jonathan. And I think he might have asked us to send a
19 copy to Mr. O'Connor. That might have been the earlier
20 time.
21    Q  And you were talking about the FPEP agreement
22 with Jonathan because why?

105

1    A  Because we were contemplating modifying all of
2 the agreements, the 3.03 and the designation; and those all
3 related to the FPEP agreement, so I thought Mr. O'Connor
4 needed to see that as well.
5    Q  And you don't recall Mr. Morris telling you to
6 provide him with a draft of the FPEP agreement after you
7 made what you call cosmetic changes; correct?
8    A  He may have asked for that. I don't -- I don't
9 recall that.
10    Q  Okay. I take it this agreement hasn't been
11 changed since Mr. Millspaugh has been hired. Is that
12 correct?
13    A  That's correct.
14    Q  And as part of his employment, was he offered a
15 promoted interest in any deals?
16    A  He was offered, yes.
17    Q  Okay. And was he offered a promoted interest in
18 any existing deals?
19    A  Yes, he was.
20    Q  Okay. And what existing deals was he offered a
21 promoting interest in?
22    A  I'd have to check and see. I believe it was

Case 1:06-cv-01131-HHK    Document 32-6    Filed 02/07/2007    Page 28 of 100

Morris vs. Buvermo    Deposition of J. Gardner 10/26/06

106

1    the -- I'd rather -- you know, I'd -- I'd rather not
2    specify and be wrong. I'd have to look at the document and
3    see.
4        Q    So you don't know whether he was offered a
5    promoted interest in the Spotswood Valley deal?
6        A    I believe he was.
7        Q    And how about the Reston International Center
8    deal?
9        A    I believe he was.
10       Q    In fact, he was offered a 12-percent promote for
11   those two deals; correct?
12       A    I believe that sounds correct.
13       Q    And in light of the fact that the operating
14   agreement serves as the vehicle for payment of those
15   promotes, why would you see it fit to amend the operating
16   agreement?
17       A    We intend to agree -- we intend to modify that
18   agreement in the near future.
19       Q    Have you started doing any work on modifying it?
20       A    What we have done is we have done the work
21   necessary to modify, as I said, paragraph 3.03 of the
22   Fidelio agreement and a draft -- a sample of the property

107

1    designation. And once we've agreed to those, then it would
2    be a very simple matter to then do the cosmetic
3    modifications necessary to the FPEP agreement.
4        Q    But as it stands right now, he's not formally a
5    member of the operating -- of the FPEP --
6        MR. SMITH: Who is "he"?
7        MR. HADDAD: Mr. Millspaugh.
8        A    That's correct.
9        BY MR. HADDAD:
10       Q    Notwithstanding the fact that he is not formally
11   a member of the LLC agreement, you recognize that he is
12   entitled to the 12-percent promote, correct, on the
13   Spotswood Valley deal and the Reston International Center
14   deal?
15       MR. SMITH: "He" again. You're not being clear.
16       MR. HADDAD: Mr. Millspaugh.
17       A    I think the terms under which he is -- he is
18   entitled, I think, we wrote in his employment agreement
19   letter. I don't -- I'd have to review that to make sure I
20   was, you know, giving you the correct -- terms that we had
21   agreed to.
22       BY MR. HADDAD:

108

1        Q    Is it your contention that he would not be
2    entitled to the promote -- the 12-percent promotes that you
3    offered him in --
4        A    No. What I'm saying is I don't --
5        Q    I'm sorry. Can you let me finish my question.
6        Are you contending that he would not be entitled
7    to those 12-percent promotes that you offered him until the
8    FPEP agreement is amended?
9        MR. SMITH: Object to form; misstates the
10   testimony.
11       BY MR. HADDAD:
12       Q    Is that what you were contending? You have to
13   answer the question.
14       A    Yeah.
15       No. The statement I was making is I don't
16   remember the terms. I just plain don't remember; and I
17   need a letter to refresh me, the terms. Okay?
18       Does that answer --?
19       Now, is he entitled to those as of today? I
20   don't remember what -- the terms we agreed to with regard
21   to those two properties.
22       BY MR. HADDAD:

109

1        Q    Uh-huh.
2        Let's assume that the agreement between you and
3    Mr. Millspaugh -- or the defendants and Mr. Millspaugh --
4    Buvermo, whoever it may be -- provides him with a
5    12-percent promote in the Spotswood Valley deal --
6        A    The --
7        Q    -- and the Reston International Center deal.
8        A    In accordance the FPEP agreement; right.
9        And we would believe that we would modify those
10   documents, and he would be a member, and he would be
11   entitled to that membership and that those would be put in
12   place, and the documents would be signed, and he would get
13   what he was entitled to.
14       Q    Okay. But do you -- I'm trying to find out
15   because you haven't amended the operating agreement.
16       A    That's correct.
17       Q    And it is the vehicle, as you've testified, for
18   payment of the promote.
19       A    Right.
20       Q    Okay. So you've offered him a 12-percent
21   promote. I'm asking you whether or not you're recognizing
22   that -- whether or not you would recognize that prior to

110

1   the amendment of the operating agreement?
2        MR. SMITH: I object to form. Again, you're
3   inserting facts which are not in the record. I mean that's
4   not what Mr. Gardner's testimony was about the percentage
5   interest.
6        You keep referring to 12 percent. Mr. Gardner
7   said several times that he can't recall what the term is.
8        But if your question is: Would --
9        MR. HADDAD: Marc --
10       MR. SMITH: -- would the company honor whatever
11  offer was made? I think that's a better question --
12       THE WITNESS: Yeah --
13       MR. SMITH: -- despite the fact that the LLC
14  agreement hadn't been amended.
15       THE WITNESS: That would be -- were you asking
16  me --
17       MR. HADDAD: You were going to say something. Go
18  ahead.
19       THE WITNESS: I was going to ask -- you were
20  going to ask me a question; I was going to respond.
21       MR. HADDAD: It looked like you were agreeing
22  your counsel, you were about to say something.

111

1        THE WITNESS: If you'd like me to --.
2    A   Yes. Our intention would be to honor that
3   agreement.
4        BY MR. HADDAD:
5    Q   Okay. If, in fact, you've offered him a
6   12-percent promote in the Reston International Center and
7   Spotswood Valley deal, it would be to honor that
8   irrespective of whether the FPEP agreement is amended;
9   correct?
10   A   What we would do is amend the agreement and honor
11  our agreement to do that.
12   Q   Okay. I'm asking you, though: If you haven't
13  amended the agreement -- you've never amended the agreement
14  once.
15       In the -- should you fail to amend the agreement,
16  do you believe that there's any obligation on your part to
17  pay him for those promotes?
18       MR. SMITH: Object to form; this has been asked
19  and answered --
20       THE WITNESS: Yeah.
21       MR. SMITH: -- I think --
22       MR. HADDAD: Marc, you may be uncomfortable with

112

1   the answer; and I understand why --
2        MR. SMITH: Absolutely --
3        MR. HADDAD: -- you might be.
4        MR. SMITH: -- not --
5        THE WITNESS: Let me ask you --
6        MR. SMITH: -- absolutely not.
7        THE COURT REPORTER: Wait, sir (addressing the
8   witness.)
9        MR. SMITH: You keep rephrasing the question a
10  different way. You've gotten your answer. The next answer
11  you get is going to be the final answer you get on this
12  issue.
13       MR. HADDAD: You can make your objections. They
14  should be short; they should be brief. You objected to
15  form, and that's fine.
16       MR. SMITH: And I objected to asked and answered.
17   A   Okay. Well, let me -- let me answer.
18       If the -- if the partners had executed the -- the
19  document that admitted those -- agreed that this was an
20  FPEP property and agreed to those -- the deal that they had
21  agreed to with Laurey -- if they had agreed and executed
22  that, then we would honor that agreement, despite the fact

113

1   that we had not modified this document. That would be
2   right.
3        So that would be the governing document; that it
4   was designated as an FPEP property, and it was -- it was --
5   the designation was executed, and then we would honor that
6   agreement.
7        BY MR. HADDAD:
8    Q   The actual designation itself?
9    A   Yes.
10   Q   So you would go by the designation and not the
11  operating agreement?
12   A   No. The designation would be then -- then we
13  would treat it exactly the way we do today.
14   Q   Which is what?
15   A   That we would honor the designation and the
16  operating agreement altogether. The designation would
17  designate Mr. Millspaugh and tell the percentages he owned,
18  and that would then coincide with the operating agreement,
19  and we would honor that.
20   Q   Have you prepared designations for Spotswood and
21  Reston International Center?
22   A   Not yet.

114

1    I say that. I'm not sure of that. We may have.
2  I don't remember.
3    Q   Well, you would be involved in that, wouldn't
4  you?
5    A   I would. But I just can't remember whether we
6  did that the last meeting or not. I -- I don't know.
7    Q   Do you recall any discussions about designating
8  those two properties as FPEP properties?
9    A   No. Clearly the intent is to designate those as
10 FPEP properties.
11   Q   And in those designations you would reflect
12 Mr. Millspaugh's promote?
13   A   We would do that, yes.
14   Q   That's what your intention is; correct?
15   A   That be would be the intention.
16   Q   Okay. And if, in fact, Mr. Millspaugh's promote
17 in those two deals is 12 percent, those designations would
18 reflect that?
19   A   Yes.
20   Q   That's your intention?
21   A   Yes.
22      MR. SMITH: Object to form.

115

1      BY MR. HADDAD:
2    Q   And you also intend to modify the operating
3  agreement to incorporate Mr. Millspaugh as a member;
4  correct?
5    A   Yes.
6    Q   Have you provided Mr. Millspaugh with a copy of
7  the operating agreement?
8    A   I don't believe so; although, we've surely said
9  there would -- "You can read anything in the files you'd
10 like."
11   Q   Did you express to him, as you expressed to
12 Mr. Morris, that its modification wasn't important at this
13 time?
14      MR. SMITH: Object to form.
15   A   I don't recall doing that one way or the other.
16 I've assured him of -- I went through the deal with him
17 very carefully, what the FPEP deal is. I did --.
18      BY MR. HADDAD:
19   Q   I believe that there is some confusion as to your
20 prior testimony.
21      I thought -- and correct me if I'm wrong -- that
22 you agreed -- okay? -- that Mr. Millspaugh had been offered

116

1  a promoted interest in Spotswood and Reston International
2  Center.
3    A   Yes. I don't recall the terms that were offered,
4  though. That's what I -- what I am questioning. I need to
5  have my memory refreshed on that. What the terms are --
6  what we wrote them (sic) that -- that -- what we told him what the
7  terms are.
8    Q   Okay. I'm just asking if you've offered him a
9  promoted interest in those properties.
10   A   We did subject to. I don't remember the "subject
11 to," if there was a "subject to".
12   Q   Okay. Do you recall the percentage of the
13 promote?
14   A   I -- you're correct on the percentage of the
15 promote, but it would help to -- you know, I'm pretty sure
16 that's right.
17   Q   And you keep referring to "subject to". Do you
18 have something in mind?
19   A   I don't recall whether we had a vesting
20 provision. Those are not -- maybe we do not. I don't
21 recall that.
22   Q   There may have been a vesting provision for

117

1  those --
2    A   That's what I don't recall. There may not have
3  been. I don't -- I don't remember. You'll just have to --
4  I'll have to refresh my memory.
5      Probably there was not.
6    Q   Why do you say that?
7    A   Because of the way the FPEP agreement works. The
8  way the FPEP agreement works is there's a clause in the
9  operating agreement itself that provides that if a party
10 is -- employment is terminated, that the -- either party
11 can cause the property to be valued and then their interest
12 bought out in the value at that time.
13      And the way that works -- the way the clause is
14 designed to work, it's the value of property at any given
15 time. And if we've just purchased a property, there is --
16 in order to have a promote, you have to have an increase in
17 value above the capital that had been invested in the
18 property.
19      And since we're just buying the property now,
20 we're buying it at market value, there is no increase in
21 value. So you really don't need a vesting provision there;
22 it's automatically put into the deal.

118

1    So if he left in a short period of time, there
2   would be no value that would be allowed under the promote
3   anyway; so that would -- a vesting is not required in that
4   case.
5    Q.  Have you advised Mr. Millspaugh that his right to
6   receive a promote for the Reston International Center or
7   Spotswood is conditioned upon amended the FPEP agreement?
8    A   No.
9    Q   Okay.  And have you advised Mr. Millspaugh that
10  his right to receive a promote on those two particular
11  deals is contingent upon preparing this designation for the
12  FPEP, an FPEP designation?
13   A   No.
14   Q   Likewise, when Mr. Morris agreed to employment
15  with Buvermo, prior to that point did you advise him that
16  any promotes he would be entitled to receive would be
17  contingent upon the amendment to the FPEP agreement?
18   A   No.
19       And the reason was -- in both cases because we
20  intend to honor that agreement and we intend to execute
21  those documents and we will do that.
22   Q   And did you advise Mr. Morris at any time prior

119

1   to his execution of his agreement that his right to receive
2   the promote in any deals that were initiated after December
3   31, 2005, or any deals that were initiated by him prior to
4   that point would be contingent upon the FPEP designation
5   being put into place?
6    A   We did not advise him it was contingent to
7   being -- the FPEP agreement being put in place. But we did
8   advise him that it was to be in accordance with the term of
9   the FPEP agreement.
10   Q   And that was -- you're referring to what was
11  stated in the letter?
12       MR. SMITH:  "The letter" being the offer letter?
13       MR. HADDAD:  Yes.
14   A   I'm -- yeah.  I'm stating -- yeah.  I'm stating
15  that when I advised him of the -- that we would admit him
16  as a member of FPEP, that he would be -- receive these
17  interests but the interests would be in accordance with the
18  FPEP agreement and the basic terms which I described.
19       BY MR. HADDAD:
20   Q   We'll get into that momentarily.
21       Now, we previously spoke about FP Investments,
22  Inc.; and that is, of course, the manager member of FPEP?

120

1    A   Yes.
2    Q   I think we agreed that you were the president of
3   that company?
4    A   Yes.
5    Q   And do you have any understanding as to what the
6   scope of your authority is to act on behalf of FP
7   Investments?
8    A   I believe I have authority to act on behalf of
9   FP -- FP Investments.
10   Q   Okay.  And on anything?
11   A   The -- yes, I believe that's true.
12   Q   Okay.
13       MR. HADDAD:  Why don't we stop now for lunch.
14       MR. SMITH:  Okay.
15  (Whereupon, the deposition was recessed at 12:19 p.m. and
16  reconvened at 1:25 p.m.)
17       MR. SMITH:  I just tendered to Mr. Haddad the two
18  documents that we discussed this morning that we believe
19  are attorney-client privilege.  And Mr. Haddad has agreed,
20  to the extent that they are privileged, that our production
21  doesn't constitute a waiver.
22       BY MR. HADDAD:

121

1    Q   With respect to the amendment of the operating
2   agreement to incorporate Mr. Millspaugh as a member, as
3   well as the amendments of Fidelio's partnership agreement
4   Section 3.03, I think you were referring to, and the
5   drafting of any -- of any FPEP property designation, do you
6   intend Mr. Millspaugh to participate in that process?
7    A   Yes.  I'll give him -- I'll show him the
8   documents and ask for his comments as well.
9    Q   Okay.  And so in effect you're open to his sort
10  of negotiation of those documents?
11   A   No, I don't think that there's negotiations to be
12  done with those documents.  I think the main issue is I
13  want to make sure they're clear and that people understand
14  them.
15       But the document is what it is, and the changes
16  we're making are really clarifying changes in order to make
17  it read better, but we're not changing any substance in the
18  deal.
19   Q   So as far as you're concerned, he doesn't have
20  a -- if he wants to remove a provision, that that's not
21  something that's negotiable?
22   A   The deal itself -- there's some very important

122

1    parts of that deal that are at the heart of our
2    arrangement, and those just aren't negotiable. And
3    that's -- that's the way it is. You known, that's part and
4    parcel of the deal.
5        Q    And he's aware that these amendments are to take
6    place?
7        A    Yes. He's aware they're to take place, and he's
8    aware of the substance of the agreements.
9        Q    I see. So --
10       A    As was Jonathan --
11       Q    Okay.
12       A    -- at least to my understanding.
13       Q    We'll get into that in a little bit.
14           And I assume what you're telling me is
15   Mr. Millspaugh is also aware that there's no room for
16   negotiation as to certain aspects of those agreements?
17       A    I don't -- I'm -- I'm -- do I -- am I aware
18   he's -- yeah, I told him that was the deal.
19       Q    Okay. That certain aspects of those
20   agreements --
21       A    That those agreements are the agreements.
22       Q    Okay. And that he is to accept them?

123

1        A    Yes. As did I. You know, that was my -- the
2    terms of my agreement as well.
3        Q    I'm sorry. Your agreement with?
4        A    With the Fidelio partners. Those were the
5    documents and that I accepted those terms.
6        Q    And --
7        A    And it's part and parcel to the deal, really.
8        Q    In your situation, had you been provided with
9    those documents before accepting -- before accepting them?
10       A    They had been -- the terms had been described to
11   me, and as -- you know, that was the deal.
12       Q    Do you expect Mr. Millspaugh to take it upon
13   himself to begin reworking these documents, or is that
14   something that --
15       A    No. I will -- I will do that. The -- basically
16   they're done.
17           And by the way, I think that in my view, it's
18   fair to both parties. I think those documents are fair to
19   both parties, and that's why I accept them, and that's
20   why -- the way I've explained them to Laurey and to
21   Jonathan.
22       Q    Except that most of them hadn't been reworked

124

1    before Jonathan came aboard; correct?
2        A    Well, no. The documents -- the substance of the
3    documents is the same, and the reworked documents will have
4    the same substance as the older documents did.
5        Q    Okay. So then I'm not sure I follow you. I
6    mean --
7        A    You mean why are we changing them if --
8        Q    Well --
9        A    -- that's the case?
10       Q    -- you're reworking documents, and yet you're
11   saying that the substance is the same.
12       A    Yeah.
13       Q    They are changing to some degree, aren't they?
14       A    I'll tell you the basic reason they're changing.
15   The documents as you -- as you can see, have been developed
16   and changed over time to take into account a number of
17   circumstances that were true at the time.
18           At one time we had three different classes, for
19   instance, of properties that we designated as FPEP
20   properties, and we went through great detail describing
21   each of those three classes. Well, those classes -- the
22   reason for having those are no longer there, so we no

125

1    longer need to have a document that has two classes that
2    are no longer applicable.
3        The other big issue was there was a -- sort of a
4    drafting concept issue where -- we have basically a
5    document, 3.03, that's a single document that deals with a
6    number of issues; and then we have documents that change
7    specifically for each deal.
8        The initial drafting had a lot of the terms that
9    in later practice changed every deal in that one document,
10   and it had a lot of terms in the documents that were new
11   for every deal that were common to all deals. So you had
12   to modify this one to pick up the changes in the base
13   document, and then this one was much longer than needed
14   because you could have put it in the other paragraph
15   (indicating).
16       So a lot of the changes were of those two types,
17   to take out things that were no longer relevant because the
18   deals were no longer the same and to make the documents
19   more operable in today's light, you know, move -- so you
20   don't have to have as long and complicated a document.
21       But what they say is essentially the same.
22       Q    Okay. At some point in time in 2004, 2005 -- I'm

Case 1:06-cv-01131-HHK    Document 32-6    Filed 02/07/2007    Page 33 of 100

Morris vs. Buvermo                                   Deposition of J. Gardner 10/26/06

126

1  not sure; you tell me -- a decision was made to hire a new
2  president for Buvermo?
3      A   Yes.
4      Q   Okay.  And who made that decision?
5      A   It was made jointly.
6      Q   By whom?
7      A   By the Fidelio partners and myself.
8      Q   When you say "Fidelio partners," you're
9  essentially referring to Joost --
10     A   Joost and --
11     Q   -- and Andre?
12     A   -- Andre, yes.
13     Q   Okay.  And what sort of precipitated those
14 discussions?
15     A   Well, those discussions went back probably much
16 earlier than 2004, 2005.  They probably went back probably
17 three or four years before that.  We were talking about
18 where we were going, what things we were going to do.  And
19 at that time I think Andre and Joost expressed some concern
20 about my age; and if they wanted to continue, what should
21 we do about my age.
22         And I think their -- they had decided that they

127

1  liked the program that we'd had for the last 20 years and
2  they'd like to do it again for a very substantial period of
3  time.  And they were concerned that by the time I got to be
4  65, that I should be thinking of stepping down, which, by
5  the way, is a -- is a common practice in Europe, maybe less
6  common in the U.S., but more common there.
7         And my initial reaction was to resist that,
8  frankly, because I said, "You know -- you know, we don't do
9  things like that in the U.S.; and I'm still capable.  And
10 why don't we continue the way we're going?"
11        And the more we talked back and forth -- and I
12 think they were open to a number of different
13 suggestions -- the more I got to thinking more about the
14 effective age.
15        You know, when you're 30 years old, time is the
16 limitless resource; and you trade time to get money.  Well,
17 as you get older and older, you say:  Gosh, you know, maybe
18 the equation's the other way.  I've got a limited amount of
19 time, and I may run out of time before I do money.
20        And the more I focused on that, the more I said,
21 you know, this might really make sense.  It might make
22 sense for all of us for me to take on a more limited role,

128

1  phase out, bring in a new person who has a longer ability
2  to respond over a longer period of time and to just, you
3  know, change the relationship, that this might be
4  appropriate.
5         So eventually during that time I came to the view
6  that this is a good idea, and I agreed with them.  And
7  so we decided we would go forward and we would structure
8  the deal that met both my needs and their needs and -- and
9  included hiring a new president for Buvermo.
10     Q   So these discussions began in early 2001 --
11     A   Yeah --
12     Q   -- 2002?
13     A   -- I don't remember the exact time, but it was
14 sort of thinking about and talking about it over an
15 extended period of time.
16     Q   Were you made aware of any mandatory age
17 requirement --
18     A   No.
19     Q   -- for retirement?
20     A   No, there's not a mandatory age requirement.
21     Q   You state that you initially resisted efforts to
22 encourage you to retire because of your age?

129

1      A   No, not because of my age; just to encourage me
2  to retire.  Yeah, I resisted the fact that they needed to
3  bring in somebody else because I thought I was perfectly
4  capable and had performed very well for them, both of which
5  they didn't disagree with.
6      Q   Uh-huh.
7         But it was -- I mean that's why they were asking
8  you to retire, correct, your age?
9      A   The thing they were asking me to do is they
10 wanted someone who they could see take it for the next very
11 long period of time.
12     Q   They wanted to bring somebody on who would take
13 control of the company for several years to come?
14     A   And what they wanted is someone who -- you know,
15 they planned on if -- if the circumstances were correct and
16 if the markets would support new investments, they were
17 going to tell someone that we intend to be here a long
18 time; and in turn they would like someone who also as
19 circumstances were -- were correct, if the person worked
20 out and if things continued on, that they were in a
21 position to be there a long time as well.
22         And I think those were -- were the way (sic) they

130

1  phrased both of those discussions.

2    Q  I'm sorry.  That discussions with you?

3    A  With me and subsequently discussions we had with

4  people who we were going to employ.

5    Q  Including Jonathan?

6    A  Including Jonathan.

7    Q  Do you still feel that you are capable of

8  continuing on in your capacity that you have been?

9    A  No.  I have agreed with them and I've agreed that

10  this new arrangement is a good arrangement for us to have

11  going forward.  I think it fits my needs and their needs.

12    Q  Uh-huh.

13    A  And I think it is integral with the way we've

14  operated in the past, and I think it will end up with me

15  having very good investment opportunities and with me being

16  able to protect my own financial interests and also my now

17  equal partners' -- you know, now we're pro rata partners

18  going forward -- financial interests.

19    Q  It sounds to me that you've learned to accept

20  this, your retirement.

21       But what I'm asking is:  Do you really want to

22  retire?

131

1       MR. SMITH:  Asked and answered.

2    A  I do.  I like -- I like this program that we're

3  following.

4       BY MR. HADDAD:

5    Q  So when do you intend to formally step down?

6    A  I am now working no more than half-time, and my

7  salary has also been reduced accordingly.

8       That was, by the way, initially effective as of

9  year end '06.  But I had to come back in full-time until we

10  replaced -- until we hired a new -- another person.

11    Q  What was your intention prior to hiring

12  Mr. Morris with respect to what your continued role would

13  be at Buvermo?

14    A  My expectation was that I would transition into a

15  role as advisor, I would continue to work on a part-time

16  basis in that capacity, and that I would also continue as a

17  pro rata investor.

18    Q  And when would you be transitioning into the role

19  of advisor?

20    A  It was to occur over a period of time.  Initially

21  it was starting from the point that would -- when we hired

22  Jonathan initially, the plan was that I was to work

132

1  full-time through the end of that year and then start that

2  transitioning process with -- ultimately at some point in

3  the future when both myself, Fidelio partners, all of us

4  said now is the time to transition and give up the -- the

5  operating control, you know, the -- the control of -- the

6  signature power; as soon as we were comfortable with that

7  party, that that would take place as well; and then I would

8  be more fully an advisor.

9    Q  So what would your full-time role -- I mean what

10  did you intend before hiring Jonathan that your title would

11  be from his hiring to the time you became the advisor?

12    A  The -- the title that I would have had would have

13  been -- and I still have -- would have been president of

14  the Fidelio Property Management, Inc.

15    Q  Okay.  And you advised Jonathan before him

16  becoming president that even though he was being offered

17  the job as president, it was you who were going to be the

18  president of company?

19    A  No, that's not the president of company.

20  Remember, this is -- Buvermo is the president of the

21  operating company; and Fidelio Property Management, Inc.,

22  is the president of the managing general partner of

133

1  Fidelio.

2    Q  Okay.  But what I'm talking about is your role at

3  Buvermo; okay?

4    A  Oh, I'm sorry.  The role you asked me as a -- at

5  Buvermo?

6    Q  Uh-huh.

7    A  Was that your question earlier?

8    Q  That's my question.

9       What was your intention with respect to what your

10  role would be at Buvermo --

11    A  At Buvermo --

12    Q  -- upon Mr. Morris's hiring?

13    A  Upon Mr. Morris's hiring, I would continue to

14  work actively with Buvermo in doing either -- you know,

15  helping Jonathan understand the background, the role that

16  we'd had in past; working with him in developing new

17  business; working with him specifically as he found new

18  investment opportunities because I continued to have the

19  role of having to agree with Jonathan on each investment

20  that was made.

21    Q  Uh-huh.

22    A  So whatever I could do that would be helpful to

Morris vs. Buvermo                                    Deposition of J. Gardner 10/26/06

134

1    him in the process, that was to be my role.

2    Q   Okay.  What was to be your title at Buvermo?

3    A   There was -- there would be no title at Buvermo.

4    Q   Okay.  And would you continue as an employee of

5    Buvermo?

6    A   Yes.

7    Q   Okay.  But without any title?

8    A   Yes.

9    Q   So you wouldn't be an officer?

10   A   It would be unlikely as -- we hadn't really

11   thought through that.  It's possible that I would have kept

12   the role as vice president of Buvermo, but I -- it

13   wouldn't -- that wouldn't have been important.  I don't

14   think a title there would have been important.

15   Q   But the intention was that immediately upon his

16   hiring, he would become the president and you would step

17   down from that position; correct?

18   A   Yes.

19       And, in fact, we were going to enact that, except

20   for the difficulties we talked about earlier with -- with

21   Jonathan's place of residence.

22   Q   Well, we'll get into that in a second.

135

1        And this role that you would have played, that

2    you contemplated playing as sort of a consultant to

3    Jonathan, as somebody who helped him through --

4    A   Right.

5    Q   -- his -- this, I guess, so-called transition

6    period, I mean is that what you envisioned being an advisor

7    was?

8    A   Yeah.

9        Let me amplify or help -- maybe help you

10   understand that.

11       The -- the -- there are two important elements,

12   as I see, of the job.  One -- and this is one that is very

13   critical to our job -- is that the person who runs that job

14   plays the role of fiduciary.  That's the most important

15   role that they play.

16       And the reason that's important is our Dutch guys

17   are 3,000 miles away.  They have a substantial amount of

18   money invested in U.S. assets.  And the way our business

19   model works is that the -- Fidelio itself acts as if it has

20   local market knowledge and that money is locally based

21   because we can act quickly, we know the markets, we can

22   respond quickly in real estate.

136

1        And the only way the Dutch guys are comfortable

2    enough in giving up that kind of power to this local

3    arrangement is if they have absolute confidence that that

4    guy acts every time in their best interests, which is the

5    definition of a fiduciary.

6        So it's very important they believe if there's a

7    conflict, the person here will act in the Fidelio's best

8    interests, even against his own.  That's at the heart of

9    the operations.  And that takes a lot of trust and a lot of

10   understanding.

11       The way we've worked in the past, in addition to

12   that level of confidence is there's been a second party,

13   in -- in the prior years, Mr. Zachariasse, who also acts as

14   an advisor, gets involved and in effect gives a second

15   opinion about things of value.

16       And it's very important that those two parties

17   act very closely together and act with unanimity because

18   the Dutch guys, first off, they depend on trusting this

19   guy's judgment and they next depend on these two people

20   working together, working out differences, coming to a

21   common conclusion in order for them to feel comfortable

22   that their money is being properly spent.

137

1        And so we're -- what we're doing is trying to

2    replicate that in the future --

3    Q   Uh-huh.

4    A   -- which means it's very important for me to work

5    with Jonathan, or whoever's in that role, in helping --

6    first off, making sure that they understand that role, they

7    play that properly, and give my feedback; and that people

8    feel comfortable that's happening; and that we work closely

9    together; and then we continue on working closely together

10   at each investment we do.

11       So that's at the heart of the company.  That's

12   what makes it work, and that's why we've been successful.

13   Q   Uh-huh.

14   A   And so my role is to build those kinds of, you

15   know, relationships with Jonathan; help him build those

16   relations with our guys; and make sure that that, in fact,

17   is what's happening; and then tailing that principal role

18   off and -- and then having it perform this -- this sort of

19   advisor role where there's trust built up between the two

20   of us and act together.  And then our guys see that trust

21   and also have that trust that the person's acting as a

22   fiduciary.

Case 1:06-cv-01131-HHK    Document 32-6    Filed 02/07/2007    Page 36 of 100

Morris vs. Buvermo                              Deposition of J. Gardner 10/26/06

138

1    That's the heart of the business. And I think,
2  if you look at all of the documents, the way they're
3  written, all of the promote calculations, all of those
4  things are oriented around that fundamental principle.
5    Q  Uh-huh.
6    A  And that's what my role, I saw, was trying to
7  bring that into -- into being.
8    Q  You were supposed to step into the shoes of
9  Mr. Zachariasse?
10   A  Well, I was supposed to do two things. One is I
11  was supposed to make sure that the person we hired
12  understood those rules, understood that's where we were
13  going, and understood -- it's not -- it's not a negative
14  sense; it's a positive sense.
15    The real power in the job is understanding that
16  role and performing it properly so that guys in the
17  Netherlands can say: Yes, I don't feel like I'm being
18  second-guessed or whatever.
19    You know, you -- if you wanted to contrast a
20  fiduciary versus a broker, a broker gets a fee for placing
21  the job. And the guy in the Netherlands says, "Wait a
22  minute. How do I know that this investment is good for the

139

1  capital, or maybe he wants to place it just for his fee."
2  So they always worry about those things.
3    When they really believe the guy is a fiduciary,
4  they say, "What he gets compensated for, he's willing to
5  waive in exchange for my own best interests." Now, that's
6  very hard to bring about; and it takes a long time. But
7  when it's there, it's a very powerful tool. And that's
8  what's made our company work.
9    Q  Okay. I appreciate that. I just want to sort of
10  flesh that out a little bit --
11   A  Okay.
12    Q  -- because while up through perhaps the end of
13  2005 Mr. Zachariasse -- am I pronouncing his name
14  correctly?
15    A  Right.
16    Q  Okay. -- he was --
17    A  It -- it's "Zachariasse," though, if you're in
18  the Netherlands. But we call him "Zachariasse" in the U.S.
19    Q  "Zachariasse" --
20    A  Right.
21    Q  -- is what I'll call him.
22    A  Yes.

140

1    Q  He was serving as sort of that intermediary
2  between you and the Dutch; isn't that right?
3    A  It's -- it's less an intermediary. It -- to some
4  times it's an intermediary role; and to some times it's
5  a -- he and I working directly together and working things
6  through together. It's a -- it's a somewhat complicated
7  role.
8    Q  So it's both an intermediary and an advisor?
9    A  Yes.
10    Q  He was an advisor to you?
11    A  Right.
12    Q  Okay.
13    A  As well as to the Dutch.
14    Q  And that's the role that you were supposed to
15  fill?
16    A  That ultimately I would transition into, yes.
17    Q  Okay. Mr. Zachariasse was -- well, when you were
18  the president of Buvermo, was Mr. Zachariasse involved in
19  finding deals on behalf of Buvermo to present to Fidelio?
20    A  No, because Mr. Zachariasse lived in the
21  Netherlands.
22    Q  Okay. So he didn't have any day-to-day sort of

141

1  management of Buvermo's --
2    A  No.
3    Q  -- business; correct?
4    A  No.
5    Q  And he didn't interfere with the day-to-day
6  operations of Buvermo; correct?
7    A  No.
8    Q  And so in effect that's what you were supposed to
9  become; correct?
10    A  Not necessarily. I was to become an advisor, but
11  not -- I don't -- I did not live in the Netherlands, and I
12  didn't intend to.
13    Q  Uh-huh.
14    A  Or Florida for that matter.
15    Q  Okay. That's not what I meant.
16    I just meant in terms of your role, not in terms
17  of where you were living.
18    A  Yeah. They -- there was no definition of role
19  that said you're not to be -- you know, you're to -- you're
20  to act as if you were in the Netherlands. That was not
21  part of the definition at all.
22    Q  But it was clearly not your role to continue to

142

1    act as the president of Buvermo --
2        A   That's correct.
3        Q   -- correct?
4            MR. SMITH:  Can we go off the record for just one
5    second.
6    (Discussion off the record.)
7            BY MR. HADDAD:
8        Q   So Mr. Morris, being hired as the president of
9    the company, was to assume day-to-day management of the
10   company's affairs, meaning Buvermo; correct?
11       A   Yes.
12       Q   All right.  And that would necessarily mean that
13   you would cede that responsibility to him?
14       A   Yes.
15       Q   Okay.  And included in the day-to-day management
16   of the company is finding and locating deals; correct?
17       A   Well, that's not the only -- you know, the
18   president's not the only person who does that.
19       Q   All right.  Well, who else has done that as
20   president in the past?
21       A   Well, the president has done that to some extent;
22   but in the past, to a large extent, other people have done

143

1    that.
2        Q   While you were the president of Buvermo, who was
3    acting on Buvermo's behalf in locating deals?
4        A   Well, the -- there was a guy named Andy vanHorn
5    who worked for us for a couple of years; and Andy's job
6    specifically was to be out front looking for new deals,
7    finding new deal activity.
8            We had always hoped -- and when Steve Bonacci was
9    there, we wanted to transition Steve more into playing that
10   role.  But he also had a role of doing a lot of directing
11   of operations, so he didn't have as much time.
12           Ideally it would be great if we could transition
13   Kara McCormick into playing that role as well.
14           So all of us would play a role in being into the
15   market, finding new deals, and sourcing deals and then
16   bringing them in.  And then all of us could evaluate, and
17   then we decide who would follow up on the deal.  That's
18   what -- that was what would be an ideal situation.
19       Q   But any deal-finding that Mr. vanHorn or
20   Mr. Bonacci may have done was under your direction;
21   correct?
22       A   Yeah.

144

1        Q   They kept you apprised of what they were doing;
2    correct?
3        A   Right.
4        Q   They didn't hold meetings without telling you;
5    correct?
6        A   Sometimes they would, and they'd tell me after
7    the fact.
8            You know, the rule was get out there; beat the
9    bushes; find out whatever you can; and if it looks like
10   it's something that's going to work, then let's all figure
11   out how to make it work, you know.
12       Q   But if you as president didn't want them to go
13   out and meet with other people without your knowledge, you
14   would expect them to respect that, wouldn't you?
15       A   I would never make that request.  But if I did --
16   if the president did make that request, I'd wonder why he
17   was doing it.  But, you know, if he's the president, then
18   we'd have to do it that way.
19           That would be in my role as a -- as someone like
20   an Andy vanHorn, yes.
21       Q   And you certainly wouldn't have tolerated as
22   president Mr. vanHorn doing anything to undermine any of

145

1    the deals you were yourself pursuing; correct?
2        A   That's correct.
3            I would -- I might modify that slightly.  I don't
4    know what you mean by "undermining a deal".  Maybe you
5    could explain that, and then I could maybe modify it
6    further.
7        Q   Okay.  Well, let's assume you were working on a
8    deal and he's out there doing things without your knowledge
9    to -- that in some way could harm the deal.  Is that
10   something that you would appreciate?
11       A   And how would it harm the deal?  What would he be
12   doing to harm the deal?  So -- he might be getting
13   independent market research, for instance?
14       Q   Right.  That might be -- that might be the case.
15       A   Right.
16           Well, I would -- you know, the way we tried to
17   operate as a company is that same -- the same thing as this
18   fiduciary role.  You know, I assume from the start that
19   everybody in the company was working in the company's best
20   interests.  And everybody's best interests was served by us
21   having the right deal done and having it done properly, and
22   that means being critical in looking at some aspects of the

146

1  deal.
2       And one of the requirements that I imposed on our
3  people is: If you belief something strongly, then you are
4  obligated to follow that up strongly; you are obligated to
5  argue it strongly; and if it's in opposition to other
6  views, that's where creativity comes from.  Creativity
7  comes from disagreeing, disagreeing with other points of
8  view.
9       Ultimately you have to agree to do a deal or not.
10  And then once you've agreed to do the deal, you no longer
11  have the right to say, "I told you so."
12      But until the day you agree that most creativity
13  comes from people with divergent opinions, divergent
14  things, with people respecting their views and dealing in
15  respect with those different opinions -- and many times the
16  answer is better than either of parts.
17      And, in fact, that was one of the real strengths
18  between Chris Zachariasse and myself.  We almost never
19  agreed when we started looking at a deal.  But it was the
20  creativity of dealing honestly with those disagreements
21  that got the best deals done.
22      And -- and I think that's the climate that you

147

1  need to foster if you're going to really take a small
2  company and have it do its job properly.
3    Q  Okay.  So if I'm hearing you correctly, what
4  you're saying is that as president you would have been okay
5  for one of your subordinates --
6    A  I would have encouraged.
7    Q  -- you would encourage one of your subordinates
8  to, without your knowledge, go out and try to find facts
9  that would undermine the deal that you're pursuing?
10   A  If he -- if he felt that it was -- that there was
11  something wrong with the deal that we needed to know about
12  and he needed to go find the facts to do that, I would
13  encourage him to do it.
14      Now, I would encourage him with the same feeling
15  of trust that he's not trying to undermine the deal or
16  undermine me; what he's trying to do is make sure that we
17  understand the deal fully.
18      And that's a different issue.  And it -- there's
19  a difference between undermining a deal and trying to
20  understand it fully so that you make good investments.
21   Q  And in that event wouldn't you want him to at
22  least tell you that, you know, "Hey, I feel strongly about

148

1  this; I'm going to go check out something" --
2    A  It -- it may be one way or the other.  He could
3  either tell me ahead of time he's doing it, or he could
4  tell me after the fact, "By the way, you know, I was
5  talking to Bill Jones; and Bill Jones has some facts that I
6  think are very important for us to consider; and now we
7  should consider them."
8       Now, he may could talk to eight Bill Joneses and
9  find there's no facts worth considering; and, therefore, I
10  don't need to know every person he talks to.
11      I do need to know when it's important.  And the
12  people who work for me I trusted that they'd let me know if
13  it was important.  And I didn't have to follow them and,
14  you know, ask them questions all the time.  I trusted that
15  if it was -- if it was important, they'd tell me and that
16  they wouldn't be doing things to undermine me or the deal.
17  And they didn't.
18      (The position specification was marked
19      Plaintiff's Exhibit No. 9 for identification.)
20      BY MR. HADDAD:
21   Q  Mr. Gardner, I've handed you what's been marked
22  as Exhibit 9 to your deposition.  This is a position

149

1  specification that appears to have been prepared by
2  Equinox, and it was produced by the defendants in this
3  case.
4       Would you take a look at this and let me know if
5  you recognize this document.
6  (The witness reviewed document.)
7    A  Yes, I do.
8    Q  Okay.  And is this the position specification
9  that was prepared on your behalf by -- or on Buvermo's
10  behalf by Equinox in its search for a president and CEO of
11  Buvermo back in 2005?
12   A  Yes.
13   Q  And do you recall reviewing this at the time that
14  it was prepared --
15   A  Yes.
16   Q  -- by Equinox?
17   A  Yes.
18   Q  And do you recall making any comments to any
19  drafts of this -- to this specification?
20   A  I believe I did.
21   Q  Okay.  And do you recall ultimately approving
22  this particular specification?

150

1    A   Yes.

2    Q   And just -- much ado has been done -- has been

3    made -- maybe not much ado.  Some ado has been made about

4    the fact that Mr. Morris was hired as the president, but

5    not as the CEO of the company.

6    A   Yes.

7    Q   I'm not sure that's an important distinction

8    but --

9    A   I don't believe it's an important distinction

10   either.

11   Q   All right.  So I just note that here the position

12   is identified as president and CEO.  Do you see that?

13   A   You know, I didn't focus on that at that time.

14   And I don't know whether I would have raised a question at

15   the time either.  It's just really not an important

16   distinction.  There's really no difference in role between

17   president and chief executive officer.

18   Q   All right.  I just want to be sure that, you

19   know, when Mr. Morris became president of the company,

20   there wasn't somebody who -- well, when Mr. Morris --

21   A   There was no --

22   Q   -- was hired as president for the company, you

151

1    weren't retaining a position as CEO of the company?

2    A   No, not at all.

3    Q   Or anybody else, for that matter?

4    A   That's correct.

5        This is, by the way, a three-person company.

6    Q   Taking a look at the client summary, the last

7    paragraph on that indicates that you have led Buvermo's

8    activities for the past 20 years.  Do you see that?

9    A   Yes.

10   Q   It further says that you decided to retire from

11   active management of the business and will transition to a

12   role as investor and advisor to the management and the

13   company's board consistent with representatives of the two

14   families.  Do you see that?

15   A   Yes.

16   Q   It goes on to say that the board has recently

17   confirmed his long-term commitment to the market, and we

18   will recruit new leadership to manage the business.  Do you

19   see that?

20   A   Yes.

21   Q   What did you feel was the purpose of this

22   position specification?

152

1    A   To guide the -- the recruiters in looking for the

2    person to fill the right -- right position and giving the

3    person the idea of what needs to be done.

4    Q   You were aware that this position specification

5    would be provided to the candidates?

6    A   Yes.

7    Q   Okay.  And I notice that there's no mention in

8    here that you would be continuing some employment

9    relationship with Buvermo after the hiring of a new

10   president.

11       Can you tell me why you decided that that

12   shouldn't be put in there?

13   A   We just -- either we missed it, or we didn't

14   think it was important.

15   Q   Okay.  And I also notice that there's nothing in

16   here that suggests that you would continue to seek out

17   deals on behalf of Buvermo after the new president's hired.

18   A   It was silent on the issue; right.

19   Q   Didn't you feel that that was something that was

20   important to disclose to the new president?

21   A   Oh, I thought that we -- that that would not be

22   an issue at all with the new president, that the new

153

1    president would welcome that help.

2    Q   Okay.

3    A   So it really wasn't an important issue one way or

4    the other at this stage of the spec.

5    Q   At least you thought it wasn't?

6    A   I'm sorry?

7    Q   At least you thought it wasn't?

8    A   I still didn't hear what --

9    Q   At least you thought it wasn't?

10   A   At least I didn't, yes.

11       THE WITNESS:  You -- you know, that's another

12   problem is, you know, the -- off the record on this one.

13   (Discussion off the record.)

14       BY MR. HADDAD:

15   Q   Can you envision a circumstance in which -- well,

16   didn't you envision a circumstance in which a president

17   coming into this position would want to be the one in

18   charge of locating deals on behalf of the company?

19   A   I did not focus on the fact that there would be

20   anybody filling this role who would have any concern about

21   deals -- whoever found a deal, that -- that they could

22   bring it in and help bring to it fruition.  I just -- I

154

1  just had no thought that that would ever be an issue with
2  anybody. I really didn't.
3      Q   And so --
4      A   It had never been an issue in our company in the
5  past at all.
6      Q   But you've been the president of the company for
7  the past 20 years; correct?
8      A   Right.
9      Q   Okay. You haven't --
10     A   Been -- yeah. I've been frustrated the other
11 way, that I wanted people to go out and find deals and help
12 me find deals and that -- that we weren't finding as many
13 as we wanted. I would -- you know, that was more of a
14 problem.
15     Q   Okay. So the concept of somebody coming in as
16 president and wanting to do things -- wanting to run the
17 show in terms of locating deals and getting those deals and
18 et cetera without interference or without somebody else
19 doing that at the same time, that's a foreign concept to
20 you?
21     A   That would have been a -- if -- if the person had
22 said that from the beginning, I guess I would begin to

155

1  wonder whether we had the right guy.
2      Q   And --
3      A   By the way, that wasn't my impression of
4  Jonathan, but that's --.
5      Q   I'm sorry. What wasn't your impression of
6  Jonathan?
7      A   I did not have any impression that Jonathan's --
8  wanted to be the only guy who went out to do the deals. I
9  didn't understand that at all.
10     Q   Are you unaware of others such as Ms. LoPinto --
11 I mean -- sorry -- Mr. LoPinto and Ms. Pearcy having some
12 concerns about how you would handle giving up management of
13 the functions of the president of this company?
14         MR. SMITH: Is the question, Is he aware of that?
15 because you said, Is he unaware of --
16         BY MR. HADDAD:
17     Q   Are you aware of that?
18     A   I'm aware that they raised that question.
19     Q   Okay. Why do you think that question was raised?
20     A   It's a logical question when someone's been in
21 the job for 20 years.
22     Q   And why is it a logical question?

156

1      A   Because the person's been in the job for 20
2  years.
3      Q   And maybe had some difficulty giving up his --
4      A   That's correct.
5      Q   -- role in that job; correct?
6      A   Right.
7      Q   And isn't that, in fact, what happened here?
8      A   No.
9      Q   No?
10     A   No.
11     Q   You never gave up the role, did you?
12     A   I never was able to give up the role.
13         You -- you mean the role or the title? There's a
14 difference between a title and a role.
15         I think I gave up the role. I was never able to
16 give up the title.
17     Q   You gave up the role immediately upon
18 Mr. Morris's hiring?
19     A   No. But -- but I -- whenever I was comfortable
20 that Jonathan could do that role properly, then I would be
21 willing to give up that role to him. It wasn't immediately
22 upon hiring him.

157

1      Q   The role was supposed to change immediately upon
2  hiring him; right?
3      A   The title was to supposed change.
4      Q   The title was. But you were supposed to continue
5  doing the deals then?
6      A   No.
7      Q   You were supposed to continue locating the deals,
8  even though Mr. Morris was the --
9      A   No --
10     Q   -- president?
11     A   -- Mr. Morris was to locate the deals.
12     Q   Okay. But you continued locating them --
13     A   No --
14     Q   -- trying to get good deals?
15     A   -- I did very little to locate the deals.
16     Q   But you did try to locate some deals, didn't you?
17     A   I talked to people about deals in a way to help
18 Jonathan, yes.
19     Q   Really?
20         But without Mr. Morris's knowledge?
21     A   No. Mr. Morris found out about it, about --
22 every time that I met with someone that I thought there was

Case 1:06-cv-01131-HHK    Document 32-6    Filed 02/07/2007    Page 41 of 100

Morris vs. Buvermo                                    Deposition of J. Gardner 10/26/06

158

1    any leads, I informed Mr. Morris right way.  Mr. Morris was
2    not uninformed.
3        Q   So he knew about all your leads and everything
4    that you were pursuing?
5        A   That -- that had any substance to them, yes.
6            The problem is you pursue fifty deals to find
7    one.
8        Q   Is it your testimony that Mr. Morris, at least in
9    the first several months, never -- first two or three
10   months, didn't tell you that he didn't want you out there
11   pursuing deals?
12           MR. SMITH:  Object to form.
13       A   He might have told me that.  And I wondered about
14   his doing that.  And I didn't pursue deals.  I spent very
15   little time pursuing deals because that's really Jonathan's
16   role, not mine.
17           BY MR. HADDAD:
18       Q   So --
19       A   I might have had two or three meetings out of
20   that whole ten-month period.  And Jonathan's supposed to
21   have had a lot more.
22       Q   So what were you doing, then, if you weren't

159

1    pursuing deals?
2        A   I was working on the existing deals.
3        Q   Servicing old deals?
4        A   Yes.
5        Q   Do you believe that you ceased engaging in active
6    management of Buvermo's business after Mr. Morris's start
7    date?
8        A   No.
9        Q   You continued to actively manage this business
10   after the fact?
11       A   I continued to participate in management of the
12   business.
13       Q   Okay.  Wasn't the point of your retirement to
14   cease any active management?
15           MR. SMITH:  Object to form.
16           THE WITNESS:  Ask me your question again.
17           BY MR. HADDAD:
18       Q   Wasn't the point of your retirement to cease
19   active management?
20       A   Eventually, but not right way.  Remember, I'm
21   full-time employed until year end.
22       Q   In what role, again?

160

1        A   Primarily in servicing the existing deals that
2    were underway.
3        Q   Was it your understanding that was supposed to be
4    your only role, unless otherwise requested by Jonathan?
5        A   No.
6        Q   So what else -- your understanding was what?
7    What else could you do in that full-time position that you
8    had?
9        A   I could help Jonathan understand the role he was
10   to play, and I could assist him in doing the things that he
11   had to do.
12       Q   And you felt that it would -- it's appropriate to
13   do that, even if he didn't want you to?
14       A   Well, to the extent that I thought he could
15   perform that properly, I think that's -- that's true.
16       Q   It sounds like you were pretty much running the
17   show.
18       A   Jonathan tended to get a lot less involved in the
19   current operations than I felt he should, and that was of
20   concern.  We have an operating company and a lot of things
21   to be done.  And Jonathan really didn't show a lot of
22   interest in either understanding the operations as we'd

161

1    done them in the past or in understanding the deals as they
2    were taking place.  And these were deals that had to be
3    closed.
4            And the agreement was with Jonathan that I would
5    continue with the existing portfolio, a lot of which we
6    were selling.  And it would not make sense to have him
7    involved in those in any case.
8        Q   Uh-huh.
9        A   But I was hoping that he would have played a lot
10   stronger role in understanding the operations,
11   understanding the existing business, and in helping to run
12   that business.  It is an operating business.
13           And, frankly, I don't think he did that very
14   well; and it was of concern because we were having things
15   that weren't -- weren't getting done.
16       Q   I'm a bit confused because I thought that you
17   just indicated that as part of your full-time position
18   there, it was your job to maintain the existing sort of
19   operations, the existing deals.
20       A   That was the agreement we made.  There were a
21   number of deals that we had that were being sold.  And the
22   selling would take place about by year end, and so I was

162

1  conducting those sales operations. We both agreed that was
2  the thing --
3     Q  Uh-huh.
4     A  -- that was proper for me to do that and have
5  Jonathan not involved with those.
6     Q  And so why is it that you -- I mean is that what
7  you're referring to with Jonathan getting involved in
8  that, that concerned you?
9     A  Well, there were, you know, understanding the
10  business and how it operated. You know, we have a long
11  history of the business; and Jonathan seemed to have very
12  little interest in understanding how we had done things in
13  the past.
14     Q  Well, how do you know what he understood and
15  didn't understand?
16        MR. SMITH: I think you're not giving John enough
17  time the get his full answer out.
18        Were you done?
19        Can we read back that last question and his
20  answer? If he's done, he's done. I just thought he wasn't
21  done.
22  (The record was read by the court reporter.)

163

1     A  There were other aspects of the business that I
2  was concerned whether Jonathan was getting deeply involved
3  in as well.
4        BY MR. HADDAD:
5     Q  Okay. What were those?
6     A  The -- a lot of the financial reporting aspects
7  of the business.
8     Q  Okay. And what discussions did you have with
9  Jonathan about that?
10     A  Well, we were -- in preparing the board package,
11  I was trying to get Jonathan a lot more involved in
12  understanding the finances, where they came from, how they
13  came about; and he seemed reluctant to want to do that.
14     Q  Okay. Well, what did he say, "I don't want to
15  look at these"?
16     A  Yeah. Or, you know, didn't seem to, you know,
17  want to pay attention to them.
18     Q  Well, what did he do exactly?
19     A  He, you know, just resisted.
20     Q  So he refused to look at what you were showing
21  him?
22     A  He was reluctant to look at it. If he did, it

164

1  was on some sort of cursory basis, in my view.
2        MR. HADDAD: Mark this as Exhibit 10, please.
3        (The memorandum dated 9/19/05 was marked
4        Plaintiff's Exhibit No. 10 for identification.)
5        BY MR. HADDAD:
6     Q  Mr. Gardner, you've been handed what's been
7  marked as Exhibit 10. It's a memo you prepared to
8  Mr. Tjaden on September 19th, 2005.
9        Do you recognize this document?
10  (The witness reviewed document.)
11     A  Yes.
12     Q  And why did you prepare the document?
13     A  To make sure that there was a good understanding
14  between Joost and myself as to what our -- my future
15  arrangement was between he and I going forward and then
16  later for us to make sure that this is -- if he and I
17  agreed, that this would -- we would put this in place. You
18  know, he would have Andre agree; and -- and, you know, this
19  would be the way we would go forward.
20     Q  Why did this -- who requested this? Did
21  Mr. Tjaden request this?
22     A  I think he and I both talked about writing

165

1  something down so that we were both in agreement with what
2  we're talking about.
3     Q  Uh-huh.
4        Why September 19th? Why not before you hired
5  Mr. Morris?
6     A  I don't know.
7     Q  Well, did anything occur that caused this to be
8  prepared around that time versus at an earlier time?
9     A  No. I think we were just thinking through the
10  process and this is when it occurred.
11     Q  You were thinking through what process?
12     A  The process of my future role.
13     Q  Wasn't that something that should have been
14  thought of before you hired a president of a company?
15     A  It was thought of, and this is an outline that
16  writes down the thoughts that we had had.
17     Q  Okay. So are these thoughts that you had had
18  before hiring Mr. Morris?
19     A  I can't remember when -- these specific details,
20  but the concepts were clearly the concepts we had. But the
21  specific details, like the amount of the salary and all of
22  those, I can't remember when Joost and I finalized that.

166

1  But by September 19th, in any case.
2      Q   Well, the first sentence says, "Following is an
3  outline of the terms which you and I have tentatively
4  agreed to regarding my ongoing employment with
5  Buvermo/ Fidelio."
6          So do you have any recollection of when this
7  tentative agreement came about?
8      A   I assume right before I wrote the memo.
9      Q   Okay.  And so there was no agreement prior to
10 that point?
11     A   In the details, no.
12     Q   In the details?
13     A   That's correct.  Like, for instance, paragraph 3.
14     Q   Okay.  So you had a general agreement prior --
15     A   Yeah --
16     Q   -- to this memo?
17     A   -- a general agreement.
18     Q   Okay.  And we've talked about your continuing to
19 work full-time, which is paragraph 1, until year end 2005.
20         And I think you previously indicated you didn't
21 know -- you didn't have a particular title; is that
22 correct?

167

1      A   Well, I did have a title in -- not in Buvermo,
2  but in Fidelio.
3      Q   I see.  Okay.
4          And in Buvermo, you didn't have a title --
5      A   Oh, I had the title in -- in name because I was
6  the president because we couldn't make that change, as we
7  discussed earlier.
8      Q   Okay.  So at the time you wrote this, you
9  believed that you were the president of Buvermo?
10     A   No; in fact, I was the president of Buvermo.
11     Q   Okay.  Well --
12     A   I was the legal president of Buvermo.
13     Q   Because?
14     A   Because that's -- we were not able to put
15 Jonathan in that role, at his request.
16     Q   When was that request made to you?  And I'm
17 talking about -- your contending that Jonathan requested
18 that he not be the president of the company?
19     A   That he not have the official title as president;
20 that's correct.
21     Q   So Jonathan Morris came to you and said, "I don't
22 want to have the official title of president of the

168

1  company"?
2      A   He says, "I want to act as president, but I can't
3  have the official title as" -- "as president and be paid as
4  president of Buvermo."  That's what he -- he advised us,
5  yes.
6      Q   Okay.  And when did he advise you of that?
7      A   I don't remember the exact date.  It was
8  somewhere early on in his employment, I believe.
9      Q   Okay.  Do you have any of documents reflecting
10 when -- that he might have had this discussion with you
11 prior to --
12     A   No.  All I know is we didn't issue him any
13 paychecks, at his request.
14     Q   Okay.  So you never issued him any paychecks
15 prior to December of '05?
16     A   Not as an employee of Buvermo, no.
17     Q   And so no paychecks were ever issued with
18 withholdings from the State of Virginia?
19     A   I don't think so.  Now, I'm not sure about that.
20 But if -- you know, the intent was not to have that happen;
21 that he was -- he was -- had a separate employment
22 agreement through his -- I think he had an LLC that he used

169

1  to be employed --
2      Q   Uh-huh.
3      A   -- through which we employed him.
4      Q   And was it -- were you fine with that?  Were you
5  okay with that?
6      A   No, I was bothered by that.  I was bothered
7  that -- that somehow it would be a problem for us.  And I
8  surely didn't want it to be a problem for Jonathan.
9          But it -- you know, so we were -- we were
10 concerned.  We had discussions with our accountants and all
11 this as to how this should be treated --
12     Q   Uh-huh.
13     A   -- because we didn't want to do something that
14 was improper.
15     Q   This treatment of him as a consultant, it was
16 done for payment purposes and payment purposes alone;
17 correct?
18     A   Yes.
19     Q   Okay.  You intended that he continue to fulfill
20 the functions of whatever the president of Buvermo would
21 fulfill --
22     A   That's right.

Morris vs. Buvermo                                   Deposition of J. Gardner 10/26/06

170

1    Q    -- correct?

2    A    And our intent initially was that he would have

3    actually been named president of Buvermo.  But Jonathan

4    didn't want that to happen because of these other issues,

5    and so that's why I kept the title.

6    Q    Uh-huh.

7         And so you kept business cards with --

8    identifying you as president?

9    A    I don't think my business cards identified me as

10   president.  I think it just has my name on it.

11   Q    Uh-huh.

12        Does anything that you -- do you recall signing

13   one document identifying yourself as president during

14   this --

15   A    Any document that had been to be signed for

16   Buvermo, I signed as president --

17   Q    Uh-huh.

18   A    -- because that -- you know, that was the legal

19   requirement.

20   Q    Would it surprise you that of the many documents

21   that we've exchanged in this discovery that I don't have

22   one document during Mr. Morris's term in which you

171

1    identified yourself as president of the company?

2         MR. SMITH:  Can you repeat that question?

3    (The record was read by the court reporter.)

4    A    My guess --

5         MR. SMITH:  I want to just object to the form and

6    say I don't think it's true.

7         But you're free to answer.

8         THE WITNESS:  Yeah.

9    A    But you -- you know, I -- normally I'm not sure

10   I -- when I sign something on Buvermo letterhead, I

11   probably just sign my name, I would think.  I don't know.

12        BY MR. HADDAD:

13   Q    Uh-huh.

14        Do you have any -- can you think of any instance

15   in which you signed as president of --

16   A    I don't --

17   Q    -- Buvermo --

18   A    I --

19   Q    -- and identified yourself as such?

20   A    I could well have.  I don't know.  I don't -- you

21   know, it's not -- not something I focused on.

22   Q    Uh-huh.

172

1         You knew Mr. Morris had business cards

2    identifying him as president, didn't you?

3    A    Yes.  And I agreed to that.

4    Q    Uh-huh.

5         And you also knew he had letterhead identifying

6    himself as president?

7    A    Yes.

8    Q    And you agreed to that as well?

9    A    Yes.

10   Q    Paragraph two says, "Following year end 2005" --.

11   Do you see that?

12   A    Yes.

13   Q    -- "I will reduce my hours to a maximum of

14   half-time and will change my role to advisor, similar to

15   the role filled by Chris."

16   A    Right.

17   Q    Uh-huh.

18        So it appears, at least in this memo, that at the

19   end of 2005 you were going to change from -- were you going

20   to give up your title as president or no?

21   A    Yeah; we had hoped at some point that we would

22   have worked out this issue with Jonathan so that he could,

173

1    you know, fully become president.  We really hadn't focused

2    on that.

3         But, by the way, circumstances did change between

4    the time of this memo and year end.  At this point it was

5    September, and this was the way we would hope to go.

6    Q    What circumstances changed -- I'm sorry -- were

7    you thinking --

8    A    We ended up in the end of the year, redefining

9    the role so that I would continue on as primary -- as -- as

10   in being the primary person responsible for the JBG

11   account.  So that's different than this.

12   Q    Okay.  Given that it's your contention that

13   Mr. Morris wasn't the president and you were going to give

14   up your role as president, who was going to serve as

15   president?

16        MR. SMITH:  Object to form.

17   A    Well, we wanted Mr. Morris to serve as president.

18        And his -- and we'd been talking -- what's in the

19   documents versus the way Jonathan was -- responds in

20   public.  The president of Buvermo doesn't have a lot of --

21   in itself there's not a lot of things the president

22   formally does.  It's the way the -- the person acts in the

174

1   outside world in supporting -- we said, you know,
2   "Jonathan, you act" -- "you know, you're" -- "you're to act
3   as the president; the world is to perceive you as the
4   president of Buvermo."
5       BY MR. HADDAD:
6       Q   And for all intents and purposes, you considered
7   him the president as well?
8       A   Yes.
9       Q   And that was throughout his employment with --
10      A   Yes.
11      Q   -- Buvermo?
12          You also considered him an employee throughout
13  his employment at Buvermo?
14      A   I didn't -- I knew he was not an employee because
15  he had -- we had this contract relationship. So he really
16  wasn't an employee.
17      Q   I see.
18      A   I mean I knew that. But that was -- seemed to be
19  something that we both felt was acceptable.
20      Q   And despite knowing that he wasn't an employee,
21  you referred to him -- to employment relationships in his
22  termination letter; isn't that right?

175

1       A   I think that we terminated any -- either
2   employment or contract relationships we had with him, yes,
3   if there were any. To the extent there was employment, to
4   the extent there was contract, we were terminating both.
5       Q   Why is it that you had an interest in continuing
6   your employment with Buvermo for a period of three years
7   after March 31, 2006?
8       A   Well, that was the deal that we made and that's
9   the deal I made with Joost.
10      Q   Uh-huh.
11          But why?
12      A   Why? Well, this is -- I'll tell you why. I
13  retained employee benefits; I retained health insurance; I
14  retained 401(k); and I get a salary of 150-, 125-, and
15  100-.
16      Q   Was that in any way intended also to extend
17  the -- any redemption of your FPEP promote interest?
18      A   FPEP promote is different than this.
19          And, by the way, these periods do not change the
20  at-will nature of my employment. This is my intention, and
21  this is Joost's intention.
22          But this -- at any time Joost and Andre could

176

1   say, "John, you are no longer employed." And my
2   understanding would be that that would have stopped this
3   operation.
4           This is what our intent is going forward. And if
5   that had happened, then we would have had the FPEP option
6   available either to me or to Joost, as is provided. So
7   this doesn't void that. You know, that -- my -- my
8   understanding is that this would not void that.
9       Q   You by virtue of your employment with Buvermo and
10  your membership, I suppose, in FPEP, had acquired rights to
11  obtain an FPEP promote --
12      A   That's correct.
13      Q   -- promote; correct?
14          And the FPEP operating agreement as currently
15  drafted contains a redemption provision which allows the
16  company to redeem your membership interests --
17      A   Right.
18      Q   -- in the event that you discontinue your
19  employment with Buvermo?
20      A   Right.
21      Q   Okay. So my question to you is: Was that
22  something that was taken into consideration when you

177

1   negotiated for a three-year term of employment here?
2       A   No.
3       Q   Okay. So did you have any understanding as to
4   when your FPEP membership interest would be redeemed --
5   (Proceedings participants speaking at the same time.)
6       A   My understanding --
7           THE COURT REPORTER: Sir, please let --
8           BY MR. HADDAD:
9       Q   -- under the --
10          THE COURT REPORTER: -- finish.
11          BY MR. HADDAD:
12      Q   -- under terms of this memorandum?
13      A   My understanding was that this memorandum itself
14  was a measure of the current intention of me and the
15  current intention of Fidelio; but that if those intentions
16  changed, that that -- you know, if -- for instance, if
17  Fidelio decided that they wanted to terminate my employment
18  on a given date, they could do that. And then at that
19  point, the FPEP agreement would come into play.
20          That was my understanding of the -- on both
21  sides. See, I could have left earlier than this; and it
22  would have occurred. And they could have asked me to

Morris vs. Buvermo                                      Deposition of J. Gardner 10/26/06

178

1    leave, and it would have occurred as well. That's the way
2    the deal --
3        Q   Uh-huh.
4        A   -- was set up.
5            But this is our current intention.
6        Q   Your current intention is to remain there for
7    three years?
8        A   Yes.
9        Q   And --
10       A   And for them to ask me -- want me to retain --
11   be there for three years.
12           MR. SMITH:  When you reach a good stopping point,
13   can we just take a break?
14           MR. HADDAD:  Yeah.  Let me just finish this
15   document here.
16           MR. SMITH:  That's fine.
17           BY MR. HADDAD:
18       Q   In the last sentence of that paragraph 3, it
19   says, "Any extension beyond the end of the three-year
20   period will be subject to our mutual agreement."
21       A   Right.
22       Q   So there is a possibility that in three years,

179

1    you're going to extend your employment even further, huh?
2        A   Yeah.
3        Q   And that's something that -- is that something
4    that you would like to have happen?
5        A   No.  I'll wait three years and see, and they'll
6    wait until three years and see.  But it has to be on both
7    parties' agreement.
8            And all this is saying is that we'll talk about
9    it when we get to the end.  And you don't even need that
10   sentence, actually; but I thought for some reason it should
11   be --.
12       Q   Paragraph 6 says, "After the end" -- "year end
13   2005 I will give up my FPEP promote interests for projects
14   originated after that time, but will retain the option to
15   invest capital pro rata through FPEP for future projects."
16           Have you done that?
17       A   Yes.
18       Q   Okay.  So you haven't -- you don't have an FPEP
19   promote in any --
20       A   No.
21       Q   -- in either the Spotswood or the --
22       A   No --

180

1        Q   -- Reston --
2        A   No.
3            I have -- I've invested capital --
4        Q   You need to let me finish.
5        A   I'm sorry.
6            THE COURT REPORTER:  Please.
7            BY MR. HADDAD:
8        Q   You don't have an FPEP promote in Spotswood or
9    Reston?
10       A   That is correct.
11       Q   Okay.  Go ahead.
12       A   There are -- in that new Reston deal -- I have my
13   old FPEP promotes in the old Reston deals.  But in the new
14   Reston, which is the Reston International Center --
15       Q   Correct.
16       A   -- which is the one we're talking about --
17       Q   Uh-huh.
18       A   -- I don't have a promote in that or Spotswood.
19       Q   But you've invested -- you've made a capital
20   contribution to both these deals?
21       A   The 2 and a half percent capital contribution,
22   yes.

181

1        Q   And it's your understanding that you have to
2    invest an amount equal to 2 and a half percent or up to 2
3    and a half percent?
4        A   The agreement -- my understanding of the
5    agreement is that I can elect up to 2 and a half percent.
6    If I choose a lower amount than 2 and a half percent, then
7    that lower amount would then apply also to any additional
8    deals.
9        Q   I see.
10           So is that what "on a nonselective basis" means?
11       A   That's correct.  What it means is you can't
12   cherry-pick.  I can't say, "I like that deal, and I want to
13   invest in that; but I don't like this deal, and I don't
14   want to invest in that."
15       Q   What if you -- what if a great deal comes along,
16   say, Reston International Center.  Let's assume it's a
17   great deal; and you do, in fact, invest 2.5 percent.
18           Does that mean that for every deal from that
19   point forward you have to invest 2.5 percent?
20       A   No.  What it means is I have the option in
21   each -- in a future deal.  But if I chose in the next deal
22   to do 2, then every deal thereafter I could -- I would have

182

1  to stay at 2.
2      Q   I see.
3          So it has to be -- so the "nonselective basis"
4  means percentage-wise?
5      A   Yes.
6      Q   You can select deal to deal, whether or not --
7      A   No --
8      Q   -- to pass?
9      A   -- no.  I -- I -- let's see.
10         If I chose not to invest in a deal, I would read
11 that as zero percent, which means I could no -- no longer
12 invest further.
13     Q   I see.
14         So let's say we have a sequence of five deals.
15 The first deal you don't invest anything.  That means
16 you're forever precluded from investing.
17     A   I could go back to the partners and argue but --
18 but, you know --
19     Q   Okay.
20     A   -- it would be -- it would be on a case-by-case
21 basis.
22         But I'd have to have a good argument because they

183

1  don't like the fact -- they -- they want this as an entire
2  portfolio.  They want you to manage the entire portfolio.
3  They don't want it to be dependent on any investment.  They
4  really want me to act like them.  That's the fiduciary
5  again.  This is a -- it's to keep me acting like them.
6      Q   Okay.  But if you did invest 2.5 percent in the
7  first deal and then invested zero in the second deal, then
8  your understanding would be subject to -- absent any
9  further agreement with the partners, that you would no
10 longer have a right to invest in the third, fourth, or
11 fifth deal?
12     A   That's correct.
13     Q   Okay.  On the other hand, if you invested --
14 let's say you invested 2 percent in the first deal.  Would
15 you then be able to invest anything other than 2 percent in
16 the second deal?
17     A   Same rule would apply.
18     Q   So it would be fixed at 2 percent?
19     A   Yeah, it would -- then I would have -- you know
20 that's the nonselective nature.  I've selected this one at
21 2, and now I don't have the option to go back.  That would
22 be cherry-picking again.

184

1      Q   Okay.  And so it's either -- from that point on
2  it's either 2 percent or nothing?
3      A   Yeah.
4      Q   And if it's nothing, then it's -- you --
5      A   And that's always subject to -- I could -- and if
6  I could convince them that I wasn't cherry-picking or
7  something else was happening, I'm sure they would listen to
8  that argument.
9      Q   Okay.  And is that your understanding of what was
10 offered to Jonathan Morris as well?
11     A   Yes.
12     Q   Paragraph 7 -- and then we'll take a break -- of
13 this Exhibit 10 says, "We will terminate the agreement for
14 FPEP to share in shortfalls and profits from November
15 properties effective year end 2005.  Any amount that I am
16 due upon termination will be paid prior to March 31, 2006,
17 after actual 2005 results are available."
18         It seems to me -- correct me if I'm wrong -- that
19 this is referring to something other than your FPEP
20 promotes.  Correct?
21     A   Yes.
22         In fact, if -- if you have that sheet that has

185

1  the four signatures on the bottom --
2      Q   Okay.  That refers to that --
3      A   Right.
4      Q   -- to this proposed revisions to the FPEP promote
5  structure for future projects?
6      A   This item 3 is the item that governs -- that
7  concerns this.  So this -- this here (indicating) describes
8  what we're talking about --
9      Q   Okay.
10     A   -- in item 7.
11     Q   Okay.  But just to be clear, it didn't have
12 anything to do with the redemption of your FPEP membership
13 interest?
14     A   No, no.  This was really a separate transaction
15 that took place apart from the formal FPEP agreement.
16         MR. HADDAD:  Okay.  Let's take a break.  Five
17 minutes?
18         THE WITNESS:  Okay.
19 (Whereupon, a brief recess was taken.)
20         BY MR. HADDAD:
21     Q   Did you run the items on this memorandum by
22 Jonathan Morris?

Morris vs. Buvermo                                    Deposition of J. Gardner 10/26/06

186

1    A   I did not before I wrote the memo. I gave him
2   the memo afterwards.
3    Q   Didn't you think it would be important to get his
4   thoughts on these things before submitting the memo?
5    A   No. These were -- this was really the deal
6   between me and Fidelio.
7    Q   You hired Equinox in 2005 to conduct the
8   executive search for you --
9    A   Yes.
10   Q   -- to find your replacement as president of
11  Buvermo?
12   A   Yes.
13   Q   And why did you decide on Equinox?
14   A   I had known Marsha Pearcy for about 20 years.
15  And she had been involved, when she worked at another firm,
16  in doing several searches both when I was at Saul and also
17  early on at Fidelio. And so I'd had experience with her.
18       And I had known Tony LoPinto, but not in a search
19  capacity.
20   Q   Okay. Did you know -- other than a professional
21  relationship with Ms. Pearcy, did you have any sort of --
22  were you friends on the side, that type of thing?

187

1    A   No, no. We were --
2    Q   Okay.
3    A   -- we were -- we were business friends. I
4   would -- I would rate her as a business friend but only in
5   a business capacity.
6    Q   And what qualities were you looking for in a
7   candidate, just generally speaking?
8    A   Well, we -- what we tried to do was outline those
9   qualities in that job description. We tried to capture it
10  as best we could. I'm not sure we did it 100 percent.
11       But, you know, we were clearly looking for
12  someone who primarily understood that fiduciary role;
13  understood Fidelio and its place in the marketplace; and
14  had both the skills, the reputation, and the background,
15  particularly in the local market, to help us continue our
16  program for a long period of time.
17   Q   Uh-huh.
18       And you mentioned earlier about Buvermo was
19  interested in hiring somebody for -- sort of to take the
20  reins for some time to come?
21   A   Yes.
22   Q   Okay. So was a long-term commitment something

188

1   that you were interested in?
2    A   We did not think at all in terms of commitment.
3   We thought more in terms of intent.
4        And I think the partners -- one of the questions
5   that someone would have when they looked at Fidelio, who
6   was in the process of selling a large amount of their
7   portfolio, particularly since the market was so high, is --
8   is: Is Fidelio going to be around in the future?
9        And so we thought it was important to let people
10  know that the intent of the partners, assuming the market
11  conditions were correct, was to be around for a long time.
12       And I think in that same vein we were looking for
13  intent with someone else. Like, for instance, if Jonathan
14  had said, "Boy, you know, I want to be in Florida in two
15  years retired," then that would be important information
16  for us to know.
17       And that could have been his case. You know,
18  very likely he could said, "Look, I only want to do this
19  for two years; and then I want to retire." And then we'd
20  say, "Well, that intention" -- "we may" -- "you know, you
21  may change your mind later on." But that intention right
22  now would be important for us to know --

189

1    Q   Uh-huh.
2    A   -- just like it would be important for Jonathan
3   to know are we planning on liquidating and being out of the
4   market two years from now.
5        But those were all intentions based upon future
6   ex- -- you know, future events that would happen, not at
7   all commitments.
8    Q   Uh-huh.
9        And how long of a -- sort of how long of an
10  intention in terms of time limits were you looking for in
11  somebody --
12   A   Well, our partners wanted to invest for the long
13  term; and they defined it 10 to 20 years. And we surely
14  wanted someone who was willing to be in business that long.
15  And if they weren't, then we should know that.
16       You know, that's not to say we wouldn't have
17  hired somebody differently. But that was sort of the --
18  the nature of the intention discussions, on both sides. It
19  went on both sides.
20       But our guys, by the way, were in no intention
21  guaranteeing that they were going to be there that time.
22  They just -- that's not -- not part of discussion. And in

190

1  no way were we looking for a guarantee, either side.

2      Q  Do you recall ever having any discussions with

3  anybody about Mr. Morris's age?

4      A  I think I knew how old Mr. Morris was; but I

5  don't recall any discussions, other than knowing how old he

6  was.

7      Q  Uh-huh.

8          You don't recall any discussions -- do you recall

9  any discussions about Mr. Morris being able to work at the

10 company through the age of 65?

11     A  I don't recall that discussion, no.

12     Q  Okay.  And do you not recall any discussions with

13 anyone about Mr. Morris being able to work at the company

14 until a -- any age for that matter?

15     A  The only discussion I recall about time of

16 employment is that Jonathan said he was willing to be

17 employed for an extended period of time, and I don't recall

18 even whether there was a definition of "extended".

19     Q  And how did that come up?

20     A  I think it's in the same nature of the

21 discussion:  How long do the Fidelio partners plan on being

22 in the market area, in the local market area.  And I think

191

1  the -- the discussion would have come up at the same time.

2      Q  Didn't you -- I mean did you at any time tell

3  him, "Hey, we're looking for a guy who's, you know, willing

4  to be around for a while," something to that effect?

5      A  I don't recall one way or the other, no.

6      Q  So you guys -- well, Buvermo obviously had an

7  interest in somebody who would want to stick around for a

8  while.  But you don't recall saying anything about it?

9      A  I -- I recall having the impression that Jonathan

10 intended to work at a position like this for an extended

11 period of time if the opportunity were there and if things

12 went well.  That was my recollection of the discussions

13 with Jonathan.

14         And that seemed to be fine.  And he seemed to be

15 comfortable with the fact that we were prepared to commit

16 to be in the market a long time if circumstances were --

17 that that was our intention based upon circumstances.

18         So it sounds like he was available and we were

19 available for those periods of time.  And that really

20 seemed to be the only important issue in my mind.

21     Q  Those periods of time --

22     A  Were extended.  I don't -- you know, I don't know

192

1  how long "extended" is.  In the real estate business, you

2  know, it's -- you know, who knows how -- you know --

3      Q  You mentioned a 10- to 20-year intention --

4      A  Yeah, that our -- our guys said they were --

5  intended to be here, you know, 10 to 20 years.

6      Q  And do you recall having any discussions with

7  Ms. Pearcy about your interest in having somebody who was

8  willing to commit for an extended period of time?

9      A  I don't recall the nature of that discussion.

10         It was just sort of assumed that, you know, we

11 didn't want to have a -- hire a guy and find out he was

12 planning on getting out of the business in two or three

13 years or something like that.  That was just sort of

14 assumed.  I don't think we necessarily had to discuss it

15 that much.  I don't know.

16         Maybe we did, but I just -- I don't recall.

17     Q  What about with Mr. LoPinto; same thing?

18     A  Yeah.  I had a lot less discussions with

19 Mr. LoPinto.  Most of my dealings were with Ms. Pearcy.

20     Q  And what about discussions with Joost and Andre

21 about time frames?

22     A  I know that I had fairly extended discussions

193

1  with Joost and Andre about their willingness to

2  participate, because I felt that was important.  In any --

3  any client we talked to, that would be a natural

4  question -- is:  If you're selling a lot of your properties

5  now, which we were, how do we know you're going to be

6  around?

7          So I wanted to be sure that they were comfortable

8  representing that that was their current intention.  So I

9  had a lot of discussions along those lines.  And they did

10 assure me, as with -- as I've said earlier.  And I thought

11 that was important for each of the candidates to hear.

12         But that was the -- that was my focus more than

13 the other way.

14     Q  If you'll just pull out Exhibit No. 10 again,

15 Mr. Gardner.

16         Is it your understanding that Fidelio -- or

17 Buvermo, for that matter -- have agreed to the terms of

18 this memorandum?

19     A  Yes, I believe they have.

20     Q  Okay.  And so, therefore, they agreed to the

21 provision in paragraph 3 which states that you will

22 continue as an employee of Buvermo Properties, Inc., after

194

1    March 31, 2006, for a period of three years?

2    A    Right.

3        We have made a modification to this agreement.

4    And the modification basically agreed that I would receive

5    full-time salary until August 15th, when we hired Laurey.

6    So basically I went back to work full-time from the end of

7    March until now, when Jon- -- when -- when I was the only

8    employee there.  And everything else moved back

9    accordingly.

10        But that's the only difference in that in here.

11   Q    So -- I'm sorry.  So then the March 31 date

12   changed to August 15th?

13   A    August 15th.

14   Q    And so your agreement with Buvermo is to continue

15   your employment there for a period of three years from

16   August 15th --

17   A    Yes --

18   Q    -- 2006?

19   A    -- that's a -- that's a -- a change to this memo.

20   Q    Okay.  And I believe you testified earlier that,

21   in your opinion, that doesn't guarantee you a term of three

22   years?

195

1    A    That's correct.

2    Q    Okay.  And that's because -- well, why are you of

3    that opinion?

4    A    That's the nature of the agreement.

5        Now, you know, I would fully expect for this to

6    be honored because I fully expect the circumstances to be

7    such that I will continue to do this and they will continue

8    to as well.  But if the circumstances changed, then I think

9    we would all have to do something different.

10   Q    Likewise, if you were to -- if Mr. Morris had

11   been told that his employment would continue for a term of

12   three years, you believe that his -- that wouldn't have

13   been a guarantee of employment?

14   A    Well, it depends on what the conditions were,

15   what -- what the statement was.  I mean that's a different

16   statement.  I don't know if -- if he had the same statement

17   as I have.  This is my understanding with Joost and Andre,

18   but there are other understandings you could make.

19   Q    Well, this statement you contend -- assuming it

20   was agreed to, you contend doesn't create a guarantee of

21   employment?

22   A    That's what my understanding is.

196

1    Q    Similarly, if you had such an exchange with

2    Mr. Morris, you would consider that not to create a

3    guarantee of employment as well?

4    A    If it were under these terms, that's right.

5        Now, it could be -- a different deal could be

6    made where it was a guarantee, but that wasn't done.  And

7    that's -- that wasn't done, in my mind, in this case.

8        Now, I don't know whether Joost and Andre look at

9    it differently or not; but I know how I look at it.

10   Q    And you look at it as not being a guarantee?

11   A    That's correct, on both sides.

12        An interesting question to test it would be:

13   Suppose three months from now I decide I want to move to

14   Florida and not do anything anymore.  Then I would assume

15   that this thing would terminate, and we'd follow the

16   course.

17   Q    Well, you wouldn't be fulfilling your job duties

18   in that effect; correct?

19   A    Right.  And then we would stop, and everything

20   would quit.

21   Q    Okay.  Did Mr. Morris have a similar type of

22   arrangement as you have here, what you consider to be a

197

1    nonguarantee with --

2    A    Mr. Morris --

3    Q    -- with Buvermo?

4    A    Yeah.  My understanding of the deal with

5    Mr. Morris was in his offer letter, and I think it --

6    that -- that captures it.

7        If you want to talk about that, I would -- I

8    would prefer to have that in front of me when we talk about

9    it.

10   Q    I'm not talking about that.

11        I'm just talking about:  Was there a discussion

12   between you and Mr. Morris regarding a non- -- what you

13   considered to be a nonbinding term of employment?

14   A    No.

15   Q    Okay.

16   A    There was no agreement on -- there was no comment

17   on term.  I read the term as at-will.

18   Q    Okay.  And no discussion whatsoever regarding

19   duration, of how long you'd want him around?

20   A    No discussion at all in terms -- in those terms,

21   no.  There was an at-will -- this is the deal; this is the

22   salary; these are the other terms.  But the -- but the term

198

1   was an at-will contract, not -- without any -- any term.
2   Q   Yet you envisioned all throughout that you wanted
3   somebody to be around for a certain time period of time at
4   least?
5   A   Right.
6   Q   So I would imagine that those discussions came up
7   somehow with Mr. Morris.
8   A   But not in terms of a contract. The contract
9   was: This is the salary; this -- and we'll have no
10  contract. You can have discussions about intent. But when
11  you say, "This is what we're going to agree to," what we
12  agreed to was a (sic) at-will contract.
13  Q   And your -- fine.
14      But let's get into your discussions about intent.
15      Your discussions about intent were: We intend to
16  have somebody around for -- we intend to be around for 10
17  to 20 years, and we would like to have somebody who intends
18  to stay with us for 10 to 20 years?
19  A   But, remember, this --
20  Q   I'm just asking is that the -- is that the kind
21  of discussion --
22  A   I'm not even sure I had the discussion with

199

1   Jonathan. I just assumed that we were okay on the time
2   frame. Jonathan had given me enough assurance that he
3   wasn't planning --.
4       I mean a key question with someone like Jonathan
5   is: Are you planning on working for two years and
6   returning to Florida? And, you know, he'd been retired for
7   a long time. Was this going to happen? And he said, "No.
8   I really like" -- "I like going back to work. I like what
9   I'm doing. And if things work out well, I intend to be
10  here a long time." That's fine. That satisfied me.
11      But then from the contract standpoint, this is
12  the salary and this is at-will.
13  Q   And no mention of, you know, "I'm willing to work
14  for you guys until the age of 60"?
15  A   I -- Jonathan might have said that; and I might
16  have just said, "Okay. That's fine." We all say things
17  like that. But you know, that would clearly be dependent
18  on circumstances.
19      But I don't recall ever -- I don't recall a
20  statement like that. And if I did, I would put no stock in
21  it because that's not -- you know, people can say those
22  things. But, you know, things change. All kinds of things

200

1   change.
2   Q   Okay. So is Fidelio -- I mean was Buvermo
3   opposed to providing any guarantee of employment?
4   A   They would have been -- in this particular case,
5   we would not have agreed to a guarantee of employment;
6   that's correct.
7   Q   And "this particular case" being what?
8   A   Being in the case of Jonathan.
9   Q   Why in particular in the case of Jonathan?
10  A   Because it's -- you know, we -- we did -- we were
11  not prepared to make a guarantee of employment in the case
12  of Jonathan.
13  Q   Okay. Anybody else?
14  A   I don't -- we have not, to my knowledge, ever
15  made a guarantee of employment.
16  Q   To your knowledge, you've never made a guarantee
17  of employment to anybody?
18  A   Yeah. I think that we had a discussion; and we
19  had -- we had made an offer to a person earlier, to
20  Jim Smith. And Jim was concerned that -- that he would --
21  he was moving his family up from Atlanta. And I don't know
22  whether we had -- maybe we had said we would guarantee his

201

1   salary for two years. I don't recall that. But there was
2   concern there because of those circumstances.
3       But that was very different than Jonathan's
4   circumstances. And I don't -- I think you've got a copy of
5   his offer letter, and I'd need to refer to that to refresh
6   my memory on what our terms were with him.
7   Q   Well, how was it different than Jonathan's
8   circumstances? Wasn't Jonathan residing in Florida?
9   A   Well, when -- when I first talked to Jonathan, I
10  didn't realize he was residing in Florida because he was
11  living in a condominium on 22nd and M. So I didn't even
12  realize that he was a Florida resident until much later.
13  And --
14  Q   How much later?
15  A   I don't know. He might have told me sometime
16  after he was employed. I can't remember exactly when I
17  knew that that was his residence.
18  Q   So it would have been after you asked him,
19  "You're not going to retire down to Florida in two years?"
20  A   I -- yeah, I think that's right. I think he
21  said, "Look, I've got" -- I knew he had a place in Florida;
22  I knew he spent a lot of time in Florida. But I also knew

202

1  he had a place here.

2        And one of the things I asked him is, "Jonathan,

3  what's your intent about Florida versus here?" And he

4  says, "No. I intend to live here. This is going to be my

5  primary residence. I" -- "in fact, I'm looking to buy a

6  bigger place. I really like it here and all" -- because we

7  didn't want someone who was, you know, commuting from

8  Florida. That would -- that would not have worked for us.

9     Q    So --

10        MR. SMITH: I'm going to object to your question

11  right before his answer. I didn't get a chance to jump in.

12  Object to form.

13        MR. HADDAD: What's the basis for your objection

14  on that one?

15        MR. SMITH: Because I think you made some

16  statements that were purportedly based on fact that aren't

17  in the record. I think you said something about Jonathan's

18  retiring to Florida in two years. I don't think that was

19  the testimony, so I'm just going to object on that basis.

20        MR. HADDAD: Okay.

21        BY MR. HADDAD:

22     Q    And so -- I'm sorry. Was it your testimony that

203

1  you did, in fact, make a guarantee of --

2     A    I -- we --

3        MR. SMITH: Hold on. Let him finish his

4  question.

5        THE COURT REPORTER: Please.

6        BY MR. HADDAD:

7     Q    Was it your testimony that you did, in fact,

8  offer a guaranteed term or at least a guaranteed salary

9  term to Mr. Smith?

10     A    We offered to Mr. Smith what was outlined,

11  that -- maybe it was not an offer letter. But there was a

12  memo that I think I'd written to his -- John (sic). And

13  whatever the terms are is what we offered him.

14        I'd have to refresh my memory. I think you have

15  a copy of it, if you want to --

16     Q    I do.

17        MR. HADDAD: Exhibit 11, please.

18        (The e-mail dated 4/15/06 was marked Plaintiff's

19        Exhibit No. 11 for identification.)

20        BY MR. HADDAD:

21     Q    You've been handed what's been marked as

22  Exhibit 11 to your deposition. This is an e-mail from you

204

1  to Ms. Pearcy with the -- with an attachment titled

2  "Jim Smith Offer". Do you see that?

3     (The witness reviewed document.)

4     A    Yes.

5     Q    And you write to her that, "Attached is an

6  outline of the offer which Joost, Jim Smith, and I

7  discussed. This is subject to confirmation with Andre."

8        And attached to that is the terms -- is a

9  document titled "Terms of Offer, Jim Smith"?

10     A    Yes.

11     Q    Okay. And is this what you recall generally

12  being offered to --

13     A    Yes.

14     Q    -- Mr. Smith?

15     A    Yeah. Item -- item 6 is what I'm -- I was

16  referring to.

17     Q    Item 6 is the employment guarantee?

18     A    Yeah.

19        And I had -- this is my recollection of the

20  discussions we had with Jim. And this was done primarily

21  because Jim had an existing job, he was moving his family

22  from Wash- -- from Atlanta to Washington, and he didn't

205

1  want to relocate without some assurance that he could be

2  here for a while.

3        Plus he was talking to other people in the

4  marketplace, and -- and so we felt this was appropriate.

5  And -- and Mr. Smith had a -- we thought he was a very

6  excellent candidate and someone we really wanted to hire.

7  Unfortunately, he had accepted a job offer somewhere else.

8        But these circumstances were a lot different than

9  with Jonathan because he -- he had a family he was moving,

10  he was moving them from Atlanta, he had to buy a house, all

11  of those things. Whereas, Jonathan was living here; he

12  was -- wasn't -- wasn't having to give up a job; and it

13  didn't -- you know, so he didn't really need them back.

14        And these were things that Smith felt was

15  important, which we agreed to, which Jonathan didn't --

16  didn't request.

17     Q    Uh-huh.

18        So Mr. Smith turned down your offer?

19     A    Yes.

20     Q    And your formal offer did include an employment

21  guarantee?

22     A    We never made a formal offer because he -- we

206

1 never got to that point.

2     Q   I see.

3     A   But it -- but we would have -- had he have

4 accepted our terms, then we would have -- have agreed to

5 this.

6     Q   He dropped out of the race before it got to that

7 point?

8     A   Yes.

9     Q   Okay. Is he the individual who you sent to

10 Holland?

11     A   Yes. --

12     Q   Okay.

13     A   -- we took him to Holland.

14     Q   Did you send any other individuals to Holland for

15 an interview?

16     A   I don't think so.

17     Q   Did you have a preference for somebody that you

18 wanted to hire?

19     A   Well, I had a preference for each person that we

20 made an offer to, yes. I mean I had a preference for Smith

21 and ultimately had a preference for -- for Jonathan.

22     Q   Was Mr. Bonacci ever considered for that

207

1 position?

2     A   Mr. Bonacci left the company about two years -- a

3 year, two years previously. There was -- for a long time

4 the question was: Could he play this role? And I think

5 that the Fidelio partners did not feel confident that he

6 could.

7     Q   Uh-huh.

8     A   And I was -- told Mr. Bonacci that I would be

9 happy to work with him along that line, but he had to

10 understand that. And then he had an opportunity to go to

11 one of our developer clients.

12     Q   JBG?

13     A   JBG.

14     And Steve and I talked a lot at length as to

15 which of those fit better. And I told Mr. Bonacci that,

16 you know, it could well be he could stay with us; but he'd

17 have to understand that was the partners' frame of mind and

18 he'd have to consider that in looking at this other option.

19     Ultimately I think he made the right choice --

20     Q   Uh-huh.

21     A   -- to go to JBG, and I supported him in that as

22 well.

208

1     Q   But you would have liked to have seen him --

2     A   Well, I don't know. I had some of the same --

3     Q   Sir, you have to let me finish my question.

4     A   I -- yeah.

5     Q   And I'm sorry to cut you off.

6     A   No, no. I -- I --

7     Q   You would have liked to have seen him succeed you

8 as the president of the company; isn't that right?

9     A   Not necessarily. No. I think that some of the

10 concerns that the Fidelio partners had were concerns that I

11 shared. And I think that I was pleased for both Fidelio

12 and for Mr. Bonacci. And I -- and for JBG I think that was

13 a very good fit; so I was very pleased with the outcome of

14 that.

15     Q   Okay. Your interviews -- how many interviews did

16 you have with Mr. Morris?

17     A   Whew. Five or six. I don't remember.

18     Q   Okay. Where did they occur?

19     A   All -- almost all either in -- in the D.C. area,

20 either at -- a lot of times at the -- at the hotel where

21 his residence is, the --

22     Q   The Ritz-Carlton?

209

1     A   -- the Ritz-Carlton.

2     Q   Okay. Aside from the Ritz-Carlton, where else do

3 you recall meeting with him?

4     A   I saw him at the -- we had rented an apartment,

5 my wife and I, temporarily on -- at 2401 Penn.

6     Q   In the District?

7     A   In the District.

8     Q   Okay.

9     A   And then at our office, the -- 1901 North Moore.

10     Q   You had an interview with him at your office?

11     A   I believe so.

12     Q   Okay.

13     A   I'm sure that -- I think I did. I don't recall

14 specifically.

15     Q   You're not certain?

16     A   No.

17     Q   Okay. Did you retain any of your notes from your

18 interviews with him?

19     A   No.

20     Q   Okay. Did you take any notes --

21     A   No.

22     Q   -- in your interviews with him?

210

1    We've talked a little bit before about what
2    Mr. Morris was told in connection with his compensation.
3    I assume that you had discussions during these
4    interviews regarding what his compensation would be?
5    A   Yes.
6    Q   Okay. And the compensation structure?
7    A   Yes.
8    Q   And that he would be not only paid a base salary,
9    but paid -- he would be entitled to promoted interests in
10   various deals?
11   A   Yes.
12   Q   Okay. Tell me as best as you can recall what
13   your discussions were with him about that.
14   A   Well, I think -- I don't recall a lot of the
15   preliminary discussions. And the -- the deal that we
16   agreed to is captured in his offer letter; and I think
17   reviewing that would be the best way for me to tell you,
18   you know --
19   Q   Okay.
20   A   -- about that.
21   But I don't recall a lot of discussions other,
22   than what ended up there. You know, I don't think there

211

1    was anything that -- that was materially different along
2    the way. There might have been, but I don't recall it.
3    Q   Okay. Do you recall having any discussions with
4    him about what the promote percentage was that he'd be
5    entitled to?
6    A   Whew. I think I might have. And I think that
7    generally what I said is what's written in the offer
8    letter, that he would have the same promote that I was
9    entitled to.
10   Q   Okay. And at that time what was your
11   understanding as to what promote percentage you were
12   entitled to?
13   A   I think at that time I was entitled to 13
14   percent.
15   Q   Okay. And why do you think that?
16   A   Because that's what it is.
17   Q   Do you recall ever mentioning to -- do you recall
18   ever telling Mr. Morris that your promote percentage was
19   actually 15.5 percent?
20   A   No.
21   Q   Okay. And you handed me a document today -- or
22   your attorney handed me a document today indicating that

212

1    the FPEP sharing ratio shall remain at 15.5 percent.
2    A   Yes.
3    Q   Okay. And so that's what -- the percentage that
4    would be paid to -- of what's remaining after the equity
5    investors such as Fidelio was paid --
6    A   Right.
7    Q   -- its capital investment plus gets its IRR.
8    FPEP would get 15.5 percent of what's remaining?
9    A   That's what that document says.
10   Q   Okay. And this was as of February 6th of 2002?
11   A   Yes.
12   Could I see the document?
13   Q   Sure. Let me make a copy.
14   (Whereupon, a brief recess was taken.)
15   MR. HADDAD: Can we mark this as Exhibit 12.
16   (The FPEP promote structure revision document was
17   marked Plaintiff's Exhibit No. 12 for
18   identification.)
19   BY MR. HADDAD:
20   Q   This is a document that was provided to me today.
21   It's titled, "Proposed Revision to FPEP Promote Structure
22   for Future Projects."

213

1    And I'm particularly interested in paragraph 4,
2    which identifies the FPEP sharing ratio shall remain at
3    15.5 percent.
4    (The witness reviewed document.)
5    A   Yes.
6    Q   Okay.
7    A   And that's the total that the Fidelio partners
8    have agreed that's available for compensation.
9    Q   Uh-huh.
10   A   At the time it was done -- when it started off, I
11   had 13 of the 15 and a half and Steve Bonacci had 2 and a
12   half of the 15 and a half. And so there's where 13 and 2
13   and a half come from.
14   Q   Uh-huh.
15   A   And what happened was that when Mr. Bonacci left,
16   the Fidelio partners bought out his 2 and a half percent.
17   But what they did is, since they paid him for that benefit,
18   they continue to take advantage of that benefit. That
19   belongs to Fidelio. They paid money and they kept that.
20   So -- and the concept has been that that's really
21   the most that -- that the most I would be entitled to would
22   have been 13, and someone else or Fidelio was entitled to

Case 1:06-cv-01131-HHK    Document 32-6    Filed 02/07/2007    Page 55 of 100

Morris vs. Buvermo                                    Deposition of J. Gardner 10/26/06

214

1  the rest.

2      Now, what we had at this time is we were

3  agreeing -- this was when we were moving Mr. Bonacci more

4  and more into the responsible role. So we were phasing --

5  cutting my percentage back and his up. And that's why the

6  75, 25, and the 66. So he went from -- I went from 13 -- I

7  went from -- from 83 or something percent of the 15 and a

8  half to 75 and down to the 66.

9      And then when Mr. Bonacci left, we agreed that I

10 would go back up to 13, with Fidelio retaining that extra

11 either because they needed it for other employees if

12 someone else came in, in the future or they would just not

13 grant that. So this was -- this sharing ratio was there at

14 the time there were two of us, with me getting only 13.

15     And Fidelio's thought was that: That what's you

16 need for me. They wanted room for someone else. They

17 didn't want to go above 15 and a half in any case --

18 Q  Uh-huh.

19 A  -- and no more than 13 for me.

20     So that's why -- if you look at the documents,

21 you'll see my ratio goes from 13 all the way down to lower

22 amounts to take in account these numbers. And then it

215

1  comes back up. That's why it doesn't go above 13.

2  Q  Uh-huh.

3  A  And, in fact, for Mr. Millspaugh, they felt that

4  12 was more appropriate than 13. And that's why his

5  number's 12.

6      And then Fidelio, in effect, retains -- they --

7  they just have not -- what -- if there was -- if he and I

8  were members of FPEP together, then the FPEP percentage

9  would not be 15 and a half. It would be 12, and it would

10 be split 12 and zero.

11 Q  Uh-huh.

12 A  So does that --?

13 Q  And so as it currently stands, Mr. Millspaugh has

14 12 percent and --

15 A  There is no other.

16 Q  There is no other?

17 A  There is no other.

18 Q  Not even Fidelio, not even FPIP -- FPMI or --

19 A  The thing that we haven't agreed to with Fidelio

20 yet is whether Fidelio keeps that phantom piece, because my

21 capital position is -- is subject not only to the 12

22 but also -- my -- my capital position is subject to the

216

1  whole 15 and a half.

2      And so we haven't decided yet whether they will

3  give me the benefit of that as well or they will keep the

4  entire benefit. I'll have to pay 15 and a half against 15

5  and a half, but they'll keep the difference between 12 and

6  13. We have to negotiate that yet.

7  Q  Okay. All right. You've just told me a lot

8  about, you know, what's been -- what was purchased from

9  Bonacci and what the structure is now with Mr. --

10 A  Right --

11 Q  -- Millspaugh --

12 A  -- the intent.

13 Q  -- having 12 percent.

14     Where -- is that documented anywhere?

15 A  Well, the -- what's documented with

16 Mr. Millspaugh is the 12 percent, which is in his offer

17 letter, which I think you also have a copy of.

18 Q  Okay.

19 A  The documentation of other items are here

20 (indicating). And the -- it was never documented, but the

21 intention would have been that Mr. Morris would have

22 stepped into my 13-percent position.

217

1  Q  That was your intention? That was what you

2  represented to him --

3  A  That's right. That's when -- when the language

4  in -- if we have his offer letter, I can show you.

5  Q  I'm --

6  A  But the intent of taking over Mr. Gardner's

7  position was the 13 percent.

8  Q  Okay.

9  A  And I believe I explained that to Mr. Morris. I

10 showed him about Mr. Bonacci and explained all of that, the

11 13 and 15 and a half.

12 Q  According to this document, Exhibit 11, when

13 we -- in 2004 you were entitled to 66 and two-thirds of the

14 15 and a half percent?

15 A  Right; I don't -- I don't know if we ever got to

16 that step because Mr. Bonacci left about that time.

17 Q  Okay. Fine.

18     Do we have anything after this which says again

19 that your interest has now changed to 13 percent?

20 A  What we need to do is go back and check the --

21 the place it would be would be in the -- the -- you know,

22 the specific property designations.

218

1    And whether we put it there specifically or not
2 or whether there is another note somewhere else in one of
3 our agreements, I'd have to go back and see.
4    But what we do is each time we do a financial
5 projection, we put those numbers in. And we're -- we go
6 over those with our partners, so they're well aware of the
7 percentages.
8    Q   Do you have any idea how Mr. Morris came up with
9 the notion that he was being offered a 15-point -- that
10 your promote was worth the entire 15.5 percent that was --
11    A   The -- the only place that I believe that
12 Mr. Morris might have gotten that idea is when we did
13 financial projections for Spotswood, we put in 15 and a
14 half percent there.
15    And we did it in error. You know, we just put --
16 I wasn't focusing on it very much. I wasn't thinking about
17 it a lot because we were really running the test to see if
18 the deal worked. But it was a mistake. You know, we just
19 put it in the wrong place. And that's my -- my guess as to
20 where he got that.
21    But that had never been what -- in order for it
22 to be effective, it, first off, has to follow the offer

219

1 letter; and I'd never had 15 and a half percent. And then
2 it would have to be agreed to by Fidelio and in the
3 property agreement. So that really was a mistake. And
4 he -- he saw that, and I didn't point it out. And that's
5 my error for not -- not doing that.
6    But I really didn't think it had any relevance
7 because it wasn't -- you know, it was not consistent with
8 the offer letter, which is what would have governed.
9    And I don't know. He may have gotten it
10 somewhere else. But that would be my -- my guess as to
11 where it came from.
12    And it was really an error, and it wasn't
13 consistent with either the deal that we had agreed to or
14 any agreements we'd all had, and really inconsistent with
15 the overall, you know, philosophy of the way we do things.
16    Q   So your recollection, then, is that -- you have a
17 specific recollection of telling him that, "Your promote
18 interest is 13 percent"?
19    A   I -- I don't specifically recall 13, but I
20 specifically recall saying, "It's equal to my interest."
21 And -- and he knew what my interest was. I mean, you know,
22 he should have known what my interest is. Every time we do

220

1 a projection, my interest is --
2    Q   I'm talking about before his employment.
3    A   Oh, before his employment.
4    I think I did say 13. I think what I did is I
5 went through and I said, "The maximum amount is 15 and a
6 half; and I've gotten 13; and there's 2 and a half that
7 Mr. Bonacci had had previously, which Fidelio had owned."
8    And, in fact, when we talked about him entering
9 into the 2 and a half percent on the existing deals, that
10 was picking up Mr. Bonacci's piece that Fidelio owned.
11    So I believe I went through that whole logic with
12 him; the 15 and a half, the 13, the 2 and a half.
13    MR. HADDAD: Let's mark this as Exhibit 13,
14 please.
15    (The letter dated 5/24/04 was marked Plaintiff's
16    Exhibit No. 13 for identification.)
17    BY MR. HADDAD:
18    Q   You've been handed what's been marked as
19 Exhibit 13 to your deposition. Do you recognize this --
20    (The witness reviewed document.)
21    A   Yes.
22    Q   -- letter?

221

1    And this is a letter that you authored; is that
2 correct?
3    A   Yes.
4    Q   And it memorializes a purchase by FP Investments,
5 Inc., of Mr. Bonacci's entire partnership interest.
6    A   Yes.
7    Q   What partnership interest?
8    A   This is his FP Executive Partners interest.
9    Q   Okay. Really what you meant to say was
10 membership interest?
11    A   That's what we meant to say, yes.
12    Q   Okay. So it's FPI, or FP Investments, that
13 acquired his interests?
14    A   Yes.
15    That's in accordance with the agreement.
16    Q   All right.
17    A   The money comes from Fidelio, but this is the
18 purchasing entity.
19    Q   All right. And was the -- I'm almost certain I
20 know the answer to this question, but let me just put it
21 this way: The operating agreement was never amended to
22 reflect this change?

222

1    A    You mean the removal of Mr. Bonacci?
2    Q    Well, both the removal of Mr. Bonacci and the
3    elimination of his membership interest with a corresponding
4    increase in the membership interest of FP Investments.
5    A    That's right. The document itself has not
6    changed; but in the corporate records, you know, there was
7    the -- all of the desig- -- the -- the property
8    designations --
9    Q    FPEP designations?
10   A    Right.
11        I -- I think what we did is we just treated
12   it that -- that Mr. Bonacci's interest then went to
13   Fidelio, but we did not change the document.
14   Q    Okay. You keep saying "Fidelio". How did
15   Fidelio acquire what was purchased by FP Investments?
16   A    FP Investments is owned by Fidelio.
17   Q    Okay. So was there an assignment by FP
18   Investments to Fidelio thereafter?
19   A    I don't know technically whether we treated that
20   it goes from Fidel- -- FP Investments and then in turn to
21   Fidelio or not. I just don't know how we do that.
22   Q    Okay. From a legal standpoint that interest

223

1    today may be held by --
2    A    It may --
3    Q    -- FPEP --
4    A    -- be well be. But the beneficiary, that's
5    Fidelio because it owns FP Investments.
6    Q    The ultimate beneficiary, of course --
7    A    Right.
8    Q    -- because it's the sole shareholder?
9    A    Yes. I believe that's right.
10       But in any -- in any case, it flows back to
11   Fidelio.
12   Q    I'm not entirely sure that that's a shareholder
13   of FP Investments, but I don't recall --
14   A    I don't recall either.
15   Q    Whoever the shareholders are?
16   A    Well, it -- it either goes -- yes, it goes to
17   shareholders.
18   Q    And it's one big family, anyway. The
19   shareholders in FP Investments are probably --
20   (Proceedings participants speaking at the same time.)
21   A    Are the same --
22       THE COURT REPORTER: Wait. Let him --

224

1    A    -- shareholders as Fidelio.
2        THE WITNESS: I'm doing it again. Sorry.
3        THE COURT REPORTER: And I can't get the end of
4    the questions.
5        BY MR. HADDAD:
6    Q    Okay. So there's been no amendment to the
7    operating agreement. The only place where this change may
8    be reflected is in the FPEP designations?
9    A    And it may even not for these properties be
10   reflected there, but it's reflected in the books of
11   Fidelio.
12   Q    Okay. Tell me about the books.
13   A    The finance -- in the financial records it's --
14   there is no Mr. Bonacci, there is no -- I think the promote
15   goes to -- I think any -- you know, we -- I don't know how
16   we treat it, you know, from a -- whether we keep it
17   separate, FP Investments, or not. I don't know that.
18   Q    When you say "books of" -- you said "books of
19   Fidelio"?
20   A    The financial statements.
21   Q    So it's sort of a computerized database where
22   this is kept track --

225

1    A    Yes.
2    Q    Okay. What do you recall, other than what's
3    contained in his offer letter?
4        I'll introduce that. Let's mark that as an
5    exhibit.
6        (The Morris offer letter was marked Plaintiff's
7        Exhibit No. 14 for identification.)
8        MR. HADDAD:
9    Q    You've been handed what's been marked as Exhibit
10   14 to your deposition, Mr. Gardner. This is
11   Jonathan Morris's -- this is a letter from you to
12   Jonathan Morris dated June 3, 2005, and signed by you
13   and Mr. Morris on the back.
14   (The witness reviewed document.)
15   A    Yes.
16   Q    And this is what we've termed the compensation
17   plan and you've termed the offer letter --
18   A    Yes.
19   Q    -- is that correct?
20       We'll just refer to it as the offer letter from
21   this point forward, at least in connection with this
22   deposition.

226

1    In the past when you've referred to, you know,
2  what's contained in Mr. Morris's offer letter, this is what
3  you're referring to?
4    A    This is what I was referring to.
5    Q    Okay.  And this is what you believe sets forth
6  the terms of Mr. Morris's employment with Buvermo --
7    A    Yes.
8    Q    -- and his compensation terms as well?
9    A    Yes.
10    Q    Okay.  And do you recall when you provided this
11  to Mr. Morris?
12    A    I think it was right around the date of the -- of
13  the letter.
14    Q    Okay.  Does e-mailing it to him on the morning of
15  June 3rd, 2005, sound right to you?
16    A    If this is what was -- what he got it, then that
17  would be right, yes.
18    Q    Okay.  And you then met that day with him to
19  discuss this?
20    A    I believe we did.  And then I believe we signed
21  it.
22    Q    Okay.  And where was that meeting?

227

1    A    I don't recall.  I think it could well have been
2  in my apartment in the District.  I don't know where it
3  was.
4    Q    It could have been in your apartment in the
5  District?
6    A    It could have been there.  It could have been in
7  our office.  I don't really recall.  Or it could have been
8  in -- in Jonathan's -- in the hotel where Jonathan's
9  residence is.
10    Q    Okay.  Did he sign it in your presence?
11    A    I believe he did.  I don't remember.
12    Q    Okay.  Did you sign it in his presence?
13    A    My recollection is we both signed it together,
14  but I don't know.  You know, I can't say for sure.
15    Q    And you have no recollection of where you were
16  when you signed it?
17    A    No.
18    Q    The offer letter states that he would be entitled
19  to "an FPEP promote currently available to you for all
20  projects initiated after December 31, 2005, and for all
21  projects initiated by you," being Mr. Morris, "prior to
22  that time, except that the preferred return to Fidelio and

228

1  other capital providers will be reduced from 12 percent to
2  10 percent to reflect current market conditions,"
3  et cetera.
4    It doesn't tell me what that FPEP promote is, but
5  I believe we've just discussed you felt it was 13 percent.
6  Correct?
7    A    That's right.
8    Q    And nor does it tell me sort of how that -- how
9  that comes about.
10    A    You mean how the promote works?
11    Q    Well, I would like to know from you what
12  discussions you had with Jonathan Morris, explaining how
13  the promote works --
14    A    Okay.
15    Q    -- prior to his execution of this agreement.
16    A    Okay.  I can do that.
17    What I did -- and typically, you know, we would
18  go through a typical deal; and -- and I would describe it
19  for Jonathan that -- you know, what we would do.
20    And many times -- you know, we actually have a
21  computer program that -- that does this that is -- what we
22  do is in order to explain it, we take a property and we

229

1  project out both -- there are -- there are two levels of
2  the profit, and you project out how the property will
3  perform.
4    And then typically in our ventures with a
5  development partner, the development partner removes a --
6  he has a certain promote level.
7    And what -- what happens is we make an investment
8  in the property, and that investment accrues at a preferred
9  rate.  And we have a schedule.  So if it's a 10-percent
10  preferred rate and we've made a million-dollar investment,
11  then the sum of the initial investment and the preferred
12  would that next year be 110 if we'd received no cash flows.
13  The next year, it would be 121, because we're compounding
14  110 at 10 percent, all the way out until we receive cash.
15    Q    Uh-huh.
16    A    And then any cash we receive would tend to offset
17  that preferred balance.  And you continue to receive cash
18  until that return of capital and any cumulative preferred
19  has gone to zero.
20    And then any amount in excess of that would be
21  the amount available subject to the preferred.  And if
22  there was a 13-percent share of that, then you take 13

Case 1:06-cv-01131-HHK    Document 32-6    Filed 02/07/2007    Page 59 of 100

Morris vs. Buvermo                        Deposition of J. Gardner 10/26/06

230

1 percent of that number; and that would be the preferred
2 that that party would be entitled to.
3        And generally I would explain it just in those
4 terms. And typically I would say if there's a 15 and a
5 half percent that had gone totally to Fidelio, 13 and a
6 half -- 13 percent would go to me and 2 and a half would go
7 to this entity that bought out Mr. Bonacci's interest.
8 That's generally the way we would -- we would keep score on
9 those. And that would represent the preferred interest.
10       And that's basically the way -- typically I would
11 do it with an actual, you know, pro forma in hand, but
12 explain it in those terms.
13    Q   And at what point did you advise Mr. Morris that
14 he would not be entitled to his promote in the event he was
15 terminated before a deal was closed?
16    A   Generally when I describe the Fidelio agreement,
17 I go through both how it works in a base case, you know,
18 how those preferreds work and all of those. And then I
19 talk particularly -- since -- since it really -- it
20 really -- this is what I would call the fiduciary part of
21 the deal. I would go through -- and, in fact, it's -- it's
22 an advantage in many cases, and I'll explain that in a

231

1 minute.
2        But I typically go through the fact that two
3 things happen. One is not only do you calculate each
4 property, but there is also an offset provision. So in the
5 event a property that we'd owned never made that hurdle
6 rate and there was a shortfall, then that shortfall is
7 offset by the profit from the next deal. So it's really a
8 cumulative thing. And I explain that because that's an
9 important part of the feature.
10       And then, lastly, I explain the -- the put-call
11 provisions; that there is -- if a -- if a party leaves,
12 then within a certain time after their leaving, either the
13 general partner can require a purchase of the entire
14 interest or a departing partner can require to be bought
15 out.
16       And the price that they're bought out at is the
17 market value of that property as if sold at that current
18 state at that time and then that value run through all of
19 the -- what we call waterfalls, all of the calculations of
20 the promote. And whatever promote you'd be entitled to at
21 the end, that would be what you get. And you would add up
22 those and net them against any losses, and that's how you

232

1 -- how you would -- would be settled up.
2        And that -- that's a strength in many ways
3 because what it does is it gives a party such as myself the
4 ability to liquify an unliquid investment because Fidelio
5 is guaranteed to buy and I'm guaranteed to be -- so in a
6 sense, that's an advantage. In a sense it's a disadvantage
7 because Fidelio has on it the other side.
8        And I thought I was fair on both parties. It's
9 really a fair clause on both parties' side (sic) because
10 both parties get the option to exercise this.
11       And generally that's the way I explain the FPEP
12 agreement to people when I talk to them.
13    Q   Uh-huh. And --
14    A   So I tell them both the offsetting provisions and
15 also the put-call provisions.
16    Q   Okay. And when exactly do you recall telling
17 Jonathan Morris about that?
18    A   -- you know, I can't recall a specific
19 conversation; but that's generally a conversation early on
20 when I have a discussion with people.
21    Q   I'm hearing that that's generally a conversation.
22 But it sounds to me you don't recall having that specific

233

1 conversation with Jonathan Morris.
2    A   I'm sure I did somewhere along the way. And
3 generally I have it -- whenever I explain -- you asked me
4 about when do I -- when did I explain the first -- how
5 it -- the FPEP works. Then generally I give those two
6 other clauses as well.
7    Q   But you don't have a specific recollection of
8 doing so with Mr. Morris, do you?
9    A   I -- I don't.
10   Q   Ultimately you obviously made the decision to
11 hire Mr. Morris, or the decision to hire Mr. Morris was
12 made.
13       Were you in favor of that decision?
14   A   Yes.
15   Q   Okay. Did you have any reservations about hiring
16 Mr. Morris at that time?
17   A   Could I come back to a point before -- before we
18 go on, a point -- are you going to come back to this later,
19 or are you --
20       MR. SMITH: Why don't you just go ahead, John, if
21 you need to clarify your testimony.
22       BY MR. HADDAD:

Case 1:06-cv-01131-HHK   Document 32-6   Filed 02/07/2007   Page 60 of 100

Morris vs. Buvermo          Deposition of J. Gardner 10/26/06

234

1   Q  Go ahead.

2   A  Okay. One of the things that I notice here and I

3  should have -- I should have pointed out, I think that I

4  had mentioned to you earlier that -- or I think you'd asked

5  me and I agreed that Mr. Morris would have been entitled to

6  the promoted interest for Spotswood and for the Reston

7  International Center. I think I did that.

8      But I think that was in error. What -- what the

9  deal is, is what's outlined in the future projects portion

10  here. And it's just any future projects that have been

11  initiated.

12      But the way the -- the Fidelio -- the practice

13  is, is that we don't -- you know, the property has to be

14  identified as an FPEP property; and we don't make that

15  identification until the property has actually closed.

16      So we really had not designated those properties

17  at FPEP properties at the time Jonathan left. So, you

18  know, our -- you know, we had not agreed that he would be

19  entitled to those two as FPEP properties by the time he

20  left because those had not been designated as FPEP

21  properties.

22   Q  So you have a specific recollection of telling

235

1  Jonathan that he could be denied his promoted interest if

2  the -- if Fidelio decided not to designate those properties

3  or property -- these future projects as FPEP?

4   A  Right. It's -- it's the full discretion,

5  unlimited discretion on the part of the Fidelio -- and

6  that's part of the FPEP agreement -- that they have the

7  full right to designate what is and what is not.

8   Q  And do you recall showing Mr. Morris the FPEP

9  agreement prior to his employment?

10   A  I don't recall showing him that.

11      MR. SMITH: Asked and answered.

12      BY MR. HADDAD: I think I might have -- did I say

13  "FPEP agreement"?

14      THE COURT REPORTER: Yes.

15      BY MR. HADDAD:

16   Q  I meant the Fidelio partnership agreement.

17   A  I don't recall showing him that agreement prior

18  to his employment.

19   Q  Uh-huh.

20      And --

21   A  But I would --

22   Q  Go ahead.

236

1   A  -- like to add the role you -- whenever I talk to

2  people about Fidelio and Buvermo and I go through the --

3  the fiduciary role, because I feel it's so important, part

4  of that role as a fiduciary is that you really have to give

5  up any rights -- you have to subject your rights to the

6  client.

7      And so it's part and parcel of that, that Fidelio

8  has to make those calls without any objection on your part.

9  That's written in the FPEP agreement. But that's at the

10  heart of the whole Fidelio -- the fiduciary relationship.

11   Q  Okay.

12   A  Sorry. And I've tried to explain that -- at that

13  time I tried to explain that "fiduciary" means that if

14  there's a choice, you -- you really have to give them the

15  full right to say -- you don't have a say to argue against.

16   Q  I'm a bit confused because in the past you've

17  suggested to me that you have difficulty recollecting what

18  was said between you and Mr. Morris regarding these

19  conversations, other than what's in his employment letter.

20      And I believe that virtually every time I've

21  asked you whether you have a specific recollection about

22  discussions concerning the compensation and his FPEP

237

1  promote, that you don't have a specific recollection; but

2  you believe you generally --

3   A  I know what I normally do when I talk to people,

4  and I know what's important, and I generally emphasize the

5  same important things. That's true.

6   Q  Okay. But you can't be certain, sitting here

7  today, that you did, in fact, do that with Mr. Morris?

8      MR. SMITH: Object to form. And I'm objecting to

9  the statement you just put into the record. It's

10  inaccurate.

11   A  In general for me to recall a specific

12  discussion, unless it was an unusual discussion, you know,

13  if it's a year earlier or something --

14      BY MR. HADDAD:

15   Q  Uh-huh.

16   A  -- no, I don't.

17   Q  Okay.

18   A  But I surely know the -- the messages I give

19  people and -- and what I try to say consistently, yes.

20   Q  Uh-huh.

21      How many times have you interviewed people for

22  the position of president of Buvermo?

238

1    A   Ten.

2    Q   Ten times over the course of twenty years?

3    A   No, over the course of this past year.

4    Q   Okay. I hear what you're saying. You're saying

5    that it's your general practice to make those types of

6    disclosures. Is that what you're saying?

7    A   Yes.

8    Q   Okay. But don't have a specific recollection of

9    making those disclosures to Mr. Morris?

10   A   That's correct.

11   Q   Okay.

12       MR. SMITH: I'm going to object to the form of

13   that question.

14       BY MR. HADDAD:

15   Q   The FPEP designation, you previously stated that

16   Fidelio fully intends to designate the Spotswood Valley

17   deal and the Reston International deal as an FPEP property;

18   correct?

19   A   That's -- that's their intention that they

20   stated. But they still -- it's not done. And until it's

21   done, they -- they have the right to not do it.

22   Q   I thought you indicated earlier that -- I thought

239

1    you indicated earlier that it might be done; you just don't

2    know?

3    A   That that -- well, if the designations had -- I

4    know that the closing had not occurred until after

5    Mr. Morris had been terminated --

6    Q   Uh-huh.

7    A   -- and I know the designation would not have been

8    done prior to the closing; so I know it had not been done

9    from the time of Mr. Morris's termination till the closing.

10       They have subsequently been closed. And what I'm

11   not sure about is what's the state of the designation

12   between the closing and now.

13   Q   Okay. But it's your understanding -- okay? --

14   that Fidelio intends to designate these properties as FPEP

15   properties; correct?

16   A   Yes.

17   Q   Because, in fact, you offered Mr. Millspaugh --

18   or the defendant or Buvermo, whomever, offered

19   Mr. Millspaugh a promote in those?

20   A   Right.

21       But then they -- they had been closed by the

22   time.

240

1    Q   I understand about closing.

2        But you wouldn't offer him a promote in those

3    deals if you didn't intend to identify them as an FPEP

4    property; correct?

5    A   Right.

6        But we could have done that after they closed.

7    But we would not have designated before.

8    Q   I appreciate what you're saying, but I'm not

9    asking you that.

10       I'm just concerned about your statement about it

11   being designated as an FPEP property. I just want to make

12   sure that there's no issue out there that these

13   properties -- that the intention is for these properties to

14   be designated as an FPEP property.

15   A   No, there's -- the intent of Fidelio is to

16   designate those two properties as FPEP properties.

17   Q   Okay.

18   A   That's different than saying that they'd agree to

19   designate as a -- and as Mr. Morris having entitlement to

20   them.

21       That is -- you know, that had not -- you know,

22   after he left, that was no longer an issue. The intention

241

1    was before he left to do that. But after he left, that

2    was --.

3    Q   You do not recall, do you, ever saying to

4    Mr. Morris that if he was terminated -- okay? -- prior to a

5    property being designated as an FPEP property, he would not

6    be entitled to the promote?

7    A   I don't even think that was an issue. I surely

8    don't recall saying that, "If you were terminated, that you

9    would have been allowed to be designated afterwards." That

10   would have been completely inconsistent with the deal.

11   Q   Under the future projects provision, it states

12   that he would be entitled to "the promote currently

13   available to you for all projects initiated after December

14   31, 2005".

15       Do you see that?

16   A   Yes.

17   Q   Do you see any mention of the projects needing to

18   be closed during his employment there?

19   A   Yeah. Well, the practice is --

20   Q   Sir --

21   A   -- you don't --

22   Q   Sir --

242

1      MR. SMITH: Let him answer the question --
2      MR. HADDAD: He's not.
3      MR. SMITH: -- don't interrupt him.
4      Well, you don't know if he's not because he
5  hasn't finished his response.
6      BY MR. HADDAD:
7    Q   Do you see any mention --
8      MR. SMITH: Let him finish his response.
9      BY MR. HADDAD:
10   Q   Do you see any mention in the document of the
11  project needing to close during Mr. Morris's employment?
12   A   I do not. But that's not necessarily -- you
13  know, this -- this still is -- the practice is that this is
14  true, but there's an additional condition required. This
15  doesn't have all of the conditions, but it surely doesn't
16  have that.
17   Q   Uh-huh.
18      I'm trying to figure out what -- the conditions
19  that it doesn't include.
20   A   The practice in Fidelio is that we do not
21  designate a property until it's been acquired.
22   Q   Okay. What conditions to him obtaining his -- a

243

1  right to payment of a promote were not included in this
2  particular paragraph?
3      The only condition I see is that it has to be a
4  project initiated after December 31 --
5   A   Right.
6   Q   -- 2005.
7   A   Yeah.
8   Q   So what conditions am I missing?
9   A   Yeah. You know, in -- in fact, it really doesn't
10  matter one side or the other whether he was designated or
11  whether he's not because the value would have been zero in
12  any case. So we really wouldn't -- you know, I'm not sure
13  that's a -- a fine point that we would worry a lot about.
14      The more important thing is that when a property
15  is purchased for market value, at that point there is no
16  promote.
17   Q   What conditions are lacking, other than his
18  project being initiated? You said that -- you indicated
19  earlier that there were certain conditions that aren't
20  identified in here.
21      So tell me what the conditions are to him being
22  entitled to his promote that were not stated in here.

244

1   A   Okay. One is the property has to be designated a
2  (sic) FPEP property.
3   Q   Okay. That's going to happen in the case of
4  Spotswood and Reston International Center; right?
5   A   Yes, that will happen; but it had not happened at
6  the time of his termination.
7   Q   Okay. So it not only has to be designated,
8  according to you -- doesn't only have to be designated as
9  an FPEP property, but it has to be designated during his
10  employment?
11   A   We really didn't put a fine point -- you know,
12  that's just -- we've not had that circumstance occur
13  before.
14      But, in any case, it really wouldn't matter one
15  way or the other because the value would not be different.
16   Q   I'm not asking that.
17      What I'm asking is that: Is it a condition of
18  him obtaining his FPEP -- him being entitled to an FPEP
19  promote on a project for that project to be designated as
20  an FPEP project prior to his termination?
21   A   It's -- it would be -- yeah, I -- if we initiate
22  a project today -- right? -- and it's designated an FPEP

245

1  property, we would feel that there would be no obligation
2  to entitle -- for him to -- have him to be admitted to
3  Fidelio; right.
4   Q   Okay. Now --
5   A   So let's suppose that initiation occurred at some
6  other point. You know, initiation isn't what makes it an
7  FPEP property. The designation is what makes it an FPEP
8  property.
9   Q   Uh-huh.
10   A   And whether it was initiated or designated after
11  he left, I don't think that has a bearing on whether he's
12  entitled to be admitted or not. It's the designation that
13  matters.
14   Q   Okay. So to answer my question, are you saying
15  that it needs to be designated -- a condition precedent to
16  him being entitled to it is that it be designated as an
17  FPEP property prior to his termination?
18   A   Yeah. I would -- I would not think that Fidelio
19  would be in a position of giving people an FPEP interest
20  that do not work for them, no. That -- that's not
21  the deal. You know, they have to work for Buvermo to be
22  entitled to an interest.

Case 1:06-cv-01131-HHK    Document 32-6    Filed 02/07/2007    Page 63 of 100

Morris vs. Buvermo                          Deposition of J. Gardner 10/26/06

246

1    Q   Okay.  So then the answer to my question is

2   "Yes"?

3    A   Yes.

4       However, even if you waive that rule and said,

5   "We'll" -- "We'll waive that rule and make it earlier," the

6   value would be zero in either case.  It would be zero

7   because he had no interest or zero because there was no

8   promote.  So on either side the value would be the same.

9   And I think that's an important point.

10   Q   Okay.  So far I have the property has to be

11  designated an FPEP property.

12   A   Yes.

13   Q   And then I have the property has to be designated

14  an FPEP property prior to termination.

15      What's next?  What else needs to happen for

16  Mr. Morris to be entitled to an FPEP promote on a project

17  initiated after December 31, 2005?

18   A   Yeah.  I'd have to go back through the document,

19  and we'd have to look and see.

20   Q   What document?

21   A   The FPEP document.

22   Q   Let's go back through it, then.  I believe it's

247

1   No. 7.

2       MR. SMITH:  Just so I'm straight, the question

3   is:  What conditions have to -- I mean I'm using my words,

4   obviously -- What conditions have to occur before

5   Mr. Morris would have been entitled to a promote

6   interest --

7       MR. HADDAD:  Uh-huh.

8       MR. SMITH:  -- that are not contained in this

9   offer letter?

10      MR. HADDAD:  Yes.

11      THE WITNESS:  I think I may have the wrong

12  document.  I think it may be -- I have to look and see.  It

13  may be 3.03 of the -- let me just see which one is the

14  relevant one.

15  (The witness reviewed documents.)

16      THE WITNESS:  Yeah.  I'm sorry.  I think it's

17  3.03 in the -- yeah.

18      BY MR. HADDAD:

19   Q   Okay.  So you're referring to the partnership

20  agreement of --

21   A   Right.

22   Q   -- Fidelio?

248

1    A   Uh-huh.

2    Q   So the conditions -- so what condition are we

3   looking at now?

4    A   Okay.  Let me just see.

5   (The witness reviewed document.)

6    A   Okay.  I think the main condition is it has to be

7   designated an FPEP property, and that is done when it's

8   designated.  And if it's not -- if it's not designated,

9   it's not an FPEP property.  There may be intent to do it,

10  but it's not an FPEP property.

11   Q   Okay.  But you've already assured me that there's

12  an intent to designate the Spotswood --

13   A   That's right.

14   Q   -- and Reston International?

15   A   That's right.

16      And I think our -- and I think technically it

17  would not -- if a person had left, they would not be

18  entitled to it because they weren't there.  I think what

19  our guys have said is -- I think they -- our guys.  I think

20  our investors have said is they'd be willing to treat this

21  as if it had been designated.  Whether it had been or not,

22  they would be willing to treat it as a designated property.

249

1       But what they also say is then the clause -- the

2   termination clause would have resulted in there being zero

3   value.

4    Q   Okay.  Well, I understand what you're referring

5   to.  You're referring to the redemption --

6    A   That's correct.

7    Q   -- provision.  Okay.

8    A   That's correct.

9    Q   I'm not there yet.

10   A   Okay.

11   Q   -- and we can get to that when --

12   A   Okay.  We will.

13   Q   Right now I'm only concerned about --

14   A   All right.

15   Q   -- an offer was made to Jonathan Morris on June

16  3rd, 2005 --

17   A   Right.

18   Q   -- that was executed both by you and Mr. Morris.

19   A   Right.

20   Q   And that offer states that he would be entitled

21  to his FPEP promote currently available to you on all

22  projects initiated after December 31, 2005.

Morris vs. Buvermo                                    Deposition of J. Gardner 10/26/06

250

1    A   Right.
2    Q   I'm trying to find out what additional conditions
3  you believe needed to be satisfied in order for him to
4  be --
5    A   Okay. I think the condition that needs to be
6  satisfied is it has to be designated as an FPEP property
7  prior to termination.
8    Q   Okay.
9    A   However, I believe our guys have been willing to
10 say that we would -- we would not treat it that way; we
11 would treat it as if it had been executed earlier for this
12 purpose.
13    Q   You guys are willing to do that for Mr. Morris,
14 is what you're saying?
15    A   Yes.
16    Q   Okay.
17    A   For -- for purposes of -- of dealing -- we're --
18 we're saying that: Yeah, if we intended to do it, then
19 let's treat it as if we have done it. Even though that's
20 not the way -- that's not the way the rules say, we would
21 treat it that way.
22    Q   Okay. And I think we've established that you did

251

1  not advise Mr. Morris that it would have to be designated
2  as an FPEP property prior to termination. Is that right?
3    A   Yes.
4    Q   Okay. And I'm also curious to know where you --
5  you pointed me to the Fidelio property agreement; correct?
6    A   Right.
7    Q   And that's an agreement that you've already
8  conceded you didn't show to Mr. Morris before entering into
9  this agreement; correct?
10    A   Yes.
11    Q   And when I say "this agreement," I'm referring to
12 the June 3rd --
13    A   That's correct.
14    Q   -- 2005 letter.
15    Okay. So he was -- he hadn't had an opportunity
16 to review Section 3.03; is that --
17    A   That's correct.
18    Q   -- correct?
19    A   Yeah.
20    Q   And Section 3.03 doesn't say anything about the
21 designation having to be made before somebody's terminated;
22 isn't that right?

252

1    A   That's right.
2    Q   Okay. So it doesn't mention that condition that
3  you just referred to?
4    A   No. But it -- it does mention that there has to
5  be a designated property. Right. It has to be designated.
6  And it doesn't say here what time it is. But it is -- it
7  is designated when it's designated --
8    Q   Uh-huh.
9    A   -- and the party that -- and there's a -- the
10 person who has the full discretion to decide when it's
11 designated is the Fidelio property partners.
12    Q   Uh-huh. And I can appreciate that.
13    The way the framework works --
14    A   Right.
15    Q   -- is that a property is invested in by Fidelio;
16 and then, thereafter, either does or does not designate it
17 as an FPEP property?
18    A   Exactly, yes.
19    Q   Incidentally, for all other projects that you've
20 initiated and introduced to Fidelio since FPEP was created
21 back in '93, have any of those projects not been designated
22 as FPEP properties?

253

1    A   I can't think of a single on.
2    No. I'm sorry. Have they not -- of all the ones
3  that we've invested in, have they been designated? No,
4  there have been some that have not been.
5    I was answering a different question.
6    Q   Uh-huh.
7    A   I wasn't waiting until you finished. I'm sorry.
8    Q   Okay. So there have been some deals that you've
9  located and you've presented --
10    A   Well, some deals that have --
11    Q   I'm sorry, sir. Just let me finish.
12    There have been some deals that you've presented
13 to Fidelio that you located by virtue of your role as
14 president of Buvermo, that you presented to Fidelio, that
15 Fidelio has invested in but that it has not designated as
16 an FPEP property?
17    A   There were some special projects. But in general
18 the practice is that if we initiate them, they're
19 designated.
20    Q   Okay. And these were, in fact, initiated by
21 Buvermo --
22 (Proceedings participants speaking at the same time.)

254

1    A   Yes.
2    Q   -- and so --
3    A   And it's very likely --
4        THE COURT REPORTER: Wait until --
5        THE WITNESS: Yes.
6        BY MR. HADDAD:
7    Q   And so these particular.
8        MR. HADDAD: Can you read it back.
9        THE COURT REPORTER: I can only read back what I
10   have before he interrupted.
11       BY MR. HADDAD:
12   Q   You're saying that the practice is for properties
13   that are initiated by Buvermo and invested in by Fidelio
14   that the practice is that those properties are designated
15   as FPEP --
16   A   That's --
17   Q   -- properties?
18   A   -- correct.
19   Q   Okay. And that's what's going to happen in
20   connection with these two properties?
21   A   That's correct.
22   Q   Okay. So if the condition was only that these

255

1    properties have to be designated as FPEP properties, that
2    condition's going to be satisfied sooner --
3    A   Correct.
4    Q   -- sooner than later; correct?
5    A   It would; that's correct.
6    Q   All right. Now, the only thing that may not be
7    satisfied is -- this additional condition that you've
8    discussed is that it needs to be satisfied -- it needs to
9    be designated an FPEP property prior to termination?
10   A   Yeah. You have to be an employee in order to be
11   entitled to the benefit.
12   Q   Okay. Where does it say that?
13   A   Well, what it does -- it says is that if you're
14   not an employee, you aren't entitled. You -- you --
15   Q   What's "it"?
16       MR. SMITH: Hold on. Hold on. You're
17   interrupting the answer.
18   A   The -- the FPEP agreement provides that the --
19   Fidelio has the right to terminate if you're not an
20   employee.
21       Now, I'm inferring from that that you would have
22   to be an employee to be entitled. I guess that's

256

1    probably -- they -- I guess they could -- they could ask --
2    they could name you an FPEP, you know, designee, I guess.
3    I don't know. I guess they're not -- that they have the
4    right to do that.
5        But the practice by far has been that that
6    benefit is only for employees. That's the practice.
7        BY MR. HADDAD:
8    Q   Okay. Now you're referring to the FPEP operating
9    agreement?
10   A   Yes.
11   Q   Okay. And this is the FPEP operating agreement
12   that you intended to amend but did not?
13       MR. SMITH: Say that again.
14       BY MR. HADDAD:
15   Q   This is the FPEP operating agreement that you
16   intended to amend but did not?
17   A   This is the operating agreement that we did not
18   intend to amend, except as necessary to conform to the
19   other changes we made.
20   Q   So you intended to amendment it?
21       MR. SMITH: It's been asked and answered. You
22   didn't get the response you wanted, but he responded to

257

1    your question.
2        BY MR. HADDAD:
3    Q   So you intend to amend it?
4        MR. SMITH: Same objection.
5        BY MR. HADDAD:
6    Q   You have to answer the question, sir.
7        MR. SMITH: He doesn't have to answer it.
8        MR. HADDAD: Yes, he does.
9        BY MR. HADDAD:
10   Q   You intended to amend it?
11   A   I told you how we -- what we do.
12   (Mr. Morris entered the conference room.)
13   Q   Okay. And so the FPEP property agreement that
14   you're referring to is the agreement that was supposed to
15   be amended, was supposed to include Mr. Morris as a member,
16   it wasn't shown -- and that wasn't shown to Mr. Morris
17   prior to him signing this agreement; correct?
18       MR. SMITH: I'm going to object to the form.
19   It's compound. There's at least three questions in there.
20   Why don't you take it apart.
21       BY MR. HADDAD:
22   Q   Exhibit No. 4 --

258

1    A    Yes.

2    Q    -- never shown to Mr. Morris prior to his

3    termination -- prior to his employment with Buvermo?

4    A    I believe that's correct.

5    Q    Okay. All right. Now, my question to you was:

6    The condition that if you designated an FPEP property prior

7    to Mr. Morris's termination. Okay? Can you point me to a

8    provision in this agreement that states that?

9         MR. SMITH: In the partnership agreement?

10        MR. HADDAD: In the FPEP agreement.

11        MR. SMITH: That's not what you're looking at

12   so --.

13        MR. HADDAD: Sorry.

14        BY MR. HADDAD:

15   Q    The FPEP agreement.

16   A    I can't point to a specific provision. But I

17   know the intent of the parties is that this is a benefit

18   provided to employees of Buvermo. That's the intent of the

19   parties.

20   Q    Intent of what parties?

21   A    The intent of the Fidelio parties and the intent

22   of the signers of this document.

259

1    Q    The intent of the -- could you repeat that again,

2    please.

3         MR. HADDAD: Could you repeat that, please.

4    (Off the record.)

5         THE COURT REPORTER: Sorry.

6         BY MR. HADDAD:

7    Q    Do you recall what you just said?

8    A    Yes.

9    Q    Okay. The intent of whom?

10   A    The intent of Fidelio and myself as a member of

11   FPEP was that this is entitlement to Buvermo employees.

12        MR. SMITH: Could we take a break whenever you're

13   at a break?

14        MR. HADDAD: Sure.

15        BY MR. HADDAD:

16   Q    To your knowledge -- listen, I may be crazy; but

17   I don't think it's a difficult question.

18        You've told me that prior to Mr. Morris's

19   termination the property must have been designated as an

20   FPEP property in order for him to be entitled to an FPEP

21   promote --

22   A    Yes. But I've also --

260

1    Q    -- okay?

2    A    Yes.

3    Q    And I just want to know: Can you point me to a

4    specific provision in either the FPEP agreement or the

5    Fidelio partnership -- the Fidelio Properties agreement

6    that states that?

7    A    No.

8    Q    Okay. Now, apart from the property being

9    designated as an FPEP property prior to termination, what

10   other conditions would be required for Mr. Morris to have a

11   recognized promoted interest?

12   A    Well, he would have to be a member of FPEP.

13   Q    Okay. And he wasn't a member -- he ultimately

14   did not become a member of FPEP; correct?

15   A    Yes.

16   Q    Okay. And that's not because of anything he did;

17   correct?

18   A    That's correct.

19   Q    That was something that you were supposed to take

20   charge of, isn't that right?

21   A    Right.

22   Q    And you didn't?

261

1    A    I did, but it wasn't relevant that it be done

2    until the property had actually been designated.

3    Q    Uh-huh.

4         There was nothing stopping you from making him a

5    member of FPEP prior to his termination, was there?

6    A    Other than preparing the documents, no.

7    Q    Okay. You just didn't do it because you just

8    didn't think it was relevant?

9    A    Well, we were in the process; but the process was

10   not completed.

11   Q    Okay. So I have that the deal would have had to

12   have been initiated after December 31; or if before

13   December 31, it would have had to have been initiated by

14   Mr. Morris; that the property would have been to be

15   designated an FPEP property prior to termination; that he

16   would have to be a member of FPEP?

17   A    Right.

18   Q    What else?

19   A    Then he would be subject to the conditions of

20   FPEP, and the deal would take -- go forward.

21   Q    Are there any other conditions that you know of?

22   A    I -- not that I'm aware of, no. I'd have to look

262

1  and see but --.

2        MR. HADDAD: Why don't we take that break.

3  (Whereupon, a brief recess was taken.)

4        BY MR. HADDAD:

5    Q  Mr. Gardner, who drafted this offer letter?

6    A  I did.

7    Q  Okay. And did you have anybody review it?

8    A  Yeah, I think I had several people review it. I

9  think I sent copies to Joost and Andre. And I don't recall

10  whether I sent an earlier draft to Jonathan or not. I

11  don't recall.

12   Q  Okay. Do you recall whether Joost or Andre made

13  any changes to it?

14   A  Well, I think they did point out several things

15  that I should have added or that I'd neglected to add. And

16  as we read through it, you know, I thought of, you know,

17  additions that were important to put in.

18   Q  Okay. Do you recall what those were?

19   A  Well, one of the conditions that Andre wanted

20  added is the addition: In the future projects and which

21  may be subject to change relative to future projects

22  dependent on future market conditions" --

263

1    Q  Okay.

2    A  -- after the 12 to 10.

3    Q  All right. Anything else that you recall?

4    A  Yeah. I had been assuming all along that this

5  was governed by the FPEP agreement, and I did add this last

6  item from an earlier draft to make sure that it was clear

7  that the -- all items were governed by the FPEP

8  agreement --

9    Q  Uh-huh.

10   A  -- because that's an important thing.

11        And I think somebody -- either I remembered or

12  somebody reminded me, you know: Let's not assume this.

13  Let's make sure that everybody fully understands that

14  that's the case.

15   Q  Okay. Are you done?

16   A  Yeah.

17        By the way, there was -- you know, when you asked

18  about the conditions, there was a condition included that I

19  forgot to -- you know, it's not an FPEP property if we

20  don't own it; so we actually have to acquire the property.

21   Q  Own the property.

264

1        Okay. And that's --

2    A  We have to actually close on the property.

3        And in, you know, this case, the property was not

4  closed on prior to Jonathan's termination.

5    Q  Okay. So is it a condition just that you have to

6  own the property or you have to own it prior to his

7  termination?

8    A  Well, I believe it's prior to his termination,

9  because it would not have been designated.

10        One other item too that I'd like to clarify about

11  the -- the agreement of our party -- of our partners to

12  waive the -- the ownership issue, you know, the closing

13  prior to our -- our having designated the property prior to

14  the time that Jonathan had been terminated --

15   Q  Yes.

16   A  -- I had made that earlier statement.

17   Q  You did.

18   A  And that statement really was one only made

19  relative to the settlement discussions we were having

20  earlier with Jonathan.

21   Q  Uh-huh.

22   A  That's not something that they have given -- you

265

1  know, have told me that I can do, other than in those --

2  those discussions --

3    Q  Okay.

4    A  -- settlement discussions.

5    Q  So for settlement purposes you were willing to

6  waive the fact that these properties had not been closed or

7  designated as FPEP properties prior to his termination?

8    A  That's correct.

9    Q  Okay. And is that both the Spotswood deal and

10  the Reston International Center?

11   A  Yes.

12   Q  Okay. This offer -- just to be sure, you were

13  authorized by Buvermo to make this offer to Mr. Morris?

14   A  Yes.

15   Q  Okay.

16   A  Yes.

17   Q  And you were also authorized by Fidelio to offer

18  Mr. Morris its promoted interest on current projects?

19   A  Yes.

20   Q  Okay. And I assume you were also authorized by

21  FP Investments to make any of the representations you made

22  in this letter to Mr. Morris?

266

1      A   Yes.
2      Q   Let's just go back to current projects real
3  quick.
4          FPEP's promoted interests -- I'm sorry -- Fidelio
5  Properties -- FPEP's promoted interests for the land
6  parcels adjacent to Sheraton Reston parcels and the
7  remaining land parcels at Twinbrook, that was a 2.5-percent
8  interest?
9      A   Right. If you remember back to that earlier
10  sheet here (indicating), this was the 2.5 percent that
11  Mr. Bonacci had previously owned that had been purchased by
12  Fidelio.
13     Q   Okay. I just want to confirm it was a
14  2.5-percent promoted interest.
15     A   Yes.
16     Q   Okay. And if we could just switch back real
17  quick to Exhibit No. 11, the Jim Smith offer letter.
18     A   Okay. Which one again?
19     Q   The Jim Smith offer. It was Exhibit No. 11.
20         THE WITNESS: I think I've got them out of order
21  again. I don't have that.
22         MR. SMITH: This is it right here (indicating).

267

1          THE WITNESS: Oh, 11. There we go.
2          BY MR. HADDAD:
3      Q   Before we look at that, this 2.5-percent interest
4  that Fidelio owned -- the 2.5-percent promote that Fidelio
5  owned, that's what was purchased from Mr. Bonacci; correct?
6      A   That's correct, yes.
7      Q   Okay. Now, if you'll direct your attention to
8  page 2 of Exhibit 11, which is the terms of offer to
9  Jim Smith, I just want some clarification on something.
10     A   Okay.
11     Q   Bullet Point No. 5 there, halfway through that
12  paragraph it starts with the sentence, "It is agreed that
13  the current projects includes all projects for which the
14  promote was purchased from Steve Bonacci at the currently
15  estimated values likely to be in excess of $400,000 of that
16  paid to purchase the interest and that around 200,000 of
17  this amount has already been received and would be escrowed
18  as provided above."
19     A   Right. There were several other projects that
20  had -- these were the full amounts that had been purchased
21  from Steve. They had -- all of them had been sold up with
22  the exception of those last two remaining parcels. So a

268

1  lot of sales had taken place, and we did not include those
2  in the amounts due Jonathan.
3      Q   I see.
4      A   So that's the difference. There were a lot of
5  other properties in there.
6      Q   That includes more properties than just --
7      A   Many more properties, yes.
8      Q   -- than just the Twinbrook and --
9  (Proceedings participants speaking at the same time.)
10     A   That's right.
11         THE COURT REPORTER: I'm sorry. I didn't get the
12  end of the question.
13         MR. HADDAD: The Twinbrook and Sheraton parcels.
14  You really need to -- well, both of us --
15         THE WITNESS: Yeah.
16         MR. HADDAD: -- we need to -- starting now, we
17  need to --
18         THE WITNESS: I know.
19         MR. HADDAD: -- stop doing that.
20         THE WITNESS: Yeah.
21         BY MR. HADDAD:
22     Q   Just out of curiosity, it says here -- it refers

269

1  to a two-year vesting period.
2      A   Yes.
3      Q   And what did you intend that to mean?
4      A   What we intended it to mean is that if Mr. Morris
5  was not employed within -- if he was no longer employed
6  prior to the end of that two-year period, that those
7  properties would -- he would not be entitled to an interest
8  in those properties. He would have to be employed for a
9  period of two years or longer for that interest to -- for
10  him to be entitled to that interest.
11     Q   Okay. And do you recall having a specific
12  discussion with Mr. Morris as to the meaning of that
13  two-year vesting period?
14     A   I think the discussion that I had with Mr. Morris
15  is that those were properties that we had acquired some
16  time ago; and because of the passage of time and their
17  increase in value, there was at the time a promoted
18  interest that was associated with them.
19         But any properties that we acquired at a given
20  point, we would have bought them for market value. And the
21  value would have been the price we paid, so there would
22  have been no promoted interest there.

Case 1:06-cv-01131-HHK    Document 32-6    Filed 02/07/2007    Page 69 of 100

Morris vs. Buvermo                                    Deposition of J. Gardner 10/26/06

270

1    And you automatically get a vesting -- you know,
2    the FPEP deal is basically a vesting -- a self-vesting
3    deal. So anytime you acquire a property, the value is zero
4    when you acquire it, by definition, because that's the
5    market price. It's only with the passage of time that
6    there becomes a value.
7        So there was really no -- there was self-vesting
8    in the FPEP agreement, but these properties were one (sic)
9    which really hadn't been initiated. In fact, they were
10   accruing value because they had been purchased some time
11   ago. And we were willing to provide that additional value,
12   but we needed some time to pass for us to be sure that that
13   value was appropriate.
14   Q   Uh-huh.
15   A   And that's what was -- and that two-year vesting
16   period for those and not for the current properties. The
17   current properties have built-in vesting. The older
18   properties, we had to build in a vesting period.
19   Q   And so what specifically do you recall telling
20   Mr. Morris would be the conditions to those vesting?
21   A   Well, what the -- the understanding about vesting
22   is employment.

271

1    Q   Okay.
2    A   If he would still be employed and doing the job.
3    Q   All right. So you recall having a specific
4    discussion with Mr. Morris that, "You have to be employed
5    here for two years before you'd be entitled to these
6    interests"?
7    A   I recall that when we discussed the vesting,
8    that's what "vesting" meant, yes.
9    Q   Do you recall having a discussion with
10   Jonathan Morris -- I'm not sure you're answering my
11   question exactly the way it's being asked.
12       What I want to know is: Did you at any point
13   tell -- recall telling Jonathan Morris that if he were not
14   employed with the company within two years, that he would
15   not be entitled to those interests?
16   A   I--
17       MR. SMITH: Asked and answered.
18       BY MR. HADDAD:
19   Q   Your answer?
20   A   Yeah. I recall going over the letter and going
21   over the issue in that -- that way, yes.
22   Q   Okay. And did you also tell him that if he was

272

1    terminated for any reason, he could be denied those
2    promoted interests on the Twinbrook and Sheraton parcels?
3    A   I recall discussing vesting. I'm not sure I used
4    exactly those terms.
5    Q   Okay. So you don't recall advising him that if
6    he was terminated for any reason, he would lose his right
7    to those interests?
8        MR. SMITH: Object to form. It's asked and
9    answered. You're trying to get -- you've got a response to
10   your question. You're trying to --
11   (Proceedings participants speaking at the same time.)
12       MR. HADDAD: You --
13       MR. SMITH: -- get it a different way, and
14   it's --
15       MR. HADDAD: Marc, listen, you can object as
16   asked and answered. There's no need to go into --
17       MR. SMITH: Well, if you're asking the same
18   question --
19       MR. HADDAD: -- a speech. And if you take a --
20       MR. SMITH: -- repeatedly, I'm going to do it.
21       MR. HADDAD: -- if you take a look at the
22   judge's -- in fact, at the judge's scheduling order --

273

1        MR. SMITH: I've looked at --
2        MR. HADDAD: Okay. Good.
3        MR. SMITH: You don't have to counsel me. You're
4    not my attorney.
5        MR. HADDAD: Good. Well, then -- well, then --
6        MR. SMITH: I'm capable of--
7        MR. HADDAD: Well, but you are bound by that; and
8    I would ask that you not make speaking objections --
9        MR. SMITH: You're bound --
10       MR. HADDAD: Please.
11       MR. SMITH: -- you're bound not to harass the
12   witness --
13       MR. HADDAD: Sir --
14       MR. SMITH: -- by asking the same question over
15   and over again.
16       BY MR. HADDAD:
17   Q   Did you tell Mr. Morris that if he was terminated
18   for any reason, he would be deprived of those interests?
19       MR. SMITH: Asked and answered.
20   A   I don't recall using those specific words, no.
21       BY MR. HADDAD:
22   Q   Do you recall using any words to that effect?

274

1    A    I recall discussing the issue of termination.
2    And I thought it was clear that if Jonathan was not
3    employed, that -- with us, that -- that he would not be
4    entitled to those -- those properties. That's what the
5    term "vesting" meant.
6    Q    Do you recall discussing the issue of
7    termination? What specifically do you recall discussing
8    about termination?
9    A    I recall discussing the concept of vesting and
10   the concept of vesting that -- that it -- it -- well, this
11   would be a two-year period; that if he were not employed at
12   the end of that time, that he would not be entitled to the
13   benefits of those properties.
14   Q    Okay. So let me see if I understand your -- what
15   you understand this agreement to mean. You believe that
16   under the terms of this agreement you could terminate
17   Mr. Morris one year prior to the end of the -- one day
18   prior to the end of the two-year vesting period and deny
19   him the right to the promote in those two particular
20   projects?
21   A    That's what the language says, yes.
22   Q    That's how you interpret it?

275

1    A    That's how I interpret it.
2    Q    The first sentence of that current project
3    section says, "You will be entitled upon start of
4    employment to the share of FPEP promoted interests."
5         Why did you include the language "upon start of
6    employment"?
7    (The witness reviewed document.)
8         MR. HADDAD: It's Exhibit 14, sir.
9         THE WITNESS: Uh-huh. Have I got the wrong one?
10        MR. SMITH: That's the offer letter.
11        THE WITNESS: Okay. You're referring to?
12        MR. HADDAD: I'm referring to current projects --
13        MR. SMITH: He's asking why you used this
14   language, "upon start of employment".
15   A    Okay. Because we already owned those properties
16   and they had already been designated as FPEP properties, so
17   the two-year period would have started from the time --
18   start of employment.
19        BY MR. HADDAD:
20   Q    Okay. Let's see here real quick. With respect
21   to future projects, assuming all the conditions that you
22   outlined earlier were met, you would agree that the promote

276

1    would vest in Mr. Morris for all projects initiated after
2    December 31, 2005, irrespective of who initiated those
3    projects; correct?
4    A    Yes.
5         MR. SMITH: Object to the form of the question.
6         BY MR. HADDAD:
7    Q    Now, just to see if I understand your
8    interpretation of the future projects provision, your
9    interpretation is that in the event Mr. Morris initiates a
10   deal after December 31st and if he is terminated at any
11   time prior to closing, then he would lose any interest in
12   that deal?
13   A    Yes.
14   Q    And terminated for any reason whatsoever?
15   A    Yes.
16   Q    And that would be irrespective of whether
17   Mr. Morris was wholly responsible for bringing that deal to
18   the table?
19   A    Yes.
20   Q    And it would be irrespective of any amount of
21   work that Mr. Morris put into the deal?
22   A    Yes.

277

1    Q    And the same would apply even if he was
2    terminated one hour before the deal was closed?
3    A    Yes.
4    Q    And you believe that to be a reasonable
5    interpretation?
6    A    Yes, I do; and I'll tell you why.
7         The properties themselves -- buying is an
8    important part of the initiation of the project, but the
9    value of the property is something that accrues over a long
10   period of time. And the role of Mr. Morris or anyone else
11   is not only to buy well but also to make the property
12   increase in value, add to the increase of value over time.
13        And, you know, the whole -- again, I don't want
14   to beat this too much. But, you know, the whole role of
15   the fiduciary is to keep a close eye and make sure that
16   value is added properly all the way along. So there's a
17   lot of role to be played. And he really only captures the
18   value as that property increases in value over time.
19        So I think that is a fair deal. It's a deal I've
20   lived with for 20 years, and I think it's been very fair.
21   That's exactly the way it works.
22   Q    Uh-huh.

278

1    And you do recognize, though, that what that
2  means essentially is that Buvermo -- assuming your
3  interpretation is correct, that Buvermo could terminate --
4  could have terminated Mr. Morris just to avoid having to
5  pay him a promote?
6    A  They could have done that and -- but they --
7  let's -- let's look it from Fidelio's standpoint. Fidelio
8  believes that promote is necessary in order to give proper
9  incentive for people to stay with the project for a long
10  time and see the project through to the end and see that
11  the value has been really added.
12    So if they -- they put that in place not just to
13  acquire the property, but to make the value be realized
14  over the life of the property. So it's a way of reflecting
15  the value added over time.
16    So I think it's very fair for Fidelio to expect a
17  person, if they want to be compensated, to make the project
18  add value to the extent that they're capable. And
19  that's -- that's the heart of -- of our deal.
20    Q  Okay. Let me just see if I can get you to think
21  about it in real terms. Let's assume that in your case --
22    A  Okay.

279

1    Q  -- you work very hard -- as I'm sure it takes a
2  lot of hard work to put these deals together; correct?
3    A  Yes.
4    Q  And after, you know, days and days and weeks of
5  work, you offer the deal to Fidelio and Fidelio agreed to
6  move forward. And so at that point it would have been
7  initiated; correct?
8    A  Right.
9    Q  And let's assume that you did some additional
10  work and that you had the -- to bring this property to
11  closing and you spent a whole deal of time doing that.
12    You follow me so far?
13    A  Right.
14    Q  Okay. And so I think what you're telling me is
15  that you would be perfectly fine with your being terminated
16  immediately prior to a closing because that's just the
17  deal?
18    A  Yeah.
19    Let's look at the --
20    Q  I'm --
21    MR. SMITH: Let him answer the question.
22    MR. HADDAD: It's a "Yes" or "No" question.

280

1    MR. SMITH: He doesn't have to answer it "Yes" or
2  "No."
3    BY MR. HADDAD:
4    Q  Would you be fine with that?
5    A  Yes, and I'll tell you why I would be fine.
6    First off, the nature of Fidelio is it doesn't do
7  any one deal that's going make or break anything. What it
8  wants is a large series of deals that are done over a long
9  period of time. It's a portfolio approach to investing.
10    And the work on a deal -- the work that I do on a
11  deal is much more intensive many times after the closing;
12  and many times three or four years later or later on, some
13  of the judgments we make, some of the involvements we have.
14    The way the deal is -- develops from raw land up
15  to -- you know, there's a lot of work and a lot of value
16  that's added long-term.
17    Q  Uh-huh.
18    A  And it's also incrementally -- no deal that we do
19  is a deal-breaker when the system's working right.
20    So I can't imagine that Fidelio would terminate
21  me to get out of this one promote, because they're going to
22  have to turn around and find somebody else to take over and

281

1  give them that promote to do it anyway because Fidelio is
2  not the beneficiary. They have fiduciary -- well, they
3  just don't do it that way.
4    And so I think it's a very fair system, and I
5  think it works very fairly, and I think it compensates
6  properly. It's not the acquisition by itself. It's the
7  value added over the entire term of the investment that
8  Fidelio's interested in, and that's why this compensation
9  system is designed that way.
10    Q  Uh-huh.
11    A  And it's worked that way for -- for many years
12  for us.
13    Q  Let's take a look at the last sentence of this
14  first page of Exhibit 14, the offer letter. It says, "All
15  items will be governed by the FPEP, LLC, agreement of which
16  you will become a member."
17    And I think we've already established that he
18  never became a member. Correct?
19    A  Yes.
20    Q  And I think we've also established that the FPEP,
21  LLC, agreement was supposed to be amended and never was.
22  Correct?

Case 1:06-cv-01131-HHK     Document 32-6     Filed 02/07/2007     Page 72 of 100

Morris vs. Buvermo                                    Deposition of J. Gardner 10/26/06

282

1      MR. SMITH: I would object; asked and answered
2   repeatedly.
3      THE WITNESS: Yeah, I think I have answered that
4   before a number of times.
5      BY MR. HADDAD:
6    Q   Okay. And that's a "Yes"; correct?
7      MR. SMITH: I'm going to object to the form of
8   the question.
9    A   I think I've stated what my views were earlier.
10     BY MR. HADDAD:
11   Q   Okay. And is the defendants' position that
12  Mr. Morris was never made a member of FPEP?
13   A   Yes.
14   Q   Okay. Now, my interest is the "all items" in
15  this sentence. What items are you referring to?
16   A   The intent of that "all items" is that the
17  governing document will be the FPEP document, so each
18  one -- each of the things referred to above will be
19  governed by FPEP.
20   Q   Okay. So would Mr. Morris's starting salary be
21  governed by FPEP?
22   A   I think that maybe there was a paragraph

283

1   indentation problem, but it was intended for this to be
2   that (indicating). And you could argue: Well, why did you
3   indent that way? But the intent was to be this way
4   (indicating).
5    Q   And was the FPEP agreement that you refer to in
6   here the FPEP agreement that was in existence at the
7   time --
8    A   Yeah.
9    Q   -- or the FPEP agreement as amended?
10   A   The FPEP agreement that was in existence in time
11  modified as necessary to admit Mr. Morris.
12   Q   Okay.
13   A   And --.
14   Q   And let me see if I understand defendants'
15  position on the redemption issue.
16     Looking through your interrogatory answers, is it
17  defendants' contention that even though Mr. Morris was not
18  made a member of the FPEP agreement, that his interests --
19  any FPEP promote interest, if recognized, would be subject
20  to redemption?
21   A   Redemption? Are you referring to a clause in
22  here or what?

284

1    Q   No.
2      I'm saying: Even though Mr. Morris is not a
3   member of FPEP, are you contending that Section -- I
4   believe it's 8.9 of the FPEP agreement applies to him?
5      MR. SMITH: Can I get some clarification? Are
6   you asking if we assume that Mr. Morris had an interest,
7   that he would have been -- his interests would have been
8   subject to redemption? Is that what you're asking? because
9   I'm not entirely clear.
10     MR. HADDAD: I'm asking -- well, I think we've
11  established that Mr. Morris isn't a member of FPEP and
12  never became a member of FPEP.
13     THE WITNESS: That's right.
14     BY MR. HADDAD:
15   Q   And so what I'm asking you is: If he -- if he is
16  deemed by a court to be entitled to a promote for these
17  properties, is it your contention that Article 9 --
18  sorry -- Article 8 dealing with redemption applies to him?
19   A   Well, my understanding is that if he were to be
20  entitled to a promote, he could only be entitled through
21  the FPEP mechanism and he would have to also have been
22  inferred to be a member of FPEP and, therefore, that it

285

1   would have governed, yes.
2    Q   Okay. So let's take a look at paragraph 8.9, if
3   you will.
4      MR. SMITH: What exhibit number is that again?
5      MR. HADDAD: 7.
6      BY MR. HADDAD:
7    Q   And paragraph 8.9 is -- I'm sure you see it
8   identifies you and Mr. Bonacci as being subject to that
9   particular provision. Do you see that?
10   A   Yes.
11   Q   Okay. And for obvious reasons -- well, I would
12  just say it just doesn't identify Mr. Morris as being
13  subject to that provision; correct?
14   A   That's correct.
15   Q   Okay. And I assume it would have been your
16  intention to include Mr. Morris had this agreement been
17  amended -- and that's the word you guys don't like to
18  use with respect to this agreement.
19     But had this agreement been amended, your
20  intention would have been to include Mr. Morris's name in
21  that provision?
22   A   Yes.

286

1    Q    Okay. And then you would have provided,
2  certainly, Mr. Morris with an opportunity to review it;
3  correct?
4    A    Yes.
5    Q    Okay. And wasn't it sort of the understanding
6  that he would then review it and pass it by his attorney
7  for his attorney's comments?
8    A    Yes.
9    Q    Okay. And it's entirely possible, is it not,
10  that Mr. Morris wouldn't have agreed to that provision, is
11  it not?
12       MR. SMITH: Object; that calls for speculation.
13  It's speculative.
14    A    We would not have agreed to do it without this
15  clause.
16       BY MR. HADDAD:
17    Q    Okay. But you didn't tell Mr. Morris that prior
18  to his employment with Buvermo, did you?
19       MR. SMITH: Tell him what?
20       MR. HADDAD: Tell him that you would not hire him
21  unless he would have agreed to a redemption provision.
22    A    I told him about this part of the agreement. And

287

1  for the entire time that Jonathan was employed by us, he
2  never once told me that he had a problem with this clause.
3       BY MR. HADDAD:
4    Q    You testified earlier, Mr. Gardner, that you
5  don't have any specific recollection of discussing the
6  redemption provision with Mr. Morris. Do you recall saying
7  that?
8       MR. SMITH: I object; that's misstating the
9  record.
10       BY MR. HADDAD:
11    Q    Do you recall --
12       MR. SMITH: The record is going to speak for
13  itself.
14       BY MR. HADDAD:
15    Q    Well, do you recall saying that?
16    A    I do.
17    Q    Okay.
18    A    But I don't -- but I do recall discussing it. I
19  just don't recall the specific discussion.
20    Q    So now you do recall discussing it with
21  Mr. Morris?
22       MR. SMITH: Hold on. Don't -- I'm going to

288

1  object to the form of the question. You're suggesting he's
2  changing his testimony, and let's --
3       MR. HADDAD: I am suggesting that.
4       MR. SMITH: Yes, you are.
5       MR. HADDAD: I am.
6       MR. SMITH: Let the record speak for itself.
7       MR. HADDAD: I am, because I think he is.
8       MR. SMITH: Well, then you're being argumentative
9  and --
10       THE WITNESS: Whatever I said before is what I
11  said.
12       BY MR. HADDAD:
13    Q    Okay. What you said before is what you said and
14  is what you meant, I assume?
15    A    I assume so.
16    Q    There's a calculation method which is discussed
17  in this provision, and it deals with -- excuse me -- if a
18  call is made or a put is made, that within 30 days of
19  notice of that, the manager, FP Investments, and the
20  departed employee, whomever that may be, shall submit to
21  the other a sum called the market value; right?
22    A    Right.

289

1    Q    And if I understand your testimony earlier
2  correctly, you interpret that to mean -- the market value
3  as being the value of the property itself; correct?
4    A    Yes.
5    Q    Okay. And so what is your position on how that
6  would be determined?
7       MR. SMITH: Well, are you asking how the market
8  value would be determined?
9       MR. HADDAD: Correct.
10    A    The term "market value" -- my understanding of
11  market value is the value of the property that a willing
12  buyer and a willing seller -- a willing buyer would be
13  willing to buy and a willing seller would be willing to
14  sell, given a reasonable time to market.
15       That's the standard market value, and that's the
16  value that we would -- that's the value -- our
17  understanding of the value. And that's as of the day of
18  valuation.
19       BY MR. HADDAD:
20    Q    Okay. That particular paragraph, which is
21  8.9(i), states that -- defines the market value as the
22  market value of Fidelio's interest in each property.

290

1    A   Right.

2    Q   Okay.  Do you recognize that there's a difference

3  between the value of one's interest in property and the

4  value of the property itself?

5    A   Right.  But the way this is calculated, it's

6  calculated as if the entire property were sold and the

7  distributions had been made in accordance with all of the

8  relevant partnership agreements with Fidelio ending up with

9  Fidelio's interests.

10   Q   Okay.  I just -- again, I'm sorry; but I don't

11 think that that was responsive.

12       My question is:  Do you recognize the difference

13 between a market value of a piece of property versus a

14 market value of an interest in a property?

15   A   Yes.

16   Q   Okay.  And what is that difference?

17   A   It depends on whether you're selling an interest

18 or not.  The way this clause is designed is Fidelio's

19 interest is the interest that it would obtain if the

20 property were sold at the market value for the property and

21 Fidelio was distributing its interest.

22   Q   Okay.  And can you point me to a specific

291

1  provision -- a provision that tells me that?

2    A   By the way, normally a Fidelio interest would be

3  less -- if you sold Fidelio's interest by itself, it

4  typically would be less than the interest you get through

5  the other calculation.

6        And the way Fidelio has agreed to do this and

7  we've interpreted this is Fidelio doesn't do it that way.

8  They do it based upon the full value as if sold, and then

9  the -- the value of Fidelio's interest is the portion it

10 gets.

11       That's the way this clause is meant to read, and

12 that's the way it's interpreted, and that comes about

13 through the distribution.

14 (The witness reviewed document.)

15   A   "The purchase price for each FPEP property by the

16 departing employee shall equal the amount" --

17       THE COURT REPORTER:  Sir, would you please slow

18 down while reading.

19       MR. HADDAD:  He's reading from paragraph 2 on

20 page 18 of the FPEP agreement.

21       Go ahead.

22   A   Okay.  "The purchase price for each FPEP property

292

1  to be received by the departing employee shall equal the

2  amount by which departing employee would receive upon

3  liquidation of the relevant property with a market value

4  following the sale of each FPEP property."

5        So the property would be sold.  It would be

6  distributed in accordance with the various waterfalls.  The

7  amount that was Fidelio's to receive is limited to Fidelio

8  and by Fidelio through the waterfalls to the company.  And

9  that's the way this is worded.

10       BY MR. HADDAD:

11   Q   Okay.  So you read that to mean that upon the

12 exercise of a put or call --

13   A   Right.

14   Q   -- okay? -- that the parties will have -- will

15 try to come to an agreement as to market value; and if not,

16 it gets submitted to arbitration; correct?

17   A   Right.

18   Q   And the way the market value is determined is you

19 take a look at what the value of the entire project or

20 property --

21   A   Right.

22   Q   -- on the whole could be sold for that day?

293

1    A   Yes.

2    Q   Okay.  And then once you determine that number,

3  you determine what FPEP's share of that is?

4    A   That's correct.  Through all of the waterfalls

5  Fidelio would get its share.  It would go through the

6  waterfall to FPEP.  And that would be the amount that was

7  determined.

8        MR. SMITH:  You might want to clarify what you

9  mean by "waterfall".

10       THE WITNESS:  I don't know -- do you what I mean

11 by that?

12       BY MR. HADDAD:

13   Q   Well, I assume that that's after all the equity

14 investors have been paid --

15 (Proceedings participants speaking at the same time.)

16   A   Oh, yeah.

17   Q   -- and received their IRRs --

18       THE COURT REPORTER:  Okay.  You have to wait.

19       BY MR. HADDAD:

20   Q   I assume it means that after the equity investors

21 have been paid and received their IRRs?

22   A   Their promoted interest and all.  We call it a

294

1  waterfall, sort of that calculation. That's sort of a
2  shorthand for describing those calculations.
3       (The Spotswood Valley Center document was marked
4       Plaintiff's Exhibit No. 15 for identification.)
5       BY MR. HADDAD:
6    Q   Mr. Gardner, you're handed what's been marked as
7  Exhibit No. 15. Do you recognize this document?
8    A   Yes.
9    Q   What is this document?
10   A   This is a document that had been prepared and
11 given to Mr. Morris and his attorneys when we were having
12 settlement discussions.
13   Q   So this was actually provided to them during
14 those settlement discussions?
15   A   Yes.
16   Q   And those were the settlement discussions that
17 occurred here in this room?
18   A   I don't -- I believe it was this room, yes. It
19 was here in this office, I believe.
20   Q   Were you at those settlement discussions?
21   A   Was I here? I was, but I can't remember -- do
22 you have an office downtown?

296

1  saying?
2    A   Yes.
3    Q   Do you know who prepared this?
4    A   I believe that Kara McCormick prepared it.
5    Q   Do you know who asked Kara McCormick to prepare
6  it?
7    A   I think either I did or the attorney did. I
8  can't remember.
9    Q   "The attorney" being Forrest Walpole?
10   A   I believe so, yes.
11   Q   And did you review this at any time after she
12 prepared it?
13   A   Yeah, I talked to her about this.
14   Q   And you calculated on this particular sheet the
15 Spotswood Valley Center deal?
16   A   Yes.
17   Q   And you calculated Mr. Morris's present day in
18 interest in that at $182,558?
19       MR. SMITH: Object to form. There's no testimony
20 about interest.
21       BY MR. HADDAD:
22   Q   What does that number represent?

295

1    Q   No.
2        So it's your belief that this was exchanged,
3  given to Mr. Morris prior to today?
4    A   Yes.
5    Q   Well, I mean prior to this litigation?
6    A   Yes.
7    Q   Okay. During settlement discussions that
8  occurred shortly after his termination?
9    A   I believe so.
10   Q   Okay. And did you personally observe him being
11 provided with this?
12   A   I believe this was passed out at the meeting.
13   Q   And you recall being at that meeting? I'm sorry.
14 I didn't get your answer.
15   A   Yeah; these were prepared relative to settlement
16 discussions. I can't recall whether they were given ahead
17 of the meeting or as part of the meeting.
18   Q   Okay. But you believe they were given to
19 Mr. Morris?
20   A   Yes.
21   Q   And this is appears to be a calculation you made
22 to come up with some settlement figure; is that what you're

297

1    A   The numbers on the page represent as follows:
2  The three parcels above were the -- Mr. Morris's
3  2-and-a-half-percent share that we had talked about earlier
4  that we had run through the waterfall we had talked about
5  earlier, assuming the current values for each of those
6  properties that we included in our financial reports as of
7  year end 2005, which is our best estimate of values for
8  those properties.
9        And the Spotswood Valley Center was based on a
10 financial projection that had been prepared that showed
11 Mr. Morris's interest at 15 and a half percent.
12       That's the one that I had mentioned to you
13 earlier that had been in error and we had calculated using
14 a 15-percent discount rate, the future value of the
15 property ten years out, which I believe is too low a
16 discount rate for a property like that.
17       But the intent was to show that even with very
18 aggressive assumptions in ownership and in value and
19 discount rate and all, this was still only -- you know, the
20 most you could get would be in the $200,000 range. That
21 was the intent of the --
22   Q   Uh-huh.

Morris vs. Buvermo                                    Deposition of J. Gardner 10/26/06

298

1    A   -- of the discussion.

2    Q   The calculation that you did for Spotswood Valley

3    Center, is that different than what you would do for a

4    calculation under the redemption provision of the operating

5    agreement?

6    A   Oh, yes.  Yeah, this is not at all consistent

7    with the redemption calculation.  This has nothing -- the

8    three above would follow the redemption calculation

9    formula.

10       The Spotswood Valley Center would have a zero

11   number if you followed the redemptions.  So we're saying

12   that our offer is much in excess of what you'd be entitled

13   to if you followed the FPEP agreement.

14   Q   Uh-huh.

15       Why didn't you include Reston International

16   Center in here?

17   A   At this particular time I'm not even sure we had

18   agreed to buy it.  I don't know where it stood in the

19   process.

20   Q   Had you been in that position?  I mean is --

21   because you weren't sure whether that was ever going to

22   close at that time?

299

1    A   Right.  If we would have put it on the sheet, it

2    would have had a value of zero.  And the reason it would

3    have had a value of zero is because we were just buying it

4    at market value, and so this would be no promoted interest

5    because the value would be equal to the price we paid.

6    Q   But wouldn't that be the same for the Spotswood

7    Valley --

8    A   It would --

9    Q   -- Center?

10   A   -- be the same for Spotswood Valley.

11       And the reason we did it this way was to show why

12   this is well in excess of what the entitlement would be,

13   the way we read the document.

14   Q   I guess I'm just wondering -- you said if Reston

15   International Center was on here, you'd put zero.  Why

16   wouldn't you put zero for Spotswood Valley Center?

17   A   If we would have followed the same logic, we

18   would have.  But we followed a different logic for

19   Spotswood Valley.

20   Q   So this must have been prepared, at the earliest,

21   March 20 -- late March; correct?

22   A   I think so, something like that.

300

1    Q   And as of late March you didn't have an

2    understanding one way or the other as to whether Reston

3    International Center was going to close?

4    A   I don't know if we did or not.  But we left it

5    off because zero is zero.  And this is one where we said if

6    Jonathan was really responsible for this one, let's put it

7    on the sheet and say, you know, What's the most you could

8    do even if we disregard it -- and this, again, is for

9    settlement purposes -- even if we disregarded the

10   agreement?  That was the purpose of this description.

11   Q   You left Reston International off because you

12   didn't feel that Jonathan had contributed anything to it?

13   A   No, because I think that it would have had zero

14   value in any case.

15   Q   But so would Spotswood Valley Center?

16   A   That's correct.

17   Q   But you didn't leave that one off?

18   A   That's right.

19       Again, these were for settlement discussions.

20   Q   Well, that's what you keep telling me.  I

21   don't --

22   A   That's right.

301

1    Q   -- see anything on here other than --

2    A   Right.

3    Q   -- what's on here.

4        You indicated that the discount rate was too low

5    of a discount rate --

6    A   Yes.

7    Q   -- 15 percent?

8    A   Yes.

9    Q   Why do you say that?

10   A   Because we believe that most equity

11   investments -- and this is an equity yield -- now should be

12   closer to 20 percent.

13   Q   And why do you believe that?

14   A   Because that's where we see the market, that's

15   the way we are investing our money.

16   Q   So you just applied 15 percent to be nice?

17   A   Because we wanted to -- we had made an offer of

18   200-, and we wanted to show even with these assumptions

19   that you really can't get above 200-.

20   Q   So you made the offer before you did this

21   calculation?

22   A   Yeah.  We didn't make the offer based upon this

Morris vs. Buvermo                                          Deposition of J. Gardner 10/26/06

---

302

1    calculation at all.
2        Q    I see.
3        So this was made after the $200,000 offer was
4    made to --
5    (Proceedings participants speaking at the same time.)
6        A    Whenever we --
7        Q    -- this was the offer --
8        A    -- whenever we --
9        THE COURT REPORTER:  Wait, wait.  I didn't get
10   part of that.
11       BY MR. HADDAD:
12       Q    This was -- this was prepared after the $200,000
13   offer to Mr. Morris was made?
14       A    This was prepared after we had agreed to make a
15   $200,000 offer.
16       Q    What factors do you consider in determining what
17   the discount rate should be?
18       A    Our judgment about the market, our judgment about
19   what rate we're willing to invest our money, and our
20   judgment about other conditions.
21       Q    And do you know what those other conditions are?
22       A    It varies.

---

303

1        Q    What about in this particular case?
2        A    I'm not sure it's a relevant question because
3    we're not valuing this property here but we're giving some
4    ranges of estimates.
5        Q    That's fine.
6        You just came up with a discount rate of 15
7    percent -- at least you used a discount rate of 15 percent.
8    And I just wanted to know what factors you relied on in
9    coming up with that.
10       A    The factor we relied on is that's the number that
11   totals close to 200-.
12       Q    I see.
13       So you played with the discount rate so that it
14   would get to around 200-?
15       A    And then the question is:  Is that a reasonable
16   discount rate or not?  In our opinion, it appeared high.
17   But regardless we were willing to make that offer.
18       Q    The checks for your employees, those are cut by
19   Beers & Cutler?
20       MR. SMITH:  Paychecks?
21       MR. HADDAD:  Yes.
22       A    Paychecks?

---

304

1        No.  I think we have a service.
2        BY MR. HADDAD:
3        Q    Who is the service?
4        A    I don't know; I'd -- I'd be guessing.
5        Q    Do you recall having any disagreements with
6    Mr. Morris during his employment with Buvermo about --
7    well, him complaining about you interfering with his
8    ability to do his work?
9        A    Yes.
10       Q    Okay.  And what specifically do you recall about
11   that?
12       A    Well, I recall Jonathan and I having a number of
13   discussions about his frustrations, whether I was
14   interfering with his ability to do his job or not, yes.
15       Q    Okay.  Do you recall meeting with Mr. Morris and
16   the Dutch, as you guys called them, Mr. van Rhee and
17   Mr. Tjaden, regarding ironing out those differences?
18       A    Yes.
19       Q    And that was in December; correct?
20       A    Yes.
21       Q    Okay.  And it was determined at that meeting that
22   you should cease spending as much time as you were at the

---

305

1    office; isn't that right?
2        A    Yes.
3        Q    Okay.  And do you know why they felt that was
4    appropriate?
5        A    Yes.  I know that the discussion that Mr. Tjaden
6    and Mr. van Rhee and I had prior to the discussions with
7    Jonathan -- and I had felt that Jonathan and I were
8    disagreeing enough and it looked like there was enough
9    differences of our views that we were really just weren't
10   going to be able the work things out.  That was my concern.
11       Q    Uh-huh.
12       A    And I was concerned about whether we really did
13   have the right person for the job or not.  And I
14   was discussing with Mr. Tjaden and Mr. van Rhee whether we
15   should just make a decision now that we had the wrong
16   person and go ahead and move to terminate.
17       And what Mr. Tjaden particularly said is, "Are
18   you sure that we've really given Mr. Morris the chance to
19   do what he's capable of?"  And he said, "You know, suppose
20   Mr. Morris is right; suppose you are interfering with him;
21   and suppose that's keeping him from doing his job.  Is that
22   really fair?"

---

306

1    And we talked about it, and we said -- and I
2  said, "Well, you know, you might be right on that. I don't
3  know. Maybe we haven't given this enough of a try; maybe
4  we haven't done quite enough.
5    "But, as I say there's" -- "you know, Mr. Morris
6  is" -- "you know, his strength is in acquisitions. He's
7  just identified a deal, the Spotswood deal; so maybe that's
8  something that we can give consideration to.
9    "And maybe if I interfere less, things will do
10  better, with one exception. You know, we have this
11  relationship with JBG, which I have had for a long period
12  of time. And in my judgment it would be wrong for me to
13  step aside from that now and have Mr. Morris go forward in
14  that relationship."
15    So -- and I also said, "If we decide to go
16  forward with Mr. Morris, we can't do it in one of these,
17  Let's sort of think of the downside; this thing's going to
18  fail. We've got to say that we're either going to
19  terminate now or we're going to give full support, we'll
20  make it" -- "do everything that we can in our best
21  interests to make it work. And if it means me stepping
22  aside and coming into the office later, then that's what we

307

1  do. But we can't do it on the basis of doing it
2  begrudgingly. We've got to do it wholeheartedly."
3    And I said, "And I'm committed to doing it that
4  way with those two exceptions."
5    And so we agreed that we had -- maybe we hadn't
6  given Mr. Morris enough of a chance, and that's what we
7  should do.
8    So that's when we agreed that I would continue to
9  handle the JBG account but that I would become less
10  involved in the office -- in fact, I'd only go in one day a
11  week -- and that I would do everything I could to try to
12  make this work with Mr. Morris; you know, try to cooperate
13  with him and try to make it work and try to do everything
14  that I could to help him, because it was clearly in my best
15  interests.
16    You know, if Mr. Morris gets good investments,
17  then I'm putting my money into good investments. That's
18  clearly in my best interests. It's -- I have every
19  incentive for Mr. Morris to succeed, and it's in my best
20  interests for that to happen, and I'm prepared to do that
21  to the best of my ability.
22    That's what we agreed to do, and that's how we

308

1  decided to go forward.
2    Q  Uh-huh.
3    A  And that was the end result of that meeting. And
4  that's when we had the discussion with Mr. Morris and
5  outlined how we planned to go forward.
6    Q  And so you staying out of the office except
7  for -- but for one day a week was one of the ways you felt
8  would be better --
9    A  That was one of the issues with Mr. Morris, that
10  I was around too much and that it was interfering with the
11  operations and he wasn't really able to run the company
12  properly if I was there all the time.
13    So that's what we -- what we agreed to do.
14    Q  And I assume it's your contention that he didn't
15  run the office properly after that point?
16    A  No. I was not involved in the office. I stayed
17  out of the office. And that was up to Mr. Morris and
18  Ms. McCormick to run the office, and I was leaving that
19  alone and letting them do that.
20    Q  And do you have any understanding as to how he
21  ran the office during that time?
22    A  I -- I don't know.

309

1    Q  You don't know?
2    A  No.
3    Q  You subsequently returned after his termination.
4  What did you find when you came back?
5    A  That, you know, the office was -- there's not a
6  lot of things that happened in this intervening time
7  running the office. The key thing is the -- is making
8  deals happen, making -- you know, being out in the market
9  and having things take place.
10    Q  Did you around this same time period suggest to
11  Mr. Morris that perhaps Buvermo should terminate
12  Ms. McCormick?
13    A  I don't recall that.
14    Q  You don't recall any discussion about
15  Ms. McCormick's termination?
16    A  I believe Mr. Morris and I talked about
17  Ms. McCormick and her role. I said, "Jonathan, that's
18  really for you to decide. I'm happy to be a resource and
19  talk it through with you. But you've really got to decide
20  how you structure the company going forward."
21    "And, you know, one of the problems is, you know,
22  Ms. McCormick is a high-salaried employee; and you've got

Case 1:06-cv-01131-HHK    Document 32-6    Filed 02/07/2007    Page 79 of 100

Morris vs. Buvermo                                        Deposition of J. Gardner 10/26/06

310

1   to figure out a way to think that through and work around
2   that. And whatever you think is right, I'm willing to
3   support you."
4        Q   Okay. And just so that I make sure I understood
5   you correctly, do you have any reason to believe that
6   during that time frame where you were only coming to the
7   office once a week and through Mr. Morris's termination
8   that he wasn't running the office as he should?
9        A   No. I was hopeful that things were going the way
10  they should go and that we would be able to work this out
11  and we'd be able to go forward successfully. I was hopeful
12  that that would happen. And I think that was my -- my
13  expectation, and I really wanted that to happen because I
14  wanted good investments to be made that I could be a part
15  of.
16       Q   Okay. I just still want an answer from you as to
17  whether or not you have any basis for -- sitting here
18  today, for saying that during that time frame, after you
19  left the office but for one day a week -- do you have any
20  reason to believe that Mr. Morris didn't operate the office
21  as he should?
22       A   I didn't have information one way or the other.

311

1        Q   Sitting here today, you have no such information?
2        A   Right.
3        Q   Did you have any discussions with Ms. LoPinto --
4   or Mr. LoPinto or Ms. Pearcy regarding terminated
5   Mr. Morris in December of '05?
6        A   Whew. I don't recall whether I did or not.
7        Q   Is it possible?
8        A   It's possible.
9        Q   Okay. And why would you have discussed that with
10  them?
11       A   I might have wanted their opinion.
12       Q   But you don't recall --
13       A   No, I --
14       Q   -- recall talking to them --
15       A   Yeah --
16       Q   -- about that?
17       A   -- I just don't remember.
18       Q   Okay.
19       MR. HADDAD: Can we take a five-minute break?
20  (Whereupon, a brief recess was taken.)
21       BY MR. HADDAD:
22       Q   Mr. Gardner, you just testified that you were

312

1   interested in seeing this situation work out with
2   Mr. Morris back in December and so you volunteered to --
3   well, was that something that you volunteered to do, only
4   coming in once a week --
5        A   It --
6        Q   -- or is that something you were told to do by --
7        A   No, that's what I volunteered.
8        Q   You made that suggestion?
9        A   Yeah.
10       Q   I see.
11           And --
12       A   Or we might have mutually agreed. But it was
13  mutual agreement to do it. It wasn't, like, you know --.
14       Q   Okay. And the point of that was basically to get
15  out of Mr. Morris's --
16       A   Yeah --
17       Q   -- hair?
18       A   -- let him -- stay out of his way, really let him
19  have his way and let's see --
20       Q   Uh-huh.
21       A   -- see how this works.
22       Q   And let him run the office as he see fit?

313

1        A   Right.
2            One thing I might correct you -- I think I
3   misunderstood your question earlier. You had asked me if I
4   had -- what I thought you asked me is if I had observed
5   anything that was awry in the office -- in the office that
6   was not going well --
7        Q   Uh-huh.
8        A   -- I had -- or had I heard anything.
9            I thought you meant just during that period,
10  which I didn't observe. But later I think Ms. McCormick
11  expressed some concern, and she may have expressed to me
12  some concern about the way --
13       Q   Actually, I believe my question to you was:
14  Sitting here today, do you recall anything? And you didn't
15  at that time.
16           But since I asked you that question, you've
17  recalled something?
18       A   Yeah. What -- I did not recall -- and I
19  interpreted your discussion to mean recall anything about
20  my observations during that period alone.
21           But subsequent to the period when I spoke to
22  Ms. McCormick, she had expressed concern about the way the

Case 1:06-cv-01131-HHK    Document 32-6    Filed 02/07/2007    Page 80 of 100

Morris vs. Buvermo                                    Deposition of J. Gardner 10/26/06

314

1    office had operated.
2    Q    Really?
3    A    Yes.
4    Q    Uh-huh.
5    A    And I think that -- I don't know if that -- I
6    think that's more responsive to your question.
7    Q    And what did she express to you?
8    A    That she was concerned about how the office had
9    been operated.
10   Q    That's all she said?
11   A    She said -- I don't recall all the details of
12   what she said.
13   Q    What do you recall?
14   A    Well, I recall that she, you know, felt -- she
15   had concerns about how things were being -- how things were
16   going.
17   Q    You don't recall what the specific concerns were?
18   A    No, I -- no, not in detail, no.
19   Q    Did you document those concerns?
20   A    No.
21   Q    You didn't think it was important to document
22   them?

315

1    A    I didn't think it was necessary.
2    Q    Okay.  Incidentally, did you ever make any of
3    your concerns about Mr. Morris known to him prior to his
4    termination?
5    A    I was expecting, all the way through the
6    breakfast meeting that Mr. Morris and I had right before
7    our March partners' meeting, that Mr. Morris was going to
8    figure out a way to make things work and that we were both
9    going to make this work together.  That was my expectation.
10   Q    So prior to that point you hadn't expressed any
11   concerns to Mr. Morris about his handling of his job?
12   A    Well, I think we had talked about it in December.
13   But since December there might have been one or two
14   instances where we had some strong disagreements.  But in
15   general I was hopeful that the climate was improving.
16   Q    Those disagreements were about your -- or his
17   perception that you were interfering with his job?
18   A    Yeah.
19   Q    It wasn't about you thinking he wasn't doing his
20   job correctly; correct?
21   A    I was hoping that we would see the results that
22   would say that he was doing his job very well, and I was

316

1    waiting to sit back and see how the results came out.
2    Q    Uh-huh.
3         And you mentioned in December expressing concerns
4    about Mr. Morris's performance.  But those concerns weren't
5    expressed to Mr. Morris by you?  They were expressed to
6    Joost and Andre; correct?
7    A    I believe Mr. Morris and I had had some pretty
8    extensive discussions in December about each -- you know, I
9    think both of us were frustrated.
10   Q    So you recall having discussions with Mr. Morris
11   about his performance in December?
12   A    I think that we were talking about both of our
13   frustrations with each other.
14   Q    Does that include his performance?
15   A    Yes, I believe so.
16   Q    You believe so?
17   A    (No response.)
18   Q    Do you recall what about his performance you
19   discussed with him?
20   A    You know, at that time I was concerned with the
21   way he and I were relating to each other; and I was
22   concerned about the way he had related to some of his --

317

1    some of the partnership relationships; and I was concerned
2    with whether he was approaching the market, getting into
3    the market properly.
4         You know, all of those concerns were on the
5    table; and those were the things we discussed in December
6    and made these decisions to go a different direction.
7    Q    And you recall having discussions with Mr. Morris
8    about those concerns?
9    A    I remember Mr. Morris and I having several heated
10   discussions, yes.
11   Q    Incidentally, none of your concerns about
12   Mr. Morris during his employment were documented; isn't
13   that right?
14   A    That's correct.
15   Q    Apart from maybe this document you provided me
16   with today?  I haven't had an opportunity to review it,
17   but --
18   A    Right.
19   Q    -- your statement --
20   A    Yes.
21   Q    -- of events?
22        That's a summary of the evening --

318

1    A   Dinner.
2    Q   -- the dinner in March of --
3    A   Yes.
4    Q   -- 2006?
5        Okay.  Going back to what I had opened up with,
6    that you testified that you wanted to see Mr. Morris
7    succeed in the role --
8    A   Yes.
9    Q   -- as part of that you were just essentially
10   going to butt out, with the exception of taking care of
11   certain things related to JBG?
12   A   Yes.
13   Q   Otherwise, you had essentially said to Mr. Morris
14   and to Joost and Andre, "It's your show, Jonathan" --
15   A   Yes.
16   Q   -- isn't that --
17   A   Yes.
18   Q   -- right?
19       Okay.  And yet in March you were still seeking
20   deals on behalf of Buvermo; isn't that right?
21   A   What are you referring to?
22   Q   Well, I'm just referring to deals other than

319

1    deals related to JBG.
2    A   And what are you -- what are you referring to?
3    Q   Okay.  Do you recall setting up a meeting with a
4    Mr. Terry Hinderman?
5    A   Yes.
6    Q   And do you recall asking Kara McCormick to attend
7    that meeting with you?
8    A   Yes.
9    Q   Okay.  And at the time Kara McCormick was
10   somebody who was supposed to be working for Jonathan --
11   A   That's correct.
12   Q   -- correct?
13       And she wasn't your employee; correct?
14   A   That's not the way we viewed the office.  No,
15   that's not the way we viewed the office.
16   Q   You viewed her as --
17   A   I viewed we all worked together.
18   Q   Okay.  But she wasn't your employee; correct?
19   A   I don't know what you mean, was she my employee.
20   I viewed us all working together.
21   Q   Well, I thought that all you were working on was
22   JBG and maintaining that relationship.  Correct?

320

1    A   Right.  But Ms. McCormick was involved in that
2    relationship as well.
3    Q   But apart from maybe her involvement in that, she
4    was to be somebody who was working with Jonathan; correct?
5    A   That's correct.
6    Q   And Mr. Hinderman, he had nothing to do with JBG;
7    correct?
8    A   That's correct.
9    Q   And you didn't advise Mr. Morris of the Hinderman
10   meeting until after you had set it up; is that correct?
11   A   That's correct.
12   Q   And you didn't advise Mr. Morris that you would
13   be taking Kara McCormick with you, until after you had set
14   that up as well; isn't that correct?
15   A   That's correct.
16   Q   So you really weren't sticking to your end of the
17   bargain there, were you?
18   A   I don't read that that way at all.
19   Q   Okay.
20       (The designation of FPEP property was marked
21       Plaintiff's Exhibit No. 16 for identification.)
22   BY MR. HADDAD:

321

1    Q   You've been handed what's been marked as Exhibit
2    16 to your deposition, Mr. Gardner.  Please take a look at
3    this document and tell me if you recognize it.
4    A   Yes.
5    Q   And is that your handwriting on this document?
6    A   I don't believe so.
7    Q   Do you recognize this handwriting?
8    A   No.
9    Q   Are you positive that's not your handwriting?
10   A   I'm pretty sure it's not my handwriting.  I don't
11   know if it's Ms. McCormick's handwriting or not, but I
12   don't think it's mine.
13   Q   Okay.  Is this a document that you prepared?
14   A   Yes.
15   Q   And when did you prepare the document?
16   A   Whew.  Goodness, I don't remember how long ago.
17   It was sometime prior to March.
18   Q   Of 2006?
19   A   Yes.
20   Q   Was it after you were supposed to be staying out
21   of the office but for one day a week?
22   A   I think I had done a draft of this -- I don't

322

1   remember when it was done.
2       Q   Okay. What was the purpose of this? Why did you
3   draft it?
4       A   The purpose of this is we were working on -- we
5   were working on revising Section 3.03 of the Fidelio
6   Properties agreement and the property designation, and this
7   was a format for the redesigned designation.
8           And I've found whenever I do formats, that
9   they're more effective if I fill in numbers. Even if they
10  aren't the right numbers, at least people can see what they
11  mean and how they add. And so at that time I picked these
12  numbers just as examples in order to have something on the
13  page.
14      Q   Okay. So was this -- this was prepared to serve
15  as a new template for the FPEP designations?
16      A   Yes.
17      Q   Okay. And do you have an idea of what year it
18  might have been prepared?
19      A   My --
20      Q   You said before March. Was it in 2006?
21      A   I believe so. It might have been the end of
22  2005. I don't remember --

323

1       Q   Okay.
2       A   -- because we had been working on the document
3   for quite some time.
4       Q   At that time, by the end of 2005, you knew that
5   no deals were going to close in 2005; right?
6       A   A lot of deals closed in 2005.
7       Q   At that point -- at the time that you drafted
8   this, you were aware that there were no deals closing in
9   2005; isn't that right?
10      A   We may well have closed deals all the way to the
11  end of 2005. I don't know.
12      Q   Okay. Were any deals initiated from Mr. Morris's
13  time at -- other than Spotswood, were any deals initiated
14  from June of 2005 through the end of 2005?
15      A   I don't recall.
16      Q   You don't recall whether any other deals were
17  initiated?
18      A   I'd have to go back and look.
19      Q   Okay. You weren't preparing this, however, for
20  use in 2005; isn't that right?
21      A   Right.
22      Q   You were preparing this for future use in 2006?

324

1       A   That's correct.
2       Q   Okay. And according to Mr. Morris's offer letter
3   and to your prior memorandum to Mr. Tjaden, you weren't
4   supposed to receive any promotes after 2006?
5       A   That's correct.
6       Q   Yet you left yourself on here as a promote
7   recipient.
8       A   This is -- this was designed to conform with the
9   way things had been done in the past so people could see
10  how it was used in the past. In the future there would be
11  different names, different percentages, various other
12  things. That was why I did it, so it would tie in with
13  people in the past.
14          I had no intention -- and, by the way, I don't
15  have any promote interests going forward after 2005. And I
16  surely, if I were going to get it, wouldn't back into
17  getting it by putting it on a sheet like this. I mean
18  that's --.
19          Are you -- are you inferring that I put my
20  percentage here in order to obtain that percentage in
21  future dealings? Is that what you're inferring?
22      Q   What I'm saying is that -- just to remind

325

1   you, this is your deposition, not mine.
2           But what I'm asking you is why you put your name
3   there. If you can provide me with a reason --
4       A   The reason was --
5       Q   -- I'd be happy to hear it.
6       A   -- this is -- this is a format that people could
7   see that's similar to what we've done in the past and you
8   can see how it was done in the past.
9           But it was clearly not my intention to do this to
10  represent that I would be due that in the future. This is
11  a -- this is a template that explains to people how things
12  work.
13      Q   Why does it matter -- who did you need to show
14  how it was done in the past?
15      A   I could have easily done it the other way, and I
16  didn't.
17      Q   I'm just saying you did it to show people how it
18  was done in the past. Well, who?
19      A   I was --
20      Q   Who are you trying to show?
21      A   Anybody who had done these in the past.
22      Q   So Andre and Joost knew how it was done in the

Case 1:06-cv-01131-HHK   Document 32-6   Filed 02/07/2007   Page 83 of 100

Morris vs. Buvermo                          Deposition of J. Gardner 10/26/06

326

1   past. They'd been in the company for a while, hadn't they?
2       A   Well -- and this shows them how it would have --
3   the -- if you saw this designation previously, it looked
4   nothing like this. And this was to relate to -- now, maybe
5   I did it wrong; maybe it wasn't helpful. But I surely
6   didn't do it with the intention of changing my promote.
7       Q   Because you never had any intention of trying to
8   claim a promote for the JBG Reston deal, which is the
9   Reston International Center?
10      A   I at this stage of the game -- I think Jonathan
11  and I talked once. And I said, "Jonathan, you know" -- I
12  intended this to be more of, you know, I had the right, you
13  know to -- to -- you know, this is my deal. I generated it
14  under this new format.
15      I had the right to go back and argue: Look, this
16  is a different format. There -- when we conceived of the
17  earlier one, it was conceived on the basis that I would not
18  be primarily responsible for JBG.
19      It would be logical for me to go back and say,
20  "Wait a minute. Now that I'm primarily responsible, we
21  should renegotiate the deal in the future."
22      But I said, "Jonathan, I'm not going to do that.

327

1   Even though it's logical that I could do that and it's" --
2   and I" -- "and I should be entitled to it, I'm not going to
3   do that. And the reason I'm not is because I want you to
4   be the guy in charge and I want you to go do it and I want
5   to give that promote to you."
6       Q   Well, it would have also been contrary to the
7   agreement that you entered into with -- that the defendants
8   had entered into with Mr. Morris.
9       A   Well, we could have -- you know, the deal was at
10  that time that I was going to back off and Jonathan was
11  going to carry the lion's share. If we've renegotiated
12  that with regard to -- to JBG, it would have been logical
13  to talk about that.
14      But I'm saying even though it might have been
15  logical, that was not my intent and I was not going to do
16  that.
17      Q   You agree, though, it would have been
18  inconsistent with the terms of Mr. Morris's offer letter?
19      A   Right.
20      But there were other things -- we would have had
21  to have talked about it and renegotiated it. And Jonathan
22  could have said, "Hey, wait a minute. That is wrong; I

328

1   don't agree" --
2       Q   Okay.
3       A   -- and we would have had to discuss it.
4       But I'm saying, "I'm not going to even raise it
5   for discussion."
6       Q   So you didn't have an interest in getting a
7   promote in Reston International; right?
8       A   That's -- that's -- that's correct. And I told
9   Jonathan that. And I don't have an interest in the promote
10  in Reston International Center.
11      Q   Isn't this what you pulled out of your pocket the
12  night of the dinner at the Four Seasons?
13      A   This was part of the -- of the items that I
14  wanted to go over with Andre and Joost, yes.
15      MR. SMITH: Let me make one clarification. This
16  is a document that was produced by Mr. Morris. And when
17  you say this is the document that he pulled out of his
18  pocket, I want to make it clear -- or maybe, you know,
19  Mr. Gardner can say whether the document he pulled out of
20  his pocket had this handwriting on there, because I think
21  that's important.
22      THE WITNESS: Yeah. That's an important --.

329

1       A   The document I pulled out was a clean version of
2   this, without any of the handwriting.
3   BY MR. HADDAD:
4       Q   Take a look at the bottom left-hand corner. It
5   appears to be maybe an initial.
6   (The witness reviewed document.)
7       Q   Can you make -- do you know what that is? It
8   looks like a J maybe?
9       A   It might be Joost. Maybe this came from Joost.
10      Q   You pulled out a document similar to this
11  containing everything except for maybe the fax heading and
12  the --
13      A   The handwriting --
14      Q   -- the handwriting --
15      A   Yes.
16      Q   -- and the Bates labeling; correct?
17      A   Yes.
18      Q   And why were you -- why did you pull that out at
19  that dinner?
20      A   Well, this was a discussion that I had had with
21  Andre and with Joost. What I wanted to do was to advise
22  them of the types of things we were considering to make

330

1  these modifications so they weren't surprised.

2      It was a chance to sit down -- typically many

3  times we would use these dinners to have an informal

4  discussion: Here's what I'm working on. I just wanted to

5  tell you this is happening. I just wanted to have a chance

6  to talk to you about it so that we could have discussion a

7  number of times before it comes up for final review. So it

8  was in that nature that we were doing it.

9      Q   Wouldn't you agree that it would make more sense,

10 though, that if you were doing it to show them what you

11 planned to do, that you wouldn't have included yourself at

12 all and just included Jonathan Morris under --

13     A   I could agree it --

14     Q   Sir, sir.

15         -- under the breakdown of FPEP promote? Wouldn't

16 that have made more sense?

17     A   It -- when I prepared this, there was a logic for

18 doing it this way. I just didn't go back and change it.

19 In retrospect, I should have gone back and changed it;

20 you're right.

21         But I don't -- I had no idea that Jonathan would

22 be as inflamed as he was. I would have thought that he and

331

1  I could have had a simple discussion, which I tried to

2  have; he would have said, "Yes, you're right. You know, I

3  want you to know my feelings because you're doing this.

4  But I understand why you did it." Then things would have

5  gone on. I mean that would have been fully my explanation.

6      And I -- when he acted the way he did, I just --

7  I was blindsided.

8      Q   I see.

9      A   If I had known he was going to react that way, I

10 probably would have done it totally differently. But I

11 surely was blind side by that reaction.

12     Q   So you don't understand why Jonathan may have

13 been --

14     A   I can --

15     Q   -- upset --

16     A   -- understand that he --

17         THE COURT REPORTER: Sir, please.

18         THE WITNESS: Sorry.

19         BY MR. HADDAD:

20     Q   My question was: So you don't understand why

21 Jonathan may have been upset by this?

22     A   I could understand why he would have had

332

1  concerns. But I would have thought that he and I could

2  have talked about it. And I tried. I said, "Jonathan,

3  this is an example"; and that that would have caused the

4  problem to go away. And he said, "Fine. Next time you use

5  an example, why don't you use better numbers." You know,

6  then we would have gone on; and that would have been fine.

7      Q   But don't you understand how maybe Mr. Morris was

8  seeing a pattern here of overreaching on your part?

9      A   No, I --

10         MR. SMITH: Object to form --

11     Q   You don't see how --

12         MR. SMITH: -- calls for speculation.

13         BY MR. HADDAD:

14     Q   -- he might have -- he thought that?

15         MR. SMITH: Same --

16     A   I'd --

17         MR. SMITH: Same --

18         THE COURT REPORTER: Wait. I couldn't get your

19 whole statement.

20         MR. SMITH: Same objection.

21         BY MR. HADDAD:

22     Q   Sir?

333

1      A   I did not -- I do not feel there would have been

2  a basis for that. And if Jonathan felt that way, he felt

3  that way.

4      Q   Okay. Well --.

5          After the February of '05 discussion that you had

6  with Mr. Andre -- or Mr. van Rhee and Mr. Tjaden regarding

7  perhaps terminating Mr. Morris --

8          MR. SMITH: You said, "February of '05".

9          MR. HADDAD: Sorry.

10         BY MR. HADDAD:

11     Q   -- December of '05 regarding terminating

12 Mr. Morris, when was the next discussion you had with them

13 regarding Mr. Morris's termination?

14     A   I don't recall any discussion prior to the

15 evening of the March 20- -- I guess whenever -- whenever we

16 had our dinner.

17     Q   Okay. And I believe you previously testified

18 that you had at least at that time no basis for concluding

19 that Mr. Morris wasn't properly performing his job in that

20 time period; correct?

21     A   That's correct.

22     Q   Okay. Did you concur with the suggestion to

334

1  terminate Mr. -- well, who made the suggestion to terminate
2  Mr. Morris?
3      A   The agreement to terminate was made by Mr. Tjaden
4  and Mr. van Rhee.
5      Q   Okay.  And what was the basis for that?
6      A   I think they were really concerned that they had
7  a person who wouldn't properly represent their fiduciary
8  interests.
9      Q   Wasn't the -- do you recall them -- one or both
10  of them saying to Mr. Morris that he should be aware of
11  documents that you are presenting at that dinner before
12  their presentation?
13      A   Yeah, I recall Mr. van Rhee making that
14  statement.
15      Q   And when prior to that dinner had you made
16  Mr. Morris aware of those documents?
17      A   Well, I had tried to show them a number of times
18  in the previous days, but I had had no success.
19      Q   A number of times in the previous days?
20      A   Yeah.  We were preparing some of the documents.
21  I said, "Jonathan, I'm happy to go over these with you."
22  But we just weren't able to do it.

335

1      Q   Really?
2          So you were in the office, obviously, on a
3  regular basis then?
4      A   I was in the office more that -- that was like --
5  we were having our partners' meeting, and it takes about
6  three weeks prior to the partners' meeting to complete
7  preparation of all of the documents that make up our board
8  package.  And --
9      Q   And -- I'm sorry.
10      A   -- and since I was responsible for the JBG
11  portfolio, which was a large part of that report, then I
12  needed to be in the office to prepare that part of the
13  report.
14      Q   Okay.  And so on how many separate occasions do
15  you recall trying to present this document as well as the
16  other documents you --
17      A   I don't recall.
18      Q   You have to let me finish, sir.
19          On how many occasions do you recall prior to the
20  dinner trying to discuss this document as well as the other
21  documents you pulled out of your pocket that night with
22  Mr. Morris?

336

1      A   I don't recall the number of times.
2      Q   Okay.  Was it more than one?
3      A   I think it was more than one.
4      Q   Was it more than two?
5      A   I don't know.
6      Q   You don't know if it was more than two?
7      A   No.
8      Q   So it might have just been two occasions?
9      A   Yeah, one or two occasions.
10      Q   And his response was what exactly?
11      A   I just -- didn't really seem interested in
12  reviewing them.
13      Q   He didn't seem interested in reviewing a
14  designation of FPEP property?
15      A   The changes we were making to this.  And we had
16  some other documents we were also working on.
17      Q   Okay.  You were preparing board packages;
18  correct?
19      A   Yes.
20      Q   And that's when you saw fit to show him these
21  documents?
22      A   As part of -- we were doing this in addition to

337

1  preparing the board package.
2      Q   Okay.  A lot of work goes into preparing those
3  board packages; correct?
4      A   Yes.
5      Q   It could have been that just Mr. Morris didn't
6  really have time to look at what you were trying to show
7  him; right?
8          MR. SMITH:  Objection; calls for speculation.
9          BY MR. HADDAD:
10      Q   He was busy, wasn't he?
11      A   I don't know --.
12      Q   Sir, do you recall him being busy then?
13      A   I recall us being busy, yes, all of us.
14      Q   In any event, you knew at the time that you went
15  to the dinner that he hadn't had an opportunity to review
16  these?
17      A   Yes.
18      Q   Yet you decided to pull them out anyway; isn't
19  that right?
20      A   Right.
21      Q   Okay.  And you felt that that was appropriate?
22      A   Yes.

338

1    Q   Okay. And as a result of that Mr. Morris got
2    berated for not knowing what those documents contained;
3    isn't that correct?
4    A   That's correct.
5    Q   And he reacted how?
6    A   By the way, we're not -- the document's that at
7    issue was not this document. It was another set of
8    documents.
9    Q   What do you mean "the document"? What
10   document --
11   A   The document that Mr. Morris was berated for not
12   having reviewed was not this document; it was another set
13   of documents.
14   Q   It was what? The revisions to 3.03?
15   A   No.
16   Q   What were they?
17   A   It was the settling up -- if we would go back to
18   the document that -- this one here (indicating), it was the
19   settling up of these items here, paragraph 3.
20   Q   So you're referring to Exhibit No. 12, and you're
21   referring to --
22   A   Paragraph 3 of Exhibit 12.

339

1    Q   -- the shortfalls --
2    A   Yes.
3    Q   -- in the profits?
4    A   Right.
5    Q   Okay. That's the document that he was berated
6    for not having reviewed prior to the meeting?
7    A   That was the document.
8    Q   Okay.
9        MR. SMITH: Hold on. Let me make sure we're
10   clear. Are you saying Gardner Exhibit 12 is the document
11   that Mr. Morris was berated about?
12       THE WITNESS: No.
13       MR. HADDAD: No. I think what he's saying is
14   that the document that relates to something that's
15   discussed in paragraph 3 is what was pulled out and what he
16   was berated for not having reviewed prior to the meeting.
17       THE WITNESS: That's correct.
18       BY MR. HADDAD:
19   Q   You had told Mr. -- you hadn't told Mr. Morris,
20   by the way, that you intended to bring that out at the
21   meeting, had you?
22   A   Yeah. And I thought that --

340

1    Q   I'm sorry. Your answer was?
2        Had you told Mr. Morris that you intended to
3    bring out those documents at the meeting?
4    A   I -- I might have told him that I planned to do
5    it. But the documents themselves and the issues themselves
6    didn't really affect Mr. Morris at all. It was a past deal
7    that I had with the Fidelio properties that we were to wind
8    up. And I thought Andre was wrong in berating Mr. Morris.
9        But I thought it was the kind of thing that, you
10   know, should have -- you know, should not have been
11   something that was a major concern. But, you know, it
12   could have, you know, been handled properly and -- and
13   would not have been an issue.
14   Q   So Mr. Morris ultimately after what one might
15   consider a heated exchange left the restaurant?
16   A   Yes.
17   Q   Okay. And do you recall who was doing the
18   yelling and who was doing the listening in that meeting?
19   A   I think the best recollection that I have of that
20   meeting is in the document that I wrote several days
21   thereafter that we've given to you.
22   Q   Okay. How many days thereafter did you prepare

341

1    that document?
2    A   I think it was just a couple of days.
3    Q   Okay.
4        MR. HADDAD: We'll take a break in a little bit
5    for me to review this. Let's see if we can get through
6    some other things here.
7        BY MR. HADDAD:
8    Q   Jonathan left. Then I assume the decision was
9    made then to terminate him?
10   A   No. I think we discussed it, and we talked about
11   our feelings, and we agreed that we would sleep on it
12   overnight and talk about it more the next day. So the
13   decision really wasn't made -- I don't know. Joost and
14   Andre may have decided. But my understanding is we would
15   wait and decide the next day to make the decision.
16   Q   What was your understanding as to the basis
17   for -- well, what was the basis for his termination?
18   A   I think when you read the memo, you'll get a good
19   sense for my feeling. But, in my belief, the basis was
20   just a lack of confidence in Mr. Morris that he could
21   really act as that fiduciary representing the partners and
22   acting in their best interests.

342

1    Q   Okay.

2    A   I just think they had lost confidence.

3    Q   All right. Just to remind you, you're here to

4    testify as a designee on behalf of numerous entities.

5    I'm just asking for what the defendants' position

6    is in terms of why he was being terminated.

7        MR. SMITH: I think he's given it to you.

8        MR. HADDAD: No. He said it's his belief.

9    A   Yeah. I think that -- that in the large measure

10   there was concern -- there was concern as to whether he was

11   doing his job properly; there was concern as to whether he

12   was outsourcing deals properly and was he actually --

13   actually working hard on our behalf.

14       But I believe that the heart of it was this lack

15   of confidence in playing the role that was very crucial to

16   be played for Fidelio partners.

17       BY MR. HADDAD:

18   Q   And all that was discussed at this dinner --

19   A   Yes.

20   Q   -- that night?

21   A   Yes.

22   Q   Do you recall any specific examples of things

343

1    that Mr. Morris was doing that inspired lack of trust?

2    A   Well, I think that one of the central things that

3    caused lack of trust was the fact that he and I weren't

4    able to get along. And I think that the whole system is

5    set up on the basis that he and I develop a trust between

6    each other, and that in turn the partners develop a trust

7    in him. And one feeds on the other. They tend to feed on

8    the other. So that was a symptom, I believe.

9        I believe the events at the dinner were more a

10   confirmation of a long series of concerns, you know,

11   concerns that had been raised back in December and that

12   culminated in the dinner. But I don't think the dinner

13   itself was the event. It was an indication of a

14   culmination of a series of events.

15   Q   Okay. Well, from December through March had

16   Mr. van Rhee or Mr. Tjaden visited the United States, to

17   your knowledge?

18   A   No.

19   Q   Okay. So they didn't really have a -- they

20   didn't have any personal knowledge of what was going on in

21   terms of day-to-day office management --

22   A   Yes.

344

1    Q   -- isn't that right?

2    A   Yes.

3    Q   And you didn't either; isn't that right?

4    A   Yeah. They were depending on Ms. McCormick and

5    myself and other things and --.

6    Q   They were depending on Ms. McCormick and yourself

7    for knowledge as to what was going on?

8    A   Right.

9    Q   Of course, you didn't know because you weren't in

10   the office hardly; right?

11   A   Right.

12   Q   And are you aware of any communications between

13   Ms. McCormick during that time period with Mr. Tjaden and

14   Mr. van Rhee?

15   A   No.

16       And I don't think that that period of time was

17   the critical period of time. I think it was the

18   culmination of this long period of time and the fact that

19   we were struggling with these difficulties. It just didn't

20   seem to be fitting.

21   Q   And you referred to his performance -- and

22   yet Mr. Morris was able to initiate the Spotswood Valley

345

1    deal; isn't that right?

2    A   Yes.

3    Q   And that's fairly sizable deal, wouldn't you say?

4    A   Yes.

5    Q   In fact, the amount of investment was -- what? --

6    3.2 million on behalf of Fidelio?

7    A   Yes.

8    Q   Which is up there in comparison to its other

9    investments; isn't that right?

10   A   It's in the range of good investments for us,

11   yes.

12   Q   So he had performed well in that regard; isn't

13   that right?

14   A   Well, what he had done is he had sourced the

15   deal, only one. I think Mr. Morris negotiated the deal.

16   And, you know, each person has their own negotiating style.

17   But I would not rate Mr. Morris more than a C in his

18   ability to put the deal together and make it happen.

19   Q   Hm.

20       And what specific aspects of the deal is it you

21   didn't like?

22   A   I think just the overall way the deal was done,

346

1  the way it was structured. And, obviously, Mr. Morris and
2  I will disagree on this because I think he believes he did
3  a very good job; and I happen to think that it was job that
4  I could sign, it was acceptable to sign. But it surely was
5  not a -- top-notch job, I didn't believe. But it was
6  acceptable, and I was willing to sign on it.
7     Q  I'm trying to figure out what about it made it
8  that it wasn't a top-notch job. You're saying his overall
9  sort of -- I mean you're speaking in very general terms,
10 and I'd like a specific.
11    A  Well, if you want, we could --
12    Q  Do you know any off the top of your head?
13    A  You know, I'd rather -- you know, we could go
14 through the deal point by point if necessary. But, you
15 know, it was -- in my view -- and I've done a lot of these
16 things. I thought it was, you know, a -- a modest effort,
17 a C effort.
18    Q  Hm.
19    '  And at the time of Mr. Morris's termination, how
20 much involvement had you had in that deal?
21    A  Well, I had -- Mr. Morris had kept me apprised of
22 the negotiations, and I had read the documents because I

347

1  was going to have to sign the documents.
2     Q  Uh-huh.
3     And did you tell him when you read the documents
4  that, you know, you felt that this was a C effort?
5     A  I didn't give him a judgment on the effort. I
6  just said, "I think it's acceptable, and I'll sign it."
7     Q  Uh-huh.
8     At some stage after Mr. -- at some point after
9  Mr. Morris's termination, you had contacted Mr. LoPinto to
10 get him to speak with Mr. Morris. Do you recall doing
11 that?
12    A  I recall talking to Ms. Pearcy, and I recall
13 talking to Mr. LoPinto, and I believe Mr. LoPinto
14 volunteered that he would speak with Mr. Morris.
15    Q  You followed up then with Mr. LoPinto to find out
16 if he had, in fact, spoke to Mr. Morris; right?
17    A  I believe I would have called him and said, "What
18 happened?"
19    Q  What were those discussions in reference to; do
20 you know?
21    MR. SMITH: Which discussions? The one he was
22 having with --

348

1     MR. HADDAD: Mr. LoPinto with Mr. Morris.
2     A  I think that the discussions were oriented around
3  what Jonathan intended to do and -- and why Jonathan was
4  taking the position with regard to the length of his
5  employment agreement.
6     BY MR. HADDAD:
7     Q  Were you -- did you ask Mr. LoPinto to try to
8  speak with Jonathan about this issue of the term?
9     A  I don't recall -- I don't recall whether I asked
10 or Mr. LoPinto volunteered. I -- I believe he volunteered.
11    Q  He volunteered to talk to Mr. Morris about --
12    A  Yeah, about why Jonathan was taking the position
13 he was taking, because he nor I agreed with it.
14    Q  Uh-huh.
15    Okay. Well, let's talk briefly about Spotswood
16 Valley.
17    A  Okay.
18    Q  Can you describe what -- that acquisition for me,
19 just in general terms.
20    A  It's a shopping center property in Harrisonburg,
21 Virginia.
22    Q  And do you recall when the opportunity was

349

1  presented to Buvermo?
2     A  I'd have to go back and -- when it was first
3  presented, I'd have to go back and look at the records. I
4  don't know.
5     Q  I believe you indicated earlier that during your
6  discussions in December of '05, the Spotswood Valley deal
7  had been -- was mentioned. Do you recall saying that?
8     A  Yeah. I think I -- if you wanted me to pick the
9  date, I'd have to look at -- I'd have to go back and see.
10 I don't -- I can't give you a date.
11    Q  Can you give me a year?
12    A  I'd have to go back and look. I don't know
13 whether it was in '05 or '06.
14    Q  Do you recall during your discussions with
15 Mr. Tjaden -- do you recall discussing earlier your
16 conversation with Mr. Tjaden and Mr. van Rhee in December
17 about Mr. Morris's proposed termination? Do you recall
18 testifying about --
19    A  Right.
20    Q  -- that today?
21    Do you recall saying during that testimony that
22 the Spotswood Valley deal was mentioned during that

350

1  discussion?
2    A  I do that.  And I don't know remember whether it
3  was during that period of time or later.
4    Q  Okay.
5    A  I -- you know, I don't recollect that.  I might
6  have said it then, but right now I can't pin the date down
7  without looking.  But there is a date.
8    Q  There's no dispute here, is there, that
9  Mr. Morris initiated that deal --
10   A  That's correct --
11   Q  -- himself; is that correct?
12   A  -- there is no dispute.
13   Q  In which case I don't think it matters whether
14  it's 2005 or --
15   A  It --
16   Q  -- 2006?
17   A  -- probably doesn't.
18   Q  But it is -- I believe it's 2005.
19   A  Yeah.  I think you could well be right.  I just
20  don't remember.
21   Q  Okay.  And there was a time in early 2006 that
22  Fidelio committed to investing in that transaction; isn't

351

1  that right?
2    A  I'm not sure when we made that commitment --
3    Q  Okay.
4    A  -- but we did commit.
5    Q  You entered into a letter of understanding with
6  SJM --
7    A  Yes.
8    Q  -- regarding that particular transaction;
9  correct?
10   A  Yes.
11      By the way, the principal of SJM is
12  Steve Garchik, and we had previous -- done two deals
13  previously with him.  So we did have knowledge of him.  He
14  knew us, and we liked respect him as a developer.
15   Q  Okay.
16      MR. HADDAD:  If you could mark this as Exhibit
17  17.
18      (The SJM letter dated 1/31/06 was marked
19      Plaintiff's Exhibit No. 17 for identification.)
20      BY MR. HADDAD:
21   Q  Mr. Gardner, this is the letter of understanding
22  that Fidelio executed with SJM --

352

1    A  Okay.
2    Q  -- and others concerning the Spotswood Valley
3  deal; isn't that right?
4    A  Yes.
5    Q  Okay.  So as of January 31st, 2006, it was pretty
6  clear that Fidelio was going to be moving forward with this
7  transaction --
8    A  Yes.
9    Q  -- right?
10   A  And it's likely then that in December we were --
11  this one was one that we had been talking about or talking
12  to people about, I think.
13   Q  Okay.  In fact, Fidelio made certain deposits in
14  February of '06; isn't that right?
15   A  I believe -- I know we made deposits in -- around
16  February.  It sounds like the right time.
17      MR. HADDAD:  Let's mark this as Exhibit 18,
18  please.
19      (The SJM payment records were marked Plaintiff's
20      Exhibit No. 18, collectively, for
21      identification.)
22      BY MR. HADDAD:

353

1    Q  If you could -- these reflect various -- this
2  document marked Gardner 18 reflects various payments that
3  appeared to have been made from Fidelio Properties account
4  to SJM Partners, Inc., account.  One is for 175,000, and
5  then appears on the second page another for 250,000?
6    A  I have two on the front page.
7    Q  I'm sorry.  Are they both on there?
8    A  Yes.
9    Q  So one for 175,000 and one for 250,000.  Do you
10  see that?
11   A  Yes.
12   Q  And that is consistent with your recollection of
13  what occurred?
14   A  I don't recall the amounts, but these look
15  like -- I know they were sizable amounts.
16   Q  And ultimately the deal closed on July 6th, 2006;
17  isn't that right?
18   A  If you have that date --
19   Q  Yeah.
20   A  -- I have no reason to disagree.
21   Q  Well, I don't have the closing settlement
22  statement -- I do have the settlement statement, but not

354

1  here with me.
2      I have another document we can mark as Exhibit
3  19.
4      (The letter dated 7/6/06 was marked Plaintiff's
5      Exhibit No. 19 for identification.)
6  BY MR. HADDAD:
7    Q   This reflects that Fidelio made a payment of
8  $3,296,876 on July 6th, 2006?
9    A   Yes.
10   Q   And that was consistent with -- that was the date
11 of closing, if I'm not mistaken?
12   A   Yes, I would think so.
13   Q   Okay. And is that the total of Fidelio's
14 investment in this --
15   A   This plus the other deposits. I don't -- I don't
16 know exactly what our total is as of now, but --
17   Q   Okay.
18   A   -- but our books would show that.
19     I'm sure there's these two deposits -- my guess
20 is these two deposits would be added to this, plus there
21 may have been some others.
22   Q   I also see -- on Exhibit No. 18, the last page I

355

1  see a check to Tremont Realty Capital for $50,000.
2    A   Yes.
3    Q   And is that also part of the Spotswood
4  investment?
5    A   Whew.
6    Q   Or do you know --
7    A   I would assume so. I think this is part of a
8  commitment fee for a lender.
9    Q   Okay. Now, is the amount -- in addition to the
10 amounts that we've seen today, did you then also invest
11 yourself a 2.5-percent -- make a 2.5-percent capital
12 investment?
13   A   Typically the way that we do our investments is
14 Fidelio makes the investment, and then I reimburse them for
15 my 2 and a half percent.
16   Q   Okay.
17   A   So it wouldn't necessarily be in addition to
18 this; it would be part of this.
19   Q   It would be included?
20   A   Yes.
21   Q   All right.
22   A   And there would be a separate transaction where I

356

1  would lend money to Fidelio, or they would net it against
2  other money that I was due.
3      MR. HADDAD: Would you mark this as 20.
4      (The Spotswood Valley financial documents were
5      marked Plaintiff's Exhibit No. 20, collectively,
6      for identification.)
7  BY MR. HADDAD:
8    Q   Okay. I'm handing you what's been marked as
9  Exhibit 20, and it appears to be a series of calculations
10 related to the Spotswood Valley deal?
11   A   Yes.
12   Q   Do you know when these were prepared?
13   A   When were they prepared?
14   Q   Yes.
15   A   The only basis I would have to go on is to look
16 at the date down in the right-hand corner. And that
17 sometimes reflects when they were prepared, and sometimes
18 it reflects when they were printed, so I don't know which
19 of those it would be.
20   Q   Do you know whose responsibilities it was to
21 prepare these?
22   A   Typically Ms. McCormick prepares our documents.

357

1  Now, whether these came from her or whether they came --
2  the documents that had been prepared by the developer I
3  don't know.
4    Q   Okay. Well, this first spreadsheet is the one
5  that you referred to earlier as having identified -- if I'm
6  not mistaken, the first page, you were referring to the
7  promote in this page, if I'm not mistaken. And it's saying
8  that you calculated Mr. Morris's promote at 15.5 percent.
9    A   Let me see.
10 (The witness reviewed document.)
11     THE WITNESS: Do you have a --
12     MR. SMITH: Without a calculator, I don't think
13 we're going to be able to answer that.
14     MR. HADDAD: There's one right there.
15     THE WITNESS: I --.
16 (Discussion off the record.)
17   A   Yep.
18 BY MR. HADDAD:
19   Q   And this is something that I believe you
20 testified you had done by mistake?
21   A   Yeah, this was done my mistake.
22   Q   So you did have some involvement in --

358

1    A   Well --
2    Q   -- preparing this; right?
3    A   -- when I say -- the number -- the 15 and a half
4    percent was a mistake.
5         Now, whether -- my guess is Ms. McCormick
6    probably put that in without -- and we just really didn't
7    talk about it, focus on it enough.  But we have intended to
8    correct that in the future.
9         It's just -- you know, the importance of this
10   projection is to see if the deal overall works.  And the
11   number by itself wouldn't affect that overall conclusion,
12   so we chose not to go back and change that.
13   Q   Does this look like something that came from your
14   office?
15   A   This page here could well have come from our
16   office.  My guess is that all of these are backup
17   assumptions which had come from the developer.
18   Q   Okay.  The assumptions may have come from the
19   developer.
20        But how about the preparation of these --
21   A   These documents were probably prepared by the
22   developer.

359

1    Q   Okay.
2    A   And this document was probably prepared in our
3    office using input from the developer's projections.
4    Q   I see.
5         And is that what you typically do on these deals?
6    A   Many times, yes.
7    Q   Okay.  What about with respect to Reston
8    International Center; have you prepared an analysis like
9    this first page?
10   A   The Reston International Center is -- this is a
11   single property that's operational, probably one of the
12   less complicated we deal with.
13        Reston International Center is a much more
14   complex project.  A building which a project like this has
15   been on, adjacent land subject to rezoning and
16   redevelopment, which projections have not been done on, we
17   looked at it more as it was -- was the land value proper
18   given the things that people hoped to do.
19        But it -- there was not one like this done for
20   that investment in its entirety.
21   Q   And none has been done to date?
22   A   I don't believe so.

360

1    Q   So you haven't sort of calculated out what the
2    promote might be down the road, as you have here --
3    A   Yeah.
4    Q   -- for the Spotswood Valley --
5    A   It's -- remember earlier on we talked about we
6    had land parcels and we had a number of different vertical
7    developments?
8    Q   Uh-huh.
9    A   Well, those were -- they came out totally
10   different than anybody thought about initially.  This
11   process was at the beginning like that, so it's really not
12   at the state that we can do those now.  We can do them, but
13   they would have no meaning.
14   Q   Okay.  Did anyone other than you invest equity
15   in this -- well, you and Fidelio invest any equity in this
16   deal, on the Fidelio side?
17   A   I believe that's right.
18   Q   Just the two of you --
19   A   Yes.
20   Q   -- just you and Fidelio?
21   A   Yes.
22   Q   All right.  And I believe you indicated earlier

361

1    that the only person that you know of that has a promoted
2    interest in this deal is Mr. Millspaugh --
3    A   Yes.
4    Q   -- at 12 percent?
5    A   Yes.
6    Q   And you're not sure about the remaining 3 and a
7    half percent?
8    A   We haven't decided yet, if anything, that's done
9    with that right now.  That's on Fidelio's side of the
10   ledger.  And it may well be that it stays there.  We just
11   don't know.
12   Q   Do you recall why this spreadsheet was prepared?
13   A   We prepare spreadsheets a number of times to try
14   to look at the performance -- so we prepare a number of
15   these as the -- as the investment progresses so -- and
16   they're basically to keep track of the investment, to make
17   sure we understand the economics of the investment and how
18   it works.
19   Q   Okay.  And isn't this also what you use to sort
20   of show the Fidelio partners?
21   A   We use a format like this.  Now, whether we
22   showed them this one or not I don't know.

362

1    Q   Okay.  Do you perform different sort of models;
2  perhaps a more aggressive, a more conservative model?
3    A   Yeah, that's part of the reasons you have the
4  models; that you can change assumptions and look at the
5  impact of the various assumptions.
6    Q   And have you done any other models such as this
7  for Spotswood Valley Shopping Center?
8    A   I -- we've done a number of models for Spotswood
9  Valley, looking at various changes and assumptions, yes.
10   Q   Do you still have those available?
11   A   I -- I'm sure they're available.  You know, I'm
12  sure --
13   Q   They would like look this?
14   A   They could.  They could look different than this.
15  But generally this is format that we use.
16   Q   Let's talk about the Reston International Center
17  deal.  Can you just generally describe that acquisition for
18  me, please.
19   A   Yes.  The -- it's a part of a much larger
20  assembly.  It's one piece of a larger assembly which we and
21  two other partners have been assembling since about 2000.
22  It is at the intersection of Reston Parkway and the toll

363

1  road.
2    Q   Uh-huh.
3    A   And there's currently a Reston -- Sheraton Reston
4  hotel, a condominium development called The Mercer, an
5  office building under construction, and a hotel under
6  construction and -- along the parkway.
7        And then further down the line, there's two
8  parcels, one of which we have an option on and one of which
9  we've acquired that have office buildings on them.
10       Then going up the other way is a large
11  building -- if you drive out to Reston, it's the black
12  building with the white top, the largest -- the highest
13  building in Reston.
14   Q   Uh-huh.
15   A   If you're going to the airport, it would be on
16  your left you'll see it.  And there's about 15 acres or so
17  of land adjacent to that property.
18   Q   So this particular deal --
19   A   It's just the office building and land adjacent.
20  But it's intended to be part of whole larger development.
21   Q   Okay.
22   A   And it's all owned by the same set of partners.

364

1    Q   And as you rated the Spotswood deal as a sort
2  of -- a grade-C deal, where would you rate this one?
3    A   A grade-C deal in what regard?
4    Q   Well, I believe you testified earlier that you
5  believed that the Spotswood deal was sort of on a grade-C
6  level.  Am I mistaken?
7    A   You're mistaken, yes.
8    Q   Okay.  How would you compare this in terms of
9  potential profitability with the Spotswood Valley deal?
10   A   Well, they're -- they're very different animals.
11       The Spotswood Valley building is in existence, so
12  there's no new development.  It does need some
13  repositioning, and it does need some refinancing down --
14  and it needs some careful reworking, releasing, and things
15  like that.  There's value to be added, but it's a single
16  property, and there are a lot less things that need to be
17  done to it.  It's much smaller.
18       Reston International Center is a much riskier
19  venture with a lot -- you know, a lot more risk involved, a
20  lot more rezoning development and other things that need to
21  take place.
22       And there has to be basically a redoing of that

365

1  whole end to become another Reston Town Center, which is a
2  very risky proposition long-term.  But it also has
3  potential for having a lot of profit long-term.  So much
4  higher risk, much higher reward, much more effort involved,
5  much larger process, and a lot more moving parts.
6    Q   And I had asked you whether you had done any
7  projections similar to the one that you had done on
8  Spotswood for Reston International.  I believe your answer
9  was no.
10   A   It's too early.  We believe it's too early now to
11  do those in any meaningful fashion.
12   Q   Okay.  And have --
13   A   We were planning now, and we need to have the
14  plans further down before we can even attempt something
15  like that.
16   Q   I see.
17       Have you done anything at all in that regard in
18  terms of projections?
19   A   We have basically made judgments on that one that
20  the price -- that it's worth the price we paid.  That's
21  been the judgment we've made.
22       And there's a lot of potential.  But it's also

366

1  offset by a long period of time; very high capital cost
2  needs; and a very complex approval design, development
3  process. So, in our judgment, whatever value you put at
4  the end, you'd need to compensate with a high enough
5  discount rate to get you back down to -- right now it's
6  worth what we paid for it.
7      Q   And what discount rate would you apply to this
8  deal?
9      A   To this deal? To which deal?
10     Q   To the Reston International Center.
11     A   I don't know.
12     Q   Okay.
13     A   This one, by the way, is the same -- any property
14  when you start, it's worth what you pay for it.
15     Q   Uh-huh.
16     A   Eventually this one will have more -- this is
17  more likely to have value and less likely to have downside;
18  so it has a narrower risk profile than --
19     Q   You're referring to Spotswood?
20     A   Spotswood.
21         But there's still -- you know, you buy them; and
22  you buy them at the market; and you pay for them what

367

1  they're worth. And then what you do is add value as you go
2  forward. That's the -- that's the name of the game.
3      Q   Can you in any way sitting here today place a
4  value on what -- well, let's say Mr. Millspaugh's
5  promote -- 12-percent promote will be ten years down the
6  road on this.
7      A   On which one?
8      Q   On Reston International Center.
9      A   No.
10     Q   You have no sort of thoughts as to that, as to
11  how you might compute it?
12     A   No. What we hope is it will be positive; because
13  if he's positive, we're positive.
14     Q   Okay. And so you haven't given any thought as to
15  what that promote might be worth down the road?
16     A   Down the road I don't even know how to calculate
17  it.
18     Q   And I assume you believe, sitting here today,
19  that your promote's worth nothing because the project is
20  just under way?
21     A   The property is worth what we paid for it, yes.
22  And I think that's true in both of these cases.

368

1      Q   Now, the Buvermo -- I mean the Reston
2  International Center was a deal that you initiated; is that
3  correct?
4      A   Well, it's -- when you say I initiated it, it was
5  part of this large complex of deals that we've been
6  acquiring as we've gone along.
7          When the opportunity to acquire it came along,
8  JBG approached the existing partners and said, "Would you
9  like to invest additionally?" So I don't know how you --
10  you know, it's -- I initiated the very beginning; and,
11  therefore, I'm the initiator and I'm the one who is
12  responsible for investment.
13     Q   Uh-huh.
14     A   But it's not like I went out on my own and found
15  that. That wasn't necessary.
16         And, in fact, that's true in many of these deals.
17  Many of the deals we do come about because of these
18  follow-on opportunities.
19     Q   It was -- do you know when this deal was
20  initiated approximately?
21     A   I don't. I'd have to go back and see.
22     Q   It was after January -- December 31, 2005;

369

1  correct?
2      A   I'm pretty sure it was after.
3      Q   Okay. And it was initiated prior to Mr. Morris's
4  termination; correct?
5      A   Yes.
6      Q   And the deal on this closed in June of '06;
7  correct?
8      A   Yeah. I don't know the exact date, but it did
9  close -- or it has closed.
10         (The letter dated 6/9/06 was marked Plaintiff's
11         Exhibit No. 21 for identification.)
12     BY MR. HADDAD:
13     Q   Take a look at Exhibit 21. This is a
14  confirmation of an amount wired by Fidelio in connection
15  with the Reston International deal; is that right?
16     A   Yes, I believe so.
17     Q   And that was, give or take, maybe a few thousand
18  dollars, the amount invested by Fidelio in that deal; is
19  that right?
20     A   I don't know the amount that's invested today
21  because I don't know whether we put more money in the deal
22  since then or not. And I don't know whether we had amounts

370

1  that we put in for deposits or whether that was prior to
2  this.
3      Q  Where would that be reflected?
4      A  It would be reflected in our current records.
5      Q  Which were produced?
6      A  I don't know.
7      Q  What records are you referring to?  I mean is
8  this, again, on that computer database?
9      A  We have a -- you know, a record of the amounts of
10  money we invest in properties.  And this is the amount of a
11  check that we sent on a given day.
12     Q  And those you can just print out back at the
13  office?
14     A  Yeah.
15     Q  Does this refresh your recollection as to
16  approximately when the closing on this property took place?
17     A  Yeah, I'm sure that that's when we closed.
18     Q  On June 9th, 2006 --
19     A  That looks like --
20     Q  -- or thereabouts?
21     A  -- what it is, yes.
22     Q  And you invested 2.5 percent equity in this as

371

1  well?
2      A  Yes.
3      Q  Or 2.5 percent capital contribution?
4      A  Yes.
5      Q  Has anyone else other than you invested in the
6  property -- well, you and Fidelio?
7      A  No.
8      Q  Okay.  And Mr. Millspaugh has a 12-percent
9  promoted interest in this deal; correct?
10     A  Yes --
11     Q  And does?
12     A  -- yes, he will have, yes.
13     Q  And nobody else has a promoted --
14     A  No.
15     Q  -- interest?
16         MR. HADDAD:  Would you identity this as Exhibit
17  22.
18         (The letter dated 2/3/06 was marked Plaintiff's
19         Exhibit No. 22 for identification.)
20         BY MR. HADDAD:
21     Q  You've been handed what's been marked as Exhibit
22  22 to your deposition.  I just want to know if you can

372

1  identify this document.
2      (The witness reviewed document.)
3      A  This looks like a document that we would have
4  prepared to send to our partners describing the investment.
5      Q  Do you recall doing that in this case?
6      A  Yeah, I believe this is what we sent.
7      Q  Okay.  This is a memorandum that you prepared --
8      A  Yeah.
9      Q  -- for Fidelio Partners?
10     A  And I assume this is the one we sent.
11     Q  Okay.  And do you recall sending this attachment
12  along with it?
13     A  I don't know.  I don't recall.
14     Q  Do you recall reviewing this attachment at any
15  time?
16     A  I might have.
17     Q  The Sheraton Reston parcels that are referred to
18  in Mr. Morris's offer letter --
19     A  Yes.
20     Q  -- does that include 11720 Sunrise Valley Drive?
21     A  Yes.
22     Q  And the Roland Clarke option?

373

1      A  Yes.
2      Q  Okay.  And is that it?
3      A  Yes.
4      Q  Okay.  And have those interests been sold?
5      A  No.
6         MR. HADDAD:  I'm going to try to wrap up fairly
7  quickly.  I'd rather see if we can try to get this done
8  today, to avoid having to come back at another time.
9         Let's mark this as 23.
10        (The 11720 Sunrise Valley Drive document was
11        marked Plaintiff's Exhibit No. 23 for
12        identification.)
13        MR. HADDAD:  And we can mark this as 24.
14        (The Roland Clarke document was marked
15        Plaintiff's Exhibit No. 24 for identification.)
16        BY MR. HADDAD:
17     Q  You've been handed what's been marked as Exhibits
18  23 and 24 to your deposition.  Do you recognize these two
19  documents, by any chance?
20     A  I don't know --.
21     (The witness reviewed documents.)
22     A  Yes, I do.

Case 1:06-cv-01131-HHK    Document 32-6    Filed 02/07/2007    Page 95 of 100

Morris vs. Buvermo                                    Deposition of J. Gardner 10/26/06

374

1    Q   Okay.  Are these projections similar to the one
2   we reviewed for Spotswood; for the Sheraton, Reston
3   parcels?
4    A   Let me see.
5   (The witness reviewed documents.)
6    A   No, I don't believe these are.
7    Q   What are these, then?
8    A   I believe that these are -- are projections that
9   we prepared in order to justify our current value
10  calculations, I believe.  But I'd have to --.
11  (The witness reviewed documents.)
12   A   Let's see.  Yeah.  We make current value
13  estimates of our portfolio as of a given date.  And I think
14  these would be the estimates that we would use as of
15  12/31/06.  So these would be the properties as if sold on
16  that given date.
17   Q   Okay.  And how do you go about determining what
18  the sale price of the property is going to be?
19   A   What we do is we make our best estimate of any
20  changes in value that might have occurred relative to the
21  price that we invested, and we make an estimate of what --
22  how that value would impact the overall projections.

375

1    Q   Okay.  Do you know who prepared these?
2    A   I believe that Ms. McCormick prepared those.
3    Q   Okay.  And do you know when they were prepared?
4    A   I don't; although, there is a date down here that
5   says "9/12/06".  My guess is that was the print, not the
6   prepared date.
7    Q   Do you recall asking her to prepare these?
8    A   Yes.
9        And I think if you look at -- if we go back to
10  that exhibit that was the -- the --.
11   Q   Calculation?
12   A   Yeah, the settlement.
13   Q   That those numbers are reflected in there --
14   A   Yeah.  If you look here, see the 175 and the
15  1526, I think that's these two numbers.  Is that 1526 or
16  1528.  I don't know if it's a 6 or an 8.  But I think that
17  and that are supposed to coincide with those two.
18   Q   Okay.
19   A   So these were based on the -- our best current
20  value estimates for this next year on these properties.
21   Q   Okay.  The promote allocation in Exhibits 23 and
22  24, it indicates you and Fidelio as being entitled to a

376

1   promote?
2    A   Yes, that's correct.
3    Q   Okay.  And is that a 13-2.5 -- 13-percent and
4   2.5-percent allocation?
5    A   I believe that's correct.  I think this 2.5 is
6   the one that Mr. Bonacci had been entitled to.  That's --
7    Q   Okay.
8    A   But let me just double-check that to make sure.
9   (Off the record.)
10   A   Yes.  That reflects the 13 and the 2 and a half.
11   Q   Okay.  And that's because that was what the
12  understanding was at the time that these deals were
13  initiated, I suppose -- or not initiated, but were
14  designated as FPEP properties?
15   A   You mean that's the -- the 13 as opposed to --
16  the 13 and 2 and a half, as opposed to one of those other
17  numbers we spoke of?
18   Q   Correct.
19   A   Yes, that --
20   Q   That was the breakdown.  And that -- perhaps it
21  was Bonacci --
22  (Proceedings participants speaking at the same time.)

377

1    A   Yes.
2    Q   -- Fidelio at that time?
3    A   Yes.
4    Q   The Sheraton Reston parcels, does it include
5   anything other than these two, at least the ones referred
6   to in Mr. Morris's --
7    A   Yes.
8    Q   Just the two?
9    A   Just the two.
10   Q   I noticed that there was a designation of new
11  FPEP that was produced for a Reston Sheraton 18-percent
12  interest?
13   A   Yes.
14   Q   Is that something different?
15   A   Yeah.  That's the hotel itself.  That was -- we
16  purchased the ownership of one of our partners in there,
17  and that's recasting the deal to reflect that.  But that's
18  not part of these.
19   Q   Okay.  Twinbrook.  The Twinbrook parcels --
20   A   Yes.
21   Q   -- have those been sold?
22   A   Yes.

Case 1:06-cv-01131-HHK    Document 32-6    Filed 02/07/2007    Page 96 of 100

Morris vs. Buvermo                                    Deposition of J. Gardner 10/26/06

378

1   Q   And when were those sold?
2   A   A month or so ago. Fairly recently.
3   Q   And what were they sold for?
4   A   Do you have a projection there? What do you have
5   that I can --?
6   Q   Well, let's see. I'll try to help you because,
7   believe it or not, I want to get out of here too.
8       This is Exhibit 25. Then let's mark this as
9   Exhibit 26 here.
10      (The Twinbrook document and the wire transfer
11          document were marked Plaintiff's Exhibit Nos. 25
12          and 26, respectively, for identification.)
13      THE WITNESS: Does the 9540 coincide with that
14  other sheet?
15      Hopefully, this 9540 coincides to the other
16  sheet.
17      MR. HADDAD: I believe it does.
18      THE WITNESS: Yeah, it does.
19      BY MR. HADDAD:
20  Q   But this other sheet was prepared --
21  A   That --
22  Q   -- back --

379

1   A   Right.
2       So I -- now I can help you answer your question.
3       This based upon -- was based upon a value of the
4   land of, like, 381 --
5   Q   Okay.
6   A   -- up here at the top.
7   Q   Uh-huh.
8   A   I think we sold it for roughly twice that, so we
9   were very --
10  Q   Okay. Let's take --
11  A   That would have doubled this number probably.
12  Q   I see.
13      Let's take a look at Exhibit No. 26, please. Is
14  that approximately what it was sold for?
15  A   Let me just see. Where is -- yeah, that's
16  probably the number.
17  Q   It says under Originator to Beneficiary
18  Information, "JBG Fund 5, purchase of Fidelio's interest in
19  JBG-JER Twinbrook Metro, LLC."
20  A   Yes. So that's -- I think that's probably the
21  right number.
22  Q   So that was the amount that --

380

1   (Proceedings participants speaking at the same time.)
2   A   That --
3   Q   It's actually --
4   A   Yeah.
5       THE COURT REPORTER: What? You know I couldn't
6   get that.
7       BY MR. HADDAD:
8   Q   That was the amount that Fidelio was paid for its
9   interest?
10  A   Yes.
11  Q   That was just on the land parcels; correct?
12  A   Yes.
13  Q   And --
14  A   But that's all of them.
15  Q   And that entire amount would have been subject
16  to -- would have been a balance subject to promote;
17  correct?
18  A   Yes.
19  Q   All right.
20  A   So in place of this 381 up here we put in 740,
21  and it would calculate what the new number would be.
22  Q   I see.

381

1       What is the status of the Reston International
2   Convenience Center deal?
3   A   That is still under contract. I think we've gone
4   firm on the contract; and I think the intended close date
5   is, like, November.
6   Q   Have any projections such as the one done for
7   Spotswood been prepared by you or Buvermo for that
8   particular --
9   A   Not --
10  Q   -- transaction?
11  A   -- of any substance.
12      It's an existing small convenience center that
13  ultimately will be part of the land -- the adjacent land.
14  It's a land play just like everything else. It just has to
15  carry along with it.
16  Q   You said not of any -- sorry -- not of any
17  particular substance?
18  A   We may have done some projections based on the
19  existing revenue from the center. But that revenue will
20  stop fairly soon, and it will just be basically a
21  land-carry income. The land itself will then be lumped
22  into the adjacent land parcel.

382

1    Q   Is that convenience center going to be knocked
2   down?  Is that --
3    A   We don't know yet, but it's likely.  We bought it
4   for the land, not the convenience center.
5    Q   I see.
6       And the idea is to lump it into the other land
7   and build on all --
8    A   Yes.
9    Q   -- that land combined?
10      And what about Merchant's Fund?
11   A   Merchants Fund is a -- it's two properties that
12  we are working on closing with another development group.
13  And they would, hopefully, close in the fairly near future,
14  if we can work out some of the details.  We still -- as we
15  speak, I think Laurey's working on that right now.
16   Q   I'm sorry.  You said Laurey?
17   A   Laurey.
18   Q   Oh, Laurey Millspaugh.
19      Have you signed any commitment to invest in that
20  particular --
21   A   We have not.  I don't even think we've signed a
22  letter of intent yet.  We have a verbal agreement.

383

1    Q   A verbal agreement in this industry?
2    A   We sometimes do that.
3    Q   How much is Fidelio going to be investing in the
4   Reston International Convenience Center deal?
5    A   I think it's on the 5- or $600,000 range.
6    Q   So it's a small --
7    A   Yes.
8    Q   -- deal?
9       What about Merchants Fund; what's the --
10   A   We're --
11   Q   -- anticipated --?  Excuse me. -- what's the
12  anticipated investment amount?
13   A   About a million 2, a million 3.
14   Q   And have you done any projections for that?
15   A   Yes, we've done projections for that.
16   Q   Okay.  That's something that you maintain at the
17  office?
18   A   Yes.
19      MR. HADDAD:  Marc, I'm going -- instead of
20  stating it on the record and going through the exercise,
21  I'm going to just write you a letter of the various
22  documents that I've kept in my mind and written down on my

384

1   list, to obtain from you.  Okay?
2       MR. SMITH:  (Counsel moves head up and down.)
3       BY MR. HADDAD:
4    Q   Just a few more questions here.
5       (The estimated values document was marked
6       Plaintiff's Exhibit No. 27 for identification.)
7       BY MR. HADDAD:
8    Q   Mr. Gardner, you've been handed what's been
9   marked as Exhibit No. 27.  Can you identify this document
10  for me?
11   A   Yes.
12   Q   Okay.  What is it?
13   A   This is a estimated current value of Fidelio
14  Properties assets as of year -- December year end of 2003.
15   Q   Uh-huh.
16      Is this generated every year, this form?
17   A   It's -- in the past we have done it not every
18  year; but starting now, we will be doing these every year.
19   Q   Okay.  So you'll be doing one at the conclusion
20  of December of 2006?
21   A   Yes.
22   Q   Okay.

385

1    A   And, in fact, the number's likely to show up for
2   the option property and 11720.  That's what that
3   calculation is for, for this purpose.
4    Q   Do you recall whether the calculations here or
5   this spreadsheet was done for purposes of the buyout of
6   Mr. Bonacci's interest?
7    A   Yes.
8    Q   Is that why this one was done?
9    A   That's why this one was done.
10   Q   Can you just tell a silly old lawyer like me what
11  the difference is on here between current value and book
12  value.
13   A   Yes.  Book value is the -- do you know what GAAP
14  is --
15   Q   Uh-huh.
16   A   -- generally accepting accounting principles?
17      If you keep your books on the basis of GAAP, what
18  you do is typically the investment you've made in the
19  property, less the capital you've returned, less
20  depreciation, plus income.  So it's an accounting measure.
21      It basically keeps track of the money that's been
22  invested in the -- in the property --

386

1  Q  Uh-huh.
2  A  -- probably less than depreciation and less the
3  money distributed.  So that's what the book value is.
4       And many times in real estate that doesn't relate
5  to the value of the property itself.  You know, the value
6  of the property is what you could sell it for at that given
7  date.  That's the difference between book value and current
8  value.
9  Q  I see.
10  A  And if you were really -- most companies are
11  required to keep their books on a GAAP basis.  And at this
12  time -- at that time we were.  So then the current value is
13  a reflection of how much more valuable the property is now
14  than what you paid for it if I sold it as of that date.
15  Q  Uh-huh.
16       The calculation of the promote value for
17  Steve Bonacci on here, do you believe that this is
18  consistent with the FPEP agreement and the method of
19  calculation in that agreement?
20  A  Yes.  This was done to be in conformance with
21  that agreement.  So he and I went through each one of these
22  properties and valued it based on our judgment as to the

387

1  current value, and then we both agreed to this.  And the
2  Fidelio partners ultimately agreed as well.
3       There's a -- he was ultimately paid 298-.
4  Q  Uh-huh.
5  A  And this is 290-, so there was a slight
6  adjustment between here and that payment.  But this is the
7  number here that corresponds to the actual payment, except
8  for that slight adjustment.
9  Q  Okay.
10  A  By the way, you remember we were talking about
11  value.  These were valued exactly, according to that
12  description earlier, as if the property had been sold on
13  this day, December 31, '03, in its current state, whatever
14  the state was, and then gone through all those waterfalls.
15  That's how these numbers came about.  And then the further
16  waterfall took it all the way down through FPEP.
17  Q  And you're referring to the numbers under Current
18  Value?
19  A  Right.
20       The current value is Fidelio's interest in these
21  properties.  We started with overall property interest, and
22  then we went through as if sold on that day --

388

1  Q  Uh-huh.
2  A  -- how much Fidelio would have gotten.
3       Then we took Fidelio's interest and took it
4  through that next step, figuring all the promotes and all
5  and coming down to Mr. Bonacci's interest.
6  Q  Do you have any other worksheets related to
7  that --
8  A  No.
9  Q  -- the calculation of --
10  A  No, we didn't -- we don't have any other that I
11  could find.
12  Q  Let me just finish the question.
13  A  Okay.
14  Q  Do you have any other worksheets related to
15  calculations on Mr. Bonacci's buyout interest?
16  A  Not that I'm aware of.
17  Q  Okay.  Your e-mail accounts at Buvermo, I believe
18  I have those.
19       Who has been your e-mail service provider?
20  A  I don't know.  You know, you're talking to the
21  wrong --
22  Q  Who has that information?

389

1  A  Kara is likely to have that information.
2  Q  Okay.  Now, from time to time do you use your
3  home e-mail address for business purposes?
4  A  Very rarely, but occasionally.
5  Q  Okay.  And what is your home e-mail address?
6  A  Well, there are two home e-mails.  One is the
7  same as the office.
8  Q  Uh-huh.
9       THE WITNESS:  And I presume I can -- should I --?
10       MR. SMITH:  (Counsel moves head up and down.)
11  A  It's anngardner, a-n-n-g-a-r-d-n-e-r, the No. 1,
12  at Verizon.net.
13  Q  Okay.  Do you use any other e-mail accounts?
14  A  No.
15       By the way, I got my own computer installed in my
16  home about three or four months ago --
17  Q  Uh-huh.
18  A  -- and so I stopped using this one after -- you
19  know, so it's really -- I use that -- I try not to use that
20  at all for the company use since I've had the one at home
21  And it's the same number as the office number.
22  Q  During what time period did you use it for

390

1  company use? When you did use it for company use?
2      A   Occasionally prior to that.
3      Q   So it would --
4      A   Very rarely.
5      Q   -- have been up until about three months ago?
6      A   I think so. Or maybe a little longer, maybe six
7  months ago.
8      Q   Okay. Mr. Walpole, he has served as the attorney
9  in the past --
10     A   Yes.
11     Q   -- for Buvermo Properties, Inc.?
12     A   He has done some work for us, for Buvermo.
13     Q   Okay. How do you know Forrest Walpole? Is he
14  somebody -- I mean how did you sort of get in touch with
15  him?
16     A   He and I are long-term -- he and I went to
17  college together.
18     Q   Okay. Do you know if he also represents Fidelio
19  Properties or has at any time?
20     A   I believe he has.
21         MR. HADDAD: Okay. Let me take two minutes to
22  get my things together. I think I'm pretty much done.

391

1  (Whereupon, a brief recess was taken.)
2         MR. HADDAD: Mr. Gardner, I'm at this time done
3  with any questioning.
4         Now, I just wanted to state on the record that
5  there are some documents that I did receive today and there
6  are some documents that I have yet to receive, but which
7  have been promised to me.
8         And in all likelihood there will be no need to
9  continue this deposition, but I can't say that one way or
10  the other until I've had an opportunity to review those
11  documents.
12         And I may have some follow-up questions based on
13  those documents; so I'm just going to reserve at this time
14  the right to continue the deposition at a later date, if
15  that proves to be necessary, following my review of those
16  documents.
17         MR. SMITH: And I'm not agreeing or not agreeing
18  at this point. I'm just going to have to see what
19  documents we're talking about.
20         I know some of them weren't requested, so I'm not
21  sure you'd have the right to open up the deposition again.
22  But we'll cross that bridge when we come to it.

392

1         And we'll read and sign.
2         (At 6:56 p.m. the taking of the deposition
3  was concluded.)

393

1  I have examined and read the foregoing 392
2  pages and find the answers contained herein with
3  the changes made by me, if any, to be true and
4  correct.


_____
7              John Gardner

Morris vs. Buvermo                                    Deposition of J. Gardner 10/26/06

394

1   As you read your deposition, if you have any corrections to make,
    please itemize them
    below.  Do not write on the transcript.  Upon completion enter
    today's date and sign
2   your name to the signature line.  This will be attached to your
    deposition for filing.
    Thank you.

3
            CORRECTIONS TO DEPOSITION
4
    PAGE LINE              EXPLANATION
5
6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  Date_____  Signature_____

395

1        CERTIFICATE OF NOTARY PUBLIC/REPORTER
2        I, Malynda D. Whiteley, the officer before whom the
3    foregoing deposition was taken, do hereby certify that the
4    witness whose testimony appears in the foregoing deposition
5    was duly sworn by me; that the testimony of said witness
6    was taken by me in stenotype and thereafter reduced to
7    typewriting under my direction; that said deposition is a
8    true record of the testimony given by said witness; that I
9    am neither counsel for, related to, nor employed by any of
10   the parties to the action in which this deposition was
11   taken; and further, that I am not a relative or employee of
12   any attorney or counsel employed by the parties hereto, nor
13   financially or otherwise interested in the outcome of the
14   action.
15       Given under my hand this 5th day of November, 2006.
16
17
18       _____
         Notary Public in and for the
19       District of Columbia
         Registered Professional Reporter
20
21   My commission expires:
22   June 30, 2011

MDW Court Reporting, Inc.  (703) 591-2341