1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - -x
                              :
JONATHAN H. MORRIS,           :
                              :
        Plaintiff,            :
                              :
    vs.                       : Civil Case No.
                              : 1:06-CV-01131 (HHK)
BUVERMO PROPERTIES, INC.,     :
et al.,                       :
                              :
        Defendants.           :
                              :
- - - - - - - - - - - - - -x
                        Rockville, Maryland

                        Thursday, October 12, 2006

Deposition of

            JONATHAN H. MORRIS

  Plaintiff, taken on behalf of counsel for the

Defendants in the above-entitled matter, before Denise

M. Brunet, RPR and Notary Public in and for the State

of Maryland, taken at the offices of Smith, Lease &

Goldstein, LLC, 11 North Washington Street, Suite 520,

Rockville, Maryland, commencing at 9:31 a.m., when

were present on behalf of the respective parties:



Page 2

```
 1          A P P E A R A N C E S :

 2  ON BEHALF OF THE PLAINTIFF:

 3      ZIAD P. HADDAD, ESQUIRE
        Tobin O'Connor Ewing & Richard
 4      5335 Wisconsin Avenue, Northwest
        Suite 700
 5      Washington, D.C. 20015
        (202) 362-5900
 6

 7  ON BEHALF OF THE DEFENDANTS:

 8      MARC J. SMITH, ESQUIRE
        Smith, Lease & Goldstein, LLC
 9      11 North Washington Street
        Suite 520
10      Rockville, Maryland 20850
        (301) 838-8950
11

12

13  ALSO PRESENT:  John Gardner

14

15

16

17                -oOo-

18

19

20

21

22
```

Page 4

```
 1  E X H I B I T S  (Cont'd.)

 2  EXHIBITS        DESCRIPTION           PAGE

 3  Morris 14    Memorandum dated 12/09/05    273

 4  Morris 15    Memorandum dated 12/09/05    277

 5  Morris 16    E-mail                       288

 6  Morris 17    E-mail                       309

 7  Morris 18    E-mail                       311

 8

 9

10

11          (Exhibits retained by counsel.)

12

13

14

15

16                -oOo-

17

18

19

20

21

22
```

Page 3

```
 1                I N D E X

 2      DEPOSITION OF JONATHAN H. MORRIS

 3          OCTOBER 12, 2006

 4  EXAMINATION BY                      PAGE

 5      Mr. Smith                        5

 6

 7  EXHIBITS        DESCRIPTION         PAGE

 8  Morris 1   Resume of Jonathan H. Morris    27

 9  Morris 2   Fidelio Partnership Agreement   93

10  Morris 3   Bylaws of Buvermo Properties,  100
               Inc.
11
    Morris 4   FPEP, LLC Operating Agreement  108
12
    Morris 5   Job Specification Sheet        127
13
    Morris 6   Document reflecting            143
14             discussion regarding employment

15  Morris 7   Offer Letter                   162

16  Morris 8   Documentation on John          224
               Gardner's continuing role
17
    Morris 9   E-mail                         257
18
    Morris 10  E-mail                         257
19
    Morris 11  E-mail                         257
20
    Morris 12  E-mail                         257
21
    Morris 13  E-mail                         258
22
```

Page 5

1          P R O C E E D I N G S

2  Thereupon,

3          JONATHAN H. MORRIS

4      was called for examination by counsel for the

5  Defendants and, after having been sworn by the Notary

6  Public, was examined and testified as follows:

7      EXAMINATION BY COUNSEL FOR THE DEFENDANTS

8      BY MR. SMITH:

9      Q  Mr. Morris, my name is Marc Smith.  We've

10  been introduced.  I represent all of the defendants in

11  this case.

12          I'm sure you've had a conversation with

13  your attorney about this.  I'm going to be asking you

14  a series of questions today.  I'll ask that you

15  provide a response to each question.

16          To the extent that you don't understand a

17  question, let me know.  I'll try to rephrase it to

18  make it understandable.  If you answer a question, I'm

19  going to assume that you did understand the question.

20          As I mentioned, anytime you want to take a

21  break today, just let me know and we can accommodate

22  that.  I plan to take a lunch break too.  I'm sure

Jonathan Morris     **Multi-Page**™     Morris v. Buvermo
Case 1:06-cv-01131-HHK    Document 32-11    Filed 02/07/2007    Page 3 of 85
10/12/06

Page 6

1 that will be acceptable to you as well.
2     Have you been deposed before?
3   A  No.
4   Q  All right.  Have you been involved in any
5 litigation before, civil or criminal?
6   A  Never.
7   Q  Okay.  Have you testified in court as a
8 witness?
9   A  No.
10   Q  All right.  Have you had any discussions
11 with anybody about your deposition other than your
12 legal counsel?
13   A  Questions about my deposition?
14   Q  Have you discussed your deposition, the
15 testimony that you're going to give today, with
16 anybody other than your legal counsel?
17   A  People know that I am here for a
18 deposition.  But other than that, no.
19   Q  When you say people know, who?
20   A  My fiancee knows I'm here.  My parents know
21 I'm here.
22   Q  All right.  What's your fiancee's name?

Page 7

1   A  Irene.
2   Q  Irene, okay.  And did you review any
3 documents in preparation for today's deposition?
4   A  Yes.
5   Q  To the best of your recollection, which
6 documents did you look at?
7   A  To the best of my recollection, I looked at
8 an array of documents provided by counsel which
9 included responses to the interrogatories by your
10 client.  I re-reviewed my responses to your
11 interrogatories.
12     I paid particular attention to e-mail
13 traffic provided by Equinox Partners and some e-mail
14 traffic that I received from you or from counsel
15 relative to activity at the firm before I was
16 terminated.
17     I reviewed the complaint, and beyond that,
18 I can't specifically tell you what else I took a look
19 at.
20   Q  All right.  Insofar as your interrogatories
21 are concerned, your interrogatory responses, after you
22 re-reviewed those responses, is there anything in the

Page 8

1 responses that is inaccurate in any respect?
2   A  No.
3   Q  All right.  Did you look at, as part of
4 your review, the bylaws for Buvermo Properties?
5   A  I reviewed them with counsel.  I mean, I
6 did not commit them to memory by any stretch of the
7 imagination.
8   Q  All right.  Have you reviewed the
9 partnership agreement for Fidelio Properties?
10   A  Not in detail, no.
11   Q  Have you reviewed the operating agreement
12 for FP Executive Partners, LLC?
13   A  Again, not in enormous detail.  Just a
14 cursory review.
15   Q  So you reviewed all those documents for
16 today's deposition?
17   A  I reviewed those documents prior to this
18 deposition as part of my role as president and CEO,
19 you know, way back when.
20   Q  Okay.
21   A  But, you know, we more or less scanned
22 them -- I scanned them myself recently --

Page 9

1   Q  All right.
2   A  -- just to refamiliarize myself.  But, you
3 know, again, I didn't commit all these documents that
4 you're alluding to to memory.
5   Q  All right.  Are there any documents that
6 you reviewed in anticipation of your deposition today
7 that you have not produced in discovery in this case?
8   A  Have I reviewed any documents that I did
9 not produce?
10   Q  Correct.
11   A  No.  Everything that I reviewed was
12 produced for this deposition.
13   Q  Okay.  And while you were employed by
14 Buvermo, did you utilize your home computer system for
15 e-mail or for preparing documents or anything like
16 that?
17   A  Did I use my home computer system for
18 preparing documents?
19   Q  Yes.  Preparing documents corresponding
20 with, you know, Fidelio, the partners, with
21 Mr. Gardner, any business on behalf of Buvermo?
22   A  Okay.  Well, that's two questions.  The

Page 6 - Page 9

Page 10

1  first question you asked me was more general, and I
2  did use my home computer for preparing documents that
3  are unrelated to this issue.
4      Q  I'm not interested in anything that's
5  unrelated.
6      A  Okay.  I used my home computer on occasion
7  for Buvermo business in very, very rare instances.
8      Q  Did you look at your computer's hard drive
9  for any documents that are responsive to our discovery
10 request?
11     A  I looked at the computer.  I don't know the
12 hard drive from anything else, to be candid with you,
13 but --
14     Q  You looked at files that are resident on
15 the computer?
16     A  I looked at files.  I provided all, you
17 know, the -- maybe five or six e-mails that we had,
18 you know.  The -- the majority of the e-mails that I
19 had were based upon the termination day, which was the
20 23rd, 24th of March.
21        Let me just clarify something.  My home
22 computer was not generally used for Buvermo, Fidelio

Page 11

1  business.
2      Q  It was just personal?
3      A  Yeah, just a personal computer.  I mean, I
4  had other business that I did on the computer, but I
5  wouldn't use it to e-mail anybody on a general basis.
6      Q  All right.  What's your present employment
7  status?
8      A  My present employment status is unemployed.
9      Q  And you've been that way since your
10 termination from Buvermo --
11     A  Yes.
12     Q  -- in March of 2006?
13     A  Right.
14        MR. HADDAD:  Jon, let him finish his
15 question before you respond --
16        THE WITNESS:  Okay.
17        MR. HADDAD:  -- just for clarity's sake.
18        THE WITNESS:  I appreciate that.
19        BY MR. SMITH:
20     Q  You've made a claim for attorneys' fees in
21 this case, Mr. Morris, as part of your fraud claim,
22 fraud, misrepresentation claim.

Page 12

1      Q  What's the nature of your fee agreement
2  with your counsel?  Is it hourly?  Is it contingent?
3  Is it a hybrid?
4      A  My arrangement with counsel is indeed a
5  hybrid arrangement, and there are instances that
6  require third-party engagements such as a -- either an
7  appraiser or valuator.
8      Q  An expert witness?
9      A  An expert witness, which, as I understand
10 and recall, will be required -- I will be required to
11 come out of pocket to pay.
12        There are other fees that the firm has
13 agreed to absorb, and then there is a contingent
14 component to it.  And I can't tell you the specific
15 terms of it, because I just don't recall the specific
16 terms of it, but it's a hybrid --
17     Q  Are you paying hourly fees to your counsel
18 at all?
19     A  No.
20     Q  Have you paid a fixed fee to your counsel?
21     A  I have paid an upfront cash payment to
22 offset any of the fees that may be required for me to

Page 13

1  pay outside of --
2      Q  You're talking about to fund the expenses
3  of the litigation, right?  Is that what you're talking
4  about?
5      A  To fund the expense of litigation we've
6  agreed that I would pay.  And at this moment, I can't
7  tell you what the balance is or what's been debited
8  against that amount.
9      Q  How much did you pay them up front?
10     A  Well, I didn't pay them.  I gave them a
11 $25,000 deposit.
12     Q  Retainer?
13     A  Right.
14     Q  Are you expected to replenish that retainer
15 if it becomes exhausted?
16     A  Am I expected to replenish the retainer.
17 If it becomes exhausted, I intend to replenish it.
18 Whether I'm required to or not, I'm not certain, but
19 I'm fully available to do that to the extent we get to
20 that point.
21     Q  All right.  And what is the contingent
22 component of the agreement?  What percentage is your

**Page 14**

1 counsel going to get from any recovery in this case?

2    A   I mean, frankly, it's a little bit of a

3 formula and I don't recall the specifics of the

4 formula but I think it's generally about one-third.

5    Q   All right. And I take it that agreement is

6 in writing?

7    A   Oh, yeah.

8    Q   And you signed it?

9    A   Sure.

10    Q   Where do you maintain your current

11 residence?

12    A   429 Australian Avenue -- it's in Palm

13 Beach, Florida -- Apartment 11.

14    Q   And how long have you maintained that

15 residence?

16    A   Oh, since, I think, February '06.

17    Q   February of '06?

18    A   Yeah. I just moved there.

19    Q   Okay. Were you a resident of Florida

20 before that time?

21    A   Yes.

22    Q   All right. When did you move -- when did

**Page 15**

1 you establish residency in Florida?

2    A   I moved to Florida in '03, and I

3 established residency January 1, '04.

4    Q   '04?

5    A   Yes.

6    Q   And what was the purpose of your

7 establishing residency in Florida?

8    A   There were several purposes. Number one, I

9 wanted to continue my real estate investment in

10 Florida at a personal level; and number two, I've been

11 going to Florida for 25 years.

12      I've maintained an apartment down there

13 since 2001, and I decided I wanted to move to Florida.

14 So I sold my large town house here and bought a small

15 apartment in Washington.

16    Q   All right. Are those the only reasons you

17 made the move to Florida?

18    A   I like the weather. I mean, I love

19 Florida.

20    Q   Were there any tax reasons you moved to

21 Florida?

22    A   No. I wound down the business in '03 with

**Page 16**

1 my previous employer, and I decided to go do something

2 else.

3    Q   When you say you wound down your business

4 in '03, who was your previous employer?

5    A   The previous employer was Lerner

6 Enterprises.

7    Q   Were you considered an employee of Lerner

8 Enterprises?

9    A   I believe I was.

10    Q   And we'll talk about your employment in a

11 minute.

12      When you moved to Florida, you said you

13 were a resident of the District?

14    A   Uh-huh.

15    Q   You need to say yes or no.

16    A   Yes. I'm sorry.

17    Q   And how long had you been a resident of the

18 District?

19    A   Oh. Since approximately 1978.

20    Q   All right. And you grew up in the area,

21 correct?

22    A   I grew up in Bethesda.

**Page 17**

1    Q   Went to high school locally?

2    A   Went to high school locally.

3    Q   And you mentioned that you purchased a

4 smaller apartment in Washington?

5    A   Yes.

6    Q   When did you purchase that apartment?

7    A   On or around October 2004.

8    Q   And up to that point, you owned a larger

9 town home?

10    A   I mean, it was 1600 square feet.

11    Q   Okay. And do you still maintain an

12 apartment in D.C.?

13    A   Oh, yes.

14    Q   And how much time do you spend in the

15 District versus your time in Florida? Just roughly.

16 Obviously I'm not holding you to any percentage.

17      MR. HADDAD: Just during what time period?

18      MR. SMITH: During the year.

19      BY MR. SMITH:

20    Q   So on an annual basis, how much time do you

21 spend in D.C. versus Florida? And if it's changed

22 over time, you can tell me that too.

Page 18

1 A Well, it has changed over time. And since
2 the termination, I spend, you know, the majority of my
3 time in Florida.
4 Q Okay.
5 MR. HADDAD: Majority being?
6 THE WITNESS: In excess of 50 percent.
7 BY MR. SMITH:
8 Q Are there any particular times of the year
9 that you stay in D.C., or do you just come up here
10 sporadically since the time of your termination?
11 A I come up here to see my family who's still
12 here.
13     I'm in the process of winding down several
14 components of my life that were ramped up based upon
15 the Buvermo hiring which include the fact that, based
16 upon the position of president and CEO, it was made
17 clear to me that I would have a requirement to
18 entertain, I would have a requirement to be social, I
19 would have an opportunity to see the Dutch at least
20 quarterly here in Washington.
21     And based upon that, I did purchase a much
22 larger apartment than the one-bedroom that I bought in

Page 19

1 October of '04. Furthermore, I informed one of the
2 partners, Joost Tjaden, of my decision to move forward
3 to buy that so that I could entertain, and he was very
4 supportive of that.
5 Q All right. The apartment you're referring
6 to that you purchased, is that at the Ritz Carlton?
7 A Yes.
8 Q All right. And when was that purchased?
9 A I believe that settlement was December '05.
10 It was an extended settlement from contract, which
11 might have been as far back as August '05.
12 Q Okay. And Mr. --
13 MR. SMITH: How do you pronounce his name,
14 John?
15 MR. GARDNER: Tjaden.
16 BY MR. SMITH:
17 Q -- Tjaden, he didn't require you to
18 purchase the apartment at the Ritz Carlton, did he?
19 A No.
20 Q That was your decision?
21 A Absolutely.
22 Q All right. And is it your testimony that

Page 20

1 you're in the process of selling your apartment at the
2 Ritz Carlton?
3 A Yes.
4 Q Is it on the market?
5 A It is being listed -- I signed the
6 documents two days ago, and it will be -- it will not
7 go into MLS. It goes into another system that I can't
8 remember the name of, but it's being listed with a
9 company called Washington Fine Properties.
10 Q All right. And do you intend to purchase
11 another apartment in D.C.?
12 A I'm considering it.
13 Q Are you looking at properties now?
14 A Yes.
15 Q Are you looking at another apartment at the
16 Ritz Carlton?
17 A Several.
18 Q Where are you registered to vote?
19 A Florida.
20 Q Are you registered in the District?
21 A No.
22 Q When did you become a registered voter in

Page 21

1 Florida?
2 A In early '04. I can't remember the date.
3 I did all the registrations at one time.
4 Q All right. And do you maintain a District
5 driver's license?
6 A No.
7 Q You just have one, a Florida driver's
8 license?
9 A Yes.
10 Q That's your only one?
11 A Yes.
12 Q Do you have any vehicles in the District?
13 A I have a vehicle in the District for use
14 that's being shipped to Florida within the next couple
15 of weeks.
16 Q And where is that vehicle licensed and
17 registered?
18 A It's licensed and registered at -- well,
19 it's in Florida.
20 Q Do you have Florida plates on it?
21 A Oh, yeah.
22 Q Do you pay any taxes in the District?

---

Page 22

1    A   Do I pay any taxes in the District.
2    Q   I imagine you pay property tax for your --
3    A   I do pay property tax.  The property is not
4  homesteaded.  I pay sales tax when I buy something.
5       I may pay a franchise tax for a partnership
6  that I had when I was with the Lerners that requires
7  some annual tax.  I can't remember the name of it,
8  but -- I mean, there's several partnerships that I
9  think are still in existence, and there is some tax
10 that's paid as a part of that.
11   Q   Did you ever pay income tax in the
12 District?
13   A   Oh, for many years.
14   Q   When did you stop paying income tax in the
15 District?
16   A   '03 was the last year, I believe.
17   Q   Apart from your apartment at the Ritz, do
18 you own any real property in the District or in the
19 metropolitan area?
20   A   Do I own any real property.
21   Q   Or do you have any interest in real
22 property?

Page 23

1    A   I have an interest in a partnership that
2  owns a land site in southeast Washington that's being
3  developed as an office building by the Lerners right
4  now.  I own a small studio apartment that I purchased
5  in 1997 or 1998.
6    Q   Is that at Sutton Place?
7    A   Yes.  It's actually Sutton Towers, and I've
8  already engaged the broker that I'm using to sell the
9  large apartment to do an analysis and sell that
10 property as well.
11   Q   All right.  Is that all of the interest in
12 property, real property, that you own at this time?
13   A   At this time in Washington or at this time
14 total?
15   Q   In Washington.
16   A   The reason I'm pausing is I'm just trying
17 to think if I have any residual interest in anything
18 that I was involved in in the past that ties to a
19 piece of property, and I can't recall anything right
20 now.
21   Q   All right.
22   A   The assets that I was involved with with

Page 24

1  the Lerner family were sold, but there was some
2  residual requirements that needed to be met to
3  distribute the balance of any escrowed funds.
4       So I do not believe that I have an interest
5  any longer, but I don't know if having an ongoing --
6  you know, a contingent liability presumes that you
7  have any ongoing interest.  I tend to doubt it, but
8  I'm just -- the most clear things are the fee simple
9  interest in the condominium at Sutton Towers and the
10 interest in the land site in southeast.
11   Q   How long have you had an interest in the
12 land site in southeast?
13   A   The property was acquired I believe in the
14 summer of 2001.  And between the acquisition date and
15 year end, we were entered in -- my business partner
16 and I were entered into the -- what I will call the
17 ownership stack, and there were several entities of
18 ownership that eventually tied to the economics of the
19 property.  So the time period of my interest was
20 somewhere between -- it's sometime in early mid '01
21 and year end '01.
22   Q   Okay.  And you mentioned a partner.  Is

Page 25

1  that Mr. Hillman?
2    A   Yes.
3    Q   What's Mr. Hillman's first name?
4    A   Mike.
5    Q   And how long have you had a business
6  relationship with Mr. Hillman?
7    A   How long have I had a business relationship
8  with Mr. Hillman.  Can you define business
9  relationship?
10   Q   Well, a partnership would be one type of
11 business relationship.
12   A   Okay.  You want to know how long I've had a
13 partnership with him?
14   Q   Yes.
15   A   Okay.  I've had a business partnership with
16 Mr. Hillman since early 2000.
17   Q   And was that the first time that you
18 entered into a partnership with Mr. Hillman?
19   A   Was that the first time I entered into a
20 partnership with Mr. Hillman.  That was the first time
21 I entered into a partnership as principal with
22 Mr. Hillman.

Page 26

1  Q  Do you have a college degree, Mr. Morris?
2  A  Yes, I do.
3  Q  And where is that from?
4  A  Towson University.
5  Q  And your degree was in what?
6  A  It was a bachelor of science, and I recall
7  they had a major of business administration.
8  Q  And any postgraduate work or degrees?
9  A  I did -- I can't remember the hours, but I
10 did several hours of postgraduate work at George
11 Washington University.
12 Q  Did you get a degree?
13 A  I did not.
14 Q  You don't have an MBA?
15 A  I do not.
16 Q  When would you have attended George
17 Washington University, if you can recall?
18 A  I believe I went to summer classes in 1977,
19 and I cannot recall what the schedule was subsequent
20 to that.
21 Q  Did you attend the university for a number
22 of years or was it just sporadically in 1977 or

Page 27

1  thereabouts?
2  A  You know, Marc, I was working full-time and
3  I had graduated undergrad in '77 and started taking a
4  class or two in the summer with the objective of going
5  as much as possible subsequent to the summer.
6      When I started working, it became evident
7  that it was pretty tough to do both a daytime schedule
8  and try to maintain a full-time MBA program schedule,
9  so I did scale back. I did go for several years.
10     I think that there were some semesters that
11 I did not take a class, I think that there were some
12 semesters that I took one class and there were some
13 semesters that I attempted to take two classes, class
14 being, I think, three unit hours. It's been a long
15 time so I don't exactly recall, but a class.
16 Q  Okay. And how many credit hours, if you
17 remember, were you short of achieving an MBA?
18 A  I don't know.
19 Q  Were you close?
20 A  I can't remember.
21 Q  All right.
22     (Thereupon, the document was marked as

Page 28

1      Morris Deposition Exhibit No. 1 for
2      identification.)
3      BY MR. SMITH:
4  Q  Mr. Morris, let me show you what I've
5  marked as Morris Deposition Exhibit Number 1 and ask
6  you to take a look at that.
7  A  Okay.
8  Q  Is this your resume, Mr. Morris? I'm not
9  sure when it was prepared, but is this a resume, your
10 resume?
11 A  Well, you just gave me the document, so I
12 will tell you that my name is at the top and there are
13 certain employers here that I recall working for.
14     I know that an electronic version of
15 something that looked like this was sent to Tony
16 LoPinto, and I cannot begin to tell you whether this
17 was the exact document that was forwarded to
18 Mr. LoPinto or not.
19 Q  Well, I'm going to ask you to take your
20 time. I'm not trying to trip you up.
21     Look at the document, and if there's
22 anything on the document that indicates it's not your

Page 29

1  resume, let me know.
2  A  Okay.
3      I mean, just in three minutes, it looks
4  like my resume.
5  Q  Okay. You can take as much time to look at
6  it, if you want to. But if you're comfortable with
7  that response, I can move forward.
8      What was the reason you sent your resume to
9  Mr. LoPinto?
10 A  What was the reason I sent my resume to
11 Mr. LoPinto. Because he requested a copy of it.
12 Q  And when did he request a copy, if you can
13 recall?
14 A  Mr. LoPinto had requested a copy of my
15 resume on several occasions over the past several
16 years. And, you know, if there was a particular
17 reason that he asked for it, it would generally have
18 been because he had been retained by an organization
19 to find an executive, and he had a desire to discuss
20 my candidacy with them. I would not have sent him my
21 resume if he discussed something that I wasn't
22 interested in.

Page 30

1     MR. HADDAD: Marc, just for the record, I
2 notice that there's no Bates numbers on it. Is this
3 something that you guys produced?
4     MR. SMITH: I'm sure we did. I may have
5 taken this from the stack before I Bates numbered it,
6 but does it not look familiar to you? It's probably
7 in the documents that we copied from Mr. Morris's
8 computer.
9     MR. HADDAD: Bates numbers are just what we
10 mark our documents with to identify where they came
11 from.
12     THE WITNESS: So you don't have the
13 document?
14     MR. HADDAD: I don't know. I don't know if
15 I have copy of this exact one or not.
16     MR. SMITH: I'm pretty sure you do, but if
17 you don't, you have one now.
18     BY MR. SMITH:
19   Q   All right, Mr. Morris. We're going to be
20 talking about Mr. LoPinto in a few minutes, but I want
21 to focus on the resume.
22     First of all, based on your review of the

Page 31

1 document, is the information reflected on this resume
2 accurate?
3   A   You know, Marc, I could go through this for
4 an hour and tell you a level of accuracy. I could go
5 through it right now and give you another level of
6 accuracy.
7     I mean, I -- this did not come from my
8 hand, so -- you handed it to me, and I don't know
9 whether this was a document that I produced originally
10 and has been amended or modified.
11     But Lerner Enterprises, I did work for
12 Lerner Enterprises and I was a 50 percent owner of LMH
13 Realty Group, LLC. The John Akridge Company, I did
14 work for them.
15     Boston Properties, I did work for Boston
16 Properties. Government Property Investors, I did work
17 for Government Property Investors. Charles E. Smith
18 Companies, I did indeed work for them.
19     Larson, Ball & Gould; Johnston, Lemon;
20 First Winthrop; Smith Barney; Sallie Mae; and NASD,
21 and I worked for all these organizations.
22   Q   Did you work for the organizations in the

Page 32

1 capacity that's noted on the resume and during the
2 time period that's noted on the resume, to the best of
3 your recollection?
4   A   The capacities, I am -- I am very certain
5 that these were the accurate capacities, and I don't
6 recall specifically the dates of employment.
7   Q   Okay.
8     MR. SMITH: Let me go off the record for
9 just a second.
10     (Discussion held off the record.)
11     BY MR. SMITH:
12   Q   What was the, starting from -- and again,
13 all of these questions are based on your recollection.
14 If you can't remember, just let me know -- the reason
15 for leaving the positions that are noted on your
16 resume, starting from the earliest position?
17   A   Let's see. The National Association of
18 Securities Dealers was my first full-time job out of
19 college. My salary, as I recall, was approximately
20 $10,200 a year.
21     I rented an apartment in Washington, D.C.
22 and moved whatever I owned at the time there. And I

Page 33

1 had an enjoyable period of time there, but I was
2 looking to make a little bit more money.
3     So I applied for a job at Sallie Mae, and I
4 was offered the job and I accepted the job. I think
5 that job paid $20,000 a year, which was a significant
6 step from where I was, and I was very happy about
7 that.
8     I worked for Sallie Mae, and I was promoted
9 several times to the point where I was working on
10 public bond financings with major investment banks,
11 and I became professionally friendly with several of
12 the investment bankers who indicated that there was
13 more compensation to be made in the market. And I was
14 referred by one of the Smith Barney investment bankers
15 to the recruiting office in New York City.
16     I went there for an interview. I was
17 hired. I trained in the summer -- I can't recall what
18 year it was -- in New York City with Smith Barney, and
19 I was assigned to the Washington, D.C. branch of Smith
20 Barney where I was a broker for several years.
21     During that time, I got involved in several
22 investments that I raised money for. They were

**Page 34**

1 real-estate based. They were sponsored by a company
2 by the name of Winthrop, and during that period, I did
3 meet and became friendly with a couple of the
4 Winthrop -- I'm not sure if they were officers, but
5 they worked for the company. They invited me to
6 interview with them because my focus was turning more
7 toward real estate versus general stocks and bonds.
8 And I joined that firm also based in Washington, D.C.
9 with the headquarters in Boston.
10     First Winthrop was winding down as a
11 company and the office was going to be liquidated, so
12 all five or six of us in the office were told more or
13 less to find a new home.
14     Several of the older guys that I worked for
15 went to Johnston, Lemon & Company, and they invited me
16 to join them as well. During my tenure at Johnston,
17 Lemon, my focus was still on the real estate side of
18 the business, and Johnston, Lemon was a general stock
19 and bond house and their objective was not to grow the
20 real estate activities at the firm but was to continue
21 as a general stock and bond broker.
22     At that point, I decided that I wanted to

**Page 35**

1 get into the direct real estate business versus being
2 involved in real estate securitization, and I met one
3 of the partners at Larson, Ball & Gould who invited me
4 to interview. And I had many interviews with Pete
5 Larson, Brian Ball, Tony Gould, who were the main
6 partners of the firm, and another guy named Steve
7 Collins.
8     It was a very small organization. They
9 were principally focused on office leasing and I was
10 principally focused on office and industrial
11 investments, and they thought it was a nice complement
12 to their business. So I joined that firm, I believe
13 it was 1989, and I spent several years there.
14     On a weekend lunch with my best friend,
15 Steve Smith, who passed away several years ago, I
16 spent time with Mr. Robert H. Smith, who is the son of
17 Charles E. Smith, and he asked me what I was doing and
18 where I was working, and I told him that I was working
19 on institutional real estate deals and having a very
20 good time.
21     He indicated that he was looking to beef up
22 his finance group and asked me if I would be

**Page 36**

1 interested in leaving where I was to join The Smith
2 Companies, and I said I would be, I'd be honored to,
3 and he said that he would arrange a meeting for me
4 with his what he termed people.
5     I had one meeting with Mr. Smith at his
6 office, and then I went to a series of meetings with
7 Mr. LoPinto and others. I don't recall exactly who.
8 I met Tony LoPinto on a Tuesday, and we got along very
9 well. He actually made me an offer that Friday.
10   Q   Tony did?
11   A   Uh-huh. So I gave my two weeks' notice at
12 Larson, Ball & Gould very cordially with Pete Larson,
13 who I consider a friend to this day, and he agreed
14 that while he thought that great things were in store
15 for me at Larson, Ball & Gould, The Charles E. Smith
16 Companies was a first-class, decades-old organization
17 with a tremendous reputation -- I had grown up with
18 Steve, my friend -- and that he would, you know,
19 begrudgingly accept my decision, but he thought it was
20 a good place to go to and he just wanted to remain
21 friends.
22     I stayed at The Smith Companies for a long

**Page 37**

1 time, in my opinion. When the company made the
2 decision to go public, I was extremely involved in all
3 aspects of the process to take a company public.
4 Taking a real estate company public was not a regular
5 IPO back in that time. It was not something that was
6 done with regularity, and Goldman Sachs was hired to
7 get us through the process.
8     I met with the Goldman Sachs people. They
9 recommended me to Mr. Smith, to assist, since I did
10 have background in real estate securities. And
11 furthermore, I'm a Washington native, so I knew the
12 market. I began by taking the investment bankers on
13 tours of the portfolio of properties and showed them
14 what we owned.
15     We went public in June of '94. I became
16 vice president and director of acquisitions. I lined
17 up properties to be acquired. I had a small staff.
18 We had a weekly list that I went over with Mr. Smith,
19 his partner Mr. Kogod, Tony LoPinto and others. And
20 furthermore, I spent a considerable amount of time
21 with the investment bankers who were writing research
22 reports on the now public company to describe what our

Page 38

1  strategy and what our game plan was for acquisitions.
2       Subsequent to producing those reports, I --
3       (Whereupon, there was an interruption to
4       the deposition.)
5       THE WITNESS: Let me see. So what we did
6  was I sent them the strategy overview and what types
7  of properties we were looking at and why, and then
8  these investment bankers and analysts would come to
9  town.
10      After the June 1994 IPO, they came to town
11 regularly to check in at the company, and they were
12 particularly interested in what was happening with
13 respect to acquisitions. The company had a growth
14 plan that was established by the executives, and a
15 large portion of that growth plan was based upon
16 buying additional properties.
17      So the -- there was a very high level of
18 interest by the investment bankers and the analysts as
19 to what we were planning on acquiring. I did create
20 several documents that were PowerPoint programs about
21 what our pipeline of acquisitions was.
22      The first Goldman Sachs report that came

Page 39

1  out on the company after the IPO truly applauded the
2  acquisition program, and, in my opinion, they felt
3  that it was well thought out, it had a good strategy
4  and, more importantly, to me personally, they felt
5  that the key executive in charge of the acquisitions
6  program was highly qualified to deliver what the
7  company had promised in terms of acquisitions.
8       This was a job that started out as more of
9  a generalist at The Charles E. Smith Companies, to
10 look at the underlying financing and existing
11 buildings that we owned. It was not a good time for
12 real estate. This was at the time when properties
13 were being taken back and there was a government
14 agency formed, the real estate -- the Resolution Trust
15 Company, and the financiers were much more concerned
16 about whether the borrowers were going to make
17 payments versus real estate values generally.
18      So my first year or two at the company was
19 to analyze what our debt-to-equity ratios were and
20 then meet frequently with the lenders for various
21 properties to assuage their fears that debt service
22 coverages could be met. And to the extent that they

Page 40

1  had any issues about it not being met, we would
2  negotiate a reduction in the amount of outstanding
3  debt on any particular asset.
4       I would take that information to Mr. Smith
5  and to Tony LoPinto, and then if the lender asked for
6  a -- as an example, if a lender asked for a reduction
7  of $10 million on a $70 million mortgage, I would take
8  that information to Mr. Smith, Mr. Kogod and
9  Mr. LoPinto, and generally they would ask me to go
10 back and try to get a $5 million reduction on the
11 outstanding mortgage.
12      So that was my role for more or less a year
13 and a half to two years. Mr. Smith decided that he
14 wanted to pursue this Goldman Sachs notion of turning
15 the company into a Real Estate Investment Trust, and
16 once that began, my role changed dramatically, my
17 compensation changed dramatically. I became an
18 officer of the company, which was not easy to do, and
19 my, quote unquote, star was rising at the company.
20      I was contacted by an executive search firm
21 in Chicago by the name of Ferguson Partners around
22 spring 1996, and the gentleman's name was Jay Costley.

Page 41

1  And he called because he had a client that was
2  interested in retaining an executive who had
3  experience going through a REIT IPO. And like I said
4  before, the notion of a REIT initial public offering
5  was not regular at that time, and there weren't many
6  executives that had gone through that experience
7  because there weren't that many REIT IPOs.
8       The concept was very simply, in a nutshell,
9  a company by the name of Brown Brothers Harriman had
10 financed by providing equity a company called
11 Government Property Investors. They had -- Brown
12 Brothers had put up a certain amount of equity to
13 create a company that would go out and acquire office
14 buildings or other commercial assets, real estate
15 assets, that were leased solely to either the federal
16 government or agencies of the federal government. The
17 underlying notion there was that the creditworthiness
18 of the tenant, of the lessee, was, in fact, the full
19 faith and credit of the United States of America.
20      The strategy was to acquire a portfolio
21 while a private company large enough to attract an
22 investment bank to want to take the company public,

Page 38 - Page 41

Page 42

1  and it was a very intriguing concept. The strategy
2  had not been fully played out. And when I say that, I
3  mean that they had acquired over 1 million square feet
4  of real estate nationally, but it did not add up to
5  enough critical mass to become a public company in the
6  eyes of Merrill Lynch, who was Brown Brothers
7  Harriman's investment bank, who was prepared to take
8  the company public once it got to a certain level.
9          I was very interested in the plan that
10 these people had. They were looking for at the time
11 an executive vice president/chief operating officer,
12 and there were other titles associated with that which
13 had to do with capital markets and other -- and other
14 responsibilities that I was very interested in.
15         The company at the time had about 25 or 30
16 employees. It had six or seven executive vice
17 presidents -- I'm sorry, senior vice presidents, and
18 it had a CEO, who was -- the board had indicated to me
19 that the CEO was departing and that he would be
20 replaced with either myself as a prospective candidate
21 or with a third party candidate from the outside
22 world, and that my job was to focus on the

Page 43

1  consolidation of the portfolio, the potential growth
2  of the portfolio and working closely with Wall Street
3  to actually take the company public.
4          I interviewed for this position several
5  times in the summer of 1996 and into the fall. It
6  evolved very slowly. They were very methodical in
7  their process. They checked references many times,
8  including the investment bankers that we used for the
9  Charles E. Smith IPO, and eventually they made me an
10 offer to become their chief operating officer with the
11 title of executive vice president. They told me in no
12 uncertain terms that I would be responsible for
13 running the office, managing the employees, helping to
14 direct a growth strategy.
15         We did have a senior vice president and
16 director of acquisitions. That was not my principal
17 role, but given my experience, they wanted me to help
18 foster that person's job, and then they wanted me to
19 assemble the components necessary to take the company
20 public, including working with Merrill Lynch.
21         Now, you should also know that my last
22 interview was with a guy named Marty Cicco, who even

Page 44

1  today is a senior managing director at Merrill Lynch.
2  And they relied more or less on him at the end to
3  decide whether I was the right candidate or not. I
4  had gotten to know Marty Cicco through many of the
5  REIT conferences, and although he wasn't our
6  investment banker on the Smith REIT deal, we had
7  gotten to know each other professionally, and he was
8  very supportive of my coming on board at that company.
9          As it turns out, I began there sometime in
10 October of '96, and I worked virtually around the
11 clock and seven days a week to assemble the components
12 necessary to take the company public. And you can
13 look at some of the bullet points there, and you will
14 find that many of these -- or all of these things are
15 necessary to create the platform for a company to go
16 public.
17         And while I was doing that, there was a --
18 there was a public company who had, unbeknownst to me,
19 expressed a desire to buy this organization in its
20 entirety approximately a year before I arrived. They
21 had apparently made an offer or two before I joined.
22         Once I joined the company, the people at

Page 45

1  Brown Brothers told this company that they now had a
2  senior executive with solid REIT IPO expertise and
3  that they were going to take the path of going public
4  and they were not any longer interested in considering
5  a sale of the company.
6          Those discussions were not -- I was not a
7  party to those conversations. Christmas 1996, we were
8  wrapping up the year-end audit which was necessary to
9  be included in the filing documents for the SEC. I
10 received a call from New York from one of the
11 partners, one of the board members, who told me that
12 it was important to get the year-end audit completed
13 in a timely manner. However, there was some other
14 activity with respect to the company that he needed to
15 inform me of, and he asked me to come to New York
16 sometime during the Christmas break in 1996.
17         I did go to New York. I met with Peter
18 Joseph, who's now passed away, and I met with one of
19 the partners of Brown Brothers Harriman, whose name I
20 can't recall, and they had told me that this public
21 company had made yet another offer that they were
22 seriously considering and that to the extent that they

**Page 46**

1 did accept the offer that they would compensate me in
2 a manner that was consistent with what we had agreed
3 to and that they were quite appreciative of the work I
4 had done to date. And at that point, I asked for
5 direction going forward, and they said we will take it
6 from here for the next couple of weeks.
7      They did enter into a definitive agreement
8 to sell the company for well over $400 million. That
9 agreement was entered into in 1997. I believe it
10 closed in the summer of 1997.
11      I received a lump sum cash payment at the
12 time, and I received a stock-for-stock conversion
13 agreement with the acquiring company, who would
14 eventually transfer stock to all the shareholders of
15 the private company over a period of time. So at that
16 point, I was unemployed, which I believe was June or
17 July 1997.
18      My role then was to wind down the office
19 and negotiate out of the lease for the office space,
20 to ship all of the documents and the files and the
21 furniture to Newton, Mass, which is where the company
22 that bought us was headquartered. I also wrote

**Page 47**

1 letters to any employee that asked about the situation
2 at the company, since they were looking for jobs, and
3 I also on my own went out looking for future
4 employment which I found with Boston Properties in
5 August of 1997.
6      Boston Properties had gone public in --
7 sometime in the first or second quarter of 1997, and
8 they were looking for someone to run the acquisitions
9 effort in Washington. I interviewed extensively with
10 Mort Zuckerman, who was the chairman, and Ed Linde,
11 who was the president and CEO. A guy named Ray
12 Ritchey was my sponsor. He was the executive VP and
13 head of acquisitions and development, and he really
14 wanted me to join.
15      I went to New York and met with Mort
16 Zuckerman for several hours. I went to Boston and met
17 with Ed Linde for several hours. They did extend an
18 offer. I did accept it. I became a vice president
19 and regional director of acquisitions.
20      And within between 12 and 18 months, we
21 bought a lot of very noteworthy buildings in the
22 Washington area, in particular, downtown D.C. I don't

**Page 48**

1 know if you know where the Old Ebbitt Grill is, but we
2 bought that building --
3      BY MR. SMITH:
4    Q   Fifteenth Street, yeah.
5    A   -- which was about a $175 million deal. We
6 bought 1301 New York Avenue. I don't know if you know
7 Baltimore at all, but we bought 100 East Pratt Street,
8 which is the largest tower on the water. I don't know
9 if you know Richmond, but we bought the two towers on
10 the water where Hunton & Williams is headquartered --
11    Q   Uh-huh.
12    A   -- Riverfront Plaza.
13      Several of those buildings have since been
14 sold at significant rates of return to Boston
15 Properties, and to this day, I retain a friendship
16 with Ray Ritchey. So that was Boston Properties.
17      At some point, I got a call from one of the
18 executives of the Akridge Company, which was a private
19 development company, and they had recently lost a
20 group that went out on their own. The partner in
21 charge of that group had responsibility for
22 acquisitions and finding equity partners for new deals

**Page 49**

1 and apparently the company was very aggressively
2 looking for someone to fill that slot.
3      And I had a very good experience with
4 Boston Properties. I really enjoyed the work and the
5 people. I was looking for an opportunity to make
6 money through interests in real estate versus working
7 for a public company, which allows you to receive a
8 salary, a bonus and some -- back then, some stock
9 options. And the concept of receiving both an equity
10 interest and a promoted interest in a deal or deals
11 was very appealing to me.
12      So I met with the folks at Akridge. I met
13 with the head of the company, Chip Akridge, and they
14 extended a very -- at the time, I recall it was a very
15 attractive offer in terms of the participation in the
16 deals. And again, they would be both deals that I
17 generated and deals that were generated in the office
18 by others, which was very attractive.
19      I decided to accept that position. I did
20 become a partner of the company, and I did become a
21 member of the executive committee. There was a period
22 of time between starting and that inclusion in the

**Page 50**

1  partnership group and the executive committee
2  membership.
3      After about eight or nine months, it became
4  clear that the structure that the Akridge Company had
5  in place to make acquisitions was inconsistent with
6  what the equity markets were looking for. The company
7  was a top real estate developer, ground-up developer,
8  but their experience in acquisitions was more limited
9  than it was in development.
10      And from my experience, when you attempt to
11  acquire an office building of approximately
12  $50 million, the institutional equity partner that
13  you're looking to become partners with requires a
14  percentage of the capital to be committed by the
15  company, quote, doing the deal. And the struggle that
16  I had was that the equity and the capital of the
17  organization was being committed to the development
18  deals, which had construction loans and other
19  liabilities associated with them, and that capital
20  wasn't readily available to me to make acquisitions.
21      So with that, a mutual friend of the
22  Lerners, a guy named Bob Baldwin, suggested that I

**Page 51**

1  speak to the Lerner family as they had indicated an
2  interest in attempting to do building acquisitions
3  versus the -- the sole basis of the company, which is
4  ground-up development. And I did meet with them, and
5  I told them that I'd only been with the Akridge
6  Company for a short time and that I was hopeful that
7  things would turn around and we would get additional
8  capital with which to make acquisition investments
9  versus the new construction.
10      The Lerners still had a high level of
11  interest. They called me from time to time and I met
12  with them from time to time, and they were desirous of
13  knowing what my game plan would be. And I eventually
14  put together a very formal business plan of what it
15  would take to acquire properties and what level of
16  investment they would have to make themselves.
17      Once they saw that document, they were
18  excited, because they did not feel that it was overly
19  aggressive, and that the dollars that I was seeking was
20  not that high, and then they wanted to pursue a joint
21  venture or a partnership with me.
22      So what I did was -- to focus on this, I

**Page 52**

1  did leave the Akridge Company. I can't tell you if
2  this is the right date or not. I did enter into an
3  agreement with Lerner Enterprises. I did become an
4  employee of the company, as I remember, and we pursued
5  the acquisition of office buildings mainly in downtown
6  Washington, D.C. We ended up buying three office
7  buildings and one land parcel.
8      We teamed up with -- in one office
9  building, we teamed up with the Bernstein family in
10  Washington to do that deal. We teamed up with
11  Guggenheim Real Estate Partners to do another deal,
12  and we teamed up with Walton Street Capital, Walton
13  Street Partners out of Chicago to do another deal and
14  then the land parcel we bought just with the family's
15  money.
16      I arranged the acquisition of those
17  properties. I arranged the equity partner coming into
18  the properties. I arranged the debt for the
19  properties. And my business partner and I -- Mike
20  Hillman -- were responsible for strategy for the
21  assets. And then once the equity partners decided
22  that they wanted to sell the buildings, we were

**Page 53**

1  responsible for discussing how the family might be the
2  buyer of the buildings versus going to market. And
3  the prices had escalated so greatly that the family
4  decided to pass and allow the assets to be sold, which
5  they were. And LMH Realty Group, LLC, was a partner
6  in each of the assets, as was my operating company
7  with Mike Hillman.
8      So the three properties have been sold.
9  The strategy of buying new investments of existing
10  properties was something that the Lerners had had an
11  interest in, and they decided they too just wanted to
12  focus on their development business. And in 1993 --
13  Q  2003?
14  A  I'm sorry -- in 2003, they approached me
15  and said it's been a great experience, but the
16  resources that they dedicated to what Mike and I were
17  doing were actually taken away from some of the other
18  buildings that they had. In other words, they didn't
19  add to their company to provide property managers to
20  us or other construction managers for interior work.
21  They had used their core employees. So they wanted to
22  not use them for buildings that the family did not

Page 54

1 build.
2     So we -- we wound down the partnership very
3 cordially, and everybody was very happy with what had
4 occurred. The buildings were eventually sold at very
5 excellent IRRs and whole dollar profits. You know, it
6 was a very, very elegant, very cordial, very classy
7 relationship with a very -- an organization that's
8 very strict in the way they manage themselves, the way
9 they manage the company, the way they manage the
10 properties, the way they develop the properties.
11     And I can tell you that between The Charles
12 E. Smith Companies experience, the Lerner Enterprises
13 experience and the Boston Properties experience, I've
14 had the honor of working with some of the best
15 professionals in literally the world.
16     And I can tell you, Marc, without any
17 equivocation, that a handshake with any of these
18 gentlemen I've discussed previously is all it took to
19 make a deal. You can put all the paper you want in
20 front of these guys. It doesn't matter to them. They
21 shake your hand, they look you in the eye, a deal is a
22 deal.

Page 55

1    Q   Are you telling me that they didn't
2 document their deals?
3    A   I'm telling you that you could shake hands
4 with them and you got a deal.
5    Q   But did they document their deals is my
6 question.
7    A   They documented their deals. But as far as
8 I'm concerned, looking back, if we didn't have a piece
9 of paper, I believe firmly I would have gotten
10 anything that would have been included in those
11 documents.
12    Q   Your partnership, for instance, with the
13 Lerners, that was documented. You had an arrangement
14 on paper, correct?
15    A   Yes, we did.
16    Q   Okay. Let me ask you just a couple
17 questions about the winding up of the partnership.
18     You indicated that the assets, the three
19 buildings were sold. Would that have been in the late
20 2003 time frame?
21    A   In 2003, we met with The Bernstein
22 Companies. As we'd owned the building for almost

Page 56

1 three years, they felt that it had gone up in value.
2 We did an analysis of the market to determine what we
3 thought it was worth.
4     Adam Bernstein, who's the president of the
5 company, decided that the anticipated value was
6 sufficient for his fund, and I worked with him both in
7 September of '03 and December of '03 to really sharpen
8 the pencils, to make sure that what we were seeing in
9 the market was as good intelligence as we could get.
10     Once we decided or he decided that that was
11 the case, we arranged several meetings with investment
12 brokers to select a company to sell the building and
13 ended up with an organization by the name of
14 Cassidy & Pinkard. They put the building on the
15 market in either the third quarter or the fourth
16 quarter of '03, and the building was sold I believe in
17 the first quarter of '04.
18     The next building to be sold -- are you
19 interested in that?
20    Q   Yeah. Yeah.
21    A   We purchased a building on K Street. I
22 believe that building was purchased in 2000 and --

Page 57

1 let's see. When was -- that building was purchased in
2 2003, I think June or July, with Guggenheim Real
3 Estate Partners, and we received an unsolicited offer
4 in I believe 2004 for that building from Carlyle and
5 Guggenheim decided to accept that offer. So that
6 building was sold in 2004.
7     And then the third building was purchased
8 in February of 2002, and sometime in 2005, Walton
9 Street Partners instructed Cushman & Wakefield to do
10 an analysis of the market. And they came back with
11 indications that it could sell for a value that Walton
12 was receptive to and they went ahead and put that
13 building on the market and that building sold sometime
14 in 2005.
15     The land site is still owned by the same
16 partnership that it was when we bought it, and the
17 building -- the land has broken ground and the new
18 building is under construction and the Lerners are
19 doing it on their own.
20    Q   Okay. And did the sale of the first two
21 buildings you mentioned, did that coincide roughly
22 with your move to Florida?

Page 54 - Page 57

Page 58

1    A    No.  The sale of the first building was in
2  the first quarter of '04, and funds were not -- there
3  was a series of distributions.  I'm not sure of the
4  first date of the distribution.  I think it was the
5  first quarter of '04.  It may have been the second.
6        The sale of the second building, which was
7  an unsolicited offer, was in -- I believe it was in
8  the summer of '04.  I can't recall exactly.  That was
9  not a programmed sale.  It was not a sale that was
10 based upon the business plan.  Actually, Guggenheim
11 had intended to hold that property much longer.
12   Q    Okay.  And you had established your
13 residency in Florida in January of '04, correct?
14   A    Uh-huh.
15   Q    You need to say yes or no.
16   A    Yes, I did.
17   Q    All right.  And was part of the reason you
18 moved to Florida to avoid any capital gains tax on
19 these properties we've been talking about?
20   A    No.
21        MR. HADDAD:  I would just object as asked
22 and answered.

Page 59

1        BY MR. SMITH:
2    Q    Did you have to pay capital gains tax on
3  the properties we talked about as a result of your
4  residency in Florida?
5    A    I had to pay capital gains tax as a United
6  States citizen.
7    Q    Okay.  Were you able to avoid any tax
8  liability as a result of moving out of the District
9  and into Florida?
10   A    I never did anything to avoid any taxes.
11   Q    If you had maintained your residency in the
12 District, would you have had to pay any more taxes as
13 a result of the sale of these properties?
14   A    I don't know.
15        MR. SMITH:  Do you want to take a quick
16 break?
17        MR. HADDAD:  Yeah, I think that's a good
18 idea.
19        (Whereupon, a short recess was taken.)
20        BY MR. SMITH:
21   Q    Let me ask you a few questions, Mr. Morris,
22 about the information you've given me about your

Page 60

1  various employers.
2        The Government Property Investors position
3  that you held from October of '96 until July of 1997,
4  you indicated that you received a lump sum payment at
5  the conclusion of your employment.
6    A    Uh-huh.
7    Q    You need to say yes or no.
8    A    Yes.  Yes.
9    Q    Uh-huh doesn't translate well on the
10 transcript.
11       Now, was that a severance payment?
12   A    You know, Marc, I don't recall the details
13 of that payment.  There was a payment made when the
14 sale of the company was consummated, and there were
15 several payments subsequent to that.
16       I mean, I just -- this was a company that
17 was purchased in -- for stock and for some cash.  The
18 structure of the deal was not negotiated by me.  It
19 was negotiated by the board members.  So there was --
20 there was a payment that included cash.  It included
21 some document that was a conversion, a stock
22 conversion certificate.

Page 61

1        And I don't want to bore you with the
2  details, but the company that we sold our company to
3  was a public company.  The company that we sold was
4  privately owned, and I owned shares in the privately
5  owned company along with options to buy additional
6  shares.  And there was a formula that the board
7  negotiated with the company that bought us, and I
8  can't tell you that I remember how that actually
9  worked.  It's been 10 years almost that --
10   Q    The formula that you're talking about is a
11 conversion formula for the stock you owned in the
12 private company and the options that you would
13 receive, a certain number of shares in the public
14 company, correct?  Is that what you're talking about?
15   A    I'm talking about the fact that there was a
16 conversion formula, but I actually don't think it had
17 anything to do with the options.  I think it had to do
18 with the stock.
19       And I'll tell you on top of that, there was
20 a last-minute recalculation by the board that the CFO
21 had encouraged them to do because there was an option
22 component.  And what happened was the nonexecutive

**Page 62**

1 employees had some options that were not in the money,
2 so the board wanted to reward some of the
3 nonexecutive, you know, employees, which is why they
4 changed the formula. So it was more complex than I
5 could begin to tell you.
6    Q   Okay. But you had indicated during your
7 testimony that the payment you received at the end,
8 the cash payment you received at the end was by
9 agreement.
10    A   The payment that I received at the end was
11 by agreement, that is correct.
12    Q   All right. Now, did you have an employment
13 agreement with the company?
14    A   I had an employment agreement -- actually,
15 strike that.
16       I had a general agreement with the company
17 which included employment. It also included a variety
18 of other aspects.
19    Q   All right.
20    A   I don't know if you call that an employment
21 agreement or what kind of agreement, you know.
22    Q   Well, I haven't seen it, but the agreement

**Page 63**

1 was in writing, correct?
2    A   The agreement was in writing. Actually,
3 the agreement was summarized in a term sheet by the
4 chairman and forwarded to me for execution. He had
5 signed it and he had sent it to me. And then
6 subsequent to that, I did receive a document that
7 mirrored the term sheet but was much more lengthy.
8    Q   All right. The term sheet that you
9 signed --
10    A   Uh-huh.
11    Q   You need to --
12    A   Yes.
13    Q   -- described the payment you would receive
14 at the conclusion of your employment if it ended for
15 certain reasons, correct?
16    A   Well, it may have, but it included a lot of
17 other things as well.
18    Q   Okay. Fair enough. And the more complete
19 document you've referred to that you signed as well, I
20 assume, right?
21    A   The more complete document that you
22 referred to that you signed as well; is that what you

**Page 64**

1 said?
2    Q   Yes.
3    A   You know, Marc, I'll be really candid with
4 you. I don't recall signing the complete document.
5    Q   Okay.
6    A   I know for a fact I signed the term sheet,
7 because I remember like it was yesterday receiving it.
8 I presume that I signed the big document, but it's
9 not --
10    Q   Did the company sign the big document?
11    A   Did the company sign the big document. The
12 company produced the big document, so, I mean -- I
13 don't recall in my mind seeing signatures on a piece
14 of paper. I recall the term sheet like it was
15 literally yesterday only because I needed to check the
16 terms that the chairman had sent to me.
17    Q   Okay. Are there any other employers that
18 are listed on your resume that provided you with a
19 payment at the conclusion of your employment as in
20 severance pay, anything that's similar to that?
21 Obviously other than the Government Property Investors
22 that we just talked about.

**Page 65**

1    A   I'm not sure what you mean.
2    Q   Did you receive severance pay from any of
3 these companies?
4    A   Can you just describe what you mean by
5 severance pay?
6    Q   You don't understand what I mean when I say
7 severance pay?
8    A   Let me tell you why I ask you that, okay?
9 There are payments that I received for interest in
10 deals that I had.
11    Q   I'm not really referring to that. By
12 severance pay, I mean a payment that a company makes
13 to you as a result of an involuntarily termination
14 situation that's meant to provide you with some
15 compensation until you transition into a new position.
16       That's the kind of a payment I'm referring
17 to, not a payout of any interest you may have held.
18    A   Well, I'm still having a hard time
19 understanding what you're asking.
20    Q   Let me try to help you. The payment you
21 received from Government Property Investors, the cash
22 payment, that wasn't the result of an interest you

Page 66

1 held in any type of deal, was it?
2   A  Well, like I said, it was a complex
3 arrangement that had roots in interests that I held in
4 the company.  I mean, there was --
5   Q  I'm talking about the cash payment only.  I
6 understand it was a complex transaction.
7       The cash payment that you received from the
8 company was not related to any interest you held or
9 stock you held --
10   A  No, I think it was.  I think -- I think --
11 I think by virtue of the fact that the board had
12 rearranged this formula that I had certain agreements
13 that I needed to sign that would relieve the
14 purchasing company of any, in particular, option
15 values.
16       So in other words, the underlying stock in
17 our company would be exchanged for stock in the public
18 company at a certain formula, okay, and that formula
19 was based on various market values of the stock.  It
20 could go up or it could go down.  And based upon a
21 ceiling or a floor, you'd get a rate, exchange rate.
22       Now, there was options and on top of the

Page 67

1 options, there was something else.  I've forgotten the
2 name of it.  But I believe that the options were
3 extinguished through this new formula, and I believe
4 that a portion of that cash was for more or less
5 signing away the options that I had.
6   Q  Okay.  And the other portion of the cash
7 was not related to options or stock or any other
8 interests you had.  It was just payment for your
9 service to the company, severance payment, correct?
10   A  Payment -- I mean, I --
11   Q  I'm not trying to be tricky here.
12   A  No, and I'm not trying to be difficult.
13 I'm telling you that it was 10 years ago and that it
14 was a very compressed period of time.  And the
15 gentleman that was responsible for it is still around,
16 and, you know, it was really a chat in his office by
17 saying here's what the new formula is, here's what you
18 have, here's what, you know, we're going to give you.
19 If you're okay with this, you know, we need to make
20 the checks out and -- because there were several
21 people that received a payment at that time.
22   Q  All right.  Let me try it a different way.

Page 68

1       Is there any payment you can recall
2 receiving from any of these companies at the
3 conclusion of your employment that wasn't tied to any
4 interest or stock or options?
5       MR. HADDAD:  Does that include salary as
6 well?
7       MR. SMITH:  Right.  Obviously, earned
8 salary would not be part of that.
9       BY MR. SMITH:
10   Q  It's a payment in addition to anything that
11 you earned, but it's not related to any interest you
12 held or any stock you held or any options you held.
13   A  I don't know.  I'm -- I've got a block.
14 I'm not getting what you're asking me.
15   Q  What I'm asking you is if you received
16 severance pay, and maybe I should start with why don't
17 you tell me what your understanding of severance pay
18 is.
19   A  Well, I mean, in its simplest form, I
20 suspect that, you know, based upon going back to the
21 Buvermo handbook or bylaws, there was, you know,
22 intimation there that an employee could get two

Page 69

1 weeks', quote, severance pay, which is, I guess,
2 consistent with maybe the world for various employees.
3       I mean, I'm not -- I don't understand
4 exactly what you're asking me.  If you're saying
5 severance pay is a payment for -- you know, for
6 somebody's salary that's not there or that is out sick
7 or they left the company, I mean, I'm just --
8   Q  You're telling me you don't understand the
9 concept of severance?  And if that's your answer,
10 that's okay.  I'll move on.
11   A  I'm not sure I've been involved in a
12 situation that I needed to get into the details of
13 severance pay.  I haven't really run a big company and
14 haven't had anybody ask me about that.
15       Is there another name for it?
16   Q  Well, I don't know.
17   A  Okay.
18   Q  Your resume, as I make this calculation,
19 reflects about 25 years or so of real estate
20 experience -- is that approximately correct -- looks
21 like, dating back to your experience with Smith Barney
22 in 1980?

Page 70

1 A That looks accurate.
2 Q All right. And how much of your real
3 estate experience has dealt with the contracting side
4 of the business, you know, reviewing contracts, joint
5 ventures, partnerships? Did you involve yourself at
6 that level?
7 A I did. My involvement was mainly based
8 upon making sure that the language in any of these
9 agreements reflected the business terms that we had
10 come to.
11    In many cases, there was a lot more words
12 that surrounded the business terms, and I would
13 usually suggest that we had some type of term sheet
14 inserted in joint venture agreements or at least as an
15 addendum so that while you could read the words, you
16 could also associate them with an example.
17    My other principal role -- and there were
18 several -- was to ensure the protection of my company
19 and my partners to the extent that there was any
20 carve-out provisions in debt, that they were either
21 limited or extinguished entirely as it relates to the
22 organization that I was representing.

Page 71

1    And in one case with respect to a deal that
2 I did at Buvermo, I fought very hard to eliminate
3 entirely the potential for the organization or any
4 affiliate to have any association with a carve-out
5 provision under either of the mortgages that were
6 placed.
7    These were very important fiduciary
8 responsibilities that I felt very serious about, and
9 there were also timing issues that I was very focused
10 on because we had a significant deposit up and I did
11 not want due diligence periods or any other periods to
12 expire unbeknownst to us or, by the way, without
13 notification so that we could protect our deposit.
14    I also fought hard to determine who the
15 escrow company was so that we knew where the money
16 was, we had the relationship, and the interest was
17 being earned that would inure to our benefit. And
18 there were a potpourri of more or less
19 business-related aspects that I focused on as it
20 relates to a joint venture agreement.
21 Q Okay. Well, just generally, did you
22 believe it was important that these details be put in

Page 72

1 writing?
2 A Did I believe that it was important for
3 these details to be put in writing. To the extent
4 that we were working with unknown entities, third
5 parties that we did not have a working relationship
6 with or had not done business with in the past, I
7 thought that it was prudent to document that sharing
8 arrangement.
9 Q And in fact, in your real estate career,
10 have you ever done a deal, any sort of deal that
11 wasn't documented, that wasn't in a document that was
12 signed by all the parties involved?
13 A Many times.
14 Q Okay. What type of transactions are not
15 documented?
16 A I'm working on a deal right now where we've
17 shaken hands on a sharing arrangement of possible
18 future income, and I've known the guy for several
19 years, and, you know, we've had counsel sitting there
20 telling us to write it up and get it signed. And
21 we've worked through the discussions between the two
22 of us and we've come to an arrangement and he's out

Page 73

1 looking to do some things right now and we haven't
2 signed a document.
3 Q Is this your partner?
4 A No. This is somebody new.
5 Q Okay. But you intend to sign a document
6 ultimately, don't you?
7 A It's not necessary.
8 Q Do you intend to sign a document?
9 A Do I intend to sign a document. Maybe.
10 Q All right. And is it -- is the type of
11 arrangement you've just described where a deal isn't
12 documented, is that typical in the real estate
13 business?
14    MR. HADDAD: I'm just going to object to
15 the form.
16    Go ahead.
17    THE WITNESS: I'm not sure it's typical. I
18 don't think it's unusual, but I don't think it's
19 typical.
20    BY MR. SMITH:
21 Q It's customary to document real estate
22 transactions?

Page 70 - Page 73

Page 74

1   A   I'd agree with that.
2   Q   All right. How many of the employers
3 reflected on your resume provided you with a
4 guaranteed or a specified term of employment, for
5 instance, two years, four years?
6   A   Let's see. I guess I've got to ask you a
7 question. What do you mean by guaranteed me a term of
8 employment?
9   Q   Put something in writing that said we agree
10 to employ Jonathan Morris for X number of years.
11   A   Uh-huh.
12   Q   How many of the employers listed on your
13 resume gave you that type of promise?
14   A   In writing or orally?
15   Q   Well, let's start with in writing.
16   A   In writing, I believe one.
17   Q   Which one?
18   A   Government Property Investors.
19   Q   Okay. So you had a document which
20 contained a term -- what I call a term of employment,
21 meaning they agreed to employ you for a specific
22 period of time; is that your testimony?

Page 75

1   A   As I recall, they agreed to employ me for a
2 specified period of time, and then there was a renewal
3 option in that arrangement that was subject to some
4 fairness test of, you know, everything's okay, we're
5 doing business, you know.
6   Q   And that promise you've referred to, that
7 you've stated, I think, that was put in writing in a
8 document that was signed by the parties, right?
9   A   That was put in writing by a document that
10 is exactly the one that I don't recall being signed,
11 but it was a component of the term sheet.
12   Q   All right. Now, how long was that period
13 of time? What was the term of employment?
14   A   It was either two years or three years.
15   Q   And in fact, you weren't employed for two
16 years. It looks like you were employed for not even a
17 year, right?
18   A   You know, you're using the word employed,
19 and I can't tell whether you employed -- employment
20 ended when we sold the company. I mean, at some
21 point, the company was wound down, so we didn't have
22 employees.

Page 76

1      But, I mean, going back to your question,
2 it was less than a year I believe between the time I
3 joined and the time the company was wound down to the
4 point where it did not have any employees.
5   Q   All right. Apart from the Government
6 Property Investors, you didn't have any written
7 promises from any of your former employers to employ
8 you for any specific period of time?
9   A   Written?
10   Q   Written.
11   A   No.
12   Q   All right. How many of these employers
13 promised you orally, verbally, a specific term of
14 employment?
15   A   Several.
16   Q   Which ones?
17   A   Larson, Ball & Gould.
18   Q   And how long a period of time did they
19 promise to employ you?
20   A   Brian Ball told me that things are going
21 great and he'd like to see me retire there.
22   Q   But he didn't specify a number of years?

Page 77

1   A   He said we -- we're very encouraged and,
2 you know, we want you here for the long term.
3      Bob Smith with Charles E. Smith Companies,
4 when I was contemplating leaving, he told me that, you
5 know, I'm a friend of the family, I'm an exemplary
6 employee, and he would like me to stay there for at
7 least 10 more years.
8      Government Property Investors did have a
9 piece of paper. Boston Properties, Ray Ritchey was
10 very satisfied and happy with my employment, and he
11 had hoped that I would stay there -- I can't recall
12 exactly what he said, but he said, you know, we'd be
13 very supportive of you being here for a long time.
14   Q   Is it your testimony that the statements
15 that you just gave us constitute an enforceable
16 promise on the part of the employer to employ you for
17 the period of time you talked about, for instance,
18 Smith, 10 years?
19      MR. HADDAD: I'm just going to object,
20 because it calls for a legal conclusion.
21      Go ahead.
22      THE WITNESS: Well, I don't know what

Page 78

1 enforceable means, so --
2     BY MR. SMITH:
3   Q  You don't know what enforceable means?
4   A  If you're asking me whether I felt that I
5 had a job there for a long time and I was welcome, the
6 answer is yes.
7   Q  Is it something that you could have taken
8 them to court for and enforced, for instance, in the
9 Smith case, a 10-year employment term? That's what I
10 really mean.
11     MR. HADDAD: Same objection.
12     THE WITNESS: When we started this process
13 today, you asked me a couple questions.
14     BY MR. SMITH:
15   Q  I'd prefer you to focus on the question
16 I've asked you.
17   A  Okay. I've never taken anybody to court
18 before, so I have absolutely no idea.
19   Q  Yet for each of the employers you've named,
20 who gave you some type of promise in terms of a term
21 of employment, you ended up leaving that job before
22 the term of employment, correct?

Page 79

1   A  Say that again?
2   Q  You ended up leaving -- for instance, in
3 the Smith -- for The Charles Smith Company, you worked
4 for them for about four years. And you just said that
5 Smith wanted you to stay for 10 years, yet you chose
6 to leave before the 10 years was up; is that correct?
7   A  Yes.
8   Q  All right. And so you didn't believe that
9 you were obligated to the company to stay for any
10 particular period of time, did you?
11   A  I viewed it as a mutually beneficial
12 opportunity to stay.
13   Q  I'm sorry?
14   A  I viewed it as a mutually beneficial
15 opportunity if I was to stay and if they were to have
16 me. I viewed it as a commitment on their part that I
17 have a home there for that period of time.
18   Q  Yet you believe you had the freedom to
19 leave before that period of time elapsed?
20   A  I believe I had the freedom to leave
21 subject to, you know, some tough decisions that I had
22 to make.

Page 80

1   Q  All right. Do you understand the phrase at
2 will employment?
3   A  No.
4   Q  You don't know what that means?
5   A  I mean, you know --
6     MR. HADDAD: Same objection, legal
7 conclusion.
8     BY MR. SMITH:
9   Q  I'm not asking for a conclusion. I'm
10 asking whether you understand what the term at will
11 employment means.
12   A  I do not.
13   Q  It's when an -- and I'm going to give you
14 my definition of it, and your counsel can object or
15 not.
16     My understanding of at will employment is
17 you're subject to being terminated at any time for any
18 reason without notice, and you have the same
19 corresponding right to leave the company at any time
20 you choose to. That's my understanding of at will
21 employment.
22     With that definition in mind, were you an

Page 81

1 at will employee for any of the employees that are
2 listed on your resume?
3     MR. HADDAD: I'm just going to object to
4 the extent it calls for a legal conclusion.
5     THE WITNESS: Well, first of all, you just
6 described at will employment to me --
7     BY MR. SMITH:
8   Q  Right.
9   A  -- so I cannot take what you told me five
10 seconds ago and begin to apply it to 25 years' worth
11 of employment.
12     I never heard the word at will with respect
13 to this job or any other job. It was never presented
14 to me as an at will employment. I never saw it
15 written anywhere. I never signed anything that said
16 at will. And if someone wanted me to be what you just
17 defined it as and wanted me to agree to that or sign
18 something to agree to that, I would feel that it
19 probably wasn't the right place to be.
20   Q  All right. Fair enough.
21     Now, in your 25 years of experience, is a
22 guarantee of employment, a specific term of

Page 78 - Page 81

Page 82

1 employment, is that something that is typically
2 negotiated at the inception of the relationship?
3    A   You know --
4       MR. HADDAD: I'm just going to object to
5 form.
6       Go ahead.
7       THE WITNESS: Let me answer this way: The
8 majority of my positions in recent history have been
9 jobs that I was qualified to do as perceived by very
10 senior-level professionals. And it was fairly well
11 understood that the objectives of the organization
12 were to accomplish and succeed at several tasks,
13 mainly the successful acquisition of real property,
14 the successful acquisition of real property that met
15 the objectives of each organization, which were
16 different from one to the other.
17       There was an understanding, and it wasn't
18 written, in virtually every job that as long as we
19 were looking at deals, pursuing deals and hopefully
20 getting good deals done that the employment would last
21 for as long as the organization had a strategy of
22 continuing to make investments.

Page 83

1       To the extent that the company did not have
2 that strategy anymore, which was the case with Lerner
3 Enterprises, then we would sit down and discuss
4 whether there was a new strategy that I could become a
5 part of or whether the strategy was shut down and
6 there was no future with that organization.
7       So I just need you to understand when you
8 ask me that question about what my skill set is and
9 what I bring to an organization. And with respect to
10 term, I can assure you that the organizations that
11 would continually be interested in making investments
12 and making acquisitions would look at me as a
13 long-term employee or officer because my skill set
14 fits particularly well with what their strategy is.
15 And only to the extent that I do something that's
16 wrong, it's egregiously wrong, would there ever be a
17 concept of not being together.
18       And I'm having a difficult time -- and
19 maybe this has been the case throughout this whole
20 process, but I have a very difficult time
21 understanding how you marry the notion of at will and
22 your description of it and your inclusion of it in

Page 84

1 perspective jobs versus organizations that have a
2 tremendous amount of capital that they want to put out
3 and want to engage the services of a professional to
4 do that. And once they see that the professional is
5 successful at getting these things done, how you
6 equate even a conversation about at will versus, you
7 know, productivity.
8       So I don't have any smart analogies for
9 you. I mean, you don't want to hear that. All I can
10 tell you is my experience has been if an organization
11 wants to get something done and they hire me to do it
12 and I get those things done, in my opinion, the
13 concept of an at will employment is as far afield from
14 my day-to-day business and my thought process as a man
15 going to Mars.
16       BY MR. SMITH:
17    Q   Are you saying that the company wouldn't
18 have a right to terminate your employment if it chose
19 to do so for any reason it deemed fit; is that your
20 testimony?
21       MR. HADDAD: Objection to legal conclusion.
22       Go ahead.

Page 85

1       THE WITNESS: I don't have -- I don't know.
2       BY MR. SMITH:
3    Q   All right. Well, let's say that you were
4 hired for a particular job. You had the experience
5 and the skill set and you performed the job well. But
6 after a period of time, it was determined that there
7 was not a good stylistic fit, that there were some
8 personality issues and the company wanted to part ways
9 with you, even though you were doing your job.
10       In your opinion, would the company have the
11 right to do that if you didn't have a contract that
12 said it couldn't do that?
13    A   I don't know.
14    Q   So just so I understand your testimony, the
15 position with Government Property Investors, that's
16 the only job you had in your 25 years where you've had
17 a written understanding, an employment contract,
18 governing the terms of your employment?
19    A   Well, it's the only one I can recall.
20    Q   All right. I mean, that's all I'm asking
21 you to do.
22    A   Okay. I mean, I just -- you know, you're

Page 86

1 talking about a tremendous amount of time that has
2 gone by, and to be, you know, again, responsive to
3 you, the notion of any agreement that I made with
4 Government Property Investors was, as I alluded to
5 several times, the fact is that this was a third-party
6 institutional organization that I didn't really have a
7 relationship with.
8        I mean, Brown Brothers Harriman is a
9 first-class firm and Merrill Lynch is there, et
10 cetera, et cetera, but, you know, they're not a
11 Washington-based company that I've known for 15 or
12 20 years and, you know, that's okay.  It's, I guess,
13 better to have a piece of paper with them since I just
14 didn't have any history with them or with any of the
15 partners.  But I don't recall being asked or being
16 told or being whatever to sign anything with anybody
17 else.
18    Q  Do you know whether it's customary in the
19 real estate business, the type of work that you do,
20 for an executive of your stature to have a written
21 employment agreement?
22    A  I don't think it is customary in my

Page 87

1 business in Washington, D.C. to have that.
2    Q  In your 25 years in the business, are you
3 personally aware of any real estate executive such as
4 yourself who has negotiated a 10-year term of
5 employment with a company in writing or orally?
6    A  Say that again?
7    Q  Are you aware of any real estate executive
8 who has a 10-year term of employment with their
9 company -- guaranteed 10 years of employment with
10 their company, either orally or in writing?  Are you
11 aware of any such situation?
12    A  I believe that there are executives in
13 Washington who have the same commitment I mentioned to
14 you before from their organizations and vice versa
15 from them to work at the company for maybe more than
16 10 years.
17    Q  Indefinitely, right?
18    A  I guess until somebody says you have to
19 retire.
20    Q  But my question specifically is do you know
21 of any specific example of a real estate executive
22 having a 10-year deal in writing?  Specifically

Page 88

1 10 years, nothing indefinite --
2    A  Well, as I mentioned to you, I moved to
3 Florida and I pursued my own investments in Florida,
4 and I was not in the Washington metro and I was in a
5 town that doesn't have what you're mentioning.  I came
6 back and I interviewed with several people, including
7 the Buvermo companies, and I have just not been
8 plugged in.
9        So to answer your question, I don't know
10 today of any executives that have that, but I may have
11 known years ago when I was much more attuned to what
12 was going on in the marketplace.  So --
13    Q  So your testimony is you can't -- as we sit
14 here today, you can't recall a single real estate
15 executive who has a 10-year employment contract?
16    A  I don't know.  I just don't know.
17    Q  You can't recall?
18    A  Okay.  I can't recall.
19    Q  Okay.  Would you expect that a commitment
20 by a company to employ an executive for 10 years would
21 be put in writing?
22        MR. HADDAD:  Object to the form.

Page 89

1        THE WITNESS:  Not necessarily.
2        BY MR. SMITH:
3    Q  So you would think that it would be okay to
4 have that type of agreement done with a handshake?
5    A  Absolutely.  And it happens.
6    Q  When?
7    A  I mean --
8    Q  Give me an example.
9    A  I don't have an example today, but I can
10 tell you that I would enter into an agreement
11 personally for 10 years on a handshake.
12    Q  You meaning if you were an employer or
13 somebody?
14    A  An employee.
15    Q  An employee.  All right.  So your
16 preference wouldn't be to have that type of
17 arrangement in writing?
18    A  The question I answered previously
19 indicated that in situations where the other party was
20 institutional, not Washington, not well known to me, I
21 think I told you that it would probably be -- I'm not
22 sure of the word I used, but --

Page 86 - Page 89

Page 90

1   Q   Prudent, I think.

2   A   -- prudent to have something in writing.

3     However, there is a fabric of trust in the

4 Washington metropolitan real estate community and

5 without that, I don't think the community works

6 particularly well and it does work very well today, in

7 my opinion.

8     So whatever answer you're trying to get out

9 of me, I just want you to know that I've been in this

10 community for a long time and there is a very high

11 level of trust throughout the community for many

12 aspects of day-to-day business. And I view the notion

13 of a long-term commitment, both to an employee and to

14 an employer, as coming under that umbrella of trust.

15   Q   Okay. And the longest employment that

16 you've held in 25 years is about four years, right,

17 with The Charles E. Smith Companies?

18   A   I think it was closer to five, but that's

19 probably right.

20   Q   Are you looking for employment right now?

21   A   I have been, yeah.

22   Q   Have you been interviewing at all?

Page 91

1   A   I have.

2   Q   Have you been extended any offers?

3   A   I have not. I have a prospective

4 arrangement with a gentleman I've known for five or

5 six years in Florida.

6   Q   Would this be an employment situation or

7 just a partnership type deal or --

8   A   It could have been an employment situation.

9 It's not turning out that way. It's turning out as

10 a -- more along the lines of a partnership type deal.

11   Q   Other than that, you haven't received any

12 job offers or anything like that?

13   A   Huh-uh.

14     MR. HADDAD: Say no.

15     THE WITNESS: No.

16     BY MR. SMITH:

17   Q   All right. Let's shift gears.

18     I want to get into your employment with

19 Buvermo, but before I do that, because we have a lot

20 of entities involved in this litigation, I want to

21 make sure that you and I are on the same page when I

22 refer to a particular entity what I mean, and when I

Page 92

1 refer to a particular type of compensation, like the

2 promote, that we're on the same page, that we have the

3 same understanding of what those terms mean. So I'm

4 going to ask you a couple questions just to lay the

5 foundation for testimony down the road.

6     Fidelio Properties is one of the defendants

7 in this lawsuit; is that correct?

8   A   Yes.

9   Q   All right. Now, it's my understanding that

10 Fidelio Properties is a general partnership that's in

11 the business of investing in commercial real estate,

12 very loosely; is that your understanding?

13   A   That's my understanding as it's been

14 described to me.

15   Q   Okay. And that's all I'm asking for. I'm

16 not trying to trick you. I'm just -- if

17 your understanding is inconsistent with what I'm

18 saying, I'm inviting you to --

19   A   You said there were a lot of entities

20 involved, and you're right. And there's several

21 affiliates of entities.

22   Q   Okay. I'm going to go through everybody

Page 93

1 and just sort of fit, you know, where they are in this

2 whole -- hopefully.

3     With respect to Fidelio Properties -- and

4 I'm going to refer to them going forward as Fidelio --

5   A   Okay.

6   Q   -- all right?

7     Fidelio, as a general partnership, is

8 governed by a partnership agreement, correct?

9   A   Fidelio is governed by a partnership

10 agreement. That's presumably correct.

11   Q   All right. And I think you've testified

12 that at some point, you had an opportunity to look at

13 the partnership agreement, correct? I'm not saying

14 you studied it, you memorized it, but you've seen it.

15   A   I've seen it.

16     (Thereupon, the document was marked as

17     Morris Deposition Exhibit No. 2 for

18     identification.)

19     BY MR. SMITH:

20   Q   Let me show you what I've marked as Morris

21 Exhibit Number 2 and ask if you can identify these

22 documents.

Page 94

1    Now, there's a fourth amended and restated
2  partnership agreement, and then there's a first
3  amendment to fourth amended and restated partnership
4  agreement.
5    So there are two documents here, and my
6  question is:  To the best of your knowledge, is this
7  the partnership agreement for Fidelio?
8    A  You're asking me if this is the partnership
9  agreement for Fidelio?
10   Q  Yes.
11   A  Well, let's see.  I mean, Marc, it looks
12  like it is.
13   Q  Okay.  Have you looked at this document
14  before today?
15   A  Not in any consequential form.
16   Q  In your role as president of Buvermo,
17  didn't you think it was a good idea to review the
18  partnership agreement for Fidelio, given its
19  relationship to Buvermo?
20   A  At some point in time, I thought it would
21  be important, yes.  However, I believe that
22  Mr. Gardner retained a certain level of purview over

Page 95

1  that partnership, as I recall.
2    Q  Are you saying that Mr. Gardner restricted
3  your access to this document?
4    A  No.
5    Q  So you had an opportunity as the president
6  of Buvermo, if you wanted to, to study this document
7  at your leisure; is that correct?
8    A  As long as it was available to me.  I don't
9  see anybody telling me not to read it.
10   Q  And it was available to you, wasn't it?
11   A  You know, I suppose that it was.  I don't
12  recall it specifically being available to me.
13   Q  All right.  But you don't -- you
14  specifically recall that nobody prohibited you from
15  looking at the document, right?
16   A  Nobody prohibited me from looking at any
17  document.
18   Q  All right.  Now, Buvermo Properties, Inc.
19  is another defendant in this case --
20   A  Uh-huh.
21   Q  -- correct?
22   A  Yes.

Page 96

1    Q  And in fact, that's the entity for which
2  you were hired to be the president, right?
3    A  That is correct.
4    Q  All right.  And this may be a very
5  simplistic definition of it, but Buvermo is the
6  operating arm of Fidelio, correct, and identifies
7  investment opportunities for Fidelio?
8    A  As I understood it to be the case, the
9  matrix of these entities was very complex.  And in
10  fact, I had asked where they came up with the name
11  Buvermo and Fidelio in the presence of Mr. Gardner and
12  Mr. Tjaden, and they could not recall how the
13  organization names evolved.
14   Q  But my question is Buvermo was the
15  operating arm of Fidelio, correct?  I mean, they did
16  the actual work in identifying investment
17  opportunities.
18   A  Well, I became president and CEO of Buvermo
19  Properties, Inc., and my charge was in fact to do --
20  find properties.  So, you know, based upon the company
21  that I was the head of and the job I had, at the time
22  I was hired, I agreed that that is the case.

Page 97

1    Prior to my either joining the company or
2  having any knowledge about how that worked, I don't
3  know.
4    Q  Okay.  All I'm asking is what you know --
5    A  Okay.
6    Q  -- with all my questions.
7    And in fact, Buvermo doesn't make any of
8  the actual investments.  That's Fidelio, right?
9  Fidelio puts the capital into the real estate
10  projects, among other people?
11   A  Actually, I think it's an affiliate that
12  puts it in.
13   Q  I guess my question is Buvermo is not the
14  entity that's making the investments in those
15  properties?
16   A  Not to my knowledge.
17   Q  All right.  And Fidelio is Buvermo's sole
18  shareholder, correct, during -- and, of course, this
19  is based on only what you know.
20   A  You know, Marc, I don't know the answer to
21  that question.
22   Q  Okay.  That's a fair response.

Page 94 - Page 97

Page 98

1   A  I've tried to find -- I've tried to find an
2 organization chart. I've tried to, you know, put the
3 pieces of the puzzle together. I know that there are
4 these entities in existence and they somehow link to
5 one another.
6      But identifying that sole shareholder
7 through all these documents that we've read, I just --
8 I cannot give you a definitive answer that I can rely
9 on.
10   Q  All right. So your testimony is that while
11 you were president of Buvermo, you never discovered
12 who its shareholder was; is that accurate?
13   A  It was -- after several inquiries on my
14 part, I was given information that indicated that
15 there was an organization that Joost represented, an
16 organization that Andre van Rhee represented that
17 collectively owned interest in several other entities
18 that ultimately provided capital to an entity that
19 would make investments that Buvermo found.
20      And I, out of curiosity as president and
21 CEO of Buvermo Properties, Inc., attempted to get a
22 little bit more definitive about the source of my

Page 99

1 company's investment capital because, as a
2 professional seeking deals, I do like to describe
3 where the capital comes from. And the reason I do
4 that is people like to know who their partner is.
5 People like to know where the capital emanates from.
6      I got as far as knowing that Joost
7 represented an organization that had teamed up with an
8 organization that Andre represented and that they were
9 partners in an entity that in fact provided the
10 capital or provided the guarantee of loans for Fidelio
11 to make investments that Buvermo found.
12      So there was no lack of my effort to
13 identify a little bit further other than innocuously
14 named partnerships. And, Marc, I will tell you that I
15 asked several times to get a little bit more
16 clarification.
17      I got so far as to find out that one of the
18 companies was founded by a family that owned -- and
19 this is what I was told -- Mercedes-Benz dealerships,
20 and the other company was funded by a family that had
21 either invented or marketed or manufactured a truck in
22 Holland, and that is as far as I got. And as was the

Page 100

1 case in many conversations that Joost and Andre did
2 not want to have with me, I got no response from
3 several additional questions.
4      So that's a long way of answering your
5 question about my knowledge of these partnerships and
6 the partners and the sole shareholders. Don't
7 misunderstand that I made concerted efforts to
8 determine who these shareholders were (sic). I did.
9   Q  Did you look at the minute books that are
10 stored in the company's kitchen?
11   A  I did.
12   Q  And you weren't able to figure out who was
13 the sole shareholder of Buvermo?
14   A  There were a lot of names in there, Marc,
15 and John wrote the majority of the minutes. So I --
16   Q  All right. Buvermo is governed by a set of
17 bylaws, right?
18   A  Yes.
19   Q  And you've had an opportunity to look at
20 those bylaws, right?
21   A  Yes.
22      (Thereupon, the document was marked as

Page 101

1      Morris Deposition Exhibit No. 3 for
2      identification.)
3   BY MR. SMITH:
4   Q  Let me ask you to look at Morris Exhibit
5 Number 3.
6      These are the bylaws of Buvermo Properties,
7 Inc., correct, that were in existence when you were
8 president?
9   A  It looks like them.
10   Q  All right. And while you were president,
11 you had the opportunity to review these bylaws, right?
12   A  Yes.
13   Q  Janivo Realty, Inc. is also a defendant in
14 this case; is that right?
15   A  Yes.
16   Q  Orvan, Inc., also a defendant?
17   A  Yes.
18   Q  Donelux, Inc., also a defendant?
19   A  Yes.
20   Q  And Fidelio Properties Management, Inc.,
21 also a defendant?
22   A  Yes.

Page 102

1  Q  And then an entity, FP Executive Partners,
2 LLC, also a defendant, right?
3  A  Yes.
4  Q  All right.  Now, all of those entities I
5 just named, they are the partners of Fidelio, right?
6  A  They are the partners of Fidelio.
7     They may be partners of Fidelio.  I don't
8 know if they're the partners of Fidelio.  I think
9 they're the partners of Fidelio that we're interested
10 in.  There may be other partners of Fidelio that I'm
11 unaware of.
12  Q  All right.  But you don't know offhand
13 whether there are other partners of Fidelio?  You
14 can't name any others?
15  A  No.
16  Q  All right.  And Fidelio Properties
17 Management is the managing partner of Fidelio, right?
18  A  Say that one more time.
19  Q  Fidelio Properties Management, which is a
20 defendant in this case, is the managing partner of
21 Fidelio?
22  A  Okay.  Yes.

Page 103

1  Q  Is that consistent with your understanding?
2  A  It's consistent with my recollection.
3  Q  All right.  Let's talk about FP Executive
4 Partners, which is a partner in Fidelio.
5     My understanding -- and you can correct
6 me -- is that FP Executive Partners, also known as
7 FPEP, was the vehicle through which its members were
8 able to participate in Fidelio's investments; is that
9 correct or incorrect?
10  A  My knowledge about that entity is limited
11 to the allusion that I was given --
12  Q  Illusion or allusion?
13  A  Allusion.
14  Q  Okay.
15  A  When I was presented with my offer letter
16 and I reviewed it with John Gardner at his apartment
17 in Washington, D.C., I reviewed the components of the
18 offer letter several times and discussed them with him
19 right then and there.
20     The notion, the allusion to this document,
21 this partnership, the reference to --
22  Q  Are you talking about the LLC, FPEP?

Page 104

1  A  Yes.
2  Q  Okay.  That's not a partnership.  That's an
3 LLC.
4  A  Okay.  The discussion about the LLC was
5 limited to a description of it being an entity which
6 allows the participation at various levels of either
7 individuals or entities in transactions.
8  Q  Fidelio's transactions.
9  A  Well, I'm not sure if it's Fidelio's
10 transactions or not.  Okay?
11     What I can tell you is that the deals that
12 were noted in the employment letter, okay, were -- or
13 the future deals, existing and future deals, at the
14 bottom of the letter, there was a sentence that talked
15 about this LLC.
16     And I asked John what the purpose of this
17 was, and he told me that it was to more or less induct
18 entities or people into the investments that
19 prospectively we would make.  And in the case of the
20 two investments that I was being given at the outset,
21 that is how I would participate in those as well.
22     But I do want to make a point, Marc, and

Page 105

1 that is that at that moment, being presented with and
2 being asked to sign -- if not to sign, execute the
3 employment letter, the -- any gravity or weight or
4 significance of importance of that LLC was not
5 presented to me as anything other than more or less an
6 attachment or passthrough entity whereupon I would
7 receive my benefits that I was promised in that offer
8 letter.
9  Q  Okay.  That's fair enough.
10     And during your employment with Buvermo,
11 you had the opportunity to look at the operating
12 agreement of FPEP, LLC, right?
13  A  I had the opportunity to look at any
14 document I wanted to.  No one restricted me from
15 looking at it.
16  Q  Did you review the FPEP, LLC operating
17 agreement?
18  A  Not early on.
19  Q  All right.  What about later on during your
20 employment with Buvermo?
21  A  Well, the steps that were taken with
22 respect to reviewing that document were, in my mind --

| Page 106 | Page 108 |
|---|---|
| 1 which was formulated by conversations with John -- | 1 me comments, and then I would sit down and go through |
| 2 that this document, number one, in its current state | 2 those comments, if he had any, about the document. |
| 3 did not reflect my president and CEO position, nor did | 3   Q   Okay. |
| 4 it reflect anything that was promised to me or what | 4      MR. SMITH: Let me have that one marked. |
| 5 benefit would inure to me in the future.  And thus, it | 5      (Thereupon, the document was marked as |
| 6 had to be amended. | 6      Morris Deposition Exhibit No. 4 for |
| 7   Q   It had to be amended to add you as a | 7      identification.) |
| 8 member, right? | 8      BY MR. SMITH: |
| 9   A   It had to be amended to reflect what was | 9   Q   Let me show you what I've marked as Morris |
| 10 promised to me in my document of employment -- | 10 Exhibit Number 4 and ask if you've ever seen that |
| 11   Q   Plus you had -- | 11 document before. |
| 12   A   -- which goes beyond what you just said. | 12   A   This is the original FPEP, LLC that was in |
| 13   Q   Plus you had to be made a member of the | 13 place at the time of my hiring, and it is something I |
| 14 LLC, correct? | 14 have seen before. |
| 15   A   I don't know whether I had to be made or | 15      However, without going through this, if it |
| 16 not, but the concept of reviewing it was more or less | 16 has been amended since the date of my hire, I have not |
| 17 dispensed with until we were close to doing a deal. | 17 seen it before. |
| 18      And therefore, I did not take it upon | 18   Q   Did you have an opportunity or did you read |
| 19 myself earlier on to familiarize myself or even read | 19 this document at any time while you were employed? |
| 20 it, you know, in detail while I joined the company and | 20   A   I reviewed it in a very cursory manner at |
| 21 began looking for deals. | 21 or around the same day I sent it to my attorney and |
| 22   Q   Well, didn't you understand that the | 22 told him that this was the old document and that it |

| Page 107 | Page 109 |
|---|---|
| 1 document really had the basic framework in place which | 1 was being amended by Gardner and counsel and a new |
| 2 wouldn't change?  Wasn't that your understanding? | 2 copy would come out soon. |
| 3   A   No, not at all. | 3   Q   Why did you send it to your lawyer? |
| 4   Q   Then what was your understanding? | 4   A   So he could have it in his file. |
| 5   A   I questioned John about that document and | 5   Q   Is that Mr. O'Connor? |
| 6 how it related to the offer letter, and he told me in | 6   A   Yes. |
| 7 no uncertain terms that that document will reflect | 7   Q   And did you send it to him because in part |
| 8 what's in the offer letter, period, end of | 8 it was going to be the framework for the new |
| 9 conversation.  And the only reason we needed to amend | 9 agreement? |
| 10 that document was to include your name. | 10   A   No, I sent it to him because I do send him |
| 11   Q   Okay.  And I'm still not clear on how the | 11 documents that relate to anything that I'm doing, you |
| 12 document was going to change other than adding your | 12 know, economically or otherwise.  I just like him to |
| 13 name. | 13 have a copy of it in case I lose it in the future. |
| 14   A   I don't know either.  But as we got closer | 14      I did not ask him to begin looking at it in |
| 15 to a deal, which began in December of '05, John had | 15 earnest.  I told him to take a quick look at it and |
| 16 another attorney come in the office and with Kara | 16 that an amended version would be coming shortly. |
| 17 McCormick began amending the document because we were | 17   Q   Okay.  Did he bill you for his time? |
| 18 getting close to doing two deals. | 18   A   I can't recall. |
| 19      I had asked for on no less than three | 19      MR. HADDAD: I'm just going to note for the |
| 20 occasions to receive a copy of the proposed amended | 20 record that this is -- this document marked as |
| 21 document, where I would take that document and send it | 21 Exhibit 4 is unsigned. |
| 22 to my counsel for then his review, where he would give | 22      MR. SMITH: Yeah.  I didn't have time.  I'm |

Page 110

1 sure I can get it signed when I copy it.

2      Let's go off the record.

3      (Whereupon, at 12:08 p.m., a luncheon

4 recess was taken.)

Page 111

1      AFTERNOON SESSION     (1:09 p.m.)

2      BY MR. SMITH:

3    Q   All right, Mr. Morris. We're back on the

4 record.

5      You've testified about Anthony LoPinto.

6 When did you first meet Mr. LoPinto? Was it at your

7 position with The Charles E. Smith Companies?

8    A   Yes.

9    Q   What was his position with Charles Smith?

10    A   At the time, I believe he was a senior VP

11 and the chief financial officer.

12    Q   And you testified, I think, that you had

13 some working relationship with Mr. LoPinto during your

14 employment with Charles Smith?

15    A   I worked directly for him.

16    Q   Directly for him.

17      And Mr. LoPinto subsequently formed a

18 company called Equinox Partners, correct?

19    A   Tony formed Equinox Partners, Equinox

20 Search after he left Smith. I mean, I don't know the

21 steps in between.

22    Q   All right. And that's a placement firm for

Page 112

1 real estate executives? They place --

2    A   Right.

3    Q   And he's the CEO of that company?

4    A   I don't know the structure.

5    Q   All right. And not counting your

6 employment with Buvermo, had you had any professional

7 dealings with Equinox?

8    A   Oh, yeah. Immediately prior to and

9 actually with some crossover with Buvermo, Tony had

10 put my information in front of Washington Real Estate

11 Investment Trust. Tony had been hired to find a new

12 president and CEO for that company. And he was very

13 excited about me getting in front of a guy named Ed

14 Cronin, who is a chairman of the company.

15    Q   Yeah, I know Ed Cronin.

16    A   So I spent the better part of four to five

17 hours with Ed for our first meeting, and I had

18 actually put together a -- in my opinion, a pretty

19 analytical document relative to his company, comparing

20 it against other REITs. And I had some suggestions

21 and some comments which I had said to Tony before I

22 met with Ed to make sure it would be okay to discuss.

Page 113

1      And Ed was looking for a candidate who not

2 only could run a company and help acquire assets but

3 understood the market generally for his company and

4 comparable companies. So we spent a lot of time

5 talking about this analysis and idea.

6      As it turned out, Ed had other candidates

7 in mind that he wanted to meet with, but he had told

8 Tony that he was still interested in talking to me

9 further. And I had heard either from Tony or from

10 Marsha Pearcy that Buvermo may be looking for somebody

11 because John was going to retire.

12      And the comparable, what I will call

13 platforms between the two companies, the Washington

14 Real Estate Investment Trust platform being a fairly

15 large public company with a role that included myriad

16 committees and maybe a fair amount of travel and

17 meetings with analysts, investment bankers, similar to

18 what I did at The Charles E. Smith Companies but at a

19 higher level, relative to a small, pretty much

20 investment-focused company, comparing the two and

21 where I was in my life, I was much more interested in

22 the Buvermo platform. The company had a good

Page 114

1 reputation and it made a lot of investments with local
2 people and I was comfortable with that platform, that
3 genre of company.
4      I mean, maybe 10 years ago, I would have
5 been more interested in the larger organization, but
6 keep in mind, I had gone to Florida. I had pursued
7 investments of my own. I was independent. And coming
8 back to Washington to take a job, even if it was
9 offered to me -- I didn't know -- Washington Real
10 Estate Investment Trust was a big departure from where
11 I was coming from.
12      I was more focused on actually doing deals
13 and generating new investments and relationships than
14 the job that WRIT had, which was very
15 management-intensive and, you know, had components of
16 transactions, but it really wasn't -- that wasn't the
17 day-to-day activity.
18      Very interestingly, Tony told me that under
19 his company's -- I don't know if it's rules or what he
20 does, but he told me that he could not introduce me
21 into the Buvermo search unless I was finished with the
22 WRIT search. So I made a decision to withdraw from

Page 115

1 the WRIT search before it was complete. And Ed had
2 told him that he would like to see me again, and he
3 felt good about my capabilities, particularly in the
4 finance arena and the acquisitions arena.
5      So, you know, once again -- I mean, maybe
6 if you're learning from this -- there was a turning
7 point with me that had I pursued the WRIT situation, I
8 had no guarantee of prevailing as the CEO or the
9 president of that company, but I had an opportunity to
10 continue the pursuit of it, which I made the decision
11 to forego.
12      And, you know -- frankly, you know, it's my
13 recollection that Tony was a little bit surprised
14 because he felt that that was a very powerful platform
15 that I could secure. It paid, you know, a lot more
16 than the Buvermo platform was going to pay, and it
17 really matched up with what I had done in particular
18 at Charles E. Smith for Tony and at Boston Properties
19 and even with Government Property Investors, where I
20 had a lot of Wall Street exposure.
21      So that was the exact time that, you know,
22 the conversation evolved into talking with Buvermo.

Page 116

1 But Tony made it very clear -- and again, these are
2 not rules or concepts that I'm familiar with, okay,
3 but he made it very clear that I couldn't go back in
4 the door and talk to Ed Cronin if I was going to
5 pursue Buvermo. And I -- I mean, I really had to tell
6 Tony several times that it was okay just for whatever
7 reason he wanted.
8      He just -- I think the first or second
9 time, he was surprised, and I think the second or
10 third time, even when Marsha got involved, they just
11 wanted to be very clear that when they reported back
12 to their client, WRIT, that a candidate had dropped
13 out not because they didn't like the position
14 necessarily, but they wanted to pursue something else,
15 and I guess it was a conflict.
16   Q   Okay. Now, just so the record's clear, you
17 did not receive any sort of job offer from WRIT?
18   A   No.
19   Q   All right. You mentioned Marsha Pearcy.
20 Did she have a role with Equinox?
21   A   Yes.
22   Q   Okay. And had you known Marsha for some

Page 117

1 time or did you meet her through Tony? How did you
2 come to know Marsha?
3   A   I met Marsha around -- I met Marsha as far
4 back as 1990 or 1991. And I was married once, and my
5 ex-wife was very friendly with Marsha. And we had her
6 over for dinner with other friends, and she ended up
7 meeting her now husband at one of our dinners at our
8 home.
9      Marsha worked for a big headhunting firm,
10 whose name escapes me, but it was a national,
11 international organization, and she wanted to -- I
12 understand she had had a child or was going to have a
13 child and she wanted to cut back, still do the same
14 work but have either a part-time or -- I'm not sure
15 how it worked, but she wanted to have a more flexible
16 schedule.
17      And what happened was Tony approached her
18 about being the Washington person for his company, and
19 Marsha called me because the circumstances under which
20 Tony left The Smith Companies was perceived by some to
21 be frictional. And I was there when this occurred,
22 and she wanted to determine whether the notion of

Page 118

1 working for Tony would have any issue or if she would
2 have any issue relative to what people had perceived
3 to have occurred at Smith Companies.
4      And I told her that I worked very happily
5 with Tony for many years and that, you know, he helped
6 advance my career and that while we weren't, you know,
7 strong personal friends on a day-to-day basis, we had
8 a good professional working relationship and I
9 considered him at the time a friend. And I
10 suggested -- you know, I encouraged her to pursue it,
11 and I think she thanked me for that. There's some
12 e-mail traffic that alludes to that.
13    Q   All right. And were you paying Equinox any
14 fees in terms of their job search?
15    A   (Shakes head negatively.)
16    Q   And were they actively trying to place you
17 with other employers other than obviously WRIT and
18 Buvermo?
19    A   No.
20    Q   Okay. When did you first start talking to
21 Equinox about seeking employment, do you remember?
22    A   I did not initiate any conversation about

Page 119

1 looking for employment.
2    Q   Okay. So someone contacted you?
3    A   Tony would call me from time to time. He
4 would tell me what assignments he had. And the
5 preponderance of the conversations were directed at my
6 pretty vast knowledge of the community, and all he
7 really wanted were some names of people that could be
8 prospects for jobs.
9    Q   Okay. So he was just getting information
10 from you?
11    A   Right.
12    Q   And when you were having discussions with
13 WRIT and were getting set to consider the Buvermo
14 opportunity, you were unemployed at the time, right?
15    A   Right.
16    Q   And at that point in time, which I'm going
17 to identify as, you know, roughly the beginning of
18 2005 -- correct me if I'm wrong -- you had not held a
19 CEO or president's position before, had you?
20    A   Huh-uh.
21    Q   You need to --
22    A   No.

Page 120

1    Q   All right. And when did you first learn
2 about the Buvermo opportunity?
3    A   You know, Marc, I don't recall exactly
4 when. I know that Marsha and Tony were working
5 together on the WRIT situation, and, you know, again,
6 Marsha was a friend and she would call and ask how the
7 meeting with Cronin went.
8      And one of the comments that I made to her,
9 again, as a friend, was, you know, I'm not so sure
10 that going from buying a condominium in Florida and
11 renovating it and selling it to going to work for, you
12 know, I guess, a billion dollar public company with
13 management committees and everything else is exactly
14 what I wanted to do, notwithstanding the fact that I
15 was honored that I was being considered.
16      And then Marsha did mention that Tony was
17 working with Buvermo and had he not -- had not Tony
18 brought that up to my attention, which he had not. So
19 I said why don't you tell me more about it, which she,
20 I think, somewhat cryptically did only because I don't
21 think that she had Tony's blessing to discuss it with
22 me but -- I mean, I don't know exactly when that

Page 121

1 occurred.
2    Q   You don't have a rough idea? 2005,
3 obviously?
4    A   It was definitely 2005.
5    Q   And you mentioned that Buvermo had a good
6 reputation in the real estate community. What did you
7 know about Buvermo at the time that you started
8 considering employment with the company?
9    A   Well, number one, I had some anecdotal
10 information because I knew of the company. We
11 actually had John Gardner come in and meet with us at
12 Smith in Tony's office to see if there was anything we
13 could do together, which we -- you know, we realized
14 there was not. We were running a much higher volume
15 operation, and the Buvermo platform was a much more
16 petite investment group. So we dismissed that
17 quickly.
18      When I formed my partnership with Mike
19 Hillman, he and I also met with John, because we were
20 doing structured deals and we thought that the Dutch
21 might be a good co-investor to the Lerners. Then we
22 realized that they too were only looking for, you

Page 118 - Page 121

Page 122

1 know, a million, 2 million, $5 million investments,
2 equity investments.
3     But most importantly, I knew that in the
4 recent history of Buvermo, they had pretty much done,
5 if not all, the majority of their deals with one
6 company and that company was turning to other places
7 for equity and that company needed greater levels of
8 equity than Buvermo could provide, so that kind of
9 sponsor of the deals that had been done to date was
10 either slowing down dramatically as an opportunity for
11 Buvermo or going away entirely.
12     And one of the prongs of the opportunity at
13 Buvermo was for me to go find other operators, other
14 people at companies that would have a property to buy
15 or develop that we could invest in.
16    Q   Okay. You mentioned the Dutch when you
17 were talking about Buvermo. What are you talking
18 about?
19    A   Well, before I got involved in the search,
20 just generally in the market, we had heard that
21 Buvermo was backed by a Dutch investor. That's all I
22 knew.

Page 123

1    Q   And you had mentioned meeting with John on
2 two occasions. I mean, were you familiar with John?
3 Did you know John just from the real estate community?
4    A   Yes.
5    Q   How long had you known John?
6    A   Well, I mean, the earliest I can tell you
7 that I definitely remember meeting John was back at
8 Smith, which could have been '92 or '93.
9    Q   And what was John's reputation in the
10 community, if you know of one?
11    A   It was good. It wasn't bad. It wasn't,
12 you know, stellar. It was just good.
13    Q   And in terms of your knowledge about
14 Buvermo's business, was it gleaned from your meetings
15 with the company at Charles Smith and later when you
16 had the partnership with Mr. Hillman? Is that how you
17 came to understand the nature of their business, how
18 they invested their --
19    A   No, I didn't learn a lot from that other
20 than the levels of equity we were talking about.
21    Q   Okay. So is it fair to say you didn't
22 really know that much about the company at the time

Page 124

1 you started considering an employment opportunity with
2 them?
3    A   No. I knew enough that I felt that the
4 focus that they had in terms of geography, the
5 structures of the deals that they would like to do and
6 the compensation arrangement that they had with the
7 president and CEO was consistent with what I would
8 have liked to have pursued with a company.
9     You know, the rates of return that they
10 were looking for were typically the same rates of
11 return people looked for years ago. I thought that
12 they were aggressive in today's marketplace, and I
13 brought that up through the interview process, but
14 I -- I knew enough pre interview to understand that it
15 seemed on the surface to be a good fit.
16     You know, subsequent to at least the
17 initial meeting, I did believe it was a good fit. To
18 this day, I still believe it's a good fit. I liked
19 the strategy, I liked the platform, I liked the -- you
20 know, I liked the international component. You know,
21 whether it's significant to anybody else or not, it
22 was an interesting twist. There were a lot of things

Page 125

1 about the job that I really did like.
2     I was not in a place in my life where I was
3 going to work for somebody. I was not in a place in
4 my life where I was going to be a partner with
5 somebody. I had already done that. I was in a place
6 where if I found the right fit to run a business, then
7 I would be very receptive to what was on the table.
8    Q   When did you start having serious
9 discussions with Tony and/or Marsha about the Buvermo
10 job?
11    A   Marc, I mean, I've got to take -- I've just
12 got to back up from the time. I mean, I think I met
13 with John and he made me the offer and I signed the
14 letter at the beginning of June.
15     So if the process took two months, then, I
16 mean, it could have been in March of '05. I mean,
17 I -- you know, I know there's some e-mails somewhere
18 that kind of support whenever the dates were.
19    Q   Now, what discussions did you have with --
20 well, I take it -- who was leading the search on
21 behalf of Equinox? Was it Marsha or was it Tony or
22 both?

Page 126

1    A   I don't know.

2    Q   When did you -- what information did they
3  give you about the opportunity specifically?

4    A   Well, the first information was oral.

5    Q   I'm sorry?

6    A   Oral.

7    Q   Right.

8    A   And the -- I can't quote anybody, but, you
9  know, Marsha more or less gave me the envelope of the
10 job, which was the Dutch have a retirement age. John
11 is close to that, and they want to find a successor.
12 The job is the president and CEO. John is winding
13 down. He will become and take the role of an advisor
14 which is currently held by somebody else who is
15 retiring.

16       I got a little bit of a description of the
17 makeup of the office, not a lot. I got a little bit
18 of history of the executive that was there for many
19 years before that did not succeed to John's role and
20 went somewhere else.

21       I mean, I got a pretty broad brush of what
22 was going on. You know, I got the picture that the

Page 127

1  entity or the company that they were doing most of
2  their deals with was probably not going to be a
3  continuous source of deals.

4    Q   Was that JBG?

5    A   Yes, although who knows. I mean, something
6  might come up.

7       But on a going-forward basis, I was told
8  that they weren't going to be a consistent source of
9  product, and one of my responsibilities was to find
10 other companies that do that for the company.

11       Then I got a job spec, which they put
12 out -- specification sheet -- which kind of reflected
13 what we were talking about. And then, you know, the
14 human part took over of meeting with John and then
15 John suggesting I meet with Joost and eventually with
16 Andre. And then Tony would insert himself from time
17 to time by phone and give me feedback or what have
18 you.

19    Q   Okay.

20       (Thereupon, the document was marked as
21       Morris Deposition Exhibit No. 5 for
22       identification.)

Page 128

1    BY MR. SMITH:

2    Q   Let me show you what I've marked as Morris
3  Exhibit Number 5. Is this the position specification
4  that you referred to a minute ago?

5    A   Well, you've asked me to confirm a lot of
6  documents today, and I think as it relates to this
7  particular document, you know, Marc, this looks like
8  it is.

9       I do not recall in my original spec that I
10 received -- and maybe it's just my recollection. I
11 don't remember this loan administration component.
12 Maybe it was there originally, maybe it wasn't.

13    Q   Where are you looking?

14    A   It's page 2. There's a bullet point 3 from
15 the bottom.

16    Q   Okay.

17    A   I mean, I -- maybe I didn't memorize that,
18 but -- I mean, it's entirely possible that this is the
19 job spec. But like I said, it says president and CEO,
20 Buvermo, and this is what -- the job that I applied
21 for and received. So, I mean, unless it's been
22 modified since the time I got it, then this is the

Page 129

1  document.

2    Q   Okay. Other than the bullet point you just
3  talked about, is there anything in here that you don't
4  recall seeing particularly in the job specification
5  that you can recall?

6    A   I mean, not off the top of my head, Marc.

7    Q   All right. And did you understand that the
8  position involved -- one of the responsibilities was
9  acting as a fiduciary to the company's investors,
10 including investors residing abroad?

11    A   Yes.

12    Q   And I take it that you carefully reviewed
13 the job specification when you received it; is that
14 correct?

15    A   I did.

16    Q   And Exhibit Number 5, on the first page,
17 third paragraph, reflects what Mr. Gardner's
18 continuing role in the company would be going forward,
19 and that is he would transition to a role as an
20 investor and advisor to the management of the
21 company's board.

22       Was that your -- consistent with your

Page 130

1 understanding of what Mr. Gardner's role would be
2 going forward?
3   A  Well, no.  My understanding is that the
4 board required John to retire and that they had a
5 mandatory retirement age of 65.  This said he recently
6 decided to retire.
7       Please reflect on something that I told you
8 before, which is I took a job as EVP and CEO of the
9 company where the CEO was supposed to retire.  That
10 did not occur at the job, and there was an issue that
11 was raised and eventually the board removed the CEO.
12 I did not become CEO because we sold the company.
13       But this was something that only on a
14 personal level was a sensitive issue to me, because I
15 had already experienced a situation where I came in as
16 the new guy and the guy who had been there was not
17 particularly receptive.  Although every indication was
18 that he was receptive, it didn't turn out that way.
19       So when I read he recently decided to
20 retire and I talked to Marsha and Tony, I had no gut
21 feeling that John ever wanted to retire.  This is not
22 a business that you work in until a certain age and

Page 131

1 you retire.  It's a transactional business.  It's in
2 your blood.  You can do it if you want until whatever
3 age you want to.
4       So in terms of voluntarily retiring, this
5 was something that I asked them specifically about.
6 As it relates to the advisory role, there is a much
7 more formal role than a small cap A. There was a guy
8 who was a true advisor to the company, and I asked for
9 a description of his role.
10   Q   His being the person who held the advisor
11 job?
12   A   Exactly.
13   Q   Who was that?
14   A   His name is Christian Zachariasse.  And my
15 understanding from Marsha and Tony at the time was
16 that he actually had a title of advisor, and he had a
17 certain protocol as it relates to how he would
18 interact with the president and CEO.
19       And the protocol, as described to me, was
20 that on a day-to-day basis, he was hands-off.  There
21 was no -- he didn't maintain an office at the company.
22 He lives in the Netherlands.  He comes to the United

Page 132

1 States occasionally.
2       He doesn't advise or comment or critique
3 the day-to-day operations of the company, and his role
4 is to be informed of prospective investments that come
5 up and discuss them with the president and CEO and
6 come to some conclusion as to whether it's a fit, and
7 if they come to that conclusion, then they present it
8 to Joost and Andre.
9       Marc, I'm going to tell you that I was very
10 succinct in my questions to Tony and Marsha about how
11 John would transition into this advisor role because I
12 didn't want any misunderstandings.  I had already
13 lived through that before, and it was not a good
14 situation.  It was very tortuous, and it was very
15 tense.
16       So I was told that John was going to take
17 this role from this other gentleman and that I would
18 have a free hand in the day-to-day operations of the
19 company.  I would have a free hand in procuring new
20 investments, working with personnel.
21       John Gardner told me specifically that he
22 had hired several of these people most recently and he

Page 133

1 realized that they were there, his hires.  And if they
2 didn't work out under the management that -- I presume
3 that he didn't have any predisposed notions that they
4 were my guys.  Of course, you know, I thought I would
5 make the effort to work with the people that were
6 there.
7       But, you know, this sentence or this
8 paragraph here is -- to me, it's a little bit more
9 breezy than I wanted on a piece of paper to make this
10 commitment, and I really spent some time to get the
11 feedback from Tony and Marsha.  As we progressed, I
12 attempted to confirm this with John and Andre and
13 Joost, and they did confirm it as such.
14   Q   Confirmed what as such?
15   A   As John would be taking this advisory role
16 and my interaction with him would be to call him if
17 there was a deal that I thought was consistent with
18 the objectives and discuss it with him and go through
19 it with him.
20       That did not mean to me that John was in
21 the office on a day-to-day basis and, more
22 importantly, that John, in any realm, was out making

Page 134

1 phone calls on his own, soliciting new transactions or
2 soliciting new partners.
3       And that activity occurred.  It occurred
4 during the period between the date I was hired and
5 year end.  At that point, I had a meeting on
6 December 10th with John Gardner, Andre van Rhee and
7 Joost Tjaden.
8    Q  I think we're getting -- we're getting a
9 little -- I'm going to give you an opportunity to talk
10 about that, but that's not -- I don't think it's
11 responsive to my actual question, but I think we're
12 going to have an opportunity to talk about all that.
13       Now, in your discussions with Tony and
14 Marsha about the job, what was discussed, if anything,
15 about a term of employment?
16    A  They were adamant that Buvermo, Fidelio was
17 looking for a long-term commitment.  And I don't want
18 to make a light comment about that.  I want to tell
19 you that a long-term commitment were the words they
20 used.
21    Q  All right.  And tell me exactly what you
22 recall them conveying to you.  Did they use the phrase

Page 135

1 long-term commitment?
2    A  Well, it was much more detailed than that.
3    Q  Okay.  Well, tell me what you can recall.
4    A  The backdrop of the long-term commitment
5 wording came from apparently a conversation that they
6 had with John, Joost and Andre.  That John's been in
7 the position for 20 years, and they wanted to find
8 someone that could be in the position long term.
9       Once we took the notion of long term to
10 break it down, I realized that this retirement was not
11 voluntary.  They had a 65-year-old retirement age, and
12 I was 50 at the time when I took -- I had just turned
13 50.
14       So I told Marsha I can't make the 20 years
15 that John made because I'm 50, and they have a
16 retirement age of 65.  If they decided to change the
17 retirement age, that that long-term commitment could
18 be construed, equal, commit to 20 years.  But based
19 upon the facts I had in front of me, it was going to
20 be 15.
21       Once the last interviews were over with
22 John, Joost --

Page 136

1    Q  I want to focus in on what you were
2 discussing with Marsha and Tony, and then we'll shift
3 over to the Buvermo's representatives in terms of --
4    A  I'm staying on track.  Let me finish my
5 sentence, and I'll tell you.
6    Q  Okay.
7    A  When we finished the last meeting, which
8 they told me was the last meeting, that last meeting
9 included Andre, which it had not before, so Joost,
10 Andre, John and me.  That was at the Four Seasons
11 Hotel.  I can't tell you the date, but it was a lunch.
12       And that night, LoPinto called me and he
13 told me in no uncertain terms several things.  Number
14 one, that they like you, they like your background, so
15 they feel it's a good fit and they want to make you an
16 offer.
17       And he said without equivocation, I need to
18 talk to you about how long you can commit to and how
19 long they can commit to you for.  And I said they
20 wanted long term.  I told you -- or I told Marsha I
21 will commit to the long term.
22       Tony knew very well that I had taken a

Page 137

1 sabbatical.  Whether it was a sabbatical equalling
2 retirement or a sabbatical taking time off, it didn't
3 matter, but he knew I had taken some time off.  So
4 Tony said, you know, I want to get specific with you
5 here, because I need to get back to them because we
6 need to resolve this.
7       And I told him look, let's think about this
8 for a second.  Fifteen years gets me to 65.  But I'll
9 be candid with you, Tony.  I'm diabetic, I have a
10 terribly bad back.  I really don't want to work past
11 60.  So my commitment to them was to work until I was
12 60 years old at or around 10 years.  He told me that
13 he needed to get back to John and to Joost, because
14 they wanted an answer.
15       Apparently, between that conversation and
16 either the next day or next days, he went back to
17 them, and John Gardner, either at a lunch or a
18 breakfast or dinner -- because we met many, many
19 times -- he was happy, I'm glad you've committed to
20 us, we can commit to you for that time period.  We
21 have a deal.
22    Q  Who's saying this?

Page 134 - Page 137

Page 138

1   A   John Gardner.

2   Q   Okay.

3   A   And then within a day or two, I received a
4   phone call.  I can't tell you exactly when, but it was
5   a cordial phone call from Joost saying I'm glad we
6   worked things out and I'm glad we worked things out
7   for the long term.  We're looking forward to having
8   you for that 10-year period, and to the extent that
9   the 10 years comes and you feel comfortable in the
10  role, in the slot, let's expand it to 15.

11      And I said that's fine.  I'm just looking
12  at my life right now, and I can give you the 10 years,
13  whatever the fractional amount was based upon my age
14  to get to age 60.

15      But, Marc, I want to tell you very clearly
16  that this was not a casual conversation.  This was
17  something that Tony was asked and that he and I
18  discussed and it wasn't something that I just came up
19  flippantly with a number.  It was a 20-minute,
20  half-hour conversation about age and where you are in
21  life and what you can commit to, and he was very
22  serious about being able to respond.  He needed to get

Page 139

1   back to them.

2       This was in my mind, to Tony, an open
3   issue.  It was an open question mark.  And I don't
4   think that the velocity of trying to hire me was
5   impeded, but I think to complete the circle and to
6   complete the picture that they had of the candidate,
7   they needed to know that.  They needed to make the
8   commitment.  I needed to make it to them.  And that's
9   what I did.

10  Q   Now, were they talking about -- and I'm
11  talking about Tony, Marsha and the Buvermo folks --
12  were they talking about a desire to have somebody who
13  could fill the position on a long-term basis because
14  that's the nature of the job, it's a -- you know,
15  there are long-term investments, they want someone who
16  is going to be there for a while to see those
17  investments through in general terms; or were they
18  talking specifically terms of employment, we're
19  agreeing to employ you for 10 years or 15 years versus
20  something more general like we're looking for somebody
21  who can commit long term because we're long-term
22  investors?

Page 140

1       MR. HADDAD:  I'm just going to object to
2   the extent it calls for speculation.

3       Go ahead.

4       BY MR. SMITH:

5   Q   What was your sense?

6   A   In my sense, it was a commitment.  It was a
7   mutual commitment to be there.

8   Q   To a specific term of employment?

9   A   To age 60.

10  Q   Now, the job specification that's marked as
11  Exhibit Number 5, nothing in this document describes
12  any term of employment, does it?

13  A   No, but it also doesn't say anything about
14  the base salary, bonus or equity component.

15  Q   All right.  Well, let's talk about that.

16      What was discussed about your compensation
17  if you took the job?

18      MR. HADDAD:  Sorry.  Is this with LoPinto
19  and Pearcy or with the other defendants?

20      MR. SMITH:  Well, we can cover both.

21      BY MR. SMITH:

22  Q   So what was being discussed about

Page 141

1   compensation and what was agreed to?

2   A   Well, the first phase of the conversation
3   was more general, because we hadn't had any formal
4   meetings.  So the first phase was base salary,
5   benefits, 401(k), health plan, et cetera, and a
6   participation in transactions.  And this was not a
7   detailed conversation.  This was a broad brush by Tony
8   and Marsha.

9       Once I met with John, he explained to me
10  not only how the promoted interest worked, but how it
11  actually evolved over a period of time.

12      And one of the key aspects of this was that
13  given the difficulty of finding high-yield
14  investments, since the price of properties had gone up
15  so much, that the company had dropped the benchmark
16  from a 12 percent hurdle rate to get the promoted
17  interest down to a 10 percent hurdle rate.

18      So these were the types of deals and
19  structures that I'd been involved with, so I respected
20  and appreciated and understood how this evolution
21  occurred.  Okay?

22      As we got further along, John discussed

Page 142

1 both the promote that they provide to a JBG type
2 company and then the promote that the CEO gets,
3 president and CEO. And he had discussed what he had
4 gotten in the past and how it worked. Then he
5 explained to me that this is -- this calculation is
6 what I would get because I was stepping into his
7 shoes.
8      Subsequent to year end '05, there was no
9 ambiguity about what the promote was for me. And you
10 probably have all the details, but in its simplest
11 form, it was 15.5 percent of any cash or other
12 consideration --
13    Q   I want to stay focused now on what the
14 discussions were before you accepted employment.
15      So what was being discussed about your
16 compensation?
17    A   The base salary, the benefits, the promoted
18 interest and the responsibilities.
19    Q   And how much -- what was the base salary
20 that was being discussed?
21    A   The base salary they told me was $250,000.
22    Q   And was that acceptable to you?

Page 143

1    A   Yes.
2    Q   And the promoted interest, was that
3 quantified in any way?
4    A   In terms of?
5    Q   Well, percentages, particular pieces of
6 property, anything like that.
7    A   It was quantified in percentages, and it
8 was applied to two pieces of property.
9    Q   All right. Were there any other components
10 to the compensation plan that were being discussed?
11    A   Other than reimbursement of expenses, no.
12 I mean, a parking space, just incidental
13 reimbursements.
14      (Thereupon, the document was marked as
15      Morris Deposition Exhibit No. 6 for
16      identification.)
17      BY MR. SMITH:
18    Q   Mr. Morris, let me show you a document
19 that's been marked as Exhibit Number 6 and ask if
20 you've seen this document before.
21    A   I have.
22    Q   You have?

Page 144

1    A   Uh-huh.
2    Q   And when was the first time you saw it?
3    A   Whenever the discovery documents came over
4 to counsel.
5    Q   Okay. And I will tell you that this
6 document purports to reflect a discussion that one of
7 Buvermo's lawyers had with Ms. Pearcy and Mr. LoPinto
8 concerning your employment.
9      And in this document, it speaks for itself,
10 but it contains information regarding what was stated
11 regarding a term of employment for you at the company.
12 And in essence, from my reading of this document, both
13 Ms. Pearcy and Mr. LoPinto emphatically deny that a
14 term of employment was ever the subject of discussion.
15      Would you agree with that summary of this
16 document? And I'm not saying that it's true or
17 untrue.
18      MR. HADDAD: So you're asking him just to
19 say whether this document says that they didn't --
20      MR. SMITH: Whether my summary is a fair
21 characterization of it.
22      THE WITNESS: Your summary is a fair

Page 145

1 characterization of what LoPinto and Pearcy said.
2      BY MR. SMITH:
3    Q   Yeah.
4    A   Yes.
5    Q   All right. And do you -- assuming that
6 this interview actually took place and these notes
7 accurately reflect the conversation, do you agree or
8 disagree with Mr. LoPinto and Ms. Pearcy's statements?
9      MR. HADDAD: Which one in particular?
10      THE WITNESS: Yeah. I mean --
11      BY MR. SMITH:
12    Q   Well, you know, I could go through them one
13 by one.
14      In the second paragraph, both Mr. LoPinto
15 and Ms. Pearcy -- and I'm quoting -- state that no
16 formal representations were made concerning security,
17 written, verbally or otherwise.
18      Do you agree or disagree with that?
19    A   Well, I just told you that I gave them my
20 word and my commitment that I'll be there till 60.
21    Q   The question is do you agree or disagree
22 with that statement?

Page 146

1   A   I disagree with this.

2   Q   All right. And then the next paragraph

3 says absolutely no representations were made

4 whatsoever about job security, severance, term or

5 anything that could be construed as job security or

6 contractual obligation. No guarantees at all.

7       Do you agree or disagree?

8   A   I vehemently disagree with this.

9   Q   And then the second to last paragraph

10 states no discussion took place concerning a contract

11 term, severance, definition of cause or anything that

12 remotely could be construed as a representation that

13 he would have some contractual right to share profits

14 for a guaranteed period.

15       Do you agree or disagree with that?

16   A   I disagree.

17   Q   Since you've seen this document, have you

18 had any conversations with Ms. Pearcy or Mr. LoPinto

19 concerning this interview or their discussions with

20 Buvermo's counsel?

21   A   Since I've seen this document?

22   Q   Yes.

Page 147

1   A   No.

2   Q   Why not?

3   A   What would the point of that be?

4   Q   Well, you consider yourself a personal

5 friend of Ms. Pearcy's and a long-term acquaintance of

6 Mr. LoPinto's, and I would find it natural to want to

7 ask them questions about the statements that have been

8 made on these documents.

9   A   My reaction to this is severalfold.

10 Firstly, they were paid a tremendous amount of money

11 by Buvermo to hire somebody, so I feel quite candidly

12 that they are swayed much more by getting paid than by

13 my personal friendship.

14       So it's my testimony that Mr. LoPinto and

15 Ms. Pearcy stated more or less whatever they needed to

16 state for the benefit of the defendant. That's number

17 one.

18   Q   So you're saying they're lying, in other

19 words?

20   A   I'm saying what I just said.

21       Number two, Mr. LoPinto did call me on or

22 around this date --

Page 148

1   Q   What date?

2   A   The date of this document, if that's the

3 date of the document -- and had a conversation with me

4 about trying to get me to say to him that I did not

5 have the conversation with him about the 10-year

6 commitment. I did not have the conversation that he

7 needed to go back to John and to Joost about.

8       I had no idea why Tony called me. Frankly,

9 he called me several days in a row to track me down.

10 I was in Florida, I was doing what I was doing and I

11 was traveling back to D.C. and he was looking for me

12 because he wanted to have a conversation with me.

13       He was very stern. He was very forceful.

14 He was very pushy. It was very unnatural. It was not

15 a conversation I had had with Tony before.

16   Q   What else was discussed in your

17 conversation?

18   A   I can't recall anything other than, you

19 know, him trying to unwind conversations that we knew

20 we had had in the past, and I was -- I was just taken

21 aback by the whole -- it was a one-sided telephone

22 call. It was him calling me, tracking me down,

Page 149

1 telling me, you know, you joined there, you were going

2 to see how things went.

3       I said, Tony, what are you talking about.

4 You called me up, you called me after the interview.

5 You specifically asked me when, how, what I would work

6 for these guys because they needed to get a commitment

7 and they were going to give me a commitment. This was

8 the last conversation I had with Tony LoPinto. I have

9 never spoken to Marsha Pearcy about this.

10       I firmly believe in my heart of hearts that

11 they exchanged cash for friendship. And you can --

12 you can pick anything you want out of that statement,

13 but once I read this and then I read other evidence

14 that was produced, I realized that, in my opinion, the

15 sole purpose of their relationship with me is just

16 business. And to the extent that they can do

17 something that benefits their client who pays them,

18 they will do it.

19   Q   During your telephone conference with

20 Mr. LoPinto that occurred on or around April 17th of

21 2006, Mr. LoPinto was denying that any conversation

22 took place regarding a term of employment, wasn't he?

Page 150

1   A   No.

2   Q   He wasn't --

3   A   He wasn't denying any conversation.

4   Q   Well, then I misunderstood your testimony.

5     What was he saying?

6   A   He was denying that he had indicated in

7 that conversation that they wanted a commitment from

8 me.

9   Q   Okay. Was anything about a 10-year term

10 discussed during your telephone conference with

11 Mr. LoPinto?

12   A   The nominal words that I got in were more

13 along the lines of look, Tony, you called me that

14 night. I told you I'll work till 60. You were

15 adamant about getting information out of me. You were

16 adamant about getting a commitment out of me. You

17 needed this information for these guys because they

18 wanted to turn around and make a long-term commitment,

19 i.e., until I'm 60, to you.

20   Q   How did Mr. LoPinto preference this call?

21 How did it start? When he finally got in touch with

22 you, what the first thing he said to you?

Page 151

1   A   Well, I mean, Tony's the quintessential

2 salesman, you know. He was cordial at the beginning.

3 He was happy. Sorry things didn't work out. I didn't

4 need, you know, his balm to help me out. I knew what

5 happened.

6     And, you know, frankly, read all the

7 documents you can read. I cried for help almost from

8 the beginning to get things worked out. I cried to

9 Tony. I cried to Marsha. Read all the e-mails.

10     I mean, I begged for somebody to come in

11 and say look, you know, this is what we told the guy

12 and it's not happening. And laborious is a minor word

13 that I can use to tell you how hard I tried to get

14 somebody to understand that the tenets of this job

15 were as I was told they were to be, and they were not

16 being met.

17     And I liked the platform. I liked the

18 concept. I liked the structure. I liked the intimacy

19 of the office. I liked it small. I liked the job. I

20 even told them before I was terminated that I will be

21 back at work next week as the president and CEO of the

22 company, and then they decided to send me a

Page 152

1 termination letter. So --

2   Q   That was after, of course, you had been

3 advised verbally that you were being terminated?

4   A   I don't think I was ever advised verbally I

5 was being terminated.

6   Q   Well, we'll get into that in a bit.

7     All right. Let's move back for a second.

8 When did you, if you can recall, officially start

9 interviewing for the position with representatives of

10 Buvermo? Just roughly. And if you don't recall, you

11 don't recall.

12   A   I do not recall.

13   Q   Do you recall who you first talked to about

14 the position from Buvermo?

15   A   John Gardner.

16   Q   All right. And what was discussed during

17 that meeting?

18   A   Well, it was fairly general. I mean, it

19 wasn't specific. It was I'm retiring, looking for a

20 successor, and the Dutch, as they were alluded to

21 several times, are looking for somebody to continue

22 what I've done.

Page 153

1     But in addition to that, the major source

2 of the transactions was probably not going to be there

3 as consistently as they were before. So add to that

4 equation finding new sponsorship, which, by the way,

5 is not an easy task.

6     So it was very general. I mean --

7   Q   Given your experience previously with the

8 CEO position that you didn't get, did you have any

9 discussions with Mr. Gardner during that initial

10 meeting about his ongoing role with Buvermo?

11   A   I had conversations with John about his

12 ongoing role with Buvermo from that moment to the

13 moment I was terminated.

14   Q   What did you discuss during that meeting,

15 the first meeting with John?

16   A   What he was going to do and when he was

17 going to leave.

18   Q   And what did he tell you?

19   A   He told me that he would be getting out of

20 my way. He would give me the freedom to run the

21 office, seek out deals, and he just wanted to be

22 advised on transactions that may come up that fit the

Page 154

1  template of what Buvermo, Fidelio was looking for.
2    Q   Did he tell you that he was going to remove
3  himself from the process in terms of continuing to
4  pursue deals, meet with folks?  Did he ever make that
5  representation to you?
6    A   He told me that I'm the guy looking for
7  deals on the street representing Buvermo.  This did
8  not turn out to be the case.
9    Q   All right.  I understand what your position
10  is there, but did he ever say he was going to remove
11  himself from the business?
12    A   Yes.
13    Q   During that initial meeting?
14    A   No.
15    Q   How many interviews did you have with
16  Buvermo, John and the people from the Netherlands?
17    A   Let me back up and take another attempt at
18  this.  With Joost, I spent about six or seven hours
19  straight.
20    Q   Same day?
21    A   In the same day.
22    Q   And you talked about what during that

Page 155

1  extended conversation?
2    A   We talked about my experience, the deals
3  I've done, the structures upon which I did them, how
4  much money I needed my partners to put in, where I got
5  the other capital from, how I financed the deals, how
6  the deals ended up, what the tenancy was like.
7  Everything you can possibly imagine about
8  transactions.
9    Q   Did you talk about what compensation you'd
10  receive if you were hired at Buvermo?
11    A   No.
12    Q   Did you talk about a term of employment?
13    A   At that meeting, no.
14    Q   Now, what about -- you spoke with Mr. van
15  Rhee at some point, correct?
16    A   Yes.
17    Q   And that was just on one occasion?
18    A   Yes.
19    Q   And what was discussed during your meeting
20  with Mr. van Rhee?
21    A   The thrust of the conversation with van
22  Rhee was much different than that with Joost.  Van

Page 156

1  Rhee had a different -- van Rhee had a different
2  outlook, I thought.  Okay?
3       Van Rhee's outlook, in my opinion, was he
4  made it very clear that he was retiring soon, within a
5  year, less than two years.  And the perception that I
6  received from him was that the recent years of making
7  investments with JBG had been very fruitful and that
8  that was not the case going back through the history
9  of Buvermo.  They lost a lot of money under John's
10  leadership, but the last couple years were pretty good
11  and he was happy about that.
12       But the perception that I got from van Rhee
13  was that by virtue of the fact that these deals are
14  being sold for such big numbers and, therefore, JBG,
15  Fidelio being the partners benefitting so
16  significantly, what makes you, Jonathan, believe that
17  there are actually deals available that we could
18  purchase and continue to generate good internal rates
19  of return if we're in the market selling properties at
20  levels that might mirror what we buy them at.
21       So my take on van Rhee was that he would
22  have preferred that I take my time and be cautious,

Page 157

1  and if the market isn't in a place where you can find
2  deals to make good returns, then we shouldn't -- and
3  this is me saying it -- we shouldn't hurt what we've
4  achieved of late by just rushing out to do business.
5       My response was twofold.  Number one, I
6  respect your position.  The market has gone up
7  dramatically.  On a broad scale, just looking at the
8  market broadly, it's tough to see that there are any
9  opportunities out there.  But if you take it a step
10  down and you're in the market on a day-to-day basis in
11  Washington, you have the relationships that I had and
12  the relationships that Buvermo had in the past, then
13  there is a likelihood that with probably more work
14  than you would have needed to do a year, two or three
15  ago, you can find deals that will generate the types
16  of returns that the company is looking for.
17    Q   What did you discuss with Mr. van Rhee
18  about your compensation?
19    A   The compensation structure was not
20  generally discussed with van Rhee or Tjaden.
21    Q   How about term of employment?
22    A   The term of employment began with the call

Page 158

1 from Tony. Other than understanding they wanted a
2 long-term commitment from somebody, et cetera, but the
3 conversation started with Tony that night.
4      It evolved into John having a conversation
5 with me, although brief, within the next day or two,
6 and a call at some point from Joost. I do not believe
7 I ever heard from Andre congratulating me on accepting
8 the positions or position or anything like that.
9    Q  I guess I'm trying to get a better
10 understanding of the conversations you had with
11 Buvermo about a term of employment.
12      Based on what you've talked about, those
13 discussions took place between you and Mr. Gardner and
14 you and Joost, correct, just on the Buvermo side of
15 things?
16    A  No. I don't think I'm being clear here.
17 Using the term term of employment, okay, in a general
18 sense, that was introduced day one because they wanted
19 a long-term commitment from the prospect.
20      They didn't want a prospect who was going
21 to be here for a year or two. They didn't want to
22 hire a 63-year-old guy, okay, because then he would

Page 159

1 have to retire if the mandatory age was maintained.
2 And they wanted somebody, I think, that was from
3 Washington, was going to stay here, was going to make
4 the commitment.
5      You know, through the evidence, I've seen
6 that they interviewed a guy from Atlanta, who was
7 going to have to move here. I'm not sure that you can
8 expect a long-term commitment from somebody whose
9 family is in another city. I mean, who knows. But
10 that notion of long-term employment was discussed
11 early on in the process.
12    Q  And we've talked about that, the difference
13 between a long-term commitment and a definite fixed
14 term of employment, and I think you told me that the
15 company's representatives made a statement to you that
16 they were going to employ you for a specific term of
17 employment.
18      Has that been your testimony?
19    A  Yes.
20    Q  Now, what I'm trying to get at is who made
21 those representations to you from the company side?
22    A  I'm going to repeat what I told you. Okay?

Page 160

1    Q  I'm just trying --
2    A  It's very important. Tony LoPinto implored
3 me to give him a sense of how long I can commit to
4 this company.
5    Q  I understand that. What I'm asking for is
6 what discussions did you have with the company? Not
7 Tony LoPinto --
8      MR. HADDAD: He's an agent of the company.
9 Just be clear about your question. That's all I'm
10 saying. I mean, that's why he's confused.
11      THE WITNESS: I'm not confused. I've
12 answered it.
13      Within a day or two after that, John
14 Gardner told me I'm glad you've committed to at least
15 your 60th birthday. We can commit to you for that as
16 well. Let's get going.
17      John Gardner pushed the date of my
18 employment up several months before I was ready to
19 start work. Within days of that conversation, Joost
20 called me and he congratulated me, thank you very
21 much, we're going to have a good time together. I
22 understand from Tony LoPinto that you've committed to

Page 161

1 work until you're 60 years old, and we can commit to
2 you for that time period as well.
3      BY MR. SMITH:
4    Q  Okay. Could you give me a rough idea about
5 what dates we're talking about here, when these
6 conversations occurred?
7    A  Well, I don't know how rough you want to
8 know, but it was -- I mean, the date of the offer
9 letter, I think, is June 1 or June 2. You know,
10 once -- we finished the interviews. It was, I think,
11 between completing the interviews and either actually
12 signing the offer letter -- it was within days of
13 signing the offer letter.
14    Q  The conversation with John where he said
15 I'm glad, you know -- and I'm using your words --
16 you've committed until you're 60, and then the
17 telephone conversation with Joost, that occurred
18 before your offer letter came in, right, those two
19 conversations?
20    A  I can't remember. My recollection is that
21 that came in before the paper came in.
22    Q  All right. Well, let's look at the paper.

Page 162

1    (Thereupon, the document was marked as
2    Morris Deposition Exhibit No. 7 for
3    identification.)
4    BY MR. SMITH:
5    Q  Before we get to this exhibit, Mr. Morris,
6  did you have any discussions either with Joost or
7  Andre -- Mr. van Rhee -- regarding what Mr. Gardner's
8  ongoing role would be with Buvermo should you take the
9  job?
10    A  Absolutely.
11    Q  And what was said?
12    A  It was principally by Joost, and he told me
13  that John is winding down.  And as I got more detail,
14  the wind down was relative to various transactions
15  that were literally being liquidated either by JBG or,
16  in one case, there was a piece of land that the
17  company had owned for many years that was under
18  contract to a hotel company to build one of those
19  hotels like at Dulles Airport.  And there was a lot of
20  work clearing the land, getting it ready for the
21  contract terms.
22    So there was -- there was a fair amount of

Page 163

1  what I would consider, I think, ministerial -- I mean,
2  it was ministerial.  It needed to be done.  But more
3  importantly, JBG was selling two large portfolios of
4  assets, and the company had a majority of their
5  investments over the past several years embedded here,
6  there in the portfolios.
7    And the essence of hiring this woman, Kara
8  McCormick, apparently was a job hire that was above
9  and beyond what Buvermo typically had needed.
10  However, given the fact that the JBG portfolios were
11  nearing their exit and that there was a lot of
12  partnerships involved and a lot of money involved,
13  that this person's strength would be a benefit during
14  that time period.
15    So she was there and John was there, and
16  John was doing a lot of work with this person
17  independent of me.
18    Q  This person?
19    A  Kara McCormick.  And it was relative to the
20  wind down that --
21    Q  I still don't think you're focusing on my
22  question.  My question was what was discussed with

Page 164

1  Andre and Joost concerning Mr. Gardner's ongoing role
2  with Buvermo --
3    A  Well --
4    Q  -- not what actually happened down the
5  road?
6    A  Yeah, okay.  I mean, Andre was more blunt.
7  Andre told me John's retiring.  He didn't mince words.
8    Joost said that John had some
9  responsibilities to the company, to wind down this JBG
10  portfolio and that he would be involved with doing the
11  reconciliations and the partner distributions, et
12  cetera and then there was this one land parcel that
13  needed to be reconciled to match the contract.  And
14  the majority of that work was John's responsibility,
15  not finding new deals or representing the company in a
16  fresh light.
17    So the concept of John continuing to work
18  for a period of time while he's reconciling these JBG
19  sales, which, by the way, all came and went by the
20  fall of '05, that was acceptable to me, because I
21  didn't think I was stepping into a place that had a
22  person out there looking for new deals and having

Page 165

1  conversations with people.  I thought I was getting
2  involved with somebody who was truly winding out of
3  deals, looking forward to being out of the office and
4  out of the role as president and CEO.
5    Q  That's the substance of the conversations
6  you had with Joost and Andre?
7    A  The substance was that John was doing the
8  wind down for the JBG portfolio sales, the one land
9  parcel left.  I would be looking for deals.  I would
10  bring deals into the office.  I'd consider them.
11    I would talk to John about it if I felt
12  like they were candidates to bring to Joost and Andre,
13  and at that point, we would either collectively do it
14  together or I would call and say I talked to John,
15  here's the deal we're talking about.
16    Q  Did you have an understanding that
17  Mr. Gardner was going to continue indefinitely as an
18  investor for new projects?
19    A  John mentioned several times that he would
20  like to continue as an investor.
21    Q  All right.  And what was discussed, if
22  anything, in terms of sort of a drop-dead date where

Page 166

1 Mr. Gardner would no longer have any involvement with
2 the business?
3    A   From my discussions with Tony and Marsha
4 and Joost, I felt very strongly that within a couple
5 of months of me arriving, John would focus all of his
6 energies on the JBG sales and this land site and not
7 have anything to do with new business, taking an
8 active role in the office. He would turn it over to
9 me. That did not happen.
10      The frustration level built to a crescendo
11 in late November, early December. It jeopardized the
12 December --
13    Q   Again, you're getting way ahead of my
14 question. My question was simply what, if anything,
15 was discussed regarding an exit date, a definitive
16 exit date?
17    A   Not later, by any stretch of the
18 imagination, than 12/31/05.
19    Q   All right. Now, given your previous
20 employment experience that you've testified about, did
21 you insist on defining Mr. Gardner's ongoing role with
22 the company in your offer letter?

Page 167

1    A   Did I insist --
2    Q   Or did you ask for clarification of the
3 role in the offer letter?
4    A   No, not to the level in retrospect that
5 maybe I should have. However, I did trust them and
6 what they told me, number one. Number two, even if I
7 had it in writing, it would not have happened, in my
8 opinion.
9    Q   What would not have happened?
10    A   John would not have wound down --
11    Q   Okay.
12    A   -- based upon the conversations that we
13 had.
14    Q   Well, you understood that at a minimum,
15 Mr. Gardner would be around for at least a few months
16 winding down the JBG deals after you had arrived,
17 correct?
18    A   I'm going to take everything you said and
19 agree to it.
20    Q   All right. Now, did you think that during
21 those months or whatever period of time it was that it
22 was important that you had a good working relationship

Page 168

1 with Mr. Gardner?
2    A   Absolutely. To the point where he didn't
3 want to give up his office, and I just suggested he
4 stay there for a little while.
5    Q   His office meaning -- my understanding is
6 Mr. Gardner occupied the largest office in Buvermo's
7 offices, the corner office, and that when you arrived,
8 he vacated that office and you took over.
9    A   That's patently false.
10    Q   You never took over that office?
11    A   No. You said when I arrived.
12    Q   Okay. How quickly did you move into that
13 office?
14    A   Quickly is not a good description.
15    Q   How much time did it take?
16    A   When I arrived at Buvermo, there was no
17 office for me.
18    Q   How much time did it take for you to move
19 into --
20    A   Several months.
21    Q   Now, where did you conduct your business at
22 Buvermo's offices if there was no office for you?

Page 169

1    A   In the copy room with a fax machine that
2 people came and went every day faxing.
3    Q   All right. And after a few months,
4 Mr. Gardner moved out of his large office and you
5 moved in, right?
6    A   After a few months, maybe more than a few
7 months, yes.
8    Q   Are you not able to give a more definitive
9 description of the time period?
10    A   It was certainly not two months. It may
11 have been three months, which, in my opinion, isn't
12 the way you treat a brand new president and CEO.
13    Q   All right. Now, apart from what we've
14 talked about today -- we've talked about discussions
15 that you've had with various people -- what evidence
16 do you have that Buvermo agreed to employ you for a
17 10-year period of time?
18    A   Other than the discussions that I had that
19 were on point with executives of the company, board
20 members and the agent of the company, that's all I've
21 got.
22    Q   You've got oral discussions.

Page 166 - Page 169

Page 170

1   A   What I just said is what I've got.
2   Q   Okay.  Now, is there a single document, to
3 your knowledge, that reflects a 10-year term of
4 employment?
5   A   I told you I have what I have.  If I had
6 something above and beyond that, I would be happy to
7 tell you.
8   Q   My question simply is is there any document
9 which supports the fact that you were offered a
10 10-year term of employment?
11   A   A document?
12   Q   A document.  A writing.
13   A   No.
14   Q   Is it your contention in this lawsuit that
15 you could not be terminated by Buvermo for any reason
16 at all?
17   A   No, I don't think that's true.
18   Q   All right.  What, in your mind, would
19 constitute a permissible reason to terminate your
20 employment?
21   A   Fraud.  I mean, I don't know if theft comes
22 up under fraud, but, you know, doing something

Page 171

1 illegal.
2   Q   How about poor performance?
3   A   I don't know how you define poor
4 performance.  I mean --
5   Q   What about if the investors had lost their
6 trust that you could faithfully act as their
7 fiduciary, would that be a permissible reason to
8 remove you?
9   A   If the investors had lost their --
10   Q   Their trust that you could act as their
11 fiduciary, would that be a permissible reason?
12   A   I would certainly want evidence to
13 understand why they would lose trust in me.
14   Q   But what if they did?
15   A   Well, you know, that's an ethereal notion
16 which could be stated for anyone's purpose.  So to the
17 extent that there was evidence to suggest that I
18 violated my fiduciary responsibility to them, then I
19 would understand their concern about losing faith in
20 my fiduciary responsibility.
21       MR. HADDAD:  I'm just going to object to
22 this line of questioning to the extent it calls for a

Page 172

1 legal conclusion.
2       BY MR. SMITH:
3   Q   Did Buvermo agree to employ you or your LLC
4 for 10 years?
5   A   Me.
6   Q   Was there any discussion with any of
7 Buvermo's principals, either Mr. Gardner, Joost or
8 Andre, regarding a guaranteed right to receive
9 compensation for a specific period of time?
10   A   Say that again?
11   Q   Was there any discussion that you would be
12 entitled to, for instance, receive a promoted interest
13 for 10 years?
14       Was there any such discussion that your
15 right to compensation would continue for a 10-year
16 period of time, or was it all tied into just the
17 company agreed to employ you until you're 60?
18   A   Well, that's a question inside of a
19 question.  Do you want to talk about promoted interest
20 or do you want to talk about all consideration or do
21 you want to talk about something more specific than
22 those two things?

Page 173

1   Q   Well, I'm trying to get an idea about
2 whether you believe the company ever promised you that
3 your compensation would continue for 10 years no
4 matter what, whether it's promoted interest, whether
5 it's salary, whether it's anything else.
6   A   Okay.  Let me be very clear.  I made a
7 commitment to this organization to work until I was
8 60 years old.  I began the job I believe on June 29th,
9 2005.  So the delta between my birthday of turning 50
10 and that date, 60, you can look at as the term because
11 that's how I looked at it.
12       They gave me a commitment that I would be
13 employed there until I was 60 years old, and
14 furthermore indicated that if that employment was in
15 good stead at that time and I wanted to continue, they
16 would commit to 65, which was their retirement age.
17       So with respect to annual compensation for
18 being the president and CEO of that company, which is
19 not deal-related, that's what I expected.  That is
20 unequivocally firmly what I expected from this
21 organization.
22       As it relates to promoted interests, do you

Page 174

1 want to discuss that as well?

2 Q Yes.

3 A Okay. I was to receive prior to year end

4 '05 a promoted interest in any deal that was generated

5 by John and myself, and the only thing that needed to

6 be worked out was the sharing arrangement of that

7 promote whereupon if we worked on a deal equally,

8 maybe it went 50/50. If he worked on it more than I

9 did, maybe the amount would be higher to him.

10     Subsequent to year end, beginning

11 January '06 going forward, any deal that was initiated

12 while I was there, I was entitled to 15.5 percent of

13 any consideration above a 10 percent return. That was

14 discussed at length intensely in John's apartment. He

15 confirmed to me that what I am saying to you today was

16 in fact the case.

17     I relied upon that. I trusted him. The

18 salary that I accepted was lower than a cash salary

19 that I was looking for, but the offset of the promote

20 and the way it was structured was acceptable to me.

21 Q Now, what happened if you had been removed

22 for cause? Do you believe you would still be entitled

Page 175

1 to ongoing salary and ongoing right to promote, a

2 promote for a 10-year period?

3     MR. HADDAD: I'm just going to continue a

4 continuing objection to the extent it calls for a

5 legal conclusion.

6     Go ahead and respond.

7     THE WITNESS: I think that once you're in a

8 deal as a promote partner or a pari-passu partner,

9 you're in the deal.

10     BY MR. SMITH:

11 Q What about for transactions you have

12 nothing to do with? Let's say you were removed in

13 March 2006 and the company initiated a transaction in

14 April 2006 which eventually came to closure. Would

15 you be entitled to a promote for that transaction?

16 A Marc, I'm telling you. Everything that was

17 initiated after January 1 --

18 Q I'm just asking you to answer my question.

19 I'm not asking you to answer anything different.

20     MR. HADDAD: I think he is answering your

21 question.

22     Go ahead.

Page 176

1     THE WITNESS: I mean, my answer to your

2 question is take the writing off the offer letter that

3 was signed and executed which is all transactions

4 after January 1, '06. I get the promote.

5     BY MR. SMITH:

6 Q Okay. So, I mean, in my example, you're

7 removed for -- let's assume for purposes of this

8 question, you're removed for cause. Your testimony is

9 that despite that, you continue to be entitled to a

10 promote for all transactions until -- for a period of

11 10 years, 2015?

12 A Are you asking about the salary as well?

13 Q Yeah. Both.

14 A Well, tell me, because I've got to know.

15 Q Yeah. Both.

16 A Okay. I don't think I'm entitled to the

17 salary if I'm removed for cause. I think I'm entitled

18 to my interest in the deals because it's a

19 transactional business.

20 Q Even on deals you have nothing to do with

21 because it occurred after --

22 A It doesn't matter. I relied wholeheartedly

Page 177

1 on this language. I read it, I reread it, I described

2 it. I sat with John, initiated --

3 Q Read what?

4 A I read this letter.

5 Q The offer letter?

6 A Yeah.

7 Q You carefully read the offer letter, you

8 were comfortable with it and you signed off on it?

9 A I was comfortable with it after I discussed

10 it with John.

11 Q Okay. So your testimony, just so I

12 understand it, is if you were terminated for cause,

13 you believe that with respect to a promoted interest,

14 you'd continued to be entitled to it for a period of

15 10 years?

16 A Absolutely.

17 Q All right. Well, let's look at your offer

18 letter, which is Exhibit Number 7.

19     Let me have you take a look at Exhibit

20 Number 7 and ask you if this is the offer letter,

21 dated June 3rd, 2005, that you signed.

22 A It looks like it.

Page 178

1   Q  It is it, right?

2   A  When you say right, it sends a chill down

3 my spine, so let me go read every word of it.

4   Q  Please do. And let me know whether that's

5 your signature at the bottom.

6   A  Okay. Yes.

7   Q  This is it?

8   A  Uh-huh.

9   Q  You need to say yes for the record.

10   A  Yes.

11   Q  The document says that the position you're

12 going into is the president of Buvermo Properties,

13 Inc. Do you see that?

14   A  I do.

15   Q  It doesn't say anything about CEO, correct?

16   A  This paper does not.

17   Q  And did you question that after you signed

18 the document or before you signed the document?

19   A  No. I asked where CEO was. John said

20 you're CEO as well.

21   Q  Okay. So you did ask about it?

22   A  Yes.

Page 179

1   Q  And Mr. Gardner indicated specifically that

2 you're CEO as well?

3   A  Yes.

4   Q  And when did that conversation occur?

5   A  I presume the day I signed it. This was in

6 his living room at his apartment and we sat next to

7 each other. We went through every word on this paper.

8    Marc, this was my document to decide if

9 this is what I was told I was getting, and if so, I

10 would take the job.

11   Q  And by signing it, I take it, that you

12 agreed with what the document stated, correct? Is

13 that fair?

14   A  That's fair. I mean, it was embellished,

15 it was discussed, but I agreed with it once I had the

16 discussion.

17   Q  And this document, Exhibit Number 7, is

18 the -- is what you refer to as your compensation plan

19 in the complaint, right, the complaint you filed in

20 this case to initiate the lawsuit?

21   A  Yes.

22   Q  All right. And let's talk about your

Page 180

1 compensation structure that's set forth in this

2 letter.

3    It provides for a starting salary of

4 $250,000 per annum, and that was consistent with your

5 discussions, correct?

6   A  (Nods head affirmatively.)

7   Q  You need to --

8   A  Yes.

9   Q  -- verbalize.

10    All right. And it also provides that you

11 were to receive standard benefits, including health

12 care, 401(k) participation, et cetera?

13   A  Yes.

14   Q  All right. And it also discussed a

15 promoted interest and it breaks down the promoted

16 interest into two parts, current projects and future

17 projects, right?

18   A  Yes.

19   Q  All right. The promoted interest, as we've

20 discussed somewhat in the deposition, is a form of

21 participation in Fidelio's investments, right? Is

22 that a fair definition of it?

Page 181

1   A  I think the definition to me is that it's

2 the participation in any investment that's initiated

3 that relates to this 15 and a half percent after year

4 end.

5   Q  Including Fidelio's investments?

6   A  It's all investments.

7   Q  All right. And with respect to Fidelio,

8 because that's the only thing I know about, I want to

9 describe to you my understanding of how the process

10 works for a promoted interest, and you tell me whether

11 you agree or disagree with my description.

12   A  Okay.

13   Q  Fidelio would first acquire an interest in

14 a real estate project. That would be the first thing

15 that was required before you could obtain a promoted

16 interest in a project, correct?

17    MR. HADDAD: I'm just going to be object to

18 legal conclusions.

19    BY MR. SMITH:

20   Q  I'm not trying to make any legal

21 conclusions. I'm trying to describe the process by

22 which you'd become entitled to a promoted interest,

Page 182

1 and you can agree or disagree.
2   A  You are talking about the promoted interest
3 only right now; is that right?
4   Q  Yes.
5   A  Okay.  So -- because there's another
6 component, which is the co-investment.
7   Q  I'm not talking about -- you're talking
8 about the 2.5 investment?
9   A  Yeah.
10   Q  I'm not talking about that.
11   A  All right.  So ask me your question again.
12   Q  The first thing that's required before you
13 receive a promoted interest is Fidelio has to acquire
14 legally an interest in a project, a piece of real
15 estate?
16   A  No.
17   Q  Okay.
18   A  Any affiliate of Fidelio.  Buvermo --
19   Q  I'm using --
20   A  Well, I don't want to use Buvermo -- I
21 mean, I don't want to use Fidelio.
22   Q  But that's how it usually happened, isn't

Page 183

1 it?
2   A  You can say it usually happened.  I didn't
3 work there yet.  Okay?  So there's partnerships that
4 can cover this table.
5      To the extent -- anything that had anything
6 to do with Fidelio, Buvermo or any other name
7 associated with these partnerships, to the extent that
8 it's a deal that was initiated after year end and the
9 company that I was the president and CEO of had an
10 affiliate that made an investment in a property
11 through a partnership, a joint venture or otherwise,
12 once that entity secured an economic interest, then
13 the clock would start for my promote.
14   Q  Okay.  I understand what you said, but for
15 purposes of simplicity, I want to just -- I want to
16 refer to Fidelio as the entity that's acquiring the
17 interest.  And I understand what you said in terms of
18 you don't believe it's limited to Fidelio.  It could
19 be any entity.
20      But I'm going to use Fidelio as an example.
21 All right?  Just to make this simple.  All right?  And
22 I'm not trying to limit your entitlement.  I'm just

Page 184

1 trying to make it easy for me and for you so we can
2 move forward in the deposition.
3   A  Okay.  But please understand that the
4 notion that I get from this whole process is the
5 limitation of my entitlement, and that's at issue.  So
6 when you describe your use of Fidelio as the entity,
7 that's where it causes concern.  I don't want my
8 entitlement to be limited.
9   Q  All right.  Well, I mean, you've reviewed
10 the operating agreement from which the promoted
11 interest springs, right?  I mean, we've talked about
12 that --
13   A  I reviewed a document that was in place
14 prior to my arriving.
15   Q  Now, does that document refer to any entity
16 other than Fidelio --
17   A  I don't know.
18   Q  You don't know because you don't remember
19 or you don't --
20   A  I don't know because, number one, I do not
21 remember; and number two, that document was supposed
22 to have been amended, to be modernized in John's

Page 185

1 words, brought up to date and include me.  And I never
2 saw an amended copy of that document.
3   Q  All right.  Well, let's try to move
4 forward.
5      Using my example -- and again, I'm not
6 trying to limit you, limit your entitlement at all --
7 once Fidelio or any other entity acquires an interest
8 in the property, the property is then designated as an
9 FPEP property?
10   A  I have no idea.
11   Q  You have no idea?
12   A  No.
13   Q  Have you read the partnership agreement?
14   A  You know, I'm going to tell you again.
15 This was a document that was in place when I got
16 there.  The answer to your question is I skimmed it.
17 I said when is this going to be amended.  Gardner told
18 me that --
19   Q  I'm not talking about the LLC operating
20 agreement.  I'm talking about the Fidelio partnership
21 agreement.  That's where a property is designated as
22 an FPEP property.

Page 186

1      Are you saying you don't know anything
2 about that?
3    A   I don't know much about it.
4    Q   Well, maybe you'd better tell me your
5 understanding of how the promote works.
6    A   I'll be happy to.
7    Q   Go ahead.
8    A   Okay.
9    Q   And try to be fairly concise, if possible.
10   A   I'll be as concise as I possibly can.
11   Q   Okay.
12   A   Anything by anybody that's initiated after
13 January 1, 2006 -- I don't care who initiated it, who
14 worked on it, okay? The operative word to me in the
15 discussion is initiated -- if that investment is
16 initiated, I am entitled to 15.5 percent over a
17 10 percent hurdle rate, and that is my promote. And
18 anything beyond that notion to me is outside the
19 bounds of any conversation I had with John Gardner or
20 anybody else.
21      That's the deal, as I understood it. I
22 liked that language. I accepted that language. And

Page 187

1 to this day, I'm entitled to that language. And I'm
2 very concerned about the concept of using Fidelio or
3 using these other words to describe aspects of an
4 entity or an LLC or a partnership that I am not a
5 party to, I was not given a copy of when I joined the
6 company, and I was told that it wasn't important until
7 we got close to the deal, and lastly, that it was
8 going to be amended to reflect my involvement in the
9 company.
10      And I said so this means I get my 15 and a
11 half percent over the 10 that you, John Gardner, got
12 previously, and he said yes.
13   Q   Where did the 15 and a half percent number
14 come from?
15   A   Ask John.
16   Q   It's my understanding that Mr. Gardner got
17 13 percent, traditionally, interest.
18   A   I can't tell you.
19   Q   All right. Well, let's move forward, then.
20 You've given me your understanding of how the promoted
21 interest worked. Let's talk about each part of the --
22 your entitlement as set forth in your offer letter

Page 188

1 starting with the current projects.
2      The document says -- and I'm going to read
3 it -- you will be entitled upon start of employment to
4 the share of FPEP promoted interests currently owned
5 by Fidelio Properties for land parcels adjacent to the
6 Sheraton Reston parcels and the remaining land parcels
7 at Twinbrook. Such interests will be subject to a
8 two-year vesting period.
9      Now, what was your understanding of the
10 FPEP promoted interest owned by Fidelio for these land
11 parcels that are described in this paragraph?
12   A   Can you say that again?
13   Q   What is your understanding of the nature of
14 the interest that was owned by Fidelio?
15   A   My understanding was what I was told,
16 because I didn't have any history or due diligence
17 regarding this paragraph.
18   Q   What were you told?
19   A   I was told that the history of this was
20 when this guy left the company --
21   Q   Steve Bonacci.
22   A   Right -- that the company bought his

Page 189

1 interest.
2   Q   The company being Fidelio?
3   A   I guess. And these interests were not
4 worth a lot of money but they were available to me,
5 and this was something that frankly I did not expect.
6      It wasn't negotiated. It was never
7 discussed that I was going to get some interest in a
8 current project and never asked for it. I'm not
9 greedy. I'm not arrogant. I'm not presumptuous.
10      So this was something that I just looked at
11 and I said, you know, I don't know what it's worth.
12 But through the discovery documents, we found some
13 numbers, which are paltry, and, you know, it was a
14 nice thing to have.
15   Q   Nice gesture on the part of Buvermo?
16   A   This is what it probably only ended up
17 being is a gesture, but that's okay.
18   Q   Now, you said that the amount of money was
19 paltry. How much was this interest worth?
20      THE WITNESS: Do you have that piece of
21 paper?
22      MR. HADDAD: No. If you don't know, say

Page 190

1  you don't know.
2      THE WITNESS: I don't know.
3      BY MR. SMITH:
4   Q  Approximately.
5   A  Under $10,000, under $15,000.  I don't know
6  the exact number.  I saw it the other day.
7   Q  And the paragraph says that the interest
8  we're talking about will be subject to a two-year
9  vesting period.
10      Now, how did you interpret that?
11   A  Frankly, I thought it was missing a little
12  bit more, you know, requirement.
13   Q  I'm sorry?
14   A  I thought it would mean two-year vesting of
15  being employed.  I thought it would go on to say that,
16  but it didn't.
17      So, you know, my interpretation of this is
18  that I worked at the company, I was in good stead, I
19  was doing my job, I worked there for two years and I
20  got the interest.
21   Q  Right.  So you had to be there two years in
22  order to get the interest?

Page 191

1      MR. HADDAD: I'll just object to the extent
2  it calls for a legal conclusion.
3      BY MR. SMITH:
4   Q  I'm not asking for a conclusion.  I'm
5  asking for your understanding of the provision.
6      Is it your understanding or was it your
7  understanding that in order to become vested in the
8  interest of these land parcels or the promoted
9  interest, you had to remain employed for two years?
10   A  No.
11   Q  That wasn't your interpretation?
12   A  No.
13   Q  All right.  Then you better explain to me
14  your interpretation again because I'm pretty sure
15  that's what you said.
16   A  To the extent that I was employed or not
17  employed for no reason of my own, that I would be
18  entitled to these interests.  So to give it to you in
19  layman's terms, I can't control a -- I can't control a
20  termination of my employment before I hit a vesting
21  period if the company for no reason wants to fire me.
22      If I'm involved in doing deals and I'm

Page 192

1  working with the company to get transactions completed
2  and I'm doing the job that I was hired to do and the
3  company wants to cut off my employment, whether it's a
4  year and a half or a day and a half before the vesting
5  period, I say I'm still entitled to it.
6      I think the notion of controlling how long
7  somebody works there relative to these benchmarks of
8  time is totally inconsistent with the way I took this
9  job, the trust that I had in these people.  I mean,
10  it's only now that I understand that some of these
11  periods are set up and can be used against you to the
12  extent the company wants to terminate you.
13      So under ordinary circumstances working at
14  a company, being productive, trying to move the ball
15  forward, I would tell you that I should be there for
16  two years before I got these, because these are not
17  deals that I found myself or the company found under
18  the initiation language that I believe in.  But I'm
19  very hard-pressed to tell you that because I was fired
20  that this just goes away.
21      So if you want to set up a structure in a
22  company that's got certain vesting and decide that you

Page 193

1  want to fire somebody before it vests so that you as a
2  company or another individual can take advantage of
3  the economic interest in this, I don't think that's
4  fair, Marc.
5      And frankly, the process that we've gone
6  through, I firmly believe that, you know, this is
7  something that can be arranged before you get to a
8  vesting period.  And I disagree with the notion that
9  you have to be there, come hell or high water, to get
10  this.
11   Q  Is it your contention that the company
12  terminated you to avoid paying you the 10 or $15,000
13  or whatever it is that these parcels were worth or the
14  interest was worth?
15   A  I don't know.
16   Q  So your interpretation of the vesting
17  period is in a nutshell that unless you're terminated
18  for cause, you would be entitled -- you are entitled
19  to this interest?
20   A  In all fairness, I agree with that
21  statement.
22   Q  Okay.  Now, did you look at the -- when you

Page 194

1 received your offer letter or afterwards, did you go
2 back and look at the operating agreement of the LLC
3 and determine what Mr. Bonacci's share was so you
4 could quantify what this interest was actually worth?
5    A   No. I never got a copy of it.
6    Q   You never got a copy of what?
7    A   Of any of these documents you're talking
8 about.
9    Q   Well, I mean, you testified earlier that
10 you had access to the documents.
11    A   Right.
12    Q   Did you ever look at the document to see
13 what interest Mr. Bonacci had?
14    A   No. John told me. I relied on what he
15 told me.
16    Q   And what did he tell you?
17    A   I believe it was a 2 or 2 and a half
18 percent interest in the promote that he had allocated
19 to him. And that he had left the company so the
20 company acquired them and they were available.
21      I didn't need to, you know, do any due
22 diligence to go find out at the time. I wasn't really

Page 195

1 concerned about it. I mean, I was concerned about
2 going out and finding deals. Marc, I didn't dwell on
3 finding evidence to support what was in this letter.
4    Q   I'm not talking about evidence. I'm
5 talking about whether you just looked at the document
6 to see what it was worth, see what the interest was.
7    A   I took it on face value. It had some
8 value. It was a nice gesture. I was happy to accept
9 it.
10    Q   Did Mr. Gardner indicate or anybody else at
11 Buvermo indicate what the interest was actually worth
12 dollarwise?
13    A   No.
14    Q   And the first time you saw that was in the
15 document?
16    A   Well, the first time I saw it was when we
17 saw that piece of paper that had a calculation of it
18 that Joost told me he had done for -- you know, to try
19 to make a settlement.
20    Q   All right. Well, let's talk about the
21 future projects, moving past the current project part
22 of the offer letter.

Page 196

1      Now, according to the offer letter, you
2 would be entitled to the FPEP promote that was
3 available to Mr. Gardner for all projects initiated
4 after December 31st, 2005, correct?
5    A   That's part of the sentence.
6    Q   I'm sorry?
7    A   That's part of the sentence, yes.
8    Q   Okay. And for all projects initiated by
9 you -- initiated by you prior to that time, and then
10 there's an adjustment on the hurdle rate from
11 12 percent to 10 percent.
12      Do you agree with me so far?
13    A   Yes.
14    Q   And then the paragraph continues, for any
15 projects jointly initiated by you and me prior to year
16 end, we will mutually agree on a fair split of the
17 promote.
18      Are you with me so far?
19    A   Yep.
20    Q   And reading that sentence, you must have
21 had some indication that Mr. Gardner would -- at least
22 until December 31st, he might be out there trying to

Page 197

1 initiate new deals?
2    A   No, not at all. We might go to a meeting
3 together.
4    Q   Okay.
5    A   We might go together and find something.
6    Q   All right. And the last part of this is
7 that you would have the right to invest pro rata
8 2.5 percent of the capital for all future projects on
9 a non-selected basis.
10      What was your understanding of that last
11 sentence?
12    A   My understanding of it was that if a deal
13 is sitting here and we're ready to do it, then I can
14 invest 2 and a half percent of the equity that the
15 company was going to put in on a pari-passu basis. So
16 thus, my two components of compensation would be the
17 promote and the ability to make the investment.
18      I never got clarification of that from
19 Joost or Andre because I never sought it out. But at
20 the dinner that preceded my termination, I brought it
21 up with them and they told me that this wasn't the
22 case. They told me that I can invest any amount up to

Page 198

1 2 and a half percent, that they would be flexible. So
2 I was prepared to do this, completely prepared to do
3 it.
4      This was more of a burden in terms of
5 dollars. If the deals got larger and we did more
6 deals, I just don't have that type of capital. But --
7 if it was something less than this, it would have been
8 better, but --
9   Q  Well, it wasn't mandatory either. You
10 didn't have to invest anything, right?
11   A  No. I was told either zero or 2.5.
12   Q  Right. So using your example, if you chose
13 not to invest -- let's say the first project you
14 brought to the company, the Spotswood deal --
15   A  That's not the first --
16   Q  Let's make an assumption that it was.
17   A  Let's not, because there was a deal within
18 weeks of me joining the company.
19   Q  All right. Well --
20   A  I don't want to be contentious, Marc, but I
21 don't --
22   Q  A deal that came to fruition, all right, is

Page 199

1 Spotswood? All right. Let's say you -- the company
2 was going forward with that investment and you had the
3 opportunity to invest 2.5 percent and you chose not to
4 invest anything, which was your right.
5      That's your understanding, correct? You
6 didn't have to invest a single dollar?
7   A  I didn't have to invest a single dollar.
8   Q  But if you chose that alternative, that
9 meant that you couldn't down the road invest any of
10 your own capital in future projects. Isn't that what
11 the term non-selective basis means in this sentence?
12   A  Yes.
13   Q  All right. Now, what is your understanding
14 of the term initiated in this paragraph, when it says
15 projects initiated? What's the term initiated mean?
16 What's your understanding of that term?
17   A  Well, every deal has a lifecycle, and the
18 lifecycle comes from having information about a
19 building being available for acquisition and taking
20 that information and considering it for the company
21 and coming to at least an informal decision that it
22 may be a deal that fits the strategy, moving it

Page 200

1 another step of going to take a look at it, take a
2 look at the building, go inside, walk the building,
3 coming back to the office, talking about it some more
4 and beginning to think that it's something worth
5 spending time on.
6   Q  So at that point, after all those things
7 have occurred, you would consider the project to have
8 been initiated?
9   A  I would say that to make a decision based
10 upon what you've seen, what you've heard and what
11 you've seen in terms of the building and the market
12 around it and then coming back to the office and
13 saying you know what, this could be a fit, let's go
14 ahead and spend some time on it, at that point, that
15 moment, it's initiated.
16   Q  All right. And having discussions with
17 potential partners, that would also trigger initiation
18 of a project?
19   A  Say that again?
20   Q  If you start conducting discussions with a
21 potential partner, like JBG, concerning a particular
22 project, would you consider the project to have been

Page 201

1 initiated at the onset of discussions?
2   A  Well, there's two parts of your sentence.
3 Having a conversation with an organization like JBG I
4 don't think is the initiation of a project. Having a
5 conversation with JBG whereupon you discuss a
6 particular asset or assets --
7   Q  Right.
8   A  -- and you decide whether you want to
9 pursue them or not and spend time on them, that's the
10 initiation in my mind.
11   Q  All right. That's what I meant, the
12 latter.
13      The 2.5 percent, the right to invest
14 2.5 percent of your own capital, was that to be
15 considered the FPEP's capital investment in a
16 particular project? That's how it would be classified
17 in the deal documents?
18   A  You know, I don't know. I really don't. I
19 mean, I told John, I told Kara, I told Joost and I
20 told Andre that I am going to make a 2 and a half
21 percent equity investment in Spotswood and in the JBG
22 deal, which she, Kara, calculated what the

Page 202

1 contribution would be. And once she did that, I was,
2 you know, comfortable that I could secure the funds to
3 make those investments.
4     So how she did the calculation relative to
5 what the company was going to put in and whether it
6 was -- I mean, there's one way to look at it, where
7 the company's putting in a hundred dollars and you put
8 in 2 and a half dollars, or the company is putting in
9 98 and a half and you're putting in 2 and a half and
10 that equals a hundred.
11     So I wasn't a hundred percent certain, so I
12 asked her how the equity contribution works, whether
13 it's on top of the hundred or within the hundred, and
14 then she did the projection and then came up with the
15 contribution.
16   Q  Okay. And what she told you, was it within
17 the hundred or outside the hundred?
18   A  I don't remember, to be honest with you. I
19 was concerned about the dollars.
20   Q  All right. The JBG deal you just
21 referenced, is that the Reston International project?
22   A  Yes, and there's other components of it.

Page 203

1   Q  And was that project initiated before or
2 after December 31st, 2005?
3   A  After the end of the year.
4   Q  It was initiated afterwards?
5   A  Uh-huh.
6   Q  Were you responsible for that?
7   A  I don't think it matters.
8   Q  Who started the discussions with JBG
9 concerning the Reston International project?
10   A  JBG had a long-standing relationship with
11 Buvermo.
12   Q  With Mr. Gardner?
13   A  With Buvermo.
14   Q  And Mr. Gardner, correct?
15   A  And me. I've known them for 20 years too.
16   Q  When did the discussions first start about
17 the Reston International project, if you know?
18   A  Well, it wasn't really a discussion. What
19 it was was a book. An offering prospectus was sent
20 out by The Winkler Companies who was selling a
21 portfolio of assets, and it just so happened that this
22 property was one of the assets that they wanted to

Page 204

1 sell.
2     So JBG owned with Buvermo as a 10 or
3 15 percent partner and another big firm as the
4 80 percent partner assets adjacent to this particular
5 building. So I presume that JBG thought that it would
6 be good to connect the adjacent land and buildings as
7 more of a portfolio.
8     I do not believe that JBG was aware of
9 Winkler's desire to sell until the sales package or
10 broker went out on the street, and it was based upon
11 that package that John indicated that there was a
12 portfolio for sale and we should take a look at it.
13   Q  And when did that occur roughly, do you
14 know?
15   A  I don't remember.
16   Q  In your offer letter, which is Exhibit 7,
17 the last sentence on the first page says all items
18 will be governed by the FPEP, LLC agreement of which
19 you will become a member.
20     Was it your understanding that the
21 reference to the FPEP, LLC agreement is the operating
22 agreement that we marked as Exhibit Number 4?

Page 205

1   A  Is it my understanding that what?
2   Q  The agreement that's being referred to in
3 the offer letter is actually the FP Executive Partners
4 operating agreement?
5   A  That's being referred to?
6   Q  Yes.
7   A  No.
8   Q  What agreement is being referred to?
9   A  I asked John several questions about this
10 sentence, and the response was as follows: Number
11 one, this agreement is old and needs to be updated and
12 modernized.
13     But you got to understand where I'm coming
14 from, because otherwise I would have said if it's that
15 important to negotiate this document right now, then
16 let's just sit down and go through it, which I did,
17 and he said no, it's merely a venue to add a name into
18 a deal.
19     And I said fine, I get it. You'll take the
20 old agreement, you'll modernize it, you'll give me a
21 copy of it and I'll send it to my attorney. Okay?
22     There's no way, shape or form that when I

Page 206

1 was given this letter and spent 45 minutes discussing
2 its terms was there any allusion other than this was a
3 ministerial/administrative document that did nothing
4 more than reflect the terms of the promote, et cetera,
5 et cetera. It was benign and it could be looked at in
6 the future sometime. That was my understanding.
7     I asked about it. I specifically got the
8 response I just told you, and I signed this agreement.
9 I was happy. I went to work. I got my salary. I
10 looked for deals, and that's what I did.
11 Q Well, you had indicated previously that you
12 actually got a copy of the FPEP operating agreement
13 which is Exhibit Number 4 to send to your lawyer.
14 A Yes.
15 Q Do you remember when you did that?
16 A I believe it was either late February '06
17 or early March.
18 Q And was it your understanding that that
19 document was going to substantively change -- and
20 obviously, your name is going to be inserted into it.
21 That's understood. But other than that, was it to
22 substantively change, based on your understanding?

Page 207

1 A Well, since I had not read this document
2 when I signed this, I would have no idea if it needed
3 to change substantively or simply, because I didn't
4 know what the components of it were.
5 Q After you obtained a copy of it, did anyone
6 indicate to you that, other than obviously adding you
7 as part of the agreement, it would be changed in any
8 other material respect?
9 A How would I know?
10 Q Well, did you ask?
11 A They were in the middle of amending it.
12 Q I understand that, but did you ask is this
13 document going to change in any material -- that's my
14 question.
15 A I did not even have a conversation about
16 it. I let them do their work.
17 Q All right. And who was going to control
18 what the document ultimately said?
19 A Well, I thought the document would say
20 exactly what it says. I had no concern when I joined
21 the company that it would say anything other than
22 this.

Page 208

1 Q Who was taking the responsibility for
2 amending the document?
3 A John Gardner, Kara McCormick and Forrest
4 Walpole.
5 Q And this was occurring after you had taken
6 the job?
7 A This was occurring in February or March of
8 '06.
9 Q All right. How come you weren't taking the
10 lead for making sure the document got done?
11 A Because I made it very clear at the outset
12 that what I was entitled to was a copy of a draft of
13 an amended document whereupon I could use that as the
14 base to give to my counsel to match up with my offer
15 terms. And I told Kara and John that several times,
16 and they said fine.
17     Now, they sat there and met in the kitchen
18 with me going in and making Xerox copies and making
19 coffee and going to a meeting and going back to my
20 office. I wasn't hiding from anybody. I wasn't
21 dodging trying to be involved in the meeting one way
22 or the other. I just asked simply that, please, do

Page 209

1 what you need to do, give me a copy of it.
2     Kara McCormick took this letter to every
3 single meeting that she had with Forrest and John to
4 track the terms of the deal. She took this letter and
5 used it in all of the projections of the Spotswood
6 deal and I presume the JBG deal for the board package.
7     This was the Bible. This was the
8 sacrosanct document that I trusted John Gardner, Joost
9 Tjaden, Andre van Rhee and, to the extent as an agent,
10 Tony LoPinto and Marsha Pearcy. And if you wonder why
11 I haven't spoken to those two people, Marsha and Tony,
12 since all of this has occurred, I can't begin to tell
13 you how distasteful this whole process is. This was
14 the deal.
15 Q This document you're referring to as the
16 Bible is Exhibit Number 7, your offer letter?
17 A I'm telling you that the salary, the
18 benefits --
19 Q My question was simply the document you've
20 been referring to as the Bible, sacrosanct --
21 A The economic benefits that I -- that inured
22 to me in this letter are what I fully expected, fully

Page 210

1 trusted these guys to give me. And to be where we are
2 right now is just unconscionable to me.
3    Q  I agree with you wholeheartedly.
4       All right. Let's turn to the second page
5 of the document where a paragraph has been inserted as
6 to Mr. Gardner's future involvement with Buvermo's
7 business.
8       I take it that you carefully read this
9 paragraph before you signed the offer letter; is that
10 right?
11   A  I read everything before I signed the offer
12 letter.
13   Q  And you agreed with what's in this
14 paragraph?
15   A  You know, Marc --
16   Q  My question is simply did you agree with
17 what's in this paragraph? You can say yes or no or
18 you can give a detailed explanation.
19   A  Well, I'm going to give you a detailed
20 explanation, okay?
21       This paragraph, which may take you three
22 minutes to read, okay, this paragraph was a

Page 211

1 conversation that maybe took 15 hours of discussion
2 with a variety of people, okay?
3       Distilling all of that face-to-face time
4 with people down to a paragraph that encapsulates what
5 I thought, what my emotions were, what Tony thought,
6 what John thought, what Joost thought, what Andre
7 thought was virtually impossible. I am not asking
8 anyone to take all those hours and spend whatever
9 period of time it is to regurgitate it on a piece of
10 paper or am I going to expect someone to give me a
11 piece of paper that is completely to my satisfaction
12 after spending all that amount of time.
13       So if you are asking me if this was
14 acceptable, then by virtue of the fact that I signed
15 this, it must have been. However, my notion was from
16 all these people that John was winding down JBG deals
17 and the piece of land, and I was finding new deals,
18 and then by year end, he was physically out of the
19 office, confirmed by Joost Tjaden and Andre van Rhee
20 on December 10th, 2005. And I recall that meeting
21 vividly.
22   Q  Did you have any concerns after you read

Page 212

1 this paragraph that the role that's described for
2 Mr. Gardner was not consistent with what had been
3 discussed during these 15 hours of conversations
4 you've referred to?
5    A  No. This was a honeymoon. You know, this
6 was -- everybody was happy. Everybody seemed to like
7 each other. And the last thing that I ever thought at
8 this point in time was that I had to distrust
9 somebody. And at that point, I would have just walked
10 away. I mean, it just doesn't -- it's not worth the
11 energy.
12   Q  What was your reaction to the vision in the
13 letter that says that Mr. Gardner would continue to
14 retain the title of president of Fidelio Properties
15 Management, Inc. which is the managing partner of
16 Fidelio? When you read that, were you concerned?
17   A  No.
18   Q  Did you understand that by virtue of the
19 fact that Mr. Gardner was going to retain the title,
20 he would have some involvement in the ongoing business
21 of the company after December 31st of '05?
22       MR. HADDAD: What company? I'm sorry.

Page 213

1 What company?
2       MR. SMITH: I'm sorry?
3       MR. HADDAD: What company are you talking
4 about?
5       MR. SMITH: Buvermo.
6       THE WITNESS: As president of Fidelio?
7       BY MR. SMITH:
8    Q  As president of Fidelio Properties
9 Management, were you concerned that because he had
10 that role, he would have some involvement in Buvermo's
11 business moving forward after December 31st of '05?
12   A  After those hours of conversations with all
13 these people, I didn't have an issue with that. I
14 don't candidly understand how a title of a Management,
15 Inc. company expands into me being fearful that he's
16 going to spend more time when I was told he wasn't.
17   Q  Well, what was your understanding of
18 Mr. Gardner's ongoing role as the president of Fidelio
19 Properties Management, Inc.? Did you understand what
20 that entailed?
21   A  Not specifically.
22   Q  Did you understand that Mr. Gardner would

## Page 214

1 continue to sign off on transactions on behalf of
2 Fidelio?

3   A  Yes.

4   Q  After December 31st of '05?

5   A  Yes.

6   Q  And did you understand as well that
7 Mr. Gardner was going to continue as the managing
8 member of the LLCs through which Fidelio owned its
9 interest in the properties?

10   A  I didn't have any issue with any of this.
11 This is not something that I considered to be a
12 contentious situation. It's a situation that I --

13   Q  I understand.

14   A  -- I understood to be pro forma. Andre and
15 Joost wanted it this way for a period of time. It
16 also indicates somewhere in here that I would take
17 over these roles after two years.

18   Q  Actually, what it says is the intent is for
19 you over time to take over --

20   A  In conversations, I was given a date. It
21 was a two-year term. That was from Andre van Rhee--

22   Q  Two-year term beyond --

## Page 215

1   A  Two years from the date I joined as
2 president and CEO of Buvermo, I would take over the
3 balance of these titles.

4   Q  So by implication, for two years after you
5 took over, Mr. Gardner would continue to have
6 involvement --

7   A  No. Signatory.

8   Q  Signatory?

9   A  That's what he told me. He said if you're
10 going to do a deal, I'll sign it, which by the way
11 worked in Spotswood and the JBG deal.

12   Q  Okay. You also see in this letter that
13 Mr. Gardner advises you that he intends to continue as
14 a pro rata 2.5 investor for all future projects.

15   Did that concern you at all?

16   A  Not at all.

17   Q  Did you understand what he meant by that?

18   A  I asked him what he meant.

19   Q  And what were you told?

20   A  I was told that he was going to put in
21 2 and a half percent in all the projects, and I was
22 happy to hear that.

## Page 216

1   Q  And that was even after December 31st of
2 '05, wasn't it?

3   A  Yes. That's a pari-passu equity
4 investment, and I'm happy to allow him to -- let the
5 company allow him to make that investment.

6   Q  All right. And as an ongoing investor in
7 the company, wouldn't you by virtue of your position
8 as president be acting in a fiduciary capacity towards
9 Mr. Gardner --

10   A  Of course.

11   Q  -- as an investor?

12   And then there's a sentence in the offer
13 letter which is entitled future decision making, and
14 it states as follows. As we discussed, for any future
15 investment decisions, both you and I will have to
16 agree before we submit the investment to Fidelio -- to
17 the Fidelio partners for their approval.

18   How did you interpret that sentence?

19   A  I interpreted it that I would find a deal.
20 I would describe it John. I'd go through the numbers
21 with him. And if he felt that it matched the
22 parameters of what the company was looking for, then

## Page 217

1 we would submit the investment to Joost and Andre.

2   Q  And how long was this arrangement to go on
3 in terms of you would have to talk to Mr. Gardner
4 about the deal before seeking approval of the Fidelio
5 partners?

6   A  The term of that, I do not recall.

7   However, again, this component and, yeah,
8 this responsibility that I had did not concern me in
9 the least. I was happy to go over deals, describe
10 what was going on and get John's input and eventually
11 get his acquiescence that we should go to the Dutch or
12 that we shouldn't.

13   I gave him the credit and the benefit of
14 the doubt knowing that better than I do. And if he
15 was adamant that a deal didn't make sense for them,
16 that's okay. There's other deals out there.

17   Q  Did you anticipate that this arrangement
18 would exist past December 31st of '05?

19   A  I expected it to.

20   Q  Exhibit Number 7, your offer letter, says
21 absolutely nothing about a term of employment; is that
22 correct?

Page 218

1  A  I don't see it in here.
2  Q  Okay. It doesn't say anywhere that the
3  company has agreed to employ you for 10 years, does
4  it?
5    MR. HADDAD:  Asked and answered.
6    Go ahead.
7    THE WITNESS:  The letter does not say that.
8    BY MR. SMITH:
9  Q  And did you realize that before you signed
10  it?
11  A  Yes.
12  Q  And what did you do after you realized it?
13  A  I felt comfortable that I trusted them.
14  John had a good reputation. I trusted him. I've
15  known Tony LoPinto for 15 years. I trusted him. I've
16  known Marsha for almost as long. I trusted her. I
17  liked Joost. I got along with him.
18    It was a cordial interview process. Nobody
19  seemed to be trying to write something and do
20  something else. I can't tell you that I felt the same
21  way about Andre, but I didn't spend as much time with
22  him.

Page 219

1    It really didn't concern me. The fact is
2  that Tony pushed hard to get a commitment out of me,
3  which was met, in my opinion, by a mutual commitment
4  by the company, and I went forward.
5  Q  So you weren't at all concerned that the
6  offer letter didn't contain any term of employment?
7  A  I did not.
8  Q  I'm sorry?
9  A  I did not.
10  Q  You were not concerned?
11  A  No.
12    MR. HADDAD:  Time to break, you think,
13  Marc, five minutes?
14    MR. SMITH:  Sure.
15    (Whereupon, a short recess was taken.)
16    BY MR. SMITH:
17  Q  Mr. Morris, let me go back for just a
18  minute.
19    With respect to the operating agreement for
20  FP Executive Partners that is the agreement that's
21  been marked as Exhibit Number 4, you've testified that
22  it was to be modernized, I think, using your word.

Page 220

1  A  That was John's word.
2  Q  Okay. John's word was it was going to be
3  modernized.
4    What was your understanding regarding the
5  terms of the new operating agreement, the major
6  substantive terms of the new operating agreement? Did
7  you have any understanding of what the terms would be?
8  A  Not really.
9    You know, I spent the better part of over
10  four years immediately in my last job making
11  investments through the promoted interest structure.
12  And moreover, I arranged the debt, the equity and
13  negotiated the promoted interest in all the deals that
14  I did with the Lerner family. So I did or I believe
15  that I had a fairly decent body of knowledge of how
16  the promoted interest works.
17    I also was pleased to see that the
18  threshold to participate in the promote was reduced
19  from 12 to 10, and I just presumed that that was a
20  component that needed to be amended. I didn't know
21  whether it currently said 12 or anything had changed.
22    I mean, you know, other than that and, you

Page 221

1  know, putting my name in, I didn't have any
2  predisposition to what was going to change or not
3  change.
4    I will continue to tell you that I did ask
5  whether this was something that needed to be
6  negotiated, amended, whatever, immediately, and, you
7  know, I was told that we don't need to focus on this
8  until we get near a deal.
9    Now, you know, I have some thoughts on
10  reflection, which aren't probably important to you,
11  but, you know, at face value, I trusted John, I
12  trusted Andre, I trusted Joost, about, you know, what
13  this said, and my understanding of it was that they
14  were going to give me this and it was acceptable to
15  me.
16  Q  Did you have any understanding that the
17  operating agreement in its revised form would contain
18  some sort of provision whereby a departing member's
19  interest would be subject to a redemption?
20  A  You are asking me if --
21  Q  You had any understanding whether that
22  would be part of the agreement.

Page 222

1 A That's not what you said. You said
2 amended.
3 Q The new document --
4 A Right.
5 Q -- the modernized document, was it your
6 understanding that that would include a redemption
7 provision?
8 A Absolutely not.
9 Q It wasn't your understanding?
10 A No.
11 Q Do you understand that that type of
12 provision is in the existing operating agreement?
13 A It may well be.
14 Q Did you negotiate that out?
15 A I didn't negotiate any part of it. You
16 understand that I told you that it was supposed to
17 have been amended. The amended draft was supposed to
18 have been given to me that I then turn over to
19 counsel.
20     And I wasn't planning on hanging anybody
21 up. In other words, I wasn't planning on getting an
22 amended copy and mulling it over for a period of time.

Page 223

1 I would have done it quickly.
2     But I'm telling you, number one, I never
3 received an amended copy. I was there for nine months
4 before I was terminated. Nobody gave me an amended
5 copy.
6     And the only exercise that I saw that had
7 any motion toward amending it was while we were
8 negotiating to do the two deals, the Reston deal with
9 JBG and the Spotswood deal, and that's when John
10 called Forrest Walpole, along with Kara, to continue
11 to bring this document into every meeting. And they
12 were sitting at the table in the kitchen working
13 through whatever they were trying to work through, but
14 I never received a copy of it.
15 Q I understand. Now, you understood, though,
16 that the company's history was redeeming the interest
17 of a departing member, Steve Bonacci. That's how
18 you --
19 A I had --
20 Q Let me finish. Let me finish.
21 A Okay.
22 Q Did you have that understanding, that the

Page 224

1 company had in practice redeemed the shares of
2 departing members?
3 A You're using the word in practice as a
4 generalization. I was told that the interests that I
5 was given were from the repurchase of Bonacci's
6 interest. This in no way, shape or form tells me that
7 this is company practice or this is, you know, de
8 rigueur or this is anything that, you know, can be
9 extrapolated telling me that this is what the company
10 does, you know, on a regular basis.
11     I mean, he may have decided that he wanted
12 to cash out of these interests. It may have been,
13 quite frankly, an irregular event.
14 Q Did you ask about why the redemption
15 occurred?
16 A No. It wasn't my business.
17     (Thereupon, the document was marked as
18     Morris Deposition Exhibit No. 8 for
19     identification.)
20 BY MR. SMITH:
21 Q Let me have you take a look at what's been
22 marked as Morris Exhibit Number 8.

Page 225

1     Have you ever seen this document before?
2 A Let me tell you my relationship with this
3 document. Okay?
4     I believe that when I was doing the budget
5 for '06, I needed to know what John's salary and
6 benefits were. And I had been told by Kara
7 McCormick -- and I think Laura Preede was still there
8 at the time -- when I asked what the deal was so I
9 could plug in the overhead number.
10     And I don't think Laura knew, and Kara told
11 me something along the lines of it was supposed to be
12 X and it became Y, and, you know, you'd better get
13 some clarification, et cetera, et cetera. And, Marc,
14 this was simply to associate the overhead for John in
15 the overall scheme of things for '06 and to the extent
16 we did anything more than that going forward.
17     I believe that I asked John several times
18 what the deal was, and he told me orally. And then I
19 believe that I asked if he had any documentation of
20 this. My recollection is that it was in an e-mail to
21 Joost and Andre about what the salary and benefits
22 were.

Page 226

1    I frankly don't recall it being in
2 memorandum form unless this was an attachment to an
3 e-mail, but I -- my recollection is that it was an
4 e-mail that John printed and gave to me.
5    My only focal point was the salary that
6 would be paid -- see, it's a split year. So John was
7 making, I think, 350, up until March -- I'm sorry,
8 through March, and then we had a -- we had to prorate
9 the 350 until March 31. Is there a March 31? And
10 then we would take the 150 and use it June -- March,
11 April -- April throughout the end of the year.
12    That was the only request that I had at the
13 time, and actually, I think I asked for that
14 information much later than September 19th, 2005. It
15 was toward year end.
16    So my recollection is I did not receive
17 this document around this date. And to the extent I
18 received it, it was subsequent to that when we were
19 doing the budget for the following year.
20    Q  Well, apart from when you received it, are
21 the contents of the document consistent with your
22 recollection of the -- what you --

Page 227

1    A  This was not a document that was given to
2 me in the ordinary course of events. In other words,
3 nobody handed me this and said here's what John is
4 doing going forward. This was given to me or at least
5 the information in sentence three was given to me so
6 that I could confirm what the budget would be.
7    Q  Okay. And when you received this document
8 in whatever form, when you did in fact receive it, did
9 you raise any questions with anybody concerning the
10 description of John's ongoing role with Buvermo?
11    A  No.
12    Q  Because it states in number three that
13 Mr. Gardner will continue as an employee of Buvermo
14 Properties for a period of three years after
15 March 31st of 2006, right?
16    A  Yes, it does.
17    Q  And your testimony is you didn't question
18 that, didn't raise any concerns about that?
19    A  I asked Laura I believe about the
20 employment status, and she told me -- and it might
21 have been Kara -- but I was told that John wanted to
22 remain an employee so he could continue with his

Page 228

1 health insurance.
2    And not that there's anything to the
3 contrary, but I was told that there was a -- either an
4 offer or a suggestion that he would become an
5 independent contractor advisor, which is what Chris
6 Zachariasse, as I understand it, was. And therefore,
7 John would assume the identical role both in terms of
8 his role in the company and his status in the company.
9    And, you know, it didn't bother me that he
10 wanted to maintain an employee status for the purposes
11 of the benefits. I know how hard it is to get health
12 insurance as an individual. So, you know, I'm
13 empathetic toward that.
14    And to the extent that he was an employee
15 for his 401(k) and his employee benefits, that didn't
16 present to me an issue that he was going to be an
17 active employee as he was, you know, prior to my
18 arrival.
19    Q  Did the money he was -- the continuing
20 salary he was going to receive for three years, did
21 that bother you?
22    A  No. It's -- it was something that

Page 229

1 apparently he negotiated with Joost and Andre, and
2 it's not something that I could -- I mean, it wasn't
3 contentious. I figured that's what they agreed upon.
4 He had been there for 20 years, and, you know, that's
5 what they worked out.
6    Q  Now, my understanding, Mr. Morris, is that
7 when you accepted the position with Buvermo, you asked
8 to work as a consultant as opposed to an employee of
9 the company; is that right?
10    A  That is patently false.
11    Q  Okay. Well, you did form an LLC, Buvermo
12 Properties Florida, LLC, right?
13    A  I formed that LLC toward the year end '05,
14 I think.
15    Q  It looks like you filed your articles of
16 organization November 9th of '05.
17    A  That's pretty much toward year end.
18    Q  All right. What was the purpose of forming
19 that LLC?
20    A  Well, I made several efforts to be paid as
21 a Florida resident, which I was and currently am. I
22 worked with Kara and the accounting firm of Beers &

Page 230

1 Cutler, and the partner in charge of the account
2 modified the payroll system to allow me to be paid
3 pursuant to whatever the reciprocal arrangements are
4 with Virginia, because the company -- the payors of
5 Virginia domiciled the company.
6     And the system apparently could not --
7 whatever the payroll system was could not mechanically
8 get it together to make a payment to me without
9 withholding Virginia taxes.
10 Q   Okay.
11 A   And I spoke to -- I forgot his name, but I
12 spoke to the partner in charge at Beers & Cutler
13 several times and said what do you suggest, because
14 the first set of checks that were cut, which you're
15 welcome to get copies of, were to me as an individual
16 at my Florida address pursuant to the way I filled out
17 my information at the company and joined the company.
18 And please make an effort to get that.
19 Q   Are you talking about the $137,000 check?
20 A   I'm talking about my salary.
21 Q   Okay. I haven't seen -- your counsel
22 hasn't produced any such documents to me, so --

Page 231

1     MR. HADDAD: Well, I imagine your client
2 would have those.
3     THE WITNESS: We don't have them.
4     MR. SMITH: Well, I mean, I haven't seen
5 them. I've seen some checks, but I haven't seen the
6 ones you're talking about. Do you have them?
7     THE WITNESS: They were handed back --
8     MR. HADDAD: Talk to your client. I don't
9 have them, no.
10     THE WITNESS: I gave them back to the
11 company, but they were produced.
12     BY MR. SMITH:
13 Q   All right. How many did you receive?
14 A   I received one set.
15 Q   When you say set --
16 A   I received a regular paycheck, and I may
17 have received like a reimbursement check. I can't
18 remember.
19     But when I got the hard copy checks, it had
20 the flap with the notation of what taxes were
21 withheld, and I fully presumed that it was the
22 Florida, social security, FICA, et cetera, numbers.

Page 232

1     And -- I mean, I remember it like it was
2 yesterday -- I had it sitting next to me in my car.
3 And I drove home and I was at a light and I went over
4 and looked at it, and I believe that it said something
5 on the order of Commonwealth of Virginia withholding,
6 et cetera, et cetera.
7     I literally called the accounting firm who
8 I had been trying to work this out with -- and this
9 guy is the partner in charge of the account -- and I
10 said look, I just got these checks from Kara. I was
11 going to deposit them, but it's not consistent with my
12 address or my residence.
13     And he said well, we've got a problem with
14 the payroll system. They only recognize Virginia even
15 when you plug in another state in there.
16     And I said all right, well, look, as much
17 as I don't want to have this withheld and then file
18 for reimbursement, I will do that if that's what I
19 must do.
20     And he said all right. Well, don't cash
21 them yet. Look into what you got to do. If that
22 doesn't work, we'll come up with an alternative.

Page 233

1     I called Steve O'Connor, and I said look,
2 do you have any suggestions to resolve --
3     MR. HADDAD: I'm just going to caution you
4 not to disclose any comments that you had with
5 counsel, any discussions you had with counsel.
6     THE WITNESS: I tried to resolve it, and I
7 was advised that it's very possible that the
8 withholding for the State of Virginia would not be
9 reimbursable because Virginia apparently doesn't have
10 reciprocity with Florida. And it was a significant
11 amount of withholding.
12     Now, I don't have any relationship with the
13 State of Virginia. I never have. And the amount of
14 money was compelling. So I said this isn't going to
15 work.
16     So I went into the office the next day, I
17 sat down with Kara, we called the accountant and we
18 said look, you know, how do we resolve this. And the
19 thought was that we pay you as an LLC member and we
20 can give you the amount of money that you're due
21 divided by the pay periods and then give you that
22 amount of money.

Page 234

1    And then with respect to the health
2 insurance, which you didn't ask about, I spent a year
3 getting health insurance on my own from BlueCross
4 BlueShield. And with my health conditions, it took a
5 while. So once I got that, I appreciated the policy
6 that I got. It took a lot of work. So I did not want
7 to begin that process again, even though it was a
8 group sponsor. I think it was the same insurance
9 company. I don't know.
10    So I told Kara look, I got my own policy.
11 I'll give you copies of what I pay. If you could just
12 gross it up or pay half or something, I'd be happy.
13 So Kara said, Jonathan, for me to cut you a check, you
14 need to give me an invoice, okay, just for backup.
15    And I said all right. I'll write you an
16 invoice. I'll give you something for you to keep in
17 your file.
18    Marc, the check that I received, 137,500,
19 is made out to Jonathan Morris, but it's not made out
20 to the LLC.
21    BY MR. SMITH:
22    Q  The first one?

Page 235

1    A  The first one, yes. I guess the second one
2 was. It took so long to get from June 29th to the
3 date I got that check that that is the salary that had
4 accrued. Okay?
5    I'm going to tell you in no uncertain terms
6 that I was hired as the president and CEO of this
7 company, and I was paid in a manner that was discussed
8 openly, that was agreed upon openly, and that was
9 something that was brought to my attention by a third
10 party being the accountant. It was not of my -- I
11 didn't create this on my own. I didn't structure this
12 because I thought it would be a good thing to do. I
13 took advice to do this.
14    So I will also tell you that to read in
15 documents that were signed that I was hired as a
16 consultant is, once again, something that, in my
17 opinion, is completely unconscionable. And regardless
18 of what I feel emotionally about this, factually,
19 everyone knew that I was the president and CEO of the
20 company.
21    I went out on the street. I met with
22 people. I took Joost Tjaden, John Gardner and myself

Page 236

1 to a series of meetings for three days in a row so I
2 could introduce Joost to new people to prospectively
3 do deals with, and I handed them my business card as
4 president and CEO. For three days running, we must
5 have had 15 meetings.
6    So there is no shred of anything that
7 indicates that I was hired as a consultant.
8    Q  I'm not suggesting you were hired as a
9 consultant. I'm suggesting that when you came aboard,
10 a decision was made to transition your status to a
11 consultant.
12    A  Well, that's untrue.
13    Q  So just so I understand your testimony, the
14 reason why you were paid through your LLC had to do
15 with the fact that the company was not equipped to
16 issue you a standard paycheck because the standard
17 check would reflect Virginia state withholdings?
18    A  And it did.
19    Q  Right. And there was no way to plug in
20 your state of residence, Florida, because Florida
21 doesn't have a state income tax, right?
22    A  But it's more than that. I would have been

Page 237

1 happy to have had the Virginia taxes withheld if I
2 could have been reimbursed, but they won't do that
3 with Florida. So it's a reciprocity issue.
4    And I will find the partner's name at Beers
5 & Cutler or you can get it from your client. But he
6 was involved as well. This was an above-board
7 discussion.
8    Q  I'm not suggesting it was anything else.
9    A  Well, it's been suggested in documents that
10 it was.
11    Q  I don't think so, but you can characterize
12 it as you will. I'm just trying to discover why it
13 was done.
14    A  Okay. I read the interrogatory responses
15 from your client and it was signed and I was converted
16 or became or was hired as a consultant, and it's
17 just -- it's so beyond the pale to me that I just --
18    Q  Okay. Buvermo Properties Florida, LLC was
19 formed for the purpose of invoicing Buvermo for
20 your -- basically your salary, right?
21    A  It was formed for that purpose, correct.
22    Q  And why was Steve O'Connor made a member?

Jonathan Morris
Case 1:06-cv-01131-HHK
Multi-Page™
Document 32-11
Filed 02/07/2007
Morris v. Buvermo
Page 61 of 85 2/06

Page 238

```
 1   A  I wanted him to be.  I asked him.
 2   Q  Were you carrying on any other business
 3 through Buvermo?
 4   A  No.
 5   Q  Have you carried on any business?
 6   A  No.  I've just -- it's been a bank account.
 7 I deposited my paycheck.  I bought gas.
 8   Q  Did you pay Mr. O'Connor for his -- I saw
 9 some notation he received, it looked like, a 1 percent
10 interest.
11   A  He's entitled to that.  He's never received
12 that.
13   Q  So you haven't paid him anything?
14   A  No.
15   Q  While you were working for Buvermo, were
16 you living in the District?
17   A  I was in living in Florida for the majority
18 of '05, and I had an apartment in Washington.
19   Q  Well, I know your residence was -- legal
20 residence was Florida.  Where were you residing during
21 the workweek?
22   A  I'd be in Washington.  I went to Florida as
```

Page 239

```
 1 many weekends and holidays as I could.
 2   Q  And what about in '06 up through the date
 3 of your termination in March?
 4   A  I spent as much time, non-work time, in
 5 Florida as I could.
 6   Q  But you spent the workweek in the District?
 7   A  Yeah.
 8   Q  And were you paid all of your salary
 9 through the date of your termination?
10   A  Was I paid all of my salary through the
11 date of termination.
12      Well, let me see.  There's two parts to
13 that question.  I did receive a check from Buvermo
14 subsequent to my termination, and I can't recall the
15 date.
16   Q  Well, I can show you.  I want to shortcut
17 some of this.
18      My documents reflect that you received --
19 well, you were issued a check dated December 14th of
20 2005 in the amount of 137,500, which is made out to
21 you personally.
22      Did you receive that check?
```

Page 240

```
 1   A  Yes.
 2   Q  All right.  And that is an amount, I guess,
 3 which you were due from the start of your employment
 4 in June of '05 all the way through December?
 5   A  Yes.
 6   Q  And that would be at the rate of $275,000
 7 annually?
 8   A  Well, no.  It's at the rate of 250, plus
 9 Kara grossed up the --
10   Q  That's what I mean.  It reflects the
11 gross-up?
12   A  Reflects the base plus the benefits.
13   Q  If you annualize the 275 --
14   A  Yeah.  And again, I want to be clear.  I
15 didn't make the calculation, okay?  I gave Kara what
16 my out-of-pockets were for the benefits that were
17 supposed to be subsumed by Buvermo, and she made the
18 calculation.
19   Q  Okay.  Did you disagree with the amount of
20 money that you received?  Did you feel it was a
21 miscalculation?
22   A  I personally didn't analyze it.
```

Page 241

```
 1   Q  All right.  And my records indicate that
 2 another check was issued to you on March 31st of '06
 3 in the amount of $68,750.
 4      Did you receive that check?
 5   A  I did.
 6   Q  And that check was made out to Buvermo
 7 Properties Florida, LLC; is that right?
 8   A  Conveniently, it was.
 9   Q  And when you say conveniently --
10   A  I don't know why one's made out to me and
11 one's made out to the entity.
12   Q  Made out to the what?
13      MR. HADDAD:  Sorry.  Go ahead.  When you're
14 done, I just have -- I'm willing to stipulate that
15 we're not making a claim for --
16      MR. SMITH:  Unpaid wages?
17      MR. HADDAD:  -- unpaid wages.
18      MR. SMITH:  Okay.
19      MR. HADDAD:  I mean, you know, we are for
20 future wages or for wages since that he's accrued, but
21 not under any Unpaid Wage Claim Act or anything of
22 that sort.
```

Page 242

1    MR. SMITH: Okay. So you're willing to
2  stipulate that Mr. Morris received all of the money he
3  earned through the date of his termination?
4    MR. HADDAD: Salary.
5    THE WITNESS: I got the gross-up too. I
6  got the benefit reimbursement.
7    MR. HADDAD: Right. But we're not making a
8  claim -- in other words, we're not making a claim for
9  salary between the date of your hire and the date of
10  your termination. We believe that you were paid all
11  of your salary for that time.
12    THE WITNESS: Yes.
13    MR. SMITH: Okay. That helps.
14    BY MR. SMITH:
15    Q   Mr. Morris, your counsel during the
16  discovery period requested all of the information,
17  documents that were resident on your hard drive of the
18  computer you used at work which we had, I guess,
19  downloaded and printed out and produced to you during
20  the discovery process.
21      I found it -- I'm not going to mark them as
22  exhibits in the deposition, but I found, you know, a

Page 243

1  fairly significant amount of correspondence,
2  agreements, personal letters to your fiancee. There
3  was a fairly significant amount of that type of
4  information on the computer, and my question is: Were
5  you preparing those documents while you were working
6  at the company during business hours?
7    A   If you're saying I sent personal e-mails
8  during the day --
9    Q   No. I'm saying that there were lengthy
10  documents on your computer system at work. There were
11  personal letters to your fiancee. There were
12  documents dealing with your residence at Ritz Carlton
13  in terms of your unhappiness with the construction,
14  documents about the furniture at your residence,
15  documents about your properties in Florida.
16      All of that information, was it prepared
17  during business hours at Buvermo?
18    A   I suppose.
19    Q   And do you think it's appropriate to engage
20  in personal business while you're being paid by a
21  company?
22    A   I think there's a balance, and I think that

Page 244

1  when you hire somebody to be the chief executive
2  officer of a company, you should allow the CEO to
3  balance what he's supposed to get done for the company
4  with what he decides to do.
5      I've never had anybody complain to me
6  before that I abused the privilege of using the
7  computer. If I had a fear that I would be criticized
8  for using my computer for personal business, I would
9  have never done it.
10      I mean, I certainly didn't achieve the
11  level of success or elevation that I have because I
12  spent all day long on the computer not doing my job.
13  And to the extent anyone is upset that I did anything
14  at work versus just doing work, I could apologize.
15  But, you know, I do have a life and that life doesn't
16  stop at 9:00 in the morning and pick up at 6:00 at
17  night.
18      So, you know, this goes back to the shame
19  on me for not being ultrasensitive to things that may
20  be construed as something other than I consider to be,
21  you know, a natural day.
22    Q   All right. You testified before that you

Page 245

1  began experiencing problems in terms of your
2  relationship with Mr. Gardner very quickly after you
3  assumed your position at Buvermo; is that fair?
4    A   Yes, it is.
5    Q   A fair statement?
6    A   Yes.
7    Q   And what sort of problems are we talking
8  about?
9    A   Well, there's many problems that we're
10  talking about, and a lot of this information is in
11  e-mails, if you had the opportunity to read them, that
12  I sent to people, in particular to the headhunters,
13  Marsha Pearcy and Tony LoPinto.
14      I felt that John was not a person who was
15  welcoming a new senior executive. He was somebody who
16  resisted any change. He constantly on his own went
17  out to solicit new transactions.
18      I heard from people in the real estate
19  community that John had been at this company or the
20  other company on his own and, Jonathan, are you really
21  the president and CEO of the company. It was actually
22  a little embarrassing. You tell somebody you've taken

---

Page 246

1 over a job, that you're representing the company, and
2 the previous CEO is out doing what he's been doing.
3     He pursued a transaction downtown, and I
4 was working very hard on that. I had brought
5 Guggenheim Partners in, I had brought Cigna in to make
6 the loan, and I heard from people in Washington that
7 John Gardner was downtown meeting with them separately
8 to determine rental rates -- prospective rental rates
9 for the building which were not only in the sales
10 package that we got from the broker, but they were
11 being vetted by myself and Guggenheim also, which is
12 part of the process.
13     And it was, you know, just shocking to me
14 that John was out there on his own doing what he was
15 doing without either telling me or suggesting that
16 he's coming up with different information or
17 additional information. And this was a very large
18 deal for us. It was $52 million dollars.
19     And what ended up happening was, in my
20 mind, Guggenheim perceived that there was a riff
21 within Buvermo, that there was a tension between
22 John's view of the building and my view of the

---

Page 247

1 building. Notwithstanding the fact that the lender,
2 Cigna, who I brought on board, was -- had done their
3 underwriting, and they were prepared to make the loan.
4 And they pushed very hard for us to do the deal so
5 they could make the loan because they felt pretty
6 confident about the building.
7     Guggenheim, who I had done business with
8 previously in a large deal before, they were prepared
9 to put up over $20 million of equity. They were very
10 sensitive to what they perceived as office politics,
11 and I had a history with them for several years. They
12 relied upon me, but they perceived an issue internally
13 at Buvermo.
14   Q   Were you told that or is that something you
15 just perceived on your own?
16   A   No. I think that a statement was made by
17 the financial analyst in North Carolina when we were
18 going over all the rental rates on a speakerphone when
19 John would chime in with different numbers. And the
20 statement was along the lines of you guys don't seem
21 to be consistent in what you think you can get for
22 rental rates, and we have board meeting coming up,

---

Page 248

1 dah, dah, dah, dah, dah, and, you know, we really need
2 this information to be tight.
3     And I was caught off guard. I was just
4 caught off guard. I didn't need anyone generating any
5 additional information even it was positive, because
6 you have one chance to solidify your position with the
7 lender and the equity partner.
8     And as the president and CEO of the
9 company, I felt comfortable that I was the spokesman
10 for the analysis and the underwriting and all of the
11 bits and pieces of the deal and I was the quarterback
12 to bring in the lender, the equity partner and our
13 money.
14     I had a relationship with the broker. It's
15 a very competitive business downtown. It's hard to
16 buy these buildings, and we were number one on the
17 list of the brokers trying to make sure that we got
18 the deal, and it really fell apart.
19   Q   And was the long and short of this that
20 John didn't assess the opportunity the same way you
21 did? He wasn't as supportive of the transaction?
22   A   I think that's a nice way to put it.

---

Page 249

1   Q   All right. And didn't you at the time --
2 what time frame did this occur in?
3   A   Very quickly. It might have been first or
4 second week of July that we looked at the deal.
5   Q   All right. And when you say you looked at
6 the deal, the deal was initiated in your mind,
7 correct?
8   A   Yes. It evolved.
9   Q   Had you reached that threshold?
10   A   Yes, we had.
11   Q   You hadn't taken it yet to the Fidelio
12 partners, rights?
13   A   We discussed it with them.
14   Q   Right. But no recommendation had been
15 made?
16   A   No. We recommended we buy the deal.
17   Q   Oh, you had already recommended in
18 writing that you --
19   A   I don't know if it was in writing, but we
20 had had a conference call with them.
21   Q   We --
22   A   John and I had a conference call.

---

---

Page 250

1 Q And did anyone tell you why the deal fell
2 apart?
3 A The Guggenheim guys just said that there
4 seems to be inconsistencies with you guys and that's a
5 concern.
6 Q But did they tell you that was why it fell
7 apart?
8 A They're way too, you know -- they're way
9 too nice to say that.
10 Q Did anyone ever tell you why specifically
11 it fell apart?
12 A The brokers told me point-blank that I'll
13 never do a deal if it's not from JBG while John is
14 still there.
15 Q The brokers on the deal you're talking
16 about?
17 A The were the top guys in town.
18 Q Who are they?
19 A Jim Luck and Warren Dahlstrom. I mean,
20 they just said you're never going to get a deal done
21 with John there unless it comes from JBG.
22 Q You say in your complaint that you filed in

---

Page 251

1 this case -- and I'm quoting paragraph 24, but I can
2 pull it out if you want to -- you make an allegation
3 that Mr. Gardner, and I'm quoting, continually
4 interfered with the progress of many deals you were
5 pursuing.
6 Do you recall that allegation in your
7 complaint?
8 A I do.
9 Q All right. Apart from this transaction you
10 just described, how did Mr. Gardner interfere with the
11 progress of other deals? And if you could, identify
12 the deals for me so I know what you're talking about.
13 A I'm trying to recall. I looked at several
14 deals after this 1660 L Street fiasco. And on a
15 general basis, not being deal-specific, the activities
16 that John undertook were to go out and look at
17 transactions on his own without me being present or
18 knowing about them.
19 Q But wouldn't that ultimately -- and I'm
20 going to go back to my question, but wouldn't that
21 ultimately benefit you if John -- you know, John's
22 been doing this for 20 years at Buvermo fairly

---

Page 252

1 successfully, right? If he found something good, if
2 he found a good deal, wouldn't that benefit you?
3 A You know, maybe, but that's not the job I
4 took.
5 Q So you had -- you just had a basic
6 objection to John continuing to participate at the
7 level he was participating in?
8 A I had a basic objection to the fact that
9 the job that I was promised and the job that I
10 accepted was not the job that I had.
11 And if I had known that I was going to have
12 a person out there looking for deals beyond my scope,
13 there's a pretty good chance I wouldn't have taken the
14 job. The reason I wanted the smaller platform was so
15 that, for better or for worse, I had control over what
16 direction we were taking.
17 John was meeting with partners of the
18 company that were buying very small office buildings
19 and cutting them up into condominiums and selling the
20 pieces of the office building off, and I personally
21 thought that was ludicrous. You know, that wasn't
22 consistent with the notion of either buying an office

---

Page 253

1 building with an institutional investor or getting
2 involved in a development deal with a company like JBG
3 who shoulders a lot of the day-to-day work. And the
4 concept of buying a 50,000 square foot office building
5 and chopping it up into a thousand or 2500 square foot
6 suites to sell to a title company or, you know, a real
7 estate company was as far off the mark as I could
8 think.
9 So my concern was that the voice of the
10 company was not just my own, but it was John's, and it
11 was inconsistent with what I believed not only the
12 history of the company had been but what was the
13 result of all these hours of conversations about where
14 we should be going with the company.
15 Q All right. And back to my question. What
16 specific deals beyond the -- and I didn't get the
17 address of the building that you were talking about.
18 A 1660 L Street.
19 Q Beyond that deal, what specific deals did
20 Mr. Gardner interfere with?
21 A I don't recall right this second.
22 Q Now, you had indicated that you were

---

Page 254

1 corresponding with Marsha Pearcy and Mr. LoPinto
2 concerning your dissatisfaction with your work
3 situation. You've alluded to that in your testimony,
4 right?
5    A   Yes.
6    Q   What specifically were you -- you were
7 corresponding via e-mail. What were you saying?
8    A   I was saying that this is an uncomfortable
9 situation, that I do not believe John's words matched
10 anything. That he has an objective, that he has told
11 the Dutch guys that Jonathan was an acceptable
12 candidate, he's going to do a great job, yet I do not
13 believe that he wanted me to be there.
14       I think that the concept of changing a
15 day-to-day rhythm after 20 years as the president and
16 CEO of the company was just not something that could
17 be achieved. I didn't feel like there was any
18 gracious effort to have me there. There was, again,
19 no office, no desk, no cards, no phone, nothing.
20       I went in there and had to figure out a way
21 to make an office. I had to meet with the
22 construction group of the building owner to find a way

Page 255

1 to reconfigure some things and move some file cabinets
2 and move the fax machine from the office that I was
3 using that John eventually took into the kitchen.
4 This took several months.
5       This was not a place that after 20 years
6 gets a brand new CEO after who knows how long of
7 interviewing different people, making offers that are
8 declined, and the new guy finally shows up and with a
9 certain amount of optimism and positive nature.
10       If I were the previous CEO, I would have
11 made sure that there was an office. I would have made
12 sure that there was a desk and a chair and a phone
13 number that was assigned to him, and I would have made
14 sure that he even got a set of business cards day one
15 with that phone number associated with it.
16       Now, maybe everybody won't do what I will
17 do, but I don't think it's fair for a president and
18 CEO to interview for several months and end up with a
19 copy room to sit in and have to work to get furniture
20 and the office arranged. I mean, I seriously
21 considered just leaving for a couple of weeks and
22 asking them to get the work done.

Page 256

1    Q   And --
2    A   This was all conveyed to Marsha.
3    Q   Right.
4    A   And you can read the e-mail.
5    Q   Yeah. I mean, I've got them and I'm going
6 to ask you to identify them for the record.
7       Just in concept, did you feel that it was
8 appropriate to be communicating to Ms. Pearcy about
9 company business and what was going on at the company?
10   A   Given the history of the evolution of the
11 search process, I thought she was the only person I
12 could talk to.
13   Q   Well, you understood that Mr. Gardner also
14 had a long-term, long-standing relationship with both
15 Ms. Pearcy and Mr. LoPinto, right?
16   A   No. I had no idea about that.
17   Q   You didn't know?
18   A   No.
19   Q   With either one of them?
20   A   No idea.
21   Q   Did you think that your communications
22 about Mr. Gardner were damaging to his reputation at

Page 257

1 all?
2    A   Absolutely not. It was all relative to the
3 situation at hand. It had nothing to do with anything
4 other than my employment or coming onboard.
5    Q   Well, you were painting a rather
6 unflattering picture of Mr. Gardner, wouldn't you say?
7    A   It was in the context of me joining the
8 company. It had nothing to do with anything other
9 than that.
10       (Thereupon, the documents were marked as
11       Morris Deposition Exhibit Nos. 9 through 12
12       for identification.)
13 BY MR. SMITH:
14   Q   Mr. Morris, let me have you look at the
15 exhibits I've marked 9 through 12.
16       Are these at least some of the e-mails that
17 you sent to Mr. LoPinto, it looks like is the first
18 one, and then Ms. Pearcy, and then the last one is to
19 Steve Garchik?
20   A   Well, let's see. This is to Tony. This is
21 from Tony.
22   Q   I'm sorry. I have one more. I misspoke.

Page 258

1 There's one more to Mr. Garchik.

2     (Thereupon, the document was marked as

3     Morris Deposition Exhibit No. 13 for

4     identification.)

5     BY MR. SMITH:

6   Q   Number 13 would be the e-mail to

7 Mr. Garchik.

8   A   Okay.

9   Q   Are these some of the e-mails that you've

10 referred to during the course of your deposition,

11 describing the problems you're experiencing with

12 Mr. Gardner?

13   A   These are some of them.  I don't think

14 these are by any stretch of the imagination all of

15 them.

16     I mean, I'm not a lawyer.  My concern is

17 that there's e-mails that I recall sending about other

18 matters that never showed up in any documents.  And

19 I'm just a little bit curious where all these other

20 e-mails are.

21     For example, I spent a considerable amount

22 of time e-mailing the Dutch guys and their assistants

Page 259

1 to set up this board meeting in March from my computer

2 that have not shown up anywhere.  I mean, I thought

3 that we were getting all e-mail transmissions from all

4 the computers.  So --

5     MR. HADDAD:  Why don't we just address

6 that.

7     THE WITNESS:  Well, I mean, you know, he

8 can ask me a question about whether these are e-mails,

9 and I will respond.  But I don't want to be asked a

10 question if these are all of the e-mails that I sent

11 with respect to the issues I had with John because

12 they're not.

13     BY MR. SMITH:

14   Q   I don't think I suggested that that was the

15 entire body.

16   A   Okay.

17   Q   And if not, hey, I want you to describe

18 every one that you can recall in which you said

19 something negative about Mr. Gardner.  I'm going to

20 give you the opportunity to say as much as you want to

21 about that.

22     So my question first is the documents that

Page 260

1 have been marked Exhibits 9 through 13, are these some

2 of the e-mails that were sent out concerning the

3 problems with Mr. Gardner?

4   A   I don't have anything against John Gardner

5 personally.

6   Q   That's not my question.

7   A   Okay.  I just want you to know that.  I

8 took a job that was interfered with by an adult, and I

9 had a problem with that.  How I tried to resolve it

10 was cordially and as a team player.  It never got

11 there.

12     I wanted this to work.  I could have just

13 walked out the door after two weeks.  I mean, the fact

14 that I reached out and complained I don't think is a

15 negative thing.  I could have just quit.

16   Q   My question --

17   A   I'll answer your question.  This is an

18 e-mail from Tony LoPinto to Jonathan Morris.  It says

19 nothing about Tony LoPinto --

20   Q   You're talking about Exhibit Number 9.  I'm

21 looking -- focusing on the second page.  This is an

22 e-mail chain.

Page 261

1   A   Let's see.  So you want me to answer a

2 question about this?

3   Q   Yeah.  It looks like the last substantive

4 paragraph is the paragraph at issue.

5   A   So you want me to describe it to you?

6   Q   No.  I'm just -- all my question was are

7 these some of the e-mails that you sent out in which

8 you described problems with John?  That's my only

9 question.

10   A   I had a problem with John's lack of

11 adherence, in my opinion, to the way the office was

12 going to be operated with respect to my presence.

13     You said problems with John.  I don't have

14 any problems with John.

15   Q   Okay.  Well, I'm not trying to be

16 deceptive.  When I say problems with John, I'm not

17 saying you had a problem with John on a personal

18 level.  I'm concerned with problems you had with John

19 at the offices of Buvermo in your capacity as --

20   A   The answer to that question is yes.

21   Q   And Exhibit Number 10, that's another

22 example?

Page 262

1  A  Yes, it is, with a retort by Marsha Pearcy.

2  Q  Where is the retort by Marsha Pearcy?

3  A  From Marsha Pearcy to Jonathan Morris.

4  Q  Well, that one precedes the -- the e-mail
5 on top is what I'm talking about.

6  A  Oh. Let me see. So 9:38, I wrote her to
7 asked her to call me. 9:47, she e-mails saying what
8 she said, and then 11:23, I e-mail back.

9  Q  And that's the e-mail I'm concerned about,
10 where you talk about Mr. Gardner.

11  A  Okay.

12  Q  And the only question really is is this
13 just an example -- one of the examples describing the
14 problems you were having with John at the office?

15  A  Yes, it is.

16  Q  And Exhibit Number 11, this is an e-mail
17 from you to Ms. Pearcy dated September 27th.

18      Again, this is an example of a
19 communication describing problems with Mr. Gardner at
20 the office, correct?

21  A  Yes.

22      MR. HADDAD: Just for the record, it's --

Page 263

1 only one of two pages is present or is in front of us.
2 There's a second page to this.

3      BY MR. SMITH:

4  Q  When you make the statement in the first
5 paragraph, it says clearly we need to agree and
6 collaborate on getting deals done, what did you mean
7 by that when you say we need to?

8  A  I mean, I think this just tracks what the
9 concept was.

10  Q  In the offer letter?

11  A  Yeah. I'm not fighting the notion that we
12 discuss the deal together and go to the Dutch
13 together.

14  Q  All right. And Exhibit Number 12 is
15 another e-mail that you authored dated October 5th of
16 '05 to Ms. Pearcy.

17      Again, in the second paragraph, you're
18 describing ongoing problems with Mr. Gardner at the
19 office, correct?

20  A  Which I had, were real, and I did describe
21 them to Marsha.

22  Q  What is -- what did you mean by -- you use

Page 264

1 the term in quotations, hondles. What is that?

2  A  Negotiates strongly in his own favor.

3  Q  That's what hondles means?

4  A  That's what it means to me.

5  Q  Is that English or --

6  A  It's a slang word.

7  Q  And again, did you feel it was appropriate
8 to be revealing Mr. Gardner's compensation that he was
9 receiving to Ms. Pearcy?

10  A  She knew what he was getting. She told me
11 he had a compensation plan, and as far as I was
12 concerned, she was aware of it.

13  Q  Was she aware of his compensation plan
14 going forward after 2005?

15  A  I'm not sure.

16  Q  But you reveal it in this letter, don't
17 you?

18  A  I was indicating that he was being
19 compensated fairly as an advisor and that it was, in
20 my mind, appropriate that he allow me to be the
21 president and CEO.

22      And as it relates to compensation, there

Page 265

1 should be no reason why there should be anything held
2 against me for taking any compensation away from him.

3  Q  Well, the question is you're revealing what
4 his compensation is going forward after 2005, correct?

5  A  I'm revealing what I presumed it to be.

6  Q  And that's not information that she was
7 privy to, was it?

8  A  I'm not sure about that.

9  Q  Well, her relationship with Buvermo, as far
10 as you knew, concluded with your placement at Buvermo,
11 right?

12  A  Well, first of all, you told me they had a
13 long-term relationship, and I presume that the
14 headhunters knew what the deal was both with respect
15 to the person who is going to step aside and the
16 person who is coming in.

17  Q  Exhibit Number 13 is a string of e-mails,
18 it looks like, to and from Steve Garchik and you. And
19 Mr. Garchik, he is with SJM Partners?

20  A  Yes.

21  Q  And is that the partner on the Spotswood
22 project?

Page 266

1  A  Yes, it is.
2  Q  All right.  And do you know whether
3 Mr. Gardner had a long-standing relationship with
4 Mr. Garchik?
5  A  Well, I believe I know the relationship
6 between Steve Garchik and John Gardner.
7  Q  All right.  And they've had a relationship
8 for some time, correct?
9  A  Well, I'm not sure about that.  I mean,
10 I've known Steve for a long time, and he's one of the
11 people that I went to to try to do business with.  And
12 he had done two deals with Buvermo in the past, and he
13 told me that he brought several other deals subsequent
14 to that, to Buvermo, which were declined.
15  Q  Okay.  So by virtue of his doing business
16 with Buvermo in the past, he must have known and been
17 familiar with John, had some sort of relationship with
18 him?
19  A  If you'd like me to continue, I will.  If
20 you don't want me to, I won't.
21  Q  I just want you to answer the question.
22 You can do that in any way you want to.

Page 267

1  A  Well, then I will.
2     I asked Steve if there was a chance that we
3 could work together, and he was reluctant to pursue
4 anything with Buvermo given the fact that he had made
5 the effort on several occasions subsequent to two
6 deals, not only having an investment close with them
7 but actually selling and creating a fairly nice return
8 for everyone.  And he was frustrated that I was asking
9 to participate with him when he had been turned down
10 many times by John and he had other sources of equity.
11     He was concerned that the deal would go to
12 Buvermo, John would analyze it -- not me -- John would
13 analyze it and decline it when he could have spent
14 that time working with another equity group.  And I
15 frankly went out on a limb and I asked him if he could
16 show us something, that I would, you know, make every
17 effort to work together with John, but I was handed
18 the opportunity to bring deals, you know, into the
19 company, that I would, without question, like to have
20 an opportunity to do that.
21
22

Page 268

1     EVENING SESSION     (5:00 p.m.)
2     BY MR. SMITH:
3  Q  All right.  Now, you are giving information
4 to Mr. Garchik concerning your -- the problems you're
5 experiencing with Mr. Gardner in the office, correct?
6  A  Steve Garchik is a personal friend.  He's
7 not just a business relationship.  I mean, I talk to
8 him as a buddy, and he gives me advice as a buddy.
9  Q  Well, this discussion was taking place
10 during -- in the context of a business discussion,
11 wasn't it, I mean, if you read the entire e-mail?
12  A  Well, we were trying to finish up the
13 basics of a deal, a component of which was a tour of
14 the shopping center.  And it just so happened that
15 while I'm trying to finish up a joint venture
16 agreement, which I was spending an enormous amount of
17 time on, I was at the same time enormously frustrated
18 by what I thought was just a -- a situation that was
19 just very difficult for me personally.
20     So I don't know how to answer your
21 question.  I know that we were working on trying to
22 get something done.  I was frustrated.

Page 269

1  Q  And you were venting a little bit?
2  A  Yes, I was.
3  Q  And as you sit here today, do you think it
4 was appropriate to communicate, to give this
5 information to Mr. Garchik during this deal?
6  A  You know, I think that if you look at
7 everything you've done in your life and you decide
8 that some things were probably something that you
9 shouldn't have done, I -- I don't disagree with you.
10 I just think that, you know, at some level, your
11 emotions take over and you're frustrated.
12     I don't think it affected the way I pursued
13 the deal.  I think that I did, you know, not only a
14 good deal but a great deal for the company.  I got a
15 great structure for the organization.
16     I took the company off of any potential
17 liability from -- there were two lenders.  I, you
18 know, really pushed hard on Steve to reduce his
19 participation, even though he brought the deal, and I
20 did it in a cordial manner.
21     So I balance the fact that I really got a
22 good deal not only in terms of the asset but the

Page 270

1 structure, and if it comes with some aggravation and
2 some venting, then I'm human.
3      You know, if everything was perfect in all
4 of these e-mails, we wouldn't be having this
5 conversation. But if everything was perfect in all
6 these documents the way I see them, we wouldn't be
7 sitting here today.
8      So, you know, do I wish that I hadn't
9 written this in an e-mail during the day, sure. You
10 know, I could have saved it for 7:00 at night when --
11 by the way, I went over to his house either that night
12 or the next to try to sit down with him and finish
13 these issues. So, yes, I could have said it then.
14    Q   And did you further expound on your
15 frustration with Mr. Garchik?
16    A   No. This is actually the last time I
17 talked to him about it.
18    Q   And with respect to the Spotswood deal that
19 you were in negotiations with Mr. Garchik about, was
20 that a transaction that you brought to Mr. Gardner and
21 discussed with him?
22    A   Absolutely.

Page 271

1    Q   And Mr. Gardner ultimately agreed that it
2 was, you know, a good investment and recommended it to
3 the partners?
4    A   Yes.
5    Q   Now, you said that Exhibits 9 through 13
6 are not all of the e-mails that contain your
7 frustrations with Mr. Gardner and the workplace, and
8 I'm not suggesting they are. But could you tell me
9 what others you recall that you sent and to whom?
10    A   No. I said that I recall other e-mails
11 that I sent.
12      In particular, in March, either late
13 February or March, I spent a lot of time trying to
14 coordinate the structure of this board meeting that we
15 had. And I know for a fact that I sent Andre's
16 secretary, Joost's secretary, Joost, Andre, e-mails
17 about dates and times. I had sent the Four Seasons an
18 e-mail about getting the room, et cetera.
19      And the only question I had, which I'll
20 rely on counsel to figure out, is are these e-mails
21 prescreened and preselected by you guys to give to us,
22 or are these all the e-mails that we get?

Page 272

1    Q   We'll take that up certainly after the
2 deposition, if you want to. I could answer the
3 question very briefly, and that is a lot of the
4 documents, the e-mails, came from Equinox -- they
5 preserve their e-mails, apparently -- and not from us.
6 So the ones that aren't Bates stamped on the bottom,
7 those didn't come from us.
8    A   Well, how could this e-mail to Steve
9 Garchik come from Equinox?
10    Q   It didn't. That has a Bates stamp on it.
11      MR. HADDAD: Jonathan, let the attorneys
12 just address that.
13      MR. SMITH: We'll take it up after the
14 deposition, if you want.
15      BY MR. SMITH:
16    Q   Now, did you raise your dissatisfaction
17 with your work situation with either Joost or Andre or
18 both?
19    A   You know, Marc, this was an ugly, public
20 struggle. This was not a quiet, hidden issue, and the
21 pot boiled over on more than one occasion. And the
22 most significant occasion that it boiled over was

Page 273

1 immediately prior to our planned December board
2 meeting, which is the annual meeting of the company.
3      What had happened was John Gardner planned
4 to participate in a conference call regarding an asset
5 in Virginia.
6    Q   Can I try to save us some time here so
7 we're not here --
8    A   Sure.
9    Q   I'm going to show you a document that may
10 cover this in enough detail.
11      (Thereupon, the document was marked as
12      Morris Deposition Exhibit No. 14 for
13      identification.)
14      BY MR. SMITH:
15    Q   Let me show you Exhibit Number 14,
16 Mr. Morris. This is a memorandum that contains your
17 name dated December 9th of '05.
18      Is this a memorandum you prepared?
19    A   Yes, it is.
20    Q   Was this sent to the -- you've addressed it
21 to the Fidelio board of directors. I'm not sure there
22 really is such, but --

Page 274

1    A    I don't think I ever sent this to anybody.
2  I think this was a draft that I made.
3    Q    All right.  And does this document -- if
4  you want to take time to read it -- describe the
5  issues you were about to get into in terms of the
6  thing that occurred right before the board meeting in
7  December?
8    A    This was the genesis of what I had in mind.
9  And if you'll let me explain it, I'll tell you what
10 happened.  Okay?
11        This board meeting that we had in December,
12 we had had one previously in August or September in
13 France.  And at that meeting in Europe, it was
14 recommended that I, Jonathan Morris, now take over the
15 coordination and running of the board meeting in
16 December.
17        Faced with all this frustration, I can tell
18 you that I put this aside and I worked very hard to
19 make the board meeting very cordial, iterative and
20 full of information, and I did a lot of things
21 differently than John had done in the past.
22        I included all of the employees in the

Page 275

1  board meeting.  I actually did role play with them
2  before we had the meeting so everybody understood what
3  their roles were, what they could talk about.  One
4  person talked about the budget, one person talked
5  about something else.  Furthermore, I went out of my
6  way to get large boards of project descriptions from
7  JBG and I placed them around the room.
8        So what ended up happening was we had a
9  couple of days of events, social events, and then we
10 had the board meeting, and it went very, very well.
11 And the Dutch guys, Joost, Andre, and their partners
12 who had come in were very happy with the board
13 meeting.
14        So I thought at that moment that I was
15 making progress, that I was having the opportunity to
16 run the board meeting.  It went very, very well and
17 maybe this was a glimmer of hope that we'll get
18 through this aggravation or I will get through this
19 aggravation and we'll get to another day.
20        So I didn't send this document, but we did
21 meet on Saturday the 10th of December.  And instead of
22 bringing up all this aggravation, we sat down, Andre,

Page 276

1  Joost, John and myself, and I said we've got to define
2  the roles because what I was told and what I agreed to
3  in the beginning is not evolving.
4        At that point, Andre van Rhee told John
5  Gardner that he could be in the office one day a week,
6  and that after six months, they would revisit that.
7  Joost seemed to agree.  I went further and said that I
8  want to be the person out looking for deals, not John.
9  I don't want John representing the company at industry
10 events.  I don't want him to carry a Buvermo business
11 card.
12        My recollection is that they agreed
13 wholeheartedly to that list that I just gave to you.
14    Q    Was this list something that was put on
15 paper?
16    A    No.
17    Q    Let me go back and just ask you about that.
18        You said they agreed to a one day a week --
19    A    No.  I'll tell you what they said.  Andre
20 van Rhee told John Gardner that he could be in the
21 office a maximum of one day per week.
22    Q    Okay.  Starting when?

Page 277

1    A    Immediately.
2    Q    Okay.  What else?  What else transpired
3  during this meeting?
4    A    I was satisfied with the four or five
5  points that were put across, and I didn't feel like
6  belaboring it any further.  I said I appreciate your
7  time.  They were leaving at 2:00 p.m. for Europe, and
8  it was 9:00 or 10:00 in the morning.  John stayed
9  behind and talked to them.  That was Saturday, and
10 that was it.
11        (Thereupon, the document was marked as
12        Morris Deposition Exhibit No. 15 for
13        identification.)
14    MR. SMITH:  Do you mind if we just take a
15 break for a couple minutes?  I want to confer with
16 John, and then you can take a look at this document.
17 I'll be right back.
18        (Whereupon, a short recess was taken.)
19    BY MR. SMITH:
20    Q    All right.  I think -- were you in the
21 middle of a response?  I actually gave you that
22 document.

Page 278

1 All right. Exhibit Number 15, Mr. Morris.
2 This is another memorandum to the Fidelio board of
3 directors, and it's under your name, dated
4 December 9th of 2005.
5 Is this a memorandum you prepared and
6 delivered to the board of directors?
7 A It was not delivered. I actually showed it
8 to John and he suggested that personnel -- this was
9 going to be in the board package. He suggested that
10 we don't put personnel issues in the board package
11 because his concept was that we manage the personnel
12 issues in the office. The other guys do not.
13 Q All right. At the December, I think, 10th
14 meeting you had, Andre indicated that John should be
15 in the office one day a week.
16 During that conversation or, you know, even
17 after that, was it agreed that despite that
18 limitation, Mr. Gardner would continue to handle the
19 JBG relationship?
20 A There was a discussion about how that would
21 work, and what happened was John's interest, in my
22 opinion, was that -- I'm just going to be very blunt

Page 279

1 with you, okay -- he wanted to maintain a relationship
2 with several -- with one or more than one of the
3 partners of JBG, because he had a good run with them.
4 And it's personally my opinion that the --
5 and this was a very big surprise to me -- the
6 difference between Buvermo and JBG in this one aspect
7 is that the JBG company is privately owned by a set of
8 partners, and it was started by an older group of
9 partners who continue to maintain an office at the
10 building and a secretary. And their economic interest
11 in the deals have probably been long gone, but on the
12 surface, they have a nice office, a secretary,
13 everything else.
14 What came as a surprise to me was that
15 John's retirement was governed not by him but by rules
16 that the Dutch had given him. And I was initially
17 surprised that there was a mandatory retirement age at
18 Buvermo.
19 So when I connected the dots of what John
20 was trying to achieve with respect to the partners at
21 JBG relative to the sort of drop-dead date, if you
22 will, of working at Buvermo, I was more empathetic at

Page 280

1 that moment than I had been for a long time. And my
2 perception was that John wanted to maintain a
3 relationship with the JBG guys as a businessperson
4 with Buvermo as more or less the sole exception to
5 anything else that I brought up. He didn't ask to
6 be -- have a relationship with Steve Garchik. He
7 didn't ask to have a relationship with anybody else
8 that the company had done business with. It was only
9 the JBG partners.
10 At that point, I decided that to make this
11 work, what I would do is I would more or less split
12 the baby. There are managing directors and maybe
13 junior partners at JBG that have day-to-day
14 responsibilities for projects, and the partners do
15 not. They are very senior, they do make broad
16 decisions. You know, they control the direction of
17 the company.
18 But when you go down to the next level, you
19 will find a collection of people between the ages of
20 35 and 50 who in many cases are more or less my peers
21 in the world in terms of age and expertise, et cetera,
22 where the partners are more along John's age and

Page 281

1 experience, et cetera.
2 So I figured that to allow John to have a
3 relationship with these guys -- and we can name who
4 they are, but in particular a guy named Mike
5 Glosserman, who I'm friends with or have been friends
6 with as well, he's around 60 or 61 -- that that should
7 not detract from what I'm trying to accomplish as long
8 as I maintain a relationship with these managing
9 directors, et cetera, et cetera.
10 Now, going back to something that you said
11 earlier about if John finds a deal, isn't that
12 beneficial to you. In the case of JBG, as long as I
13 was getting the promote and the economic benefit --
14 and by the way, I always wanted to be involved. I
15 always wanted to go to the meetings, and I always
16 wanted to know what was going on. I never wanted to
17 be a remote control guy.
18 As long as I had the relationship with a
19 set of managing directors and an occasional
20 relationship with this particular partner and John
21 still wanted to have his chummy relationship with them
22 and have the dinners or lunches, I figured it's no

Page 282

1 skin off my nose.

2     So on the one hand, I did not de facto say
3 you deal with JBG, I'll deal with the rest of the
4 world. I did say continue your relationship, most of
5 it personal, with the JBG partners, but I need to be
6 involved at the operational level of JBG not only to
7 know what's going on with our existing remaining
8 assets, but to the extent something new comes up, I
9 want to be involved.

10     So offering that concession or allowing
11 that concession to occur I did not feel was harmful,
12 and I thought that it would be helpful to get this
13 working properly. And that's the extent of my
14 knowledge of that conversation.

15     With the -- under the auspices of I did
16 want to find a way to make the job work, because I
17 will tell you again, I liked the job and I thought it
18 was a good fit for me, but I wanted to run the
19 company. I wanted to have the responsibilities that I
20 was told I was going to have. I wanted to have my
21 promote, my salary, and my benefits. And if I was
22 allowed to do that, then I think it would have turned

Page 283

1 out into a very good situation for everybody.

2     Q   Now, following the December meetings with
3 the board, Mr. Gardner adhered to the one day a week
4 restriction all the way up until sometime in the March
5 time frame, correct?

6     A   I don't believe that to be the case.

7     Q   And could you clarify your response?

8     A   Well, John came in the office on Monday
9 after the meeting on Saturday, and he gave me his view
10 of the conversation.

11     And, you know, to be honest with you, at
12 that very moment, I was really in the midst of working
13 with this law firm, this partner in Boston, trying to
14 get Spotswood done.

15     And while I appreciated his gesture of
16 saying, you know, I want to support you and I want to
17 live up to this, I did say, well, you know, you agreed
18 to one day a week and I don't feel like being a jerk,
19 but we really got to decide on what day that is, if
20 it's a day during the week -- you're here every
21 Thursday, you're here every Wednesday -- or it's like
22 a rotating day, and that never got resolved.

Page 284

1     That was on a Monday. I can't tell you the
2 day, but I know in my heart of hearts that John was in
3 again that week. And it's not so much that it
4 bothered me that John was in the office, but my
5 feeling was that there were so many things that had
6 occurred previous to that that it was going to evolve
7 back into a situation that was not tenable.

8     I made a concession by suggesting that we
9 buy a brand new computer, install it at John's house,
10 link it into the Buvermo system and with that, he
11 could use a computer at home and at least physically
12 would not be in the office. And I understood the need
13 to use a computer, because we didn't have Blackberrys.

14     I had also hired a consultant, a computer
15 guy, to buy a server and link everybody's computer and
16 calendar, and I was terminated before I saw the result
17 of that. But prior to my arrival, they had just
18 bought, you know, from Circuit City or somewhere,
19 standalone PCs.

20     And when I asked John in the beginning that
21 I needed to share calendars with him, he made a Xerox
22 copy of his pocket calendar and brought it in, and I

Page 285

1 knew that we needed to go to a different level.

2     So I thought that having the computer at
3 home at John's house with a calendar on it with
4 whatever things that he needed to do or wanted to do
5 that he could make me aware of and that there was
6 communication flow but he wasn't sitting there every
7 day, that that would be a good way to get through
8 January, February, March, April, May, June, which is
9 kind of the six-month period that Andre had looked at
10 before we decided what to do next. You know, if we
11 could get from here to there, then maybe we can work
12 this out long term.

13     So, you know, I will reiterate. You read a
14 lot of information that I was frustrated. I could
15 have quit. I mean, I just could have walked out the
16 door. But I liked the company, I liked the platform,
17 I wanted to make it work. And while I was frustrated
18 to the nth degree, I was at the same time trying to
19 find ways that would at least allow John to feel like
20 he still has a role other than advisor and is
21 perceived by the JBG guys as just not a retiree, you
22 know, someone that's got a relationship with them, and

Page 286

1 try to balance that with the fact that I did want to
2 run the company.
3      We had lost two employees. I was
4 instructed at the dinner in cryptic terms to not
5 continue Kara McCormick's employment. There was
6 discussion about the fact that their opinion was she
7 was overpaid and that her use during the sales of the
8 JBG portfolios was terrific, but she's too heavy for
9 the company now. She didn't have any real estate
10 underwriting experience and that they were making a
11 suggestion, albeit veiled, and then it was more direct
12 that I find a way to let her go at some point. We
13 hadn't talked about when. That would leave me and
14 John as an advisor as the whole company.
15      So, I mean, I figured if I could find a way
16 to make John happy, work on his computer at home,
17 still have a relationship with friends at JBG, and
18 then I guess go restaff the company, I would try to
19 make that work.
20    Q   And you were talking about bringing on an
21 acquisition person?
22    A   Yeah. I was talking about bringing on my

Page 287

1 own business partner. He would have been a perfect
2 fit.
3    Q   And in that regard, didn't you make an
4 inquiry to either John or to the board members whether
5 Buvermo was going to be around for the long term?
6    A   That was a follow-on conversation of
7 something that occurred much earlier where they had
8 told me that they had considered shutting the company
9 down and that, I think -- I don't know which one --
10 one of the investors was not sure they wanted to
11 continue. The other one apparently did, and then the
12 one that was thinking about not continuing said we'll
13 go ahead too. Joost had told me this, because he
14 wanted to explain that they had reaffirmed their
15 commitment to the Washington metro and to this
16 program.
17      The reason I asked that is because my
18 business partner had just had a second child and had
19 just bought an expensive home, and his concern wasn't
20 necessarily the deal structure but it was longevity of
21 the salary. And I just had to ask Joost for Mike's
22 benefit if there was something near term, three to

Page 288

1 five years, that would cause them to rethink, you
2 know, their dedication to this.
3      And with that, John met my partner, Kara
4 met my partner, and Joost spoke to him on the phone.
5 We never arranged a face-to-face meeting. Mike ended
6 up going in another direction. There were other
7 people that I wanted to talk to, but we never got to
8 that point.
9      (Thereupon, the document was marked as
10      Morris Deposition Exhibit No. 16 for
11      identification.)
12    BY MR. SMITH:
13    Q   Let me show you Exhibit Number 16, and I
14 want you to look at the first e-mail on the top of the
15 page from you to Mr. Gardner dated March 14th of '06.
16      In this e-mail -- this is an e-mail you
17 sent, correct?
18    A   It looks like it.
19    Q   All right. And in the e-mail, you state I
20 think it would be a positive thing for you, being John
21 Gardner, to continue as the lead on the JBG Reston
22 projects.

Page 289

1      Is that -- do you remember preparing this
2 e-mail?
3      MR. HADDAD: Let me just interrupt real
4 quick. Again, no Bates numbers on this. It doesn't
5 appear to be a document that was produced by Equinox.
6      Is this something that we've seen before?
7      MR. SMITH: I feel sure that we did produce
8 this. Some of the copying I did I may have copied
9 from a stack that just wasn't Bates stamped, but
10 you've gotten everything.
11      MR. HADDAD: To the extent we have it, I'm
12 just going to object to questioning on this document.
13    BY MR. SMITH:
14    Q   All right. And what was the reason that
15 you wanted Mr. Gardner to continue as a lead on the
16 JBG Reston projects?
17    A   Well, you know, this is an example of a
18 positive/caring e-mail to try to make things work that
19 maybe I wish I don't have in front of me as much as a
20 negative e-mail.
21      I mean, this is, you know, an effort to --
22 it's in March already. You know, we're trying to make

Page 290

1  things happen. It's just -- you know, I'm not sitting
2  here saying you are the lead on the JBG Reston
3  projects de facto. That's your role and my role is
4  something else.
5      I mean, this was just a nice thing to say.
6  I mean, I'm not trying to make this a definitive role
7  or job spec or anything like that. I just -- you
8  know, if somebody is going to put this in front of me
9  and say it was detrimental for you to say that, then I
10  think that's wrong.
11      Q  My question is why were you making a
12  statement that you thought it was a positive thing for
13  John to continue as the lead?
14      A  Well --
15      Q  I mean, you meant that he was going to
16  continue to work the deal, right?
17      A  No. What I meant was that there was
18  several deals out in Reston that had evolved for years
19  before this one new deal. And actually, this meeting
20  had to do -- actually, this meeting had to do with the
21  old deal.
22      This meeting was to discuss the land

Page 291

1  parcels that are part of that nominal promote. This
2  has nothing to do with the new deal. This Reston
3  Charette was all about the land parcels in the back
4  and the road continuing up to the hotel.
5      Q  Well, I guess my point is you still
6  expected Mr. Gardner to act as the lead for that
7  particular project?
8      A  Well, it was a word that I used to be
9  positive.
10      Q  Okay.
11      A  I didn't expect you to turn that into a
12  formal admission of --
13      Q  Now, it's my understanding that sometime in
14  March, Mr. Gardner started to come to the office more
15  frequently than he had been, and it's my under --
16  isn't that right? Do you recall that?
17      A  Yes, I do.
18      Q  All right. And prior to that time, after
19  you had gotten him the office computer, was
20  Mr. Gardner for the most part complying with the one
21  day a week?
22      A  It was a lot better than it used to be.

Page 292

1      Q  All right. So Mr. Gardner starts coming to
2  the office more frequently I believe in the March '06
3  time frame. Wasn't that to help prepare part of the
4  board presentation dealing with the JBG projects?
5      A  Well, I don't know what you think it was
6  for. I had already met with JBG several times to get
7  the boards. I mean, I had gone to great lengths to
8  make sure that we had this collateral material that
9  heretofore we never had.
10      Q  But who was preparing the written material
11  for the board presentation?
12      A  It was a team effort.
13      Q  And John was included in that effort,
14  right?
15      A  John was included in the effort with regard
16  to, A, the minutes from the previous meeting, which he
17  always drafted and had available, and then he did --
18  don't you have a board package? I mean, you have a
19  board package that shows who wrote what memo to who.
20      So, yes, he was involved in constructing
21  the board package. You know, if that means that he
22  needs to be in the office when he's got a home

Page 293

1  computer to do that, I mean, maybe there was a reason
2  that he had to be in the office. I don't know. But
3  you say that, but the day the Dutch came in, which was
4  Wednesday --
5      Q  I don't want to go there yet. I mean, my
6  question just right now is limited to Mr. Gardner
7  coming to the office more frequently, which you've
8  agreed with.
9      And did you take issue with Mr. Gardner
10  coming in more frequently? Were you upset about that?
11      A  I thought it was a violation of what we had
12  agreed to.
13      Q  And that's what you told Mr. Gardner, in
14  fact, isn't it?
15      A  Well, I told him at lunch -- you know, I
16  was just about to tell you -- that I would really
17  appreciate it if he lived up to what we had agreed to.
18      And this was subsequent to him telling me
19  that he had orchestrated, planned, whatever you want
20  to call it, a meeting downtown with another guy, who I
21  didn't have any knowledge of, and he was taking Kara
22  McCormick with him, and this came out of the clear

Page 294

1 blue sky.
2        So when I combine the more frequent office
3 visits with an admission that he's going downtown the
4 following week to talk about new deals in downtown
5 Washington in March of '06, I -- I have a problem with
6 that.
7    Q   All right.  And this breakfast meeting was
8 March 21st, right?
9    A   It was the Wednesday -- it was the 22nd.
10   Q   The breakfast meeting was?
11   A   Yes.
12   Q   I thought the 22nd was the dinner meeting.
13   A   It was as well.
14   Q   So you met on the same --
15   A   We had breakfast in the morning, John and
16 I.  I left, got gas, and went to Dulles Airport and
17 picked the Dutch up at 2:00 p.m.  I took them to
18 Reston, where they met with John Schlicting (ph),
19 myself, John Gardner, Kara McCormick.
20       And then we were supposed to have a dinner
21 the following night, which I had planned, but John
22 said that he wanted to meet with them that night as

Page 295

1 well.
2    Q   Did you actually meet both nights?
3    A   No.  I was told not to come in the next
4 day.
5    Q   All right.  So it's your testimony that the
6 breakfast meeting was on March 22nd, right?
7    A   That's my recollection.
8    Q   Okay.  And in addition to what we've talked
9 about, didn't you and Mr. Gardner also discuss during
10 that breakfast meeting the importance of conveying to
11 the Dutch partners that the two of you were working
12 better together?
13   A   That was spoken before I had any knowledge
14 of him making the plan with this guy.
15   Q   Okay.  But that was discussed during this
16 breakfast meeting?
17   A   It was discussed at the beginning.
18   Q   Right.  And you agreed with that, correct?
19 You agreed that it was important to present a unified
20 front?
21   A   I agreed with that with the most recent
22 knowledge that John was not coming in as often up

Page 296

1 until the recent week.  And with the disclosure of
2 this meeting, it more or less told me that John can do
3 or say one thing that is a positive thing for the
4 relationship, but then immediately do or say something
5 that is very negative for the relationship.
6    Q   So immediately following or following the
7 discussion about work, you know, conveying to the
8 Dutch investors that you're working together, the
9 relationship is better, Mr. Gardner disclosed the fact
10 that he was -- had scheduled this meeting and you
11 became upset about that?
12   A   Yes.
13   Q   And then that evening, you had dinner at
14 the Four Seasons; is that right?
15   A   Yes.
16   Q   And who was present at that meeting?
17   A   John, Joost, Andre and myself.
18   Q   All right.  And you became pretty upset
19 during this dinner meeting as well, didn't you?
20   A   I was irritated.
21   Q   And what were you irritated about?
22   A   John had taken it upon himself to pull

Page 297

1 literally pieces of paper out of his pocket.  Not out
2 of a briefcase, but literally out of his pocket.  They
3 were folded like this (indicating).
4        I was talking to Joost to my right.  John
5 was talking to Andre.  Joost and I were having a very
6 social, cordial conversation about -- not about
7 business, and John starts going through pieces of
8 paper with Andre.
9    Q   I'm sorry, with what?
10   A   With Andre.  And I stopped Joost for a
11 second.  I said hold on a second.  I said, John, what
12 is it that you're going over, can you just tell me.
13       As it turns out, it was the promoted
14 interest calculation that he had generated, a
15 two-and-a-half-page document that I had seen briefly
16 the day before, which reflected -- this is his
17 document -- reflected a promote which was oriented
18 toward John Gardner taking the lion's share of the
19 promoted interest, and I was getting a smaller piece
20 of it.  That's been -- the document's in discovery.
21   Q   You have that document?
22   A   I do have that document.

Page 298

1    MR. HADDAD: It's been produced.
2    BY MR. SMITH:
3    Q   Okay. I have no idea what you're talking
4 about.
5    MR. HADDAD: Go ahead. Continue.
6    THE WITNESS: Do you want to pull it out?
7    MR. HADDAD: I'll see if I can find it.
8    THE WITNESS: I have it in my briefcase.
9    BY MR. SMITH:
10   Q   Let me ask you a few questions about it
11 while your counsel is looking for the document.
12      Did this promote -- it wasn't related to
13 any particular real estate project, was it?
14   MR. HADDAD: Just answer the question.
15   BY MR. SMITH:
16   Q   It didn't have to do with the overage that
17 existed between Buvermo's expenses and profitability?
18 It really had nothing to do with you, did it?
19   A   No. This was a -- this was a schedule that
20 showed where the promoted interest went.
21   Q   Promoted interest for what?
22   A   It was my presumption that John was sitting

Page 299

1 there talking to them about the new promote structure.
2    Q   Okay. When you say your presumption, you
3 didn't know one way or the other what he was talking
4 about, did you?
5    MR. SMITH: Let me take a break. Maybe I
6 can shortcut this.
7    (Whereupon, a short recess was taken.)
8    BY MR. SMITH:
9    Q   Mr. Morris, I'm not going to mark this as
10 an exhibit, but one of the documents that Mr. Gardner
11 pulled out of his pocket at the meeting on the 22nd,
12 the dinner meeting -- I'm going to show you -- was
13 entitled designation of FPEP property.
14      Is that the document?
15   A   It was three pages.
16   MR. HADDAD: He's saying one of the
17 documents. Was that one of the documents he pulled
18 out?
19   THE WITNESS: It's a piece of one of the
20 documents, yes.
21   BY MR. SMITH:
22   Q   Okay. And your perception was that

Page 300

1 Mr. Gardner was attempting to change your promote, and
2 you got angry about that, right?
3    A   Well, my perception was that John Gardner
4 is bringing documents to the table with gentlemen that
5 I perceive to be my bosses to discuss something that I
6 might have had a brief view of the day before, but it
7 was never explained to me.
8       I never agreed to it. I never read it in
9 its entirety, and this just exacerbated the
10 frustration that I had that I'm not in any way, shape
11 or form being viewed by John as the president and the
12 CEO.
13   Q   Okay. Fair enough.
14   A   I mean, to the extent it affects the
15 promote, it's even worse. But --
16   Q   And didn't, though, on that point,
17 Mr. Gardner attempt to explain to you during this
18 meeting that this document was only meant as an
19 example, and he was just plugging in numbers to show
20 the partners what the document would look like once it
21 was revised? He did not intend to amend your promote.
22 Didn't he try to explain that to you?

Page 301

1    A   No, because we didn't get that far.
2    Q   Did he try to explain that to you?
3    A   I went on to what -- the question about
4 what the second document was, and immediately, upon
5 asking, got scolded by Andre about why I didn't know
6 what John Gardner was bringing to a dinner and why I'm
7 not in the loop as the president and CEO -- he called
8 me the managing director, president, CEO, various
9 things -- but that the -- and the aggravation began
10 with Andre being mad at me because he felt that I
11 wasn't prepared to discuss the documents that John was
12 bringing out of his pocket, and he was right.
13      And it was a concern that he had that I was
14 not managing the company. I did not have knowledge of
15 pieces of paper that were supposed to be discussed at
16 a meeting with frankly the partners of the company.
17 And I was embarrassed for myself that John would just
18 take it upon himself to bring out components of
19 sharing arrangements which affected my income and
20 everything else and not go over it with me prior to
21 that meeting and then sit down and discuss it at the
22 meeting, if that was the key.

Page 302

1    We were supposed to have the dinner the
2 following night, the more formal dinner, and we could
3 have just as easily discussed this together and then
4 presented it to the Dutch the following day.
5    The second document --
6    Q   But you're making a presumption, before we
7 move on to that second document, that Mr. Gardner was
8 attempting to alter your promote, aren't you?
9    A   Say that again?
10   Q   You're making an assumption that that's
11 what he was attempting to do, correct?
12   A   Well, like I said, I didn't study this
13 document, okay?  But when I read down to the bottom
14 and it says promote percentage and I see John Gardner
15 at 10 and Jon Morris at 3, then the bell goes off in
16 my head that this is not only inconsistent with what I
17 thought my deal was, it doesn't reflect what I see in
18 the offer letter.
19   Q   Okay.  And I understand that.  And, you
20 know, my earlier question to you was didn't
21 Mr. Gardner attempt to clarify that that's not what
22 this document was intended to do?

Page 303

1    A   His only words to me were this is just an
2 example.
3    Q   Right.
4    A   Okay.  But I can't even begin to tell you
5 what it's an example of.
6    Q   All right.  But your reaction -- I mean,
7 you were angry, weren't you?
8    A   I was angry at the principle that as much
9 of an effort as I had made to date to do the things
10 that I had done, that at this dinner, which was not
11 called by anybody other than John, he's pulling out
12 pieces of paper that I haven't had the opportunity to
13 review or even to get the knowledge that you're
14 suggesting that he intimated that I could get.  And
15 now we're in front of the Dutch guys who have flown
16 for, you know, six or seven hours and I've spent three
17 or four hours with them out in Reston and they're not
18 in a good mood.  They're tired.
19   Q   All right.  Now, what about this second
20 document that Mr. Gardner pulled out?  What was that?
21   A   I don't have a copy of it, and I didn't see
22 it at the dinner.  But it was waved in front of my

Page 304

1 face by Andre, and he told me this is a reconciliation
2 for John Gardner to take a check for 140 or $170,000
3 out of your company.  You should have seen it.
4    Q   Now, that arrangement where Mr. Gardner was
5 going to take that amount of money, that had nothing
6 to do -- I mean, you weren't involved in terms of
7 negotiating that with Mr. Gardner, were you?  That was
8 a preexisting arrangement he had with the partners,
9 right?
10   A   My answer to you is twofold.  Number one, I
11 suppose; and number two, the issue was that it was
12 coming out of the company that I had already worked
13 hard to arrange a budget for '06.  I worked on that.
14 This was not in the budget, to my knowledge.
15    You're talking about three months after the
16 submission and approval of the '06 budget, and the
17 overall overhead was about $1.3 million.  So you're
18 talking about at least a 10 percent delta to that.
19    And if I were Andre, I would feel that it
20 was a little sloppy on the president's part that he
21 doesn't have a copy of a check request basically for
22 10 percent of the following year's -- the next year's

Page 305

1 budget.
2    Q   Now, once that second document was pulled
3 out, you became even more angry, didn't you, and --
4 let me ask you that first.  You got -- you reacted
5 very strongly to it?
6    A   I don't think I reacted any more strongly
7 than anybody else would.
8    Q   Well, did you at that point engage in a
9 rather heated discussion with Andre?
10   A   Andre yelled at me.
11   Q   And did you yell back?
12   A   No.  I stood my ground.  I mean, I -- I
13 think that I just protected my integrity.  I wasn't
14 doing anything wrong and I have nothing to hide and I
15 just wasn't given the opportunity to look at or review
16 documents with anybody and I didn't look good in front
17 of Andre.
18    I don't think he should have taken it upon
19 himself to direct as much anger as he did to me, but
20 that's the way it came across and I didn't yell,
21 scream or fight back.  I stood up for myself.  And I
22 wasn't going to take more than an hour of being

Page 306

1 berated.
2   Q   Did you attempt to argue with Mr. van Rhee,
3 Andre?
4   A   I attempted to try to explain that these
5 are documents that I had not seen.  And given the
6 opportunity to see them or review them, then I would
7 have been, you know, maybe happy to go through them
8 with them in a forum not at dinner at the Four
9 Seasons, not with food being delivered and wine being
10 delivered.
11      I mean, this is very important information,
12 and this affects me and my income.  And I don't think
13 that that's an appropriate venue to pull pieces of
14 paper out of literally your pants pocket, give them to
15 the people who just flew over here from Europe, not
16 having shown them to the president and CEO.  And I
17 just think it's wrong.
18   Q   How does the payment of the 170 or whatever
19 it was thousand dollars to Mr. Gardner affect your
20 income?  I mean, your income wasn't based on anything
21 but a salary and a promote.
22   A   No.  No.  It was the fact that I had no

Page 307

1 idea what was being discussed with respect to that
2 check which was what started the irritation with
3 Andre.  The fact is that that is not something that
4 was handed to me and included in our annual budget.
5 That's secondary.
6   Q   All right.  Now, you left that dinner
7 abruptly, didn't you?
8   A   I absolutely excused myself, and I told
9 them point-blank that, number one, I felt that I had
10 been subjected to as much yelling, degradation,
11 whatever, as I could possibly take.  I had gone in and
12 checked my blood sugar in the bathroom, and it was
13 three to four times higher than normal, which is very
14 dangerous.  I told them that, and I told them I had to
15 go.  I had to take a tremendous amount of insulin when
16 I got home, and it took several hours for my blood
17 sugar to return to anywhere near normal.
18      I feared for my health.  I did excuse
19 myself.  I stood up.  I pushed the chair in cordially.
20 I told them where I was going, if they wanted to reach
21 me, and I was prepared to tour the Spotswood Valley
22 Shopping Center the following day, even though I

Page 308

1 wasn't in great shape in terms of my blood sugar that
2 night.
3   Q   And did you consider the way you handled
4 yourself with Andre to be professional?
5   A   I don't know exactly what the definition of
6 professional behavior would have been in that
7 particular situation.  I was -- I felt like I was
8 being attacked more so than I had ever been attacked
9 in my professional career.
10      I was making an effort to explain that I
11 had not seen these documents.  I was irritated with
12 that.  I felt that it was a continuation in some cases
13 of John just not sharing information with me before he
14 brought it to the partners, and that was just not an
15 acceptable excuse.
16   Q   All right.  And the following morning, you
17 requested to meet with the partners?
18   A   No.  They asked me to meet.
19   Q   All right.  And this was a breakfast
20 meeting?
21   A   It was a breakfast meeting for them.
22   Q   And you showed up at the meeting, correct?

Page 309

1   A   I did.
2   Q   And they advised you at that time that they
3 had made the decision to terminate your contract;
4 isn't that right?
5   A   They told me it was not working.  And Joost
6 asked me to come back at 4:00 that day and sit down
7 and discuss what it was that the company owed me.
8   Q   And Mr. Gardner was not present at that
9 meeting, was he?
10   A   No.
11   Q   And at that point, you -- it looks like you
12 returned home, and you sent an e-mail which I think
13 you've referred to during your deposition.
14      (Thereupon, the document was marked as
15      Morris Deposition Exhibit No. 17 for
16      identification.)
17   BY MR. SMITH:
18   Q   Let me show you Exhibit Number 17.  Is that
19 an e-mail you sent to Joost on March 24th?
20   A   Yes.
21   Q   All right.  And what was the purpose for
22 sending this e-mail when you had been advised that

**Page 310**

1 your contract was going to be terminated?
2   A   Well, I think that's where we're at odds.
3 I wasn't told in no uncertain terms that my contract
4 was going to be terminated. I was told that this was
5 not working out.
6       This is what, a Friday?
7   Q   So it says.
8   A   Okay. Joost had asked me to come back at
9 4:00, and he called me at a quarter of 4:00 -- this
10 was on Thursday -- and I said I'm happy to come back
11 over. I'm actually on my way, but I do not have
12 anything to talk about because I haven't had a chance
13 to talk to Steve.
14       When I did talk to Steve, one of the --
15       MR. HADDAD: I'm just going to advise you
16 not to disclose any discussions you had with counsel.
17       THE WITNESS: Anyway, I liked the platform.
18 I liked the job. Okay? I took a tremendous amount of
19 abuse on Wednesday night, and I had Thursday to cool
20 off, think about it, et cetera.
21       I thought I was doing a very good job, and
22 the deal was -- and my two deals were getting done,

**Page 311**

1 and I told Joost that I'll be back next week. And I
2 did not know of a termination until several hours
3 after this. And then I was informed by e-mail.
4       BY MR. SMITH:
5   Q   All right. The deals that you just
6 referred to, the two deals were the Spotswood deal and
7 the Reston International deal?
8   A   Yes.
9   Q   And were those the only two deals that were
10 active at the time, active, I mean, in going to
11 closure?
12   A   As far as I can recall.
13   Q   All right. And isn't it a fact that as of
14 March 24, 2006 that those transactions had not yet
15 been consummated?
16   A   As of that date, they had not been
17 consummated. As of that day, they had not, to my
18 knowledge, been consummated.
19       MR. SMITH: This will be our last document
20 here.
21       (Thereupon, the document was marked as
22       Morris Deposition Exhibit No. 18 for

**Page 312**

1       identification.)
2       BY MR. SMITH:
3   Q   Let me show you what's been marked Exhibit
4 Number 18. Is this the e-mail you received with an
5 attachment -- it looks like a letter -- officially
6 terminating your employment with Buvermo Properties?
7   A   No. I think this is the only letter.
8   Q   I'm sorry?
9   A   I think this letter is the letter.
10   Q   The letter is the letter, but it looks like
11 the e-mail -- it says Jonathan H. Morris, Buvermo, I
12 ask that the attached be delivered to you by Forrest
13 Walpole, Attorney. It doesn't matter.
14       The letter that's attached to the first
15 page, is that the termination letter you received on
16 March 24th?
17   A   Yes.
18   Q   Now, you've made some allegation in your
19 complaint that the termination wasn't in accordance
20 with the bylaws of Buvermo.
21       In what way was the termination not in
22 accordance with the bylaws of Buvermo?

**Page 313**

1       MR. HADDAD: I'm just going to object to
2 the extent it calls for a legal conclusion.
3       Go ahead and answer it.
4       THE WITNESS: Well, I'm not sure that I
5 find any term or condition that requires anyone to be
6 the recipient of an hour to 90 minutes of being yelled
7 at and decides based upon the fact that he did not
8 believe any progress was being made; and number two,
9 that he had a health risk, cordially excuses himself
10 from the dinner table.
11       You know, I just wanted to find out what it
12 was John Gardner was discussing with what I considered
13 one of my two bosses.
14       BY MR. SMITH:
15   Q   My question was simply -- I understand you
16 want to explain, but my question was really limited to
17 in what way did your termination violate the bylaws of
18 Buvermo?
19   A   I don't have a response for you right this
20 second.
21   Q   Now, the bylaws provide that officers may
22 be removed at any time by the shareholders with or

Page 314

1  without cause in section 6, article II.
2      Is that inconsistent with your
3  understanding of what the bylaws state?  You're free
4  to look at it.  It's Exhibit Number 3.
5      MR. HADDAD: I just want to note an
6  objection about these particular bylaws.
7      THE WITNESS: What page is it?
8      BY MR. SMITH:
9  Q  It's Bates number 39.
10     MR. HADDAD: These bylaws were produced in
11 discovery.  We haven't had an opportunity yet to
12 confirm that these are the actual bylaws of the
13 Buvermo Properties, Inc.  I note that they're not
14 signed.  I have to determine whether there is a signed
15 copy.  There may not be.
16     Finally, I'll just note the objection that
17 we've requested but we've not been provided with any
18 stock certificates for Buvermo Properties, Inc.  So
19 therefore, I do not know who the actual shareholders
20 are.
21     Having said that, go ahead.
22     MR. SMITH: You've requested the stock

Page 315

1  certificates?
2      MR. HADDAD: I believe I did.
3      (Discussion held off the record.)
4      BY MR. SMITH:
5  Q  Don't the bylaws provide officers can be
6  removed with or without cause by the shareholders?
7  A  Well, was I removed by a shareholder?
8      MR. HADDAD: Don't worry about that.  He's
9  just asking you does the document in front of you say
10 what he just said it does.
11     THE WITNESS: Let's see.  May be removed at
12 any time by the shareholders with or without cause.
13 That's what you said?
14     BY MR. SMITH:
15 Q  Yes.
16 A  Okay.  So that's what this says.
17 Q  All right.  I want to -- we're almost done,
18 fortunately.  I want to talk a little bit about your
19 claim just so I understand each one of your claims
20 that you're making in this case.
21     As I understand it, you're claiming
22 entitlement to your salary, the 200 and -- was it 275

Page 316

1  or $250,000 annually for 10 years?
2      MR. HADDAD: I'm sorry, I -- this will have
3  to wait.  Can you reread that question, please?  Or
4  why don't you just repeat it if you remember it.
5      MR. SMITH: Sure.  I'm just trying to
6  clarify the claims.
7      One of Mr. Morris's claims -- and correct
8  me if I'm wrong -- is to his salary through June, it
9  looks like, the year 2015; is that correct?
10     THE WITNESS: I believe that the term is
11 correct.
12     BY MR. SMITH:
13 Q  And my question is is it a salary based on
14 250,000 or 275,000 annually?
15 A  I would presume that given the fact that
16 I'm paying my BlueCross BlueShield, it would go back
17 to the base salary of 250.
18 Q  Okay.  250 per year for 10 years?
19 A  Right.
20 Q  And you're also claiming entitlement to
21 Fidelio's share of the FPEP promote for the parcels
22 of -- land parcels adjacent to the Sheraton Reston

Page 317

1  parcel and the remaining Twinbrook parcel as reflected
2  in your offer letter; is that right?
3  A  Uh-huh.
4  Q  Yes?
5  A  Yes.
6  Q  And we've talked about the two-year vesting
7  period.
8      If we're going to assume -- and we're not
9  conceding this, obviously -- you're entitled to this
10 interest, do you have -- have you quantified the
11 value?  Are you able to testify today about the value
12 of that interest?
13 A  No.  We'll either do that ourselves or have
14 an expert witness provide that information.
15     MR. HADDAD: Right.  I mean, as you know,
16 Marc, it's been about 10 days, 10 to 15 days since we
17 received a lot of these documents which are
18 voluminous, including those from SJM and those that we
19 expect to receive from JBG.  So we have experts
20 retained for that purpose.
21     We certainly have not had time to go
22 through all those documents in the level of detail

Page 318

1 that we'd like to. So we will supplement our
2 interrogatory responses, and certainly that will be
3 the subject of the expert's report.
4     MR. SMITH: All right.
5     BY MR. SMITH:
6 Q Are you also claiming entitlement to the
7 promote for all new projects initiated by Buvermo
8 after December 31st, 2005, all the way through
9 June 2015?
10 A That's the claim.
11 Q All right. And at the time you were
12 terminated, you had not officially been made a member
13 of the FP Executive Partners Limited Partnership, LLC?
14 A Not to my knowledge.
15 Q All right. And are you able -- and I think
16 I know the answer to this. Are you able to quantify
17 your damages for the promote?
18     MR. HADDAD: I'll just ditto what I just
19 said about one page ago.
20     MR. SMITH: That's fine.
21     BY MR. SMITH:
22 Q Okay. Are you able to quantify the damages

Page 319

1 for the Spotswood deal?
2 A I'll answer the question. I have a
3 reasonable value in my mind, reasonable being what I
4 consider it to be. I have additional information that
5 we've received that will probably change that
6 valuation, but I would prefer an expert to --
7 Q I would like to hear what your input is on
8 it. I mean, I'm obviously not going to hold you to
9 it, but what is your estimate -- and I'll phrase it
10 that way -- of your damages at this point for the
11 Spotswood or -- you know, the value of the Spotswood
12 promote?
13 A Well, that's not an easy question to
14 answer. If you want me to take a shot at it, I will.
15 If you don't, I won't.
16 Q Yeah. Take a shot at it.
17 A The Spotswood transaction had several
18 projections run with association to prospective events
19 that could occur. The most compelling event would be
20 the renewal and expansion of the grocery anchor
21 tenant.
22 Q The Kroger?

Page 320

1 A The Kroger. In the event that occurs, then
2 the value is dramatically more than the projection
3 that we had as part of the board package and the
4 holding period is significantly less.
5     John Gardner had suggested to Steve Garchik
6 that he produce a more conservative estimate for the
7 investment so we can include something a little bit
8 more nominal in the board package.
9     But at the same time, Steve, for his own
10 purposes as a partner, had run myriad projections. So
11 that deal has advanced past where we were in March of
12 '06, and I think we'll have a better handle on what
13 the holding period and the value is.
14 Q What's your guesstimate right now?
15 A I don't think that the promote will be
16 worth less than $900,000. And on a present value
17 basis, I think it will be worth more, given the fact
18 that I doubt it will take 10 years to get there.
19 Q All right. Now, that transaction closed
20 when?
21 A I don't know the date.
22 Q What's your understanding of the term

Page 321

1 closed?
2 A Well, it changes. If you personally go buy
3 a house, then the closing date, in my opinion, is the
4 date it's settled and recorded.
5     If you're doing a complicated structure
6 transaction, then it may be a little bit different
7 when the sponsor takes down the property and you have
8 a commitment to fund equity. Once the property is
9 closed, your commitment becomes real, and you're
10 obligated to --
11 Q Close meaning what? That's what --
12 A If somebody buys a property that you've
13 committed equity to.
14 Q And title is transferred?
15 A Well, title may not transfer to some
16 entities. It may be a structured deal. Somebody may
17 come into a title that's in existence.
18     I mean, a definition could be having a
19 principal economic interest in an asset, which could
20 go through several entities to get to. But it doesn't
21 necessarily mean the name is on the title.
22 Q Okay. Well, regardless of what definition

Page 322

1 we agree to, the Spotswood transaction had not closed
2 as of March 24th of 2006, correct, using your
3 definition?
4    A  I didn't track it.
5    Q  Well, you would have known if the property
6 had closed, wouldn't you?
7    A  I wouldn't have.
8    Q  You wouldn't have?
9    A  No.
10   Q  Okay. Why not?
11       MR. HADDAD: I think he's asking while you
12 were there, would you have known if the property had
13 closed.
14       THE WITNESS: March 24th, I was terminated.
15       MR. HADDAD: He's saying if you were there
16 when it closed, would you have known that it closed.
17       THE WITNESS: If I was there when it
18 closed, I would have known, yes.
19       BY MR. SMITH:
20   Q  And the same goes with the Reston
21 International deal?
22   A  If I was still at the company, I would have

Page 323

1 known, yeah.
2    Q  And as far as you knew, the property had
3 not closed as of the last day of your employment?
4    A  The property had -- well --
5    Q  The project or whatever you want to call
6 it.
7    A  On the last day of my employment, I do not
8 know if the property had closed or not.
9    Q  It wasn't forecasted to close that quickly,
10 was it, in March?
11   A  It was subject to the acquiescence of the
12 first deed of trust lender, Wachovia, to allow us to
13 buy the property.
14   Q  Right. And that had not occurred?
15   A  You're telling me something new.
16   Q  You also have a claim under your amended
17 complaint that you're claiming a right to invest
18 2.5 percent of capital in all projects until 2015?
19   A  Which is consistent with the offer letter.
20   Q  And have you attempted to tender any
21 capital towards any of the projects that have closed
22 since your termination, Spotswood, Reston

Page 324

1 International, for instance?
2    A  Have I tried to give anybody money?
3    Q  Yes.
4    A  No, not yet.
5    Q  All right. You've also made an allegation
6 for fraud in your complaint.
7       Is the claim -- that claim, the fraud
8 claim, limited to the allegations contained in your
9 complaint, or are there other facts that you're aware
10 of that support the fraud claim?
11       MR. HADDAD: Do you want to provide him a
12 copy of the complaint?
13       MR. SMITH: Sure. This is not the amended
14 complaint, but --
15       THE WITNESS: I have the amended complaint.
16       MR. SMITH: -- I don't think your fraud
17 count changed at all in the amended complaint.
18       MR. HADDAD: Let me check.
19       MR. SMITH: It's count V.
20       MR. HADDAD: And your question, Marc, is
21 what again?
22

Page 325

1       BY MR. SMITH:
2    Q  Does the complaint contain all of the
3 factual allegations that support the fraud claim?
4       MR. HADDAD: So you want him to review the
5 entire complaint from the very beginning?
6       MR. SMITH: Yeah.
7       BY MR. SMITH:
8    Q  I mean, you've incorporated, I guess, the
9 complaint. I just want to know if your complaint
10 contains all of the allegations that support your
11 fraud claim. I'm entitled to know it. I mean, I can
12 file a motion for a more definite statement if you
13 want to.
14       MR. HADDAD: If that's what you feel is
15 necessary.
16       MR. SMITH: Well, all I'm asking is a
17 question.
18       BY MR. SMITH:
19   Q  Are you able to answer my question,
20 Mr. Morris, whether there are facts which you believe
21 have been omitted from the complaint which support the
22 fraud claim?

### Page 326

1  A  Are there facts that have been omitted from
2 this complaint that support the fraud claim.
3      MR. HADDAD: I'm going to caution you again
4 in answering that until you review each and every
5 allegation of the complaint.
6      THE WITNESS: Okay.
7      MR. HADDAD: So if we want to sit here
8 for 15, 20 minutes, we might as well --
9      THE WITNESS: I'm not sure I understand the
10 question.
11     MR. HADDAD: He wants to know -- and
12 actually, let me make an objection to that.
13     This asks our client to determine what
14 facts are relevant to his fraud claim, which is a
15 lawyer's job, as you know, and which calls for a legal
16 conclusion. So I object on that basis as well.
17     MR. SMITH: All right.
18     MR. HADDAD: Marc, I got to tell you, I
19 think this is kind of a pointless exercise and it's
20 going to take a lot of time.
21     We can go off the record, if you don't
22 mind.

### Page 327

1      (Discussion held off the record.)
2      THE WITNESS: What are you advising me?
3      MR. HADDAD: I'm not going to advise you to
4 say -- I mean, do you know whether all the facts that
5 support your fraud claim are in the complaint?
6      MR. SMITH: No. That's not precisely the
7 question.
8      BY MR. SMITH:
9  Q  The question is: Are there any facts that
10 you're aware of that support your fraud claim that
11 have been omitted from the complaint?
12  A  So is there anything outside the complaint
13 that we know of --
14  Q  Right.
15  A  -- that supports the claim?
16  Q  Yes. I mean, you've used the word fraud
17 during this deposition, so I think you understand what
18 fraud is.
19     And I'm not telling you, you know, the
20 legal elements of it, but are there any facts which
21 exist which support your fraud allegations which are
22 not in the complaint that you're aware of?

### Page 328

1      MR. HADDAD: And I'll just repeat my
2 objection as to legal conclusion.
3      MR. SMITH: That's fine.
4      MR. HADDAD: If you don't know, say you
5 don't know.
6      THE WITNESS: I don't know.
7      MR. HADDAD: Do you want to take a couple
8 minutes' break?
9      (Whereupon, a short recess was taken.)
10     BY MR. SMITH:
11  Q  Mr. Morris, we touched on this briefly at
12 the beginning of your deposition.
13     What efforts have you undertaken to find
14 alternative employment since you were terminated from
15 Buvermo in March of 2006?
16  A  I met with some investment brokers up here
17 and talked to them about what was going on with the
18 different firms in town. I have spoken with another
19 brokerage firm, not a commercial firm, a residential
20 firm, and, you know, I just wanted to get some
21 feedback about what was going on, anybody hiring, not
22 hiring.

### Page 329

1      But my direction has pretty much been back
2 toward Florida and -- which is where I'm trying to
3 wind out of this condo and I'll be moving back there.
4 I'm going back soon, but instead of 60 percent of the
5 time, I'll spend a hundred percent of the time. I've
6 talked to two real estate companies down there and one
7 property management company down there.
8  Q  About employment?
9  A  Yes.
10  Q  Would you say you're actively seeking
11 employment at this time?
12  A  I have been actively seeking employment
13 through the summer and into the fall, and I think I've
14 come to an arrangement with a guy in Florida to work
15 with him in his property management business and, you
16 know, I've known him for five or six years.
17     I explained what had happened up here, and,
18 you know, I think it affected the deal that I could
19 have made with him, an employee situation. So now
20 I'm -- he would prefer at this point just to have me
21 as a business partner and then see how it goes. So
22 that's probably the direction I'm going to go in.

Page 330

1  Q  Have you put your resume out there?  Have
2  you made it known to headhunters that you're looking
3  for a position?
4  A  No.  I mean, I've been around for a long
5  time.  I kind of know the end user, if you will, of
6  these companies maybe better than the headhunters
7  know.  So I haven't -- I haven't talked to a hundred
8  people, but I might have talked to 10 or 15 people.
9  Q  Ten or 15 prospective employers?
10  A  No.  Ten or 15 people that might know
11  what's going on in the --
12  Q  How many prospective employers have you
13  talked to about a position?
14  A  Five or less.
15  Q  Okay.  Have you documented your efforts to
16  find alternative employment?
17  A  No.  I've just had meetings.
18  Q  Have you earned any money through
19  employment since you were terminated?
20  A  No.
21  Q  You haven't held any positions?
22  A  Have I held any positions.  No.

Page 331

1  Q  Okay.  Independent, have you acted as a
2  consultant, gotten compensated as a consultant?
3  A  No.
4  Q  You've hired a -- or you've named an expert
5  witness in this case.
6  Do you have any sort of preexisting
7  relationship with your expert?
8  A  No.
9  Q  What's his name?
10  A  I don't recall.  I don't know the guy's
11  name.
12  MR. HADDAD:  Brent Solomon.
13  THE WITNESS:  The firm is Reznick Group.
14  BY MR. SMITH:
15  Q  Have you had any dealings with the Reznick
16  firm in the past?
17  A  I've dealt with some of the principals.
18  Q  And what type of firm are they?
19  A  Well, they were originally a CPA firm, and
20  then they evolved into a real estate consulting firm.
21  MR. SMITH: All right.  No further
22  questions.

Page 332

1  MR. HADDAD:  And we'll read.
2  (Whereupon, signature not having been
3  waived, the deposition concluded at
4  6:40 p.m.)
5  -oOo-
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

Page 333

1  ACKNOWLEDGEMENT OF DEPONENT
2  I, JONATHAN H. MORRIS, do hereby acknowledge I
3  have read and examined the foregoing pages of
4  testimony, and the same is a true, correct and
5  complete transcription of the testimony given by me,
6  and any changes and/or corrections, if any, appear in
7  the attached errata sheet signed by me.
8
9  _____
   JONATHAN H. MORRIS
10
11
12  Subscribed and sworn to before me this
    _____ day of _____, 2006.
13
14  _____
    Notary Public in and for the
15
16  My commission expires:  _____
17
18
19
20
21
22

Page 334

1  JONATHAN H. MORRIS v. BUVERMO PROPERTIES, INC., ET AL.

2      ERRATA SHEET

3  Page: Line: Reads:    Should Read:    Reason:

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 335

1      CERTIFICATE OF NOTARY PUBLIC

2      I, Denise M. Brunet, the officer before

3  whom the foregoing deposition was taken, do hereby

4  certify that the witness whose testimony appears in

5  the foregoing deposition was duly sworn by me; that

6  the testimony of said witness was taken by me

7  stenographically and thereafter reduced to print by

8  means of computer-assisted transcription by me; that

9  said deposition is a true record of the testimony

10  given by said witness; that I am neither counsel for,

11  related to, nor employed by any of the parties to this

12  litigation and have no interest, financial or

13  otherwise, in the outcome of this matter.

14

15      _____
         Denise M. Brunet
16      Notary Public in and for the
         State of Maryland

17  My commission expires:

18  November 1, 2007

19

20

21

22

Page 334 - Page 335