Case 1:06-cv-01131-HHK    Document 32-13    Filed 02/07/2007    Page 1 of 6

Morris vs. Buvermo                          Deposition of K. McCormick 10/27/06

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - -x

                                    :

JONATHAN H. MORRIS,                 :

                                    :

            Plaintiff,              :

                                    :

    vs.                             :  Case No.

                                    :  1:06CV01131 (HHK)

BUVERMO PROPERTIES, INC., et al.,   :

                                    :

            Defendants.             :

                                    :

- - - - - - - - - - - - - - - - - -x

                            Washington, D.C.

                            Friday, October 27, 2006

    Deposition of KARA McCORMICK, witness, called for

examination by counsel for the plaintiff, pursuant to

notice, at the offices of Ziad P. Haddad, Esq., Tobin,

O'Connor, Ewing & Richard, 5335 Wisconsin Avenue,

Northwest, Suite 700, Washington, D.C., before

Malynda D. Whiteley, a Registered Professional Reporter and

a notary public in and for the District of Columbia,

beginning at 10:44 a.m., when were present on behalf of the

respective parties:

EXHIBIT
11

Case 1:06-cv-01131-HHK    Document 32-13    Filed 02/07/2007    Page 2 of 6

Morris vs. Buvermo                                              Deposition of K. McCormick 10/27/06



2

A P P E A R A N C E S

1
2
3  ON BEHALF OF THE PLAINTIFF:
4      ZIAD P. HADDAD, ESQ.
5      STEPHEN J. O'CONNOR, ESQ.
6      Tobin, O'Connor, Ewing & Richard
7      5335 Wisconsin Avenue, Northwest
8      Suite 700
9      Washington, D.C. 20015
10     (202) 362-5900
11
12  ON BEHALF OF THE DEFENDANTS:
13     MARC J. SMITH, ESQ.
14     Smith, Lease & Goldstein
15     11 North Washington Street
16     Suite 520
17     Rockville, Maryland 20850
18     (301) 838-8950
19
20  ALSO PRESENT:
21     John Gardner
22

3

I N D E X

1
2
3              EXAMINATION BY COUNSEL FOR:
4          PLAINTIFF,    DEFENDANTS,
   WITNESS        MR. HADDAD    MR. SMITH
5
   Kara McCormick        4        141
6
7
8              E X H I B I T S
9              (None)
10
11
12
13
14
15
16
17
18
19
20
21
22

4

PROCEEDINGS

1
2   Whereupon,
3        KARA ANN McCORMICK,
4   witness, was called for examination by counsel for the
5   plaintiff, and after having been duly sworn, was examined
6   and testified as follows:
7        EXAMINATION BY COUNSEL FOR THE PLAINTIFF
8        BY MR. HADDAD:
9   Q   Would you state your name for the record, please.
10  A   Kara Ann McCormick.
11  Q   Ms. McCormick, have you ever had your deposition
12  taken before?
13  A   No.
14  Q   Okay. I'm going to be asking you a series of
15  questions today; and you are required to some degree,
16  unless your attorney instructs you not to, to respond to my
17  questions. And your responses are under oath. We're not
18  in front of a courtroom. We don't have a judge or a jury
19  here, but in terms of truthfulness it's just as important
20  to tell the truth now as it would be then. Do you
21  understand?
22  A   Yes.

5

1   Q   Okay. And from time to time I may ask you a
2   question that you don't understand. And if that's the
3   case, I'd ask that you just let me know; and I'll try to
4   rephrase the question or talk through what the
5   misunderstanding might be. Is that fair?
6   A   Yes.
7   Q   Okay. And in addition to that, from time to time
8   you may need to take a break for whatever reason; and
9   that's fine. Just let me know, and we'll discuss when an
10  appropriate time to break would be. Okay?
11  A   Yes.
12  Q   Just a couple more rules. It's very important,
13  because the court reporter is writing down everything we're
14  saying today, that you and I take turns talking and not
15  talk over one another. So when I ask you a question, it's
16  important for you to wait until I'm done with my question
17  and not respond before the end, even if you know what I'm
18  going to ask. Okay?
19  A   Yes.
20  Q   And it's also important for you to respond to my
21  questions with words instead of "Uh-huhs" and "Uh-uhs,"
22  that type of thing because, otherwise, the record won't

Case 1:06-cv-01131-HHK    Document 32-13    Filed 02/07/2007    Page 3 of 6

Morris vs. Buvermo                                        Deposition of K. McCormick 10/27/06

26

1    Q    Who's "they"?
2    A    Partners, our partners.
3    Q    This is Joost and Andre?
4    A    Yes.
5    Q    What did they tell you that role was going to be?
6    A    I don't -- there was not a specific discussion
7    about the role.
8    Q    Okay. Do you recall anything that they discussed
9    about what Mr. Gardner was supposed to be -- was supposed
10   to do after Mr. Morris was hired?
11   A    Consulting. He would be in the same role as
12   someone who had just ended his career with us would be
13   doing.
14   Q    So at the time Mr. Morris was hired, it was your
15   understanding that Mr. Gardner was supposed to become
16   merely a consultant?
17   A    It was my understanding that there would be a
18   transition period for about six months.
19   Q    Uh-huh.
20        And when did you acquire that understanding?
21   A    I'm not sure. When he was -- it was when
22   Jonathan was hired.

27

1    Q    Okay. Who told you that?
2    A    John Gardner.
3    Q    Okay. Do you recall whether it was before or
4    after Jonathan Morris was hired?
5    A    I don't recall.
6    Q    It could have been after?
7    A    It could have been before.
8    Q    Okay. Were you ever told by anyone that
9    Mr. Gardner had been asked to retire as president of
10   Buvermo?
11   A    No.
12   Q    Was it your understanding that that was a
13   decision he had made voluntarily?
14   A    It was my --
15        MR. SMITH: Object to form.
16        You can answer.
17   A    It was my understanding that the partners in the
18   Netherlands felt that there was an age when that was
19   appropriate, to step down, and they encouraged that to
20   happen.
21        BY MR. HADDAD:
22   Q    Uh-huh.

28

1         And what was that age?
2    A    I think it's 60 in the Netherlands; it's 60, 65.
3    Q    And where did you acquire this understanding?
4    A    John Gardner.
5    Q    So did he tell you that he had been asked to step
6    down because of his age?
7    A    Not asked to step down, no.
8    Q    Okay. Well, can you tell me as best as you can
9    what you recall about that particular discussion in which
10   this retirement -- this age, retirement discussion
11   occurred?
12   A    It was not a discussion per se. It was something
13   that was -- that we knew about. We would talk about it
14   intermittently, that it was something that they believed
15   and we understood, the partners believed. And we
16   understood that that was the course of things.
17   Q    Okay. So you understood that the partners wanted
18   certain people to retire when they reached a certain age,
19   whether it be 60 or 65?
20   A    Yes.
21   Q    But you didn't have any understanding that that's
22   what was happening with Mr. Gardner in connection with his

29

1    retirement?
2    A    I knew that that's what was happening.
3    Q    Okay. And so it was -- from your perspective,
4    Mr. Gardner just understood that he had to retire because
5    of his age and had agreed to do so?
6         MR. SMITH: Object to form.
7         BY MR. HADDAD:
8    Q    I mean was that your -- there came a time when
9    you learned that Mr. Gardner was going to be stepping down;
10   right?
11   A    Yes.
12   Q    Okay. And did you have any question in your mind
13   as to why he was stepping down?
14   A    No.
15   Q    Okay. And what did you believe to be the reason
16   why he was stepping down?
17   A    That that was the age at which it was
18   appropriate.
19   Q    Okay. Because that was the age that the Dutch --
20   A    Correct.
21   Q    -- required him to step down; correct?
22   A    Correct.

Case 1:06-cv-01131-HHK    Document 32-13    Filed 02/07/2007    Page 4 of 6

Morris vs. Buvermo
Deposition of K. McCormick 10/27/06

118

1   Q   So you have a cash-flow analysis and investment
2   pro formas, is what you said?
3   A   Yes.
4   Q   And that's for every deal?
5   A   Uh-huh, yes.
6   Q   Do you have one for Spotswood Valley Center?
7   A   Yes.
8   Q   And you have one for Reston International Center?
9   A   Yes.
10  Q   And for all other deals of which Fidelio has made
11  an investment?
12  A   Yes.
13  Q   Let me show you what was marked as Exhibit 20 to
14  Mr. Gardner's deposition yesterday. If you'd take a look
15  at this document and let me know if you recognize it.
16  (The witness reviewed document.)
17  A   I recognize it.
18  Q   I'd ask just that you flip through the entire
19  thing, if you would.
20  (The witness reviewed document.)
21  Q   Is this something that was generated by you?
22  A   Yes.

119

1   Q   Okay. The entirety of it?
2   A   No. The first is mine. The rest is what we
3   received from our JV partner.
4   Q   Okay. So the last four, five pages you received
5   from SJM; correct?
6   A   Yes.
7   Q   All right. And then you generated this first
8   page?
9   A   Right.
10  Q   And what would you call this first page?
11  A   I would call this the contributions and
12  distributions for Fidelio and FPEP to come up with -- to
13  make sure that the hurdle rates are achieved, their equity
14  goes in and the hurdle -- you know, the preferred return
15  gets calculated. And anything over, above their equity and
16  their preferred return is subject to promote for FPEP.
17  Q   Uh-huh.
18      So do you have -- I mean I was just wondering if
19  you have a short way of saying that back at the office?
20  A   Short way of saying that?
21  Q   Well, I mean it's a single document. I'm sure
22  you don't always describe these -- is this the only time

120

1   you've ever --
2   A   I'd probably say, "This is the FPEP waterfall."
3   Q   I see. The FPEP waterfall.
4       And that's, obviously, different from a cash-flow
5   analysis; correct?
6   A   Yes.
7   Q   All right. And it's different from an investment
8   pro forma?
9   A   Yes.
10  Q   Now, as far as FPEP waterfalls are concerned, do
11  you perform those for all deals in which Fidelio invests?
12  A   Yes.
13  Q   Okay. And have you performed a similar one for
14  Reston International Center?
15  A   No.
16  Q   Okay. Why not?
17  A   Because we don't have enough information.
18  Q   Okay. So what you have -- because you don't feel
19  like you've been provided with what Spotswood provided to
20  you in the last five pages of this document?
21  A   Right.
22  Q   All right. Now, aside from --

121

1   A   And the fact that the plan will likely change
2   with development.
3   Q   Okay. So you don't prepare these FPEP waterfalls
4   for all deals, just for some?
5   A   That would be an exception. Reston International
6   would be an exception.
7   Q   Okay. So as far back as you can remember, you've
8   done it for every deal except for Reston International
9   Center?
10  A   Yes.
11  Q   Okay. What, if anything, did you do to prepare
12  for Reston International Center to determine what maybe the
13  breakdown might be of the FPEP promotes and the various
14  capital contributions?
15  A   I don't think we went out very far. The capital
16  contributions would have been pro rata. And I don't think
17  that we came up with a promote yet because we don't know,
18  like I said, what's going happen with the property, if it's
19  going to be developed or changed.
20  Q   So you yourselves haven't made any internal
21  projections concerning this particular deal?
22  A   I don't think so.

Morris vs. Buvermo                                    Deposition of K. McCormick 10/27/06

---

122

1    Q   Do you recall when you prepared this first page
2  of this document?
3    A   March of 2006. We used it for the -- well, to
4  get the partners' consent to move forward on it, so it was
5  part of a memo to the partners.
6    Q   Okay. What makes you think it was March of 2006?
7    A   It says "3/17/06" at the bottom.
8    Q   Could that be the print date maybe?
9    A   Oh, it absolutely was the print date.
10   Q   Okay.
11   A   But it was sometime in the month -- somewhere
12 around there that we would have sent the memo to the
13 partners with this pro forma attached.
14   Q   So it would have been whenever the memo --
15   A   Right.
16   Q   -- was sent to the partners?
17   A   Yes.
18   Q   Okay. And who was involved in preparing this?
19   A   I was.
20   Q   Okay. And who else?
21   A   Nobody.
22   Q   Did anyone ask you to make revisions to this?

---

123

1    A   We probably had revisions before it went to
2  print.
3    Q   Okay. Who did you discuss those revisions with?
4    A   Probably both Jonathan and John.
5    Q   Now, you say "probably". I'm just -- you know,
6  if you don't recall, I'd just --
7    A   I don't recall.
8    Q   Okay. So you don't recall whether or not there
9  were any revisions made?
10   A   Correct.
11   Q   And you don't recall whether you had any
12 discussions about revisions to be made?
13   A   Correct.
14   Q   I don't want you to --
15   A   Okay.
16   Q   Okay. Do you know whether Mr. Gardner reviewed
17 this after you prepared it?
18   A   I don't know.
19   Q   But he would have participated in the -- well,
20 who did you provide it to after you prepared it?
21   A   Jonathan. I would think we had to put it with
22 the memo.

---

124

1    Q   Okay.
2    A   He wrote the memo.
3    Q   And you don't know whether Mr. Gardner ever had
4  an opportunity to review it before it went out?
5    A   I don't know, but I'm sure he did.
6    Q   Why are you sure he did?
7    A   Because I can't imagine something so big would be
8  not reviewed.
9    Q   By Mr. Gardner?
10   A   Yes.
11   Q   Even though it was March of 2006?
12   A   Yes.
13   Q   We calculated yesterday that the promote share
14 that was attributed to Jonathan Morris in this document is
15 actually 15.5 percent of the total balance subject to
16 promote.
17       Do you recall how you came up with that number?
18   A   I would think that would be the FPEP promote.
19 That was, like, the original percentage.
20   Q   Uh-huh.
21   A   That's 15 -- you know.
22   Q   Did you refer to Jonathan's offer letter in

---

125

1  preparing this document?
2    A   Probably.
3    Q   Okay. And given that you credit him with 15.5
4  percent of the total promote, is it fair to assume that
5  that's what you understood was Mr. Morris's share of the
6  promote?
7    A   Yes.
8    Q   And do you recall how you came to that
9  understanding?
10   A   No, I don't.
11   Q   Okay. If you had prepared a different model, in
12 other words, perhaps a more aggressive model or a more
13 conservative model than the one reflected in here, is that
14 something that you would have maintained a copy of?
15   A   May, may not.
16   Q   Okay. And was it something that you would -- you
17 know, is it something that you would maintain a hard copy
18 of; or would you just save it on your computer type of
19 thing?
20   A   I would save it on my computer, but I might have
21 overwritten it with the latest -- the revision of it.
22   Q   Have you at any time in connection with this

---

Case 1:06-cv-01131-HHK    Document 32-13    Filed 02/07/2007    Page 6 of 6

Morris vs. Buvermo                                      Deposition of K. McCormick 10/27/06

142

```
 1       I have examined and read the foregoing 141
 2   pages and find the answers contained herein with
 3   the changes made by me, if any, to be true and
 4   correct.
 5
 6                    _____
 7                    Kara McCormick
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
```

143

```
 1   As you read your deposition, if you have any corrections to make,
     please itemize them
     below. Do not write on the transcript. Upon completion enter
     today's date and sign
 2   your name to the signature line. This will be attached to your
     deposition for filing.
     Thank you.
 3
         CORRECTIONS TO DEPOSITION
 4
     PAGE LINE          EXPLANATION
 5
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   Date_____  Signature_____
```

144

```
 1       CERTIFICATE OF NOTARY PUBLIC/REPORTER
 2       I, Malynda D. Whiteley, the officer before whom the
 3   foregoing deposition was taken, do hereby certify that the
 4   witness whose testimony appears in the foregoing deposition
 5   was duly sworn by me; that the testimony of said witness
 6   was taken by me in stenotype and thereafter reduced to
 7   typewriting under my direction; that said deposition is a
 8   true record of the testimony given by said witness; that I
 9   am neither counsel for, related to, nor employed by any of
10   the parties to the action in which this deposition was
11   taken; and further, that I am not a relative or employee of
12   any attorney or counsel employed by the parties hereto, nor
13   financially or otherwise interested in the outcome of the
14   action.
15       Given under my hand this 31st day of October, 2006.
16
17
18                    _____
                      Notary Public in and for the
19                    District of Columbia
                      Registered Professional Reporter
20
21   My commission expires:
22   June 30, 2011
```