Page 14

1  counsel going to get from any recovery in this case?
2      A    I mean, frankly, it's a little bit of a
3  formula and I don't recall the specifics of the
4  formula but I think it's generally about one-third.
5      Q    All right. And I take it that agreement is
6  in writing?
7      A    Oh, yeah.
8      Q    And you signed it?
9      A    Sure.
10     Q    Where do you maintain your current
11 residence?
12     A    429 Australian Avenue -- it's in Palm
13 Beach, Florida -- Apartment 11.
14     Q    And how long have you maintained that
15 residence?
16     A    Oh, since, I think, February '06.
17     Q    February of '06?
18     A    Yeah. I just moved there.
19     Q    Okay. Were you a resident of Florida
20 before that time?
21     A    Yes.
22     Q    All right. When did you move -- when did

Page 15

1   you establish residency in Florida?
2       A    I moved to Florida in '03, and I
3   established residency January 1, '04.
4       Q    '04?
5       A    Yes.
6       Q    And what was the purpose of your
7   establishing residency in Florida?
8       A    There were several purposes.  Number one, I
9   wanted to continue my real estate investment in
10  Florida at a personal level; and number two, I've been
11  going to Florida for 25 years.
12           I've maintained an apartment down there
13  since 2001, and I decided I wanted to move to Florida.
14  So I sold my large town house here and bought a small
15  apartment in Washington.
16      Q    All right.  Are those the only reasons you
17  made the move to Florida?
18      A    I like the weather.  I mean, I love
19  Florida.
20      Q    Were there any tax reasons you moved to
21  Florida?
22      A    No.  I wound down the business in '03 with

1  my previous employer, and I decided to go do something
2  else.
3      Q   When you say you wound down your business
4  in '03, who was your previous employer?
5      A   The previous employer was Lerner
6  Enterprises.
7      Q   Were you considered an employee of Lerner
8  Enterprises?
9      A   I believe I was.
10     Q   And we'll talk about your employment in a
11 minute.
12         When you moved to Florida, you said you
13 were a resident of the District?
14     A   Uh-huh.
15     Q   You need to say yes or no.
16     A   Yes. I'm sorry.
17     Q   And how long had you been a resident of the
18 District?
19     A   Oh. Since approximately 1978.
20     Q   All right. And you grew up in the area,
21 correct?
22     A   I grew up in Bethesda.

Page 17

1  Q  Went to high school locally?
2  A  Went to high school locally.
3  Q  And you mentioned that you purchased a
4  smaller apartment in Washington?
5  A  Yes.
6  Q  When did you purchase that apartment?
7  A  On or around October 2004.
8  Q  And up to that point, you owned a larger
9  town home?
10 A  I mean, it was 1600 square feet.
11 Q  Okay.  And do you still maintain an
12 apartment in D.C.?
13 A  Oh, yes.
14 Q  And how much time do you spend in the
15 District versus your time in Florida?  Just roughly.
16 Obviously I'm not holding you to any percentage.
17      MR. HADDAD:  Just during what time period?
18      MR. SMITH:  During the year.
19      BY MR. SMITH:
20 Q  So on an annual basis, how much time do you
21 spend in D.C. versus Florida?  And if it's changed
22 over time, you can tell me that too.

Page 18

1   A    Well, it has changed over time. And since
2   the termination, I spend, you know, the majority of my
3   time in Florida.
4   Q    Okay.
5        MR. HADDAD: Majority being?
6        THE WITNESS: In excess of 50 percent.
7        BY MR. SMITH:
8   Q    Are there any particular times of the year
9   that you stay in D.C., or do you just come up here
10  sporadically since the time of your termination?
11  A    I come up here to see my family who's still
12  here.
13       I'm in the process of winding down several
14  components of my life that were ramped up based upon
15  the Buvermo hiring which include the fact that, based
16  upon the position of president and CEO, it was made
17  clear to me that I would have a requirement to
18  entertain, I would have a requirement to be social, I
19  would have an opportunity to see the Dutch at least
20  quarterly here in Washington.
21       And based upon that, I did purchase a much
22  larger apartment than the one-bedroom that I bought in

Page 19

1   October of '04.  Furthermore, I informed one of the
2   partners, Joost Tjaden, of my decision to move forward
3   to buy that so that I could entertain, and he was very
4   supportive of that.
5        Q    All right.  The apartment you're referring
6   to that you purchased, is that at the Ritz Carlton?
7        A    Yes.
8        Q    All right.  And when was that purchased?
9        A    I believe that settlement was December '05.
10  It was an extended settlement from contract, which
11  might have been as far back as August '05.
12       Q    Okay.  And Mr. --
13            MR. SMITH:  How do you pronounce his name,
14  John?
15            MR. GARDNER:  Tjaden.
16            BY MR. SMITH:
17       Q    -- Tjaden, he didn't require you to
18  purchase the apartment at the Ritz Carlton, did he?
19       A    No.
20       Q    That was your decision?
21       A    Absolutely.
22       Q    All right.  And is it your testimony that

Page 20

1  you're in the process of selling your apartment at the
2  Ritz Carlton?
3      A    Yes.
4      Q    Is it on the market?
5      A    It is being listed -- I signed the
6  documents two days ago, and it will be -- it will not
7  go into MLS.  It goes into another system that I can't
8  remember the name of, but it's being listed with a
9  company called Washington Fine Properties.
10     Q    All right.  And do you intend to purchase
11 another apartment in D.C.?
12     A    I'm considering it.
13     Q    Are you looking at properties now?
14     A    Yes.
15     Q    Are you looking at another apartment at the
16 Ritz Carlton?
17     A    Several.
18     Q    Where are you registered to vote?
19     A    Florida.
20     Q    Are you registered in the District?
21     A    No.
22     Q    When did you become a registered voter in

1   A   Yes.

2   Q   Okay. That's not a partnership. That's an
3   LLC.

4   A   Okay. The discussion about the LLC was
5   limited to a description of it being an entity which
6   allows the participation at various levels of either
7   individuals or entities in transactions.

8   Q   Fidelio's transactions.

9   A   Well, I'm not sure if it's Fidelio's
10  transactions or not. Okay?

11      What I can tell you is that the deals that
12  were noted in the employment letter, okay, were -- or
13  the future deals, existing and future deals, at the
14  bottom of the letter, there was a sentence that talked
15  about this LLC.

16      And I asked John what the purpose of this
17  was, and he told me that it was to more or less induct
18  entities or people into the investments that
19  prospectively we would make. And in the case of the
20  two investments that I was being given at the outset,
21  that is how I would participate in those as well.

22      But I do want to make a point, Marc, and

Page 105

1  that is that at that moment, being presented with and
2  being asked to sign -- if not to sign, execute the
3  employment letter, the -- any gravity or weight or
4  significance of importance of that LLC was not
5  presented to me as anything other than more or less an
6  attachment or passthrough entity whereupon I would
7  receive my benefits that I was promised in that offer
8  letter.
9      Q    Okay.  That's fair enough.
10          And during your employment with Buvermo,
11 you had the opportunity to look at the operating
12 agreement of FPEP, LLC, right?
13     A    I had the opportunity to look at any
14 document I wanted to.  No one restricted me from
15 looking at it.
16     Q    Did you review the FPEP, LLC operating
17 agreement?
18     A    Not early on.
19     Q    All right.  What about later on during your
20 employment with Buvermo?
21     A    Well, the steps that were taken with
22 respect to reviewing that document were, in my mind --

Page 168

1  with Mr. Gardner?

2      A    Absolutely. To the point where he didn't
3  want to give up his office, and I just suggested he
4  stay there for a little while.

5      Q    His office meaning -- my understanding is
6  Mr. Gardner occupied the largest office in Buvermo's
7  offices, the corner office, and that when you arrived,
8  he vacated that office and you took over.

9      A    That's patently false.

10     Q    You never took over that office?

11     A    No. You said when I arrived.

12     Q    Okay. How quickly did you move into that
13 office?

14     A    Quickly is not a good description.

15     Q    How much time did it take?

16     A    When I arrived at Buvermo, there was no
17 office for me.

18     Q    How much time did it take for you to move
19 into --

20     A    Several months.

21     Q    Now, where did you conduct your business at
22 Buvermo's offices if there was no office for you?

Misty Klapper & Associates
703-780-9559

66cdaec6-8a0c-489b-a89a-b54ec5facc3c

Page 235

1  A    The first one, yes. I guess the second one
2  was. It took so long to get from June 29th to the
3  date I got that check that that is the salary that had
4  accrued. Okay?
5        I'm going to tell you in no uncertain terms
6  that I was hired as the president and CEO of this
7  company, and I was paid in a manner that was discussed
8  openly, that was agreed upon openly, and that was
9  something that was brought to my attention by a third
10 party being the accountant. It was not of my -- I
11 didn't create this on my own. I didn't structure this
12 because I thought it would be a good thing to do. I
13 took advice to do this.
14       So I will also tell you that to read in
15 documents that were signed that I was hired as a
16 consultant is, once again, something that, in my
17 opinion, is completely unconscionable. And regardless
18 of what I feel emotionally about this, factually,
19 everyone knew that I was the president and CEO of the
20 company.
21       I went out on the street. I met with
22 people. I took Joost Tjaden, John Gardner and myself

1   known, yeah.
2       Q    And as far as you knew, the property had
3   not closed as of the last day of your employment?
4       A    The property had -- well --
5       Q    The project or whatever you want to call
6   it.
7       A    On the last day of my employment, I do not
8   know if the property had closed or not.
9       Q    It wasn't forecasted to close that quickly,
10  was it, in March?
11      A    It was subject to the acquiescence of the
12  first deed of trust lender, Wachovia, to allow us to
13  buy the property.
14      Q    Right.  And that had not occurred?
15      A    You're telling me something new.
16      Q    You also have a claim under your amended
17  complaint that you're claiming a right to invest
18  2.5 percent of capital in all projects until 2015?
19      A    Which is consistent with the offer letter.
20      Q    And have you attempted to tender any
21  capital towards any of the projects that have closed
22  since your termination, Spotswood, Reston

Page 324

1   International, for instance?
2       A   Have I tried to give anybody money?
3       Q   Yes.
4       A   No, not yet.
5       Q   All right.  You've also made an allegation
6   for fraud in your complaint.
7           Is the claim -- that claim, the fraud
8   claim, limited to the allegations contained in your
9   complaint, or are there other facts that you're aware
10  of that support the fraud claim?
11          MR. HADDAD:  Do you want to provide him a
12  copy of the complaint?
13          MR. SMITH:  Sure.  This is not the amended
14  complaint, but --
15          THE WITNESS:  I have the amended complaint.
16          MR. SMITH:  -- I don't think your fraud
17  count changed at all in the amended complaint.
18          MR. HADDAD:  Let me check.
19          MR. SMITH:  It's count V.
20          MR. HADDAD:  And your question, Marc, is
21  what again?
22