UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JONATHAN H. MORRIS,<br><br>           Plaintiff,<br><br>     v.<br><br>BUVERMO PROPERTIES, INC., et al.,<br><br>           Defendants. | Civil Action 06-01131 (HHK) |

MEMORANDUM OPINION

By this action Plaintiff Jonathan H. Morris seeks to hold his former employer Buvermo Properties, Inc., and seven related parties, liable on causes of action, including breach of contract, arising from the termination of his employment as Buvermo's president. Before the court is defendants' motion for summary judgment [#28]. Upon consideration of the motion, the opposition thereto, and the summary judgment record, the court concludes that defendants' motion must be granted in part and denied in part.

I. BACKGROUND

Morris, a resident of Florida, is an experienced real estate professional who was hired in 2005 to serve as president of Buvermo. Buvermo, a Delaware corporation with offices in Virginia, purchases and manages real estate investments. Certain other defendants — F.P. Executive Partners (FPEP), Fidelio Properties Management, Inc., L.L.C., Janivo Realty, Inc., Donelux, Inc., Orvan, Inc. — are partners of Fidelio Properties ("Fidelio"), a New York

partnership that invests in Washington, D.C. real estate and owns a majority of Buvermo's stock. John Gardner, a resident of Virginia, is a minority owner of Buvermo who served as its president for twenty years before he was to be replaced by Morris.

In approximately February 2005, Buvermo hired an executive search firm, Equinox Partners, to identify candidates who would be considered for the position of Buvermo's president. The search was handled by the search firm's chief executive officer, Anthony LoPinto, and an executive recruiter, Marsha Pearcy, who prepared a "position specification" to describe the opening. The specification does not specify a term of service for the position and when LoPinto and Pearcy spoke with Morris in approximately May 2005 regarding the opportunity they did not indicate that the position was for a specific term.

Following these discussions, Morris was interviewed by Buvermo's principals: Joost Tjaden and Andre van Rhee, members of Fidelio's management committee, and Gardner. During the interviews, the principals of Buvermo explained to Morris that they were committed to long-term investment in real estate and were seeking a president who shared that outlook and would be available and willing to commit to the position for the long-term. Morris indicated that he shared that outlook and would be willing to make such a commitment.

Following these interviews, LoPinto called Morris to determine how long he would be willing to commit to serving as Buvermo's president. Morris indicated that he would make a ten-year commitment. Pl.'s Ex. 9 (Morris Dep.) at 136–38. Morris asserts that he "confirmed both with Gardner and Tjaden his commitment to remain employed with Buvermo for a period of ten years and they, in turn, confirmed Buvermo's agreement to employ him for a minimum of ten

years." *See* Pl.'s Statement of Material Facts ¶ 50 (citing to Pl.'s Ex. 9 (Morris Dep.) at 136–140, 157–161, 173–74). Gardner and Tjaden, however, dispute that they ever promised to employ Morris for ten years.

On June 3, 2005, Morris accepted the terms of employment as presented to him in an offer letter from Buvermo Properties, Inc. ("Offer Letter"). Pl.'s Ex. 14. The Offer Letter provided Morris's salary ($250,000), his starting date, and his benefits (health care, 401K, etc.). The Offer Letter also provided that Morris was entitled to certain "promoted interests," which are a certain percentage of investment proceeds that Buvermo may distribute to some of its partners and employees after first recovering its initial capital investment and a preferred rate of return. Compl. ¶¶ 20- 21.[1] Morris was entitled "upon start of employment" to a promoted interest in two existing projects (Sheraton Reston and Twinbrook), subject to a two-year vesting period. Pl.'s Ex. 14. at 1. The Offer Letter also provided that Morris was entitled to a promoted interest on certain future projects — projects that Morris initiated on or before December 31, 2005, and all projects initiated by Buvermo after that time. *Id.* Morris would also be entitled to invest in all future projects. *Id.* These interests would be provided through FPEP and subject to the terms of the FPEP Agreement. *Id.* The Offer Letter was silent as to a definite period of employment.

In his deposition, Morris testified that he was aware that the offer which he accepted was silent as to a term of years. Defs.' Ex. 5 (Morris. Dep.) at 217–18. He explained that he accepted the terms of the Offer Letter because he "trusted them." *Id.* at 218. According to Morris, in order to accept the position with Buvermo, he sold his townhouse in Florida and gave

---

[1] All citations to the "Complaint" refer to the Amended Complaint.

up pursuit of certain real estate investment opportunities. Further, he asserts that he purchased a $1.9 million penthouse in Washington, D.C., as a residence and a location where he could entertain Buvermo's clients.

After Morris began working for Buvermo, Morris helped identify and initiate two real estate projects for Buvermo — Spotswood Valley Shopping Center and Reston International Center — which were not acquired until after his termination. Meanwhile, a conflict arose between Morris and Gardner regarding the roles each were to play at Buvermo and whether Gardner was relinquishing sufficient control of the duties and responsibilities he had as Buvermo's former president.

On March 22, 2006, Morris attended a dinner meeting with Gardner, van Rhee, and Tjaden. At that meeting, Gardner presented a document that purported to show that Gardner's interest was ten percent of FPEP property and Morris's interest was three percent. Morris became "angry" about the document because it represented his interest at less than what he understood it to be, and because he had not been shown the document previously. Pl.'s Ex. 9 (Morris. Dep.) at 302–03. Morris was also upset because van Rhee "scolded" him for not knowing what was contained in the documents that Gardner presented. *Id.* at 301. After a heated discussion with van Rhee about Gardner's compensation, Morris told the others that he had been "subjected to as much yelling, degradation, whatever, as [he] could possibly take" and he excused himself from the dinner. *Id.* at 307.

On March 24, 2006, Morris was advised, by letter, that he was being terminated effective immediately, citing no reasons for his termination.

## II.  ANALYSIS

Under Federal Rule of Civil Procedure 56, summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law.  Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In considering a motion for summary judgment, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.  But the non-moving party's opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986).  The non-moving party is "required to provide evidence that would permit a reasonable jury to find" in its favor. *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).  If the evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. *Anderson,* 477 U.S. at 249-50.[2]

Morris's amended complaint asserts claims for breach of contract, fraud, and tortious interference with contractual relation.  Defendants seek summary judgment as to each claim, each of which will be addressed in turn below.

---

[2] In an action, such as this one, that invokes this court's diversity jurisdiction, the court must determine which forum's substantive law to apply. *Young Women's Christian Ass'n v. Allstate Ins. Co.*, 275 F.3d 1145, 1150 (D.C. Cir. 2002).  It is unnecessary to engage in analysis in order to make such a determination here, however, as both sides agree, and appropriately so, that there is no conflict between the laws of the potential jurisdictions, Virginia and the District of Columbia.  *See* Defs.' Mot. for Summ. J. at 5; Pl.'s Opp'n at 2.  Accordingly, the court will apply the substantive laws of both Virginia and the District of Columbia.

A.    **Breach of Contract**

   i.    **Statute of Frauds**

In Virginia and the District of Columbia, the statute of frauds requires that contracts which cannot be performed within one year to be in writing and signed by the party to be charged in order to support a claim for breach of contract. *See* Va. Code § 11-2(8); D.C. Code Ann. § 28-3502. Where a party has admitted the existence of the agreement at issue, however, that party has waived and may not assert a statute of frauds objection to the enforcement of an oral agreement. *See, e.g., Wemhoff v. Investors Mgmt. Corp. of Am.*, 455 A.2d 897, 899 (D.C. 1983); *Kwon v. Lee*, 1993 WL 946217 at *1–2 (Va. Cir. Ct. Sept. 1, 1993) (citing *Harris v. Diamond Constr. Co.*, 184 Va. 711, 722 (Va. 1946)) (admission of existence of contract constitutes waiver of the protections afforded by the statute of frauds). Also, under the doctrine of equitable estoppel, a defendant is prevented from employing the statute of frauds as a defense to an alleged breach of contract if the plaintiff can prove that she reasonably relied on a representation by the defendant to her detriment. *T. v. T.*, 216 Va. 867, 873 (Va. 1976); *Landow v. Georgetown-Inland West Corp.*, 454 A.2d 310, 313 (D.C. 1982).

Morris's breach of contract claim ostensibly is barred by the statute of frauds because, as defendants assert, the oral contract which Morris contends governed his employment could not, by its very terms, be performed in less than ten years. Consequently, Morris's breach of contract claims fails as a matter of law unless defendants are prevented from invoking the statute due to waiver or equitable estoppel, both of which Morris asserts are applicable here.

With regard to waiver, Morris contends that defendants have waived the protection of the statute of frauds because they have admitted the existence of a long-term employment contract with him. In support of his position, Morris points to the following evidence:

- Tjaden testified that after he and Morris discussed their long-term commitments to the real estate market, they "seemed to agree." Pl.'s Ex. 2 (Tjaden Dep.) at 102–03.
- Gardner testified that Buvermo was "prepared to commit to be in the market for a long time" and that it sounded like Morris "was available and we were available for those periods of time." Pl.'s Ex. 4 (Gardner Dep.) at 191.
- Van Rhee testified that Morris asked about their commitment "to the business" and van Rhee explained that "we were committed for another ten years." Pl.'s Ex. 3 (van Rhee Dep.) at 75.

Morris's position as to waiver can not withstand scrutiny as the evidence which Morris cites only shows that the principals of Buvermo spoke about their commitment to the real estate business and such evidence cannot be reasonably construed as an admission on their part that they had entered or intended to enter into an agreement to guarantee Morris's employment for ten years. *See Fleming v. AT & T Information Services, Inc.*, 878 F.2d 1472, 1474 (D.C. Cir. 1989) (concluding that corporate goal of "longevity of employment" is insufficient to prove fixed term employment). Thus, defendants have not waived the statute of frauds.

Alternatively, Morris asserts that defendants should be equitably estopped from invoking the statute of frauds because he detrimentally relied on the representations that he would be employed by Buvermo for a minimum of ten years. According to Morris, because of these representations he abandoned his real estate prospects in Florida, sold his home there, and purchased a penthouse in the District of Columbia that he could not maintain without his Buvermo salary.[3]

---

[3] Of course, for present purposes, the court must assume that Morris's version of what occurred is true.

Absent fraud or deception, a party invoking the doctrine of equitable estoppel must show that: (1) there was a representation by the defendant; (2) the party relied upon that representation to its detriment; and (3) that reliance was "reasonable." *T.*, 216 Va. at 872–73; *see also Simard v. Resolution Trust Corp.*, 639 A.2d 540, 552 (D.C. 1994). Morris argues that each of these elements exists here and, in support of his position that the doctrine defeats defendants' statute of frauds defense, cites *Nargi v. CaMac Corp.*, 820 F. Supp. 253, 257 (W.D. Va. 1992). In *Nargi*, plaintiff Nargi and his former employer entered into a contract of employment the terms of which, according to the defendant employer, were set forth in a letter sent to Nargi. The letter acknowledged "recent conversations" between Nargi and an agent of the defendant regarding negotiations about the terms of the employment and set forth the plaintiff's salary, an offer of payment to plaintiff's moving and temporary living expenses, "access" to a company car, and membership at a local country club. No mention, however, was made of any promise on the part of the defendant to purchase Nargi's home or to employ him for a term of at least four years, terms which Nargi asserted were agreed upon orally. Nargi was terminated from his employment after only one year.

Construing the evidence in Nargi's favor, the *Nargi* court held that the defendant was equitably estopped from asserting the statute of frauds as a defense to Nargi's breach of contract claim. The court found significant evidence that Nargi had inquired about the omissions in the letter of employment concerning the purchase of his home and the alleged promise of employment for a definite term. The court observed that there was evidence that the defendant had assured the plaintiff that he was wanted "for a long time" and that the defendant's fulfillment of a term omitted from the letter, the purchase of Nargi's home, supported Nargi's version of

events. Further, there was evidence that the plaintiff had moved in reliance on a job offer that he understood to be guaranteed for four years. Consequently, the defendant's motion for summary judgment was denied as there were genuine issues of material fact.

While the events as alleged by Morris here are not nearly as favorable to him as the events in *Nargi* were favorable to the plaintiff in that case, the evidence here, construed, in the light most favorable to Morris, requires that defendants' motion for summary judgment be denied with respect to Morris's breach of contract claim. Simply put, there are disputed material facts regarding whether defendants promised to employ Morris for ten years, whether Morris relied on such a representation to his detriment, and if he did rely on such a representation, whether such reliance was reasonable. Consequently, defendants' motion for summary judgment insofar as it is grounded on the statute of frauds must be denied.

    ii.    **At-will Employment**

Alternatively, defendants contend that Morris was employed "at-will," meaning that his employment was for an indefinite period and could be terminated by Buvermo for any reason. Thus, they contend that a claim for breach of contract cannot lie when they were entitled to terminate the contract for any reason, or no reason at all.

At-will employment is presumed unless it is rebutted by evidence that the employment was for a definite period, or that it was terminable only for cause. *Nickens v. Labor Agency of Metro. Wash.*, 600 A.2d 813, 816 (D.C. 1991) ("Unless parties indicate an intent to enter a contract of employment for a specific term, the employment relationship is terminable at will."); *County of Giles v. Wines*, 262 Va. 68, 72 (Va. 2001) (same). This presumption applies unless the parties state clearly their intention to limit the employer's right to terminate, through such means

as a contract provision setting out employment for a fixed term or language that allows termination only for cause. *Daisley v. Riggs Bank, N.A.*, 372 F. Supp. 2d 61, 68 (D.D.C. 2005). Such provisions must be contained within a writing that satisfies the statute of frauds. *See id.* at 70; *Falls v. Virginia State Bar*, 240 Va. 416, 418–19 (Va. 1990). The "mere oral promise of fixed-term employment . . . is insufficient to rebut the presumption of at will employment." *Daisley*, 372 F. Supp. 2d at 69-70 (internal quotation marks omitted); *see also Graham v. Central Fidelity Bank*, 245 Va. 395, 399 (Va. 1993) (refusing to consider alleged "oral assurances" of employment contract because they were not in compliance with the statute of frauds).

Morris's only response to defendants' contention that he was terminable at will is that "defendants agreed to employ plaintiff for a minimum of ten[]years." Pl.'s Opp'n at 23. Morris concedes, however, that such a promise was oral, which is not sufficient to rebut the presumption of at-will employment. *See Falls*, 240 Va. at 419; *Daisley*, 372 F. Supp. at 70. Here again, however, the doctrine of equitable estoppel is available to Morris to prevent defendants from availing themselves of the protection of the statute of frauds if he can establish a detrimental reliance on their representations. And, as discussed above, whether Morris can prevail in his assertion of a representation of a ten-year term of employment is a matter for a jury to determine. Thus, defendants are not entitled to summary judgment on Morris's breach of contract claim.[4]

---

[4] Morris's related contract claims, including his claim for "promoted interests" in current and future real estate deals, in large part depend upon the merits of his claim that he was promised employment with Buvermo for at least ten years. As defendants are not entitled to summary judgment with respect to this threshold claim, they are not entitled to summary judgment with respect to Morris's related contract claims, including his claim for promoted interests, either. As for defendants' further assertion that they are entitled to summary judgment with respect to Morris's claim grounded on his asserted interest in two future projects that were initiated while he was a Buvermo because Morris was never added as a member of the FPEP by way of an amendment to the FPEP Agreement, there is a material fact in dispute as to whether

**B.    Fraud**

A plaintiff asserting a cause of action for fraud bears the burden of proving: (1) a false representation; (2) concerning a material fact; (3) made with knowledge of its falsity; (4) with the intent to deceive; and (5) upon which reliance is placed.  *Higgs v. Higgs*, 472 A.2d 875, 876 (D.C. 1984)*; Evaluation Research Corp. v. Alequin*, 247 Va. 143, 148 (Va. 1994).  A plaintiff's reliance on a false representation must be reasonable.  *Metrocall of Del., Inc. v. Cont'l Cellular Corp.*, 246 Va. 365, 375 (Va. 1993); *Williams v. District of Columbia*, 902 A.2d 91, 94 (D.C. 2006).

Morris's allegations of fraud fall into three general categories: that Gardner, individually, and on Buvermo's behalf, misrepresented (1) the term of Morris's employment; (2) the nature of Morris's promoted interests; and (3) the extent of Gardner's continuing involvement in Buvermo's operation.  The first two allegations, as defendants point out, are merely a recasting of Morris's contract claims and he fails to present evidence sufficient to support a cause of action for fraud.

The third set of allegations — regarding Gardner's representation of his future role in Buvermo's operations — are contradicted by Morris's own testimony and the terms of the Offer Letter.  Morris asserts that Gardner represented that he would cease involvement with Buvermo's operations no later than December 31, 2005.  Morris testified, however, that he understood that Gardner would continue to be involved for two years after Morris's hiring in 2005, *see* Morris Dep. at 214; that Gardner would sign off on transactions on behalf of Fidelio, even after

---

formal amendment of the FPEP Agreement was required.

December 31, 2005, *id.* at 213–14; that Morris would be required to obtain Gardner's approval on all projects even after December 31, 2005, *id.* at 216–17; and that Gardner would continue to be employed by Buvermo until 2009, *id.* at 225–28. Such activities are entirely consistent with the Offer Letter, which provides that Gardner intended to work and support Morris "for an extended period of time thereafter [the end of 2005]." Pl.'s Ex. 14 (Offer Letter) at 2. It also provides that Gardner would retain title of president and managing general partner of Fidelio Properties, with the intent that Morris take over that position "over time." *Id.* Finally, it concludes by explaining that "any future investment decisions" would have to be agreed upon by both Morris and Gardner. *Id.* The testimony that Morris points to in his opposition merely shows that Morris and Gardner had difficulty sorting out their roles in the transition; such evidence, however, does not raise a suggestion that Gardner intentionally misled Morris regarding his role at the company. Thus, defendants are entitled to summary judgment on Morris's fraud claims.

**C.    Tortious Interference**

Morris alleges that Gardner tortiously interfered with his contract with Buvermo. The elements of a cause of action for tortious interference with a contract are: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship; and (4) resultant damage. *Duggin v. Adams*, 234 Va. 221, 226 (Va. 1987); *Paul v. Howard Univ.*, 754 A.2d 297, 309 (D.C. 2000).

Generally speaking, an employer cannot be held liable for interfering with a contract with its own employee. *McManus v. MCI Communications Corp.*, 748 A.2d 949, 958 (D.C. 2000)

(observing that it is "axiomatic that an employer cannot interfere with its own contract"); *Fox v. Deese*, 234 Va. 412, 427 (Va. 1987). An agent of an employer may be liable for tortious interference if that agent acted outside the scope of her employment in a manner that "procure[d] a discharge of the plaintiff for an improper or illegal purpose." *McManus*, 748 A.2d at 958; *see also Fox v. Deese*, 234 Va. 412, 427 (agent can only be held liable for tortious interference with employer's contract if agent was acting outside of scope of employment).

As Buvermo was Morris's employer, Morris cannot, as a matter of law, maintain a claim for tortious interference against Buvermo. Morris contends that Gardner, as Buvermo's agent, is nonetheless susceptible to suit for tortious interference. The key fact however, is not that Gardner is Buvermo's agent but that Gardner is a minority stockholder in Buvermo, which is undisputed. As a part owner of Buvermo, Gardner is a party to the contract that Morris alleges existed and thus cannot be sued for tortious interference with his own contract. Accordingly, defendants are entitled to summary judgment on this claim.[5]

---

[5] Morris also contends that he is entitled to two-weeks' severance pay under Buvermo's employee manual. As defendants correctly note, this claim is not made in Morris's complaint or in his interrogatory responses. Thus, he is foreclosed from prosecuting any claim for severance pay in this action.

### III. CONCLUSION

For the foregoing reasons, it is this 24th of September, 2007, hereby

**ORDERED** that defendants' motion for summary judgment [#28] is **GRANTED** in part and **DENIED** in part as set forth above.


                                              Henry H. Kennedy, Jr.
                                              United States District Judge