Page 14

1   counsel going to get from any recovery in this case?
2       A    I mean, frankly, it's a little bit of a
3   formula and I don't recall the specifics of the
4   formula but I think it's generally about one-third.
5       Q    All right. And I take it that agreement is
6   in writing?
7       A    Oh, yeah.
8       Q    And you signed it?
9       A    Sure.
10      Q    Where do you maintain your current
11  residence?
12      A    429 Australian Avenue -- it's in Palm
13  Beach, Florida -- Apartment 11.
14      Q    And how long have you maintained that
15  residence?
16      A    Oh, since, I think, February '06.
17      Q    February of '06?
18      A    Yeah. I just moved there.
19      Q    Okay. Were you a resident of Florida
20  before that time?
21      A    Yes.
22      Q    All right. When did you move -- when did

1   you establish residency in Florida?
2       A   I moved to Florida in '03, and I
3   established residency January 1, '04.
4       Q   '04?
5       A   Yes.
6       Q   And what was the purpose of your
7   establishing residency in Florida?
8       A   There were several purposes.  Number one, I
9   wanted to continue my real estate investment in
10  Florida at a personal level; and number two, I've been
11  going to Florida for 25 years.
12          I've maintained an apartment down there
13  since 2001, and I decided I wanted to move to Florida.
14  So I sold my large town house here and bought a small
15  apartment in Washington.
16      Q   All right.  Are those the only reasons you
17  made the move to Florida?
18      A   I like the weather.  I mean, I love
19  Florida.
20      Q   Were there any tax reasons you moved to
21  Florida?
22      A   No.  I wound down the business in '03 with

```
 1   my previous employer, and I decided to go do something
 2   else.
 3        Q    When you say you wound down your business
 4   in '03, who was your previous employer?
 5        A    The previous employer was Lerner
 6   Enterprises.
 7        Q    Were you considered an employee of Lerner
 8   Enterprises?
 9        A    I believe I was.
10        Q    And we'll talk about your employment in a
11   minute.
12             When you moved to Florida, you said you
13   were a resident of the District?
14        A    Uh-huh.
15        Q    You need to say yes or no.
16        A    Yes.  I'm sorry.
17        Q    And how long had you been a resident of the
18   District?
19        A    Oh.  Since approximately 1978.
20        Q    All right.  And you grew up in the area,
21   correct?
22        A    I grew up in Bethesda.
```

Page 17

1  Q  Went to high school locally?

2  A  Went to high school locally.

3  Q  And you mentioned that you purchased a
4  smaller apartment in Washington?

5  A  Yes.

6  Q  When did you purchase that apartment?

7  A  On or around October 2004.

8  Q  And up to that point, you owned a larger
9  town home?

10 A  I mean, it was 1600 square feet.

11 Q  Okay. And do you still maintain an
12 apartment in D.C.?

13 A  Oh, yes.

14 Q  And how much time do you spend in the
15 District versus your time in Florida? Just roughly.
16 Obviously I'm not holding you to any percentage.

17    MR. HADDAD: Just during what time period?

18    MR. SMITH: During the year.

19    BY MR. SMITH:

20 Q  So on an annual basis, how much time do you
21 spend in D.C. versus Florida? And if it's changed
22 over time, you can tell me that too.

1   A   Well, it has changed over time. And since
2   the termination, I spend, you know, the majority of my
3   time in Florida.
4   Q   Okay.
5        MR. HADDAD: Majority being?
6        THE WITNESS: In excess of 50 percent.
7        BY MR. SMITH:
8   Q   Are there any particular times of the year
9   that you stay in D.C., or do you just come up here
10  sporadically since the time of your termination?
11  A   I come up here to see my family who's still
12  here.
13       I'm in the process of winding down several
14  components of my life that were ramped up based upon
15  the Buvermo hiring which include the fact that, based
16  upon the position of president and CEO, it was made
17  clear to me that I would have a requirement to
18  entertain, I would have a requirement to be social, I
19  would have an opportunity to see the Dutch at least
20  quarterly here in Washington.
21       And based upon that, I did purchase a much
22  larger apartment than the one-bedroom that I bought in

1    October of '04.  Furthermore, I informed one of the
2    partners, Joost Tjaden, of my decision to move forward
3    to buy that so that I could entertain, and he was very
4    supportive of that.
5        Q    All right.  The apartment you're referring
6    to that you purchased, is that at the Ritz Carlton?
7        A    Yes.
8        Q    All right.  And when was that purchased?
9        A    I believe that settlement was December '05.
10   It was an extended settlement from contract, which
11   might have been as far back as August '05.
12       Q    Okay.  And Mr. --
13            MR. SMITH:  How do you pronounce his name,
14   John?
15            MR. GARDNER:  Tjaden.
16            BY MR. SMITH:
17       Q    -- Tjaden, he didn't require you to
18   purchase the apartment at the Ritz Carlton, did he?
19       A    No.
20       Q    That was your decision?
21       A    Absolutely.
22       Q    All right.  And is it your testimony that

1  fairly significant amount of correspondence,
2  agreements, personal letters to your fiancee. There
3  was a fairly significant amount of that type of
4  information on the computer, and my question is: Were
5  you preparing those documents while you were working
6  at the company during business hours?
7      A    If you're saying I sent personal e-mails
8  during the day --
9      Q    No. I'm saying that there were lengthy
10 documents on your computer system at work. There were
11 personal letters to your fiancee. There were
12 documents dealing with your residence at Ritz Carlton
13 in terms of your unhappiness with the construction,
14 documents about the furniture at your residence,
15 documents about your properties in Florida.
16          All of that information, was it prepared
17 during business hours at Buvermo?
18      A    I suppose.
19      Q    And do you think it's appropriate to engage
20 in personal business while you're being paid by a
21 company?
22      A    I think there's a balance, and I think that