# EXHIBIT

# 1

26

```
 1    hold any other positions at Buvermo?

 2         A     Not at Buvermo.

 3         Q     Okay.  What about at Fidelio; do you have any --

 4    do you hold any sort of office at Fidelio?

 5         A     Not at Fidelio itself.  I'm a member of FPEP,

 6    which is a member of Fidelio.

 7         Q     How long have you been a member of FPEP?

 8         A     Since its formation.  And I believe it was formed

 9    around 1993.

10               I'm sorry.  What was the question again?

11         Q     How long have you been a member of FPEP?

12         A     Okay.  Yeah.  Okay.  Yes, since about 1993.

13         Q     I may have said "Fidelio" so --.

14         A     I wasn't sure whether you said that or not.  And

15    I was thinking: Wait a minute.  I might have answered the

16    wrong question.

17         Q     We're dealing with a lot of entities, so it's --

18         A     Yeah.

19         Q     -- going to happen, so I'll try to do my best.

20               Has your membership interest in FPEP in any way

21    increased or decreased since 1993?

22         A     The membership in FPEP has changed itself, but
```

Morris vs. Buvermo, et al.                                    Deposition of J. Gardner 10/26/06

27

1    the -- the FPEP -- when you say "membership interest in

2    FPEP," I'm a member of FPEP.  And by virtue of that

3    membership, I have various ownership entities in each of

4    the properties that are designated FPEP properties.

5         And those membership in those properties have

6    changed over time.  You know, each property designates one

7    separately.  There's really no ownership interest in FPEP

8    in general.  It only entitles you to ownership, you know,

9    to a certain percentage interest of those properties.  So

10   it's the property interests that have changed over time.

11        Q    Okay.  So it's not -- is it your understanding

12   that you don't have any fixed membership interest in FPEP?

13        A    What FPEP provides for is FPEP provides for a

14   participation in properties which Fidelio owns.  And the

15   FPEP agreement specifies two things; what percentage --

16   what the ownership interest in this property is on the part

17   of FPEP, and then there's also a specification about what

18   percentage that I own relative -- relative to other members

19   of FPEP.

20        Q    Okay.  I think when we get into that, when we

21   pull out the FPEP agreement --

22        A    That's probably better to do that because it's

MDW Court Reporting, Inc. (703) 591-2341

Morris vs. Buvermo, et al.                          Deposition of J. Gardner 10/26/06

28

1    not like a -- you know, I own 20 percent of a company or

2    something like that.  The ownership interest really runs to

3    the properties.

4         Q    I'm sorry.  You're still a member of FPEP today?

5         A    Yes.

6         Q    And did you at any time cease being a member of

7    FPEP and then become a member again or has --

8         A    No.

9         Q    -- it been continuous?

10        A    Continuous.

11        Q    And today -- sitting here today, who are the

12   other members of FPEP?

13        A    There are no other members of FPEP today.  I

14   believe that's true.  The only possible difference is

15   Fidelio acquired an interest of a departing partner.  I

16   don't remember if they acquired that interest -- I don't

17   believe they acquired it by entering FPEP.  I think they

18   just acquired that prior to the ownership being passed to

19   FPEP.  That's what I don't recall.

20        Q    Are you referring to Steve Bonacci?

21        A    Yes.

22             "Bonacci".

MDW Court Reporting, Inc.  (703) 591-2341

35

1      A    Yes.  He and I both became a member of FPEP.

2      Q    Was that also at its inception?

3      A    Yes.

4      Q    And why was he given membership to FPEP?

5      A    He was given membership for the same reason that

6 I was, that the Fidelio partners wanted to provide an

7 ownership incentive to us in addition to our -- our salary

8 compensation.

9      Q    When Mr. Bonacci left the company, what happened

10 to his membership interest?

11     A    Fidelio purchased his membership interest in

12 accordance with the terms of the FPEP agreement.

13     Q    So is Fidelio now a member of FPEP?

14     A    I -- that's what I don't recall.  I don't believe

15 they are.  I believe that what the FPEP agreement provides

16 for is that -- when I say -- I think I misspoke.

17        I think the way the FPEP agreement works is it's

18 the managing member who actually purchases the interest,

19 but the funds are provided from Fidelio.  I think that's

20 what's provided for in the FPEP agreement.

21     Q    Okay.  The management member being FP

22 Investments?

49

1      Q    Okay.  And so why do you -- why do you do these

2    every year, if the term is unspecified?  I mean why not

3    just continue on with your presidency?

4      A    Well, you know, the presidency is at will; and it

5    can go or be terminated at will.  I don't know why we did

6    these every year as opposed to just letting one run on.  I

7    don't know the answer to that.

8      Q    And you've done these once a year since the

9    formation of Buvermo Properties, Inc.?

10     A    I believe, you know, pretty close once a year.

11     Q    Let's just -- generally can you tell me what

12   Buvermo does as a business.  What is the business of

13   Buvermo?

14     A    Yeah.  Buvermo is employed by Fidelio to manage

15   its assets.  And it's involved in finding assets to invest

16   in; it's involved in negotiating the contracts for those

17   assets; it's involved in acquiring and closing on the

18   sales, structuring any of the ventures with any venture

19   partners or people we act with; and then in supervising and

20   directing the efforts to take that asset once owned and

21   take it through to fruition and have it realize its full

22   value as a real estate asset.  So it's involved in that

50

1    whole process on behalf of Fidelio.

2        Q    Okay.  So Fidelio is actually the one who

3    actually invests the money?

4        A    Yes.

5        Q    Okay.  And Buvermo itself doesn't invest any

6    money --

7        A    No.

8        Q    -- in these -- in these deals; correct?

9        A    No.

10        Q    And what kind of investments are we talking

11    about?

12        A    The -- the typical investment we do are in

13    commercial real estate properties in the Washington, D.C.,

14    area.  And that ranges anywhere from -- we've done

15    self-storage deals; we've done a resident -- a retail deal.

16    We have done a number of office buildings deals.  We have

17    some hotel -- an interest in a hotel property and want it

18    to be developed.

19        So we have a fairly broad range.  And there are

20    also some residential deals, typically condominiums.  So

21    it's commercial real estate in the Washington, D.C., area;

22    and they're typically done in partnership with a developer

56

1    investment, depending on how far back you want to go, you

2    know, might be twenty-five or thirty million.

3        Q    Okay.  How about during your time there?

4        A    That's going back through my time.  Yeah.

5    Through the twenty years that I've been involved, the

6    biggest investment we made -- I was trying to think if

7    there was one bigger than twenty-five or thirty.  There

8    probably was one or two bigger than that.

9        Q    That was an investment that Fidelio made in which

10   it invested twenty-five million of its own funds?

11       A    Yeah.  More than twenty-five.

12           For the last ten or fifteen years, I think the

13   most we've done is maybe typically five to seven.  We may

14   have done more than that.  I'd have to remember.  But, you

15   know, one to five to seven is probably more typical.

16           Now, when I say that, that -- when I talk about

17   individual investments, that might be one of those

18   buildings at Dulles Business Park that I mentioned.  It

19   might have a three million dollar investment, but in that

20   park we might have six or seven of those in that park.

21       Q    Now, Fidelio, it's a general partnership;

22   correct?

57

```
 1        A    Yes.
 2        Q    And it has no officers or directors; is that
 3   right?
 4        A    I believe that's right.
 5        Q    Does it have any employees?
 6        A    No.
 7             MR. HADDAD:  Exhibit 4, please.
 8             (The Fidelio Properties first amendment to fourth
 9              amended and restated partnership agreement was
10              marked Plaintiff's Exhibit No. 4 for
11              identification.)
12             BY MR. HADDAD:
13        Q    Mr. Gardner, you've been handed what's been
14   marked as Exhibit 4 to your deposition.  This appears to be
15   a Fidelio -- a document entitled "Fidelio Properties First
16   Amendment to Fourth Amended and Restated Partnership
17   Agreement".
18        A    Yes.
19        Q    And attached to that four-page document or
20   five-page document is a document titled, "Fourth Amended
21   and Restated Partnership Agreement of Fidelio Properties".
22        A    Yes.
```

Morris vs. Buvermo, et al.                                     Deposition of J. Gardner 10/26/06

87

1    thinking about how I should change it.  We would get

2    started on it; then we'd start it, start it, stop.

3          There was really no time pressure because we had

4    not acquired any properties in that intervening time, so we

5    really didn't feel a real sense of urgency, but we thought

6    it did need to be done.  We really worked on it probably

7    that whole year in various -- you know, in bits and pieces.

8          Q    Did you ever provide Mr. Morris with a proposed

9    draft of the FPEP agreement?

10         A    I -- you know, I sent him drafts of things we

11   did; and I tried --

12         Q    Of the FPEP operating agreement?

13         A    Yeah, some of the thoughts.

14         And I sat down and went over the FPEP agreement

15   with him.  The FPEP agreement was, you know, pretty much --

16   it stands in -- we're not making many changes to this.  The

17   main changes we were making was to Section 3.03 of the

18   Fidelio agreement and the designation itself.  Those were

19   the two documents that we were changing.

20         This really had no substantive -- we didn't

21   contemplate any substantive changes, other than to do the

22   cleanups on things like this.

89

1      Q      -- which designates the members and the

2  membership percentage?

3      A      Right.

4             At the time that was written, it was thought --

5  that would have been a constant.  In practice that changes

6  property by property.  We pick up that change now in the

7  designation, so we really would intend to remove this and

8  refer to the designation instead.  That kind of change is

9  always contemplated.

10     Q      I see.

11            What was the intention in terms of who would

12 remain a member of the FPEP agreement after Mr. Morris's

13 hiring?

14     A      The intention after Mr. Morris's hiring is that

15 he and I would be the FPEP members.

16     Q      Okay.  And would FP Investments, Inc., remain --

17     A      Yeah.  I'm sorry.  FP Investments would have

18 remained as well.

19     Q      As the managing member?

20     A      Yes.

21     Q      Okay.  And why did you think it was important for

22 you to remain a member of FPEP?

100

1    at that time; correct?

2        A    I think both of -- my understanding of that was

3    that both of us agreed.  I -- I didn't feel there was a

4    sense of urgency, and Jonathan didn't raise a sense of

5    urgency, and that seemed logical to me because there were

6    really no properties that were involved.

7        Q    Okay.  And you had explained to him -- and had

8    you explained to him that it wasn't urgent because there

9    were no properties involved?

10       A    I believe -- I believe that was what was said.  I

11   don't recall that specifically, but I'm sure that that's

12   what I would have said.

13       Q    You indicated that you did some reworking of this

14   agreement during Mr. Morris's employment?

15            MR. SMITH:  You're referring to the operating

16   agreement?

17            MR. HADDAD:  Correct.  I'm talking about the

18   operating agreement.

19       A    No.  What I -- the thing that I did some

20   reworking was the paragraph 303 out of the Fidelio

21   Properties agreement and the property designations.  I

22   really did no reworking on the -- on the operating

101

1    agreement itself, the FPEP operating agreement itself.

2         BY MR. HADDAD:

3    Q    I see.

4         But it was your intention to do some reworking on

5    the operating agreement itself; correct?

6    A    No.  The thought was that the changes that needed

7    to be made were really in 303 and in the property

8    designation.

9         The operating agreement itself really was the

10   substance of the deal.  The only changes we -- would have

11   made there would have been these -- these cosmetic changes

12   or changes otherwise that would conform to 303; like, for

13   instance, as I mentioned, about the operating agreement --

14   Exhibit 7, I guess it is and that page 6 -- just conforming

15   the changes of the membership percentage to be consistent

16   with current practice.

17   Q    So you would --

18   A    Those were the only changes we were really

19   thinking of.

20   Q    Okay.  So you were thinking of no changes, but

21   you didn't begin to make any of those changes?

22   A    I didn't begin to make those.

117

1    those --

2         A    That's what I don't recall.  There may not have

3    been.  I don't -- I don't remember.  You'll just have to --

4    I'll have to refresh my memory.

5              Probably there was not.

6         Q    Why do you say that?

7         A    Because of the way the FPEP agreement works.  The

8    way the FPEP agreement works is there's a clause in the

9    operating agreement itself that provides that if a party

10   is -- employment is terminated, that the -- either party

11   can cause the property to be valued and then their interest

12   bought out in the value at that time.

13             And the way that works -- the way the clause is

14   designed to work, it's the value of property at any given

15   time.  And if we've just purchased a property, there is --

16   in order to have a promote, you have to have an increase in

17   value above the capital that had been invested in the

18   property.

19             And since we're just buying the property now,

20   we're buying it at market value, there is no increase in

21   value.  So you really don't need a vesting provision there;

22   it's automatically put into the deal.

212

1    the FPEP sharing ratio shall remain at 15.5 percent.

2        A    Yes.

3        Q    Okay.  And so that's what -- the percentage that

4    would be paid to -- of what's remaining after the equity

5    investors such as Fidelio was paid --

6        A    Right.

7        Q    -- its capital investment plus gets its IRR.

8    FPEP would get 15.5 percent of what's remaining?

9        A    That's what that document says.

10       Q    Okay.  And this was as of February 6th of 2002?

11       A    Yes.

12            Could I see the document?

13       Q    Sure.  Let me make a copy.

14   (Whereupon, a brief recess was taken.)

15            MR. HADDAD:  Can we mark this as Exhibit 12.

16            (The FPEP promote structure revision document was

17            marked Plaintiff's Exhibit No. 12 for

18            identification.)

19            BY MR. HADDAD:

20       Q    This is a document that was provided to me today.

21   It's titled, "Proposed Revision to FPEP Promote Structure

22   for Future Projects."

250

1  A  Right.

2  Q  I'm trying to find out what additional conditions

3 you believe needed to be satisfied in order for him to

4 be --

5  A  Okay.  I think the condition that needs to be

6 satisfied is it has to be designated as an FPEP property

7 prior to termination.

8  Q  Okay.

9  A  However, I believe our guys have been willing to

10 say that we would -- we would not treat it that way; we

11 would treat it as if it had been executed earlier for this

12 purpose.

13  Q  You guys are willing to do that for Mr. Morris,

14 is what you're saying?

15  A  Yes.

16  Q  Okay.

17  A  For -- for purposes of -- of dealing -- we're --

18 we're saying that:  Yeah, if we intended to do it, then

19 let's treat it as if we have done it.  Even though that's

20 not the way -- that's not the way the rules say, we would

21 treat it that way.

22  Q  Okay.  And I think we've established that you did

255

1     properties have to be designated as FPEP properties, that
2     condition's going to be satisfied sooner --
3          A    Correct.
4          Q    -- sooner than later; correct?
5          A    It would; that's correct.
6          Q    All right.  Now, the only thing that may not be
7     satisfied is -- this additional condition that you've
8     discussed is that it needs to be satisfied -- it needs to
9     be designated an FPEP property prior to termination?
10         A    Yeah.  You have to be an employee in order to be
11    entitled to the benefit.
12         Q    Okay.  Where does it say that?
13         A    Well, what it does -- it says is that if you're
14    not an employee, you aren't entitled.  You -- you --
15         Q    What's "it"?
16              MR. SMITH:  Hold on.  Hold on.  You're
17    interrupting the answer.
18         A    The -- the FPEP agreement provides that the --
19    Fidelio has the right to terminate if you're not an
20    employee.
21              Now, I'm inferring from that that you would have
22    to be an employee to be entitled.  I guess that's

256

1    probably -- they -- I guess they could -- they could ask --

2    they could name you an FPEP, you know, designee, I guess.

3    I don't know.  I guess they're not -- that they have the

4    right to do that.

5              But the practice by far has been that that

6    benefit is only for employees.  That's the practice.

7              BY MR. HADDAD:

8        Q    Okay.  Now you're referring to the FPEP operating

9    agreement?

10       A    Yes.

11       Q    Okay.  And this is the FPEP operating agreement

12   that you intended to amend but did not?

13             MR. SMITH:  Say that again.

14             BY MR. HADDAD:

15       Q    This is the FPEP operating agreement that you

16   intended to amend but did not?

17       A    This is the operating agreement that we did not

18   intend to amend, except as necessary to conform to the

19   other changes we made.

20       Q    So you intended to amendment it?

21             MR. SMITH:  It's been asked and answered.  You

22   didn't get the response you wanted, but he responded to

Morris vs. Buvermo, et al.                                          Deposition of J. Gardner 10/26/06

263

1      Q     Okay.

2      A     -- after the 12 to 10.

3      Q     All right.  Anything else that you recall?

4      A     Yeah.  I had been assuming all along that this

5   was governed by the FPEP agreement, and I did add this last

6   item from an earlier draft to make sure that it was clear

7   that the -- all items were governed by the FPEP

8   agreement --

9      Q     Uh-huh.

10     A     -- because that's an important thing.

11           And I think somebody -- either I remembered or

12   somebody reminded me, you know:  Let's not assume this.

13   Let's make sure that everybody fully understands that

14   that's the case.

15     Q     Okay.  Are you done?

16     A     Yeah.

17           By the way, there was -- you know, when you asked

18   about the conditions, there was a condition included that I

19   forgot to -- you know, we actually have to own the

20   property.  You know, it -- it's not an FPEP property if we

21   don't own it; so we actually have to acquire the property.

22     Q     Own the property.

277

1      Q     And the same would apply even if he was
2    terminated one hour before the deal was closed?
3      A     Yes.
4      Q     And you believe that to be a reasonable
5    interpretation?
6      A     Yes, I do; and I'll tell you why.
7            The properties themselves -- buying is an
8    important part of the initiation of the project, but the
9    value of the property is something that accrues over a long
10   period of time.  And the role of Mr. Morris or anyone else
11   is not only to buy well but also to make the property
12   increase in value, add to the increase of value over time.

13           And, you know, the whole -- again, I don't want
14   to beat this too much.  But, you know, the whole role of
15   the fiduciary is to keep a close eye and make sure that
16   value is added properly all the way along.  So there's a
17   lot of role to be played.  And he really only captures the
18   value as that property increases in value over time.

19           So I think that is a fair deal.  It's a deal I've
20   lived with for 20 years, and I think it's been very fair.
21   That's exactly the way it works.
22     Q     Uh-huh.

Morris vs. Buverno, et al.

Deposition of J. Gardner 10/26/06

281

1   give them that promote to do it anyway because Fidelio is

2   not the beneficiary.  They have fiduciary -- well, they

3   just don't do it that way.

4        And so I think it's a very fair system, and I

5   think it works very fairly, and I think it compensates

6   properly.  It's not the acquisition by itself.  It's the

7   value added over the entire term of the investment that

8   Fidelio's interested in, and that's why this compensation

9   system is designed that way.

10       Q    Uh-huh.

11       A    And it's worked that way for -- for many years

12   for us.

13       Q    Let's take a look at the last sentence of this

14   first page of Exhibit 14, the offer letter.  It says, "All

15   items will be governed by the FPEP, LLC, agreement of which

16   you will become a member."

17       And I think we've already established that he

18   never became a member.  Correct?

19       A    Yes.

20       Q    And I think we've also established that the FPEP,

21   LLC, agreement was supposed to be amended and never was.

22   Correct?

MDW Court Reporting, Inc.  (703) 591-2341

283

1    indentation problem, but it was intended for this to be

2    that (indicating).  And you could argue:  Well, why did you

3    indent that way?  But the intent was to be this way

4    (indicating).

5        Q    And was the FPEP agreement that you refer to in

6    here the FPEP agreement that was in existence at the

7    time --

8        A    Yeah.

9        Q    -- or the FPEP agreement as amended?

10       A    The FPEP agreement that was in existence in time

11   modified as necessary to admit Mr. Morris.

12       Q    Okay.

13       A    And --.

14       Q    And let me see if I understand defendants'

15   position on the redemption issue.

16            Looking through your interrogatory answers, is it

17   defendants' contention that even though Mr. Morris was not

18   made a member of the FPEP agreement, that his interests --

19   any FPEP promote interest, if recognized, would be subject

20   to redemption?

21       A    Redemption?  Are you referring to a clause in

22   here or what?

326

1    past.  They'd been in the company for a while, hadn't they?

2         A     Well -- and this shows them how it would have --

3    the -- if you saw this designation previously, it looked

4    nothing like this.  And this was to relate to -- now, maybe

5    I did it wrong; maybe it wasn't helpful.  But I surely

6    didn't do it with the intention of changing my promote.

7         Q     Because you never had any intention of trying to

8    claim a promote for the JBG Reston deal, which is the

9    Reston International Center?

10        A     I at this stage of the game -- I think Jonathan

11   and I talked once.  And I said, "Jonathan, you know" -- I

12   intended this to be more of, you know, I had the right, you

13   know to -- to -- you know, this is my deal.  I generated it

14   under this new format.

15              I had the right to go back and argue:  Look, this

16   is a different format.  There -- when we conceived of the

17   earlier one, it was conceived on the basis that I would not

18   be primarily responsible for JBG.

19              It would be logical for me to go back and say,

20   "Wait a minute.  Now that I'm primarily responsible, we

21   should renegotiate the deal in the future."

22              But I said, "Jonathan, I'm not going to do that.

350

1    discussion?

2        A    I do that.  And I don't know remember whether it

3    was during that period of time or later.

4        Q    Okay.

5        A    I -- you know, I don't recollect that.  I might

6    have said it then, but right now I can't pin the date down

7    without looking.  But there is a date.

8        Q    There's no dispute here, is there, that

9    Mr. Morris initiated that deal --

10       A    That's correct --

11       Q    -- himself; is that correct?

12       A    -- there is no dispute.

13       Q    In which case I don't think it matters whether

14   it's 2005 or --

15       A    It --

16       Q    -- 2006?

17       A    -- probably doesn't.

18       Q    But it is -- I believe it's 2005.

19       A    Yeah.  I think you could well be right.  I just

20   don't remember.

21       Q    Okay.  And there was a time in early 2006 that

22   Fidelio committed to investing in that transaction; isn't

351

```
 1   that right?
 2        A    I'm not sure when we made that commitment --
 3        Q    Okay.
 4        A    -- but we did commit.
 5        Q    You entered into a letter of understanding with
 6   SJM --
 7        A    Yes.
 8        Q    -- regarding that particular transaction;
 9   correct?
10        A    Yes.
11             By the way, the principal of SJM is
12   Steve Garchik, and we had previous -- done two deals
13   previously with him.  So we did have knowledge of him.  He
14   knew us, and we liked respect him as a developer.
15        Q    Okay.
16             MR. HADDAD:  If you could mark this as Exhibit
17   17.
18             (The SJM letter dated 1/31/06 was marked
19              Plaintiff's Exhibit No. 17 for identification.)
20             BY MR. HADDAD:
21        Q    Mr. Gardner, this is the letter of understanding
22   that Fidelio executed with SJM --
```

Morris vs. Buvermo, et al.                                    Deposition of J. Gardner 10/26/06

353

1      Q     If you could -- these reflect various -- this
2   document marked Gardner 18 reflects various payments that
3   appeared to have been made from Fidelio Properties account
4   to SJM Partners, Inc., account.  One is for 175,000, and
5   then appears on the second page another for 250,000?
6      A     I have two on the front page.
7      Q     I'm sorry.  Are they both on there?
8      A     Yes.
9      Q     So one for 175,000 and one for 250,000.  Do you
10   see that?
11      A     Yes.
12      Q     And that is consistent with your recollection of
13   what occurred?
14      A     I don't recall the amounts, but these look
15   like -- I know they were sizable amounts.
16      Q     And ultimately the deal closed on July 6th, 2006;
17   isn't that right?
18      A     If you have that date --
19      Q     Yeah.
20      A     -- I have no reason to disagree.
21      Q     Well, I don't have the closing settlement
22   statement -- I do have the settlement statement, but not

369

1    correct?

2        A    I'm pretty sure it was after.

3        Q    Okay.  And it was initiated prior to Mr. Morris's

4    termination; correct?

5        A    Yes.

6        Q    And the deal on this closed in June of '06;

7    correct?

8        A    Yeah.  I don't know the exact date, but it did

9    close -- or it has closed.

10            (The letter dated 6/9/06 was marked Plaintiff's

11            Exhibit No. 21 for identification.)

12            BY MR. HADDAD:

13       Q    Take a look at Exhibit 21.  This is a

14   confirmation of an amount wired by Fidelio in connection

15   with the Reston International deal; is that right?

16       A    Yes, I believe so.

17       Q    And that was, give or take, maybe a few thousand

18   dollars, the amount invested by Fidelio in that deal; is

19   that right?

20       A    I don't know the amount that's invested today

21   because I don't know whether we put more money in the deal

22   since then or not.  And I don't know whether we had amounts