# EXHIBIT

# 3

Case 1:06-cv-01131-HHK    Document 73-4    Filed 04/24/2008    Page 2 of 7

Morris vs. Buvermo, et al.                                    Deposition of A. van Rhee 12/06/06

10

1  yesterday evening?
2       A    Yeah.
3       Q    What documents did you review?
4       A    That was the partnership agreement of Fidelio and
5  the FPEP partnership agreement or bylaws or whatever the
6  name is and the Buvermo bylaws and my own letter that I
7  made about what happened in the March dinner and after
8  that.
9       Q    Let's talk about some of the resolutions that
10 were passed at yesterday's meeting.  Do you recall what
11 resolutions were passed?
12      A    They were designations for FPEP for the Spotswood
13 Shopping Center and Reston International Center, I think.
14 And it was -- we decided to make changes to the FPEP
15 agreement or whatever that is to make it possible to enter
16 Mr. Millspaugh and to take away the name of Mr. Bonacci,
17 who left the company quite some time ago.
18      Q    Were any other properties other than Spotswood
19 and Reston International Center designated as FPEP
20 properties?
21      A    Not as I recall.
22      Q    And did the designations reflect an FPEP

Case 1:06-cv-01131-HHK    Document 73-4    Filed 04/24/2008    Page 3 of 7

Morris vs. Buvermo, et al.                              Deposition of A. van Rhee 12/06/06

11

```
 1  percentage that would be paid to certain individuals?
 2       A    Yes.
 3       Q    Okay.  And do you recall what percentage -- what
 4  individuals were identified as potential recipients of an
 5  FPEP promote?
 6       A    Promote only Mr. Millspaugh, but co-investment
 7  also Mr. Gardner.
 8       Q    Did Mr. Millspaugh invest in the equity in the --
 9       A    No.
10       Q    -- Spotswood deal?
11       A    No.
12       Q    And what about Reston International Center?
13       A    No, he didn't.
14       Q    And what about Mr. Gardner; did he invest in
15  either one of those --
16       A    Yes.
17       Q    -- deals?
18       A    Yes.
19       Q    Okay.  It's important that you wait until I
20  complete my question.  Is that fair?
21       A    I'm sorry.
22       Q    Okay.  And do you know the percentage of
```

15

1   Okay. And Mr. Millspaugh was appointed president
2   at yesterday's meeting --
3   A   No --
4   Q   -- is that correct?
5   A   -- no. That was -- I want to be careful.
6   Anyway, the appointment was earlier. Whether that was
7   confirmed, I don't think that was necessary at this
8   meeting. I mean I think we had done that earlier.
9   Q   So you don't recall --
10  A   The only thing we did is bring him into FPEP,
11  written. But he was already president. I mean that's --
12  that was last meeting all -- at last meeting already.
13  Q   Okay. So you don't recall any discussion at
14  yesterday's meeting regarding confirming Mr. Millspaugh as
15  the president of --
16  A   Buvermo.
17  Q   -- Buvermo?
18  A   No.
19      He was chairing the meeting; I mean nothing new.
20  Q   Let's just go through some of the organizations
21  in which you're involved.
22      You are familiar with the general partnership

Case 1:06-cv-01131-HHK   Document 73-4   Filed 04/24/2008   Page 5 of 7

Morris vs. Buvermo, et al.                                Deposition of A. van Rhee 12/06/06

61

1          MR. SMITH:  Do you mean a promoted interest, or
2  do you mean something different?
3          MR. HADDAD:  In any way.
4     A    No, as far as I know.
5          But I mean you constantly suggest that people get
6  compensated for sourcing a project, but that's not what it
7  is.  We compensate people for successfully managing our
8  interest in a project.  It's -- it's not that we give money
9  because they source it; we give money if they bring it to a
10 good end.
11         BY MR. HADDAD:
12    Q    Okay.  I'm not --
13    A    There's a very different approach.
14    Q    I don't agree with your characterization of what
15 I'm suggesting.
16         I'm just asking you whether Buvermo or Fidelio or
17 anyone else, for that matter, has compensated Mr. Gardner
18 for sourcing the JBG deal?  And your answer to that is
19 "No"; correct?
20    A    Correct.
21    Q    And let me ask a similar question, different but
22 similar.  Does Fidelio or Buvermo, for that matter, have

Case 1:06-cv-01131-HHK   Document 73-4   Filed 04/24/2008   Page 6 of 7

Morris vs. Buvermo, et al.                                    Deposition of A. van Rhee 12/06/06

106

1  know?

2       And maybe Mr. Tjaden know -- knew more about that
3  because he had these conversations when they had a clash.
4  But I was -- I was aware about all kind of -- not doubts,
5  but worries that Mr. Gardner had about how things would be
6  taken care of in the future. But a worry is different from
7  a doubt. I mean he is a very fiduciary man for us, and --
8  and -- and these things is what he said.

9       Now, I -- that's the reason that we kept him in
10 place; and he also advised us to keep him for a while in
11 place in the president of F -- of Fidelio Partners
12 Management, whatever the name is, because we had to be
13 really sure that Mr. Morris could play that role as well,
14 not only be active in the real estate markets, but also be
15 a good fiduciary representative for us in the States.

16 Q   Uh-huh.

17     Did you seek any information about Mr. Morris's
18 performance in his role as president during -- since --
19 during the period of December through March, before coming
20 to the conclusion that you should terminate him?
21 A   No. We did it immediately after that because our
22 termination had to do with the fiduciary function: Could

Case 1:06-cv-01131-HHK    Document 73-4    Filed 04/24/2008    Page 7 of 7

Morris vs. Buvermo, et al.                                    Deposition of A. van Rhee 12/06/06

107

we trust this man? And for whatever reason. I mean if we don't trust him, whatever the reason is, we cannot work like that.

And the other thing is: Was he doing his -- his office work or his other work right? That was not the issue basically for us.

That was our surprise. First, the surprise during -- during the -- the dinner; that John Gardner said that he was not well taking care of his normal responsibilities.

But the day after that, when we informed Kara McCormick about our decision, then we got stories that -- and that confirmed it all in a much stronger way.

Without that we would have done the same. We were not discontinuing him because he wasn't doing his -- his office work right, because we are not controllers of the office work of the president, but because we could not trust him with our interests in the U.S. anymore because the personal trust was broken.

Q    You had a discussion with Kara McCormick about the goings-on in the office after you made the decision to terminate Mr. Morris; correct?