# EXHIBIT

# 8

Morris vs. Buvermo, et al.                                    Deposition of J. Tjaden 12/05/06

9

```
 1        A     No.
 2        Q     Okay.  Were you provided with a board package in
 3   connection with this meeting?
 4        A     Yes, I was.
 5        Q     Okay.  And where is that right now?
 6        A     It's in my bag.
 7        Q     And where is your bag?
 8        A     In the -- in the car.
 9        Q     Downstairs?
10        A     With my luggage, yes.
11        Q     Were any resolutions passed at today's meeting?
12        A     Yes, we passed resolutions.
13        Q     Okay.  Do you have a recollection of what
14   resolutions were passed?
15        A     I do.
16        Q     What are they?
17        A     We passed -- we passed a resolution designating
18   certain interests in the FPEP to Laurey Millspaugh, and we
19   passed a resolution amending Article 303 of the FPEP -- of
20   the Fidelio partnership agreement.
21        Q     Were those resolutions in writing?
22        A     Yes, they were.
```

27

1       A    Yes.

2       Q    Okay.  And that would be the designations that

3   were issued today; correct?

4       A    Correct.

5       Q    Okay.  And the designations -- the FPEP

6   designations that were issued today relate to both the --

7   relate to Spotswood?

8       A    Correct.

9       Q    Okay.  And also to Reston International Center?

10      A    Correct.

11      Q    Okay.  And any other properties?

12      A    (No response.)

13      Q    Let me rephrase that.

14           Were any other properties designated as FPEP

15   properties today?

16      A    I believe so.

17      Q    Okay.  And can you tell me which properties those

18   were?

19      A    I don't recall.  The problem is we signed --

20   we discuss these decisions materially, and then we -- we

21   are -- and there's a list.  I'm fully aware of what it is.

22   And then later on we sign the designation.  I sign as

50

1     Q    And perhaps VBM, but you're not sure?

2     A    I'm not sure.

3     Q    Okay.  And do you know why -- well, do you know

4 whether any such resolution was passed during Mr. Morris's

5 employment with Buvermo to make him a member of FPEP?

6     A    I believe it was not.

7     Q    Okay.  Do you know why one was not?

8     A    Because -- I don't believe why it was not, and

9 I don't know why it was not.  If not, it should have.  It

10 certainly was the intent.

11     Q    Okay.

12     A    And, again, as far as I'm concerned, that's all

13 following a resolution by the management committee that he

14 should participate, as is stated in his letter -- in a

15 letter written to him.

16     And for the rest, it is up to the management, in

17 that case Mr. Morris, to just implement these things and

18 get them signed, amended, whatever; and then, if necessary,

19 get our -- get us to review it if he feels uncertain that

20 the thing's not been done right.

21     Q    Okay.  So just to make sure I understand you

22 correctly, do you recall there ever being a resolution that

58

1          A     At least, in a general sense.

2          Q     Okay.  And I --

3          A     And I never took an agreement and -- and went

4    through it and said, "All right.  Here's where you change

5    it."  I never directed him in that manner.

6          Q     Fair enough.

7                I think you actually misunderstood me.  I wasn't

8    asking you whether or not you spoke with Mr. Morris about

9    what specific provisions needed to be changed.  I'm asking

10   you whether you recall specifically telling Mr. Morris that

11   it was his responsibility to see to it that the FPEP

12   agreement was amended.

13         A     No.  The specific --

14               MR. SMITH:  Object to the form.

15         A     Let me tell you.  The specific responsibility

16   that he had was to -- to take the letter that we had given

17   him and that he had signed where it said specifically that

18   FPEP agreement was the basis of our dealing with him --

19   so -- but that -- and when -- that the agreement should be

20   amended in such a manner that he would be admitted.

21               So whatever administrative resolution was

22   necessary for him to be admitted, it wasn't -- it did not

Morris vs. Buvermo, et al.                                    Deposition of J. Tjaden 12/05/06

59

1    specifically -- we had never discussed any specifics of the

2    agreement itself because, other than admitting him, there

3    was no -- and changing one name for the other and making

4    sure the percentages were correct, there was nothing to be

5    changed.

6              BY MR. HADDAD:

7         Q    Uh-huh.

8         A    If -- that is in -- in that sense that amendment,

9    yes.

10             Any other amendments, we would not have changed

11   the FPEP agreement.  We want -- that's -- and he -- he --

12   that was not part of the understanding.

13        Q    Okay.

14        A    The understanding was that the existing agreement

15   would rule his -- the agreement with him, the existing FPEP

16   agreement.

17        Q    Okay.  And just to be clear, Mr. Tjaden, I

18   appreciate your testimony.  But, frankly, I'm not very

19   interested right now in what your understanding was or what

20   you believe Mr. Morris's understanding was.

21             I'm interested in specific discussions you had

22   with Mr. Morris.  And what I would like to know is:  Do you

136

1      Q      That was a new opportunity --

2      A      Yeah.

3      Q      -- for Fidelio?

4      A      New deals change attitudes.

5      Q      Now, you ultimately voted in favor of terminating

6   Mr. Morris in March of 2006; correct?

7      A      That's correct.

8      Q      All right.  As best as you can, tell me what your

9   basis for terminating him was.

10      A      It was -- it was really that dinner that we had

11   at the Four Seasons Hotel where he behaved erratically and

12   entirely inappropriately towards us, meaning Mr. van Rhee

13   and myself; and where I was very concerned and deeply

14   concerned when that -- when he abruptly left the dinner

15   meeting without any further explanation; that somebody like

16   that would represent us in a fiduciary basis.

17           And as a fiduciary -- I mean it's such an

18   important part of the whole role.  I lost all -- all faith.

19   I was -- I was shocked to my deepest roots.

20           And he called me later after the dinner and --

21   and he must have known how I felt.  And I have to say I --

22   you know, I probably was his biggest supporter through

137

1    that -- through all these difficult times; but that -- this

2    was just the straw that broke the camel's back.  There was

3    no way that we could continue, I felt.

4            And I had a meeting with Mr. van Rhee the next

5    morning, a breakfast meeting.  And he apparently felt the

6    same way, because we determined at that time that we would

7    terminate the relationship with Mr. Morris.

8       Q    Okay.  So his conduct at the March meeting --

9       A    Yes.

10      Q    -- was, in your opinion, the reason for his

11   termination?

12      A    Yes.

13      Q    Okay.  Now, let's talk a little bit about that.

14           This was March 22; correct?

15      A    Correct.

16      Q    And this was a dinner at the Four Seasons Hotel?

17      A    Correct.

18      Q    Okay.  And at that dinner Mr. Gardner took some

19   documents out of his pocket; correct?

20      A    Correct.

21      Q    And he showed them to you and Mr. van Rhee at the

22   table?